C. D. Michel – SBN 144258
cmichel@michellawyers.com
Sean A. Brady – SBN 262007
sbrady@michellawyers.com
Konstadinos T. Moros – SBN 306610
kmoros@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile:   (562) 216-4445

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| RENO MAY, an individual; ANTHONY MIRANDA, an individual; ERIC HANS, an individual; GARY BRENNAN, an individual; OSCAR A. BARRETTO, JR., an individual; ISABELLE R. BARRETTO, an individual; BARRY BAHRAMI, an individual; PETE STEPHENSON, an individual; ANDREW HARMS, an individual; JOSE FLORES, an individual; DR. SHELDON HOUGH, DDS, an individual; SECOND AMENDMENT FOUNDATION; GUN OWNERS OF AMERICA; GUN OWNERS FOUNDATION; GUN OWNERS OF CALIFORNIA, INC.; THE LIBERAL GUN CLUB, INC.; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED,<br><br>Plaintiffs,<br>v.<br><br>ROBERT BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10,<br><br>Defendants. | Case No.: 8:23-cv-01696 CJC (ADSx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Hearing Date:    December 4, 2023<br>Hearing Time:    1:30 p.m.<br>Courtroom:        9 B<br>Judge:             Hon. Cormac J. Carney |

---

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities ...................................................................................................iii

1. Introduction and Background .................................................................................. 1

2. Argument ................................................................................................................ 4

   A. Plaintiffs Are Likely to Succeed on the Merits ................................................ 4

      i. Historical analysis under the Second Amendment ....................................... 4

      ii. Under *Bruen*, the mere existence of historical analogues is not enough, as there must be evidence of a well-represented historical tradition................... 6

      iii. Sensitive places are narrowly defined under *Bruen* .................................. 8

      iv. SB 2 violates the Second and Fourteenth Amendments because it is not consistent with any historical tradition of firearm regulation ........................ 9

      v. Federal District Courts in New York, New Jersey, and Hawaii have already persuasively explained why the text, history, and tradition do not allow firearm carry to be banned in several places included in SB 2 ........... 11

         1. Parking Areas (including government-owned or -operated parking areas under Section 26230(a)(5)) ........................................................ 12

         2. Healthcare Facilities (Section 26230(a)(7)) .................................... 15

         3. Public Transportation (Section 26230(a)(8)) .................................. 15

         4. Places that Serve Liquor (Section 26230(a)(9)) ............................. 16

         5. Parks and Playgrounds (Section 26230(a)(11-13)) ......................... 17

         6. Libraries (Section 26230(a)(17)) ..................................................... 21

         7. Places of Worship (Section 26230(a)(22)) ...................................... 22

         8. Financial Institutions (Section 26230(a)(23)) ................................. 23

         9. The "Vampire Rule" (Section 26230(a)(26)) ................................. 24

      vi. The "vampire rule" also fails because it compels speech ........................ 26

      vii. SB 2 violates due process by not providing notice as to where carry isn't allowed ...................................................................................................... 28

   B. Plaintiffs Will Suffer Irreparable Harm if Denied Relief ............................... 29

   C. The Balancing of the Equities Sharply Favors Plaintiffs ............................... 29

      i. The Constitution forbids restricting protected conduct on the basis of a claimed "public safety" rationale .................................................................. 29

ii

TABLE OF CONTENTS

ii. Even if public safety interests are considered, people with carry permits commit crimes at a lower rate than the public at large ...................................30

D. Preliminary Injunctive Relief Is in the Public Interest......................................35

3. Conclusion............................................................................................................35

iii

TABLE OF CONTENTS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
No. 21-476, 2023 WL 4277208 (U.S. June 30, 2023) ...........................................27

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)...............................................................................30

*Am. Trucking Ass'ns v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009).................................................................................4

*Antonyuk v. Hochul*,
No. 1:22-CV-0986 (GTS/CFH), 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y.
Nov. 7, 2022)..................................................................................................passim

*Baird v. Bonta*,
No. 23-15016, 2023 WL 5763345 (9th Cir. Sept. 7, 2023) ...................................29

*Bonidy v. United States Postal Serv.*,
790 F.3d 1121 (10th Cir. 2015).......................................................................10, 13

*Carrillo v. Penn Nat'l Gaming, Inc.*,
172 F. Supp. 3d 1204 (D.N.M. 2016) ....................................................................25

*Christian v. Nigrelli*,
No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652 (W.D.N.Y.
Nov. 22, 2022)...................................................................................................12, 26

*Columbia Hous. & Redevelopment Corp. v. Braden*,
No. M2021-00329-COA-R3-CV, 2022 Tenn. App. LEXIS 395 (Oct. 13, 2022) 13

*Cooper v. Aaron*,
358 U.S. 1 (1958) ...................................................................................................28

*Drummond v. Robinson Township*,
9 F.4th 217 (3d Cir. 2021)........................................................................................6

*Elrod v. Burns*,
427 U.S. 347 (1976) ...............................................................................................29

*Espinoza v. Mont. Dep't of Revenue*,
140 S. Ct. 2246 (2020) .............................................................................................7

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011)..................................................................................29

*Ezell v. City of Chicago*,
846 F.3d 888 (7th Cir. 2017)..................................................................................10

*Hardaway v. Nigrelli*,
No. 22-CV-771 (JLS), 2022 U.S. Dist. LEXIS 200813 (W.D.N.Y.
Nov. 3, 2022)...................................................................................................12, 22

iv

*Heller v. District of Columbia,*
   670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) .................................................... 7

*Klein v. City of San Clemente,*
   584 F.3d 1196 (9th Cir. 2009) ............................................................ 35

*Koons v. Platkin,*
   No. CV 22-7463 (RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023) passim

*Lambert v. California,*
   355 U.S. 225 (1957) .......................................................................... 29

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rts. Comm'n,*
   138 S. Ct. 1719 (2018) ..................................................................... 27

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) .......................................................................... 29

*McMahon v. City of Panama City Beach,*
   180 F. Supp. 3d 1076 (N.D. Fla. 2016) ............................................ 24

*Md. Shall Issue, Inc. v. Montgomery County,*
   No. CV TDC-21-1736, 2023 WL 4373260 (D. Md. July 6, 2023) ............... 19, 20

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ............................................................ 29

*Monterey Mech. Co. v. Wilson,*
   125 F.3d 702 (9th Cir. 1997) ............................................................ 29

*Morris v. U.S. Army Corps of Eng'rs,*
   60 F. Supp. 3d 1120 (D. Idaho 2014) ............................................... 13

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ............................................................. passim

*Oliver v. United States,*
   466 U.S. 170 (1984) .......................................................................... 24

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n,*
   475 U.S. 1 (1986) ............................................................................. 27

*Preminger v. Principi,*
   422 F.3d 815 (9th Cir. 2005) ............................................................ 35

*Project 80s v. Pocatello,*
   942 F.2d 635 (9th Cir. 1991) ............................................................ 25

*Rodriguez v. Robbins,*
   715 F.3d 1127 (9th Cir 2013) ........................................................... 30

*Spencer v. Nigrelli,*
   No. 22-CV-6486 (JLS), 2022 U.S. Dist. LEXIS 233341 (W.D.N.Y.
   Dec. 29, 2022) ........................................................................ 12, 22

v

TABLE OF AUTHORITIES

*Susannah Warner Kipke, et al., v. Wes Moore, et al.*,
  D. Md. No. 1:23-cv-01293-GLR (Dkt. No 31) ....................................................25

*United States v. Byle*,
  No. 8:10-CR-419-T-30TGW, 2011 U.S. Dist. LEXIS 54220 (M.D. Fla.
  Apr. 15, 2011) ..........................................................................................................24

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) ...........................................16

*United States v. Daniels*, No. 22-60596, 2023 WL 5091317 (5th Cir.
  Aug. 9, 2023)..............................................................................................................8

*United States v. Harrison*,
  No. CR-22-00328, 2023 WL 1771138 (W.D. Okla. Feb. 3, 2023) .....................16

*United States v. Kokinda*, 497 U.S. 720 (1990)........................................................14

*United States v. United Foods*,
  533 U.S. 405 (2001) ................................................................................................27

*Valle del Sol Inc. v. Whitting*,
  732 F.3d 1006 (9th Cir. 2013)................................................................................30

*Winter v. Nat. Res. Def. Council, Inc.*,
  55 U.S. 7 (2008) .........................................................................................................4

*Wolford v. Lopez*,
  No. CV 23-00265 LEK-WRP, 2023 WL 5043805 (D. Haw. Aug. 8, 2023).passim

*Wooley v. Maynard*,
  430 U.S. 705 (1977) ..........................................................................................26, 27

**Statutes**

1859 Conn. Pub. Acts, ch. LXXXII, § 5 ...................................................................17

1867 Kan. Sess. Laws 25 .............................................................................................17

Cal. Pen. Code § 26150 ..................................................................................................1

Cal. Pen. Code § 26230 ..........................................................................................passim

Mich. Comp. Laws Serv. § 750.234d ........................................................................23

Neb. Rev. Stat. § 69-2441 ...........................................................................................23

Senate Bill 2....................................................................................................................passim

**Other Authorities**

11A Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 2948.1 (2d ed.
  1995).........................................................................................................................29

Assemb. Comm. on Pub. Safety, Bill Analysis, S. 2, 2023-2024 Reg. Sess. (Cal.
  June 26, 2023),

TABLE OF AUTHORITIES

<https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB2> (select 06/26/23 – Assembly Public Safety) .........................................31

Bernabei, Leo, *Taking Aim at New York's Concealed Carry Improvement Act,* Duke Center for Firearms Law Blog (Aug. 7, 2023), <https://firearmslaw.duke.edu/2023/08/taking-aim-at-new-yorks-concealed-carry-improvement-act/> (as of Aug. 8, 2023) ......................................................10

