C. D. Michel – SBN 144258
cmichel@michellawyers.com
Sean A. Brady – SBN 262007
sbrady@michellawyers.com
Konstadinos T. Moros – SBN 306610
kmoros@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile:   (562) 216-4445

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| RENO MAY, an individual; ANTHONY MIRANDA, an individual; ERIC HANS, an individual; GARY BRENNAN, an individual; OSCAR A. BARRETTO, JR., an individual; ISABELLE R. BARRETTO, an individual; BARRY BAHRAMI, an individual; PETE STEPHENSON, an individual; ANDREW HARMS, an individual; JOSE FLORES, an individual; DR. SHELDON HOUGH, DDS, an individual; SECOND AMENDMENT FOUNDATION; GUN OWNERS OF AMERICA; GUN OWNERS FOUNDATION; GUN OWNERS OF CALIFORNIA, INC.; THE LIBERAL GUN CLUB, INC.; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10, <br><br> Defendants. | Case No.: 8:23-cv-01696 CJC (ADSx) <br><br> **DECLARATION OF CLAYTON CRAMER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> **42 U.S.C. §§ 1983 & 1988** <br><br> Hearing Date:   December 4, 2023 <br> Hearing Time:   1:30 p.m. <br> Courtroom:      9 B <br> Judge:          Hon. Cormac J. Carney |

DECLARATION OF CLAYTON CRAMER

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*D.C. v. Heller,*
  554 U.S. 570 (2008) ................................................................ 1

*Ex parte Cheney,*
  90 Cal. 617, 27 P. 436 (1891); ................................................ 9

*Ex parte Luening,*
  3 Cal. App. 76; 84 P. 445 (1906). ........................................... 9

*In re Ramirez,*
  193 Cal. 633 (1924) ............................................................... 14

*McDonald v. Chicago,*
  561 U.S. 742 (2010) ................................................................ 1

*Mosby v. Devine,*
  851 A.2d 1031 (R.I. 2004) ...................................................... 1

*New York State Rifle & Pistol Assn, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022) ........................................................... 14

*People v. Rappard,*
  28 Cal.App.3d 302 (1972) ...................................................... 14

*State v. Sieyes,*
  168 Wash.2d 276 (Wash. 2010) ............................................... 1

*Young v. Hawaii,*
  992 F.3d 765 (9th Cir. 2021) .................................................... 1

**Statutes**

Acts of the General Assembly of the Province of New Jersey. ch. 226 at 187
  (1776) ................................................................................... 28

1 Records of the Colony of Rhode Island and Providence Plantations, in New
  England 94 (1856) .................................................................. 19

1 Records of the Governor and Company of the Massachusetts Bay in New
  England 190 (1853) ................................................................ 32

1 Records of the Governor and Company of the Massachusetts Bay in New
  England 190 (1853) ................................................................ 26

1 The Public Records of the Colony of Connecticut, 1636-1776 15 (1850) ........... 26

12 Statutes at Large; Being a Collection of All the Laws of Virginia 10 (1823) ..... 27

i

18 Colonial Records of the State of Georgia 7 (1910) ..............................26

2 Acts of the General Assembly of the Province of New Jersey ch. 155 at 362-363 (1761). ....................................................................................28

2 General Public Statutory Law and Public Local Law of the State of Maryland Ch. 96 at 1620-21 (1840); ...............................................................28

3 New-England Magazine 111 (1832). ....................................................25

4 Statutes at Large of South Carolina No. 1054 at 394-395 (1838).........27

7 Statutes at Large of South Carolina 417 (1840). ..................................33

7 Statutes at Large; Being a Collection of All the Laws of Virginia ch. 3 at 94-95 (1820). ....................................................................................27

A Collection of all the Public Acts of Assembly, of the Province of North-Carolina: Now in Force and Use 215 (1751) ................................................26

An Act to Prevent Gaming, and Horse Racing, Laws of Georgia 201 (1800).........27

An Act to suppress excessive and deceitful Gaming, 23 State Records of North Carolina: Laws 1715-1776 ch. 35 at 838-840 .........................................27

Colony of New Jersey, Acts of the Council and General Assembly of the State of New-Jersey 65 (1784) ..................................................................26

Compact with the Charter and Laws of the Colony of New Plymouth 115 (1836).32

Records Of The Colony And Plantation Of New Haven, From 1638 To 1649 131-132 (1857) ....................................................................................26

Records Of The Colony And Plantation Of New Haven, From 1638 To 1649 486 (1857) ....................................................................................32

State of Connecticut, Acts and Laws of the State of Connecticut, in America 144 (1786). ....................................................................................26

The Grants, Concessions, and Original Constitutions of the Province of New-Jersey 78 (Philadelphia: W. Bradford, 1752) ............................................26

**Other Authorities**

3 New-England Magazine 111 (1832). ....................................................25

Albert Bushnell Hart and Mabel Hill, *Camps and Firesides of the Revolution* 230 (1918). ....................................................................................29

American Library Association, https://www.ala.org/aboutala/before-1876 ...........30

Arna Bontemps Museum, The Oldest Museums in the World ...............................31

ii

DECLARATION OF CLAYTON CRAMER

California Assembly Concurrent Resolution No. 42. https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100ACR42 ...................................................................................................... 14

Charles H.J. Smith, Parks and Pleasure Grounds; or Practical Notes on Country Residences, Villas, Public Parks, and Gardens (1852). ......................................... 30

Claudia Aoraha, A new low for San Francisco: Cleaver-wielding convict terrorizes BART train passengers trapped in underwater tunnel by pacing up and down train threatening them, then slashing man in the back, [United Kingdom] Daily Mail, May 11, 2023 .................................................................. 21

Clayton E. Cramer, Race and Reporting: The Los Angeles Times in Early 1916 ... 10

Courthouse Lawn Shots Fatal To 4, [Marshall, Tex.] Marshall News Messenger, Nov. 14, 1955, 1 ....................................................................................... 17

David Alan Johnson, Founding the Far West: California, Oregon, and Nevada, 1840-1890 110 (1992 ................................................................................... 3

Davis McEntire, Residence and Race: Final and Comprehensive Report to the Commission on Race and Housing 269 (1960). ...................................................... 9

E. Benjamin Andrews, 3 History of the United States: From the Earliest Discovery of America to the Present Day 227-228 (1894) .................................................. 16

Eleni Balakrishnan, One dead in 24th Street BART Plaza shooting, Mission Local, December 18, 2022, .............................................................................. 20

Fanny S. Stone, ed., 1 Racine Belle City of the Lakes and Racine County Wisconsin 476 (1916). ............................................................................... 23

Four People Wounded, Palestine [Tex.] Daily Herald, Feb. 4, 1909, 2 ................ 17

Gabriel J. Chin, The Jena 6 and the History of Racially Compromised Justice in Louisiana, 44 Harvard Civil Rights-Civil Liberties Law Review, 369 ............... 17

H.W.S. Cleveland, Outline Plan of a Park System for the City of St. Paul (1885). 30

Harry Harris, Oakland: Woman shot near Fruitvale BART station, San Jose Mercury News, April 14, 2023, ............................................................... 20

Joanne B. Freeman, The Field of Blood: Violence in Congress and the Road to the Civil War "Author's Note" (2018) ....................................................... 16

John Robert Soennichsen, The Chinese Exclusion Act of 1882 127-128 (2011). ..... 8

John Thomas Scharf, 1 History of Western Maryland 130 (1882). ....................... 28

Jury Verdict Not Guilty, *Liberty* [Tex.] *Vindicator*, Feb. 11, 1910, 1 .................... 17

Katie Lauer, Teen arrested in sexual assault near Concord BART station, East Bay Times, August 7, 2023 ..................................................................... 20

DECLARATION OF CLAYTON CRAMER

LeeAnna Keith, . The Colfax Massacre: The Untold Story of Black Power, White Terror and the Death of Reconstruction xii (2008)................................................17

Neil Vigdor, Man Who Fatally Stabbed Woman on BART Platform Is Convicted of Murder, New York Times, March 10, 2020 ...........................................20

Parke Godwin, 1 A Biography Of William Cullen Bryant, With Extracts From His Private Correspondence 16-17 (1883). ..................................................24

Philadelphia Zoo, An American First........................................................30

Raymond W. Thorp, Bowie Knife 4 (1948)............................................16

Ronald A. Smith, Sports and Freedom: The Rise of Big-Time College Athletics 9-10 (1988................................................................................25

Samuel Charles Wiel, 2 Water Rights in the Western States: The Law of Prior Appropriation 1166 (3d ed. 1911).............................................................8

State of California, 1 Debates and Proceedings of the Constitutional Convention of the State of California, Convened at the City of Sacramento, Saturday, September 28, 1878 285 (1880). ...................................................................9

The Talaquah Slaughter, [Jonesboro, Tenn.] Herald and Tribune, May 2, 1872, 1.17

Update: Suspect in deadly shooting outside Lake Merritt BART station charged with murder, CBS San Francisco, August 15, 2023 ...........................................19

Woman shot dead near Oakland BART station, police say, KTVU, November 14, 2022 ..................................................................................21

Woman to Face Murder Charge, Waxahachie [Tex.] Daily Light, (Feb. 8, 1909)..17

DECLARATION OF CLAYTON CRAMER

1  <u>**DECLARATION OF CLAYTON CRAMER**</u>

2      1.    My M.A. in History is from Sonoma State University in California.

