Rob Bonta
Attorney General of California
R. Matthew Wise
Mark R. Beckington
Supervising Deputy Attorneys General
Todd Grabarsky
Jane Reilley
Lisa Plank
Robert L. Meyerhoff
Deputy Attorneys General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta, in his Official Capacity as
Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Reno May, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**Robert Bonta, in his official capacity as Attorney General of the State of California, and Does 1-10,**<br><br>Defendants. | Case Nos. 8:23-cv-01696 CJC (ADSx)<br>8:23-cv-01798 CJC (ADSx)<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date:          December 20, 2023<br>Time:          1:30 p.m.<br>Courtroom:  9B<br>Judge:         Hon. Cormac J. Carney |
| **Marco Antonio Carralero, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**Rob Bonta, in his official capacity as Attorney General of California,**<br><br>Defendant. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................1

Statutory Background ..................................................................................2

Procedural Background................................................................................4

Legal Standard............................................................................................5

Argument.....................................................................................................6

I.   Plaintiffs Are Unlikely to Succeed on Their Second Amendment Claim..............................................................................................6

A.   The Supreme Court Has Consistently Held that "Sensitive Place" Restrictions Comport with the Second Amendment......6

B.   The Challenged Restrictions Prohibiting Firearms in New and Analogous Sensitive Places Are Constitutionally Permissible ...............................................................................8

C.   The Places Covered by SB 2 Are Properly Deemed Sensitive ...............................................................................10

1.   Certain Places Are Sensitive Because of the Activities that Take Place There ...................................10

a.   Local Government Buildings ..............................11

b.   Houses of Worship...............................................12

c.   Financial Institutions...........................................14

2.   Certain Places Are Sensitive Because of Their Physical Nature.......................................................16

a.   Public Gatherings and Special Events ................17

b.   Sellers of Liquor for Consumption on Site..........21

c.   Public Transportation...........................................23

d.   Casinos, Stadiums, and Amusement Parks..........26

3.   Certain Places Are Sensitive Because of the People Found There......................................................28

a.   Health Care Facilities...........................................28

b.   Playgrounds and Youth Centers..........................31

c.   Parks and Athletic Facilities................................32

d.   Libraries, Museums, and Zoos ...........................34

4.   Parking Lots of Sensitive Places Are Also Sensitive .....36

5.   Plaintiffs' Theory of Sensitivity Based on "Perceived" Need Does Not Pass Constitutional Muster.........................................................................37

D.   Plaintiffs' Proposed Course of Conduct of Carrying Firearms on Private Property Does Not Implicate the Plain Text of the Second Amendment ...................................39

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

**TABLE OF CONTENTS**
**(continued)**

Page

II.   Plaintiffs Are Unlikely to Succeed on the Merits of Their Other Claims ..................................................................................... 45

    A.   The May Plaintiffs Are Unlikely to Succeed on Their First Amendment Claim ....................................................... 45

    B.   Plaintiffs Are Unlikely to Succeed on Their Due Process Claim ................................................................................. 47

III.  The Remaining Preliminary Injunction Factors Weigh Against the Issuance of an Injunction .......................................... 49

    A.   Plaintiffs Have Failed to Show They Will Suffer Irreparable Harm if an Injunction Does Not Issue ................. 49

    B.   The Equities and Public Interest Weigh Against the Issuance of an Injunction ...................................................... 49

IV.   Enforcement of Any Injunction Should Be Stayed Pending Appeal .......................................................................... 50

Conclusion ...................................................................................... 50

# TABLE OF AUTHORITIES

**Page**

CASES

*303 Creative LLC v. Elenis*
    600 U.S. 570 (2023)........................................................................47

*Alexander v. State*
    27 Tex. App. 533, 537 (1889) ........................................... 16, 17, 20

*Andrews v. State*
    50 Tenn. 165 (1871)................................................................. 13, 20

*Antonyuk v. Hochul*
    639 F. Supp. 3d 232 (N.D.N.Y. 2022)....................................9, 31, 32

*Appleby v. Johnson & Johnson Corp.*
    2022 WL 2987182 (C.D. Cal. July 26, 2022)....................................43

*B&L Productions, Inc. v. Newsom*
    2023 WL 7132054 .........................................................................27

*Baird v. Bonta*
    81 F.4th 1036 (9th Cir. 2023).....................................................9, 40

*Boland v. Bonta*
    2023 WL 2588565 (C.D. Cal. Mar. 20, 2023)...................................40

*Bonidy v. U.S. Postal Serv.*
    790 F.3d 1121 (10th Cir. 2015)....................................... 10, 11, 12, 36

*Brooks v. State*
    15 Tex. App. 88 (1883).................................................................20

*Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*
    468 U.S. 491 (1984).....................................................................26

*California v. Texas*
    141 S. Ct. 2104 (2021).................................................................46

*Christopher v. Ramsey Cty.*
    621 F. Supp. 3d 972 (D. Minn. 2022)........................................ 16, 27

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

4

*Clapper v. Amnesty Int'l USA*
    568 U.S. 398 (2013)......................................................................46

5

6

*Crosby v. Cal. Physicians' Serv.*
    498 F. Supp. 3d 1218 (C.D. Cal. 2020) ........................................45

7

8

*Davis v. Bragg*
    2009 WL 10740797 (C.D. Cal. Dec. 21, 2009) ..............................15

9

*DiGiacinto v. Rector & Visitors of George Mason Univ.*
    704 S.E.2d 365 (Va. 2011)............................................................28

10

11

*District of Columbia v. Heller*
    554 U.S. 570 (2008)................................................................*passim*

12

13

*Drakes Bay Oyster Co. v. Jewell*
    747 F.3d 1073 (9th Cir. 2014)........................................................5

14

15

*Fla. Retail Fed'n, Inc. v. Att'y Gen. of Fla.*
    576 F. Supp. 2d 1281 (N.D. Fla. 2008) ........................................41

16

17

*GeorgiaCarry.Org, Inc. v. Georgia*
    687 F.3d 1244 (11th Cir. 2012)....................................................42

18

19

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*
    212 F. Supp. 3d 1348 (N.D. Ga. 2016)..........................................11

20

21

*GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*
    788 F.3d 1318 (11th Cir. 2015)....................................................16

22

*Goldstein v. Hochul*
    2023 WL 4236164 (S.D.N.Y. June 28, 2023) ..................... 12, 14, 48

23

24

*Hernandez v. Sessions*
    872 F.3d 976 (9th Cir. 2017)..........................................................5

25

26

*Hill v. State*
    53 Ga. 472 (1824) ..................................................... 11, 13, 20, 21

27

28

*Hoven v. Walgreen Co.*
    751 F.3d 778 (6th Cir. 2014)........................................................42

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

4

*Jarvis v. Vill. Gun Shop*
    53 F. Supp. 3d 426 (D. Mass. 2014)...................................................43

5

6

*Kipke v. Moore*
    2023 WL 6381503 (D. Md. Sept. 29, 2023).............................*passim*

7

8

*Koons v. Platkin*
    2023 WL 3478604 (D.N.J. May 16, 2023)...................................9, 31

9

10

*Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*
    138 S. Ct. 1719 (2018).......................................................................46

*Maupin v. State*
    17 S.W. 1038 (Tenn. 1890).................................................................20

11

12

13

*McCool v. Austal USA, LLC*
    2022 WL 4373611 (S.D. Ala. Aug. 16, 2022)...................................43

14

15

*McDonald v. City of Chicago*
    561 U.S. 742 (2010)................................................................. 1, 6, 7

16

17

*Md. Shall Issue, Inc. v. Montgomery Cnty.*
    2023 WL 4373260 (D. Md. July 6, 2023) .................................*passim*

18

19

*Munaf v. Geren*
    553 U.S. 674 (2008)..............................................................................5

20

21

*New York State Rifle & Pistol Ass'n v. Bruen*
    142 S. Ct. 2111 (2022)...................................................................*passim*

22

*Nordyke v. King*
    563 F.3d 439 (9th Cir. 2009)......................................................16, 24

23

24

*Or. Firearms Fed'n, Inc. v. Brown*
    644 F. Supp. 3d 782 (D. Or. 2022)....................................................49

25

26

*Owens v. State*
    3 Tex. App. 404, 406 (1878)..............................................................20

27

28

*Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*
    475 U.S. 1 (1986)................................................................................46

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

*Project 80's, Inc. v. City of Pocatello*

4

   942 F.2d 635 (9th Cir. 1991)..............................................................................47

5

*Rendell-Baker v. Kohn*

6

   457 U.S. 830 (1982)........................................................................................43

7

*Renna v. Bonta*

8

   2023 WL 2846937 (S.D. Cal. Apr. 3, 2023)....................................................39

9

*Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*

   547 U.S. 47 (2006)..........................................................................................47

10

*State v. Pigg*

11

   85 Mo. App. 399 (1900)..................................................................................20

12

*State v. Reando*

13

   (Mo. 1878).......................................................................................................13

14

*State v. Shelby*

15

   90 Mo. 302 (1886) .....................................................................................20, 23

16

*State v. Torres*

17

   134 N.M. 194 (N.M. App. 2003)......................................................................23

18

*Trenham v. Sanfilippo*

19

   2023 WL 6190733 (C.D. Cal. Sept. 21, 2023) ................................................50

20

*United States v. Alaniz*

   69 F.4th 1124 (9th Cir. 2023)............................................................................9

21

*United States v. Allam*

22

   2023 WL 5846534 (E.D. Tex. June 14, 2023)......................................8, 34, 36

23

*United States v. Class*

24

   930 F.3d 460 (D.C. Cir. 2019) .....................................................11, 36, 37, 48

25

*United States v. Davis*

26

   304 F. App'x 473 (9th Cir. 2008)....................................................................10

27

*United States v. Dorosan*

28

   350 F. App'x 874 (5th Cir. 2009)....................................................................36

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

**TABLE OF AUTHORITIES**
(continued)

Page

*United States v. Langan*
    263 F.3d 613 (6th Cir. 2001).............................................................................15

*United States v. Lewis*
    50 V.I. 995 (D.V.I. 2008)................................................................................36

*United States v. Marique*
    647 F. Supp. 3d 382 (D. Md. 2022)................................................................11

*United States v. Marx*
    485 F.2d 1179 (10th Cir. 1973)......................................................................15

*United States v. Masciandaro*
    648 F. Supp. 2d 779 (E.D. Va. 2009).......................................................16, 28

*United States v. Nichols*
    841 F.2d 1485 (10th Cir. 1988) .....................................................................41

*United States v. Reyna*
    2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) .............................................39

*United States v. United Foods, Inc.*
    533 U.S. 405 (2001).......................................................................................46

*United States v. Walter*
    2023 WL 3020321 (D.V.I. Apr. 20, 2023) .................................................31, 36

*United States v. Walters*
    2008 WL 2740398 (D.V.I. July 15, 2008).......................................................28

*W. Va. State Bd. of Educ. v. Barnette*
    319 U.S. 624 (1943).......................................................................................46

*W. Va. Coal. Against Domestic Violence, Inc. v. Morrisey*
    2023 WL 5659040 (S.D.W. Va. Aug. 31, 2023) ............................................42

*Warden v. Nickels*
    697 F. Supp. 2d 1221 (W.D. Wash. 2010).....................................................33

*We The Patriots, Inc. v. Grisham*
    2023 WL 6622042 (D.N.M. Oct. 11, 2023) ...............................................30, 32

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008) ................................................................................5

4

5

*Wolford v. Lopez*
    2023 WL 5043805 (D. Haw. Aug. 8, 2023) ..................................... 9, 15, 16, 42

6

7

*Wooley v. Maynard*
    430 U.S. 705 (1977) ............................................................................46

8

9

*Wynne v. State*
    51 S.E. 636 (Ga. 1905) ......................................................................20

10

**STATUTES**

11

12 U.S.C.A. § 1882 .............................................................................15

12

18 U.S.C.A. § 2113 .............................................................................15

13

18 U.S.C.A. § 2113(e) .........................................................................15

14

1889 Ariz. Sess. Laws 17 ............................................................ 13, 30, 31

15

Cal. Penal Code § 626.9 ........................................................................2

16

Cal. Penal Code § 26150 ........................................................................3

17

Cal. Penal Code § 26230 ................................................................3, 4, 7

18

1756 Del. Laws 13 .............................................................................21

19

1870 Ga. Laws 421 ........................................................................ 12, 19

20

21

1878 Ga. Laws 1181-82 ........................................................................12

22

1901 Idaho Sess. Laws 84 .....................................................................19

23

1876 Iowa Acts 142 ............................................................................17

24

25

1867 Kan. Sess. Laws 25 ......................................................................22

26

1831 La. Acts 372 .............................................................................18

27

1870 La. Acts 159 .............................................................................36

28

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

1870 La. Acts 160, § 73 ......................................................................10

4

1647 Md. Laws 216 ...............................................................................10

5

1756 Md. Laws 460 ...............................................................................21

6

7

1817 Md. Laws 15 .................................................................................21

8

1878 Miss. Laws 175 .............................................................................22

9

1878 Miss. Laws 176 .......................................................................28, 31

10

Mo. Laws 50, 1879 ................................................................................31

11

1875 Mo. Laws .....................................................................................13

12

1879 Mo. Laws 224 .........................................................................*passim*

13

1883 Mo. Laws 76 ...................................................................... 13, 19, 31

14

15

1903 Mont. Laws 49 ..............................................................................19

16

1903 Mont. Laws 49–50 ...................................................................30, 31

17

1820 N.H. Laws 322 ..............................................................................17

18

1722 N.J. Laws 101 ..............................................................................43

19

20

1746 N.J. Laws 146 ..............................................................................21

21

1771 N.J. Laws 344 ..............................................................................44

22

1799 N.J. Laws 444 ..............................................................................21

23

1852 N.M. Laws 67 ..............................................................................18

24

1853 N.M. Laws 69 ........................................................................22, 26

25

1763 N.Y. Laws 441–42 ........................................................................43

26

27

1787 N.Y. Laws 345 ..............................................................................10

28

1890 Okla. Sess. Laws 495 ....................................................................22

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

1
2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3    1890 Okla. Sess. Laws 496 ..............................................................*passim*

4    1893 Okla. Sess. Laws 503 ...........................................................................13

5    1893 Or. Laws 79 .........................................................................................44
6
7    1721 Pa. Laws 254–55....................................................................................43

8    1780 Pa. Laws 368.........................................................................................21

9    1793 Pa. Laws 473.........................................................................................21

10   1869 Tenn. Pub. Acts 23 ...............................................................................18

11   1866 Tex. Gen. Laws 1321 ...........................................................................44

12   1870 Tex. Gen. Laws 63 ....................................................................*passim*
13
14   1871 Tex. Gen. Laws 25–26 ...................................................................30, 31

15   1879 Tex. Gen. Laws 43 .........................................................13, 19, 31

16   1859 Wash. Sess. Laws 119 ..........................................................................17

17   1883 Wis. Sess. Laws 290..............................................................................22
18