Cramer, Clayton E. & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679 (1995)...........................................32

Fla. Dep't of Agric. & Consumer Servs., Div. of Licensing, *Concealed Weapon or Firearm License Summary Report Oct. 1, 1987- Jun. 30, 2023* (June 30, 2023), <https://ccmedia.fdacs.gov/content/download/7499/file/cw_monthly.pdf> ...........................................................................................32

Floor Alert from Cal. State Sheriffs' Ass'n to All Members of the Cal. State Assemb. (Aug. 29, 2022), <https://tinyurl.com/calstatesheriffsopposeSB918> ..31

Kopel, David & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018)...................................................................................9, 11, 22

Madison, James. *The Writings, vol. 5 (1787-1790)*. G. P. Putnam's Sons, 1904. Letter to Thomas Jefferson, October 1788......................................................2

Mitchell, James T. et al., *Statutes at Large of Pennsylvania from 1682 to 1801*, vol. III (1896) .......................................................................................25

Press Release, *BCA Releases 2021 Permit to Carry Annual Report, Data Provided to BCA by Minnesota Law Enforcement Agencies* (Mar. 1, 2022), <https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-Releases-2021-Permit-to-Carry-Annual-Report.aspx> ................................................................34

Rosenberg-Douglas, Katherine, *Explore: Shootings by CCL Holders in Illinois Since Concealed Carry Law Went into Effect in 2014*, Chic. Trib. (Mar. 1, 2020), <https://www.chicagotribune.com/news/breaking/ct-viz-illinois-ccl-shootings-tracker-20200227-ww4ldqwdjrd2ze63w3vzewioiy-htmlstory.html> (last visited July 12, 2023) ...................................................................................................33

Smith, Mark W., *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J.L. & Pub. Pol'y Per Curiam 31 (2022)...................7

Tex. Dep't of Pub. Safety, *Active License/Certified Instructor Counts as of Dec. 31, 2020* (Dec. 31, 2020), <https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/actlicandinstr/activelicandinstr2020.pdf>.........................................................................31

Tex. Dep't of Pub. Safety, *Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2020 – 12/31/2020*, at 5 (Feb. 11, 2021), <https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/convictionratesreport2020.pdf> ...........................................................................31

U.S. Const., amend. I.................................................................................25

Walters, Steven, *The Legacy of Concealed Carry in Wisconsin*, Urban Milwaukee

(Oct. 11, 2021), <https://urbanmilwaukee.com/2021/10/11/the-state-of-politics-the-legacy-of-concealed-carry-in-wisconsin/> (last visited July 12, 2023)..........33

Wis. Dep't of Just., *Department of Justice Concealed Carry Annual Report – 175.60(19) – January 1 – December 31, 2022,* <https://www.doj.state.wi.us/sites/default/files/dles/ccw/2022%20Annual%20CCW%20Statistical%20Report.pdf> (last visited July 12, 2023) .............................32

viii

TABLE OF AUTHORITIES

## 1.    INTRODUCTION AND BACKGROUND

California is defying the U.S. Supreme Court's findings and order that the Second Amendment includes a right to carry arms in public for self-defense. The state has passed laws with unprecedented restrictions curtailing where that right may be exercised. These atextual, ahistorical, and unconstitutional restrictions, serve to constrict the right of bearing of arms in public into a mere parchment guarantee that effectively nullifies the right. California has hijacked the Supreme Court's "sensitive places" dicta to impose criminal penalties on almost all instances of the peaceable, public carry of firearms.  Because California's novel restrictions have no basis in early American laws or traditions, they are repugnant to the Constitution. An injunction is necessary to prevent imminent, irreparable harm to the Second Amendment rights of the plaintiffs and other Californians impacted by this new and unprecedented law, and to preserve the status quo in place for years.[1]

The individual Plaintiffs are law-abiding, adult residents of California who have concealed carry weapons permits ("CCW permits") issued under California Penal Code Section 26150.[2] The associational Plaintiffs[3] are non-profit civil rights organizations representing the interests of their members who have CCW permits who are also affected by Senate Bill ("SB") 2.[4] Each of the individual Plaintiffs has submitted declarations in support of this motion that illustrate how SB 2 will

---

[1] California state law has had some version of a concealed weapon licensing regime in place for nearly a century. These new breathtaking restrictions on these licenses based on location imposed by SB 2 are unprecedented in 2023 because the Supreme Court has only just affirmed that the right to a license is not limited to the politically privileged. That there has been a century of concealed weapon policies in California without SB 2's location bans is a strong admission by California that public safety is an afterthought and that animus for the right protected is the driving force behind SB 2.

[2] Two of the individual Plaintiffs also run private businesses held open to the public, and object to being required to post signs – thus making them gatekeepers for others to exercise their right to bear arms within those places of business.

[3] Note that associational Plaintiff the Liberal Gun Club, Inc. was erroneously mislabeled as "Liberal Gun Owners Association" in the complaint, which is an older name it used.

[4] Plaintiffs' Complaint contains an in-depth review of the legislature's antipathy to *Bruen* that inspired SB 2. *See* Complaint, ¶¶ 71-86.

1

irreparably harm them. *See* Declarations of Individual Plaintiffs: Reno May, Anthony Miranda, Eric Hans, Gary Brennan, Oscar A. Barretto, Jr., Isabelle R. Barretto, Barry Bahrami, Pete Stephenson, Jose Flores, Andrew Harms, and Dr. Sheldon Hough. The associational Plaintiffs likewise have submitted declarations about how SB 2 irreparably harms their members and supporters with CCW permits. *See* Declarations of Alan Gottlieb, Sam Paredes, Erich Pratt, and Richard Minnich.

A supporting declaration has also been submitted by the President of the Peace Officers Research Association of California. *See* Declaration of Brian Marvel. Another supporting declaration has been submitted by a member of Plaintiff CRPA about how the law affects him. *See* Declaration of Moris Davidovitz. Finally, Clayton Cramer, an instructor in History at the College of Western Idaho and the author of many court-cited articles on weapons regulation, has submitted an expert declaration explaining the history of concealed carry laws in California, as well as the history of "sensitive places" restrictions in the founding era. *See* Expert Declaration of Clayton Cramer.

The Supreme Court anticipated that state actors might try to make entire urban areas "sensitive places" and preemptively quashed that sophistry with a warning. SB 2 defies that warning. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2118-19 (2022).

SB 2 adds Section 26230(a) to the Penal Code. The full text was reproduced in Plaintiffs' Complaint at ¶ 87. As described in the Complaint, the effect of SB 2 is that individual Plaintiffs and the members of the associational Plaintiffs who have CCW permits can no longer carry at nearly all of the places they frequent. Their right to self-defense in public has been reduced to what James Madison called a "parchment barrier" against the state infringing their fundamental rights.[5]

---

[5] Madison, James. *The Writings, vol. 5 (1787-1790)*. G. P. Putnam's Sons, 1904.  Letter to Thomas Jefferson, October 1788.

2

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

Moreover, with no signage requirement for prohibited places under SB 2, Plaintiffs have no notice that they may be violating SB 2 when they enter a property where firearms are to be prohibited.  Instead, SB 2 forces business owners (two of the plaintiffs) to engage in compelled speech if they welcome customers/clients exercising Second Amendment rights into their own places of business.

For the purposes of this preliminary injunction, Plaintiffs seek to enjoin the enforcement of SB 2 as to the following places, which are listed next to their corresponding subparts under Section 26230(a):

(5) A building, parking area, or portion of a building under the control of a unit of local government, unless the firearm is being carried for purposes of training pursuant to Section 26165.

(7) A building, real property, and parking area under the control of a public or private hospital or hospital affiliate, mental health facility, nursing home, medical office, urgent care facility, or other place at which medical services are customarily provided.

(8) A bus, train, or other form of transportation paid for in whole or in part with public funds, and a building, real property, or parking area under the control of a transportation authority supported in whole or in part with public funds.

(9) A building, real property, and parking area under the control of a vendor or an establishment where intoxicating liquor is sold for consumption on the premises.

(11) A playground or public or private youth center, as defined in Section 626.95, and a street or sidewalk immediately adjacent to the playground or youth center.

(12) A park, athletic area, or athletic facility that is open to the public and a street or sidewalk immediately adjacent to those areas, provided this prohibition shall not apply to a licensee who must walk through such a place in order to access their residence, place of business, or vehicle.

(13) Real property under the control of the Department of Parks and Recreation or Department of Fish and Wildlife, except those areas designated for hunting pursuant to Section 5003.1 of the Public Resources Code, Section 4501 of Title 14 of the California Code of Regulations, or any other designated public hunting area, public shooting ground, or building where firearm possession is permitted by applicable law.

(17) A building, real property, or parking area under the control of a public library.

3

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

(22) A church, synagogue, mosque, or other place of worship, including in any parking area immediately adjacent thereto, unless the operator of the place of worship clearly and conspicuously posts a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property. Signs shall be of a uniform design as prescribed by the Department of Justice and shall be at least four inches by six inches in size.

(23) A financial institution or parking area under the control of a financial institution.

(26) Any other privately owned commercial establishment that is open to the public, unless the operator of the establishment clearly and conspicuously posts a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property. Signs shall be of a uniform design as prescribed by the Department of Justice and shall be at least four inches by six inches in size.

Plaintiffs also seek to enjoin <u>every</u> subpart as to the "parking areas" portions. Whether the principal places described in those remaining subparts are truly sensitive places, their parking areas cannot also be sensitive based on mere spatial relationship, because banning public carry to and from a sensitive place would be an overbroad application of the limited, though legitimate, sensitive places doctrine.

## 2.   ARGUMENT

To obtain a preliminary injunction, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 55 U.S. 7, 20 (2008)).