3  teach history at the College of Western Idaho.  I have nine published books, mostly

4  scholarly histories of weapons regulation.  My 18 published articles (mostly in law

5  reviews) have been cited in *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v.*

6  *Chicago*, 561 U.S. 742 (2010); *Jones v. Bonta,* 34 F.4th 704 (9th Cir. 2022) vacated

7  by *Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022)(remanded to the district court for

8  further proceedings consistent with Bruen); *Young v. Hawaii*, 992 F.3d 765 (9th

9  Cir. 2021) cert, granted by *Young v. Hawaii*, 142 S.Ct. 2895 (judgment vacated and

10  case remanded to the Ninth Circuit for further consideration in light of Bruen);

11  *State v. Sieyes*, 168 Wash.2d 276 (Wash. 2010); *Senna v. Florimont*, 196 N.J. 469

12  (N.J. 2008); *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004).  A comprehensive list of

13  my scholarly works and citations can be found at

14  https://claytoncramer.com/scholarly/journals.htm.

15      2.    In several cases, my work has been cited in defense of laws limiting

16  firearms ownership: State v. Roundtree (Wisc. 2021), State v. Christen (Wisc.

17  2021), King v. Sessions (E.D.Penn. 2018).  My work was also cited in the

18  McDonald v. Chicago (2010) dissent.[1]

19      3.    I am being compensated for services performed in the above-entitled

20  case at an hourly rate of $350 for expert declarations.  My compensation is not

21  contingent on the results of my analysis or the substance of any testimony.

22  **I.**    **The Origins of California Concealed Carry Laws**

23      **A.**    **The California Constitutional Convention (1849)**

24      4.    The delegates discussed what individual rights should be listed in the

25  state constitution's bill of rights.  Delegate Ord proposed, "Every person has a right

26  to bear arms for the defence of himself and the State." Delegate McCarver wanted

27  to add, "provided that they are not concealed arms." This is not surprising; in the

28

---

[1] *McDonald v. Chicago,* 130 S.Ct. 3022, 3132 (Breyer, J. diss.)

DECLARATION OF CLAYTON CRAMER

period before the Civil War, many states passed laws either prohibiting or restricting the concealed carrying of deadly weapons. State constitutional conventions often added such restrictions to existing arms guarantees to make sure that the legislature could ban what was increasingly regarded as a cowardly way of fighting-the use of "secret arms."[2]

5.     McCarver, however, also believed that it would be best if there were no provision preventing "the Legislature from regulating matters of this kind."[3]  He thought guaranteeing a right to bear arms was not "a proper subject for the Constitution." Other delegates agreed with McCarver that there should be no arms provision in the state bill of rights-but not because the state should have the power to regulate the carrying of weapons.  Delegate Sherwood argued that denying an individual the right to bear arms "would be null and void, inasmuch as it would be in opposition to the Constitution of the United States," and then quoted the Second Amendment. Sherwood thought an arms guarantee was unnecessary because the Second Amendment already protected such a right.

6.     Delegate Botts argued against adding the arms guarantee in this particular location in the state constitution because he feared that it might not be a strong enough protection; such a guarantee belonged in the section that specified the powers of the legislature. Botts also claimed that it made little sense to exclude it, "because it was contained in the Constitution of the United States.  After taking half-a-dozen provisions from that Constitution, word for word, such an objection came with rather a bad grace."[4]  "Even Delegate Sherwood was persuaded by this argument, admitting that the arms provision "directly touches the rights of every citizen."  When the convention voted on both Ord's proposal for a right to bear

---

[2] *See generally* Clayton E. Cramer, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM (1999).
[3] John Ross Browne, REPORT OF THE DEBATES IN THE CONVENTION OF CALIFORNIA, ON THE FORMATION OF THE STATE CONSTITUTION, IN SEPTEMBER AND OCTOBER, 1849 47 (1850).
[4] Id.

2

DECLARATION OF CLAYTON CRAMER

arms, and McCarver's amendment that the right not apply to concealed weapons, both proposals died-and with it, any possibility of adding a right to keep and bear arms to the California Constitution's bill of rights. ("The question was then taken, and both the amendment, and amendment to the amendment, were rejected.")[5]

7.     You cannot draw too strong a message from this series of back and forth discussions, but it appears that some delegates argued that there was no need for an individual right to keep and bear arms in California's Constitution, because the Second Amendment already protected such a right, and other delegates arguing that the right needed to be located elsewhere to be better protected. The only delegate who clearly spoke against a right to bear arms was McCarver.

8.     Today, McCarver is most remembered for another proposal he made a few minutes later: that blacks would be forever banned from living in California.[6] (Such provisions were added to many other state constitutions of the period;[7] McCarver even played a part in Oregon adopting such a ban while a member of the territorial legislature.[8])  In spite of considerable support from other delegates, this proposal did not pass the California Constitutional Convention.

### B.     California's First Concealed Weapon Law

9.     Not just mining camps, but even Gold Rush cities in California were pretty wild places, and the absence of an effective police force caused many Californians to regularly arm for self-defense.  Visitor J.D. Borthwick described how San Francisco was awash in places of entertainment with signs that announced, "No weapons admitted."  While Borthwick thought little of the entertainments available, he did describe why it was nonetheless worth going:

> if only to watch the company arrive, and to see the practical enforcement of the weapon clause in the announcements. Several doorkeepers were

---

[5] Id.

[6] Id., at 44, 48.

[7] Clayton E. Cramer, BLACK DEMOGRAPHIC DATA, 1790-1860: A Sourcebook 32-35 (1997).

[8] David Alan Johnson, FOUNDING THE FAR WEST: CALIFORNIA, OREGON, AND NEVADA, 1840-1890 110 (1992).

3

DECLARATION OF CLAYTON CRAMER

in attendance, to whom each man as he entered delivered up his knife or his pistol, receiving a check for it, just as one does for his cane or umbrella at the door of a picture-gallery. Most men draw a pistol from behind their back, and very often a knife along with it; some carried their bowie-knife down the back of their neck, or in their breast; demure, pious-looking men, in white neckcloths, lifted up the bottom of their waistcoat, and revealed the butt of a revolver; others, after having already disgorged a pistol, pulled up the leg of their trousers, and abstracted a huge bowie-knife from their boot; and there were men, terrible fellows, no doubt, but who were more likely to frighten themselves than any one else, who produced a revolver from each trouser-pocket, and a bowie-knife from their belt. If any man declared that he had no weapon, the statement was so incredible that he had to submit to be searched; an operation which was performed by the doorkeepers, who, I observed, were occasionally rewarded for their diligence by the discovery of a pistol secreted in some unusual part of the dress.[9]

10.   A search of newspapers of the period does show a lot of murders, gunfights, and knifings.  I can see why the California legislature felt that they had to do something.  But what?  The legislature debated a ban on concealed carry throughout the 1850s.  Even those who supported such laws often had a narrow notion of who needed to be restricted.  During debates in February of 1856, the state senator who represented Nevada County (appropriately, a derringer-shaped county in California's foothills) indicated that he was in support of a bill to ban concealed carry if it were for the purpose of disarming "Greasers."[10] ("Greasers" was a slang term used throughout the nineteenth and early twentieth century for Mexicans[11]). However, the concealed carry ban did not pass the legislature that year.

11.   Nothing happened on this subject until 1863. Did California have the authority to regulate the bearing of arms?  As the San Francisco newspaper the DAILY ALTA CALIFORNIA explained the perceived need:

During the thirteen years that California has been a State, there have

---

[9] J.D. Borthwick, *Three Years in Calafornia* [sic], 2 HUTCHINGS ILLUSTRATED CALIFORNIA MAGAZINE at 171-2, October 1857.
[10] *Letter From Sacramento,* [San Francisco] DAILY ALTA CALIFORNIA, FEBRUARY 19, 1856, 2.
[11] Win Blevins, DICTIONARY OF THE AMERICAN WEST 166 (2001).

4

DECLARATION OF CLAYTON CRAMER

been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. Heretofore there has been no law passed which would remedy the evil. Public opinion, as expressed through the action of our legislators, seems to have sanctioned the custom, barbarous though it be. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons. A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority, enacted the subjoined act, entitled "An Act to prohibit the carrying of concealed weapons."[12]

12.     The law banned concealed carrying of "any dangerous or deadly weapon" except for police officers or travelers.[13]   This law is similar to nature and language to laws passed mostly in the South, before the Civil War, to discourage dueling. (Yes, really: to discourage dueling, even though duelists did not conceal their weapons. The connection is real but very complex.)[14]

13.     Not surprisingly, the law was not universally followed.  Indeed, when I searched for "concealed weapon" in California newspapers from 1863 to 1870, there are hundreds of matches, some editorials complaining about the law's counterproductive effects, and many others involving violations of this law; there were doubtless more that did not make the newspapers.[15] An example of a criminal case: Police Court, *Daily Alta California*, November 13, 1868.  An example of an opposition editorial: Concealed Weapons, *Weekly Colusa Sun,* March 3, 1866.

14.     What is fascinating, however, is that some of the same newspapers that had supported passage of the law in 1863, by 1869 and 1870, realized that all the good intentions were not enough-that the law was in some respects counterproductive, violated the Second Amendment, and needed to be repealed.