CONSTITUTIONAL PROVISIONS

19
     Second Amendment ..........................................................................*passim*
20
21   Del. Const. Article 28 (1776)....................................................................10, 36

22   COURT RULES

23   L.R. 7-20.........................................................................................................50

24   OTHER AUTHORITIES

25
     1 Fed. Reg. 671, 791 (June 27, 1936)............................................................33
26
27   Alameda County Transportation Commission, STUDENT TRANSIT PASS
        PROGRAM 2021-2022 .............................................................................24
28

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

4

American Hospital Association, TRENDWATCH: TEACHING HOSPITALS'
IMPACT IN A CHANGING HEALTH CARE LANDSCAPE ...........................................30

5

American Medical Colleges, STATE-BY-STATE GRADUATE MEDICAL
EDUCATION DATA ............................................................................................................30

6

7

Benjamin Vaughan Abbott, *Judge and Jury* 333 (1880).......................................16

8

California Library Literacy Services, PROGRAM OVERVIEW ..................................35

9

California Museum, FIELD TRIPS AND GROUPS.......................................................35

10

California State Library, LUNCH AT THE LIBRARY ................................................35

11

12

13

Carina B. Gryting & Mark A. Frassetto, *NYRSPA v. Bruen and the*
*Future of the Sensitive Places Doctrine*, 63 B.C. L. Rev. E. Supp.
I.-60 (2022)..........................................................................................................17

14

15

Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. On Firearms &
Pub Pol'y 1 (2016).............................................................................................14

16

17

Congressional Institute, PROTECTING THE CONGRESS: A LOOK AT
CAPITOL HILL SECURITY...................................................................................38

18

19

Darrell A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28
Wm. & Mary Bill Rts. J. 459 (2019)...............................................................11

20

Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations*
*and Criminological Considerations*, 60 Hastings L.J. 1339 (2009)................41

21

22

G. Robert Blakey, *Gaming, Lotteries, and Wagering*, 16 Rutgers L.J.
211, 212 (1985)...................................................................................................26

23

24

25

Guadalupe Gutierrez, Ph.D., *Jurisdictional Ambiguities Among*
*Sovereigns: The Impact of the Indian Gaming Regulatory Act on*
*Criminal Jurisdiction on Tribal Lands*, 26 Ariz. J. Int'l & Comp. L.
229, 255 (2009)...................................................................................................26

26

27

28

**TABLE OF AUTHORITIES**
**(continued)**

Page

1 Joseph Chitty, *Commentaries on the Laws of England by the Late Sir W. Blackstone* 142–43 (1826) ............................................................16

L.A. Metro, GoPass for K-12 and Community College Students..................24

National Center for Educational Statistics, Digest of Educational Statistics ........................................................................................38

The New York Times, *Casino Guards, Used to Handling Drunks, Confront Greater Danger*, October 5, 2017 ......................................38

Paul J. Getty Museum, Planning a School Visit ................................................35

San Diego Union-Tribune, *Metal Detectors Coming to Dodgers Stadium this Season*, March 31, 2015................................................38

San Diego Zoo, Student and Youth Groups......................................................35

Santa Barbara Zoo, Field Trips and Group Reservations ................................35

State Legislatures, Polling Places.......................................................................39

United States Capitol Police, Our History .........................................................38

United States Senate, Bomb Explodes at Capitol...............................................38

William Waller Hening, *The Virginia Justice* 50 (4th ed. 1825)...........................16

**INTRODUCTION**

Following the Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen,* 142 S. Ct. 2111 (2022), California enacted Senate Bill 2 (SB 2) to implement a shall-issue permitting regime for the concealed carry of firearms in the State. As part of that statutory regime, one section of SB 2 places limits on where licensees may carry arms in certain sensitive places. SB 2 limits carriage in places that are sensitive by virtue of the activities performed there (e.g., the exercise of other constitutional rights, governmental operations, and financial transactions), the nature of the spaces (e.g., large gatherings, confined spaces, and where dangerous activities occur), and the people who populate those places (e.g., schoolchildren and other vulnerable populations). It does so by specifying the particular places in which licensees are prohibited from carrying arms, and by requiring licensees to have clear consent from owners of private property before they enter that private property armed.

SB 2 satisfies *Bruen*'s text-and-history standard for evaluating firearms restrictions under the Second Amendment, and thus Plaintiffs are unlikely to succeed on the merits of their claims. The Supreme Court has repeatedly affirmed that such sensitive places restrictions are "constitutionally permissible." *Bruen*, 142 S. Ct. at 2133; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) (plurality opinion); *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The Court recognized in *Bruen* that permissible sensitive places restrictions include not only "'longstanding'" prohibitions that no one could dispute are "lawful[]," but also "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places." *Bruen*, 142 S. Ct. at 2133. Indeed, many sensitive place provisions challenged by Plaintiffs restrict firearms in locations, such as public transportation facilities, playgrounds, and amusement parks, that did not exist in their modern form in the Founding and Reconstruction eras. While *Bruen* confirms that law-abiding individuals may carry firearms "publicly" (i.e., "outside the

home") for the purpose of self-defense, *id.* at 2122, it does not prevent California from enacting laws like SB 2 to limit the concealed carry of firearms in sensitive places. Each of the sensitive places limitations that Plaintiffs challenge here is consistent with *Bruen* and is thus constitutionally sound.

The *May* Plaintiffs are also unlikely to succeed on their First Amendment claim. They have not established any First Amendment injury of their own and thus lack standing to contest the prohibition against concealed carry on private property without the owner's consent. In any event, SB 2 does not compel anyone to convey any particular message. Nor are the *May* Plaintiffs likely to succeed on their Due Process Clause claim because they do not identify any specific language in the statute that is vague, unintelligible, or otherwise violates their due process rights.

Equitable considerations also weigh against issuing a preliminary injunction. Plaintiffs have failed to sufficiently assert irreparable harm, and this Court should not enjoin a duly enacted statute that implicates strong public safety concerns. Plaintiffs' motions for a preliminary injunction should be denied.

## STATUTORY BACKGROUND

California has long restricted carrying firearms in certain sensitive places. Before SB 2, the State restricted carrying firearms in school zones (Cal. Penal Code § 626.9); state or local public buildings (*id.* § 171b); the State Capitol and its grounds, any legislative office, the office of the Governor or other constitutional officers, and Senate and Assembly hearing rooms while a hearing is conducted (*id.* § 171c); the Governor's Mansion and Senate or Assembly member residences without permission (*id.* § 171d); airports (*id.* § 171.5); and the "sterile areas" of public transportation facilities (*id.* § 171.7). Plaintiffs do not challenge any of these restrictions.[1]

---

[1] As explained below, the *May* Plaintiffs challenge California Penal Code Section 26230(a)'s restrictions on carrying concealed in local government buildings and both sets of Plaintiffs challenge subdivision (a)'s restrictions on carrying concealed in public transit, but they have not challenged any restrictions in other sections of

SB 2 specifies additional sensitive places in which possession of a firearm is prohibited.[2] Under California Penal Code section 26230, concealed firearms[3] cannot be carried, subject to certain exceptions, in the following places:

- Places that are sensitive by virtue of the activities performed there (e.g., the exercise of First Amendment rights, government operations, or those for which firearms would be particularly dangerous): buildings under the control of an officer of the state executive or legislative branch ((a)(3)), court buildings ((a)(4)), local government buildings ((a)(5)), adult and juvenile detention centers ((a)(6)), airports and passenger vessel terminals ((a)(18)), property controlled by the federal Nuclear Regulatory Commission ((a)(21)), places of worship unless the operator of the place of worship posts a sign permitting the carrying of firearms ((a)(22), financial institutions ((a)(23)), police stations ((a)(24)), and polling places ((a)(25)).

- Places that are sensitive by virtue of the nature of the spaces (e.g., that are places where large numbers of people congregate): public transportation such as buses and trains and public transit facilities ((a)(8)), places where intoxicating liquors are sold to be consumed on the premises ((a)(9)), public gatherings and special events ((a)(10)), casinos ((a)(15)), stadiums ((a)(16)), and amusement parks ((a)(19)).

- Places that are sensitive by nature of the people who populate those places (e.g., vulnerable populations such as children and the ill and infirm): school zones ((a)(1)), preschool and childcare facilities ((a)(2)), hospitals or other health care facilities ((a)(7)), playgrounds and youth centers ((a)(11)), parks and athletic facilities ((a)(12)), property of the Department

---

the Penal Code.

[2] For the complete text of the law, *see* S.B. 2, 2023-24 Reg. Sess. (Cal. 2023), *available at* https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=202320240SB2.

[3] SB 2's sensitive place restrictions also apply to those individuals who, as residents of counties with less than 200,000 people, have received a license to carry openly. *See* Cal. Penal Code §§ 26150(b)(2), 26155(b)(2), 26230(1).

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

of Parks and Recreation or Department of Fish and Wildlife ((a)(13)), colleges and universities ((a)(14)), public libraries ((a)(17)), and zoos and museums ((a)(20)).

Section 26230 also restricts concealed carry in privately-owned commercial establishments open to the public, unless the owner posts a sign permitting the carrying of firearms ((a)(26)), in any places prohibited by other provisions of state, federal, or local law ((a)(27)-(29)), and in the parking lots of certain of those sensitive places. *Id*. § 26230(a)(2)-(9), (14), (16)-(24).[4]

Section 26230 contains several exceptions to some of these restrictions. For example, restrictions on carry at special events and public gatherings, and parks and athletic facilities, contain an exception for those licensees who must walk through to access their residence, place of business, or vehicle. *Id*. § 26230(a)(10), (12). And the restrictions in subdivision (a) would not be violated by a licensee transporting "a firearm within their vehicle so long as it is locked in a lock box," or by a licensee "if they are traveling along a public right-of-way that touches or crosses any of the premises identified in subdivision (a)." *Id*. § 26230(b), (e).

## PROCEDURAL BACKGROUND

On September 12, 2023, before the Governor signed SB 2 into law, the *May* Plaintiffs filed their Complaint. *May* Dkt. No. 1. The *May* lawsuit challenges certain unspecified subdivisions of SB 2 as unconstitutional under the Second Amendment (*id*. at ¶¶ 115-121) and the Fourteenth Amendment's Due Process Clause (*id*. ¶¶ 122-129), and it challenges on First Amendment grounds SB 2's provision that allows property owners to post a sign to authorize individuals to carry concealed weapons on their property (*id*. ¶¶ 130-136). On September 26, 2023, the *Carralero* Plaintiffs filed a separate lawsuit challenging certain provisions of SB 2. *Carralero* Dkt. No. 1.

---

[4] Plaintiffs only seek to enjoin sixteen of the twenty-nine categories of sensitive places, as well as the parking lot restrictions. The sensitive places designated at subdivisions (a)(1)-(4), (6), (14), (18), (21), and (24)-(29) are not at issue here.

In each case, Plaintiffs filed a motion for a preliminary injunction. *Carralero* Dkt. No. 6, 6-1; *May* Dkt. No. 13, 13-1. Both sets of Plaintiffs seek to enjoin SB 2's restrictions on carrying firearms in health care facilities, on public transit, at establishments that sell liquor for consumption on site, at public gatherings and special events, in parks and athletic facilities, on property controlled by the State Department of Parks and Recreation or Department of Fish and Wildlife, at libraries and museums, and on private property without the owner's consent. *May* Dkt. No. 13-1; *Carralero* Dkt. No. 6-1. The *May* Plaintiffs also seek to enjoin restrictions on carrying firearms in local government buildings, at playgrounds and youth centers, in religious buildings without the operator's consent, and at financial institutions. *May* Dkt. No. 13. The *Carralero* Plaintiffs also seek to enjoin restrictions on carrying firearms at casinos, stadiums, and amusement parks. *Carralero* Dkt. No. 6-1.

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary and drastic remedy'; it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citations omitted). The party seeking a preliminary injunction must make a "clear showing" that (1) it is likely to succeed on the merits; (2) it would likely suffer irreparable harm absent an injunction; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord, e.g.*, *Hernandez v. Sessions*, 872 F.3d 976, 989–90 (9th Cir. 2017). The final two *Winter* factors—the balancing of the equities and the public interest—merge when a government official is a defendant. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

1

### ARGUMENT

2

**I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR SECOND AMENDMENT CLAIM**

3

4

**A.   The Supreme Court Has Consistently Held that "Sensitive Place" Restrictions Comport with the Second Amendment**

5

The Supreme Court has repeatedly held that restrictions on the carrying of

6

firearms in sensitive places comport with the Second Amendment.

7

In *Heller*, the Court recognized that the Second Amendment confers on an

8

individual the right to keep and bear arms. 554 U.S. at 635. But that right "is not

9

unlimited," and is not "a right to keep and carry any weapon whatsoever in any

10

manner whatsoever and for whatever purpose." *Id*. at 626-27. *Heller* specifically

11

noted that "nothing in our opinion should be taken to cast doubt on longstanding

12

prohibitions on the possession of firearms by felons and the mentally ill, or laws

13

forbidding the carrying of firearms in sensitive places such as schools and

14

government buildings." *Id*. And it further stated that "[w]e identify these

15

presumptively lawful regulatory measures only as examples; our list does not

16

purport to be exhaustive." *Id*. at n.26.

17

In *McDonald*, the Court reiterated the "assurances" "made [] clear in *Heller*"

18

that sensitive places restrictions are presumptively lawful. 561 U.S. at 786; *see also*

19

*id*. at 925 (Breyer, J., dissenting) (the majority opinion sets forth a "simple rule[]"

20

that the Court will "not touch . . . 'laws forbidding the carrying of firearms in

21

sensitive places such as schools and government buildings'") (quoting *Heller*, 554

22

U.S. at 626-67).

23

In *Bruen*, the Court reaffirmed that sensitive places restrictions as a general

24

category are constitutionally sound. The Court cited approvingly "*Heller*'s

25

discussion of 'longstanding' 'laws forbidding the carrying of firearms in sensitive

26

places such as schools and government buildings,'" *Bruen*, 142 S. Ct. at 2133, and

27

noted that "[a]lthough the historical record yields relatively few 18th- and 19th-

28

century 'sensitive places' where weapons were altogether prohibited—e.g.,

legislative assemblies, polling places, and courthouses," the Court was "also aware of no disputes regarding the lawfulness of such prohibitions," *id*. (citing D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018)). The Court "assume[d] it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id*.; *see also id*. at 2162 (Kavanaugh, J., concurring). Indeed, all the Justices in *Bruen* agreed that States may forbid firearms in sensitive places. *Id*. at 2181 (Breyer, J., dissenting) ("The Court affirms *Heller*'s recognition that States may forbid public carriage in 'sensitive places.'").