### A.   Plaintiffs Are Likely to Succeed on the Merits

#### i.   Historical analysis under the Second Amendment.

Last year, the Supreme Court unequivocally reaffirmed the *Heller original public meaning test* for analyzing Second Amendment challenges. Applying that test, the Supreme Court found that the Second Amendment protects the right to armed self-defense in public. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2127, 2134-35 (2022) ("*Bruen*"). The *Bruen* Court reiterated that courts may

4

not engage in any form of "intermediate scrutiny" or even "strict scrutiny" in Second Amendment cases. *Id.* at 2129.

The Court made crystal-clear how a proper Second Amendment analysis is to be conducted by a reviewing court:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126. Lest there be any confusion, the Court explained the burden that the Second Amendment imposes: "[T]he *government must demonstrate* that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126 (emphasis added); *see also id.* at 2127, 2130, 2149 n.25, 2150, 2156.

Moreover, the government cannot simply proffer just any historical law that vaguely references firearms (which would be wholly irrelevant to the court's analysis under the rules of evidence anyway.) Rather, when challenged laws regulate features, conduct, or circumstances that already existed at the time of the Founding, the absence of widespread historical laws restricting those same features, conduct, or circumstances indicates that the Founders understood the Second Amendment to preclude such regulation. *Id.* at 2131. In contrast, uniquely modern circumstances that did not exist at the time of the Founding call for an analogical analysis, based on the government's proffered historical record. *Id.* at 2132.

Though it is not Plaintiffs' burden to present historical analogues, District Courts in other jurisdictions have already issued opinions striking down laws nearly identical to SB 2. Judicial resources can be preserved if California would spend its briefing opportunity distinguishing SB 2 from those cases, or presenting some new evidence of historically relevant laws that meet the straightforward questions of historical relevancy under *Bruen*.

Nearly all of the sorts of public places that SB 2 restricts which Plaintiffs seek to preliminarily existed in one form or another during the Founding era. Because similar litigation in New York, New Jersey, and Hawaii has addressed the same constitutional questions presented here, the State should not need much time to identify historical laws, as it can look at the various laws those states relied on. Those historical sources were not credible or persuasive when presented by New York, New Jersey, and Hawaii. They have not gained credibility or persuasive authority through mere repetition in this matter.

   ii.   **Under *Bruen*, the mere existence of historical analogues is not enough, as there must be evidence of a well-represented historical tradition.**

Outliers and one-off statutes do meet the standard set by the *Bruen* Court. To be included as part of a proper analysis, an historical law must be a "well-established and representative historical analogue." *Id.* at 2133. Courts may not uphold a modern law just because a few similar laws may be found from the past. Doing so "risk[s] endorsing outliers that our ancestors would never have accepted." *Id.* (quoting *Drummond v. Robinson Township*, 9 F.4th 217, 226 (3d Cir. 2021).

For example, in *Bruen*, New York presented, and the Supreme Court analyzed, three laws from the colonial era, three turn-of-the-18th-century laws, three 19th-century laws, and five late-19th-century regulations from the Western Territories. *Id.* at 2138-56. The Court held that all that history was not enough to uphold New York's Sullivan Act. The Court emphasized, as it did in *Heller*, that it will not stake its interpretation of the Second Amendment upon historical outliers that contradict the overwhelming weight of other evidence about the right to bear arms in public for self-defense. *Id.* at 2153.

The Court also explained that Reconstruction Era 19th-century evidence is relevant only if it provides confirmation of what had been established before: "postratification adoption or acceptance of laws that are inconsistent with the

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258-59 (2020) (noting that even "more than 30 States" adopting laws "in the second half of the 19th century . . . cannot by itself establish an early American tradition" because "such evidence may reinforce an early practice but cannot create one").[6]

Twentieth-century antecedents are even less relevant, and almost entirely (if not completely) irrelevant; the Court discussed such laws only in a brief footnote. *Bruen*, 142 S. Ct. at 2154 n.28. Thus, to the extent that California tries to justify SB 2 based exclusively on laws arising in the 1860's and after, this Court is bound to reject that invitation when those laws clearly contradict the original public meaning of the text of the Second Amendment.

Finally, *Bruen*'s observation that "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," *Id.,* 142 S. Ct. at 2132. This case is "fairly straightforward" because SB 2 purportedly "addresses a general societal problem that has persisted since the 18th century." *Id.* at 2131. The social concern of criminals committing crimes with weapons they carry is not a 21st Century innovation. The Supreme Court made clear that the "lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* (emphasis added).

Thus, even if California considers the carry of firearms a "societal problem," *it is not a new or novel problem.* Nor is it a new or novel social ill that violence

---

[6] *See also* Mark W. Smith, *Attention Originalists: The Second Amendment Was Adopted in 1791, Not 1868*, 24 Harvard J.L. & Pub. Pol'y Per Curiam 31 (2022) ("No Supreme Court case has ever looked to 1868 as the principal period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities remained consistent with the public understanding in 1791.").

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

occurs in public places. Consequently, this Court should not allow California to equivocate relevant analogues with irrelevant anachronisms in an attempt to fabricate an early American tradition that has never existed.[7]

### iii.   Sensitive places are narrowly defined under *Bruen*.

As to whether there are any special locations where the right to bear arms might be restricted without infringing Second Amendment rights, the Court explained that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Bruen*, 142 S. Ct. at 2133. And it cautioned that:

> [E]xpanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. . . . [It] would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense.

*Id.* at 2134. The *Bruen* Court also warned that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id.* at 2118-19. Likewise, there is no basis for California to limit carry to just some streets and sidewalks and a few private businesses that go to the trouble (and cost) to put up signs "allowing" fellow citizens to exercise their rights.

---

[7] Few of the specific sensitive places at issue in this preliminary injunction are places that did not also exist in the past. For those that did not, the State must find historical laws that restricted public carry in sufficiently similar places during the Founding era. *See, e.g.*, *Wolford v. Lopez*, No. CV 23-00265 LEK-WRP, 2023 WL 5043805, at *29 (D. Haw. Aug. 8, 2023) (historical laws barring the carry of firearms on enclosed private plantations without permission are not relevantly similar to a modern law barring carry on all private property held open to the public unless the owner gives permission). "What matters is whether a conceptual fit exists between the old law and the new." *United States v. Daniels*, No. 22-60596, 2023 WL 5091317, at *3 (5th Cir. Aug. 9, 2023).  Indeed, such laws generally were aimed at preventing illegal poaching or hunting wild game (or even domesticated livestock) on another's lands, a "why" (*Bruen* at 2133) that has no connection to SB 2, which bans guns in gas stations and grocery stores.

8

#### iv. SB 2 violates the Second and Fourteenth Amendments because it is not consistent with any historical tradition of firearm regulation.

*Bruen* confirmed "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." *Bruen*, 142 S. Ct. at 2122. SB 2, meanwhile, declares that the overwhelming majority of places that ordinary people would go in their daily lives is now a constitutional dead-zone. SB 2's concessions, excepting some roads and sidewalks and any private businesses or churches that put up signs affirmatively allowing carry (so long as they do not violate  SB 2's other restrictions on firearms that override the proprietor's wishes, such as Plaintiff Hough's dental office) is not enough to satisfy the *Bruen* test.

Indeed, sensitive places are intended to be the *exception* to the general rule that firearms must be permitted virtually everywhere because "the historical record yields **relatively few** 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited." *Bruen*, 142 S. Ct. at 2133 (emphasis added). The *Bruen* Court, using the historical record, actually acknowledges only three types of places where firearm carry might presumptively be foreclosed: legislative assemblies, polling places, and courthouses. *Id.* (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-236, 244-247 (2018) ("D. Kopel & J. Greenlee")). Beyond that, the Court identified are no other well-represented examples that might possibly meet *Bruen*'s test.

In all, under SB 2, if a Californian wants to exercise their right to carry, they now must carefully plan out exactly where they are going that day and make sure any parking lots of places they wish to visit are not shared with other businesses that serve alcohol, have athletic facilities, or fall under any of SB 2's myriad other restrictions. SB 2 even forecloses reliance on public transportation because, SB 2 bars carry on all public transportation. A walk in one's own neighborhood must not be adjacent to another place restricted by SB 2, such as the park across the street from Plaintiff Hans's home, Hans Decl. ¶ 10, or the playground Plaintiff Miranda

9

must walk by to collect his mail. Miranda Decl. ¶ 9. In other words, California apparently takes the position that only those with access to private transportation and/or those who live in gated communities should retain at least some semblance of a rights to public carry. This amounts to a camouflaged means-ends test that was forbidden by *Bruen. Id.,* at 2127.

Virtually none of SB 2's prohibited locations is even arguably "sensitive" because, as one judge has explained, "most places are 'sensitive' for someone. Surely that, without more, cannot categorically justify a firearms regulation in all such places. Such a conclusion would give the government untrammeled power to restrict Second Amendment rights in any place even plausibly considered 'sensitive.'" *Bonidy v. United States Postal Serv.*, 790 F.3d 1121, 1136-37 (10th Cir. 2015) (Tymkovich, J., concurring in part and dissenting in part). And while this motion will discuss why specific places included in SB 2 are not sensitive, *infra*, this Court should also consider that each of the long list of prohibited places, "when considered in combination[,] . . . effectively exempt[s] cities from the Amendment's protections."[8]  This aggregate effect analysis was first developed by the Seventh Circuit in a challenge to the City of Chicago seeking to zone gun ranges out of existence, because the "combined effect" of the various zoning rules left very little of the City of Chicago available for gun ranges. *Ezell v. City of Chicago*, 846 F.3d 888, 894 (7th Cir. 2017).

Under SB 2, prohibited places are the norm, and places open to the right to carry are the exception. Indeed, it would have been easier for California to simply list the places where citizens *could* carry. SB 2's restrictions on possessing firearms in places like parks, libraries, and many other similar places therefore runs afoul of the Supreme Court's warning that "expanding the category of 'sensitive places'

---

[8] Leo Bernabei, *Taking Aim at New York's Concealed Carry Improvement Act,* Duke Center for Firearms Law Blog (Aug. 7, 2023), <https://firearmslaw.duke.edu/2023/08/taking-aim-at-new-yorks-concealed-carry-improvement-act/> (as of Aug. 8, 2023).