---

[12] *City Items*, DAILY ALTA CALIFORNIA, June 26, 1863, 1.
[13] Theodore Henry Hittell, 1 *The General Laws of the State of California, From 1850 to 1864, Inclusive* 261 (1865) (citing Criminal Practice Act §§ 1585-1586).
[14] Cramer, op. cit., 52-62.
[15] California Digital Newspaper Collection, https://cdnc.ucr.edu/?a=q&hs=1&r=1&results=1&txq=concealed+weapons&dafdq=&dafmq=&dafyq=1863&datdq=&datmq=&datyq=1870&puq=&txf=txIN&ssnip=txt&oa=&oa=1&e=-------en--20--1--txt-txIN-concealed+weapons-------1

DECLARATION OF CLAYTON CRAMER

15.     Unlike the other states that were early adopters of concealed weapon bans, California repealed its ban on concealed carry in 1870 with no legislative explanation as to why it was doing so.  Even more peculiar, the act repealing the law provided that any charges still pending would continue to trial "as if said Act had not been repealed."[16]

16.     Newspaper coverage provides the only clues as to why the law was repealed, and yet existing charges were allowed to go forward.  Less than six years after that editorial from the Daily Alta California supporting the concealed weapons ban, the same newspaper ran an editorial arguing that the law was both impossible to enforce and unconstitutional because it violated the Second Amendment:

> The Federal Constitution says "the right of the people to keep and bear arms shall not be infringed." The purpose of that provision, it is well known, was to prevent the practice common in Europe in the last century of seizing all the arms in the possession of the common people, especially in times of political disaffection. As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure. Under the rules of general literary interpretation of the Constitutional provision, it is evident that the prohibition of carrying concealed weapons is an infringement of the right to bear arms.[17]

17.     This being a long time ago, the editorial writer recognized that the U.S. Constitution was not living, breathing, and constantly mutating.  Instead:

> The rules of legal interpretation, however, require us to find out first what 'the right to keep and bear arms' was in 1791 when this provision was adopted….  We have examined the question, and our opinion… is that in 1791 there was a right of keeping and bearing arms, that it was not limited in the matter of carrying concealed weapons, and that our statute is an infringement of the right.

18.     The editorial went on to argue that the statute was in error because it criminalized the carrying of concealed weapons even when there was no criminal intent in carrying a weapon.  They argued instead that putting a gun in your pocket is a convenience: "To put a thing in its customary and convenient receptacle is not

---

[16] STATUTES OF CALIFORNIA… 1869-70 ch. 63 at 67 (1870).
[17] *The Carrying of Concealed Weapons*, DAILY ALTA CALIFORNIA, March 13, 1869, 2.

6

DECLARATION OF CLAYTON CRAMER

concealment. Concealment is a matter of motive. An article dropped by accident in an out of the way place and lost irretrievably is not concealed."[18]

19.     Finally, the editorial argued that the law:

> bothers the good and assists the bad. It disarms the orderly citizen and places no obstruction in the way of the robber. Homicides were very common some years ago in California, and their frequency was partly due to the general custom among the miners of carrying revolvers and large knives. They were mostly single men, who would occasionally drink freely, and under the influence of strong liquor they did not hesitate to take life in case of a quarrel. But of late years, families have increased, dissipation has decreased, and drunken affrays are more rare. At the same time, robbery on the highway, and especially in this city, is more frequent.[19]

20.     Instead, the editorial argued that repealing the law would only cause an increase of "killing of robbers in self-defence, and that would be a benefit to the community."[20]

21.     The following year, the SACRAMENTO DAILY UNION published an editorial along much the same lines, discussing the 1870 repeal of the concealed weapon ban:

> There is reason to believe it was generally observed by the vast majority of good citizens. There is as good reason to believe it was not observed by the vast majority of roughs, fighting men, and predatory characters. In many cases of assault between quiet citizens and these last named characters, it was found that the good citizen had to defend himself unarmed against the predacious one with arms, the former suffering for his respect of the law. It was also found that the police were apt to arrest any quiet citizen on whom they discovered concealed weapons, while they paid little attention to the roughs who were known to carry arms habitually.[21]

22.     The editorial explained that

> a law essentially good in theory, became an abomination in practice, in that it placed the peaceful citizen completely at the mercy of a class whose offenses against order it was intended to check, but did not,

---

[18] Id.
[19] Id.
[20] Id.
[21] *Concealed Deadly Weapons*, SACRAMENTO DAILY UNION, December 16, 1870, 2.

7

DECLARATION OF CLAYTON CRAMER

owing to the remissness in duty of the guardians of the law.[22]

23.     Sacramento's experience with criminals was the immediate cause of the repealing movement… where bands of armed roughs, scorning the law against carrying concealed weapons, were perpetrating highway robberies on quiet, unarmed citizens, who could not prepare for self-defense without danger of being arrested and fined every day.[23]

24.     The editorial acknowledged that one of the good things hoped for had happened in the intervening years:

> It was reasoned with much plausibility that if the roughs once knew that quiet citizens might prepare to defend themselves without danger of being punished for misdemeanor, the bare suspicion that such a person had about him a weapon would disarm the roughs and prevent robberies. This has in fact been one of the results.[24]

**C.     The California Constitutional Convention (1878)**

25.     California held another constitutional convention in 1878. The 1849 constitution seemed increasingly inadequate because of questions about water rights and the "Chinese problem."[25]

26.     The 1878 convention seems not to have even discussed the question of a right to keep and bear arms-except for one startling provision. The convention was divided between a conservative, generally wealthy group, and what became known as "the Workingmen," who represented a populist collection of white laborers, intent on driving Asian immigrants from California.[26]  They made many proposals that are horrifying in their racism today and became part of the 1879 California Constitution.

27.     Of most relevance to gun control was their demand that aliens who

---

[22] Id.
[23] Id.
[24] Id.
[25] Samuel Charles Wiel, 2 WATER RIGHTS IN THE WESTERN STATES: THE LAW OF PRIOR APPROPRIATION 1166 (3d ed. 1911); John Robert Soennichsen, THE CHINESE EXCLUSION ACT OF 1882 127-128 (2011).
[26] Emily J. Zackin, LOOKING FOR RIGHTS IN ALL THE WRONG PLACES: WHY STATE CONSTITUTIONS CONTAIN AMERICA'S POSITIVE RIGHTS 200 (2013).

8

DECLARATION OF CLAYTON CRAMER

could not become citizens would be prohibited from bearing arms. Delegate O'Donnell introduced this request as a constitutional provision: "No alien who cannot become a citizen of the United States shall be allowed to bear arms."[27] What sort of aliens could not become citizens of the United States?  Until 1952, no Oriental (as persons of East Asian ancestry were then described) could become a naturalized citizen.[28]  If you were born in the United States, you were a natural-born citizen, but an immigrant from the Far East would always be an alien. O'Donnell's proposal was "Referred to Committee on Chinese" where it seems to have silently died, or at least this text appears none of the three volumes of the Debates that I could find.[29]

### D.    California's Second Concealed Weapon Law & Pancho Villa

28.    Between 1870 and 1917, there was no statewide regulation of concealed carry, but some localities required a license to carry concealed and a fair number of convictions appear, with some associated case law.[30]  Ex parte Cheney (Ca. 1891) upheld the ban with the interesting admission: "It is a well-recognized principle in government that the police requirements of a city are different from those of the state at large, and that stricter regulations are essential to the good order and peace of a crowded metropolis than are required in the sparsely peopled portions of the country."[31]

29.    In the fiscal year ending June 30, 1910, there were 276 convictions across the state for concealed weapons-but these are in only 12 of California's 58

---

[27] State of California, 1 DEBATES AND PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF CALIFORNIA, CONVENED AT THE CITY OF SACRAMENTO, SATURDAY, SEPTEMBER 28, 1878 285 (1880).

[28] Davis McEntire, RESIDENCE AND RACE: FINAL AND COMPREHENSIVE REPORT TO THE COMMISSION ON RACE AND HOUSING 269 (1960).

[29] State of California, 1, 2, 3 DEBATES AND PROCEEDINGS OF THE CONSTITUTIONAL CONVENTION OF THE STATE OF CALIFORNIA, CONVENED AT THE CITY OF SACRAMENTO, SATURDAY, SEPTEMBER 28, 1878 (1880).

[30] Ex parte Cheney, 90 Cal. 617, 27 P. 436 (1891); Ex parte Luening, 3 Cal. App. 76; 84 P. 445 (1906).

[31] Ex parte Cheney, 90 Cal. 617 (Cal. 1891).

9

1   counties.[32]  While the counties without convictions might have simply been very

2   law-abiding, it is more likely that most did not have such bans.

3       30.    In 1917, California again passed a concealed weapon statute.  Instead

4   of completely prohibiting concealed carry (as the 1863 law had done), this law

5   made it a misdemeanor to carry concealed firearms in cities without a license—and

6   a felony for those previously convicted of a felony.  (It was still legal to carry

7   concealed in unincorporated areas.)[33]   Also for the first time, California required

8   registration of handgun sales, with a "Dealers' Record of Sale" mailed to local law

9   enforcement.[34]

10      31.    What provoked the legislature to again pass a statewide law?  I spent a

11  bit of time reading through the 1917 legislative journals trying to find the reason.[35]

12  As is usual, with legislative journals, what is present are details of passage,

13  readings, committee and house votes, without any discussion of intent.  Newspaper

14  coverage was no more illuminating.