Based on the Supreme Court's discussion of sensitive places restrictions in *Heller*, *McDonald*, and *Bruen*, several themes emerge. First, it is "settled" that if a place is determined to be "sensitive," restrictions on firearms in that place comport with the Second Amendment. *Bruen*, 142 S. Ct. at 2133. Second, sensitive places restrictions that the Court has deemed constitutionally sound often do not have numerous historical analogues, but the Court still had no difficulty finding that they were sensitive. *Id*. (citing Kopel, *The "Sensitive Places" Doctrine*, *supra*, at pp. 229–236, 244–47, which in turn cites only two Maryland colonial laws restricting weapons in legislative assemblies and one 18th century Delaware law restricting weapons in polling places). Third, the absence of historical "disputes regarding the lawfulness" of a category of sensitive place restrictions is relevant in determining whether the restriction is constitutional. *Bruen*, 142 S. Ct. at 2133. Fourth, the categories of sensitive places restrictions specifically identified as constitutional by the Supreme Court—"schools and government buildings," *Heller*, 554 U.S. at 626, and "legislative assemblies, polling places, and courthouses," *Bruen*, 132 S. Ct. at 2133—are merely examples of such permissible restrictions and are the floor, not the ceiling, of the types of places in which the State can restrict firearms. *Id*. (using "e.g.," rather than "i.e.," in listing "legislative assemblies, polling places, and courthouses"); *Heller*, 554 U.S. at 626 (recognizing

"longstanding prohibitions . . . forbidding the carrying of firearms in sensitive places *such as* schools and government buildings.") (emphasis added); *id*. n.26 (these "presumptively lawful regulatory measures" were listed "only as examples; our list does not purport to be exhaustive"). And <u>fifth</u>, sensitive places restrictions must be evaluated under *Bruen*'s "more nuanced" analytical approach where they are designed to address "unprecedented societal concerns" or "dramatic technological changes," because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132–33; *see also id*. at 2133 ("[C]ourts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible."*).

> **B. The Challenged Restrictions Prohibiting Firearms in New and Analogous Sensitive Places Are Constitutionally Permissible**

The sensitive places restrictions challenged here are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129–30. The Supreme Court has "assume[d] it settled" that certain areas are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *Id*. at 2133; *see also Heller*, 554 U.S. at 626. This was so even though the historical record before the Supreme Court in *Bruen* "yield[ed] relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses." 142 S. Ct. at 2133; *United States v. Allam*, 2023 WL 5846534 (E.D. Tex. June 14, 2023), at *25 ("*Bruen* noted that, in the context of sensitive place prohibitions, 'the historical record yields relatively few' of these historical precursors," yet "[n]onetheless, *Bruen* seemed to view these few precursors to be compelling.").[5]

---

[5] Thus, Plaintiffs' contention that laws "existing in only a few jurisdictions" must be "disregarded" as "historical outliers" (*Carralero* MPA at 8 (cleaned up)) should be accorded little weight. The post-*Bruen* decisions that have enjoined sensitive

The Supreme Court also acknowledged that there may be "*new* and analogous sensitive places [that] are constitutionally permissible." *Bruen*, 142 S. Ct. at 2133.

Plaintiffs contend that only the Founding era is relevant for identifying historical analogues. *See, e.g.*, *Carralero* MPA at 7, *May* MPA at 8 n.7.[6] That is wrong. *See Bruen*, 142 S. Ct. at 2132 ("The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."); *id.* at 2133 (describing a review of the "historical record . . . [of] 18th- and 19th-century 'sensitive places'"). Plaintiffs' view also contravenes the Ninth Circuit's recent decisions treating post-1791 evidence as relevant under *Bruen*. *See United States v. Alaniz*, 69 F.4th 1124, 1129 (9th Cir. 2023) (finding that a "historical tradition is well-established" based on the fact that "several States enacted [analogous] laws throughout the 1800s"); *Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023) (noting the relevance under *Bruen* of Reconstruction-era regulations). The historical analogues discussed below, like SB 2's restrictions, are representative of the well-worn American tradition of regulating firearms in sensitive places.

Moreover, the historical inquiry required must look not only at statutes, but also to "newspapers, journals, institutional histories," and other sources to understand the "reasoning behind" laws and the "effect of those statutes on the lives of Americans," including how they were enforced "not only by agents of the state but also by community norms." Schrag Decl., ¶¶ 14-15. The *May* Plaintiffs concede

---

[6] *Carralero* MPA refers to the Amended Memorandum of Points and Authorities filed by the *Carralero* Plaintiffs, Case No. 01696, Dkt. No. 7, and *May* MPA refers to the Memorandum of Points and Authorities filed by the *May* Plaintiffs, Case No. 01798, Dkt. No. 13-1.

places restrictions have made this mistake. *Koons v. Platkin*, 2023 WL 3478604, at *78 (D.N.J. May 16, 2023), *appeal filed* June 9, 2023 (finding a sensitive place restriction unconstitutional in part because "only a handful of state laws" that were analogous existed); *Wolford v. Lopez*, 2023 WL 5043805, at *18 (D. Haw. Aug. 8, 2023), *appeal filed* Sept. 8, 2023 (suggesting it could not credit any analogous law "unless it was done in a state where a significant percentage of the people . . . resided"); *Antonyuk v. Hochul*, 639 F. Supp. 3d 232, 336-37 (N.D.N.Y. 2022) (finding that four state laws were nonetheless "outliers" based on the percentage of the population of the nation those four states contained).

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

as much when they contend that SB 2's restrictions "have no basis in early American laws *or traditions*." *May* MPA at 1 (emphasis added). Identifying relevant laws and understanding their context is a time-consuming, labor-intensive task, which requires faithful application of the historical method. *See, e.g.,* Schrag Decl., ¶¶ 7, 19, 37. Although the *May* Plaintiffs' putative expert repeatedly states that he has "never seen a law restricting arms possession" (Cramer Decl., ¶ 66) relating to certain sensitive places (*id.*; *id.* at ¶¶ 67, 87, 90, 103 (similar)), such evidence is far from definitive and is difficult to evaluate without knowing what methods he used or sources he consulted in drawing this conclusion.

### C.   The Places Covered by SB 2 Are Properly Deemed Sensitive

#### 1.   Certain Places Are Sensitive Because of the Activities that Take Place There

<u>First</u>, places that are "sensitive" by virtue of the *activities taking place there* include many forms of government property, locations where people are free to exercise their constitutional rights, or locations particularly attractive to terrorism or organized crime. *See Bruen*, 142 S. Ct. at 2133 ("legislative assemblies, polling places, and courthouses"); *Heller*, 554 U.S. at 626 ("government buildings"); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015) ("post offices"); *United States v. Davis*, 304 F. App'x 473, 474 (9th Cir. 2008) ("airplane"). This category has historical roots in laws prohibiting firearms in places of election and legislative assembly. *See* Del. Const. art. 28 (1776), Comp. Ex. 28 ("To prevent any violence or force being used at the said elections, no person shall come armed to any of them."); 1647 Md. Laws 216, Comp. Ex. 14  ("no one shall come into the house of Assembly (whilst the house is set) with any weapon"); *see also* 1787 N.Y. Laws 345, Comp. Ex. 32 ; *see also Proceedings of the Conventions of the Province of Maryland, in 1774, 1775, & 1776* 185 (1836), Comp. Ex. 29; 1870 La. Acts 160, § 73, Comp. Ex. 75;  1870 Tex. Gen. Laws 63, Comp. Ex. 77; 1877 Va. Acts 305, Comp. Ex. 97; 1879 Mo. Laws 224, Comp. Ex. 103. These restrictions are intended

1  to prevent the carry of firearms from interfering with "the production of other kinds
2  of public goods protected by other kinds of constitutional rights." *See, e.g.*, Darrell
3  A.H. Miller, *Constitutional Conflict and Sensitive Places*, 28 Wm. & Mary Bill Rts.
4  J. 459, 466 (2019). As one 19th-century court put it, "the temple of justice" must
5  not be "turned into a barracks." *Hill v. State*, 53 Ga. 472, 477–78 (1824).

6              **a.    Local Government Buildings**

7          Section 26230(a)(5)'s restriction on the carrying of concealed firearms in local
8  government buildings is among the "laws forbidding the carrying of firearms in . . .
9  government buildings" that do not violate the Second Amendment. *Heller*, 554 U.S.
10  at 626; *Bruen*, 142 S. Ct. at 2133 (describing any debate over the constitutionality
11  of these "longstanding" laws as "settled"). Courts have repeatedly upheld
12  restrictions on firearms in government buildings against Second Amendment
13  challenges. *See Bonidy*, 790 F.3d at 1123 (holding that "the Second Amendment
14  right to bear arms has not been extended to 'government buildings'"); *United States
15  v. Class*, 930 F.3d 460, 463 (D.C. Cir. 2019) (ban on firearms on Capitol Hill
16  grounds does not "impinge [] upon a right protected by the Second Amendment"),
17  *abrogated in part on other grounds by Bruen*, 142 S. Ct. 2111 (ban on firearms on
18  Capitol Hill grounds does not "impinge[ ] upon a right protected by the Second
19  Amendment")[7]; *United States v. Marique*, 647 F. Supp. 3d 382, 393 (D. Md. 2022)
20  (restriction on carrying firearms into National Institutes of Health is "consistent
21  with the nation's historical regulation of firearms").

22          And just as a private property owner may control conduct on its own land, the
23  government holds a similar right when it operates as a proprietor. *See, e.g.,
24  GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 212 F. Supp. 3d 1348, 1363
25  (N.D. Ga. 2016) (upholding prohibition of firearms on U.S. Army Corps of

26  _____

27  [7] *Class* and other sensitive places cases were decided based on the Second
Amendment's scope under a standard that *Bruen* endorsed as "broadly consistent
28  with *Heller*" and appropriately "rooted in the Second Amendment's text, as
informed by history," 142 S. Ct. at 2127.

1  Engineers property); *Bonidy*, 790 F.3d at 1126 (observing that "the fact that the

2  government is acting in a proprietary capacity, analogous to that of a person

3  managing a private business, is often relevant to constitutional analysis").

4      Given this precedent, it is unsurprising that while Plaintiffs seek to enjoin

5  Section 26230(a)(5), *May* MPA at 3, they provide no argument in support of

6  enjoining that provision.

7                    **b.   Houses of Worship**

8      Plaintiffs are unlikely to succeed on their challenge to Section 26230(a)(22),

9  which restricts the carrying of concealed firearms in places of worship unless the

10  operator of the place of worship permits such carrying, because the historical record

11  confirms "that houses of worship are sensitive places, where it is constitutionally

12  permissible for the state to regulate the carrying of firearms." *See Goldstein v.*

13  *Hochul*, 2023 WL 4236164 (S.D.N.Y. June 28, 2023), at *12, *appeal filed* July 6,

14  2023; *see also Md. Shall Issue, Inc. v. Montgomery Cnty.*, 2023 WL 4373260 (D.

15  Md. July 6, 2023), at *10 ("The historical record . . . demonstrates a well-

16  established and representative number of statutes that prohibited firearms in places

17  of worship."). This tradition extends as far back as the 15th century, when English

18  law specifically prohibited the carrying of arms in churches and religious

19  congregations. 4 Hen 4, c. 29 (1402), Comp. Ex. 6 ("no Man be armed nor bear

20  defensible armor to Merchant Towns Churches nor Congregations in the same");

21  *see also* Charles Decl., ¶ 10.

22      After the Founding, as explained in greater detail below, *see infra*, Section

23  I(C)(2)(a), many of the general regulations prohibiting firearms at public gatherings

24  and assemblies specifically mentioned places of worship as examples of prohibited,

25  sensitive locations. *See* Charles Decl., ¶¶ 13-17, 20. Georgia in 1870 and 1882

26  prohibited the carrying of firearms and deadly weapons "to any . . . place of public

27  worship." 1870 Ga. Laws 421, Comp. Ex. 74; 1878 Ga. Laws 1181–82, Comp. Ex.

28  99. Texas in 1870 and 1879 prohibited anyone (except for law enforcement) from

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

carrying a gun into "any church or religious assembly." 1870 Tex. Gen. Laws 63, Comp. Ex. 77; 1879 Tex. Gen. Laws 43, Comp. Ex. 104. Missouri in 1875, 1879, and 1883 prohibited firearms in any place people assembled for religious worship. 1875 Mo. Laws at 50–51, Comp. Ex. 92; 1879 Mo. Laws 224, Comp. Ex. 103; 1883 Mo. Laws 76, Comp. Ex. 115. Virginia in 1877 prohibited guns and other dangerous weapons in "any place of worship while a meeting for religious purposes is being held." 1877 Va. Acts 305, Comp. Ex. 97. And the territories of Arizona in 1889 and Oklahoma in 1890 and 1893 prohibited the carry of firearms into "any church or religious assembly." 1889 Ariz. Sess. Laws 17, Comp. Ex. 138; 1890 Okla. Sess. Laws 496, Comp. Ex. 144; 1893 Okla. Sess. Laws 503, Comp. Ex. 162. Localities enacted similar restrictions in places of worship. Charlotte, N.C. (July 30, 1872), Comp. Ex. 82; Columbia, MO (1890), Comp. Ex. 142; Webb City, Mo., Ordinance 577 (1905), Comp. Ex. 196; Stockton, Kan., Ordinance 76 (July 1, 1887), Comp. Ex. 133; *see also* Charles Decl., ¶¶ 16-20 (recounting numerous other state and local laws restricting the carrying of firearms in places of worship); Rivas Decl., ¶ 53 (same). Indeed, California's law is less restrictive than these examples because permittees may be allowed to carry into some houses of worship (if the operator consents to such carrying).

Courts of the era not only upheld the constitutionality of firearm prohibitions in places of worship, but also evinced the general sentiment that religious gatherings are no place for dangerous weapons. *See State v. Reando* (Mo. 1878), Comp. Ex. 101 (upholding the constitutionality of Missouri's law prohibiting carry of firearms in, among other locations, churches); *Hill*, 53 Ga. at 475 ("[C]arrying arms at . . . places of worship[] is a thing so improper in itself, so shocking to all sense of propriety, so wholly useless and full of evil, that it would be strange if the framers of the constitution have used words broad enough to give it a constitutional guarantee"); *Andrews v. State*, 50 Tenn. 165, 182 (1871) ("[A] man may well be

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

1    prohibited from carrying [or wearing] his arms to church, or other public

2    assemblage."); *see also* Charles Decl., ¶ 21 n.31 (collecting cases).

3    Plaintiffs argue that "[i]n the Founding era, there were statutes all over

4    America that *required* bringing guns into churches, and sometimes to other public

5    assemblies." *May* MPA at 22. Instead of supporting Plaintiffs' position, the

6    existence of these laws suggests that "legislatures have long exercised significant

7    regulatory power over firearm carry, and individuals' ability to carry firearms in

8    houses of worship." *Goldstein*, 2023 WL 4236164, at *14. And, as one court has

9    explained, "these requirements were not rooted in the Second Amendment's

10    tradition"; rather, such laws were rooted in "racism" because they "required

11    militiamen or free white men to bring their firearms to church . . . so they could

12    defend against potential attacks by Native Americans and Blacks during slave

13    uprisings." *Id*. at *14; *see also* Charles Decl., ¶¶ 27-29.[8]

14    c.    **Financial Institutions**

15    Section 26230(a)(23)'s restriction on the carrying of concealed firearms into

16    financial institutions fits within the nation's tradition of firearms regulation. The

17    Court should apply a "more nuanced approach" because banks did not exist in their

18    modern form in 1791 and 1868. Murphy Decl., ¶ 8. Banks during those time

19    periods did not occupy a central place in the American economy, were primarily

20    frequented only by a small, elite clientele, and were not the target of armed

21    robberies. *Id*. at ¶¶ 8, 12, 21.