10

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Bruen*, 142 S. Ct. at 2134.

Defendants policies implicitly admit that these places are not truly "sensitive." The Kopel & Greenlee article approvingly cited by the Supreme Court in *Bruen at* 2133 explains:

> The government's behavior can demonstrate the true importance of the alleged government interest. Passing a statute declaring some place to be a "gun free zone" does nothing to deter criminals from entering with guns and attacking the people inside. In contrast, when a building, such as a courthouse, is protected by metal detectors and guards, the government shows the seriousness of the government's belief that the building is sensitive. . . . Conversely, when the government provides no security at all – such as in a Post Office or its parking lot – the government's behavior shows that the location is probably not sensitive; further, the disarmament burden inflicted on citizens is not mitigated by alternative protectors supplied by the government.

D. Kopel & J. Greenlee, *supra*, at 290. SB 2 does nothing to actually protect the places (or people in them) that the State suddenly – in 2023 -- now declares to be "sensitive" and the State's lack of security at nearly all of the locations that SB 2 covers confirms that Defendants do not consider them to be truly sensitive.[9]

California might have more credibility trying to justify SB 2, by mandating (and paying for) metal detectors and armed security at their list of sensitive places, but SB 2 would still be unconstitutional because the creation of a police state would also fail to comport with founding era laws, customs, and traditions.

> **v.      Federal District Courts in New York, New Jersey, and Hawaii have already persuasively explained why the text, history, and tradition do not allow firearm carry to be banned in several places included in SB 2.**

District courts in New York, New Jersey, and Hawaii have already ruled on near-identical questions to those presented here, as all three states enacted very

---

[9] Of course, this is not to say that government provision of security is sufficient to suddenly transform any given location into a constitutional "sensitive place." "Sensitive places" are constitutional only if they survive the Second Amendment's rigorous textual and historical analysis.

11

similar "sensitive places" laws designed to thwart and undermine *Bruen*. These
rulings include *Antonyuk v. Hochul*, No. 1:22-CV-0986 (GTS/CFH), 2022 U.S.
Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022);[10] *Hardaway v. Nigrelli*, No. 22-CV-
771 (JLS), 2022 U.S. Dist. LEXIS 200813 (W.D.N.Y. Nov. 3, 2022); *Christian v.
Nigrelli*, No. 22-CV-695 (JLS), 2022 U.S. Dist. LEXIS 211652 (W.D.N.Y. Nov.
22, 2022); *Spencer v. Nigrelli*, No. 22-CV-6486 (JLS), 2022 U.S. Dist. LEXIS
233341 (W.D.N.Y. Dec. 29, 2022); *Koons v. Platkin*, No. CV 22-7463
(RMB/AMD), 2023 WL 3478604 (D.N.J. May 16, 2023); and *Wolford v. Lopez*,
No. CV 23-00265 LEK-WRP, 2023 WL 5043805 (D. Haw. Aug. 8, 2023).

This Court may consider as persuasive authority the opinions of other district
courts that adjudicated nearly-identical laws passed in New York, New Jersey, and
Hawaii. Those decisions are strongly persuasive that SB 2 is also unconstitutional.

SB 2's list of "sensitive places" – similar to the restrictions in New York,
New Jersey, and Hawaii that were enjoined include:

1. Parking Areas (including government-owned or -operated parking areas
   under Section 26230(a)(5))

Section 26230 bans carry in the parking areas of most of the "sensitive
places" it lists. This means that Plaintiffs cannot patronize or visit a place that
shares a parking lot with, for example, a restaurant that serves alcohol. Parking

---

[10] The Second Circuit stayed this ruling, as well as the others in New York.
While the Supreme Court denied emergency relief to lift the Second Circuit's stay
on Judge Suddaby's ruling in *Antonyuk*, Justices Alito and Thomas referred to that
ruling as "thorough" and encouraged the plaintiffs in that matter to file again for
emergency relief if the Second Circuit failed to move reasonably quickly in hearing
the appeal. *Antonyuk v. Nigrelli*, 143 S. Ct. 481, 481 (2023) (Alito, J., and Thomas,
J., concurring) ("The District Court found, in a thorough opinion, that the applicants
were likely to succeed on a number of their claims, and it issued a preliminary
injunction as to twelve provisions of the challenged law.
…
I understand the Court's denial today to reflect respect for the Second
Circuit's procedures in managing its own docket, rather than expressing any view
on the merits of the case. Applicants should not be deterred by today's order from
again seeking relief if the Second Circuit does not, within a reasonable time,
provide an explanation for its stay order or expedite consideration of the appeal.").
If the Second Circuit issues a ruling substantially disagreeing with its district
courts, Supreme Court review is thus likely.

12

areas are not truly "sensitive places", and California will not likely be able to
provide any historical support for its inclusion in several sub-sections of SB 2.

In a 2015 opinion Judge Tymkovich explained that "the unique
characteristics supporting the regulation's validity within the post office are far
weaker in the parking lot." *Bonidy*, 790 F.3d at 1129 (Tymkovich, J., concurring in
part and dissenting in part). As Judge Tymkovich explained:

> The White House lawn, although not a building, is just as sensitive as
> the White House itself. Consequently, the presumption of lawfulness
> for a regulation penalizing firearm possession there might approach
> the categorical. At the spectrum's other end[,] we might find a public
> park associated with no particular sensitive government interests – or
> a post office parking lot surrounding a run-of-the-mill post office.

*Id.* at 1137. None of the parking lots restricted by SB 2 are of the rare sort of places
Judge Tymkovich identified, and Plaintiffs should not have to "scout out" whether
their intended destination just so happens to share a parking lot with a prohibited
place. *See also Wolford*, 2023 WL 5043805, at *14.  "To the extent that the
challenged parking areas are shared with non-government buildings, do not
exclusively serve the government building, and are not reserved for government
employees, they are generally public spaces."

Nor does the State have a landlord or proprietor's interest in the parking lots
it owns or operates, such as those adjacent to some public buildings and public
transportation hubs. Why? Because the government is not a private actor against
whom constitutional rights rarely apply, and there is no general power of any
government to restrict carry on all *public property*. For instance, the Tennessee
Court of Appeals ruled just last fall that tenants in public housing did not forfeit
their Second Amendment rights. *Columbia Hous. & Redevelopment Corp. v.
Braden*, No. M2021-00329-COA-R3-CV, 2022 Tenn. App. LEXIS 395, at *10
(Oct. 13, 2022). Similarly, the District of Idaho held, in *Morris v. U.S. Army Corps
of Eng'rs*, 60 F. Supp. 3d 1120, 1125 (D. Idaho 2014), that "[t]he regulation
banning the use of handguns on Corps' property by law-abiding citizens for self-

13

defense purposes violates the Second Amendment." The *Antonyuk* court likewise ruled that New York may not ban public carry of firearms on various types of public property, including public parks and buses. 2022 U.S. Dist. LEXIS 201944, at *190-92, *197-203. The *Koons* court held the same when referring to government-owned property:

> [T]he Second Amendment cases that the State cites do not support the sweeping proposition that carrying for self-defense in public does not extend to any location in which the government owns the land. In each of the cases cited, the courts found that the government property was integrally connected to a government building that it regarded as a "sensitive place" where prohibition on carrying firearms is presumptively lawful.

2023 WL 3478604, at *54.

Nor does the government being the proprietor change the analysis. "While it is certainly true that 'the government has, with respect to its own lands, the rights of an ordinary proprietor, to maintain its possession and to prosecute trespassers . . . [just] as a private individual' may, the State is not *exempt* from recognizing the protections afforded to individuals by the Constitution simply because it acts on government property." *Id.* at *51 (citations omitted); *see also United States v. Kokinda*, 497 U.S. 720, 725 (1990) ("The Government, even when acting in its proprietary capacity, does not enjoy absolute freedom from First Amendment constraints, as does a private business . . . ."). The *Wolford* court also explained the ramifications of what an expansive reading of the "government as proprietor" argument would entail:

> If the government's capacity to act as a proprietor was a determinative factor in the first step of the analysis, then the fundamental right of public carry – as expressed fully in <u>Bruen</u> – would be jeopardized. Indeed, under such a theory, an argument could be made that the government possesses the unfettered power to restrict public carrying of firearms in many – if not most – public places because it has a proprietary interest in those areas. Whether the government acted as a proprietor may have been relevant when assessing Second Amendment challenges under a means-end scrutiny test, but it has no place under the first step of the <u>Bruen</u> analysis.

2023 WL 5043805, at *20.

14

### 2. Healthcare Facilities (Section 26230(a)(7))

SB 2 stops Plaintiffs Dr. Hough and Oscar Barretto from carrying in healthcare facilities. *See also* Davidovitz Decl., ¶ 9 (discussing taking his grandchildren to therapy sessions). Prior to SB 2 this was not an issue. But "[H]ospitals and medical care facilities existed before and after this Nation's founding." *Koons*, 2023 WL 3478604, at *93.[11] Despite the existence of medical facilities dating back to before the American Revolution, the *Koons* court "uncovered no laws from the 18th or 19th centuries that banned firearms at hospitals, almshouses, asylums, or other medical facilities." *Id.*

Similarly, the *Antonyuk* court explained that "certainly the medical profession existed in 18th and 19th century America; and certainly gun violence existed in 18th and 19th century America. However, the State Defendants do not cite (and the Court has been unable to yet locate) any laws from those time periods prohibiting firearms in places such as 'almshouses,' hospitals, or physician's offices." *Antonyuk*, 2022 WL 16744700, at *60. *See also* Cramer Decl., ¶¶ 59-60 (no known laws restricting carry in founding-era hospitals).