15      32.    In the previous year, California experienced a burst of anti-Mexican

16  sentiment as a result of Pancho Villa's cross-border raid on Columbus, New

17  Mexico.  Even conservative Republican newspapers such as the *Los Angeles Times*

18  (this was obviously a long time ago), which was far less prejudiced about race than

19  most newspapers of the era, went off the deep end in their fear and hatred of

20  Mexicans, many of whom were refugees from the Mexican Revolution.[36]

21      33.    In Los Angeles, Police Chief Snively feared that Mexicans

22

23  [32] State of California, FOURTEENTH BIENNIAL REPORT OF THE BUREAU OF
24  LABOR STATISTICS OF THE STATE OF CALIFORNIA, 1909-1910 380 (1910).
    [33] James H. Deering, SUPPLEMENT TO THE CODES AND GENERAL LAWS OF THE
25  STATE OF CALIFORNIA Act 889 §§ 3, 6 at 651, 652(1917).
    [34] Id. § 7 at 652.
26  [35] State of California, JOURNAL OF THE ASSEMBLY DURING THE FORTY-SECOND
    SESSION OF THE LEGISLATURE OF THE STATE OF CALIFORNIA 353, 797, 823, 827,
27  894, 904, 955, 974, 1669, 1961, 2290, 2405 (1917).
    [36] Clayton E. Cramer, *Race and Reporting: The Los Angeles Times in Early 1916*,
28  available at http://www.claytoncramer.com/unpublished/LATimesAndRace.pdf.

DECLARATION OF CLAYTON CRAMER

sympathetic to Pancho Villa might take up arms, and gave orders that lacked any legal authority:

> Acting under orders from Chief Snively, the police department yesterday took drastic action to prevent any local outburst on the part of Villa sympathizers. The cordon of officers thrown about the Mexican quarter was extended and reinforced and the embargo against the sale of arms and liquor to Mexicans amplified and made general….[37]

34.   The article described the measures taken as being for the benefit of Mexicans who have become excited over the action of the Federal government against Villa and who have made threats of vengeance and violence:

> No liquor will be sold to Mexicans showing the least sign of intoxication.
>
> No guns can be sold to Mexicans and all dealers who have used guns for window displays have been ordered to take them from the windows and to show them to no Mexican until the embargo is lifted.[38]

35.   At least part of what might have provoked Chief Snively unlawful actions was that:

> Three admitted anarchists, priding themselves upon being disciples of the Magon brothers and all heavily armed, were taken into custody on charges of carrying concealed weapons and were given sixty-day sentences by Police Judge White….[39]

36.   The Magon brothers had no connection to Villa.  Quite the opposite, the Magon brothers regarded Villa as "just another parasite" preventing a socialist revolution in Mexico.[40]   Chief Snively seems to have missed these distinctions. Nonetheless, there were some significant political demonstrations of pro-Villa support among Mexicans living in Los Angeles, and it appears that Mexicans immigrants were buying guns in what appeared to be unusual numbers.

37.   News accounts suggest that these purchases, primarily of "heavy revolvers," might have been for defensive purposes.  The Villa raid had inflamed

---

[37] Draw Teeth of War Breeders, LOS ANGELES TIMES, March 14, 1916, 2:1.
[38] Id.
[39] Id.
[40] Colin M. MacLachlan, ANARCHISM AND THE MEXICAN REVOLUTION: THE POLITICAL TRIALS OF RICARD FLORES MAGON IN THE UNITED STATES 64 (1991).

11

anti-Mexican sentiment among Americans all along the border, and many Mexicans

appeared to be buying handguns because they were afraid of being attacked, not to

be aggressive.[41]  Was the statewide concealed weapon permit law—and the

handgun registration requirement—driven by the somewhat understandable concern

about Pancho Villa supporters in California?  It is an interesting question, and one

that requires more research.  A search of California newspapers from 1915 to 1917

for "concealed handgun" or "concealed weapon" found no matches relevant to

legislative intent for the 1917 law.[42]

### E.    California's Third Concealed Weapon Law

38.    What is far more certain is what motivated the next revision of

California's gun control laws, a package passed in 1923 that included the ancestor

of California's current discretionary concealed weapon permit law.[43] A variation of

the Uniform Revolver Act passed in several American states in the 1920s, this law

enhanced the punishments for various crimes committed with a handgun,[44]  made

carrying a handgun without a permit evidence of intention to commit a felony,[45]

required a concealed weapon permit anywhere in the state (not just in cities),[46]  and

also prohibited possession of concealable handguns by anyone who was not a U.S.

---

[41] *Draw Teeth of War Breeders,* LOS ANGELES TIMES, March 14, 1916, at 2:1,
2:2; State Troops Ready for War, LOS ANGELES TIMES, March 27, 1916, at 1:9; For
the Safety of Los Angeles, LOS ANGELES TIMES, March 16, 1916, at 2:4.

[42]    *California   Digital   Newspaper   Collection*,   http://cdnc.ucr.edu/cgi-
bin/cdnc?a=q&hs=1&r=1&results=1&txq=concealed+handgun&txf=txIN&ssnip=t
xt&o=20&dafdq=&dafmq=&dafyq=1915&datdq=&datmq=&datyq=1917&puq=&
e=--1915---1917--en--20--1--txt-txIN-concealed+weapon------,    and
http://cdnc.ucr.edu/cgi-
bin/cdnc?a=q&hs=1&r=1&results=1&txq=%22concealed+weapon%22&txf=txIN
&ssnip=txt&o=20&dafdq=&dafmq=&dafyq=1915&datdq=&datmq=&datyq=1917
&puq=&e=--1915---1917--en--20--1--txt-txIN-concealed+handgun------,    last
accessed April 7, 2015.

[43] Stats. 1923, ch. 339, p. 695, the DANGEROUS WEAPONS CONTROL LAW of
1923.

[44] Id., § 3.

[45] *Id.*

[46] Stats. 1923, ch. 339, § 5.

12

DECLARATION OF CLAYTON CRAMER

1    citizen.[47]

2         39.    What motivated passage of this law?  Legislative reports, are as usual,

3    astonishingly sparse on the reasons, but as is sometimes the case, newspaper

4    coverage is more forthcoming.  Governor Friend W. Richardson signed the law

5    after R. T. McKissick, "president of the Sacramento Rifle and Revolver Club,"

6    argued that this law preserved the "rights of those using firearms for competition or

7    hunting or for protection in outing trips."  McKissick was concerned that a more

8    stringent gun control law might be passed if Governor Richardson vetoed this one.

9    McKissick admitted that the provision prohibiting handgun ownership by non-

10   citizens was of questionable constitutionality, but that he believed that if it was

11   upheld, it would have a beneficial effect "in checking *tong* [gang] wars among the

12   Chinese and vendettas among our people who are Latin descent."[48]

13        40.    Why did Richardson sign a law with racist intentions?  When

14   Richardson ran for governor in 1922, he would not answer the question of whether

15   he was a member of the Ku Klux Klan—but the Klan enthusiastically endorsed

16   Richardson.[49]   Perhaps Richardson had a hood and robe in his closet only brought

17   out for special occasions.

18        41.    With such blunt statements of racist intent, not surprisingly, the

19   discriminatory effect of the new law was immediately recognized.  The Mexican

20   consul in Los Angeles protested the alien handgun ban, since "a large proportion of

21   the foreigners in California were of Mexican descent."[50]   Mexican immigrants,

22   being white, could at least apply for citizenship.  Asian immigrants were ineligible

23   for naturalization—and therefore were breaking the law if they owned a handgun.

24        42.    The constitutionality of the alien handgun ban was challenged quite

25

26   _____
     [47] Stats. 1923, ch. 339, § 2.
     [48] *New Firearms Law Effective on August 7*, SAN FRANCISCO CHRONICLE, July
27   15, 1923, at 3, col. 1.
     [49] David M. Chalmers, HOODED AMERICANISM: THE HISTORY OF THE KU KLUX
28   KLAN 124 (1981, 3rd ed.).
     [50] Ricardo Romo, EAST LOS ANGELES: HISTORY OF A BARRIO 157 (1983).

DECLARATION OF CLAYTON CRAMER

1   soon after the new law took effect.  A Mexican citizen was convicted of possession

2   of a .25 ACP pistol and sentenced to one to five years in prison.  The California

3   Supreme Court upheld the conviction in 1924.[51]  And yet, in 1972, the California

4   Court of Appeals correctly determined that the handgun ban violated the equal

5   protection clause of the Fourteenth Amendment.  (The rest of the package of laws

6   passed as part of that same bill was allowed to stand.)[52]

7        43.    California legislators did eventually admit the racism.  "Among other

8   things, these laws denied the Chinese in California the right to own land or

9   property, the right to vote, and the right to marry a white person, denied children of

10  Chinese descent [*sic*] access to public schools, denied Chinese immigrants the right

11  to bear arms."[53] [emphasis added]

12  **II.    What Dates Matter?**

13       44.    While the Bruen opinion held that "[W]e have generally assumed that

14  the  scope of the protection applicable to the Federal Government and States is

15  pegged to the public understanding of the right when the Bill of Rights was adopted

16  in 1791,"[54] they also admitted that "that there is an ongoing scholarly debate on

17  whether courts should primarily rely on the prevailing understanding of an

18  individual right when the Fourteenth Amendment was ratified in 1868 when

19  defining its scope."[55] In the dispute adjudicated in Bruen, the difference did not

20  matter: "the public understanding of the right to keep and bear arms in both 1791

21  and 1868 was, for all relevant purposes, the same with respect to public carry."[56]

22

23

24       [51] *In re Ramirez*, 193 Cal. 633 (1924).

25       [52] *People v. Rappard*, 28 Cal.App.3d 302 (1972).

26       [53]    California    Assembly    Concurrent    Resolution    No.    42.
     https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=200920100AC

27   R42

28       [54] *New York State Rifle & Pistol Assn, Inc. v. Bruen*, 142 S. Ct. 2111, 2138 (2022).
         [55] Id., at 2139.
         [56] Id.