22    Conversely, today banks are central to the functioning of the financial system,

23    are frequented by vulnerable populations such as the elderly, and are targets of

24    armed and potentially violent robberies. *Id*. at ¶¶ 13, 14, 26. Like government

25    buildings and airports, banks are spaces that are particularly attractive to

26    ---

[8] The *May* Plaintiffs' purported expert holds the same opinion as well. Clayton E.

27    Cramer, *Colonial Firearm Regulation*, 16 J. On Firearms & Pub Pol'y 1, 7 (2016)
(describing the requirement in colonial Massachusetts as based on the "fear of
Indian attack" and the "principal concern" of colonial Virginia's requirement as

28    driven by "protection of the white inhabitants from possible slave uprising").

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

coordinated attacks by groups, including those with links to terrorism, *see, e.g., United States v. Langan*, 263 F.3d 613, 615 (6th Cir. 2001) (noting that a neo-Nazi group committed "bank robberies throughout the Midwest to support their avowed purpose of committing terrorist acts"), and, like airplanes, pose a particular risk of hostage taking (*see* 18 U.S.C.A. § 2113(e)) (specifically criminalizing hostage-taking during commission of a bank robbery). The government has long recognized this reality by, among other things, requiring banks to establish minimum standards to discourage robberies, 12 U.S.C.A. § 1882, and criminalizing bank robbery on the federal level, 18 U.S.C.A. § 2113. *See United States v. Marx*, 485 F.2d 1179, 1186 (10th Cir. 1973) (federal prohibition on bank robbery was "enacted to combat the multitude of murders and kidnappings occurring during attempts by bank robbers to flee the scene of the crime"). Indeed, banks often provide the armed security that both sets of plaintiffs argue weighs in favor of finding that firearms can be restricted. *May* MPA at 11; *Carralero* MPA at 19. Given these societal changes, Section 26230(a)(23) is thus analogous to historical firearms regulations at government buildings, and is the sort of new and analogous places the sensitivity of which appears beyond dispute. *See Davis v. Bragg*, 2009 WL 10740797 (C.D. Cal. Dec. 21, 2009), at *4 ("[T]he Second Amendment right to possess firearms does not extend to sensitive places such as airports and airplanes."); *Carralero* MPA at 19 (areas secured by TSA could be considered sensitive).[9]

The *May* Plaintiffs assert that there is "no historical tradition of barring the carrying of arms in banks" despite the fact that banks have purportedly "existed since the Founding (and long before)." *May* MPA at 23 (citing *Wolford*). But the language that Plaintiffs quote from *Wolford* sets forth the limitations of the court's holding: "The State also does not make any argument that this Court should

---

[9] The fact that neither set of Plaintiffs challenge restrictions at places such as jails and those involving nuclear power reflects the understanding that activities at certain locations (e.g., guarding inmates, handling dangerous materials) are obviously incompatible with private citizens carrying concealed firearms.

analogize to different historical regulations because banks at the time of the Second Amendment's ratification are substantially different than modern banks." *Id*. at 23-24 (citing *Wolford*, 2023 WL 5043805, at \*25). Here, Defendant has met its burden of establishing that, under the "more nuanced approach" appropriate here, banks are analogous to government buildings and other undisputedly sensitive places.

### 2. Certain Places Are Sensitive Because of Their Physical Nature

Second, the *physical nature* of a place may make it "sensitive." This is particularly true of places where "thousands of people" are "present in often crowded conditions." *Christopher v. Ramsey Cty.*, 621 F. Supp. 3d 972, 981 (D. Minn. 2022); *see also Nordyke v. King*, 563 F.3d 439, 459–60 (9th Cir. 2009) (firearms can be lawfully prohibited in certain "gathering places where high numbers of people might congregate"), *vacated on other grounds*, 575 F.3d 890 (9th Cir. 2009);[10] *see also GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d 1318, 1320, 1325–26 (11th Cir. 2015) (denying preliminary injunction against firearms ban in "area [that] is specifically designed for recreation").

This tradition harkens back to the longstanding prohibition on "going armed" under "such circumstances as are apt to terrify the people," including the carrying of arms in "places" where it was not "customary to make use of them." William Waller Hening, *The Virginia Justice* 50 (4th ed. 1825), Comp. Ex. 203. In early America, it was uncommon for civilians to carry arms in certain crowded gatherings, such as while "attending [public] meetings," 1 Joseph Chitty, *Commentaries on the Laws of England by the Late Sir W. Blackstone* 142–43 n.18 (1826), Comp. Ex. 204, or in "a place where persons were assembled for amusement." *Alexander v. State*, 27 Tex. App. 533, 537 (1889); *see also* Benjamin Vaughan Abbott, *Judge and Jury* 333 (1880), Comp. Ex. 206 (admonishing those

---

[10] Despite having been vacated, "the panel opinion in *Nordyke* is persuasive with respect to its 'sensitive places' analysis." *United States v. Masciandaro*, 648 F. Supp. 2d 779, 791 n.18 (E.D. Va. 2009), *aff'd*, 638 F.3d 458 (4th Cir. 2011), *abrogated in part on other grounds by Bruen*, 142 S. Ct. 2111.

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

who "toy[] with" pistols "at picnics, on board steamers, and in saloons"). Other early American laws reflecting these concerns involved prohibitions on firearms near parades and on trains. *See* 1820 N.H. Laws 322, Comp. Ex. 41 (prohibiting "any non-commissioned officer or private . . . [to] come on to any parade with his musket, rifle, or pistol loaded with powder and ball, slugs or shot"); 1876 Iowa Acts 142, Comp. Ex. 95 (making it a crime to "present or discharge any gun, pistol, or other fire arm at any railroad train, car or locomotive engine").[11]

These laws were aimed at preventing the predictable consequences of carrying firearms in crowded environments. *See Alexander*, 11 S.W. at 629 (upholding conviction for carrying pistol in schoolhouse holding evening entertainment). Among other things, these laws preserved order at public gatherings, improved the safety of travelers, and diminished the risk of panic in confined spaces. *See, e.g.*, Carina B. Gryting & Mark A. Frassetto, *NYRSPA v. Bruen and the Future of the Sensitive Places Doctrine*, 63 B.C. L. Rev. E. Supp. I.-60, I.-68 (2022) (explaining that [t]he number of potential targets" and "the increased risk of conflict all seem to be relevant in the historical determination that an area constitutes a sensitive place").

### a. Public Gatherings and Special Events

Section 26230(a)(10)'s restriction on the concealed carrying of firearms at or within 1,000 feet of permitted public gatherings or special events fits within the Nation's tradition of restricting firearms in these types of settings. In England, beginning in the 13th century, what "constituted a 'sensitive place' in which arms bearing could be regulated and restricted … encompassed densely populated areas, as well as areas where people regularly congregated for lawful purposes." Charles

---

[11] *See also, e.g.*, 1859 Wash. Sess. Laws 119, Comp. Ex. 63 (prohibiting carry in a penitentiary, jail, or house of correction); 1870 Tex. Gen. Laws 63, Comp. Ex. 77 (banning guns in any "ball room, social party or other social gathering composed of ladies and gentlemen"); 1879 Mo. Laws 224, Comp. Ex. 103 (prohibiting "concealed" carry of "firearms" in "any other public assemblage of persons met for any lawful purpose other than for militia drill").

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

Decl., ¶¶ 9-11 (noting restrictions in 1351 and 1419 that prohibited "go[ing] armed" in London); *see also* Rivas Decl., ¶ 38; Winkler Decl., ¶ 11; 1328 Statute of Northampton, Comp. Ex. 1 (prohibiting bringing "force in affray of the peace, nor [going] nor rid[ing] armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers").

Historical evidence "unequivocally" demonstrates "that armed carriage restrictions and the English common law against 'going armed' in urban and densely populated locations indeed made their way into the American Colonies and subsequent United States." Charles Decl., ¶ 12; Rivas Decl., ¶¶ 39-41; Winkler Decl., ¶¶ 12-15. In fact, around the time of the Founding, two jurisdictions—Virginia and North Carolina—expressly enacted or retained their own versions of the Statute of Northampton that were understood to impose restrictions on carrying weapons at public gatherings. 1786 Va. Laws 35, Comp. Ex. 31; 1792 N.C. Sess. Law 60–61, Comp. Ex. 33.

When jurisdictions in the United States began enacting more location-specific restrictions in the 19th century, it was common for these laws to prohibit weapons at large gatherings that were open to the public. Charles Decl., ¶¶ 13–15; Winkler Decl., ¶¶ 13–22; 1831 La. Acts 372, Comp. Ex. 44; 1852 N.M. Laws 69, Comp. Ex. 57. Exemplary of this trend is an 1870 Texas law that prohibited going armed in all places of gatherings or assemblies, such as:

> any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, . . . or *to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly*[.]

1870 Tex. Gen. Laws 63, Comp. Ex. 77 (emphasis added); *see also* Rivas Decl., ¶¶ 42–55 (discussing the 1870 Texas law and its subsequent iterations). Numerous other states and territories passed similar prohibitions on carrying in public gatherings, assemblies, and events. *See* 1869 Tenn. Pub. Acts 23, Comp. Ex. 72

("any fair, race course, or other public assembly of the people"); 1870 Ga. Laws 421, Comp. Ex. 74 ("any court of justice, or any election ground . . . , or any place of public worship, or any other public gathering in this State"); 1874 Mo. Laws 43, Comp. Ex. 91 ("any church or place [of worship], any school room or place where people are assembled for educational, literary or social purposes, . . . or into any other public assemblage of persons met for any lawful purpose [other than militia mustering]); 1879 Mo. Laws 224, Comp. Ex. 103 (same); 1889 Ariz. Sess. Laws 17, Comp. Ex. 138 ("any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering . . . or to any other public assembly"); 1893 Okla. Sess. Laws 496, Comp. Ex. 162 ("any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly"); 1901 Idaho Sess. Laws 84, Comp. Ex. 194 ("any public assembly"); 1903 Mont. Laws 49, Comp. Ex. 195 ("any church or religious assembly, any school room or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, . . . or social gathering . . . , or at any public assembly").

Local ordinances similarly restricted the carrying of firearms at public assemblies and gatherings. *See* Charles Decl., ¶¶ 16–19; Rivas Decl., ¶¶ 39–41, 53–55; *see also* Columbia, Mo., 1890, Comp. Ex. 142 ("where people have assembled for educational, literary or social purposes" and, more generally, at "any other public assemblage of persons met for any lawful purpose"); Stockton, Kan., Ordinance 76 (July 1, 1887), Comp. Ex. 133 (same); New Orleans, La., Ordinance

Respecting Public Balls (1816), Comp. Ex. 38 (forbidding weapons in public ballrooms).

Judicial opinions upholding these laws conveyed the consensus that governments could constitutionally restrict firearms at public gatherings. *See Andrews*, 50 Tenn. at 182 ("[A] man may well be prohibited from carrying his arms to church, or other public assemblage."); *Hill*, 53 Ga. at 476 ("[T]he bearing of arms of any sort [at concerts] is an eye-sore to good citizens, offensive to peaceable people, an indication of a want of a proper respect for the majesty of the laws, and a marked breach of good manners."); *Owens v. State*, 3 Tex. App. 404, 406 (1878) (affirming conviction for carrying a pistol into a public social gathering under Texas statute); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (upholding conviction under statute prohibiting carrying firearm to any place "where people are assembled for educational, literary, or social purposes"); *Alexander*, 27 Tex. App. at 537 (affirming conviction under statute prohibiting carrying weapons "into an assembly of people"); *Maupin v. State*, 17 S.W. 1038, 1039 (Tenn. 1890) (affirming conviction for carrying firearm at a mill, which was "a public . . . place to which customers were constantly invited and daily expected to go"); *State v. Pigg*, 85 Mo. App. 399, 402 (1900) (affirming conviction for carrying firearm at an in-home public social gathering); *Wynne v. State*, 51 S.E. 636, 637 (Ga. 1905) (affirming conviction for carrying firearm at a Fourth of July barbeque at which hundreds of people were assembled). These laws were upheld even in the face of arguments that carrying firearms in large gatherings would be necessary for self-defense. *See e.g.*, *Alexander*, 27 Tex. App. at 537; *Brooks v. State*, 15 Tex. App. 88, 90 (1883); *Maupin*, 17 S.W. at 1039; *see also* Charles Decl., ¶ 21 & n.31; Winkler Decl., ¶¶ 32–35.

Additionally, public gatherings and special events implicate many of the hallmarks of the places recognized by the Supreme Court as sensitive places, as such gatherings and events often involve the exercise of the right to assemble and

1   other constitutional rights. *Hill*, 53 Ga. at 476 ("[t]he right to bear arms," does not

2   "guarantee that the owners of these arms may bear them at concerts, and prayer-

3   meetings, and elections"); Miller, *supra*, 28 Wm. & Mary Bill Rts. J. at 466 (2019)

4   ("[P]laces are sensitive because they are the locus of the production of other kinds

5   of public goods protected by other kinds of constitutional rights").

6            **b.   Sellers of Liquor for Consumption on Site**

7        Section 26230(a)(9)'s restrictions on firearms in establishments "where

8   intoxicating liquor is sold for consumption on the premises" comports with the

9   history and tradition of firearms restrictions. As an initial matter, this provision is

10   broadly consistent with the rich history and tradition of restricting firearms at social

11   gatherings and public assemblies, *see supra*, Section I(C)(2)(a), and in areas that

12   feature vulnerable populations (i.e., those whose judgment is impaired), *see infra*,

13   Section I(C)(3).

14        More specifically, there is an abundance of historical laws restricting the

15   carrying of firearms in alcohol-rich environments that reflect an understanding of

16   the unique dangers of mixing alcohol and guns. "[B]y the mid-eighteenth century,

17   many colonial lawmakers viewed liquor and arms bearing as a potentially

18   dangerous combination." Charles Decl., ¶¶ 22–23 (compiling statutes that

19   prohibited the sale of liquor to militiamen both before and around the time of the

20   ratification of the Constitution); *see also* Winkler Decl., ¶ 26. Thus, many colonies

21   prohibited the sale of alcohol to militiamen while on duty, 1746 N.J. Laws 146,

22   Comp. Ex. 20; 1756 Del. Laws 13, Comp. Ex. 22; 1780 Pa. Laws 368, Comp. Ex.

23   30, and Maryland even went so far as to entirely prohibit the sale of alcohol within

24   the proximity of places of military training, 1756 Md. Laws 460, Comp. Ex. 23.