### 3. Public Transportation (Section 26230(a)(8))

As discussed in their respective declarations, Plaintiffs May, Stephenson, and Bahrami desire to continue to carry on public transportation as they have prior to SB 2. While the Supreme Court did not reach the question of public transportation in its *Bruen* ruling, because it had "no occasion to comprehensively define 'sensitive places' in th[at] case," 142 S. Ct. at 2133, the Court clearly contemplated the right to carry of individuals who rely on public transportation in deciding *Bruen*. For example, during oral argument, Justice Alito described some who were wrongfully denied carry permits as follows:

---

[11] *See* https://orb.binghamton.edu/cgi/viewcontent.cgi?article=1231&context=neha (discussing the New York Hospital, "constructed between 1773 and 1775").

15

None of these people has a criminal record. They're all law-abiding citizens. They get off work around midnight, maybe even after midnight. **They have to commute home by subway, maybe by bus**. When they arrive at the subway station or the bus stop, they have to walk some distance through a high-crime area, and they apply for a license, and they say: Look, nobody has told – has said I am going to mug you next Thursday. However, there have been a lot of muggings in this area, and I am scared to death. They do not get licenses, is that right?

*See* Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen* (20-843), Oyez, <https://www.oyez.org/cases/2021/20-843> (as of Aug. 31, 2022) (emphasis added). As for applicable district court rulings, the *Koons* court did not grant a preliminary injunction on that issue, but only because it intended to hold an evidentiary hearing about whether or not security was present in the "transportation hubs" where New Jersey had banned carry. As to history, New Jersey cited only a single 1876 Iowa law specific to carrying guns on public transportation, which only barred individuals from *shooting at* trains. *Koons*, 2023 WL 3478604, at *92 (citing Iowa Stat. tit. XXIV, ch. 3, § 1, p. 985 (1880) (codifying 1867 law)). As for New York, even some of the historical city laws it relied on "contain a reasonable exception for travel (e.g., for travel to and from work, or to and from a repair shop)." *Antonyuk*, 2022 WL 16744700, at *70.

4. <u>Places that Serve Liquor (Section 26230(a)(9))</u>

All of the individual Plaintiffs desire to continue to carry in places that serve alcohol, as they have prior to SB 2. To be clear, none of them intend to carry while drinking or intoxicated; they simply oppose being barred from carrying in a restaurant or bar even when sober. Indeed, Dr. Hough and the Barrettos *never* drink, yet SB 2 bars them from carrying in restaurants that serve alcohol. Hough Decl., ¶ 8; Oscar Barretto Decl., ¶ 7; Isabelle Barretto Decl., ¶ 7. If California had chosen merely to ban carrying while intoxicated in public, it might have found some support in the historical record. *See, e.g.*, *United States v. Daniels*, 77 F.4th 337, 346 (5th Cir. 2023); *United States v. Harrison*, No. CR-22-00328, 2023 WL 1771138, at *7 (W.D. Okla. Feb. 3, 2023) (both discussing mid-to-late 19th-century

16

prohibitions on carrying a firearm while intoxicated). But under SB 2, even those who never drink will still be prohibited from taking their families out to dinner (while carrying) at a restaurant that also happens to serve beer and wine. There is no historical basis for such a prohibition.

Striking down a similar ban, the *Antonyuk* court said of New York's similar law that it "did not criminalize becoming intoxicated while carrying a firearm. It criminalized a license holder's *mere presence* at an establishment licensed for the on-premises consumption of alcohol while carrying concealed – regardless of whether he or she is consuming alcohol there." 2022 WL 16744700, at *72.

For its part, New Jersey relied on a historical law barring the possession of pistols by intoxicated persons, 1867 Kan. Sess. Laws 25, and a law barring the sale of alcohol near a military encampment. 1859 Conn. Pub. Acts, ch. LXXXII, § 5, at 62. Neither affected the carry rights of people who were not intoxicated. New Jersey also cited a lone law from the Oklahoma territory that banned firearms from places where liquor was sold, but the *Koons* court rightly noted that the law was an outlier, concluding that "the State has not shown that well-established and representative historical firearm laws support Chapter 131's handgun ban at bars and restaurants that serve alcohol." 2023 WL 3478604, at *86. And in Hawaii, the *Wolford* court agreed in analyzing similar laws presented by the state, writing that:

> Although this Court declines to make a finding as to whether those laws conclusively establish a national historical tradition of regulating intoxicated individuals from carrying firearms, even if such a conclusion were assumed, [Hawaii's law] is broader than those laws. [It] prohibits people from carrying firearms in bars and restaurants that **serve alcohol**. It includes individuals carrying in those establishments regardless of whether they are **consuming** alcohol. . . . Those laws, therefore, do not show a national historical tradition of regulating people from carrying firearms in establishments serving alcohol irrespective of whether the individual carrying is consuming alcohol.

2023 WL 5043805, at *18 (emphasis in original). *See also* Cramer Decl., ¶¶61-67. SB 2 fails for the same reasons.

5. Parks and Playgrounds (Section 26230(a)(11-13))

17

Plaintiffs May, Brennan, Harms, Bahrami, Miranda, Stephenson, and Hans desire to continue to carry in or near parks, athletic facilities, playgrounds, or on real property under the control of the Departments of Parks and Recreations and Fish and Wildlife, as they have prior to SB 2. *See also* Davidovitz Decl., ¶ 9.

As other courts have found, there is little historical support for barring carry in parks. In *Antonyuk*, for example, New York presented a handful of local laws that barred guns in city parks, but the court explained that "even if the number and geographical origins of these city laws . . . were sufficient to constitute a tradition that was *established*, they do not constitute a tradition that was *representative* of the Nation." 2022 WL 16744700, at *67. And the court noted how even that small degree of historical support vanishes when applied to parks outside of cities: "at most, the city laws support a historical tradition of banning firearms in public parks *in* a city (where the population density is generally higher), not public parks *outside of* a city (where people are generally free to roam over vast expanses of mountains, lakes, streams, flora and fauna)." *Id.* at *66.

In examining New Jersey's similar law, the *Koons* court concluded that "the State has failed to come forward with any laws from the 18th century that prohibited firearms in areas that today would be considered parks. Consistent with the *Koons* [p]laintiffs' findings, this [c]ourt has only uncovered colonial laws that prohibited discharging firearms in areas that were the forerunners of today's public park." *Koons*, 2023 WL 3478604, at *83. As to the late-19th-century laws that New Jersey cited, they were not "representative of the entire nation. By 1890, those laws – one state law and about 25 local ordinances – governed less than 10% of the nation's entire population and thus are unrepresentative." *Id.* at *85. *See also* Cramer Decl., ¶ 58 (no known laws restricting carry in founding-era "commons").

Plaintiffs know of only one case that has arrived at the opposite conclusion, which it reached by ignoring *Bruen*'s methodology. *See Md. Shall Issue, Inc. v. Montgomery County*, No. CV TDC-21-1736, 2023 WL 4373260 (D. Md. July 6,

18

2023). The court there cited almost exclusively local historical regulations to uphold a ban on carrying in parks, even though *Bruen* contemplated an "enduring American tradition of *state* regulation." *Bruen*, 142 S. Ct. at 2155 (emphasis added). As the court in *Antonyuk* discussed, these local ordinances were clearly not representative of the nation.

Moreover, the *Maryland Shall Issue* court cited just two laws of any kind, both from around the time of the ratification of the Fourteenth Amendment, 2023 WL 4373260, at *11, and none from the relevant Founding-era period of 1791, despite the fact that Maryland was one of the original ratifying states of the Second Amendment. Even if the court were to disregard that there were no Founding-era laws cited and focus just on the 19th century, *Bruen* was clear that relying on even two state laws would not be enough. 142 S. Ct. at 2153. Only one law from the Reconstruction era relied on in *Maryland Shall Issue* was a state law, and even that 1870 Pennsylvania law only applied to Fairmount Park, not all parks in the state. The earliest state law that banned carry within state parks generally that the *Maryland Shall Issue* court cited did not become law until 1905 in Minnesota. There is simply no early historical tradition of state regulations barring that carry of arms in parks, even though parks existed throughout our history.

Perhaps realizing this obvious deficiency in the historical record, the district court in Maryland instead relied on a series of mostly local laws from the 1890s and the early 20th century. *Md. Shall Issue*, 2023 WL 4373260, at *11. But the Supreme Court did not "endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights." *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring). And it did not bother with 20th-century history at all because, "[a]s with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28. Here, the handful of late-in-time laws and local ordinances

19

contradict the history of generally allowing the carrying of arms in parks.

Finally, many laws and ordinances the *Maryland Shall Issue* court relied on were regulations enacted to protect wildlife and stop poaching, not to stop gun-related violence. Faced with yet another point that undermined the government's position, the court invented a rule that, when there is a clear historical example of a similar regulation, "how and why" that regulation was enacted is not relevant. *Md. Shall Issue*, 2023 WL 4373260, at *11. This contradicts what the Supreme Court said. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing *that problem* is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131 (emphasis added). If the historical law presented did not address "that problem" but some other unrelated problem, it is neither distinctly similar nor analogous. The *Maryland Shall Issue* Court clearly did not conduct a proper *Bruen* analysis.

Moreover, the *Wolford* court, which ruled after *Maryland Shall Issue*, agreed with the *Antonyuk* and *Koons* rulings and criticized *Maryland Shall Issue*: "[O]ut of the seventeen laws the [*Maryland Shall Issue*] court reviewed, only one local ordinance was enacted before the Fourteenth Amendment's ratification and only one state law was enacted 'during' the time of the Fourteenth Amendment's ratification. This Court is not convinced that there was a national historical tradition of prohibiting the carrying of firearms in parks at the time of the Fourteenth Amendment's ratification." 2023 WL 5043805, at *24.