14

### III.   A History of "Sensitive Places" in Second Amendment Jurisprudence

45.   What are "sensitive places"?  Heller tells us:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.[57]

46.   The accompanying footnote tells us: "We identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."  Because this question was not briefed in Heller, which concerned only the right have a pistol in one's home, it seems more accurate to say that this was not only not "exhaustive," but of questionable value for determining what are properly considered "sensitive places."  Bruen's discussion of "sensitive places" is primarily to reject a broad definition of the term:

> Although we have no occasion to comprehensively define "sensitive places" in this case, we do think respondents err in their attempt to characterize New York's proper-cause requirement as a "sensitive-place" law. In their view, "sensitive places" where the government may lawfully disarm law-abiding citizens include all "places where people typically congregate and where law-enforcement and other public-safety professionals are presumptively available."… But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below…  Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a "sensitive place" simply because it is crowded and protected generally by the New York City Police Department.[58]  [emphasis added]

47.   What are "sensitive places"?  This question is large enough that it can be examined in far more detail than anyone would want to read.  Suffice it to say

---

[57] *D.C. v. Heller*, 554 U.S. 570 (2008).
[58] *N.Y. State Pistol & Rifle Association v. Bruen* (2022).

DECLARATION OF CLAYTON CRAMER

that Bruen disposed of the question so quickly as to suggest the question was only answered for three places:

> Although the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions.[59] [emphasis added]

48.     Legislative bodies, where short-tempered persons have a history of turning policy disputes into violent attacks[60] would seem a good example of a "sensitive place" where a weapon might be inappropriate.  Bruen's list of "sensitive places" ("legislative assemblies, polling places, and courthouses") is hardly proof that the Court has given a final word on the subject and it does not include government buildings in general.  Alternatively, the absence of such regulation could also be interpreted as meaning that there is no historical tradition in favor of "government buildings" in general being sensitive areas.

49.     That some legislative bodies in the colonial period did restrict arms possession in their presence might well be evidence in support of such areas being "sensitive areas."  Certainly, the way Bolsheviks intimidated the delegates at the first Duma after the overthrow of the Czar is a powerful lesson: "[I]n the ensuing chaos, a sailor on guard raised his rifle and took aim at a stout SR delegate from

---

[59] Id.

[60] Rep. Preston Brooks' caning of Sen. Charles Sumner on the floor of the Senate; E. Benjamin Andrews, 3 HISTORY OF THE UNITED STATES: FROM THE EARLIEST DISCOVERY OF AMERICA TO THE PRESENT DAY 227-228 (1894); "Many years ago, when I began researching this book , it was far less timely and far more puzzling. There seemed to be so much violence in the House and Senate chambers in the 1830s, 1840s, and 1850s.  Shoving. Punching. Pistols. Bowie knives. Congressman brawling in bunches while colleagues stood on chairs to get a good look. At least once, a gun was fired on the House floor."  Joanne B. Freeman, THE FIELD OF BLOOD: VIOLENCE IN CONGRESS AND THE ROAD TO THE CIVIL WAR "Author's Note" (2018); Speaker of the Arkansas House engaged in a fatal knife fight on the floor with another representative. He was expelled for conduct unbecoming of a member.  Raymond W. Thorp, BOWIE KNIFE 4 (1948).

16

DECLARATION OF CLAYTON CRAMER

1  Moscow, Osip Minor, only to be stopped from squeezing the trigger at the last

2  second by a more sober comrade."[61]

3  　　　　50.　　Polling places have a long history of political passions leading to

4  violence.[62]  Courthouses are often hotbeds of anger and violence.[63]

5  　　　　51.　　Neither Heller nor Bruen makes any mention of government buildings

6  in general.  Courthouses are government buildings; legislative bodies are

7  governments; in some places polling places are in government buildings; these are

8  only a subset of government buildings.

9  　　　　52.　　We also have pre-1791 examples that suggest government buildings

10  were not necessarily "sensitive places."  This letter from George Washington:

11  　　　To Each County Lieutenant in the Northern District

12  　　　Mount Vernon, August 2, 1755.

13  　　　Sir: I intend myself the honour of waitg. upon your County, in order to
14  　　　exercise the Militia; and shou' d be glad if you wou'd appoint your
15  　　　Officer's to meet me at the Court Ho., or some other convenient place
    　　　with a Firelock, Ammunition, &c. on the of September next, and the

16

17

18  　　　[61] Alexander Rabinowitch, THE BOLSHEVIKS IN POWER: THE FIRST YEAR OF SOVIET RULE IN PETROGRAD 122 (2007).

19  　　　[62] Whites attacked the Grant Parish courthouse in a dispute about election
20  results.  After accepting surrender of the blacks inside the courthouse they murdered 150 of them.  Gabriel J. Chin, *The Jena 6 and the History of Racially Compromised*
21  *Justice in Louisiana*, 44 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REVIEW, 369; LeeAnna Keith, . THE COLFAX MASSACRE: THE UNTOLD STORY OF BLACK
22  POWER, WHITE TERROR AND THE DEATH OF RECONSTRUCTION xii (2008).

23  　　　[63] Miss Verna Ware opened fire in the Gatesville courthouse in 1909, killing the man she accused of seducing her, two others not involved in the case and wounding
24  a fourth. *Woman to Face Murder Charge*, WAXAHACHIE [Tex.] DAILY LIGHT, Feb. 8, 1909, 1; *Four People Wounded*, PALESTINE [Tex.] DAILY HERALD, Feb. 4, 1909,
25  2; Jury Verdict Not Guilty, *Liberty* [Tex.] *Vindicator*, Feb. 11, 1910, 1.  Exchange of gunfire from inside the courthouse left seven of the eleven dead, with 16 or 17
26  wounded. *The Talaquah Slaughter*, [Jonesboro, Tenn.] Herald and Tribune, May 2, 1872, 1.  The murderer shot to death his wife, her father, and her uncle as they left
27  the courthouse from a grand jury hearing at which the murderer was apparently under investigation for beating his wife. *Courthouse Lawn Shots Fatal To 4,*
28  [Marshall, Tex.] MARSHALL NEWS MESSENGER, Nov. 14, 1955, 1.  Alas, I can cite many more if needed.

17

DECLARATION OF CLAYTON CRAMER

Militia properly accoutre'd, the day following. I am Sir, etc.[64] [emphasis added]

## IV.   SB 2

53.     This new law contains "several places" wherein a concealed carry licensee may not lawfully carry.  The Legislative Counsel's Digest includes: "an unloaded firearm into, or upon the grounds of, any residence of the Governor, any other constitutional officer, or Member of the Legislature" plus many other locations. [emphasis added]  This looks like the counsel mischaracterized the bill.

54.     The actual text of the new law contains provisions that certainly fit into the "sensitive places" standard, although even some of these might be arguable. § 171b. (a) prohibits carrying of a firearm in public buildings "or at any meeting required to be open to the public."  Certainly this fits into the legislative or courthouse standard.  Legislative meetings and public hearings in general bring out the worst in people; the knowledge that firearms are present might intimidate participants even if those weapons were concealed.  I note a pre-1791 law of relevance: "Because of the danger of Indian attack, and because much of the population was neglecting to carry guns, every person above eighteen years of age (except magistrates and elders of the churches) were ordered to "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets, upon paine of 12d. for every default."[65]   Perhaps colonial Americans were calmer than Californians.  I have sat in legislative hearings in the Idaho State Capitol where one of those getting up to speak during public comment (and not about a gun law) had an openly holstered handgun; the Idaho State Police officer present at the meeting seemed unconcerned.

---

[64] 1 The WRITINGS OF GEORGE WASHINGTON 158 (1931)
[65] 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (1853).

18

### A.   Parking Associated with or Adjacent to Prohibited Areas

55.   Many of the prohibited areas include parking adjacent to or associated with the prohibited area.  I am unaware of any similar or analogous restrictions on arms possession in the time periods identified by Bruen as relevant.  This is unsurprising.  People walked almost everywhere in the cities (small as they were by modern standards) and villages.  Persons on horseback would have "parked" their vehicles on public streets in front of buildings into which they might enter.

### B.   Public Transit

56.   § 171.7(a) prohibits possession in any public transit facility.  There is no equivalent pre-1791 law because there was no public transit.  As close as there is to an analogous law is a 1636/7 Massachusetts staute: "And no person shall travel above one mile from his dwelling house, except in places wheare other houses are neare together, without some armes, upon paine of 12d. for every default."[66]   Also, a 1631 Massachusetts law ordered "that noe [person] shall travel single betwixte [this plantations] and Plymouthe, nor without some armes, though 2 or 3 togeathr."[67]   Rhode Island: "It is ordered, that noe man shall go two miles from the Towne unarmed, eyther with Gunn or Sword; and that none shall come to any public Meeting without his weapon."[68]

57.   Travel on public transit is not terribly safe, or at least not safe enough that it is unreasonable for a licensee to not be armed.  A few examples just from BART:

- • "The suspect arrested in a fatal shooting outside the Lake Merritt BART station in Oakland last week is now facing a murder charge, according to authorities."[69]

---

[66] Id.

[67] Id., at 85.

[68] 1 RECORDS OF THE COLONY OF RHODE ISLAND AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 94 (1856).