25   These militia- and military-focused liquor laws extended into and after the

26   Founding period with numerous States enacting similar laws. 1799 N.J. Laws 436–

27   37, Comp. Ex. 35; 1793 Pa. Laws 473, Comp. Ex. 34; 1817 Md. Laws 15, Comp.

28   Ex. 39. And a Connecticut statute from 1859 prohibited the sale of alcohol to

*anyone* within one mile of a military ground or encampment because such areas contained a large concentration of persons carrying firearms. 1859 Conn. Acts 62, Comp. Ex. 62.

In the 19th century, jurisdictions broadened restrictions on carrying firearms and other weapons amidst alcohol, even by those who choose not to drink. *See* Charles Decl., ¶ 24; Mancall Decl., ¶ 15; Winkler Decl., ¶¶ 28–31. For example, laws nearly identical to Section 26230(a)(9) prohibited the carrying of firearms in "any place where intoxicating liquors are sold," 1890 Okla. Sess. Laws 496, Comp. Ex. 144, and in social gatherings "where Liquors are sold," 1853 N.M. Laws 69, Comp. Ex. 58. Likewise, local laws—*e.g.*, New Orleans (New Orleans, La. (1882), Comp. Ex. 112)) and San Antonio (San Antonio, Tx., An Ordinance Concerning the Carrying of Arms or Deadly Weapons (Dec. 14, 1870), Comp. Ex. 76)—barred bringing weapons into barrooms, taverns, saloons and other places where alcohol is served, even by those who themselves were not drinking. Winkler Decl., ¶¶ 29–31. And still other laws prohibited "retailer[s] of intoxicating liquors" from being issued a permit to keep or sell gunpowder. *See* Chicago, Ill., Regulating the Keeping and Conveying Gun Powder and Gun Cotton (1851); Comp. Ex. 55; St. Paul, Minn. (1858), Comp. Ex. 61. Indeed, an 1880 legal treatise noted that "keeping pistols … in saloons" is a "practice[] upon which every good citizen will frown, and which the law of the land is every year more explicitly discouraging." Benjamin Vaughan Abbott, Judge and Jury 333 (1880), Comp. Ex. 206.

States and localities also have historically prohibited the carrying of firearms by intoxicated individuals. 1867 Kan. Sess. Laws 25, Comp. Ex. 69; 1878 Miss. Laws 175, Comp. Ex. 100; 1879 Mo. Laws 224, Comp. Ex. 103; 1883 Wis. Sess. Laws 290, Comp. Ex. 119; 1890 Okla. Sess. Laws 495, Comp. Ex. 144. The existence of these laws in conjunction with the widespread prohibitions on carrying firearms in public gatherings and assemblies (*see supra*, Section I(C)(2)(a)) demonstrates the consensus across jurisdictions about the unique dangers of having

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

firearms in the presence of alcohol, even where those who are carrying might not be intoxicated. Charles Decl., ¶¶ 25–26; *see also Shelby*, 90 Mo. at 302 (upholding statute as "in perfect harmony with the constitution" because "[t]he mischief to be apprehended from an intoxicated person going abroad with fire-arms upon his person is equally as great as that to be feared from one who goes into an assemblage of persons with one of the prohibited instruments").

Section 26230(a)(9) reflects these longstanding concerns about mixing guns and alcohol. *See* Mancall Decl., ¶¶ 10–14, 26-27 (describing the historical understanding and concerns about the dangers posed by alcohol and weapons); Winkler Decl., ¶ 31 ("The mere threat of intoxication from being at parties, social gatherings, or taverns was historically sufficient to justify the prohibition on firearms."). Modern bars, restaurants, nightclubs, and other places that sell liquor for on-site consumption feature large crowds assembled for long periods of time, often in close quarters. When alcohol is added to these environments, people's inhibitions are lowered and their judgment is impaired—creating a vulnerable population, even among those who choose not to drink. *See State v. Torres*, 134 N.M. 194, 197 (N.M. App. 2003) (recognizing "obvious danger in the combination of firearms and liquor consumption"). Because intoxicated individuals may fail to appreciate the danger of firearms—even those carried by sober individuals—these weapons are likely to exacerbate an already volatile situation, rather than quell any potential danger. Because 18th and 19th century lawmakers understood these risks, they regulated these unique settings accordingly, enacting laws to keep firearms separate from gatherings where alcohol would be present.

### c.   Public Transportation

Section 26230(a)(8)'s designation of public transportation systems as sensitive places is also consistent with historical tradition. As with financial institutions, California's restrictions of concealed weapons on public transportation must be analyzed under *Bruen*'s "more nuanced approach," because—as the *May* Plaintiffs'

purported expert concedes—"there was no public transit" prior to 1791. Cramer Decl., ¶ 56.[12] Rather, "[u]ntil the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers." Rivas Decl., ¶ 63; Salzmann Decl., ¶ 84 (privately owned and operated "turnpikes, stage coaches, streets, roads, wagons, ferries, and shops of early America" should not be analogized to today's transit systems).

Today's public transportation systems in California bear several characteristics that have historically justified the restriction of firearms. First, public transit vehicles and facilities are crowded, confined spaces designed to transport large numbers of people as efficiently as possible. In such densely packed spaces, the discharge of a firearm is highly likely to result in severe injury to innocent bystanders, either via a gunshot wound or due to mass panic from attempts to escape the shooter. *See Nordyke*, 563 F.3d at 459–60 (designating "gathering places where high numbers of people might congregate" as sensitive places).

Public transportation systems are also sensitive places because they serve vulnerable populations, particularly children. For example, many California transit systems all provide free rides or discounted fares for students.[13] As with schools, California's public transportation systems are sensitive places, given their critical

_____

[12] The *Carralero* Plaintiffs identify a single "public ferry" that was established in South Carolina "as early as 1725." *Carralero* MPA at 20. But the regulations that applied to this ferry addressed the ferriage of militiamen during times of emergency, not members of the general public in times of peace. Rivas Decl., ¶ 64; *Kipke v. Moore*, 2023 WL 6381503, at *10 (D. Md. Sept. 29, 2023) (discounting Plaintiffs' citation to "one public ferry in South Carolina that was established as early as 1725").

[13] Alameda County Transportation Commission, STUDENT TRANSIT PASS PROGRAM 2021-2022, available at https://www.alamedactc.org/wp-content/uploads/2021/08/NUSD_STPP-2021-2022-Student-FAQs-AC-Transit.pdf#:~:text=The%20Student%20Transit%20Pass%20Program%20%28STPP%29%20provides%20free,trips%20and%20youth%20discounts%20on%20other%20transit%20systems; L.A. Metro, GOPASS FOR K-12 AND COMMUNITY COLLEGE STUDENTS, available at https://www.metro.net/riding/fares/gopass/.

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

role in transporting children to and from school—without which education would be inaccessible to many young students.

Additionally, many public transportation facilities—such as train stations and bus stops—are owned or operated by state and local government agencies.[14] These facilities thus are government buildings—another category of sensitive places that has been expressly recognized by the Supreme Court. *Bruen*, 142 S. Ct. at 2133; *see supra*, Section I(C)(1)(a).

Finally, California's prohibition of concealed weapons on public transit systems is consistent with Reconstruction-era restrictions on the carry of firearms on trains. *See* Rivas Decl., ¶ 67; Salzmann Decl., ¶¶ 69–77. These regulations demonstrate that, consistent with the Nation's historical tradition of firearm regulation, restricting firearms on transit systems is not viewed as a violation of the Second Amendment.

The *May* Plaintiffs attach significance to the exception for "travel" in various historical statutes that otherwise restricted the carry of concealed weapons. *May* MPA at 16. However, such travel exceptions were "narrowly defined"; they did not apply to "everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern transportation." Rivas Decl., ¶ 57. Instead, these exceptions applied only to travel that necessitated "ventur[ing] outside one's community sphere and becoming vulnerable to dangers such as robbers and predatory animals." *Id.*; *see also id.* at ¶¶ 59–62 (summarizing cases describing the limitations imposed by various courts on the traveler exception). The limited nature of historical traveler exceptions to concealed carry

---

[14] The *Carralero* Plaintiffs suggest that airports could be considered "sensitive places" because of the presence of "TSA at the airport." *Carralero* MPA at 22. But having the constitutional permissibility of sensitive places restrictions turn on whether the government chooses to provide a certain level of screening at that location would mean that Second Amendment rights turn not "text, history, and tradition," but instead on at which places a jurisdiction presently chooses to conduct security screening.

laws thus underscores—rather than undermines—the legitimacy of California's prohibition of firearms within public transportation systems.

### d.    Casinos, Stadiums, and Amusement Parks

Section 26230(a)(15), (a)(16), and (a)(19)'s restrictions on the carrying of concealed firearms in casinos, stadiums, and amusement parks are constitutionally sound. These types of spaces did not exist in their modern form at either the Founding or Reconstruction. *See* Winkler Decl., ¶¶ 23, 27; Brewer Decl., ¶¶ 17–20; Macall Decl., ¶¶ 20, 24–25; G. Robert Blakey, *Gaming, Lotteries, and Wagering*, 16 Rutgers L.J. 211, 212 (1985) (noting that before 1950 there were "few exceptions to a general prohibition against gambling at the federal and state levels").[15] Nor could the Founders have imagined a place like Dodger Stadium, with seating capacity roughly the size of Boston's population in 1820.  Thus, a "more nuanced approach" is called for in drawing historical analogies to these restrictions.

Using this approach, the rich historical tradition of prohibiting the carry of firearms where people gather for social and entertainment purposes is the most relevant source of analogues. Laws during both the Founding era and the Reconstruction era prohibited firearms in these locations. 1786 Va. Laws 35, Comp. Ex. 31 (restricting firearms "in fair or markets"); New Orleans, La., Ordinance Respecting Public Balls (1816) Comp Ex. 38 (prohibiting "any person to enter into a public ballroom with any . . . weapon"); 1853 N.M. Laws 69, Comp. Ex. 58 (banning firearms at "Balls or Fandangos"); New Orleans, La. (May 1882),

---

[15] Restricting firearms at casinos is also supported by the nature of the activity occurring there. "[G]ambling has been associated with several other high risk behaviors," Guadalupe Gutierrez, Ph.D., *Jurisdictional Ambiguities Among Sovereigns: The Impact of the Indian Gaming Regulatory Act on Criminal Jurisdiction on Tribal Lands*, 26 Ariz. J. Int'l & Comp. L. 229, 255 (2009), and casinos are more likely to have a connection to organized crime than other establishments, *see Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*, 468 U.S. 491, 495 (1984) ([T]he vast amount of money that flows daily through a casino operation and the large number of unrecorded transactions make the industry a particularly attractive and vulnerable target for organized crime.").

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

Comp. Ex. 112 (prohibiting arms in "any place of public entertainment or amusement"); *see also supra*, Section I(C)(2)(a) (collecting Reconstruction-era laws banning firearms in various entertainment venues).

Just as jurisdictions could constitutionally restrict carrying firearms at fairs and ballrooms in the 18th and 19th century, California can do so at a casino, stadium, or amusement park today. *See Bruen*, 142 S.Ct. at 2133 ("courts can use analogies to those historical regulations" to uphold any "modern regulations prohibiting the carry of firearms in *new* and analogous sensitive places"); *Kipke*, 2023 WL 6381503, at *15 ("regulations restricting firearms in stadiums, racetracks, amusement parks, and casinos are analogous to historical statutes banning them in gathering places for entertainment"); *Christopher*, 621 F. Supp. 3d at 981 (because "thousands of people and children [are] present in often crowded conditions" at a state fair, fairgrounds property is a sensitive place); Transcript of Oral Argument, *Bruen* (Case No. 20-843), 64:4-9, *available at* https://www.supremecourt.gov/oral_arguments/argument_transcripts/2021/20-843_7m5e.pdf (Justice Roberts: "I can understand, for example, a regulation that says you can't carry a gun into, you know, Giants Stadium, just because a lot of things are going on there and it may not be safe to have—for people to have guns.").[16] Section 26230(a)(15), (a)(16), and (a)(19) and their historical predecessors both prohibit carrying firearms in certain places of social gathering and entertainment, and are justified by the desire to "protect individuals engaged in these recreational and social activities from confrontations and encounters involving firearms," *see Md. Shall Issue*, 2023 WL 4373260, at *12, and to protect vulnerable populations such as children who visit stadiums and amusement parks, *see Christopher*, 621 F. Supp. 3d at 981.

---

[16] A few days ago, the court in *B&L Productions, Inc. v. Newsom*, 2023 WL 7132054 (C.D. Cal. Oct. 30, 2023), enjoined California's restrictions on gun shows on state-owned property. *Id.* at *1. But the court noted that the challenged provisions there were sale, not carry, restrictions. *Id.* at *15.

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

### 3.    Certain Places Are Sensitive Because of the People Found There

*Third*, a place may be sensitive because of the *people* who congregate there, including particularly vulnerable groups such as children, the elderly, and those suffering from illness. *See Heller*, 554 U.S. at 626–27; *United States v. Walters*, 2008 WL 2740398 (D.V.I. July 15, 2008), at *1 & n.1 (criminalizing possession of gun within 1,000 feet of school does not violate the Second Amendment); *Kipke*, 2023 WL 6381503, at *8 ("[H]ealth care facilities . . . serve a vulnerable population, and their regulation is justified by the protection of that population."). The frequent presence of children in a particular location strongly indicates that the area should be deemed sensitive for Second Amendment purposes. *See, e.g.*, *DiGiacinto v. Rector & Visitors of George Mason Univ.*, 704 S.E.2d 365, 370 (Va. 2011) (university was "sensitive place" in part because "elementary and high school students" were there in the summer). The sensitivity of such places finds considerable support in Reconstruction-era laws prohibiting guns in "any school room or other place where persons are assembled for educational, literary or scientific purposes." *See* 1870 Tex. Gen. Laws 63, Comp. Ex. 77; *see also* 1878 Miss. Laws 176, Comp. Ex. 100; 1879 Mo. Laws 224, Comp. Ex. 103. These laws were designed to, among other things, protect vulnerable persons who, because of their age or physical state, cannot easily escape attack, much less defend themselves. *See, e.g., Masciandaro*, 648 F. Supp. 2d at 791 (explaining that "schools" are treated as sensitive places because "possessing firearms in such places risks harm to great numbers of defenseless people (e.g., children)").

#### a.    Health Care Facilities

Section 26230(a)(7)'s restriction on firearms in health care facilities fits within the Nation's tradition of sensitive place restrictions because modern health care facilities exist for scientific and educational purposes and serve a vulnerable population. A "more nuanced approach" is applicable here because health care

facilities have undergone "dramatic technological changes" since the Founding and Reconstruction eras. *Bruen*, 142 S. Ct. at 2132. As the *May* Plaintiffs' own purported expert concedes, hospitals were "rare" at the time of the Founding (Cramer Decl., ¶ 66), and the few hospitals that did exist were not the technologically advanced "medical workplaces" that exist today. Fissell Decl., ¶ 13. Rather, hospitals of the 1790s and 1860s were "primarily charitable rather than medical institutions, serving a patient clientele of poor, sick persons in cities." Kisacky Decl., ¶ 31. Unlike today's hospitals, hospitals in the Founding era focused heavily on "disciplining and improving the morals of their inmates" by imposing strict rules, including mandatory twice-daily prayers and work requirements, and these early hospitals offered only the most rudimentary (and often questionable) medical treatments (such as bloodletting and prescribing alcohol). *Id*. at ¶ 21.