SB 2's ban on carrying in parks fails for the same reasons the New York, New Jersey, and Hawaii laws did. That some parks may be run or owned by the government does not change the analysis. *See* discussion pp. 13-15, *supra*.

In a rare instance of disagreement with Plaintiffs' position, the *Antonyuk* and *Koons* courts ruled that playgrounds (but not parks) were indeed sensitive places, analogizing them to schools given that they primarily serve children. *See, e.g.*,

20

*Antonyuk*, 2022 WL 16744700, at *65 ("this ban also finds support in those historical analogues prohibiting firearms in schools given that, by their very nature, both places often contain children."). But the comparison to schools misses a critical point: when children are at school, their teachers and other school staff are acting *in loco parentis*. Their job is to care for their students as a parent would, including keeping them safe. A playground has no metal detectors or armed security, meaning that the parents of the children retain their duty of care for their own children and should also retain the right to exercise that duty. This is a critical difference in "how" the restrictions operate.

Plaintiffs Harms and Bahrami want to be able to carry on playgrounds specifically to be able to protect their children in the event of a criminal attack. Harms Decl. ¶ 8; Bahrami Decl. ¶ 9.[12] *See also* Davidovitz Decl., ¶ 9. If this Court is inclined to agree that playgrounds are sensitive places, it should at least rule the restriction unconstitutional *as applied to parents or guardians of children who are currently at the playground*. Parents like Plaintiff Harms should have the right to defend their children in unsecured areas. The *Antonyuk* court, while ruling that playgrounds were sensitive, did at least hint at such an exception: "The Court finds [historical laws prohibiting firearms in schools] to be particularly analogous here given that, generally, adults (**at least when they are not supervising children**) do not frequent playgrounds as much as children do. 2022 WL 16744700, at *65 (emphasis added).

6. Libraries (Section 26230(a)(17))

Plaintiffs Harms and Bahrami desire to continue to carry in public libraries. Harms Decl., ¶ 8; Bahrami Decl., ¶ 10. The *Koons* court rejected New Jersey's argument that it could ban carry in libraries and museums just because children are sometimes present in those places. "[T]he mere presence of children is not, by

---

[12] Plaintiff Miranda also challenges the playground restriction because he wants to be able to walk to get his mail on the streets and sidewalks adjacent to a playground near his home. Miranda Decl. ¶ 9.

21

itself, enough to make a certain location like a school." *Koons*, 2023 WL 3478604, at *85. As for historical laws, the state could only come up with mostly territorial laws from the mid- to late-19th century, which were insufficient to establish any kind of national tradition of banning firearms at public libraries and museums. *Id.* at *86. Of course, the fact that the libraries may be run by the government does not change the analysis. *See* discussion pp. 13-15, *supra*.

### 7. Places of Worship (Section 26230(a)(22))

As discussed in their respective declarations, Plaintiffs Oscar and Isabelle Barretto, as well as Plaintiff Miranda, desire to continue to carry in their places of worship, as they have prior to SB 2. *See also* Davidovitz Decl., ¶ 11. There is no relevant historical tradition of restricting carry in churches. Quite the opposite is true. In the Founding era, there were "statutes all over America that *required* bringing guns into churches, and sometimes to other public assemblies." D. Kopel & J. Greenlee, *supra*, at 242 (emphasis added); Cramer Decl., ¶¶ 85-95; *see also Koons*, 2023 WL 3478604, at *21 (noting that "several colonial governments passed laws requiring colonists to bring arms to church").

In defending its ban on carrying in churches, the laws New York cited failed to "demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense at all places of worship or religious observation across the state." *Hardaway*, 2022 WL 16646220, at *14. The laws they did cite were "spasmodic enactments involving a small minority of jurisdictions governing a small minority of population. And they were passed nearly a century after the Second Amendment's ratification in 1791." *Spencer*, 2022 WL 17985966, at *12. The *Antonyuk* court took a similar position, because the states that restricted carry in churches in the 19th century only made up a small minority of the nation's population, and it too found no Founding-era history supporting such a restriction.

22

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

*Antonyuk*, 2022 WL 16744700, at *62. SB 2 fails on these points for the same reasons.[13]

### 8. Financial Institutions (Section 26230(a)(23))

As discussed in their respective declarations, Plaintiffs Brennan, Stephenson, and Hans desire to continue to carry when visiting their bank, as they have prior to SB 2. There is no historical tradition of barring the carrying of arms in banks. Banks have existed since the Founding (and long before), yet regulations on carrying arms in them at the time were utterly nonexistent.[14] *See also* Cramer Decl., ¶ 96 (no known laws restricting carry in founding-era banks).

In *Wolford*, realizing that historical support was barren, Hawaii attempted to analogize to laws restricting carry in banks to laws restricting carry in fairs or markets,[15] which the court rejected as inadequate, given that banks existed at the time. "The State also does not make any argument that this Court should analogize to different historical regulations because banks at the time of the Second Amendment's ratification are substantially different than modern banks. Without

---

[13] As to places of worship, SB 2 does include a provision allowing carry only when the operator "clearly and conspicuously posts a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property." A similar provision that is applied to all private property generally is discussed below, and the arguments made there apply here.

[14] Even today, only two states partially restrict carrying in banks. *See* Mich. Comp. Laws Serv. § 750.234d(1) (allowing concealed carry but not open carry); Neb. Rev. Stat. § 69-2441 (a) (allowing open carry but not concealed carry). To be sure, this does not include the recent *Bruen*-response bills from Hawaii, New York, New Jersey, and Maryland, which include banks among many other places, and are facing Second Amendment challenges. Before *Bruen*, however, no state fully banned carry in banks.

[15] And while the *Wolford* court did not mention it, even these historical restrictions typically only applied to those carrying in a way that would frighten people, as was discussed in *Bruen*: "Respondents next direct our attention to three late-18th-century and early-19th-century statutes, but each parallels the colonial statutes already discussed. One 1786 Virginia statute provided that 'no man, great nor small, [shall] go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the Country.'
...
A by-now-familiar thread runs through these three statutes: They prohibit bearing arms in a way that spreads 'fear' or 'terror' among the people." 142 S. Ct. at 2144-45.

---

23

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

more, the State has not met its burden." 2023 WL 5043805, at *25. SB 2 fails for the same reason.

### 9. The "Vampire Rule" (Section 26230(a)(26))

While SB 2's list of sensitive places is wholly objectionable, nothing goes further in eviscerating the right to carry than Section 26230(a)(26), which proscribes carry in "[a]ny other privately owned commercial establishment that is open to the public, unless the operator of the establishment clearly and conspicuously posts a sign at the entrance of the building or on the premises indicating that license holders are permitted to carry firearms on the property." Nick-named the "vampire rule," because the law requires that people with carry permits be invited in like mythological vampires, the requirement flips the traditional rule for private property on its head – especially as to businesses that serve the public. This unprecedented rule affects every Plaintiff. *See also* Davidovitz Decl., *passim*.

Usually, a private property owner who wants to exclude certain people must post signs letting the public know who or what actions or items are *prohibited*. While some spaces are so obviously private that there need not be signage to announce they exclude people, such as fenced-off private property, that does not apply to places of business open to the public because they are "by positive law and social convention, presumed accessible to members of the public unless the owner manifests his intention to exclude them." *Oliver v. United States*, 466 U.S. 170, 193 (1984) (Marshall, J., dissenting).[16]

---

[16] *See also United States v. Byle*, No. 8:10-CR-419-T-30TGW, 2011 U.S. Dist. LEXIS 54220 (M.D. Fla. Apr. 15, 2011) (reasoning that owner's intent to exclude visitors was not apparent because gate was not locked and no "No Trespassing" signs were posted); *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1096 (N.D. Fla. 2016) ("Thunder Beach contains no barricades, barriers, or attendants meaningfully limiting egress and ingress. It contains no signs conveying a message to the effect of 'private event – no trespassing.' Any person can choose to walk in to the event just as one could choose to walk to the same location on a given weekend when an event is not being held.").

Moreover, while *businesses* open to the public have a broad right to exclude people from their establishments, *Carrillo v. Penn Nat'l Gaming, Inc.*, 172 F. Supp. 3d 1204, 1217 (D.N.M. 2016), under SB 2 the *State* decides who to exclude, unless the business owner publicly states otherwise. This is something that would never be acceptable in the First Amendment context. *See, e.g.*, *Project 80s v. Pocatello*, 942 F.2d 635, 639 (9th Cir. 1991) ("Under the Idaho Falls and Pocatello ordinances, residents who wish to receive uninvited door-to-door solicitors must post a 'Solicitors Welcome' sign. The government's imposition of affirmative obligations on the residents' first amendment rights to receive speech is not permissible.").

The few historical examples of anti-poaching laws requiring permission before carrying a gun onto private property did not deal with places of business accessible to the public. For example, a 1721 Pennsylvania statute provided that "if any person or persons shall presume . . . to carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation . . . he shall for every such offense forfeit the sum of ten shillings." James T. Mitchell et al., *Statutes at Large of Pennsylvania from 1682 to 1801*, vol. III, at 254 (1896). Such a restriction on enclosed private lands where unauthorized hunting could be excluded is obviously not analogous to a modern coffee shop or grocery store. And Plaintiffs know of no relevant historical examples of laws that generally barred carrying in all businesses open to the public unless the person carrying a firearm first received permission from the owner. *See also* Cramer Decl., ¶ 98 ("There are no laws in the time period requiring a positive invitation for persons carrying arms to enter a business.").

<u>All four</u>[17] district courts to examine this question so far have agreed with Plaintiffs' position. *Antonyuk*, 2022 WL 16744700, at *79 ("Section 5's imposition of a state-wide restriction on concealed carry on all private property that is *open for*

---

[17] And, just as this motion was about to be filed, a fifth ruling came in agreeing with these four. *See Susannah Warner Kipke, et al., v. Wes Moore, et al.*, D. Md. No. 1:23-cv-01293-GLR (Dkt. No 31), pp. 26-31.