[69] *Update: Suspect in deadly shooting outside Lake Merritt BART station charged with murder*, CBS SAN FRANCISCO, August 15, 2023,

19

DECLARATION OF CLAYTON CRAMER

- "A 17-year-old boy was arrested in connection to an alleged rape near the Concord BART station Friday morning, authorities said.  BART police reported that the assault happened in a BART parking structure shortly before noon Friday. An active investigation, including review of surveillance video, is currently underway, according to agency spokesperson Anna Duckworth."[70]

- "An afternoon shooting at the southwest 24th Street BART plaza today left one person dead, officials have confirmed.  Two suspects are at large, according to BART spokesperson James Allison. BART police are leading an investigation."[71]

- "Man Who Fatally Stabbed Woman on BART Platform Is Convicted of Murder."[72]

- "Oakland: Woman shot near Fruitvale BART station."[73]

---

https://www.cbsnews.com/sanfrancisco/news/update-suspect-in-deadly-shooting-outside-lake-merritt-bart-station-charged-with-murder/, last accessed September 13, 2023.

[70] Katie Lauer, *Teen arrested in sexual assault near Concord BART station*, EAST BAY TIMES, August 7, 2023, https://www.eastbaytimes.com/2023/08/05/teen-arrested-in-sexual-assault-near-concord-bart-station/, last accessed September 13, 2023.

[71] Eleni Balakrishnan, *One dead in 24th Street BART Plaza shooting*, MISSION LOCAL, December 18, 2022, https://missionlocal.org/2022/12/one-dead-sf-bart-plaza-shooting/, last accessed September 13, 2023.

[72] Neil Vigdor, *Man Who Fatally Stabbed Woman on BART Platform Is Convicted of Murder*, New York Times, March 10, 2020, https://www.nytimes.com/2020/03/10/us/john-cowell-trial-nia-wilson.html, last accessed September 13, 2023.

[73] Harry Harris, *Oakland: Woman shot near Fruitvale BART station, San Jose Mercury News,* April 14, 2023, https://www.mercurynews.com/2023/04/14/oakland-woman-shot-near-fruitvale-bart-station/, last accessed September 13, 2023.

DECLARATION OF CLAYTON CRAMER

- "Cleaver-wielding convict terrorizes BART train passengers trapped in underwater tunnel by pacing up and down train threatening them, then slashing man in the back."[74]

- "A woman was shot and killed in Oakland last night, police said. Officers were called to 40th Street near the MacArthur BART station just before 8 p.m. after receiving a ShotSpotter alert. They found the woman at the scene who had been shot by an unknown person, they said."[75]

58.    I only searched for serious crimes on BART because it has an easy search acronym.  I have been the victim of a robbery and a battery that put my left arm in a cast for six weeks on a Santa Monica Municipal Bus in the 1960s; I am confident that a search for crimes on public transit systems other than BART would provide lots of other preventable tragedies.

59.    It is not just that a licensee might protect herself from a crime but might well protect others under attack.  The protective effects of keeping violent criminals afraid of a victim that shoots back is also a free rider issue; everyone benefits when violent criminals do not know which other persons in the bus, train carriage, transit platform or parking lot may threaten or actually shoot back.  This exchange of gunfire puts other passengers potentially at risk, but so does a police officer and the law allows them to be armed.

---

[74] Claudia Aoraha, *A new low for San Francisco: Cleaver-wielding convict terrorizes BART train passengers trapped in underwater tunnel by pacing up and down train threatening them, then slashing man in the back,* [United Kingdom] Daily Mail, May 11, 2023, https://www.dailymail.co.uk/news/article-12074149/Cleaver-wielding-convict-terrorizes-BART-train-passengers-trapped-underwater-tunnel.html, last accessed September 13, 2023.

[75] *Woman shot dead near Oakland BART station, police say, KTVU,* November 14, 2022, https://www.ktvu.com/news/woman-shot-dead-near-oakland-bart-station-police-say, last accessed September 13, 2023.

DECLARATION OF CLAYTON CRAMER

60.     § 26230 lists several places where licensees may not be armed.  Some are clearly contrary to Bruen's standards; I am aware of no pre-1791 statutes similar to or analogous to them.  Bruen puts the burden is on California to produce such.

**C.     Preschool or Child Care Facility**

61.     § 26230(a)(2): "A building, real property, or parking area under the control of a preschool or childcare facility, including a room or portion of a building under the control of a preschool or childcare facility."

62.     There are no pre-1791 equivalent laws because there were no equivalent facilities.  I have never seen a preschool or child care facility referenced in pre-1791 America because small children were generally under the care and supervision of parents.

**D.     Parks**

63.     (a)(12): "A park, athletic area, or athletic facility that is open to the public."

64.     There are no equivalent laws although there were equivalent locations such as the commons of most towns.

**E.     Hospitals**

65.     (a)(7): "A building, real property, and parking area under the control of a public or private hospital or hospital affiliate, mental health facility, nursing home, medical office, urgent care facility, or other place at which medical services are customarily provided."

66.     The very first hospitals appear before 1791, but they are rare.  I have never seen a law restricting arms possession in such places.

**F.     Bars**

67.     "A building, real property, and parking area under the control of a vendor or an establishment where intoxicating liquor is sold for consumption on the premises."  There are no bans on firearms in bars before 1791 of which I am aware. Bruen puts the burden of proof on California.  Alcohol and firearms should not mix,

DECLARATION OF CLAYTON CRAMER

but Colonial and early Republic practice shows that drinking while armed was widespread, even if unwise.  There are many examples both before 1791 and before 1868:

> We met people coming from a militia muster, drunk, and staggering along the lanes and paths; these unhappy souls have had their camp-meeting, and shout forth the praises of the god of strong drink: glory be to God, we have our camp-meetings too of longer continuance, and more and louder shouting of glory, and honour, and praises to the God of the armies of the earth.[76]  [emphasis added]

68.    And:

There is no space for a detailed examination of the charges against the courage of the Virginians of the seventeenth century and of the poor quality of the militia. There were only a few occasions when the militia was called out prior to the French and Indian War, but the service was in each case as satisfactory as a militia is apt to be. Had Mr. Wertenbaker been a reader of Dryden he would have remembered that the poet said that the *chief object of militia-muster in England in his day, was to get drunk.*[77] [emphasis added]

69.    And:

The ringing of a steamboat bell at the head of the column filled up the ranks, and the Racine Militia gallantly trained til noon, when they adjourned to the Fulton House for dinner, where they all go so drunk they couldn't muster at all in the evening.[78]

70.    It is unclear to what years this refers, but the other parts of the chapter reference the antebellum period:

> MILITIA MUSTER DAYS. On the second Saturday of October each year there was a general muster at each county seat, when the various

---

[76] 3 Journal Of The Rev. Francis Asbury, Bishop Of The Methodist Episcopal Church, From August 7, 1771 , To December 7, 1815 121 (1821).

[77] 18:1 Book Review of Patrician And Plebeian In Virginia Or The Origin And Development Of Social Classes In The Old Dominion," Virginia Magazine Of History And Biography 346 (1910)

[78] Fanny S. Stone, ed., 1 Racine Belle City Of The Lakes And Racine County Wisconsin 476 (1916).

DECLARATION OF CLAYTON CRAMER

companies drilled in battalion or regimental formation; and each separate company met on its local muster grounds quarterly, and on the fourth of July the commanding officers met at the court house to drill. The Big Musters called most of the people together, and there was much fun and many rough games to beguile the time. Cider and ginger cakes were sold, and many men got drunk.[79]

71.    And:

At that time there was in each township at least one company of militia, which was required to hold several meetings in the course of the year, and at these the minister was always present. The military parade, with the drums and fifes and other musical instruments, was a powerful attraction for the boys, who came from all parts of the neighborhood to the place at which the militia mustered. But on these occasions there was one respect in which the minister's presence proved but a slight restraint upon excess. There were then no temperance societies, no temperance lecturers held forth, no temperance tracts were ever distributed, nor temperance pledges given. *It was, to be sure, esteemed a shame to get drunk; but, as long as they stopped short of this, people, almost without exception, drank grog and punch freely with out much fear of a reproach from any quarter. Drunkenness, however, in that demure population, was not obstreperous, and the man who was overtaken by it was generally glad to slink out of sight.* I remember an instance of this kind. There had been a muster of a militia company on the church green for the election of one of its officers, and the person elected had treated the members of the company and all who were present to sweetened rum and water, carried to the green in pailfuls, with a tin cup to each pail for the convenience of drinking.

The afternoon was far spent, and I was going home with other boys, when we overtook *a young man who had taken too much of the election toddy,* and, in endeavoring to go quietly home, had got but a little way from the green, when he fell in a miry place, and was surrounded by three or four persons, who assisted in getting him on his legs again. The poor fellow seemed in great distress, and his new nankeen pantaloons, daubed with the mire of the road, and his dangling limbs, gave him a most wretched appearance. It was, I think, the first time I had ever seen a drunken man. As I approached to pass him by, some of the older boys said to "Do not go too near him, for if you smell a drunken man it will make you drunk.[80]  [emphasis added]

---

[79] John Preston Arthur, WESTERN NORTH CAROLINA A HISTORY (FROM 1730 TO 1913) 284 (1914).

[80] Parke Godwin, 1 A BIOGRAPHY OF WILLIAM CULLEN BRYANT, WITH EXTRACTS FROM HIS PRIVATE CORRESPONDENCE 16-17 (1883).

24

DECLARATION OF CLAYTON CRAMER

72.     The year is not clear but it is in a chapter titled "Mr. Bryant's Early Life" and Bryant was born in 1797.

> "At that time, it was less thought of, since it was the universal custom , in all regiments of the militia, with which I had any acquaintance, for the officers, on every muster day, to get gloriously drunk in their country's service."[81]

73.     The date of this event is unclear but certainly before the publication date of 1832!

**G.     Colleges**

74.     (a)(14): "Any area under the control of a public or private community college, college, or university, including, but not limited to, buildings, classrooms, laboratories, medical clinics, hospitals, artistic venues, athletic fields or venues, entertainment venues, officially recognized university-related organization properties, whether owned or leased, and any real property, including parking areas, sidewalks, and common areas."