Thus, Founding-era hospitals "were the last, not the first, place persons would choose to go when injured and sick" (*id*. at ¶ 32), and "the only patients in such places were people with no other choice"; the wealthy preferred house calls (Fissell Decl., ¶ 6). It was not until the late nineteenth century, as medical practices grew in sophistication and complexity, that "there was a shift in the norm of medical practice at home to 'the professionalization of health care practices that eventually included the development of a full and competitive commercial market for medical services that increasingly took place in hospitals.'" *Md. Shall Issue, Inc.*, 2023 WL 4373260, at *14.

Plaintiffs ignore the fact that "hospitals did not exist in their modern form at the time of the ratification of the Second or Fourteenth Amendments." *Kipke*, 2023 WL 6381503, at *8. They also overlook the fact that laws expressly prohibiting firearms in hospitals were not necessary at the time of the Founding because the patient population of those hospitals could not afford—and thus, did not possess—firearms, and because such laws would have been duplicative of the hospitals' own rules aimed at ensuring order and control over their patients. Fissell Decl., ¶ 14.

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

1    Applying a "more nuanced approach," Section 26230(a)(7)'s restriction on

2    carrying firearms in modern-day healthcare facilities falls squarely within the

3    Nation's historical tradition of prohibiting the carry of firearms in sensitive places.

4    First, health facilities inarguably serve the "scientific purpose" of administering

5    medical treatment, and states and municipalities have traditionally prohibited

6    firearms in places where persons assembled for "scientific purposes." *See* 1870

7    Tex. Gen. Laws 63, Comp. Ex. 77; San Antonio, Tx., An Ordinance Concerning the

8    Carrying of Arms or Deadly Weapons (Dec. 14, 1870), Comp. Ex. 76; 1871 Tex.

9    Gen. Laws 25–26, Comp. Ex. 80; 1889 Ariz. Sess. Laws 17, Comp. Ex. 138; 1890

10   Okla. Sess. Laws 496, Comp. Ex. 144; 1903 Mont. Laws 49–50, Comp. Ex. 195;

11   *see also supra*, Section I(C)(2)(a). "While these statutes do not expressly prohibit

12   firearms in health care facilities, *Bruen* does not require historical statutes to be a

13   'twin' or 'dead ringer' for the modern regulation." *Kipke*, 2023 WL 6381503, at *8.

14   Second, "health care facilities . . . serve a vulnerable population, and their

15   regulation is justified by the protection of that population." *Id.*; *see also We The*

16   *Patriots, Inc. v. Grisham*, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), at *11

17   (concluding that what constitutes a sensitive place can be determined by "whether a

18   vulnerable population" uses that location). And third, California's 107 teaching

19   hospitals[17]—where physicians complete their medical training and which "follow a

20   tripartite mission of clinical care, education and research"[18]—share many of the

21   same characteristics as schools; thus, prohibiting firearms in these hospitals falls

22   within the historical tradition of designating places that serve "educational

23   purposes" as sensitive places. *See* 1870 Tex. Gen. Laws 63, Comp. Ex. 77; San

---

24   [17] Association of American Medical Colleges, STATE-BY-STATE GRADUATE
25   MEDICAL EDUCATION DATA, available at https://www.aamc.org/advocacy-
     policy/state-state-graduate-medical-education-
26   data#:~:text=California%2015%20MD-%20and%20DO-
     granting%20schools%20107%20teaching,training%201%2C860%20residents%20n
27   ot%20supported%20by%20Medicare%20DGME.
     [18] American Hospital Association, TRENDWATCH: TEACHING HOSPITALS' IMPACT IN
     A CHANGING HEALTH CARE LANDSCAPE, November 2020, available at aha-
28   trendwatch-teaching-hospitals-1020.pdf.

Antonio, Tx., An Ordinance Concerning the Carrying of Arms or Deadly Weapons (Dec. 14, 1870), Comp. Ex. 76; 1871 Tex. Gen. Laws 25–26, Comp. Ex. 80; 1874 Mo. Laws 43, 1875 Mo. Laws 50, 1879 Mo. Laws 224, and 1883 Mo. Laws 76, Comp. Exs. 91–92, 103, 115; 1878 Miss. Laws 176, Comp. Ex. 100; Stockton, Kan., Ordinance 76 (July 1, 1887), Comp. Ex. 133; 1889 Ariz. Sess. Laws 17, Comp. Ex. 138; 1890 Okla. Sess. Laws 496, Comp. Ex. 144; Columbia, Mo. (1890), Comp. Ex. 142; Huntsville, Mo., An Ordinance in Relation to Carrying Deadly Weapons (July 17, 1894), Comp. Ex. 169; 1903 Mont. Laws 49–50, Comp. Ex. 195.

### b.    Playgrounds and Youth Centers

Plaintiffs are unlikely to succeed on their challenge to Section 26230(a)(11)'s restriction on firearms at playgrounds and youth centers. These types of spaces did not exist in their modern form at either the Founding or Reconstruction (*see* Brewer Decl., ¶¶ 16, 23; Glaser Decl., ¶ 69), and the challenged modern regulations are "reasonably proportionate" to relevant historical analogues. *See Antonyuk*, 639 F. Supp. 3d at 324 (citing New York, N.Y., Ordinances of the Central Park (1858), Comp. Ex. 60; Philadelphia, Pa. (Apr. 14, 1868), Comp. Ex. 70; 1881 Chicago, Ill. 391–92, Comp. Ex. 106; 1883 Tower Grove Park, Mo. 117, Comp. Ex. 117; 1888 St. Paul, Minn. 689, Comp. Ex. 137, in refusing to enjoin firearms restrictions on playgrounds)); *see also Koons*, 2023 WL 3478604, at *82 (refusing to enjoin a law banning "firearms at playgrounds").

Restrictions on firearms at playgrounds and youth centers are not only supported by those specific historical restrictions, but also by restrictions on firearms at schools. *See Heller*, 554 U.S. at 626 (noting constitutionality of "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings"); *United States v. Walter*, 2023 WL 3020321 (D.V.I. Apr. 20, 2023), at *7–8 (affirming constitutionality of federal ban on possession of a firearm in school zones). The same analogical reasoning was adopted by the court

in *Antonyuk*, which concluded that modern restrictions on playgrounds find support in historical analogues prohibiting firearms in schools "given that, by their very nature, both places often contain children." 639 F. Supp. 3d at 324; *see also We The Patriots, Inc.*, 2023 WL 6622042, at \*10 ("[T]his Court finds that playgrounds are 'sensitive places' and are excepted from the Second Amendment's commands."). And such restrictions should be considered under a "more nuanced approach" because playgrounds and other non-school settings where children would gather (such as youth centers) to play and learn emerged alongside modern parks only in late nineteenth and early twentieth centuries. *See* Glaser Decl., ¶¶ 69–71; Young Decl., ¶ 36.

### c.   Parks and Athletic Facilities

Section 26230(a)(12)'s restriction on carrying firearms in public parks and athletic facilities and subdivision (a)(13)'s restriction on the carrying of firearms in state parks are constitutionally sound. Public parks that resemble modern parks only began to emerge in the middle of the nineteenth century. Young Decl., ¶¶ 15, 27–29; Glaser Decl., ¶ 18. Plaintiffs argue that "[p]arks obviously existed before and during the Founding," citing Boston Common as an example. *Carralero* MPA at 14. But far from being the equivalent to today's public park, until the mid-nineteenth century, places like Boston Common were "multi-purpose utilitarian space[s]" that contained livestock housing, cemeteries, and even places for organized militias to drill. Young Decl., ¶¶ 15–16; *see also Kipke*, 2023 WL 6381503, at \*9 (finding that the "few" parks that existed prior to the mid-19th century "did not resemble the modern, expansive State and federal park system that the United States has today," and noting that "Boston Common, for example, was used primarily as a pasture, a place of execution, and site for the militia to muster and drill").

"The push for larger greenspaces in cities began in earnest in the pre-Civil War years as increasing numbers of Americans chose to live in cities." Young

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

Decl., ¶ 25; *see also* Glaser Decl., ¶¶ 14, 18–19. New York City's Central Park became the first such space in the mid-nineteenth century. Young Decl., ¶ 25. Before the nineteenth century ended, America's best-known urban parks had appeared, including those in California (i.e., San Francisco's Golden Gate Park, Los Angeles's Griffith Park, and San Diego's Balboa Park). *Id.* at ¶ 27. Many of these parks "swiftly promulgated similar prohibitions concerning the carrying of firearms . . . because they shared a common purpose—the improvement of American society." *Id.* at ¶¶ 34, 37 (collecting park regulations prohibiting the carrying of firearms in Central Park, Brooklyn's Prospect Park, and San Francisco's Golden Gate Park, among other parks); *see also Kipke*, 2023 WL 6381503, at *10 ("The historical record further shows that as States and cities created more parks, they also imposed firearm regulations.").

By 1900, the carrying of firearms was prohibited in more than two dozen parks across at least ten different states. *See* Young Decl., ¶¶ 34–35, 37. Once the park movement took hold on the national level, Yellowstone National Park banned firearms in 1897. Comp. Ex. 186; *see also* Glaser Decl., ¶ 32 (explaining influence of park movement on national level). And after a national rule-making commission was established, firearms were banned from all national parks in 1936, *see* 1 Fed. Reg. 671, 791 (June 27, 1936), Comp. Ex. 201, a ban that was in place for more than 70 years. Similarly, once the state park movement took hold, firearm bans were enacted in many state parks, including California's. Glaser Decl., ¶¶ 54–55. Defendant is unaware of any case challenging these regulations as unconstitutional, and Plaintiffs have not pointed to any "disputes regarding the lawfulness of such prohibitions." *Bruen*, 142 S. Ct. at 2133; *see also Warden v. Nickels*, 697 F. Supp. 2d 1221, 1229 (W.D. Wash. 2010) (finding that like a "government building or school, a city-owned park where children and youth recreate is a 'sensitive' place where it is permissible to ban possession of firearms" because there is "no logical distinction between a school on the one hand and a community center where

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

educational and recreational programming for children is also provided on the other"). Like the historical analogues identified in Section I(C)(3)(b), *supra*, Section 26230(a)(12) and (a)(13)'s restrictions on firearms in parks and athletic facilities lawfully prohibit the carrying of firearms for the purpose of maintaining those spaces as a safe space of repose.

### d.    Libraries, Museums, and Zoos

Plaintiffs cannot show that they are likely to succeed on their challenges to Section 26230(a)(17) and (a)(20)'s prohibitions on carrying concealed weapons in libraries, museums, and zoos. As a preliminary matter, libraries, museums, and zoos did not exist in their modern form during the Founding or Reconstruction eras. *See* Glaser Decl., ¶¶ 13, 63; Brewer Decl., ¶¶ 14–16; Kevane Decl., ¶¶ 8–9. The first public library similar to those existing today did not open until 1833,[19] and it was not until the late nineteenth century that public library systems' growth accelerated alongside the Nation's broader public education movement. Kevane Decl., ¶¶ 12, 14, 24. Similarly, few museums that were open to the public (as opposed to those that were "primarily the private collections of the wealthy") existed until the mid-to-late nineteenth century. Glaser Decl., ¶ 63; *see also* Brewer Decl., ¶ 15. And the first zoo opened by an American city—the Philadelphia Zoo— did not exist until 1874. Glaser Decl., ¶ 63 n.45. Accordingly, these three categories of sensitive places are subject to *Bruen*'s "more nuanced approach." *Bruen*, 142 S. Ct. at 2132.

California's prohibition of firearms within libraries, museums, and zoos falls naturally within the Nation's historical tradition of regulating firearms in places of gathering for "literary," "educational," or "scientific purposes." *See supra*, Section I(C)(3)(a) (collecting laws regulating firearms at places with those purposes); *see also Allam*, 2023 WL 5846534, at *21 ("[I]t appears that these state and territorial

---

[19] Benjamin Franklin's Library Company of Philadelphia opened in 1731, but that was a privately owned subscription library open only to its shareholders. Kevane Decl., ¶ 9; Brewer Decl., ¶¶ 12–14.

restrictions were intended to keep firearms and other weapons out of . . . areas where the free flow of information and ideas was to be encouraged."); *Md. Shall Issue*, 2023 WL 4373260, at *12 (collecting statutes and denying motion to preliminarily enjoin firearm restrictions in libraries because they are "places of gathering for literary or educational purposes").

The public library system was created to supplement America's public education system, Kevane Decl., ¶¶ 22–23, a mission which California's public libraries continue today by, among other things, offering free adult and family literacy classes,[20] distributing voter registration applications,[21] and providing free lunches to school-aged children during summer.[22] Museums were created for a similar educational purpose; for example, Congress established the Smithsonian Institution in 1846 "for the increase and diffusion of knowledge." Glaser Decl., ¶ 64. Today, California's museums educate the public on a wide variety of academic subjects and are routinely visited by students during field trips.[23] Likewise, zoos—another popular field trip destination for students[24]—not only serve to educate the public about the natural world, but also are critical conservation and research centers.

California's designation of libraries, museums, and zoos as sensitive places is further justified by the fact that vulnerable populations—most notably, children—frequent these institutions. These locations are often crowded, creating a high risk

---

[20] California Library Literacy Services, PROGRAM OVERVIEW, available at https://libraryliteracy.org/about/overview/.
[21] California Secretary of State, VOTER REGISTRATION, available at https://www.sos.ca.gov/elections/voter-registration.
[22] California State Library, LUNCH AT THE LIBRARY, available at https://www.library.ca.gov/services/to-libraries/lunch/.
[23] *See, e.g.,* The Paul J. Getty Museum, PLANNING A SCHOOL VISIT, available at https://www.getty.edu/education/for_teachers/trippack/; California Museum, FIELD TRIPS AND GROUPS, available at https://californiamuseum.org/visit/field-trips-groups/; California Academy of Sciences, SCHOOL FIELD TRIPS, available at https://www.calacademy.org/educators/field-trips.
[24] *See, e.g.,* San Diego Zoo, STUDENT AND YOUTH GROUPS, available at https://zoo.sandiegozoo.org/student-youth-groups; Santa Barbara Zoo, FIELD TRIPS AND GROUP RESERVATIONS, available at https://www.sbzoo.org/visit-the-santa-barbara-zoo/field-trips/.

of severe injury to innocent bystanders if a firearm is discharged. This risk is particularly acute at zoos, given the presence of wild animals with the propensity to act in unpredictable and destructive ways. Thus, prohibiting the concealed carry of weapons in libraries, museums, and zoos also falls within the historical tradition of restricting firearms in locations where vulnerable persons gather in large numbers. *See supra*, Section I(C)(3).