25

*business to the public* finds little historical precedent."); *Christian*, 2022 WL 17100631, at *9 (citation omitted) ("that right has always been one *belonging to the private property owner* – not to the State."); *Koons*, 2023 WL 3478604, at *67 ("The colonial hunting laws and the Default Rule are differently situated; they do not impose a comparable burden on licensed firearm carriers."); *Wolford*, 2023 WL 5043805, at *27 ("What [Hawaii's law] does, and what cannot be constitutionally permitted, is remove the presumption of the right to carry a firearm on private property held open to the public.").

If private businesses want to post signs telling people with CCW permits they are not welcome, they may do so, but that is based on private property principles, not because the business is a "sensitive place." What California cannot do is preemptively declare all private businesses (and churches) to be sensitive places by default, unless proprietors say otherwise.

### vi.   The "vampire rule" also fails because it compels speech.

In addition to violating the Second Amendment, the "Vampire Rule" also violates the First Amendment. It unconstitutionally compels speech by the individual Plaintiffs who are business owners. Dr. Hough Decl. ¶¶ 10-12; Flores Decl. ¶¶ 6-8. These Plaintiffs want to continue to allow people who legally carry concealed weapons into their businesses, as they have for years prior to SB 2. Their objection is being forced to put up a sign saying so, which would involve them publicly taking an unpopular position in California that will assuredly alienate some of their customers regardless of what decision they make.

Nor should Plaintiffs be required to make this unenviable choice, because the First Amendment protects them against such compelled speech. Freedom of thought and expression "includes both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977). "Just as the First Amendment may prevent the government from prohibiting speech, the Amendment may prevent the government from compelling individuals to express

26

certain views." *United States v. United Foods*, 533 U.S. 405, 410 (2001). Moreover, the Supreme Court "has repeatedly rejected the notion that a speaker's profit motive gives the government a freer hand in compelling speech." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rts. Comm'n*, 138 S. Ct. 1719, 1745 (2018).

Even if they did not fear customer backlash, Plaintiffs object to being required to put up signs for an additional reason as well: it makes them a part of the State's unconstitutional antigun efforts, efforts which with which they philosophically disagree. Putting up such signs grants further legitimacy to the State's unconstitutional regime, and Plaintiffs have the right *not* to "be an instrument for fostering public adherence" to points of view they find unacceptable. *Wooley*, 430 U.S. at 715. Nor would putting up a disclaimer assuage this concern, as the Supreme Court has decided that question too. "The Colorado Court of Appeals also erred by suggesting that Phillips could simply post a disclaimer, disassociating Masterpiece from any support for same-sex marriage. Again, this argument would justify any law compelling speech. And again, this Court has rejected it." *Masterpiece Cakeshop*, 138 S. Ct. at 1745. The government may not "require speakers to affirm in one breath that which they deny in the next." *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 16 (1986). Just recently, the Supreme Court reaffirmed that the First Amendment guards against compelled speech, explaining that it does not matter "whether the government seeks to compel a person to speak its message when he would prefer to remain silent or to force an individual to include other ideas with his own speech that he would prefer not to include." *303 Creative LLC v. Elenis*, No. 21-476, 2023 WL 4277208, at *8 (U.S. June 30, 2023).

At least one court has agreed with Plaintiffs' position. In discussing New York's similar provision, the *Antonyuk* court stated that New York's law "appears to compel Plaintiffs' speech another way: by ***coercing*** them, as busy store owners, to conspicuously speak the state's controversial message." *Antonyuk*, 2022 WL

27

16744700, at *83.  That message is no less controversial in New York than it is in California.

This "Vampire Rule" -- more than any other part of SB 2, is an affront to the Supreme Court's instruction that there are "relatively few" "sensitive places." *Bruen*, 142 S. Ct. at 2133. In defiance of the Supreme Court's orders, SB 2 has made most businesses that people rely on in their daily lives into gun-free zones, turning the Second Amendment right to carry arms in public for self-defense on its head. But SB 2 also "[R]aises questions of the highest importance to the maintenance of our federal system of government." *Cooper v. Aaron*, 358 U.S. 1, 4 (1958).

Like the revolt that inspired the unanimous *Cooper* decision, this case "[N]ecessarily involves a claim by the Governor and Legislature of a State that there is no duty on state officials to obey federal court orders resting on this Court's considered interpretation of the United States Constitution." *Id at* 4.

SB 2 does not just rest on poorly reasoned policies, or bone-headed partisanship – it is defiance of the constitutional order of our republic and should receive the strongest possible rebuke from this Court.

### vii.   SB 2 violates due process by not providing notice as to where carry isn't allowed.

To the extent the individual Plaintiffs or the members of the associational Plaintiffs attempt to lawfully carry in the face of SB 2's making so much of the state off-limits for carry, they are highly likely to *accidentally* break the law because they are unaware that they have entered a "sensitive place". In this way, SB 2 also violates Plaintiffs' and their members' rights to due process. As the Supreme Court has explained, "[e]ngrained in our concept of due process is the requirement of notice. Notice is sometimes essential so that the citizen has the chance to defend charges. Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed." *Lambert v. California*, 355

U.S. 225, 228 (1957).

For the reasons stated *supra*, Plaintiffs' likelihood of succeeding on the merits is exceedingly high. Accordingly, they are entitled to a preliminary injunction.

## B.   Plaintiffs Will Suffer Irreparable Harm if Denied Relief.

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995). The Ninth Circuit has imported the First Amendment's irreparable-if-only-for-a-minute rule to cases involving other rights and, in doing so, has held a deprivation of these rights irreparable harm per se. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). Most recently, the Ninth Circuit has reaffirmed the importance of the likelihood of the success on the merits step, explaining that "[i]f a plaintiff bringing such a [constitutional] claim shows he is likely to prevail on the merits, that showing will almost always demonstrate he is suffering irreparable harm as well." *Baird v. Bonta,* No. 23-15016, 2023 WL 5763345, at *4 (9th Cir. Sept. 7, 2023).

The Second Amendment should be treated no differently. *See McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (refusing to treat the Second Amendment as a second-class right subject to different rules); *see also Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable and ha[s] no adequate remedy at law").

## C.   The Balancing of the Equities Sharply Favors Plaintiffs.

### i.   The Constitution forbids restricting protected conduct on the basis of a claimed "public safety" rationale.

In contrast to Plaintiffs' injury of being denied their Second Amendment right to carry in non-sensitive places, Defendants suffer no injury because there is

29

no plausible, identifiable interest that infringing Plaintiffs' constitutional rights serves. Indeed, Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir 2013); *see also Valle del Sol Inc. v. Whitting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable . . . to allow the state . . . to violate the requirements of federal law . . . .").

### ii. Even if public safety interests are considered, people with carry permits commit crimes at a lower rate than the public at large.

As explained above, the Supreme Court has repeatedly banned interest-balancing analyses in Second Amendment cases. *Bruen*, 142 S. Ct. at 2127. That said, at the preliminary injunction stage, one of the factors for courts to consider is the balance of hardships between the parties. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011). Unlike Plaintiffs, who would have their rights to carry eviscerated because they could carry almost nowhere, California will face no hardship whatsoever. Indeed, neither the legislature nor the Governor cited any evidence that *people with CCW permits* (i.e., those subject to SB 2) are causing a significant amount of gun-related crime. They did not because they could not; no such evidence exists.[18]

Quite to the contrary, Americans with CCW permits are an extremely law-abiding demographic. Last year, when California tried to pass SB 918, a law much like SB 2, the California State Sheriffs' Association opposed[19] the bill largely because people with CCW permits seldom commit crime, and they do not generally pose a problem to law enforcement. The Association stated in a letter to the

---

[18] *See also Koons*, 2023 WL 3478604, at *108 ("And herein lies the problem: despite ample opportunity for an evidentiary hearing, the State has failed to offer any evidence that law-abiding responsible citizens who carry firearms in public for self-defense are responsible for an increase in gun violence.").

[19] Numerous individual Sheriffs have vocally opposed it as well. Fresno County Sheriff John Zanoni recently released a video about how SB 2 harasses law-abiding citizens with CCW permits, while doing little to stop criminals. <https://www.youtube.com/watch?v=HsFgY5Qqlt0> (Last accessed September 27, 2023).

30

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

California State Assembly that SB 918 "greatly restricts when and where licensees may carry concealed and could severely restrict the exercising of the right [to bear arms]. . . . [I]*ndividuals who go through the process to carry concealed legally are exceedingly unlikely to violate the law*, yet SB 918 turns much of the state into 'no-carry' zones that will do nothing to foster public safety."[20] Many police organizations likewise oppose SB 2. *See* Complaint, ¶ 82 and Marvel Decl., *passim*.

The evidence from other states that maintain data on crimes committed by CCW permit holders also establishes that people with CCW permits are overwhelmingly peaceable and law-abiding. For example, in 2020 (before it enacted constitutional carry), Texas had 1,626,242 active concealed-carry weapon license holders.[21] CCW permit holders thus made up about 5.7% of the state population in 2022. But according to the Texas Department of Public Safety, they made up just 114 of the state's 26,304 convictions.[22] That is just 0.4334% of the state's serious crimes. Even among those few convictions, most involved no gun at all. Of the ones that did, permit holders were responsible for an even smaller percentage. For example, there were 1,441 convictions for aggravated assault with a deadly weapon in 2020, but people with a valid CCW permit committed just 4 of those – or 0.2776% of the total, again far below their 5.7% share of the population.