75.     Colleges in the Colonial period often prohibited students from hunting, but this does not appear to have been a prohibition on firearms possession.  Harvard in the early eighteenth century prohibited not only hunting, but also fishing and skating, as distractions from the duties of a scholar; for similar reasons, Yale, Princeton, King's College (now Columbia) prohibited many sports and recreational activities such as field hockey, games involving balls, or swimming off campus.[82] If restrictions on hunting extended to a prohibition on firearms possession, it must have been implied.

76.     The evidence from the Colonial and Revolutionary periods shows not just that students *could* have been armed with firearms, but in many colonies (and states after the Revolution), students were *required* to be armed for militia duty

---

[81] 3 NEW-ENGLAND MAGAZINE 111 (1832).
[82] Ronald A. Smith, SPORTS AND FREEDOM: THE RISE OF BIG-TIME COLLEGE ATHLETICS 9-10 (1988).

DECLARATION OF CLAYTON CRAMER

while at college.  Different colonies and states had different age limits for militia duty, but 16, 17, and 18 were all quite common.[83]

77.    It was not at all uncommon for states to exempt faculty (but not students) from this obligation to be armed for militia duty, such as New Jersey did in 1778 ("That, after the passing of this Act, each and every Master or Teacher of a publick School, wherein common School- Learning is taught, in any Village, Town or Neighbourhood of any Part of this State, who shall in the Militia be actually and bona fide employed in that Calling, and have under his Care and Tuition any Number of Scholars or Pupils not less than fifteen, shall be entitled to an Exemption from actual Service in the Militia;…")[84]   A few states, such as Connecticut, exempted "the President, Tutors and Students of College" (along with a few other occupations) from militia duty, and therefore the obligation to be armed,[85] but these appear to be the exception.

---

[83] 1 THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, 1636-1776 15 (1850) (1637 statute"aboue the age of sixteen yeers"); Id. 542-543 (1650 statute "all persons that are aboue the age of sixteene years"); 18 COLONIAL RECORDS OF THE STATE OF GEORGIA 7 (1910) (1755 statute "All Male Persons from the Age of 16 to 60 years liable to bear arms");  1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (1853) (1636/7 law "every person above eighteen years of age");  Acts and Laws, Passed by the General Court or Assembly of the Province of New-Hampshire in New-England 91-97 (1716) (1716 law "That all Male Persons from Sixteen Years of Age to Sixty"); RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649 131-132 (1857) (1644 law: "every male from 16 to 60 yeares olde"); THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW-JERSEY 78 (Philadelphia: W. Bradford, 1752) (1668 law "every Male from 16 Years and upwards, to the Age of 60 Years, shall be furnished at their own Cost and Charge, with good and sufficient Arms");  A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY, OF THE PROVINCE OF NORTH-CAROLINA: NOW IN FORCE AND USE... 215 (1751); ACTS AND LAWS, OF HIS MAJESTIES COLONY OF RHODE-ISLAND, AND PROVIDENCE PLANTATIONS IN AMERICA (1179 [1719]) (1746 law "all the Freemen and Servants... between the Age of Sixteen Years, and Sixty");

[84] Colony of New Jersey, ACTS OF THE COUNCIL AND GENERAL ASSEMBLY OF THE STATE OF NEW-JERSEY… 65 (1784).

[85] State of Connecticut, ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 144 (1786).

DECLARATION OF CLAYTON CRAMER

78.     Even states that sometimes exempted students as well as faculty from the duty to be armed for militia duty, such as Virginia did in 1757,[86] at other times exempted only faculty as with the 1785 militia law that exempted "all professors, and tutors at the University of William and Mary, and other public seminaries of learning…" but not students.[87]   In this period, students were obligated by militia laws to arm themselves for duty, and there is no surviving evidence that colleges prohibited student possession of arms for such purposes.

## H.     Casinos

79.     (a)(15): "A building, real property, or parking area that is or would be used for gambling or gaming of any kind whatsoever, including, but not limited to, casinos, gambling establishments, gaming clubs, bingo operations, facilities licensed by the California Horse Racing Board, or a facility wherein banked or percentage games, any form of gambling device, or lotteries, other than the California State Lottery, are or will be played."

80.     There are no equivalent laws from pre-1791 because there are no equivalent institutions.  Gambling was in many colonies and pre-1791 states prohibited.[88]

---

[86] 7 STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA… ch. 3 at 94-95 (1820).

[87] 12 STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA… 10 (1823).

[88] 1777: *An Act to Prevent Gaming, and Horse Racing*, LAWS OF GEORGIA 201 (1800); *An Act to Prevent Card Playing, and Other Deceitful Practices* (1777) referenced in 1 PUBLIC ACTS OF THE GENERAL ASSEMBLY OF NORTH CAROLINA ch. 5 at 448; *An Act to Revive Part of an Act entitled "An Act to Suppress Excessive Gaming",* Id., at 448; 1764: *An Act to suppress excessive and deceitful Gaming*, 23 STATE RECORDS OF NORTH CAROLINA: LAWS 1715-1776 ch. 35 at 838-840 ("Whereas Card playing and other deceitful Gaming, hath been found injurious to the Inhabitants of this Province, and tend greatly to the discouragement of Industry, Corruption of Youth, and destruction of Families : For Remedy whereof."; 1777: "WHEREAS, on the twentieth day of October, one thousand seven hundred and seventy-four, the honorable the Continental Congress did, on the part of the then United Colonies, (now free and independent States, ) associate, agree and declare against every species of extravagance and dissipation, especially all horse-racing;" 4 STATUTES AT LARGE OF SOUTH CAROLINA No. 1054 at 394-395 (1838); 1804: Maryland declared that in Baltimore "he, she or they, procure a livelihood, and

27

DECLARATION OF CLAYTON CRAMER

**I.     Sporting Arenas**

81.     (a)(16): "A stadium, arena, or the real property or parking area under the control of a stadium, arena, or a collegiate or professional sporting or eSporting event." Such facilities did not exist before 1791.

82.     There were almost certainly community sporting events, but they do not suggest laws banning guns.

83.     Frederick County, Maryland raised two companies of riflemen to join the army forming outside of Boston. An eyewitness account of Captain Michael Cresap's rifle company of "upwards of 130 men" described a demonstration:

> to show the gentlemen of the town their dexterity at shooting. A clapboard, with a mark the size of a dollar, was put up; they began to fire off-hand, and the bystanders were surprised, so few shots being made that were not close to or in the paper.

> When they had shot for a time in this way, some lay on their backs, some of their breast or side, others ran twenty or thirty steps, and, firing, appeared to be equally certain of the mark. With this performance the company was more than satisfied, when a young man took up the board in his hand, not by the end, but by the side, and holding it up, his brother walked to the distance, and very coolly shot into the white; laying down his rifle, he took up the board, and, holding it as was held before, the second brother shot as the former had done.

> By this exercise I was more astonished than pleased. But will you believe me, when I tell you, that one of the men took the board, and placing it between his legs, stood with his back to the tree, while another drove the center?[89]

84.     Other accounts of Cresap's company also report on their marksmanship:

---

every woman who is generally reputed a common prostitute, and every juggler or fortune-teller, or common-gambler, shall be adjudged a vagrant, vagabond, prostitute or disorderly person, within the meaning of this act." 2 GENERAL PUBLIC STATUTORY LAW AND PUBLIC LOCAL LAW OF THE STATE OF MARYLAND Ch. 96 at 1620-21 (1840); 1748: ban on "Lotteries, playing of Cards and Dice, and other Gaming for Lucre of Gain," ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW JERSEY ch. 226 at 187 (1776); 1760: prohibited "all Shooting Matches for Lucre of Gain," "except on days of publick Training" as well as limiting the betting on horse races 2 ACTS OF THE GENERAL ASSEMBLY OF THE PROVINCE OF NEW JERSEY ch. 155 at 362-363 (1761). Give me some time; I can find more.

[89] JOHN THOMAS SCHARF, 1 HISTORY OF WESTERN MARYLAND 130 (1882).

---

28

DECLARATION OF CLAYTON CRAMER

[W]e mention a fact which can be fully attested by several of the reputable persons who were eye-witnesses of it. Two brothers in the company took a piece of board five inches broad and seven inches long, with a bit of white paper, about the size of a dollar, nailed in the centre; and while one of them supported this board perpendicularly between his knees, the other, at the distance of upwards of sixty yards, and without any kind of rest, shot eight bullets through it successively, and spared a brother's thigh!

Another of the company held a barrel stave perpendicularly in his hands with one edge close to his side, while one of his comrades, at the same distance, and in the manner before mentioned, shot several bullets through it, without any apprehension of danger on either side.

The spectators appearing to be amazed at these feats, were told that there were upwards of fifty persons in the same company who could do the same thing; that there was not one who could not plug nineteen bullets out of twenty, as they termed it, within an inch of the head of a tenpenny nail. In short, to prove the confidence they possessed in their dexterity at these kind of arms, some of them proposed to stand with apples on their heads, while others at the same distance, undertook to shoot them off; but the people who saw the other experiments declined to be witnesses of this.[90]

85.     Philip Gosse, an English naturalist visiting Alabama in the 1830s provided one of the more complete descriptions of the attitude of the population towards hunting and firearms.  He also emphasized the high level of marksmanship in America:

But skill as a marksman is not estimated by quite the same standard as in the old country.  Pre-eminence in any art must bear a certain relation to the average attainment; and where this is universally high, distinction can be won only by something very exalted.  Hence, when the young men meet together to display their skill, curious tests are employed, which remind one of the days of old English archery…. Some of these practices I have read of, but here I find them in frequent use.  "Driving the nail" is one of these; a stout nail is hammered into a post about half way up to the head; the riflemen then stand at an immense distance, and fire at the nail; the object is to hit the nail so truly on the head with the ball as to drive it home.  To hit at all on one side, so as to cause it to bend or swerve, is failure; missing it altogether is out of the question.