### 4.   Parking Lots of Sensitive Places Are Also Sensitive

Restricting firearms in the parking areas of sensitive places does not violate the Second Amendment. "[T]his Nation is no stranger to prohibiting individuals from possessing or carrying firearms . . . within a certain proximity of sensitive places." *Allam*, 2023 WL 5846534, at *23; *see also Walter*, 2023 WL 3020321, at *7 ("Not only is there historical evidence of regulation on firearms in sensitive places, but there is also evidence of laws creating 'buffer zones' around those places as well."); *Md. Shall Issue*, 2023 WL 4373260, at *13 (finding "numerous examples of laws prohibiting firearms in buffer zones of a certain distance around a 'sensitive place'"); *United States v. Lewis*, 50 V.I. 995, 1000–01 (D.V.I. 2008) (upholding constitutionality of statute with 1,000 foot buffer zone around schools); Del. Const. art. 28 (1776), Comp. Ex. 28 (outlawing "any 'battalion or company' from coming within a mile of a polling place for twenty-four hours before or after the election"); 1870 La. Acts 159, Comp. Ex. 75 (banning "any dangerous weapon, concealed or unconcealed, on any day of election . . . or registration . . . within a distance of one-half mile of any place of registration").

Numerous cases have upheld sensitive places restrictions that specifically included parking lots. *See Class*, 930 F.3d at 464 (concluding that "the same security interests which permit regulation of firearms 'in' government buildings permit regulation of firearms on the property surrounding those buildings"); *Bonidy*, 790 F.3d at 1125 (concluding that "the parking lot should be considered as a single unit with the postal building itself to which it is attached and which it

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

exclusively serves"); *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009) (parking lot used by the Postal Service "falls under the 'sensitive places' exception recognized by *Heller*"). Plaintiffs' argument—that prohibiting public carry in a parking lot "would be an overbroad application of the limited, though legitimate, sensitive places doctrine" (*May* MPA at 4)—thus runs against the vast weight of authority addressing this issue.[25]

### 5. Plaintiffs' Theory of Sensitivity Based on "Perceived" Need Does Not Pass Constitutional Muster

As the historical record set forth above demonstrates, whether a place is sensitive is not determined based on the perceived "need" to carry guns there. Yet Plaintiffs argue that the unifying theme among the sensitive places the Supreme Court has recognized is that they are "all securable locations that were protected by heightened government-provided security, greatly reducing the public's need for individual weapons." *Carralero* MPA at 19; *see also May* MPA at 11 (arguing that "California might have more credibility trying to justify SB 2, by mandating (and paying for) metal detectors and armed security at their list of sensitive places"). This argument fails for three reasons.

First, many "paradigmatic 'sensitive places'" are "open to the public, without any form of special security or screening," including schools and post offices, thus underscoring that "the 'level of threat' posed" does not determine which "places are 'sensitive.'" *Class*, 930 F.3d at 465. As *Bruen* makes clear, the question is whether the regulated space is "analogous" to a historically sensitive place, 142 S. Ct. at 2133–34, which turns on the nature of the property at issue as well as "the people found there or the activities that take place there." *Class*, 930 F.3d at 465; *id.* at 464

---

[25] Plaintiffs contend that they "cannot patronize or visit a place that shares a parking lot with, for example, a restaurant that serves alcohol." *May* MPA at 12. But because the statute permits transporting "a firearm within [a] . . . vehicle so long as it is locked in a lock box," Cal. Penal Code § 26230(b), anyone carrying a firearm could simply secure it in their vehicle while visiting a restaurant.

(rejecting the limiting of sensitive places doctrine to only places "protected by metal detectors and security guards").[26]

Second, as a historical matter, none of the sensitive places identified by the Supreme Court had the sort of "government-provided security" envisioned by Plaintiffs. For example, armed security and access restrictions were limited, if they existed at all, for many early legislative assemblies. Until 1827, the U.S. Capitol was guarded by a "lone watchman, John Golding,"[27] although other reports suggest "Golding was essentially a groundskeeper,"[28] and one did not need to pass through metal detectors to enter Capitol buildings themselves until 1983.[29] Nor have schools historically been subject to armed security; as recently as 2005, less than 27 percent of public primary schools had any security staff, and less than 16 percent had any armed security staff.[30]

Third and finally, Plaintiffs do not explain why government-provided security would "greatly reduc[e] the public's need for individual weapons" (*Carralero* MPA at 19) whereas private security would not. Many of the sensitive places that Plaintiffs challenge, such as casinos and stadiums, have metal detectors,[31] armed

---

[26] The *May* Plaintiffs acknowledge that a school playground "has no metal detectors or armed security" but suggest that schools are sensitive places because "when children are at school, their teachers and other school staff are acting in *loco parentis*" and thus "keeping [students] safe" is part of their job. *May* MPA at 21. But this concession that restrictions on the possession of firearms in places where children congregate "keep[s] [them] safe" supports an expansive view of the sensitive places doctrine.

[27] United States Capitol Police, OUR HISTORY, available at https://www.uscp.gov/the-department/our-history.

[28] Congressional Institute, PROTECTING THE CONGRESS: A LOOK AT CAPITOL HILL SECURITY, available at https://www.congressionalinstitute.org/2013/09/27/protecting-the-congress-a-look-at-capitol-hill-security/.

[29] United States Senate, BOMB EXPLODES AT CAPITOL, available at https://www.senate.gov/about/historic-buildings-spaces/capitol/bomb-explodes-1983.htm.

[30] National Center for Educational Statistics, DIGEST OF EDUCATIONAL STATISTICS, available at https://nces.ed.gov/programs/digest/d18/tables/dt18_233.70.asp.

[31] San Diego Union-Tribune, *Metal Detectors Coming to Dodgers Stadium this Season*, March 31, 2015, available at https://www.sandiegouniontribune.com/sdut-metal-detectors-coming-to-dodger-stadium-this-2015mar31-story.html.

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

security,[32] or a combination of both, while places that have been indisputably recognized by the Supreme Court as sensitive (*e.g.*, polling places) routinely have neither.[33] *See Bruen*, 142 S. Ct. at 2133.

### D. Plaintiffs' Proposed Course of Conduct of Carrying Firearms on Private Property Does Not Implicate the Plain Text of the Second Amendment

For the provision restricting carry at privately-owned commercial establishments where the operator has not given consent (Section 26230(a)(26)), this Court need not conduct the historical analysis outlined above because Plaintiffs' challenge fails at the threshold inquiry under *Bruen*: Plaintiffs' proposed course of conduct of carrying firearms on private property is not protected conduct under the Second Amendment. *See Bruen*, 142 S. Ct. at 2129–30 (plaintiffs must show that "the Second Amendment's plain text covers an individual's conduct").

Plaintiffs define their course of conduct with sweeping generality. *See May* MPA at 29 (suggesting that their proposed course of conduct is "carry[ing] in non-sensitive places"); *Carralero* MPA at 6 (describing their course of conduct as "licensed carry in various public places"). But such a broad description effectively eliminates the threshold inquiry. Instead, "it is necessary to identify and delineate the specific course of conduct at issue." *Renna v. Bonta*, 2023 WL 2846937 (S.D. Cal. Apr. 3, 2023), at *6, *appeal filed* Apr. 20, 2023; *see also United States v. Reyna*, 2022 WL 17714376 (N.D. Ind. Dec. 15, 2022), at *4 (cautioning against generalized descriptions of proposed conduct). Properly defined, Plaintiffs' conduct does not implicate the plain text of the Second Amendment because the right to keep and bear Arms would not have been understood by Americans in 1791 or 1868 to extend to others' private property.

---

[32] The New York Times, *Casino Guards, Used to Handling Drunks, Confront Greater Danger*, October 5, 2017, available at https://www.nytimes.com/2017/10/05/us/mandalay-bay-jesus-campos-security-casino.html.
[33] National Conference of State Legislatures, POLLING PLACES, available at https://www.ncsl.org/elections-and-campaigns/polling-places.

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

In *Heller*, the Court determined that the plain text of the Second Amendment guaranteed "the individual right to possess and carry weapons in case of confrontation." 554 U.S. at 592. *Bruen* clarified "that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside the home*." 142 S. Ct. at 2122 (emphasis added). In other words, *Bruen* rejects the notion that States can "confine the right to 'bear' arms to the home." 142 S. Ct. at 2134–35; *id*. (noting that "confrontation can surely take place outside the home" and that a person "is a good deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment") (quotation omitted).[34] However, the Court did not announce a right to carry in all places outside the home. *Id*. ("history reveals a consensus that States could not ban public carry *altogether*") (emphasis added); *see also Baird*, 81 F.4th at 1040 (*Bruen* recognizes the "individual's right to carry a handgun for self-defense *outside the home*") (emphasis added). And the indisputable constitutionality of restrictions on carrying in public spaces like courthouses and other government buildings makes clear that the plain text of the Amendment does not cover the bearing of arms in every place open to the public. *Bruen*, 142 S. Ct. at 2133.

As established in *Heller*, the Second Amendment right is strongest in "the home, where the need for defense of self, family, and property is most acute." 554 U.S. at 628-29 (holding that "banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family" violates the Second Amendment); *see also id.* at 635 (the Second Amendment "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in

---

[34] This Court's discussion in *Boland v. Bonta*, 2023 WL 2588565 (C.D. Cal. Mar. 20, 2023) (Carney, J.), echoes *Bruen*'s observation that the Second Amendment's protections are at their strongest in the home and on public thoroughfares. *Id*. at *10 (finding that "ordinary law-abiding people feel a need to possess handguns to protect themselves against violence . . . because they *live in high-crime neighborhoods*, or because they must *traverse dark and dangerous streets* in order to reach their homes after work or other evening activities") (emphasis added, quotation omitted).

defense of hearth and home").[35] Given that the defense of the hearth and family lies at the core of the Second Amendment, the average American in 1791 or 1868 would not have understood the Amendment to confer any right to carry onto *someone else's* property. Any such suggestion is also undermined by the placement of the Amendment's guarantee within the Bill of Rights. The immediately following Amendments (i.e., the Third, Fourth, and Fifth Amendments) all act to restrict intrusions into one's home. *See United States v. Nichols*, 841 F.2d 1485, 1510 n.1 (10th Cir. 1988) (Logan, J., dissenting) (noting that the Third Amendment requires "the consent of the Owner," the Fourth Amendment refers to the right of "people to be secure in their persons, houses, papers, and effects," and the Fifth Amendment declares that no person shall "be deprived of life, liberty, or property, without due process of law"). Against this backdrop, the Second Amendment would not have been understood to confer a right to carry firearms onto another's private property without their consent. Plaintiffs offer no evidence to the contrary.

Plaintiffs argue that their Second Amendment rights are implicated by Section 26230(a)(26) because it "places the burden on individuals to secure consent from business open to the public before they can exercise their right to carry firearms for self-defense." *Carralero* MPA at 8. But Plaintiffs have no "right" to carry firearms onto others' private property, and any claim of a "'constitutional' right to bear arms [in a private business] must be read to include rights that arise not under the state or federal Constitution" because "a private business's banning of guns on its own property plainly is not unconstitutional." *See Fla. Retail Fed'n, Inc. v. Att'y Gen. of Fla.*, 576 F. Supp. 2d 1281, 1295 & n.7 (N.D. Fla. 2008) (describing as a "radical

---

[35] Even the *May* Plaintiffs' purported expert, Clayton Cramer, has argued that only "in the twentieth century did anyone suggest the Second Amendment's purpose had been other or less than guaranteeing law-abiding, responsible adults a right to arms *for the defense of self, home, and family.*" Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1346–47 (2009) (emphasis added).

and totally unprecedented view" that the Second Amendment restricts private actors).[36]

Put simply, "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them" (*Heller*, 554 U.S. at 634–35), and a right to carry firearms on others' private property was not within the scope of the Second Amendment when it was adopted. The Second Amendment did not "in any way abrogate[] the well established property law, tort law, and criminal law that embodies a private property owner's exclusive right to be king of his own castle," and did not "not expand, extend, or enlarge the individual right to bear arms at the expense of other fundamental rights." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *see also Hoven v. Walgreen Co.*, 751 F.3d 778, 784 (6th Cir. 2014) (the Second Amendment does "not prevent interference . . . by private actors"); *W. Va. Coal. Against Domestic Violence, Inc. v. Morrisey*, 2023 WL 5659040 (S.D.W. Va. Aug. 31, 2023), at *7 ("[N]o court has recognized a right [to bear Arms] against private encumbrances."). Thus, how default property rules "[u]sually" operate (*May* MPA at 24) or what "our Nation's traditional regulatory approach" is (*Carralero* MPA at 8) are irrelevant because they are creatures of "the law of trespass" (*Carralero* MPA at 8) and "private property principles" (*May* MPA at 26), not the Second Amendment.

Plaintiffs are also unlikely to succeed on their challenge to this provision because the state action that their claim requires is absent here. "Only the state, or an individual acting in an official capacity, can violate individual constitutional rights" because the "Constitution secures rights and protections for the individual

---

[36] In *Wolford*, the court held that a restriction similar to Section 26230(a)(26) likely violated the Second Amendment because conduct "that was presumptively protected under the Second Amendment is now presumptively not protected." 2023 WL 5043805, at *27. But this conclusion reflects the same misunderstanding that Plaintiffs in this case have—namely, that a presumption of the ability to carry firearms on private land exists as a part of the Second Amendment.

against government action." *Jarvis v. Vill. Gun Shop*, 53 F. Supp. 3d 426, 431 (D. Mass. 2014) (rejecting a Second Amendment claim against a privately owned gun shop), *aff'd*, 805 F.3d 1 (1st Cir. 2015); *McCool v. Austal USA, LLC*, 2022 WL 4373611 (S.D. Ala. Aug. 16, 2022), at *5 ("[T]he constitutional right to bear arms restricts the actions of only the federal or state *governments* or their political subdivisions, not private actors."). Under Section 26230(a)(26), it is the property owner, not the State, that determines whether concealed firearms can be carried onto their property. Nowhere do Plaintiffs argue that the decisions of those property owners can "be fairly attributed" to the State, *Rendell-Baker v. Kohn*, 457 U.S. 830, 838–39 (1982), and "Section 1983 is generally inapplicable to private parties." *Appleby v. Johnson & Johnson Corp.*, 2022 WL 2987182 (C.D. Cal. July 26, 2022) (Carney, J.), at *2. While Plaintiffs object that "under SB 2 the *State* decides who to exclude, unless the business owner publicly states otherwise," *May* MPA at 25, the same would be true if the State had decided, as a starting point, to exclude no one.[37]

If this Court were nonetheless to proceed to stage two on this issue, it should determine that Section 26230(a)(26) fits within the Nation's tradition of firearms regulation. There are numerous relevant analogous to Section 26230(a)(26):

- 1721 Pa. Laws 254–55, Comp. Ex. 17 (1721 Pennsylvania law making it a criminal offense to "carry any gun or hunt on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation.")
- 1722 N.J. Laws 101, Comp. Ex. 18 (1722 New Jersey law providing for criminal penalties "if any Person or Persons shall presume . . . to carry any Gun, or hunt on the improved or inclosed Lands in any Plantation, other than his own, unless he have License of Permission from the Owner of such Lands or Plantation")
- 1763 N.Y. Laws 441–42, Comp. Ex. 25 (1763 New York law establishing criminal liability for persons who, among other things, carry "Musket,

_____

[37] For all of these reasons, Plaintiffs' challenge to Section 26230(a)(22), which prohibits the concealed carry of firearms into places of worship without the operators' consent, is also unlikely to succeed. As explained above, the text of the Second Amendment does not include the right to bring firearms onto any private property, including a house of worship, without the owner's consent.