The State of Florida confirms this pattern as well. Indeed, as of June 2023, the state had issued almost 5.8 million concealed weapon licenses since October 1,

---

[20] Floor Alert from Cal. State Sheriffs' Ass'n to All Members of the Cal. State Assemb. (Aug. 29, 2022), <https://tinyurl.com/calstatesheriffsopposeSB918> (emphasis added). This year, SB 2 was opposed by many law enforcement organizations for the same reasons. Assemb. Comm. on Pub. Safety, Bill Analysis, S. 2, 2023-2024 Reg. Sess. (Cal. June 26, 2023), <https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202320240SB2> (select 06/26/23 – Assembly Public Safety).

[21] Tex. Dep't of Pub. Safety, *Active License/Certified Instructor Counts as of Dec. 31, 2020*, at 1 (Dec. 31, 2020), <https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/actlicandinstr/activelicandinstr2020.pdf>.

[22] Tex. Dep't of Pub. Safety, *Conviction Rates for Handgun License Holders, Reporting Period: 01/01/2020 – 12/31/2020*, at 5 (Feb. 11, 2021), <https://www.dps.texas.gov/sites/default/files/documents/rsd/ltc/reports/convictionratesreport2020.pdf>.

31

1987. Of those, over 2.5 million are active.[23] In that 26-year timespan, only about 18,000 permits have been revoked without being reinstated, or roughly 0.3% of the total issued. *Id.*

The modern right-to-carry movement gathered steam in Florida, though a handful of states had liberal permit-issuance policies before then. The state's enactment of "shall-issue" permitting was met with predictions of wild west-style violence and "blood in the streets," but none of that happened. At least one prominent opponent of the law admitted his error: Representative Ronald A. Silver stated in 1990 that "[t]here are lots of people, including myself, who thought things would be a lot worse as far as that particular situation [carry reform] is concerned. I'm happy to say they're not." Clayton E. Cramer & David B. Kopel, *"Shall Issue": The New Wave of Concealed Handgun Permit Laws*, 62 Tenn. L. Rev. 679, 692-93 (1995). John Fuller, General Counsel for the Florida Sheriffs Association, added: "I haven't seen where we have had any instance of persons with permits causing violent crimes, and I'm constantly on the lookout." *Id.* The Metro Dade Police Department originally kept detailed records of every incident involving concealed weapon licensees from enactment of the law in 1987 until August 31, 1992. *They stopped doing so because the rarity of such incidents made the effort a waste of time*. *Id.*

Wisconsin has similar data. In 2022, the state issued 38,326 new permits and 60,838 renewals.[24] While Wisconsin does not appear to consistently report the

---

[23] Fla. Dep't of Agric. & Consumer Servs., Div. of Licensing, *Concealed Weapon or Firearm License Summary Report Oct. 1, 1987- Jun. 30, 2023*, at 1 (June 30, 2023), <https://ccmedia.fdacs.gov/content/download/7499/file/cw_monthly.pdf>.

[24] Plaintiffs arrived at these numbers by subtracting the number of new or renewal applications "denied" from the number of new or renewal applications "accepted." For instance, the state accepted 40,306 new applications, of which 1,980 were denied, for a total of 38,326 new applications approved and new permits issued. Wis. Dep't of Just., *Department of Justice Concealed Carry Annual Report – 175.60(19) – January 1 – December 31, 2022*, at 1-2, <https://www.doj.state.wi.us/sites/default/files/dles/ccw/2022%20Annual%20CCW%20Statistical%20Report.pdf> (last visited July 12, 2023).

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

number of active permits, as of 2021, 458,630 total permits had been issued.[25] According to the 2022 report, 1,334 licenses were revoked. Wis. Dep't of Just., *supra*, at 3. Of those, 463 were revoked because the permit holder was no longer a Wisconsin resident, while another 332 were revoked because the permit holder was found to have unlawfully used a controlled substance like marijuana (but committed no other crime). *Id.* The remaining 539 were a mix of misdemeanor and felony crimes, involuntary commitments, and more. *Id.* It is unclear how many of the 539 were revoked because the holder had used a firearm in furtherance of a crime – the relevant concern when it comes to fears that people will use a legally carried firearm to commit a crime. In any event, what *is* clear is that 539 is just 0.12% of 458,630. Wisconsinites with CCW permits rarely commit violent crimes of any kind.

Turning to Illinois, in 2020, the Chicago Tribune reported on all known uses of a gun (shootings or threats) by the 315,000 people in the state with CCW permits.[26] The Tribune found just 71 incidents between 2014 and 2020. Many incidents listed were not crimes, but legitimate self-defense. For instance, one of the entries in the article reads:

> Elvis Garcia, 39, was talking outside with neighbors ages 20 and 27. Two men drove up and started shooting at them; all three were hit. Garcia, a CCL holder, returned fire, killing Michael Portis, 17. Both Garcia and Portis died from their wounds. The second man who fired at the three neighbors later was arrested.

But even if all 71 incidents were crimes, that would come out to CCW permit holders in Illinois having a 0.02% chance of committing a crime using a gun at any point in the six-year period the Tribune examined.

---

[25] Steven Walters, *The Legacy of Concealed Carry in Wisconsin*, Urban Milwaukee (Oct. 11, 2021), <https://urbanmilwaukee.com/2021/10/11/the-state-of-politics-the-legacy-of-concealed-carry-in-wisconsin/> (last visited July 12, 2023).

[26] Katherine Rosenberg-Douglas, *Explore: Shootings by CCL Holders in Illinois Since Concealed Carry Law Went into Effect in 2014*, Chic. Trib. (Mar. 1, 2020), <https://www.chicagotribune.com/news/breaking/ct-viz-illinois-ccl-shootings-tracker-20200227-ww4ldqwdjrd2ze63w3vzewioiy-htmlstory.html> (last visited July 12, 2023).

Minnesota goes a step further and identifies not just the infrequent crimes committed by permit holders, but also the proportion of crimes involving firearms. According to the Department of Public Safety, the state had 387,013 valid carry permits in 2021 – *and only 40 permits were revoked that year*.[27] In addition, 3,863 crimes were committed by people with carry permits. Press Release, *supra*. This sounds much larger than Texas or Florida, but that is because Minnesota greatly expands the definition of what constitutes a "crime." Indeed, of those 3,863 crimes, more than 60% were DWIs or other traffic offenses. *Id.* Just over 2% of the crimes – or about 80 of them – were crimes where a firearm was used to further the crime. *Id.* In other words, in Minnesota, only about 0.02% of people with carry permits used a firearm in furtherance of a crime in 2021.

The *Wolford* court relied in part on this evidence, which some of the associational Plaintiffs here presented to that court as *amici*, to conclude that there is indeed little threat from people with CCW permits:

> Although it is possible post-Bruen that more conceal carry permits are eventually issued in Hawai'i, that alone does not negate Plaintiffs' position that the vast majority of conceal carry permit holders are law-abiding. See, e.g., GOA Amicus Brief at 21-22 (stating that Texas in 2020 had [1,441] convictions for aggravated assault with a deadly weapon but only four of those convictions were people with valid concealed carry permits – roughly 0.278% of the total).

*Wolford*, 2023 WL 5043805, at *32. There are probably other states with similar data, but these five examples, along with the California State Sheriffs' Association's letter opposing the failed SB 918 (and the opposition to SB 2 by numerous police organizations this year) make the point: even if California could use "public safety" as a reason to curtail the right to carry in places that are not truly sensitive (and it cannot because *Bruen* forbids such interest balancing), people with

---

[27] Press Release, *BCA Releases 2021 Permit to Carry Annual Report, Data Provided to BCA by Minnesota Law Enforcement Agencies* (Mar. 1, 2022), <https://dps.mn.gov/divisions/ooc/news-releases/Pages/BCA-Releases-2021-Permit-to-Carry-Annual-Report.aspx>.

34

carry permits are dramatically more law-abiding than the population as a whole and are thus very unlikely to pose a criminal threat. The criminals California must worry about are already carrying illegally, and they do not bother to obtain permits. With SB 2, the State is punishing the law-abiding for going through a long legal process to exercise a constitutional right.

### D.   PRELIMINARY INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

 "A plaintiff's likelihood of success on the merits of a constitutional claim also tips the merged third and fourth factors decisively in his favor. Because 'public interest concerns are implicated when a constitutional right has been violated, ... all citizens have a stake in upholding the Constitution,'" *Baird*, 2023 WL 5763345, at *4 (citing *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).

When challenging government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] sharply in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). Thus, not only are Plaintiffs' rights at stake, but so are the rights of all Californians with CCW permits seeking to engage in conduct that SB 2 prohibits. Therefore, injunctive relief is in the public interest. *Klein*, 584 F.3d at 1208.

### 3.   CONCLUSION

SB 2 is an unmistakable unconstitutional attempt to nullify *Bruen*. For the aforementioned reasons, Plaintiffs respectfully request this Court to grant their motion for preliminary injunction.

Respectfully Submitted,

Dated:  September 29, 2023

**MICHEL & ASSOCIATES, P.C.**

*/s/ C.D. Michel*
C.D. Michel
Counsel for Plaintiffs

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

Dated:  September 29, 2023

**LAW OFFICES OF DON KILMER**

*/s/ Don Kilmer*

Don Kilmer
Counsel for Plaintiff Second Amendment
Foundation

## ATTESTATION OF E-FILED SIGNATURES

I, C.D. Michel, am the ECF User whose ID and password are being used to file this MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION. In compliance with Central District of California L.R. 5-4.3.4, I attest that all signatories are registered CM/ECF filers and have concurred in this filing.

Dated: September 29, 2023

*/s/ C.D. Michel*

C.D. Michel

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *May, et al. v. Bonta*
Case No.: 8:23-cv-01696 CJC (ADSx)

IT IS HEREBY CERTIFIED THAT:

      I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

      I am not a party to the above-entitled action. I have caused service of:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Robert L. Meyerhoff, Deputy Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Email: Robert.Meyerhoff@doj.ca.gov
     *Attorney for Defendant*

      I declare under penalty of perjury that the foregoing is true and correct.

Executed September 29, 2023.

_____
Laura Palmerin