**J.     Public Library**

86.     (a)(17): "A building, real property, or parking area under the control of a public library."  What is a public library before 1791?  There is the Library

---

[90] "From The Virginia Gazette (1775)" in Albert Bushnell Hart and Mabel Hill, CAMPS AND FIRESIDES OF THE REVOLUTION 230 (1918).

29

DECLARATION OF CLAYTON CRAMER

Company of Philadelphia founded by Benjamin Franklin in 1731, but this was "was a subscription library and supported by members."  "The first free modern public library was opened in 1833" in Peterborough, N.H.  This was "was the first institution funded by a municipality with the explicit purpose of establishing a free library open to all classes of the community."  Boston opened a public library in 1848.[91]  I am unaware of any laws regulating being armed in public libraries before 1868.

### K.   Airport or Passenger Vessel Terminal

87.    (a)(18): "building, real property, or parking area under the control of an airport or passenger vessel terminal."  Before 1868, there were no airports.  If any passenger vessel terminal (a port in pre-1791 language) regulated arms possession, I am unaware of it.

### L.   Amusement Park

88.    (a)(19): "A building, real property, or parking area under the control of an amusement park."  Amusement park?  As close as early America gets to amusement parks are "pleasure grounds." Pre-1868 books are primarily about private lands and are published in Britain.[92]   American books about parks that are explicitly public are post-1868.[93]

### M.   Zoo or Museum

89.    (a)(20): "A building, real property, or parking area under the control of a zoo or museum."  "Philadelphia Zoo, America's first zoo, is renowned for innovation in animal care and unwavering commitment to wildlife. A zoo of firsts, Philadelphia Zoo has been a leader since opening its historic gates on July 1, 1874."[94]

---

[91] American Library Association, https://www.ala.org/aboutala/before-1876, last accessed September 15, 2023.

[92] Charles H.J. Smith, PARKS AND PLEASURE GROUNDS; OR PRACTICAL NOTES ON COUNTRY RESIDENCES, VILLAS, PUBLIC PARKS, AND GARDENS (1852).

[93] H.W.S. Cleveland, OUTLINE PLAN OF A PARK SYSTEM FOR THE CITY OF ST. PAUL (1885).

[94] Philadelphia Zoo, *An American First*, https://www.philadelphiazoo.org/about-

DECLARATION OF CLAYTON CRAMER

90.    There are American museums before 1791 such as the Charleston Museum, founded in 1773.[95]   I can find no evidence of restrictions on arms possession.

### N.    Nuclear Facilities

91.    (a)(21): "A street, driveway, parking area, property, building, or facility, owned, leased, controlled, or used by a nuclear energy, storage, weapons, or development site or facility regulated by the federal Nuclear Regulatory Commission."  There are of course no such facilities before 1791, but there is an analogy: gunpowder storage facilities.  It would be surprising indeed if such magazines had no restrictions.  I would also be surprised if federal law does not already restrict firearms on nuclear facilities.

### O.    Houses of Worship

92.    (a)(22): "A church, synagogue, mosque, or other place of worship, including in any parking area immediately adjacent thereto, unless the operator of the place of worship clearly and conspicuously posts a sign at the entrance of the building or on the premises indicating that licenseholders are permitted to carry firearms on the property."

93.    Here there is a strong counterpart to pre-1791 law.  Many colonies required the carrying of guns to church.

94.    Georgia, 1770: ""An act for the better security of the inhabitants by obliging the male white persons to carry fire arms to places of public worship." This law required all white male inhabitants to carry either a long gun or a pair of pistols to church, and "That the church warden or church wardens of each respective parish, and the deacons, elders or select men... to examine all such male persons" to make sure that they were armed.[96]

---

the-zoo/t accessed September 14, 2023.

[95] Arna Bontemps Museum, *The Oldest Museums in the World*, https://www.arnabontempsmuseum.com/the-oldest-museums-in-the-world/, last accessed September 14, 2023.

[96] 1 COLONIAL RECORDS OF THE STATE OF GEORGIA 138-139 (1910).

DECLARATION OF CLAYTON CRAMER

95.    Maryland, 1642: "Noe man able to bear arms to goe to church or Chappell or any considerable distance from home without fixed gunn and 1 Charge at least of powder and Shott."[97]

96.    Massachusetts, 1636/7: Because of the danger of Indian attack, and because much of the population was neglecting to carry guns, every person above eighteen years of age (except magistrates and elders of the churches) were ordered to "come to the publike assemblies with their muskets, or other peeces fit for servise, furnished with match, powder, & bullets, upon paine of 12d. for every default."[98]

97.    New Haven Colony, 1646: The colony imposed fines in 1649 on several men "for not bringing ther armes to the meeting [church] on day when it was their turne" and failure to bring slowmatch (for matchlock guns), bullets, flints, and other accessories.[99]

98.    Plymouth Colony, 1641: "It is enacted That every Towneship within this Government do carry a competent number of pieeces fixd and compleate with powder shott and swords every Lord's day to the meetings--one of a house from the first of September to the middle of November, except their be some just & lawfull impedyment."  While not terribly clear writing, it also seems to indicate that at least one person from every home should bring either gun or sword.

99.    Plymouth Colony, 1658: There is an order that 1/4 of the militia "carry theire armes" to church every Sunday, defined as "some serviceable peece and sword and three charges of powder and bullets" or be fined "2 shillings and six pence...."[100]

100.   South Carolina, 1743:

---

[97] 3 ARCHIVES OF MARYLAND 103 (1885).
[98] 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (1853).
[99] RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649 486 (1857).
[100] COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 115 (1836).

DECLARATION OF CLAYTON CRAMER

1
2
3
4
5
6
7

That within three months from the time of passing this Act , every white male inhabitant of this Province , (except travellers and such persons as shall be above sixty years of age, ) who, by the laws of this Province is or shall be liable to bear arms in the militia of this Province, either in times of alarm or at common musters, who shall, on any Sunday or Christmas day in the year, go and resort to any church or any other public place of divine worship within this Province , and shall not carry with him a gun or a pair of horse pistols, in good order and fit for service, with at least six charges of gun- powder and ball , and shall not carry the same into the church or other place of divine worship as aforesaid, every such person shall forfeit and pay the sum of twenty shillings, current money, for every neglect of the same…[101] [emphasis added]

8    101.   Virginia, 1619: This mandatory church attendance law also required

9    "all suche as beare armes shall bring their pieces swords, pouder and shotte."  There

10   was a three shillings fine for failing to be armed at church.[102]

11   102.   It is certainly true that these mandatory "bring your guns to church"

12   laws were in response to fear of attack by Indians or slaves, depending on the

13   colony and year.  Of course, things are no different now; bloodthirsty monsters still

14   attack houses of worship, in the hopes that no one will shoot back.

15   **P.    Banks**

16   103.   (a)(23): "A financial institution or parking area under the control of a

17   financial institution."  I have never seen such a law in the time period.  Banks may

18   have had their own rules on this, but private business rules are not laws.

19   **Q.    Private Businesses**

20   104.   (a)(26): "Any other privately owned commercial establishment that is

21   open to the public, unless the operator of the establishment clearly and

22   conspicuously posts a sign at the entrance of the building or on the premises

23   indicating that licenseholders are permitted to carry firearms on the property."

24   105.   There are no laws in the time period requiring a positive invitation for

25   persons carrying arms to enter a business.  (And there are no licenses yet for

26   concealed carry of arms; concealed carry with a few exceptions was only prohibited

27   in  a few states and then only starting in 1813.)

28

---

[101] 7 STATUTES AT LARGE OF SOUTH CAROLINA 417 (1840).
[102] Lyon G. Tyler, ed., NARRATIVES OF EARLY VIRGINIA, 1606-1625 273 (1907).

33

DECLARATION OF CLAYTON CRAMER

106.   California is seeking not simply to allow businesses to exclude licensees, but require an affirmative declaration that licensees are welcome.  Could California decree that unless a business had a "Blacks Allowed" sign, blacks were prohibited entry?  Yes, this would be contrary to the Fourteenth Amendment but following Bruen, it would also be contrary to the Second Amendment right incorporated against the states through the Fourteenth Amendment.

**V.    Summary**

107.   California's "sensitive places" list includes many areas where there are no pre-1791 laws limiting arms possession.  In some cases, not only are there no laws limiting possession in those places but there are such places and no analogs. And in some cases, such as religious assemblies, the legal tradition not only allowed but required carrying of loaded arms.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed on September 28, 2023, in Middleton, Idaho.


Clayton Cramer
Declarant

DECLARATION OF CLAYTON CRAMER

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *May, et al. v. Bonta*
Case No.: 8:23-cv-01696 CJC (ADSx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**DECLARATION OF CLAYTON CRAMER IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Robert L. Meyerhoff, Deputy Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Email: Robert.Meyerhoff@doj.ca.gov
        *Attorney for Defendant*

I declare under penalty of perjury that the foregoing is true and correct.

Executed September 29, 2023.

Laura Palmerin

CERTIFICATE OF SERVICE