Fowling-Piece, or other Fire-arm whatsoever, into, upon, or through any . . . inclosed Land whatever . . . without License in Writing first had and obtained for that Purpose from such Owner, Proprietor, or Possessor . . .")

- 1771 N.J. Laws 344, Comp. Ex. 26 (1771 New Jersey update to its statute, both simplifying its language and broadening its reach, and providing for penalties for persons who "carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in writing from the Owner or Owners or legal Possessor");

- 1865 La. Extra Acts 14–17, Comp. Ex. 65 (1865 Louisiana law prohibiting "the carrying of fire-arms on premises or plantations of any citizen," without the consent of the owner);

- 1866 Tex. Gen. Laws 1321, Comp. Ex. 68 (1866 Texas law providing that "[i]t shall not be lawful for any person or persons to carry firearms on the inclosed premises or plantation of any citizen, without the consent of the owner or proprietor");

- 1893 Or. Laws 79, Comp. Ex. 163 (1893 Oregon law making it unlawful to be "armed with a gun, pistol, or other firearm, to go or trespass upon any enclosed premises or lands without the consent of the owner or possessor thereof").

Plaintiffs argue that such regulations were "enacted to protect wildlife and stop poaching." *May* MPA at 20. But the plain language of these statutes is not limited to wildlife or poaching. And only two of the statutes—Texas' law from 1870 and Oregon's from 1893—are limited in scope by enclosure, and the language in both ("the inclosed premises or plantation of any citizen" and "any enclosed premises or lands") makes clear that the laws encompass a person's entire enclosed property. 1866 Tex. Gen. Laws 1321, Comp. Ex. 68; 1893 Or. Laws 79, Comp. Ex. 163. Nor have Plaintiffs provided any historical evidence to suggest that, notwithstanding their plain language, these laws were merely intended to prevent poaching or the unpermitted entry onto private land.

Plaintiffs also argue that the "why" of Section 26230(a)(26) and these historical laws is different because the historical laws were purportedly not enacted "to stop gun-related violence." *May* MPA at 20. Yet Section 26230(a)(26) and these

1  historical laws both not only promote public safety, but also protect individual

2  rights. SB 2, § 1(a).

3  **II.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR
   OTHER CLAIMS**

4

5  **A.    The *May* Plaintiffs Are Unlikely to Succeed on Their First
       Amendment Claim**

6        The *May* Plaintiffs are unlikely to succeed on their First Amendment claim

7  because (1) Plaintiffs can only challenge Section 26230(a)(26) as property owners,

8  and in that role they lack standing because they have no threat of injury, and (2) SB

9  2 does not compel them to speak at all.

10       To begin with, Plaintiffs lack standing to assert their First Amendment claim

11 because there is no threat that they will suffer an injury-in-fact. The only plaintiffs

12 who are allegedly at risk of being compelled to speak are "the individual Plaintiffs

13 who are also business owners." *May* MPA at 26. To satisfy the Article III standing

14 requirement, a plaintiff must show that "he has suffered an injury in fact that is . . .

15 concrete and particularized and . . . actual or imminent, not conjectural or

16 hypothetical." *Crosby v. Cal. Physicians' Serv.*, 498 F. Supp. 3d 1218, 1226 (C.D.

17 Cal. 2020) (Carney, J.). Plaintiffs have not established any injury deriving from a

18 denial of their First Amendment rights because they are not being compelled to

19 speak any message, much less one that they disagree with. And Section

20 26230(a)(26) imposes no civil or criminal penalties on "the operator" of a privately-

21 owned establishment for posting or failing to the post "a sign at the entrance of their

22 premises," so there is no threat of "concrete and particularized" injury, much less

23 one that is "actual or imminent."

24       Plaintiffs nonetheless suggest that Section 26230(a)(26) would injure them

25 because they "fear customer backlash" and "will assuredly alienate some of their

26 customers regardless of what decision they make." *May* MPA at 26–27. But a

27 plaintiff does not have Article III standing if their "theory of *future* injury is too

28 speculative to satisfy the well-established requirement that threatened injury must

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

be 'certainly impending.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Perhaps posting signage affirmatively permitting concealed carry on their private property will encourage patrons who wish to do so to frequent Plaintiffs' businesses over other businesses, or perhaps some individuals may feel safer going to a business which posts such a sign and thus Plaintiffs' businesses will have increased profits as a result. Because Plaintiffs' theory of First Amendment injury is highly speculative, not "certainly impending," Plaintiffs do not have standing to pursue a First Amendment claim.[38]

In any event, Plaintiffs' First Amendment claim fails because Section 26230(a)(26) does not compel them to speak. Each of the cases cited by Plaintiffs in support of their argument that the challenged provision compels speech involved laws requiring a person to make an affirmative statement or face punishment, *see, e.g.*, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 627–29 (1943) (resolution required students to repeat the pledge of allegiance or face expulsion); *Wooley v. Maynard*, 430 U.S. 705, 707 (1977) (law made it a misdemeanor not to display license plate including state motto), or that mandated that a private entity speak a message with which they disagreed, *see, e.g.*, *Pac. Gas & Elec. Co. v. Pub. Utilities Comm'n of California*, 475 U.S. 1, 4 (1986) (state agency required private enterprise to include messages on its mailings which it disagreed with); *United States v. United Foods, Inc.*, 533 U.S. 405, 411 (2001) (law required mushroom grower to contribute to message broadly promoting industry despite the grower's belief that his mushrooms were superior to other mushrooms); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1726 (2018) (state agency

---

[38] Plaintiffs also lack standing to bring a First Amendment claim because their alleged injury would be caused by private parties (i.e., potential customers who allegedly would decide to not patronize Plaintiffs' businesses), not by the government, and Plaintiffs have failed to show any basis for their predictions about how potential customers will "likely" behave. *See California v. Texas*, 141 S. Ct. 2104, 2117 (2021) ("[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party, . . . the plaintiff must show at the least that third parties will likely react in predictable ways.").

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

sought to compel a business owner "to exercise his artistic talents to express a message with which he disagreed"); *303 Creative LLC v. Elenis*, 600 U.S. 570, 581 (2023) (pre-enforcement challenge to state law which would have compelled business owner "to create websites celebrating marriages she does not endorse").

In contrast, Section 26230(a)(26) does not require Plaintiffs to do anything at all. If Plaintiffs do nothing, they will not face any criminal or civil punishment. And if Plaintiffs post signage stating that concealed firearms are permitted in their business, they will suffer no criminal or civil punishment. To be clear, Plaintiffs are not even left with a binary choice. They could post the signage contemplated under the statute (or not) and also express (through signage or otherwise) any other message conveying their beliefs about SB 2, firearms in general, or virtually anything else. In other words, the law neither compels speech nor restricts it.

Plaintiffs object that Section 26230(a)(26) "makes them a part of the State's unconstitutional antigun efforts, efforts which with which they philosophically disagree," and that "[p]utting up such signs grants further legitimacy to the State's unconstitutional regime." *May* MPA at 27. But there is no constitutional right not to follow a law simply because one philosophically disagrees with it or fears that compliance will legitimize it. *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*, 547 U.S. 47, 64–65 (2006) (rejecting compelled speech claim as well as plaintiffs' argument that if they facilitated military recruiting on campus as the challenged law required, "they could be viewed as sending the message that they see nothing wrong with the military's policies, when they do").[39]

## B.    Plaintiffs Are Unlikely to Succeed on Their Due Process Claim

SB 2 does not violate the *May* Plaintiffs' due process rights. Plaintiffs contend that they are "highly likely to accidentally break the law because they are unaware

---

[39] Plaintiffs mistakenly rely on *Project 80's, Inc. v. City of Pocatello*, 942 F.2d 635 (9th Cir. 1991). In that case, the court struck down the challenged restriction on a signage requirement for uninvited solicitors because it limited the "residents' first amendment rights to *receive* speech" from solicitors. *Id.* at 639 (emphasis added).

that they have entered a 'sensitive place.'" *May* MPA at 28 (emphasis omitted). But they do not identify any language in SB 2 is that is vague, overbroad, or offends any other notion of due process. Because "there is no risk that individuals will not be put on notice by the text of the Challenged Provision, or that the wording of the law would encourage arbitrary enforcement," Plaintiffs are unlikely to succeed on the merits of their due process claim. *Goldstein*, 2023 WL 4236164, at *18 (rejecting a due process challenge to sensitive places restriction on "places of worship" because "it is clear that the term . . . has a long history of being used within a legal context and also has a clear and broadly understood common meaning"); *Class,* 930 F.3d at 467 (rejecting a due process challenge to sensitive places laws because the challenged "laws do not use complicated phrasing or specialized vocabulary").

Plaintiffs appear to suggest, without citation to any authority, that the State can only designate a certain number of categories of places as sensitive before the Second Amendment is violated. *See May* MPA at 9 (arguing that SB 2 declares the "overwhelming majority of places that ordinary people would go in their daily lives . . . now a constitutional dead-zone"); *Carralero* MPA at 18 (arguing that "the challenged provisions effectively render licensed carry outside of one's home impossible in many circumstances"). By asking this Court to invalidate the challenged restrictions based on how sensitive places restrictions impact a plaintiff's choice of daily activities, Plaintiffs seek to introduce the very interest-balancing that the Court in *Bruen* rejected, 142 S. Ct. at 2129, and that they themselves decry, *May* MPA at 30. As they elsewhere acknowledge, the constitutionality of "each of SB2's challenged provisions" properly rests on a Second Amendment analysis under *Bruen*. *Carralero* MPA at 20.

### III. THE REMAINING PRELIMINARY INJUNCTION FACTORS WEIGH AGAINST THE ISSUANCE OF AN INJUNCTION

#### A. Plaintiffs Have Failed to Show They Will Suffer Irreparable Harm if an Injunction Does Not Issue

Plaintiffs' briefs fail to show that they will suffer irreparable harm in the absence of an injunction. *May* MPA at 29 (merely arguing that an "irreparable-if-only-for-a-minute rule" applies to this case); *Carralero* MPA at 21 (stating that "[i]t is evident that SB2 causes Plaintiffs irreparable harm by depriving them of their fundamental right to carry in public spaces"). And because Plaintiffs are not likely to succeed on the merits of their claims, they have not shown the sort of constitutional injury that would support a finding of irreparable harm.

#### B. The Equities and Public Interest Weigh Against the Issuance of an Injunction

The balancing of the equities and the public interest, which merge when the government is a party, weigh against issuance of an injunction. "Defendants have a substantial interest in enforcing validly enacted statutes," and any "time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 812 (D. Or. 2022). As discussed above, SB 2 is constitutionally sound; thus, these factors weigh against enjoining the law.

Moreover, the State has a strong public safety interest in prohibiting the carry of concealed firearms in the places that SB 2 covers. The Legislature, based on social science studies and other evidence, has determined that allowing individuals to carry in sensitive places would lead to increased violence and a suppression of other constitutional rights. SB 2, § 1(a) (identifying the bill's purposes as, among other things, protecting "its residents' rights to keep and bear arms while also protecting the public's health and safety in the state by reducing the number of people killed, injured, and traumatized by gun violence," and "protecting the

exercise of other fundamental rights"); *id.* § 1(j)(2) (noting the 1700% increase in mass shootings motivated by religious hate from 1996 to 2020).

The *May* Plaintiffs argue that the equities weigh in favor of an injunction because "Americans with CCW permits are an extremely law-abiding demographic" and "are thus very unlikely to pose a criminal threat." *May* MPA at 30, 35. Yet SB 2's sensitive places provisions are intended not only to stop crime, but also to promote individual rights. *See* SB 2, § 1(j)(2) ("Widespread public carry . . . intimidates those who hope to peacefully worship."); *id.* § 1(j)(3) ("Carrying firearms impedes the exercise of other rights of the First Amendment to the United States Constitution, including the right to protest and vote. In a nationally representative survey, 60 percent responded that they would be 'very unlikely' to attend a protest if guns were present, whereas only 7 percent said they would be 'very likely' to attend such a protest."). These interests support denying Plaintiffs' motions.

## IV.    ENFORCEMENT OF ANY INJUNCTION SHOULD BE STAYED PENDING APPEAL

Plaintiffs are not entitled to a preliminary injunction as to any of SB 2's provisions.[40] But if the Court were inclined to issue an injunction, Defendant respectfully requests that the Court stay the injunction pending appeal.

### CONCLUSION

This Court should deny Plaintiffs' motions for a preliminary injunction in their entirety.

//

//

---

[40] Additionally, because they failed to include a proposed order, the *Carralero* Plaintiffs' motion should be denied. "A separate proposed order shall be lodged with any motion or application requiring an order of the Court." L.R. 7-20. A "fail[ure] to include a separate proposed order" is a "fatal" deficiency because, in "this District, [a] separate proposed order shall be lodged with any motion or application requiring an order of the Court." *Trenham v. Sanfilippo*, 2023 WL 6190733, at *1 (C.D. Cal. Sept. 21, 2023).

1    Dated:  November 3, 2023                    Respectfully submitted,

2                                                ROB BONTA
                                                 Attorney General of California
3                                                R. MATTHEW WISE
                                                 MARK R. BECKINGTON
4                                                Supervising Deputy Attorneys General

5

6                                                /s/ Robert L. Meyerhoff
                                                 ROBERT L. MEYERHOFF
7                                                Deputy Attorney General
                                                 *Attorneys for Defendant Rob Bonta in*
8                                                *his official capacity as Attorney*
                                                 *General for the State of California*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Preliminary Injunction Motions
                                                 (Case Nos. 8:23-cv-01696 and 8:23-cv-01798)

1

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Rob Bonta in his official capacity as Attorney General of the State of California, certifies that this brief contains 17, 165 words, which complies with the word limit set by court order dated October 11, 2023.

Dated: November 3, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
MARK R. BECKINGTON
Supervising Deputy Attorneys General


/s/ Robert L. Meyerhoff
ROBERT L. MEYERHOFF
Deputy Attorney General
*Attorneys for Rob Bonta in his official capacity as Attorney General of the State of California*

Opposition to Preliminary Injunction Motions
(Case Nos. 8:23-cv-01696 and 8:23-cv-01798)