ROB BONTA
Attorney General of California
MARK R. BECKINGTON
R. MATTHEW WISE
Supervising Deputy Attorneys General
TODD GRABARSKY
JANE REILLEY
LISA PLANK
ROBERT L. MEYERHOFF
Deputy Attorneys General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta, in his Official Capacity as*
*Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RENO MAY, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of the State of California, and Does 1-10,**<br><br>Defendants. | Case Nos. 8:23-cv-01696 CJC (ADSx)<br>8:23-cv-01798 CJC (ADSx)<br><br>**DECLARATION OF LEAH GLASER IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date:        December 20, 2023<br>Time:        1:30 p.m.<br>Courtroom:  9B<br>Judge:      Hon. Cormac J. Carney |
| **MARCO ANTONIO CARRALERO, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of California,**<br><br>Defendant. | |

# DECLARATION OF LEAH GLASER

I, Leah Glaser, declare under penalty of perjury that the following is true and correct:

1.     I have been retained by the Office of the Attorney General of the California Department of Justice to provide expert opinions and testimony in these cases. For this engagement, I have been asked to provide an expert opinion on the history/development of parks and State Parks in the United States and California, including whether modern day parks and State Parks existed around 1791 and/or 1868. I have been further asked to provide an expert opinion on the history/development of particular cultural spaces and institutions, generally, in the United States and California, including whether modern versions existed around 1791 and/or 1868.

2.     This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND

3.     I am a tenured, full Professor of History at Central Connecticut State University and coordinator of the Public History program. For the last 20 years, I have taught college-level courses on American History, the history of the American West, Public History, and, more recently Environmental History, for which I focus on historic preservation. I have taught students and supervised over 40 capstone projects on topics primarily related to Connecticut history.

4.     I earned a PhD in American History, the American West and Public History from Arizona State University, where I also earned a Master's degree in Public History. During and since my 8 years in the West, I worked for several entities whose missions address public land use and resource management, including the Salt River Project, the United States Bureau of Reclamation (USBR) and the National Park Service (NPS) in Alaska and Pennsylvania. I also worked as

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

a consultant for the cities of Tucson and Tempe, Arizona, and for the State of Connecticut (in the 2023 case of *Nastri v. Dykes*) and the County of Fairfax, Virginia (in the 2023 case of *LaFave v Fairfax County*). A copy of my complete CV is attached as **Exhibit 1**.

5.      Since 2009, I have also been a leader in encouraging inclusion of environmental issues as a central component in the field of Public History, including in an issue of the professional journal I edited and as a theme for two national conferences, one in Hartford in 2019. From 2010 to 2013, I conducted extensive research into Connecticut forests and parks in anticipation of the centennial of the Connecticut Park and Forest Commission. I presented conference papers (see CV), and published on the topic for connecticuthistory.org (Connecticut Humanities), and I edited an issue of Connecticut Explored, the popular history magazine of the state, on the relationship between Connecticut and the American West, including the state's influence on national public land policy and the activities of Samuel Colt involving mining investment. I am currently co-editing a book on the cultural significance of trees in American history, for which I wrote an essay that focuses on forestry in Connecticut.

6.      I am currently contracted with the National Council on Public History (NCPH) and the NPS to conduct a Historic Resource Study of the soon to be established Coltsville National Historic Park in Hartford, Connecticut.

7.      I currently serve on the Connecticut State Historic Preservation Council, the Board of Connecticut Preservation Action and the Advisory Board of Wesleyan University's Center for the Study of Guns and Society, the first academic center in the U.S. dedicated to interdisciplinary humanities study and teaching on the social and cultural history of firearms.

8.      I am aware of this lawsuit, have reviewed the Complaints  filed by Reno May, et al. and Marco Antonio Carralero, et al. in this matter, and am familiar with the claims and allegations of the Complaints.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

9.     The testimony in this Declaration is based upon a combination of my professional training, research, and work experiences in my various academic roles and personally reviewing relevant documents, rules, regulations, and historical sources of information. Any information I obtained from those outside sources is consistent with my own understanding.

10.     This Declaration is presented in a form that is much different from academic writings. It reflects an accurate recounting of my research and conclusions regarding this historical period and the subject matter discussed. However, given the time constraints at issue in this case, as well as the fact is it prepared in connection to a pending lawsuit, it is not drafted at the level of depth, nor with the historical context and discussion of scholarship that would be expected for academic writing. Thus, I reserve the opportunity to supplement this declaration to reflect any additional research or context that may be necessary.

## RETENTION AND COMPENSATION

11.     I am being compensated for services performed in the above-entitled cases at an hourly rate of $250/hour for record review and consultation and document preparation, and $300/hour for deposition and trial testimony. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

12.     The opinion I provide in this report is based on my review of the various documents filed in this lawsuit, relevant historical documents, current historical scholarship in peer-reviewed journals and books, as well as thirty years engaged in the field of History and these topics through my education, expertise, and research in the fields of American, environmental, western, cultural, and public history. The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

**SUMMARY OF OPINIONS**

<u>Overview</u>

13.    Just prior to the Civil War (1861), and accelerating during and following Reconstruction (1870s), the growing American industrial economy and the rise of big business changed the nature of work and fueled labor needs. In the meantime, world events and these very labor needs encouraged and accelerated immigration to increasingly congested and ill-equipped cities. The separation of leisure and labor in an industrial era separated the workplace from home and community life, and it is thus very difficult to directly compare leisure and labor activities today to what existed at the nation's founding. While in some cases there may be prior versions in different forms, the development of the parks, playgrounds, museums, libraries, stadiums, and other cultural spaces of public gathering that we have today coincides with industrialization and the development of its labor force. They are all, therefore, spaces specifically designed to accommodate the needs of dense, urban populations for purposes of leisure time. They are products of and reflect a range of responses to industrial era changes that accelerated after the passage of the Reconstruction Acts beginning in the 1870s. This also explains why most such places tended to have origins in cities of the Northeast, where industrialization first dictated the economy and daily life. In my opinion, these spaces of cultural activity today are not analogous to what would have existed in the colonial and early America era (1791).

<u>Open and "Common" Space Preservation in 18th and 19th Century New England</u>

14.    The idea of setting aside land, (which in many cases was land deemed undesirable for farming and industrial uses), expressly for (primarily municipal and national) public parks began as a mid-19th century movement in response to the rapid urbanization and industrialization of the East as well as the American West. The development of the state park system emerged through national and municipal

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

efforts, led by Progressive era ideologies advocating that public resource policy should address "the greatest good for the greatest number of people." A great number of thinkers defined ideas about public land use and management at all levels, but urban park designer Frederick Law Olmsted and his firm had a particular influence on defining the purpose and management of California's park system. He and other "park-builders" based their ideas about use and purpose on philosophies of natural resource conservation, land preservation and health, both mental and physical. The state park movement, based on similar ideals, expanded primarily in the twentieth century when city parks grew insufficient and workers gained access to automobiles allowing them to leave the city for less manicured and more "natural" and meditative spaces. These ideas and practices reflected anxious responses to the rapid changes brought by new technology, urbanization, the industrial economy, and western expansion.

15.    Historical context is critical for understanding the purpose and function of modern-era parks. Early English settlers in the original thirteen colonies brought with them the belief that land ownership equated to independence and self-sufficiency. However, early New England towns featured centralized public land, known as commons, or greens, for planting and shared grazing, around which many built their homes. Access to the commons was a legal property right. According to some, the tradition dates back to medieval England and is intended to protect livestock from wild animals, for use by commoners who did not own much land, or for public markets and fairs, but that is still highly debated. By the Colonial era, places like the Boston Commons allowed multiple people to access the natural resources of pasture and trees. Communities managed use and regulated access to and among private individuals to prevent overuse at town meetings. Access remained a property right that could be bought and sold. English colonists of the Connecticut Colony established a green as a central feature in the nation's oldest

planned city of New Haven, Connecticut. While it is managed by the city, it continues to be owned by a private group of citizens.[1]

16.    As the primary public space in the community, "town greens" also served as public gathering spaces, particularly religious, and many historic churches continue to occupy prominent sites adjacent to these public spaces today. As Michael Lawson explained, the line between labor and leisure did not exist at this time, for example, craftsmen, journeymen and farmers worked at home. Likewise, people used sites like greens and the Boston Commons for a huge spectrum of purposes, including play and strolling. Communities also used them for formal military exercises, public executions, the grazing of their animals, and sometimes dumping grounds for discarded household items. While Colonial-era towns reserved these shared public spaces, such as commons, town squares, plazas, or greens, for a variety of shared uses and purposes, the idea and purpose of parks in the nineteenth century was more specific and deliberate in purpose.[2]

17.    After the Revolutionary War, in the 1820s and 30s, improvements in roads allowed some people to move further away from the town center, and the green became more of a commercial and civic center. Some claim the Boston Common was America's first public park because Boston began to make this shift in the 1820s. Boston and other local, municipal governments established parks as antidotes for the mental and physical stress and dehumanizing effects of heavy industrialism, development, and urbanization in an era driven by the political and

---

[1] Rob Shirley, *Village Greens of England: A Study in Historical Geography*, Durham theses, Durham University, 11-12, 21 (1994). Available at Durham E-Theses Online: http://etheses.dur.ac.uk/6120/

[2] Michael Rawson, *Eden on the Charles: The Making of Boston* (Harvard University Press, 2014), 22-73.

economic opportunities of western expansion and the development of western natural resources for manufacturing purposes.[3]

**Frederick Law Olmsted and the Mid-Nineteenth Century Origins of Municipal (and later National) Parks**

18.     Only in the mid-late nineteenth century, in response to industrialization and urbanization, did most greens evolve into a place of refuge and recreation, as public, urban parks. The modern notion of parks began in the decade before the Civil War. It evolved out of a sense of anxiety over profound social and economic changes of "modern" life. Municipal parks such as Central Park in New York City proliferated throughout the Northeast region since the 1850s, shaping public perceptions of state parks and forests. The landscaping and manicured, or "parklike," maintenance of the green corresponded with a larger movement, beginning shortly before the Civil War, to find ways to beautify the increasingly industrialized cities, and recall the pastoral and agrarian roots so central to core American values.

19.     In the mid-nineteenth century, cities looked to set aside nature for urban workers, and urban planners saw parks as a physical and deeply spiritual escape from the harshness of urban and industrial life into nature. Landscape architect Frederick Law Olmsted envisioned and articulated a model of the urban park in his designs for places like New York City's Central Park, Boston's Emerald Necklace, and parks in smaller cities in other states. Municipal park design essentially began with Olmsted, who witnessed how the growth of cities and industry had transformed northeastern rural landscapes, as well as the lands and resources in the American West.

---

[3] Rawson and Eric Lehman, *Connecticut Town Greens* (Globe Pequot, Illustrated edition, August 1, 2015), xi-xvi.

20.     Olmsted's parks echo the aesthetic of the mid-nineteenth century Hudson River Valley (HRV) school of painters influenced by the Romantic style. He later translated their naturalistic landscape vision to western lands, depicting vast fields and vistas, majestic mountains, and calming lakes and streams, where man was inconsequential. His landscapes lured out thousands of explorers and homesteaders. Hartford's Frederic Church, the founder of the HRV painting school, was an early advocate of national parks, particularly Niagara Falls in New York, which was established in 1885 and is now the nation's oldest state park.[4] These images convinced many Americans that nature was important to physical, emotional and mental health, and defined the spiritual core of a newer nation, the equivalent of the cathedrals of Europe.

21.     The landscapes of artists like Thomas Moran and Albert Bierstadt, who painted his first Yosemite landscape in 1864 after he camped there the year before, also greatly influenced public perceptions of western lands and inspired the federal government to establish its first preserve in Yellowstone National Park in 1872 and then Yosemite National Park in 1890. Like the popular HRV School and other nineteenth century landscape painters, Olmsted envisioned a controlled but naturalistic landscape. He designed his parks as pastoral and naturalistic landscapes, where urban residents could feel invigorated and escape the harsh realities of industrial work without losing the comforts of the city.

22.     Olmsted also developed his philosophy about the influence of natural beauty on moral and social behavior from close family friend and spiritual advisor, Reverend Horace Bushnell. Bushnell's sermons, including "Unconscious Influence," and others in the Transcendentalist movement (e.g., Ralph Waldo Emerson and Henry David Thoreau) of the 1820s and 30s surely inspired young

---

[4] California first designated Yosemite a state park, but Congress later designated it as the second national park behind Yellowstone.

Olmsted's ideas about nature and "public parks as instruments of moral influence and reform and the value of passive recreation and unconscious mental and spiritual refreshment…" as well as communal well-being as a way of coping with and healing from the stresses of industrial revolution.[5] Olmsted's philosophies about the essential purposes of urban parks as a natural space reserved for the general public for passive contemplation and spiritual renewal in pastoral surroundings continued to provide the model for urban park design.

23.     Olmsted's vision resonated with many, although not everyone seemed to understand the concept and the use of a park in the same way. Worker volatility, as seen in numerous street strikes beginning in the 1870s, also contributed to support for urban parks. Genteel ideas about recreation like those of Bushnell and Olmsted stressed receptive (or passive) recreation (e.g., arts, music) to restore the soul, but people disagreed about whether parks served a therapeutic role or that of amusement and/or activity, and interpreted recreation in different ways. Conrad Wirth, who served as NPS Director in the 1950s, reflected both interpretations when he began his memoir quoting Transcendentalist Henry David Thoreau, then wrote, "The importance of reserving space for what we have come to call recreation has long been understood."[6]

24.     After New York City's Central Park, several cities across New England began establishing parks in 1860s. In the West as well, anxiousness about urbanization overtaking rural and "natural" places and the proliferation of urban

---

[5] "Olmsted in Connecticut: Landscape Documentation Project, Statewide Context and Survey Report (September 2022), 20-25, 58-59; George Scheper. "The Reformist Vision of Frederick Law Olmsted and the Poetics of Park Design," *The New England Quarterly* 62: 3 (1989), 378.

[6] Conrad Wirth, *Parks, Politics, and the People* (Norman: University of Oklahoma Press, 1980), 3-5.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

power helped create support to establish city as well as national parks.[7] With the start of the Civil War in 1861, Olmsted took leave as director of Central Park to work in Washington, D.C., as Executive Secretary of the U.S Sanitary Commission, which predated the Red Cross.[8]

### Western Expansion, Industrialization, and Urbanization

25.    Much of Colonial America was based upon an agrarian economy. By 1791, those who crafted the Declaration of Independence and the Constitution defended independence by declaring "natural rights," rooted in the ideas of the Enlightenment, the intellectual and philosophical movement that swept through Europe in the 17th and 18th centuries.  Property was one of the "natural rights." Many of the founding fathers, especially Thomas Jefferson, valued and celebrated farming as a noble, ideally independent, self-sufficient existence, in a natural, pastoral setting. He advocated and promoted America as an "agrarian nation," and he wove this idea into the Northwest Ordinance of 1785 and 1787, the law that set out the plan for America's western expansion, distribution of public lands for settlement and criteria for statehood.

26.    After the Civil War, the proliferation of the railroad and technology spurred settlement out west. The urbanization of the agrarian nation, and the realization that not every part of arid western lands could be farmed, became important factors in the federal government setting aside other lands for public use.

---

[7] Roy Rosenzweig, *Eight Hours for What We Will: Workers and Leisure in an Industrial City, 1870-1920*, Interdisciplinary Perspectives on Modern History. (Cambridge; New York: Cambridge University Press, 1985); Alexander Von Hoffman, *Local Attachments: The Making of an American Urban Neighborhood, 1850 to 1920* (Johns Hopkins Paperbacks Ed., 1996); Creating the North American Landscape. (Baltimore: Johns Hopkins University Press, 1996); Stephen Hardy, "Parks for the People: Reforming the Boston Park System, 1870-1915," *Journal of Sport History* 7:3 (Winter 1980), 5-24. 18.

[8] Olmsted tended to the wounded during the American Civil War. Exhausted, in 1863 he took a job managing a gold mining estate in California.

27.     In the West, most lands remained in the public domain, while in the original thirteen colonies land remained largely under private ownership. The federal government bequeathed California with the responsibility to manage the first public state park in the country (Yosemite Valley and the nearby Mariposa Big Tree Grove) on June 30, 1864, predating Congress's establishment of the first National Park (1872), yet initially managed by Frederick Law Olmsted, whose Central Park had ignited the municipal park movement.

28.     President Lincoln signed legislation placing Yosemite into California's trust in 1864, before the end of the Civil War. Like the transcontinental railroad and the Homestead Act, the decision about public land use asserted federal power, imbuing the federal government with new responsibilities to facilitate public access to public lands and its natural resources. Former National Park Superintendent Rolf Diamont and Landscape Historian Ethan Carr argue that the Civil War played a central role in the creation of a Yosemite Park.  They argue that there is a direct connection between the state/national parks movement, begun with the establishment of Yosemite State Park in California, and the post-Civil War laws and "constitutional reforms to significantly broaden people's relationship to their national government," which raised their expectations of government's role in improving public life."[9]

29.     Naturally, Olmsted, who had designed Central Park to realize republican and democratic ideals centered on the people and their enjoyment, received the appointment to chair the Yosemite Commission.  Between September 1864 and August 1865, Olmsted wrote the Commission's entire founding report, which served as a "blueprint" for all future parks: national and state. Olmsted characterized the landscape as an act of "equity and benevolence" for all citizens

---

[9] Rolf Diamont and Ethan Carr, "Three Landscapes: An Excerpt from Olmsted and Yosemite," *Park Stewardship Forum* 38:3, 2022.

aiding in the nation's recovery and reconstruction. Olmsted addressed this point directly in the third paragraph of the Yosemite Report, citing the Civil War's influence on the events leading to the park's establishment and arguing for the government's obligation "to provide means of protection for all its citizens in the pursuit of happiness against the obstacles, otherwise insurmountable, which the selfishness of individuals or combinations of individuals is liable to interpose to that pursuit." Recreation was key to that pursuit, and he emphasized that the government obligation to preserve the site was aimed toward the populace, rather than individuals.[10]

30.     Regarding management, Olmsted first stressed preservation to maintain the natural scenery as closely as possible, in its present condition "as a museum of natural science," without compromising public access, "that is to say, within the narrowest limits consistent with the necessary accommodations of visitors, of all artificial constructions and the prevention of all constructions markedly inharmonious with the scenery or which would unnecessarily obscure, distort or detract from the dignity of the scenery." He further stressed that the management should include certain oversight, stating: "It should, then, be made the duty of the Commission to prevent a wanton or careless disregard on the part of anyone entering the Yosemite or the Grove, of the rights of posterity as well as of contemporary visitors, and the Commission should be clothed with proper authority and given the necessary means for this purpose." And Olmsted wrote that: "[W]ithout means taken by government to withhold them from the grasp of individuals, all places favorable in scenery to the recreation of the mind and body will be closed against the great body of the people. For the same reason that the water of rivers should be guarded against private appropriation and the use of it for

---

[10] Frederick Law Olmsted, "The Yosemite Valley and the Mariposa Big Tree Grove," 1865. https://www.nps.gov/parkhistory/online_books/anps/anps_1b.htm

the purpose of navigation and otherwise protected against obstruction, portions of natural scenery may therefore properly be guarded and cared for by government. To simply reserve them from monopoly by individuals, however, it will be obvious, is not all that is necessary. It is necessary that they should be laid open to the use of the body of the people…."[11]

31.     When Yosemite homesteaders protested their rights to property by earlier legislation all the way the Supreme Court, the Court affirmed the constitutionality of the 1864 Yosemite Act to allow the government to set land aside for a different purpose, especially before it has been surveyed.  The decision helped support the park idea, and indeed, in 1872, the same year as the decision, Congress reserved and established the first national park in what was then Wyoming Territory, that is, Yellowstone National Park, which was described as a "public park or pleasuring-ground for the benefit and enjoyment of the people."[12] Twenty-five years after Yosemite became a state park, in 1890, the federal government designated the Yosemite National Park. In 1905, California granted its first state park, Yosemite Valley and the Mariposa Grove of Big Trees to the federal government, completing the Yosemite National Park boundaries.[13]

32.     As seen in the prior discussion of Central Park, this concept of "enjoyment" for "people" or the "public," is repeated throughout most literature across the board upon the creation of parks at local, state, and national levels, and

---

[11] Olmsted, "Yosemite Report;" see also Rolf Diamant and Ethan Carr, *Olmsted and Yosemite: Civil War, Abolition, and the National Park Idea* (United States: Library of American Landscape History, 2022).

[12] For the text of laws relating to the national park system, see Hillary A. Tolson, Laws Relating to the National Park Service and the National Parks and Monuments (Washington, DC: Government Printing Office, 1933).

[13] Theodore A. Goppert, The Yosemite Valley Commission, "The Development of Park Management Policies, 1864-1905, California State College, Hayward, MA Thesis, 1972.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

1   repeated for decades afterward. It echoes Progressive era philosophies about
2   managing resources for the collective good and protecting them against individual
3   or corporate exploitation.

4          33.    The Department of Agriculture created a Division of Forestry in 1881
5   to "provide timber for the purposes of western agrarian settlement," eventually
6   becoming the U.S. Forest Service in 1901.[14] Both public forests and parks served to
7   protect natural resources, but forests followed the Progressive era idea of efficient
8   resource use for the "greatest good" of the most people while National Parks served
9   to preserve natural resources for the enjoyment and benefit of present and future
10  generations.

11                 **Progressive Reform (1880s-1920s)**

12         34.    During what historians refer to as the Gilded Age, the proliferation of
13  technology transformed an agrarian nation into an industrial economy, thereby
14  challenging national values and identities. The changes yielded an increasingly
15  imbalanced allocation of resources, both in monetary wealth and in access to
16  natural, political, and social resources. Vocal, often middle class, reformers alarmed
17  by the rapid changes protested against corruption and the consolidation of wealth,
18  which in their view compromised the values of equality in the United States. They
19  collectively developed programs and laws that could address anxiety about a
20  rapidly growing diverse population and changing landscape. Urbanization and wage
21  labor challenged American identity and values around economic opportunity and
22  political participation, not to mention public health.  In 1890, Congress realized big
23  businesses were limiting competition through monopolies and passed the Sherman
24  Antitrust Act, regulating such corporate behavior. At the turn of the century,
25  Progressive reformers found a like mind in President Theodore Roosevelt, a well-

26

27         [14] Harold K. Steen, *The U.S. Forest Service: A Centennial* History (Seattle,
28  WA: University of Washington Press), 3-21.

known supporter of Progressive reforms such as fair housing standards and natural resource conservation. Progressives embraced the Conservationist philosophy that discouraged waste, and advocated for expert-directed and scientifically planned management of natural resources, particularly forests, for the benefit of the *public good*— often, but not always, defined in economic as well as social terms.

**Conservation vs Preservation**

35.     Two schools of thought regarding natural resource management for future generations dominated the Progressive era: preservation as exemplified by parks, and conservation, efficient natural resource use and management, as exemplified by forests and other public lands. Conservation and development seem like opposing inclinations, but in 1910, Gifford Pinchot, the first chief of the United States Forest Service (and the founder of scientific forestry in the United States), asserted that, "The first principle of conservation is development, the use of natural resources now existing on this continent for the benefit of the people who live here now. There may be just as much waste in neglecting the development and use of certain natural resources as there is in their destruction."[15] He advocated for the scientifically planned development of natural resources, particularly forests. Like the preservationists, resource conservation served "the greatest good to the greatest number of people for the longest time."[16]

36.     These environmental philosophies came to a head in 1911 with a very public debate that epitomized the different ideas about the environment: the battle over damming the Yosemite Valley to serve the growing city of San Francisco. A supporter of conservation, Gifford Pinchot, fought and won the highly public and

---

[15] Gifford Pinchot, "The Fight for Conservation," 1910 (University of Washington Press, 1967, reprint), 42-43.

[16] Gifford Pinchot in Char Miller, *Gifford Pinchot: Selected Writings* (University Park, PA: Penn State University Press, 2017), 110.

political debate against his former friend John Muir and the preservation-minded Sierra Club he headed.

37.    Neither the public, nor Congress, trusted the Forest Service to protect cherished sites of natural beauty, but both Pinchot and Henry Graves, Dean of the Yale School of Forestry and a Chief of the USFS, insisted that creating a park board, in addition to the Forest Service, was wholly unnecessary. The dispute led to a lengthy debate about what constituted a forest, and what constituted a park.[17] Congress dismissed the foresters' view that forests could serve the same purpose as parks by establishing the NPS within the Department of the Interior in 1916 to protect exceptional lands for "public enjoyment."[18]

38.    Olmsted's son, Frederick Law Olmsted, Jr. drafted the statement of purpose paragraph in Section 5 of the 1916 NPS bill: "That the parks, monuments and reservations herein provided for shall not at any time be used in any way contrary to the purpose thereof as agencies for promoting public recreation and public health through the use and enjoyment by the people of the said parks, monuments and reservations, and of the natural scenery and objects of interest therein, or in any way detrimental to the value thereof for such purpose."[19]

**The State Park Movement**

39.    The state's Yosemite Commission worked and planned for several decades to develop the park for public use and tourism before the federal government absorbed the park under NPS jurisdiction in 1890. The state's drawn-out process was largely due to the California legislature, which had protested the

---

[17] Steen, 113-114

[18] An Act to establish a National Park Service, and for other purposes. Pub. L.Tooltip Public Law (United States) 64–235, H.R. 15522, 39 Stat. 535, enacted August 25, 1916.

[19] Quote in Diamont and Carr from 8 Letter From Frederick Law Olmsted Jr. to Frank Pierce, Acting Secretary of the Interior, December 31, 1920, Frederick Law Olmsted National Historic Site 109.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

use of land for such a purpose and refused to fund it, but also because those (often businessmen) appointed to the Commission lacked the expertise to understand how to manage the landscape and its unique environment. There was therefore little visitation between 1865 and 1890.

40.     The Yosemite Commission brought in the Sierra Club to help address vandalism in 1894.  Sierra Club recommendations helped the Commission develop initial Park rules entitled "Rules and Regulations for the Convenience and Safety of campers and Tourists and the Preservation of the Valley." These rules included, in addition to camping site assignments, leaving all firearms at the gate office during visits to the Park. Elsewhere under "Rules and Regulations," was a strict prohibition on the discharge of firearms in Yosemite Valley and the Mariposa Grove and a request for men who could patrol the park and enforce the regulations.[20]

41.     The development of an "American System of Manufacturing" and mass production accelerated urbanization across the country, and the rapid change into the twentieth century triggered tremendous social anxiety and political tensions between rural and urban power. Concerns included urban density, poverty, disease, crime, labor conflicts, unsanitary living environments, unsafe working conditions, and an overworked labor force. To many urban reformers, modernity had destroyed leisure and family time and the worker was in desperate need for outlets of recreation. Horace McFarland, President of the American Civic Association and a key figure in the City Beautiful Movement articulated the "American Park Idea." In a 1910 speech, McFarland argued that like the ideas for municipal parks in the

---

[20] See Goppert, 50-71, 98; "Biennial Report of the Commissioners to Manage the Yosemite Valley and the Mariposa Big Tree Grove," (United States: T.A. Springer, state printer, 1894), 11-12, 25; Biennial Report of the Commissioners to Manage the Yosemite Valley and the Mariposa Big Tree Grove. United States: T.A. Springer, state printer, 1896), 29. See **Exhibit 2**.

1850s, county and state parks could also serve a broader purpose that fell somewhere in between the city park and the national park. "If, when a natural wonder is found to be of national importance and to need national protection, it may properly be controlled by the nation, surely a location or opportunity too large for local or municipal control may as properly be controlled by the state." In line with other proponents, he agreed that state parks "must be unmistakenly beautiful, they must present to the enjoyment of all some consistent unspoiled type of landscape." He added that parks should be accessible by the public and ideally connected by parkways—indicating that he saw the park system and recreation as integrated with parkways across the state. He asserted that state parks should lie no more than a day's travel to industrial populations, and that ideally, a state should hold an acre of land per 1000 population.[21] Seemingly as an afterthought, he added that another characteristic of the state park "may well be the inclusion of historical sites, to be suitably and permanently marked so that in a sense of life of the state as man has dealt with it is persevered for future generations, as well as the natural features of the state as Nature made them. Not infrequently both of these characters may be combined to advantage in one state."[22]

---

[21] J. Horace McFarland, President, American Civic Association, "A Brief Discussion of the Later Development of the Recreation Movement" by J. Horace McFarland, President, American Civic Association, Washington Convention, December 14, 1910, SFPC, Wilkins, Documents 1909-1915, State Archives; McFarland, "State Park- Their size and character" Parks and Recreation, volume 5, p. 471. 1921-22.

[22] J. Horace McFarland, President, American Civic Association, "A Brief Discussion of the Later Development of the Recreation Movement" by J. Horace McFarland, President, American Civic Association, Washington Convention, December 14, 1910, SFPC, Wilkins, Documents 1909-1915, State Archives; McFarland, "State Park- Their size and character" Parks and Recreation, volume 5, 1921-22, p. 471.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

42.     State park systems gained momentum with the increase in leisure time, urban density, and recreational access, and the proliferation of the automobile, which allowed more people of all socioeconomic backgrounds to escape the city for short periods of time. In order to protect the exclusiveness of the National Park designation, NPS Director Stephen Mather, born in California, organized the first meeting of the National Association of Parks in Des Moines, Iowa in 1921 to encourage all states to adopt a park system and coordinate their efforts. California was in regular attendance.[23]

43.     This National Conference on (State) Parks grew out of the National Park movement, but was an independent body of delegates from several states.[24] Its stated objective was "to urge upon our governments, local, county, State, and National, the acquisition of additional land and water areas suitable for recreation, for the study of natural history and its scientific aspects, and the preservation of wild life, as a form of the conservation of our natural resources..."[25]

44.     State parks could be beneficial in that they would not be held to the same high standards of selection as National Parks. Others saw state parks as more "natural," and hosting far less *organized* recreative activities than municipal parks.[26] Albert Turner, who served as the state park secretary and primary official for Connecticut's State Park Commission and on the executive committee of the National Conference on State Parks, emphasized that a state park's purpose, like

---

[23] "Proceedings of the National Conference on State Parks," 1922, 1923, 1924. GoogleBooks.

[24] Ney C. Landrum, *The State Park Movement in America a Critical Review*, 2004; State Park Anthology: Rebecca Conard, "The National Conference on State Parks: Reflections of Organizational Genealogy," *George Wright Forum* 14:4 (1997), 47-93.

[25] Conard, 35.

[26] Thomas R. Cox, "From Hot Springs to Gateway: The Evolving Concept of Public Parks, 1832-1976," *Environmental Review* 5: 1 1981: 14-26.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

urban parks, was one of public mental health, an essential refuge from the stresses of modern urban life.[27]

45.   The definition of a park, however, varied by state, and Mather believed each state should determine its own park development. As Historian Rebecca Conard observed, "A common vision of parks as special places, whether they be valued for their scenic quality, their recreational amenities, their scientific attributes, or their educational potential, makes it incumbent that public land management agencies serve as society's fulcrum to balance demands of 'the public' who would enjoy parks to environmental ruin with those of 'the public' who would unnecessarily limit access to them."[28]

46.   The development of State Park systems therefore emerged through national and municipal efforts, led by Progressive era (1880s-1920s) ideologies, to reserve certain lands for both the purposes of environmental preservation and public use. The state park movement inherited Progressive era philosophies as it expanded upon the spiritual purpose of a park into that of "play," or recreational use, where authorities designated certain areas for certain uses.  Due to the preservation purposes of parks, stewardship required establishing expectations regarding public behavior in these new shared spaces.

47.   The "park-builders" based these ideas about collective use and purpose on philosophies of natural resource conservation and land preservation, but also advanced natural spaces for the social good, including both mental and physical health. These ideas and practices reflected anxious responses to the rapid changes brought by new technology, urbanization, the industrial economy and western

---

[27] Report of the State Park Commission to the Governor, 1920, 23. Connecticut Digital Archive, http://hdl.handle.net/11134/30002:21895214.

[28] Conard, 40; Stephen Mather to Albert Turner, February 6, 1922. Series 2, Box 3, Folder 1, RG 079:017 State Park and Forest Commission, Connecticut State Archives, Hartford, CT.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

expansion. Numerous worker strikes encouraged better hours through welfare capitalism (company concessions) and workplace reforms that restricted work hours to 8-10 hours a day.[29] Along with the affordability of personal automobiles, increased leisure time allowed industrial workers to escape their urban environment and gain access to increased recreational opportunities, to escape the city for less manicured and more "natural" and meditative spaces.

48.    Albert Turner, the Field Secretary Connecticut's State Park Commission hired in 1914, served on the organization's executive committee. That same year, Turner implored the newly founded National Conference on State Parks to distinguish forests and parks.  "We have supposed the Park to be first of all for recreation, and the Forest for economic purposes- to wit, namely to grow timber. This subtle distinction seems to be confined almost entirely to the old Nutmeg state…"[30]  Turner saw the definition of parks as fluid, but consistently stressed the conservationist philosophy that conceived parks and forests as shared, public spaces set aside for the "greatest good for the greatest number of people." Regarding proposed rules and regulations for use of the State Parks, he asked the Commission "to make the rules as few and simple as is consistent with the preservation of the public property and individual freedom. In general, that measure of freedom may be permitted which does not interfere with the rights or enjoyment of others, pollute

---

[29] See Roy Rosenzweig, *Eight Hours for What We Will: Workers and Leisure in an Industrial City, 1870-1920* (Cambridge University Press, 1985), Wayne F. Stormann, The ideology of the American urban parks and recreation movement: Past and future, (*Leisure Sciences*, 13:2, 1991) 137-151, DOI: 10.1080/01490409109513132, and the Fair Labor Standards Act of 1938, 52 Stat. 1060 through 52 Stat. 1070

[30] Turner to Miss Harlean James, December 31, 1921, Series 2, Box 3, Folder 1, RG 079:017 State Park and Forest Commission, Connecticut State Archives, Hartford, CT.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

the waters, or injure the forest-growth. This would involve the prohibition of firearms, but not the gathering of nuts, berries, or wild flowers…."[31]

49.     In 1918, the Commission adopted a general "form of notice," to be posted in all parks addressed "To the Citizens of Connecticut," explaining that the state park "belongs to you," the general public.  It stated that "there is a reason for every rule and regulation made… It is desired that this park shall be used for picnic parties, camping, and outdoor life by the people of Connecticut, provided the park is used in a wholesome and reasonable way, and the trees, shrubs, and plants are not injured, and all rubbish is placed in receptacles prepared for it, or buried, or burned. The People using this state park should not monopolize it, nor disturb, nor unpleasantly intrude upon other parties using it." Fires outside of stone fireplaces were prohibited, and "the use of firearms or having them in your possession is forbidden, also the killing or disturbing of wild animals, birds, or birds' nests." [32]

50.     Turner laid out his "system" approach, which other state park officials would cite as a model for other states, as well, stressing such factors as natural suitability, beauty, fitness; historical or traditional association; distribution with regards to centers of population, size, accessibility, and level of development of park properties.[33] Turner believed that state parks had a specific purpose quite different from city parks, which were more art than science, more "museum-like" than natural. State parks provided a more natural, less landscaped aesthetic to the controlled movement and limited recreative options in the Olmstedian city parks, without departing from those basic values. The 1920 annual report continued to debate the purposes of state parks: public recreation, historical association, and/or natural and scenic beauty. Turner began to emphasize a state park's purpose as one

---

[31] Annual Report, Report of State Park Commission, 1914, 29.

[32] Report of the State Park Commission, State of Connecticut (1918), 30-31.

[33] Annual Report, Report of State Park Commission, 1914, 23-20.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

of public mental health, an essential refuge from the stresses of modern urban life, and he called out the carrying and use of firearms as an example, even for a recreative activity like hunting. "Why do we issue hunting licenses by tens of thousands to "sportsmen" who frequently tramp the woods all day without getting a legitimate shot at a moving thing? Must we forever be condemned to carry a gun as an excuse for the pleasure of walking in the woods?"[34] Firearms, associated with hunting, were incompatible with wildlife preservation, but also with the spiritual and special purpose of a public park as a peaceful refuge and remedy for the dangers of the city.

51.    In California, after the establishment of Yosemite as a National Park, a grassroots campaign began to preserve the redwoods in the Santa Cruz Mountains. Thereafter California continued to seek to preserve other natural spaces, while acquisition efforts took years. The state created the California Redwoods State Park, and the Humboldt and Del Norte State Parks in 1918.  By 1925, the state administered its six parks under three different administrations with little financial support for development.[35]

52.    In 1927, the California state legislature established a state park commission and authorized it to undertake a comprehensive survey to guide the "ultimate development of a comprehensive, state park system" as a means of "conserving and utilizing the scenic and recreational resources of the state." The commission hired Frederick Olmsted, Jr. who like his father had advocated for national and state parks.[36] As part of Olmsted, Jr.'s survey, he divided the state into

---

[34] Report of the State Park Commission to the Governor, 1920, 23. Connecticut Digital Archive, http://hdl.handle.net/11134/30002:21895214.

[35] Beatrice Ward Nelson, *State Recreation: Parks, Forests, and Game Reserves, National Conference on State Parks, 1928. 36-44.*

[36] Olmsted, Jr. also planned Palos Verdes Estates (1923), and moved there with his family in 1927.

regions and consulted with local residents and experts; his process and criteria remained policy through the 1950s. Olmsted, Jr. also served as a National Park Board advisor for nearly his whole life.[37]

53.     The rising popularity of and access to the car in the 1930s increased recreational demand and park visitation. At the same time, there were fewer appropriations for acquiring additional lands. The Great Depression provided additional opportunity for state conservation efforts through expansion of federal programming and powers in New Deal programs like the Civilian Conservation Corps (CCC) initiated in 1933, one of President Franklin Delano Roosevelt's flagship work programs. It served as a boon for California's recreational and economic forest development. By 1934, California had 49 parks offering relief during the economic crisis. The parks covered 300,000 acres, and they expanded further in 1964 and 1984, as automobile access expanded opportunities to more sites. The state also established more parks closer to cities to engage urban populations.

54.     California State Park Rules and Regulations echoed the stipulations of the Yosemite Commission, that "Firearms are not allowed, and must be sealed or checked at the warden's office."[38]

55.     The Digest of Laws Relating to State Parks," published in 1936, lists firearms bans in several states. As part of its "Rules and Regulations," Connecticut explained the purpose of parks as public spaces and included "The use of firearms or having then in possession is forbidden, also the killing or disturbing of wild

---

[37] Frederick Law Olmsted, Jr. "Report of the Director of the Survey to the California State Park Commission," December 29, 1928 in National Association for Olmsted Parks 14:1 (Spring 2012); Rolf Diamont, Ethan Carr, and Lauren Meir, The Olmsteds and the National Park Service, Northeast Regional History Program, NPS, US Department of the Interior, 2020), 113-126.

[38] "Digest of Laws relating to State Parks," Volumes I (National Park Service: Department of the Interior, 1936), 20. See **Exhibit 3**.

animals, birds, or birds' nests." Indiana had a similar strategy, stating "Firearms are prohibited at all times." Kansas and Michigan forbade firearms in its state parks. See **Exhibit 4**. New York prohibited "the possession of any firearms or fireworks of any kind" within park areas, but had laws specific to each park, some related specifically to hunting, and others not. The Central New York State Parks Commission further instructed in Ordinance No. 4 that "no person except employees or officers of the commission shall carry firearms of any description within the park." In Ohio, "Shooting of firearms of any description or the carrying of firearms, either loaded or unloaded, in any state park under the control of the Ohio State Archeological and Historical Society" was "positively forbidden." Virginia instructed visitors that that "Firearms are prohibited at all times." West Virginia prohibited shooting anywhere near a park or "other place where persons gather for purpose of pleasure" in Section 6054, Code of 1932."[39]

56.   In 1939, California adopted a Department of Natural Resources in its Public Resources Code (Chapter 93 in Laws of 1939). The State Park Commission designated all parks as game reservations, and thus hunting was not allowed. In 1951, the Division of Fish and Game was charged with designating public shooting grounds, not in the parks, and not under the jurisdiction of the Division of Beaches and Parks.[40]

57.   From 1945 until approximately 1966, California operated its parks under a "Division of Beaches and Parks" within that Department. The Division was responsible for "all parks, beaches, monument sites, landmark sites, and sites of

---

[39]"Digest of Laws relating to State Parks," Volumes I (National Park Service: Department of the Interior, 1936), 27, 35, 55, 77, 122 (**Exhibit 4**); "Digest of Laws relating to State Parks," Volumes II and III (National Park Service: Department of the Interior, 1936), 190, 195, 201, 205, 310, 347, 368, 397 (**Exhibit 5**).

[40] Flavel Shurtleff, Planning and Zoning Commission, "Digest of Laws Relating to State Parks," (Washington, DC, National Conference on State Parks, 1955), 12-18.

1  historic interest created or acquired by the State," excepting Balboa Park in San

2  Diego and the State Fair Grounds in Sacramento. It was empowered to administer,

3  protect and develop such areas "for the enjoyment of the public." The Division was

4  "authorized to establish rules and regulations for the government and administration

5  of the State Park System not inconsistent with law; and may confer on the Chief of

6  the Division of Beaches and Parks and such other employees as it may designate

7  full authority and powers of peace officers for the parks. Any person who violates

8  the established rules and regulations to be guilty of a misdemeanor (Chapter 93 in

9  Laws 1939)."

10      58.    In 1966, the California Department of Parks and Recreation was

11  created and assumed the Division of Beaches and Parks' jurisdiction over parks and

12  beaches, among other things. Cal. Pub. Resources Code, § 53.

13      59.    Public Resources Code Section 5001, subdivision (a), provides

14  in part that: "California's state parks are a true reflection of our state's collective

15  history, natural and cultural heritage, and ideals. The state parks can be models of

16  healthy, natural, and sustainable ecosystems and they can also commemorate

17  important cultural traditions or historic events. To remain relevant now and into the

18  future, state parks must protect California's heritage and be welcoming in order that

19  visitors may understand and appreciate these special places that have been set aside

20  for their inspiration and enjoyment." California law forbids the carrying,

21  possession, or discharge of any firearm "across, in, or into any portion of any unit"

22  of a state park, except in designated hunting areas.[41]

23      60.    Today, California has the largest state park system in the United

24  States, with a total of 280 units, totaling nearly 1.4 million acres.

25      _____

26  [41] "Firearms not having a cartridge in any portion of the mechanism . . . may
    be possessed within temporary lodging or mechanical mode of conveyance when

27  such implements are rendered temporarily inoperable or are packed, cased, or
    stored in a manner that will prevent their ready use." CAL. CODE REGS., tit. 14, §

28  4313; see Pub. Resources Code, § 5003.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

1

## **Recreational and Cultural Gathering Spaces**

2    61.    Over time, recreation extended beyond parklike activities, however,

3 and this demand led to the development of more spaces of leisure in or at the

4 outskirts of cities. While for leaders like Olmsted parks served as a primary outlet

5 for the ills of industrialism, recreation took many forms and created many new

6 spaces for public gathering.

7    62.    In the Colonial Era, work, entertainment, and socializing all took place

8 far more often in and near the home than in large public gatherings. People gathered

9 for leisure in the theatre and music halls with minstrel shows and novelty acts in the

10 mid-nineteenth century, all this growing increasingly popular in the 1830s, likely as

11 improved transportation allowed both audiences and entertainers to travel further

12 distances.[42] In his classic study of working class leisure, Historian Roy Rosenzweig

13 characterized the factory as a place of workplace discipline, separated from the

14 socializing, drinking, sharing and storytelling that had been part of artisan

15 workshop life. Factory work moved leisure and social time to taverns and saloons,

16 pool and dance halls. Efforts to limit workday hours began as early as the 1840s.[43]

17    63.    Park advocates like Olmsted and Turner often described parks as

18 spaces akin to museums for the working class. Museums and libraries in early

19 America were not the centers of extensions of public education or the family outing

20 destinations that they are today, rather they were primarily the private collections of

21 the wealthy, often of a scientific variety. Few, by the late 18th century, would be

22 open to the public.[44] These included Charleston Museum (1773), Pierre Eugène Du

23 Simitière's American Museum in Philadelphia (open only from 1782 to 1784),

24

25    [42] Foster Rhea Dulles, *A History of Recreation: America Learns to Play*, New York Meredith Publishing Company, 1965.

26    [43] Rosenzweig, *Eight Hours for What You Will*, 38-50.

27    [44] Andrea Stulman Dennett, *Weird and Wonderful: The Dime Museum in America* (New York: New York University Press, 1997), 1 as quoted in NHL.

28

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

Scudder's Museum in New York City (1791-1841) and Charles Willson Peale's Philadelphia Museum (1786–1845). They were primarily for artifacts and personal objects, and associated with the intellectual pursuits of the learned and/or upper class, often naturalistic, ethnological, and zoological. Peale's "Museum" even featured a live menagerie, a predecessor to the zoo, but almost by definition for the purpose of private, not public viewing.[45] Scudder's and the Peale Musuem inspired P.T. Barnum's opening of the American Museum in New York City in 1842 as a place for "instructional entertainment."  It included a research library, exhibit space, and lecture hall. He even created the "Ocean and River Gardens" exhibit, America's first public aquarium, in 1857. It was primarily with the post-Civil War era, however, that he found success. Interested in profit, Barnum sought his audience with the "common man," the museum catered his collections and exhibits to the working class, and he is certainly one of the founders, along with people like Buffalo Bill, who resonated with audiences through what we know today as popular culture. He began traveling shows in the 1870s and 80s, eventually merging with the Ringling Brothers for the well-known circus. Barnum's museums, like other "dime museums" catered to the masses at all levels of culture, and he supported scholarly and research-based museums such as the Smithsonian Institute and the Barnum Museum at Tufts University in Medford, Massachusetts. Barnum opened his circus which included a menagerie and curiosity museum in 1871.[46]

---

[45] Philadelphia was the first city to open a zoo in 1874, but Central Park included one in the mid-nineteenth century. Alexander, *Museums in Motion, 110-116;* Golden Gate Park in San Francisco added a zoo in the 1930s, but it regularly displayed a range of animals, from exotic to farm, throughout the 1880s and into the twentieth century. Young, 38; "Animals of Golden Gate Park," at "Historical Images of San Francisco," accessed October 15, 2023, https://opensfhistory.org/Photoset/Animals_of_Golden_Gate_Park.

[46] Adams, et. al.

64.     Even the Smithsonian Institution—which was created by Congress in 1846 following a gift from Englishman James Smithson—was similarly based around large private collections. By establishing the Smithsonian in 1846 as "an establishment for the increase and diffusion of knowledge," Congress had the federal government assume the role of preserving the nation's history, but it did not realize its museum form until 1873, when the primary function extended beyond collections to public education as a venue through which to democratize knowledge. It then received many of the exhibitions from Philadelphia's Centennial Exposition, constructing a new building to house it, completed in 1881. However, as William Walker discusses in his new book, *A Living Exhibition*, the "castle" still did not quite resemble the cultural centers of large themed exhibits and family public programming we know today until after World War II.[47]

65.     The American Museum of Natural History and the Metropolitan Museum of Art (1870) in New York City and the Boston Museum of Fine Arts (1876), grew out of private collections, and catered increasingly to the adult middle and upper classes.[48]

66.     The end of the Reconstruction period coincides with America's centennial celebration in 1876, with the World's Fair in Philadelphia, Pennsylvania, also known as the Centennial Exposition, which tended to display the kind of spectacle and public exhibitions we associate with today's museum exhibit spaces. Directed toward large crowds of varying social and economic class, these more resembled today's blockbuster museums, festivals and amusement parks.  The privately funded and organized, but federally supported (congressional

[47] William Walker, *A Living Exhibition: The Smithsonian and the Transformation of the Universal Museum* (Amherst, MA: University of Massachusetts Press, 2013).

[48] William Walker, *A Living Exhibition: The Smithsonian and the Transformation of the Universal Museum*. Amherst, MA: University of Massachusetts Press, 2013.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

appropriation took the form of a loan) Columbian Exposition and fairs in Chicago in 1893, Buffalo in 1901—and even an international exposition in San Francisco in 1894—served to assert America's unity, economic, political, cultural, and technological power to its citizens and to the world. Thousands attended, and officials anticipated, planned, and provided public security for the masses. The World's Fairs inspired global collecting world-wide.

67.     At its 1893 fair, to accommodate the unusually large crowds of over 15,000, Chicago assembled a police force explicitly to provide safety and security to its attendees, with a special "secret service" as "a branch of the physical force of the Fair under the Department of Works, deriving its authority from the State, operating on park territory…"[49] These fairs collectively coalesced and solidified American identity after the fracture of the Civil War.

68.     Similarly growing out the success of the World's Fairs, amusement parks, most notably Coney Island in New York City, which opened as the first enclosed amusement park in 1895, served as one of the original sites of leisure for the working class.[50]

69.     Like other deliberately designed and defined cultural spaces, there is no true analogue for modern playgrounds in America prior to the late-nineteenth and twentieth century. By conception and definition, Progressive era reformers conceived and designed these urban places to offer safe spaces for leisure and play, and within those spaces, dictate behavior by organizing and purposing those spaces. While European gardens inspired public park design, historians have characterized such late nineteenth century reformers as using both parks and playgrounds for

[49] R.W. M'Clughry, General Superintendent Chicago Police, and John Bonfield, Chief Secret Service World's Columbian Exposition, "Police Protection at the World's Fair," 1893.

[50] See Roy Rosenzweig, "Eight Hours for What We Will: Workers and Leisure in an Industrial City, 1870-1920" (Cambridge, MA: Cambridge University Press, 1983), 127-152.

social control, repeatedly insisting on regulating proper behavior. It was, however, more complicated than that. Planners like Olmsted and civic leaders held sincere beliefs about nature and concerns for public health in the cities, but workers and children often revised the design and use of these spaces, often using them less for enlightenment and repose, and more for play-centered activities. Middle and upper classes would embrace this notion of sports and recreation in the mid- to late-nineteenth century.

70.    Designers of mid-nineteenth century parks like Frederick Law Olmsted did not initially include playgrounds in urban park planning, favoring passive recreation over active. In most public places in the world, playgrounds did not become ubiquitous until the twentieth century. The concept of educating children through play was just emerging. In the early 1800s, Germany educational reformer Friedrich Fröbel's kindergartens featured sand gardens to encourage the development of morally, mentally, and physically healthy children. American Elizabeth Palmer Peabody opened the first English-language kindergarten in the United States in the 1860s.[51] Progressive social reformers like John Dewey saw playspaces for children as educational.[52] Interestingly, San Francisco claims the first playground in the nation as early as 1888, Sharon's Quarter.

71.    Progressive reformers formed the Playground Association of America (PAA) in 1906 and it was under their guidance that playgrounds established a moral code of child development with directed child-centered activities.[53] Officers

---

[51] Robert D. Putnam, *Bowling Alone: The Collapse and Revival of the American Community* (New York, NY: Simon & Schuster, October 2020), 395.

[52] Putnam, *Bowling Alon*, New York, NY: Simon & Schuster, (October 2020), 393; Walter de Burley Wood, *The Playground Movement in America and its Relation to Public Education* (Board of Education. London, England: His Majesty Stationary Office, 1913).

[53] Kim Hart, "The History of Playgrounds and the First Playgrounds," AAA State of Play, aaastateofplay.com, (2021); Playground Association of

included well-known Progressives like Honorary President Theodore Roosevelt, Honorary Vice President famed muckraker journalist Jacob Riis (author of *How the Other Half Lives*, published in 1890), Horace McFarland of the City Beautiful movement, and Jane Addams, founder of the well-known Hull House in Chicago, a Settlement House which supported immigrants' assimilation into American life. Representatives from San Francisco, Los Angeles, and San Diego attended the first convention of the PAA.[54]

72.     Reformers hoped to mediate the crowded, unsanitary, and unsafe living conditions of urban cities, and the working-class demand for play spaces. The great influx of immigration from the 1880s through the 1910s overwhelmed city tenements with immigrant families. Populations outpaced housing and space. Urban children played in the streets. In some places, playing in the street became so dangerous that it became illegal. Furthermore, prior to child labor laws in the 1930s, many older urban children were simply not available for daytime play.

73.     Formally designated American playgrounds began with places like Jane Addams' Hull House in Chicago and other major cities at the turn of the twentieth century. Such settlement houses, located near tenements and poor immigrant worker neighborhoods, began to host fenced-in playgrounds as a way to support immigrant families, but also a vehicle for assimilating children in spaces distanced from their parents and neighborhoods.[55] Early on, such places were

America, Playground and Recreation Association of America. *The Playground* (New York, NY: Executive Committee of the Playground Association of America, April, 1923).

[54] Kaitlin O'Shea, "How We Came to Play: The History of Playgrounds," https://savingplaces.org/stories/how-we-came-to-play-the-history-of-playgrounds/; Playground Association of America, *The Playground* ((New York, NY: Executive Committee of the Playground Association of America, April 1907-1909).

[55] O'Shea; Playground Association of America, *The Playground* (1907-1909).

highly regulated, with separate areas for boys and girls and trained playground workers to organize play and provide instruction on acceptable behavior when needed.[56]

74.     Efforts to assimilate immigrant families also influenced the proliferation of local public libraries. Benjamin Franklin did start the nation's first, again in Philadelphia, "Library Company," but it operated by member subscription. After he donated it to a town in Franklin, Massachusetts, the town voted in 1790 to offer them for free and it served as a model for towns and cities. Boston Public Library did not open until 1848, coinciding with the arrival of German and Irish immigrants. During and after World War I, both museums and libraries served as Americanization vehicles for immigrants, the latter growing especially popular with the passage of the 1917 Immigration Act that required literacy to gain citizenship.

75.     Spectator events became more popular in the mid-nineteenth century. Foster Rhea Dulles argued that as villages broke up, informal games and activities declined. Event sites included theaters and race tracks, but games like baseball also evolved from children's play and gained popularity. Other sports skewed toward amateur athletic clubs, especially for the middle and upper class, with croquet, skating, archery, and rowing. Intercollegiate sports also grew in popularity in the 1860s and 1870s.[57]

76.     Formal baseball teams formed in about 1842 when business and professional men organized teams and games in Hoboken, New Jersey. The Boston Common hosted games in the 1850s, and the game began to attract spectators across the country until the Civil War interrupted momentum. Basketball did not

---

[56] Henry Curtis, *Education Through Play,* New York, NY: The MacMillan Company. (1915), 63-65; Robert D. Putnam, *Bowling Alone: The Collapse and Revival of the American Community*, New York, NY: Simon & Schuster, (October 2020), 393-394.

[57] See Dulles, *A History of Recreation*.

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

begin as a game until the 1890s. Rhea Dulles argued that limited leisure time restrained the numbers of spectators that such games might attract, although there were certainly exceptions.[58]

77.    When union activity of the late nineteenth century saw wages rise and limits to work hours, and with the introduction of affordable transportation in the form of the streetcar, urban centers saw significant participation in commercialized leisure, and what one would now understand as mass culture, that could unite an ethnically diverse population.[59] Historian Roy Rosenzweig characterized those who saw commercial profits in offering what historians like Kathy Paiss have coined as "cheap amusements" as "recreational entrepreneurs;" referring to those who created large theaters and amusement parks, spaces specifically designed to cater to communities and large crowds.[60]

78.    The prosperity of the 1920s included the availability of credit, which meant more disposable income and leisure time for the working class, and this is the time when states begin to focus on acquiring parklands for recreational activity as well.

**Conclusion**

79.    It is my opinion, as a professional historian, that the park idea was part of a concerted movement for a far more defined, and different, notion about public use and behavior than the greens and commons in Colonial America. Rather, the park movement is far more a reflection of the Civil War and Reconstruction era that

---

[58] Dulles, *A History of Recreation*, 182-200.

[59] Rosenzweig, *Eight Hours for What We Will*, 171-221; John Kasson, *Amusing the Million: Coney Island at the Turn of the Century* (New York: Hill and Wang, 1978); Kathy Peiss, *Cheap Amusements: Working Women and Leisure in Turn-of-the-Century New York* (Philadelphia, PA: Temple University Press, 1986).

[60] Rosenzweig and see Kathy Peiss, *Cheap Amusements: Working Women and Leisure in Turn-of-the-Century New York* (Philadelphia: Temple University Press, 1985).

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

shook and shifted political, economic, and regional identities. The post-war period saw rapid changes in American life from industrialization, urbanization, and immigration. The words and work of America's most influential park designer and steward, Frederick Law Olmsted, articulated and defined the park movement he began and influenced at the local, state, and national levels, prescribing certain uses and behaviors for those shared spaces. Formal and designated parks served as places of physical and deeply spiritual escape from the harshness of urban and industrial life into nature. Olmsted conceived and designed parks as places of preservation as well as physical recreation and mental refuge, not conservation. It would therefore be consistent to restrict firearms as well as hunting in such places. Carrying firearms was very much inconsistent with the lofty and transcendentalist views of Progressive era conservationists and preservationists when they established public parks for collective "public enjoyment."

80.     Similarly, as responses to and products of the industrial era, cultural sites of public gathering today have little similarity to places in colonial America. In colonial and early America, sites of leisure, recreation and entertainment stayed in and/or close to home and community. After Reconstruction, museums, fairs, parks, and spectator sports evolved in form and purpose out of political and business leaders' need and desire to control behavior and provide a diverse, restive, and growing labor class population with entertainment, leisure, and recreation at a time when an industrial economy and urban space now rigidly defined the workplace.

81.     This Declaration is based on my knowledge as a trained Historian of the American West, and as a Public Historian who has worked in federal land use agencies such as the National Park Service and the Bureau of Reclamation, and taught about American culture and its cultural institutions. It addresses the context and form in which several types of cultural spaces began in the United States. When initially conducting any original archival research on this topic, it was specific to

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

Connecticut. Furthermore, I was not looking specifically for references to firearms and hunting, nor to California. My initial questions focused upon debates about the purpose and use of parks, searching for definitions delineating parks from forests. For this declaration, I have included background knowledge regarding California and enlisted cursory research available online, as well as some recent scholarship. There may some more explicit discussion of prohibition or regulation in undigitized archives, like the Yosemite and State Park Commission reports, papers, and correspondence in the California State Archives, land deeds that may include provisions beyond maintenance, or patrolling reports, that could imply something more specific about the regulations. There are also likely additional resources, including correspondence that could provide evidence of intent for these public land reservations in California, or further insight into the values and definitions around recreation, including additional evidence regarding public attitudes towards firearms in these spaces, but I had neither the time nor access to locate and evaluate those sources.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

Executed on October 31, 2023, at New Britain, Connecticut.

_Leah S. Glaser_

_____
Leah S. Glaser

Declaration of Leah Glaser
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

# Exhibit 1

Exhibit 1
Page 38

# Leah S. Glaser, PhD

Department of History, Central Connecticut State University
1615 Stanley Street, PO Box 4010
New Britain, CT  06050-4010
860-832-2825, glaserles@ccsu.edu

## EDUCATION

**Arizona State University**, Tempe, AZ                                                             May 2002
*Doctor of Philosophy* in American History
*Fields*: Public History, U.S. History from 1865, American West
*Dissertation*: "Rural Electrification to Multiethnic Arizona: A Study in Power, Urbanization, and Change."

Advisors: Jannelle Warren-Findley, Peter Iverson, Robert Trennert, Vicki Ruiz

*Master of Arts* in Public History: Historic Preservation emphasis.                          December 1996
*Thesis*: "The Story of Guadalupe, Arizona: The Survival and Preservation of a Yaqui Indian Community."

**Tufts University**, Medford, MA
*Bachelor of Arts* in History and Art History.                                                     May 1992

**Syracuse University**, Florence, Italy                                                          Fall 1990

## TEACHING

**Central Connecticut State University**, New Britain, CT
*Coordinator, Public History Program*                                          Spring 2014- *present*
*Professor of History*                                                              Fall 2017-*present*
*Associate Professor of History* (tenured)                                      Fall 2011-Spring 2017
*Acting Coordinator, Public History Program*                                    Fall 2009- Spring 2010
*Assistant Professor of History*                                                        Fall 2006

HIST 511: Historic Resource Preservation and Planning (Graduate)

HIST 510: Seminar in Public History (Graduate)

HIST 502: Historiography: American West (Graduate /team-taught)

HIST 405/505/LTN 470: Local History and Community Development (Undergraduate/ Graduate)

HIST 492: Public History Intern Experience (Undergraduate)

HIST 302: Introduction to Public History (Undergraduate)

HIST/LTN 316: History of the American West to 1890 (Undergraduate)

HIST/LTN 317: History of the American West from 1890 (Undergraduate)

HIST 305: Connecticut and the Nation (Undergraduate online)

HIST 301: The Historical Imagination: Immigration/ Mexican Immigration and Labor/
American West/ Borderlands/ Japanese Internment/The 60s (Undergraduate)

HIST 162: History of American Life II (Undergraduate /classroom and online)

HIST 100: US Environmental History

*Supervise internships for MA in Public History (2-4 annually)*

*Supervise capstone projects for MA in Public History (40 to completion)*

*Supervise theses for MA in History (2 to completion)*

*Class Projects*:

"Rooted in History:" Connecticut Tree Stories, *Grating the Nutmeg*, podcast, HIST 405/505, Spring 2021.

"Pandemic in Perspective," Online Exhibit, CCSU Burritt Library, HIST 302, Fall 2020.

Women's Suffrage Transcription Project, Connecticut State Archives, HIST 302, Fall 2019.

Latino History Harvest, HIST 405/505, Spring 2017-2018.

Iwo Jima Biography Project, HIST 302, Fall 2014-2018.

Exhibit 1
Page 39

Glaser                                                                                       2

"Historic Structure Reports," Coltsville National Historic Park, Hartford, CT, HIST 511, Fall 2016 and Spring 2017.

New Britain Industrial Museum Visitors' Survey, HIST 302, Fall 2016.

"Triumph Through Adversity: The Borinqueneers," Exhibit, New Britain Visitors' Center Gallery, New Britain, CT, HIST 302, Fall 2015.

"Voices from Vietnam," Veterans History Project, CCSU, HIST 302, Fall 2014.

"The History of Homelessness in New Britain," HIST 405/505, Spring 2012.

**Quinnipiac University,** Hamden, CT
*Adjunct Assistant Professor of History*                                   Fall 2003- Spring 2006
Introduction to Public History
The Gilded Age and Progressive Era
The West in American History to 1900
United States History (to 1877 and from 1877)

**Arizona State University,** Tempe, AZ
*Faculty Associate*                                                        Fall 1999-Fall 2001
American Cultural History from 1865 to Present
United States History Survey (to 1877 and from 1865)

**Maricopa County Community Colleges,** Maricopa County, AZ
*Adjunct Faculty*                                                          Fall 1998-Spring 2002
Chandler-Gilbert Community College, Chandler, AZ
    United States History Survey (to 1877 and from 1865)
South Mountain Community College, Phoenix, AZ
    Yaqui Indian History and Culture (designed, developed and co-taught)

**Arizona State University,** Tempe, AZ
*Research Graduate Assistant,* Center for Indian Education                  Fall 1995-Fall 2001
*Teaching and Research Graduate Assistant,* History Department             Fall 1994-Fall 1996; 1998

## PUBLICATIONS
**Books**

w/ Philip Levy, eds. *Branching Out: The Public History of Trees.* Amherst, MA: University of Massachusetts Press (Public History in Historical Perspective series), *under contract.*

*Interpreting Energy at Museums and Historic Sites*. Lanham, MD: American Association of State and Local History (AASLH)/ Rowman and Littlefield (Interpreting History series), 2023.

*Electrifying the Rural American West: Stories of Power, People, and Place.* Lincoln, NE: University of Nebraska Press, 2009.
    Favorably reviewed in 13 prominent and prestigious academic journals including the *American Historical Review, Journal of American History, Western Historical Quarterly,* the *Pacific Historical Review,* and the *Montana, The Magazine of Western History.*

*The History, Values, and Visions of Carollo Engineers*. Walnut Creek, CA: Carollo Engineers, 2003.

Linenberger, Toni Rae and Leah S. Glaser, *Dams, Dynamos, and Development: The Bureau of Reclamation's Power Program and Electrification of the West.* Washington, DC: US Government Printing Office, 2002.

**Book Chapter**

"When a Tree Falls…: Listening to and Managing Connecticut's Historic Landscape," in *Branching Out: The Public History of Trees*. University of Massachusetts Press (Public History in Historical Perspective series), *under contract.*

" 'An Absolute Paragon of Paradoxes:' Native American Power and the Electrification of Arizona's Reservations," in Sherry L. Smith and Brian Frehner, eds. *Indians and Energy: Exploitation and Opportunity in the American Southwest.* Santa Fe, NM: School of Advanced Research Press, 2010.

Exhibit 1
Page 40

Glaser                                                                                                                3

**Edited Journal**

Guest Editor (theme issue), "Public History and Environmental Sustainability," *The Public Historian* 36:3 (August 2014).

**Articles in Academic Journals**

"Hidden Gems: Hopewell Furnace National Historic Site," *Pennsylvania Magazine of History and Biography*, Special Issue on Energy (October 2015), 353-355.

w/ Nicholas Thomas, "Sam Colt's Arizona: Investing in the West," *Journal of Arizona History* 56:1 (Spring 2015), 29-52.

"Identifying and Defining Issues of Environmental Sustainability in Public History" *The Public Historian* 36:3 (August 2014), 10-16.

"Let's Sustain This!" *The Public Historian* 36:3 (August 2014), 130-144.

"Beyond the Boom/Bust Cycle: Locating Enduring Stories in the Cultural Resources of the West," in Field Notes, *Western Historical Quarterly* 41 (Summer 2010): 218-226.

"Nice Towers, eh? Evaluating a Transmission Line in Arizona," *CRM: Cultural Resource Management* 20:14, U.S. Department of the Interior, National Park Service (1997): 23-24.

"Working for Community: The Yaqui Indians at the Salt River Project," *Journal of Arizona History* 37: 4 (Winter 1996):  337-356.

**Articles in Popular Magazines, Newspapers**

"Trees as Memorials and Witnesses to History," *Connecticut Explored* (Spring 2021): 14-19.

"Readers Respond to Removal of Christopher Columbus Statues," *Hartford Courant* (June 26, 2020).

"Historic Preservation Checks a Lot of Boxes," *Connecticut Preservation News* (January/February 2019): 4-5.

"Taking Away Conservation Funds Hurts the State," editorial, *Hartford Courant* (June 20, 2017).

Guest Editor (theme issue), "Connecticut in the West," *Connecticut Explored* (Winter 2017).

-    "Sam Colt Mines the Arizona Territory," *Connecticut Explored* (Winter 2017).

-    "Western Ideas for Eastern Lands," *Connecticut Explored* (Winter 2017).


**Reports (peer-reviewed)**

w/ Elizabeth Correia. National Register of Historic Places, "Congregation Mishkan Israel," Hamden, New Haven County, Connecticut, *approved by Connecticut State Historic Preservation Review Board, March 2021.*

National Register of Historic Places, "New Haven Armory," New Haven, New Haven County, Connecticut, *approved by Connecticut State Historic Preservation Review Board, December 4, 2020.*

Glaser, Leah S. *et.al.* National Register of Historic Places, "Downtown New Britain," New Britain, Hartford County, Connecticut, National Register #93000771. Reviewed/approved by Connecticut State Preservation Board, December 7, 2015. Submitted to National Park Service February 2016. Listed May 3, 2016.

Glaser, Leah S. (chair) with Maren Bzdek, Priya Chhaya, Rebecca Conard, David Glassberg, William Ippen, Melinda Jetté, and Angela Sirna (National Council on Public History Task Force on Environmental Sustainability), "Public History and Environmental Sustainability: A Role for the National Council on Public History," White Paper, submitted to the NCPH Board in September, 2014.

Connecticut State Register of Historic Places, "1631 Chapel Street," New Haven, New Haven County, Connecticut, Reviewed/approved by Connecticut Historic Preservation Council, 2006.

Connecticut State Register of Historic Places, "Short Beach Union Chapel," New Haven, New Haven County, Connecticut, Reviewed/approved by Connecticut Historic Preservation Council, 2006.

National Register of Historic Places, "Ball's Oyster Dock," Branford, New Haven County, Connecticut, Reviewed/approved by Connecticut State Preservation Board, 2006.

National Register of Historic Places, "Perry Avenue Bridge," Norwalk, Fairfield County, Connecticut, Reviewed/approved by Connecticut State Preservation Board, 2006.

National Register of Historic Places, *"*Westville Village Historic District (Boundary Increase)," Reviewed/approved by Connecticut State Preservation Board, 2005.

Exhibit 1
Page 41

Glaser                                                                                                    4

National Register of Historic Places, "Knickerbocker Golf Club," New Haven, New Haven County, Connecticut, Reviewed/approved by Connecticut State Preservation Board, 2005.

"An Industrial Place in a Rural Space: The Administrative History of Hopewell Furnace National Historic Site," Philadelphia. PA: Northeast Regional Office/ National Park Service/ Bloomington, IN: Organization of American Historians, August 2005.

"The Navajo Indian Irrigation Project," Bureau of Reclamation History Program, Denver, CO, 1998.

"The San Juan-Chama Project," Bureau of Reclamation History Program, Denver, CO, 1998.

"The EMA Transmission Line," No. AZ-6- B. Historic American Engineering Record (HAER), National Park Service, Western Region, 1996.

**Encyclopedia Entries**

"Dynamic Tensions: Conservation and Development in Connecticut to 1920s," *ConnecticutHistory.org.* Connecticut Humanities Council, September 2012.

"A Public Responsibility: Conservation and Development in Connecticut in the Twentieth Century," *ConnecticutHistory.org.* Connecticut Humanities Council, September 2012.

"Hopewell Furnace National Historic Site," *United States Geography* Database*.* ABC-CLIO, Santa Barbara, CA. (posted August 2011).

**Blog and Newsletter Publications**

"Guidelines for Historic Tree Preservation," *History@Work* in "Public Historians in our Climate Emergency" series. www.ncph.org (October 5, 2021).

"From the Desk of Leah Glaser: Hey Texas! Read my Electricity Book," UNP Guest Blog, University of Nebraska Press, March 1, 2021.

Michelle McClellan, Carolyn Barske Crawford, and Leah Glaser, "Repairing National Register Nominations: Educational Institutions and The National Register Process," *History@Work*, The NCPH Blog, www.ncph.org, July 28, 2020.

"Public History and Sustainability: An Overview and Invitation," *History@Work*, www.ncph.org, (June 7, 2013).

"A Point Paper from the Public Historians and Sustainability Working Group," *History@Work*, www.ncph.org, (July 20, 2012).

w/ Will Ippen. "Public History and Sustainability," *Public History News* 32:4 (September 2012), 11.

"Public Historians Take on Climate Change," *History@Work* (April 29, 2012).

w/ Jannelle Warren-Findley, "Negotiating Histories: Perspectives on Public History," *Perspectives: A Newsletter of the American Historical Association* (May 1999).

**Reviews**

Book Review of Richard F. Hirsch, *Powering American Farms: The Overlooked Origins of Rural Electrification*. Baltimore, MD: Johns Hopkins University Press, 2022 in *Business History Review* 97:1 (May 2023), 180-183.

Book Review of Debra Reid and David Vail, *Interpreting the Environment at Museums and Historic Sites*. Lanham, MD: AASLH/Rowan and Littlefield, 2019 in *The Public Historian* 43:2, (May 2021), 167-169.

Book Review of Casey P. Cater, *Regenerating Dixie: Electric Energy and the Modern South*. (History of the Urban Environment.) Pittsburgh, Pa.: University of Pittsburgh Press, 2019 in *American Historical Review* 126:1 (March 2021), 352-353.

Book Review of Marisa Elena Duarte, *Network Sovereignty: Building the Internet Across Indian Country*. Seattle, WA: University of Washington Press, 2017 in *Pacific Historical Review* (2018), 43-44.

Exhibit Review of "Rising Tides: Fairfield's Coast: Past to Future," Fairfield Museum and History Center, Fairfield, CT in *The Public Historian* 39:2 (May 2017), 91.

Book Review of James Robert Allison, III, *Sovereignty for Survival: American Energy Development and Indian Self-Determination*. New Haven, CT: Yale University Press, 2015 in *Journal of American History* 103: 3 (December 2016), 841-842.

Exhibit 1
Page 42

Glaser                                                                                                          5

Book Review of David B. Danbom, ed. *Bridging the Distance: Common Issues of the Rural West*. Forward by David M. Kennedy. Salt Lake City, UT: University of Utah Press, 2015 in *Western Historical Quarterly* 21 (July 2016), 488-489.

Book Review of Don E. Albrecht, *Rethinking Rural: Global Community and Economic Development in the Small Town West*, Pullman: University of Washington Press, 2014 in *Environment, Space, Place* (Fall 2015).

Book Review of Greg Gordon, *When Money Grew on Trees: A.B. Hammond and the Age of the Timber Baron*. Norman: University of Oklahoma Press, 2014 in *Journal of American History* 101:4 (2015), 1287-1288.

Book Review of Diane Barthel-Bouchier, *Cultural Heritage and the Challenge of Sustainability*. Walnut Creek, CA: New Left Press, 2013 in *H-Environment, H-Net Reviews* (June 2014).

Book Review of Paul Hirt, *The Wired Northwest: The History of Electric Power, 1870s–1970s*. Lawrence, KS: University Press of Kansas, 2012 in *Western Historical Quarterly* 44 (Autumn 2013), 355-356.

Book Review of Mary S. Melcher, *Pregnancy, Motherhood, and Choice in Twentieth Century Arizona*. Tucson, AZ: University of Arizona Press, 2012 in *Journal of Arizona History* 54:3 (Autumn 2013), 349-530.

Book Review of Ronald M. James, *Virginia City: Secrets of a Western Past*. Historical Archaeology of the American West Series. Lincoln: University of Nebraska Press and the Society for Historical Archeology, 2012 in *Western Historical Quarterly* 43:4 (Winter 2012), 526-527.

Exhibit Review of "Making Connecticut," Connecticut Historical Society Museum in *Connecticut History* 51:1 (Spring 2012), 103-107.

Book Review of Brian Q. Cannon, *Reopening the Frontier: Homesteading in the Modern West*. Lawrence: University Press of Kansas, 2009 in *American Historical Review* 116: 2 (April 2011), 484.

Book Review of Marsha Weisiger, *Dreaming of Sheep in Navajo Country*. Seattle: University of Washington Press, 2010 in *Agricultural History* 85:2 (Spring 2011), 261-2.

Book Review of David Grayson Allen, *The Olmsted National Historic Site and the Growth of Historic Landscape Preservation*. Boston: Northeastern University Press, 2007 in *Connecticut History* 47:1 (Spring 2008), 174-176.

Exhibit Review of "Remembering Our History: The Chinese American Presence in Phoenix," Phoenix Museum of History in *The Public Historian* 24:3 (Summer 2002), 86-88.


## CONFERENCE Participation

*Chair,* "Telling a Revolving American Story: Museums and Firearms History,"                    October 13, 2023
"Current Perspectives on the History of Guns and Society,"
**Center for the Study of Guns and Society,** Wesleyan University, Middletown, CT

*Participant,* Working Group: "Five Year Combined BA/MA in Public History,"                        April 2023
**National Council on Public History,** "To Be Determined," Atlanta, GA

*Participant,* Working Group: "Developing Partnerships and Teaching Cultural Heritage              April 2023
and Heritage Tourism in the University Classroom"
**National Council on Public History,** "To Be Determined," Atlanta, GA

*Chair,* "Museums and Firearms History,"                                                          October 14, 2022
"Current Perspectives on the History of Guns and Society,"
**Center for the Study of Guns and Society, Wesleyan University**, Middletown, CT

*Organizer and Participant,* "Environmental Stewardship and Storytelling through the Humanities,"    May 19, 2021
**Campuses for Environmental Stewardship 2021 Summit,** Maine Campus Compact (virtual).
http://mainecompact.org/ces-summit-2021/

*Participant,* **National Council on Public History,** "The Presence and Persistence of Stories,"    March 2021
Salt Lake City, UT (virtual)

*Participant,* Working Group: "Public Historians in our Climate Emergency"                          March 2020
**National Council on Public History,** "Threads of Change," Atlanta, GA (virtual)

*Co-Chair, Local Arrangements Committee,*                                                         April 2018- March 2019

Exhibit 1
Page 43

Glaser                                                                                      6

*Member, Program Committee,*
**National Council on Public History,** "Repair Work," Hartford, CT

*Planner/ Coordinator,* <u>Public Plenary,</u> "Considering Coltsville: A Revolving Story," Center Church, Hartford
**National Council on Public History,** "Repair Work," Hartford, CT                March 2019
A conversation with community leaders and local gun safety advocates about the future of
Coltsville in Hartford, a city facing serious concerns about gun violence.
<u>What role will the park play in communities most affected?</u>

*Participant,* Structured Conversation: "Trees, Preservations, and Public Historians:
Challenges and Opportunities"
**National Council on Public History,** "Repair Work," Hartford, CT                March 2019

*Participant,* Working Group: "Repairing National Register Nominations,"
**National Council on Public History,** "Repair Work," Hartford, CT                March 2019

*Co-Chair,* "History on the Fly: Gun Violence, Gun Safety, and Gun Rights,"            April 2018
**National Council on Public History,** "Power Lines," Las Vegas, NV

*Co-Chair,* Local Arrangements Committee, Planning and Presentation (Awards Breakfast Presentation)   April 2018
for Annual NCPH Conference 2019, "See You in Hartford"
**National Council on Public History,** "Power Lines," Las Vegas, NV

*Participant,* Structured Conversation: "Resources and Best Practices for Public History Education   April 2018
and Training and Environmental Sustainability"
**National Council on Public History,** "Power Lines," Las Vegas, NV

*Participant,* Working Group: "Public History Education and Sustainability,"            April 2017
**National Council on Public History,** "In the Middle," Indianapolis, IN

*Paper,* "Urban Tree Preservation in this Era of Climate Change,"                March 2016
**National Council on Public History,** "Challenging the Exclusive Past," Baltimore, MD

*Invited Panelist,* "Old Roots, New Routes," **Connecticut Trust for Historic Preservation**,   October 2015
Hartford, CT

*Panelist,* "Sustaining Historic Preservation as a Cultural Practice: A Structured Conversation"   April 2015
**National Council on Public History,** "On the Edge," Nashville, TN

*Co-facilitator,* "Memorials and Violence and the American West" Discussion,            May 2014
**Western Historians in the Northeast Region**, Yale University, New Haven, CT

*Invited Panelist,* "Sustaining Public History in a Changing Climate- A State of the Field Roundtable,"   April 2014
**New England Historical Association**, Springfield College, Springfield, MA

*Co-Chair,* Program Committee
**National Council on Public History**, "Sustainable Public History," Monterey, CA      March 2014

*Co-Moderator,* Public Plenary, A Conversation with Keynote Speaker Richard Heinberg, "The End of Growth,"
**National Council on Public History**, "Sustainable Public History," Monterey, CA      March 2014

*Chair, "*Public History and Environmental Sustainability Task Force White Paper: Feedback,"
**National Council on Public History**, "Sustainable Public History," Monterey, CA      March 2014

*Discussant,* "Beyond Saving: Achieving Sustainability in Historic Preservation" Working Group
**National Council on Public History**, "Sustainable Public History," Monterey, CA      March 2014

*Paper,* "Choo, Choo (Cough, Cough): Interpreting and Preserving Western Scenic Railroads   October 2013
in the Era of Sustainability," **Western History Association**, "Vital Signs," Tucson, AZ

*Co-Chair,* Program Committee, Planning for Annual NCPH Conference 2014.            April 2013
**National Council on Public History,** Ottawa, ON, Canada

*Paper,* "Western Ideas for Eastern Lands: The Influence of Western Environmental Policies   October 2012
on Connecticut's State Parks and Forests, 1913-1943,"
**Western History Association**, "Boundary Markers and Border Crossings," Denver, CO

Exhibit 1
Page 44

Glaser                                                                                                      7

*Paper*, "'Now, That's the Smell of History!' Addressing Environmental Sustainability          September 2012
    in Historic Preservation," **Preservation Education: Best Practices**, Providence, RI

*Organizer, Co-facilitator*, Working Group: "Public History and Sustainability,"                April 2012
    **National Council on Public History/ Organization of American Historians**, Milwaukee, WI

*Organizer, Chair, Panelist*, "Public History and Sustainability" Roundtable,                    April 2011
    **American Society for Environmental History**, Phoenix, AZ

*Chair*, "Many Languages, Cultures, and Wests: Contestation of American Education               October 2010
    in the Southwest and the United States." **Western History Association**, "Many Wests," Lake Tahoe, NV

*Organizer and Chair*, "Green Planning: Green Jobs for Liberal Arts Majors,"                       April 2010
    **Global Environmental Sustainability Symposium,** "A Green Economy for a Sustainable Future,"
    Central Connecticut State University, New Britain, CT

*Organizer, Chair, Panelist*, "History in the Balance: Reconciling the Management               March 2010
    of Natural and Cultural Resources in the National Parks" Roundtable,
    **National Council on Public History/ American Society for Environmental History**, Portland, OR

*Organizer, Co-facilitator*, Working Group: "Recycling Buildings? Reframing Historic Preservation   March 2010
    in the Language of Sustainability and the Green Economy,"
    **National Council on Public History/ American Society for Environmental History**, Portland, OR

*Panelist*, "The Electric West" Roundtable                                                     October 2009
    **Western History Association**, "The Wired West," Denver, CO

*Co-Organizer*, "Memory and the American West" Discussion,                                          May 2009
    **Western Historians in the New England Region**, Amherst, MA

*Discussant*, "So You're Teaching in a Public History Program," Working Group                     April 2009
    **National Council for Public History**, Providence, RI

*Organizer*, "Recycling Buildings: Historic Preservation and Embodied Energy"                     April 2009
    **Global Environmental Sustainability Symposium:** Renewable Energy and Carbon Neutrality**,**
    Central Connecticut State University, New Britain, CT

*Chair*, "Learning the Hard Way: A Century of National Park Planning,"                         January 2009
    **American Historical Association**, New York, NY

*Organizer and Chair*, Roundtable: "Historic Preservation IS Smart Growth,"                   November 2008
    **Statewide Smart Growth Conference**, New Haven, CT

*Paper*, "Power to the Indians: The Production and Use of Electricity                  September 2007/ April 2008
    on Arizona's Reservations," **Indians and Energy: Exploitation and Opportunity**
    **in the American Southwest Symposium and Conference** at the School of American Research, Santa Fe,
    New Mexico (September 2007) and at Clements Center for Southwestern Studies, Southern Methodist
    University, Dallas, TX (April 2008), respectively.

*Panelist*, "Environmental History and Changes at Hopewell,"                                    August 2003
    **Hopewell Furnace National Historic Site Natural Resources Roundtable,** Birdsboro, PA
    Sponsored by the National Park Service

*Panelist*, "The Founding Legislation and Intent of Hopewell Furnace National Historic Site,"      June 2003
    **Hopewell Furnace National Historic Site Natural Resources Roundtable,** Birdsboro, PA
    Sponsored by the National Park Service

*Paper*, "Power Through Diversity: Rural Electrification to Arizona's White Mountains,"            April 2001
    **Arizona History Convention**, Pinetop/Lakeside, AZ

*Paper*, "Native American Power: The Navajo Tribal Utility Authority,"                          October 1999
    **Western History Association**, Portland, OR

*Paper*, "Surviving Across the Border: Yaqui Immigration to the United States, 1880‐1940,"         June 1998
    **National Association for Chicano and Chicana Studies,** Mexico City, Mexico

*Paper*, "Guadalupe's Current Problems and Past Issues,"                                            May 1997
    **National Council for Public History**, Albany, NY

*Paper*, "Working for Community: The Yaqui Indians at the Salt River Project,"                     April 1996
    **Arizona History Convention**, Sierra Vista, AZ

Exhibit 1
Page 45

Glaser                                                                                      8

## HONORS and AWARDS

*Excellence in Teaching Honor Roll*, Central Connecticut State University,
2008-9, 2016-17, 2017-18, 2018-19, 2019-20, 2020-21, 2021-22, 2022-23.

State of Connecticut Board of Regents for Higher Education,
**Connecticut State University <u>System-Wide</u> Norton Mezvinsky Research Award**, 2012.

State of Connecticut Board of Regents for Higher Education,
**Central Connecticut State University-Level Norton Mezvinsky Research Award**, 2012.

*Best Graduate Student Paper*, "Working for Community: The Yaqui Indians at the Salt River Project,"
Arizona Historical Convention, 1996.

## GRANTS

"Finding your Place: Teaching the History of People of Color in Connecticut through Place-Based Learning,"
*Spotlight on Humanities in Higher Education, Grant, National Endowment for the Humanities*, 2023-24.
$60,000.

Consultant, Institute of Museums and Library Services w/ Connecticut Historical Society, Hartford, CT, "Community
Historian Project," 2021. < $200K

Participant/ Consultant, National Park Service Battlefield Preservation Interpretation Grant, "Forgotten Voices of the
Revolutionary War," w/ CRIS Radio, Windsor, CT. October 2021-May 2023.

Sabbatical Leave, "Love and War: Climate and Trees," Spring 2020.

*Campuses for Environmental Stewardship Grant*, (awarded with Dr. Charles Button, *et. al.*). 2019. $7000

*National Endowment for the Humanities/ American Library Association Grant*, Host on-campus screenings of PBS'
*Latino Americans* (awarded with Heather Rodriguez (Sociology) for Latino Studies). Recruited and booked
up guest speakers. Involved students through class projects (see load credit), 2015-16. $10,000

Sabbatical Leave, "Public History and Sustainability," Spring 2013.

*Faculty Development Grant,* "The National Council on Public History 2014 Conference: Making CCSU a Leader in
Public History Education, 2013-14 (awarded with Professor Heather Prescott). $1350

*Faculty Development Grant*, "Public History and Sustainability," 2010-2011. $900

*CCSU Community Engagement Grant*, "Local History and Community Development: Homelessness and Affordable
Housing in New Britain," 2011-2012. $1000

*CCSU Community Engagement Grant*, "Sustainability Education Programs for the CCSU Community and Beyond,"
2010-2011. $1000

*Dean's Research Initiative Grant,* College of Arts and Sciences, Central Connecticut State University, 2008. $900.

*Associated Students of Arizona State University (ASASU) Graduate Research Grant,* 2000.

*Charles Redd Center for Western Studies Upper Division and Graduate Student Summer Research Award,* 2000.

*Max Millett Family Fund Summer Research Award,* 2000.

## OTHER PROFESSIONAL WORK EXPERIENCE

**National Park Service**                                                      March 2023-*present*
*Project Historian*
Conduct Historic Resource Study for Coltsville National Historical Park

**Attorney General's Offices, Several States**
*Historical Expert/ Consultant*                                            March 2023-*present*
Provided historical declarations primarily about state park history for pending cases on the prohibition of firearms.

**Connecticut Department of Energy and Environmental Protection**         October 2021-October 2022
*Historical Consultant*
Drafted text for an interpretative panel with Dr. Stephen Amerman and Ms. Rachel Sayet, MA (Mohegan) on Native
use and connections for Sleeping Giant State Park, in Hamden.

**Arcadis, Inc.**                                                             August 2019-March 2021
*Historical Consultant*

Exhibit 1
Page 46

Glaser                                                                                        9

National Register nomination for Goffe Street Armory and text for an interpretative panel for 71 Shelton Street, both in the City of New Haven.

**Department of Public Works**, New Britain, CT                               January 2014-present
*Writer, Contributor, and Content Development* for Downtown Way-finding and Historic Signage project

**New Britain Historic District Commission,** New Britain, CT                January 2014-December 2015
*Historical Consultant*
Worked with Commission and State Historic Preservation Office to revise a draft, develop, further research, document, write, and submit the New Britain Downtown Historic District for listing on the National Register of Historic Places.

**Morgan, Angel, and Associates,** Washington, DC                           2004-2012 (*intermittent*)
*Historical Consultant*

**Wild and Scenic River, Lower Farmington River and**                                    Fall 2009
**Salmon Brook Study Committee**, **National Park Service,** Simsbury, CT
*Lead Consultant* of Cultural Landscape Study. Senior researcher for reviewing and documenting the cultural landscape of the lower Farmington River and Salmon Brook for proposal to Congress to designate the river as a National Wild and Scenic River.  Worked with Public History MA students (one former and one current as my co-consultants).

**New Haven Preservation Trust**, New Haven, CT                       October 2004-September 2007
*Historical Consultant, Secretary/ Recorder for New Haven Historic District Commission, and Volunteer*

**Greater New Haven Holocaust Memory, Inc.**  New Haven, CT              October 2005- May 2007
*Curriculum Committee*
Consulted on the development of grade school curriculum to examine the role and function of memorials and memory.

**Virginia Center for Digital History,** University of Virginia, Charlottesville, VA        April-August 2004
*Contract Historian*
Identified online primary documents for and wrote bibliographic summaries on several topics in American History corresponding to Virginia Standards of Learning. Teachers in Virginia use these essays to help guide development of eleventh grade curriculum.

**National Park Service/ Organization of American Historians**, Philadelphia, PA      July 2002-June 2004
*Contract Historian*
Researched and wrote administrative history of Hopewell Furnace National Historic Site in Pennsylvania to inform park's general management plan regarding the management and preservation of the park's resources.

**Carollo Engineers,** Walnut Creek, CA                              March 2002-December 2003
*Contract Historian*
Researched, documented, and wrote published corporate history of a sanitary engineering company. Also authored script for company training video.

**City of Tucson,** Tucson, AZ
*Litigation Consultant*                                              December 1999-July 2000
Provided historical research support for law firm representing Tucson in unresolved court case regarding telephone utilities and property issues. Provided information for opposing council in formal deposition.

**National Park Service**, Anchorage, AK
*Cultural Landscape Historian*, GS-170-7/9                                June 1-August 11, 1999
Compiled data, explored sites, assessed historical and cultural significance, and developed inventories, maps, and histories for cultural landscapes (CLIs) in accordance with federal preservation regulations for Alaska parks.

**United States Bureau of Reclamation**, Lands, Recreation, and Cultural Resources Office, Lakewood, CO
*Historian*, GS-170-5/7                                          May 28-September 30, 1998
Co-authored 100+ page draft describing the development of Reclamation's hydroelectric power program (see publications).  Conducted primary research and drafted historical studies of historic Reclamation projects.

**Salt River Project Archives**, Phoenix, AZ
*Research Historian*                                              June 1995-November 1996
Conducted historical research and analysis for water and power corporation.

Exhibit 1
Page 47

Glaser                                                                                              10

## CONFERENCES/WORKSHOPS/ PROFESSIONAL DEVELOPMENT, TRAINING and SKILLS

"Connecticut's Sites of Conscience," **CT Humanities/State Historic Preservation Office**                 August 8, 2022
Mashantucket Pequot Museum, Mashantucket/Ledyard, CT

"The Presence and Persistence of Stories," **National Council on Public History,**                        March 2021
Salt Lake City, UT (virtual)

Certified Interpretative Guide Training, **National Association for Interpretation**,                      January 6-9, 2021
Fort Collin, CO (virtual).

**Past Forward Online,** a conference of the **National Trust for Historic Preservation** (virtual) October 27-30, 2020

"Migrations, Meeting Grounds, and Memory," **Western History Association** (virtual)          October 12-17, 2020

"Dismantle Preservation Unconference." (virtual)                                                           July 28, 2020

"Coltsville in Context: Presentation and Public Discussion Scholars"                                       March 26, 2019
Roundtable for Coltsville National Historic Park, Church of the Good Shepherd, Hartford, CT

"Preservation in a Changing Environment," **Connecticut State Historic**                                   May 18, 2017
**Preservation Office**, Storrs, CT

"Olmsted Parks in Transition," **Connecticut Chapter of the American Society**                             April 28, 2017
**of Landscape Architects**, Hartford, CT

The Future of the Past in Connecticut: The National Historic Preservation Act at 50,"                      October 29, 2016
**New Haven Preservation Trust/ CT Trust for Historic Preservation/ State Historic Preservation Office**,
New Haven, CT

"Preserving Diverse Communities: Making Historic Tax Credits Work,"                                        October 7, 2016
**Connecticut Preservation Action** Symposium, Mashantucket, CT

"Keeping History Above Water: A Conference on Sea-level Rise and Historic Preservation,"
**Newport Restoration Foundation**, et. al., Newport, RI                                                   April 11, 2016

"Connecticut Preservation Now! Challenges and Opportunities in Funding"                                    November 2015
**Connecticut Preservation Action** Symposium, Bridgeport, CT

**Connecticut Main Street Center**, 2015 Awards Gala, New Britain, CT                                      June 8, 2015

"Precision Valley Symposium," **Springfield Armory National Historic Site**                                May 2015
and **Springfield Technical Community College**, Springfield, MA

"Where There's a Mill, There's a Way! Effective Strategies for Restoring,                                  May 2015
Repurposing, and Redeveloping Connecticut's Historic Mills and Factories."
**Torrington Historic Preservation Trust**, Warner Theater, Torrington, CT

Advocacy Day for History, Preservation, and the Humanities.                                                April 2015
**Connecticut League of History Organizations**

"New Money for Old Places: Revenue Sources for Gap Funding: A Seminar for Developers,                      January 2012
Contractors, Architects, and Historic Preservationists," **Connecticut Preservation Action** Symposium,
Bloomfield, CT

"New Money for Old Places: Historic Preservation Incentives for the Economy,"                              September 2010
**Connecticut Preservation Action** Symposium, Hartford, CT

Short Course on *Historic Preservation: Sustainability,*
*"Green Building: Tools and Strategies for Sustainable Reuse"*                                             June 2008
**Cornell University Historic Preservation Planning Program**, Cornell AAP Center, New York, NY

*New Faculty Meetings with Provost: College Teaching*                                                      Fall 2006
**Central Connecticut State University**, New Britain, CT

*Summer Technology Institute*
**Chandler Gilbert Community College,** Chandler, AZ                                                       June 2000, May 2001
Training in technology for teaching and curriculum development.

*Teaching Tools Workshop*                                                                                  Fall 1999
**Arizona State University**, Tempe, AZ

Exhibit 1
Page 48

Glaser                                                                                                11

*Automating Processing Practices and Finding Aids*                                    February 1996
**Society of American Archivists**

*Identification and Management of Traditional Cultural Places*                              Spring 1997
**National Preservation Institute**

*Oral History Workshop*                                                                      Fall 1996
**Southwest Oral History Association**

## PROFESSIONAL ACTIVITY

### *Professional Affiliations, past and present*

National Council on Public History; Western History Association, Western Historians in the Northeast Region; American Society of Environmental History, American Association of State and Local History

## SERVICE to the Community

*Council Member,* **Connecticut Historic Preservation Council**, Hartford, CT                  June 2016- *present*
    State appointment by the Governor.

*Advisory Board Member,* **Center for the Study of Guns and Society,**                      October 2022-*present*
    **Wesleyan University**, Middletown, CT

*Speaker,* "Branching Out: Preserving Tree History in the Era of Climate Change,"             May 10, 2023
    **Fairfield Museum and History Center**, Fairfield, CT.

Invited Speaker, "The Goffe Street Armory: Putting History in Historic Preservation,"        February 21, 2021
    John Herzan Lecture Series, **New Haven Preservation Trust**, New Haven, CT.

Invited Speaker, "Talking About Preservation: Future Preservationists,"                      September 18, 2020
    **Preservation Connecticut**

Invited Speaker, "Colleague Circle: Digital Internships," **CT League of History Organizations**   June 19, 2020

Member, **Spring Forward** (*A Task Force for Housing Equity*) in Hamden, CT          September 3, 2020- *present*

Member, **Desegregate Connecticut**                                                        July 2020-*present*

Guest, "Through Local History: A Stronger Sense of Place,"                                  February 13, 2018
*Where We Live* w/ Lucy Nalpathanchil, **WNPR**, Hartford, CT

"Iwo Jima Biography Project at CCSU,"                                            November 7, 2015; May 27, 2017
Interview on **WTIC News- Talk 1080** with Steve Parker, CBS Connecticut.

"Tour of Walnut Hill Park," New Britain, CT for "Olmsted Parks in Transition,"               April 29, 2017
**Connecticut Chapter of the American Society of Landscape Architects**

*Panelist,* "Salon at Stowe," **Harriet Beecher Stowe Center**, Hartford, CT                  April 2017

Invited Speaker, "Sam Colt Mines the West," *Grating the Nutmeg*/ *Connecticut Explored*      February 28, 2017

*Board Member*, **Whitneyville Cultural Commons**, Hamden, CT                         January 2016-*present*
    Helped oversee the creation of this non-profit, non-denominational community center located in a historic
    church and parish that serves to develop, preserve, and maintain the aesthetic, spiritual, and social center
    of the neighborhood, while envisioning a future where every community has valuable resources
    preserved for perpetual public use, with just and equitable access to enhance the quality of life for all.

*President,* **Connecticut Preservation Action,** Hamden, CT                           June 2015- *July 2018*
    "Taking Away Conservation Funds Hurts the State," *Hartford Courant*                  July 20, 2017

    "Testimony Regarding SB90: An Act Regarding Responsible Development,"               February 19, 2016
    **Committee of Planning and Redevelopment**, Connecticut Legislature, Hartford, CT

    Host, "Preserving Diverse Communities: Making Historic Tax Credits Work,"            October 7, 2016
    **Connecticut Preservation Action** Symposium, Mashantucket, CT

    "Connecticut Preservation Now! Challenges and Opportunities in Funding"             November 2015
    **Connecticut Preservation Action** Symposium, Bridgeport, CT

*Board Member*, **Connecticut Preservation Action,** Hartford, CT          February 2010- June 2015, July 2018-*present*
    Work with Connecticut state legislature to preserve funding for historic
    preservation in Connecticut. Set monthly meeting agendas, testify to legislature. Plan symposia.

Exhibit 1
Page 49

Glaser                                                                                                      12

      "Testimony Regarding Elimination of the Community Investment Act,"                      March 9, 2015
      **Finance, Revenue and Bonding Committee**, Connecticut Legislature, Hartford, CT

*Board of Directors,* **Jewish Historical Society of New Haven,** New Haven, CT                            2016-*present*
      Archives Committee

*Board of Trustees,* **Jewish Historical Society of New Haven,** New Haven, CT                             2014-2016

*Invited Panelist,* "Surviving Academic Motherhood,"                                                       April 15, 2016
      **Southern Connecticut State University**, New Haven, CT

"Testimony Regarding HB 5150: An Act Concerning Tree Wardens'                                              February 19, 2016
      Notices on Trees and Shrubs Prior to Removal, Tree Removal along State Highways
      and Clean-up by Public Utility Corporations following Certain Tree Removal,"
      **Environment Committee**, Connecticut Legislature, Hartford, CT

*Invited Participant,* "Imagining the Future of Parks," *Next Parks*, Coltsville Workshops,                December 7, 2015
      **National Park Service** and **Van Allen Institute**, Hartford, CT                      November 16, 2015
      The two workshops brought together key stakeholders- NPS staff, historians, local residents, designers,
      government officials, social programs- to brainstorm and develop ideas for innovative visitor experiences,
      partnerships, and stories to guide future planning and programming of the new Coltsville National Historic
      Park. Invited to give part of tour on "Coltsville National Historic Park and Sustainability."

*Grant Advisory Committee,* "Come Home to Downtown,"                                                       February 2014-Summer 2015
      **Connecticut Main Street Program**, New Britain, CT

*Advisor/ Consultant,* Way-Finding and Historic Signage Project                                           January 2014-*present*
      **Department of Public Works**, City of New Britain, CT

*Invited Speaker,* "The Downtown New Britain National Register Historic District: A Proposal"             October 2014
      *Trinity-on-Main*, **New Britain Historic Preservation Commission**, New Britain, CT

*Invited Keynote Speaker,* "The History and Architecture of the Knickerbocker Golf Clubhouse,"            September 2014
      *Knickerbocker Golf Club 70ᵗʰ Anniversary Gala,* **Knickerbocker Golf Club**, New Haven, CT

*Workshop Leader,* "Western Expansion," **American Voices**, **Teaching American History**,                January 2011
      Central Connecticut State University, New Britain, CT

*Panelist,* "Making Use of Old Buildings,"                                                                 September 16, 2010
      *Where We Live* with John Dankowsky, **WNPR**, Hartford, CT

*Lecture,* "The Role of Art in Western History,"                                                          November 2, 2009
      **New Britain Museum of American Art**, New Britain, CT

*Lecture and Workshop,*
      "Energy and the Development of Natural Resources in the West"                           July 24, 2009
      "Technology and the West"                                                               April 30, 2009
      **Teaching American History** Grant, Capitol Region Education Council (CERC), Hartford, CT

"Researching Your Historic House," **Fair Haven Homeowner's Association**,                                 April 5, 2008
      Fair Haven Public Library, New Haven, CT

 "Water Rights in the City of Tempe: Past and Present."                                                April 2002
      **Moving Waters: The Colorado River and the West,** Lecture Series, Tempe Public Library, Tempe, AZ

Exhibit 1
Page 50

# Exhibit 2

Exhibit 2
Page 51

insist upon going on the trails with their road horses, animals entirely unfit for such service. They take the trails without guides and without regard to the perils of passing parties that may be met mounted on the regular trail animals, and without thought of the consequences fatal to themselves and others that may result from their own lack of judgment and the inexperience of their animals. During the last season the committee has to report two accidents on the Glacier Point trail from these causes. In one, a road horse, ridden by a lady, went over the cliff, carrying with it the rider, who, fortunately, was caught by a tree top and saved from death. In the other, a horse unaccustomed to packing, but used to carrying a camper's lunch up the same trail, went over and was never seen nor heard of afterward. Your committee need not dwell upon the melancholy consequences, if at the occurrence of either accident, when the bodies of the animals went rolling and bouncing down the cliff, loosening stones and dirt, there had been a mounted party below, with the resulting scare and stampede which such a sight would cause even amongst the regular trail animals. Other visitors, who take the trail on foot, were found to practice leaving the path and cutting across the zigzags, thereby loosening stones and starting avalanches. In other cases it was perfectly evident that they had willfully removed the stones of the retaining walls of the trail to use in rolling down the cliff, across walls and parapets, and knocking them out of place, endangering the trail, destroying its defensive walls, and creating risks for others, and even for themselves.

These several acts attracted not only the attention of your committee, but were observed by others, and widely and correctly reported, and as a result we received the following communication from the Sierra Club, an organization devoted to acquiring and spreading knowledge of our mountains, to the preservation of forests and natural scenery, all public objects of high importance:

MARCH 9, 1894.

*To the Yosemite Commission, etc.:*

The following named members of the Sierra Club have been appointed a committee to consider certain reports relating to the injury and defacement of natural objects in the Yosemite Valley, and to recommend such measures as may be found to be practicable and advisable to prevent such injuries in the future: Prof. George Davidson, Judge M. H. Myrick, Thomas Magee, James Runcie, Elliott McAllister.

The committee has received statements setting forth the details of acts of vandalism by visitors to the Valley, which, in the absence of any system of patrol and supervision, may be repeated at any time. The committee is prepared to submit these statements to the Commisson and will be glad to be advised if it will be convenient for the Commissioners to confer with them with a view to taking such measures as will secure the Valley from such injuries at the hands of visitors during the coming season.

For the committee.

J. E. RUNCIE,
Secretary, 317 Powell Street.

In response to this invitation members of your committee met the representatives of the club and thoroughly canvassed the interests and affairs of the Valley and Big Tree Grove. The consultation developed an active sympathy on the part of the club with this Commission and its work. We submitted to the club the following proposed code of rules and discipline, aimed at correcting the abuses above named:

*Rules and Regulations for the Convenience and Safety of Campers and Tourists and the Preservation of the Valley.*

I. All campers must report to the Guardian upon entering the Valley, and before pitching camp, and will occupy such location as he may assign them, and no other.

II. Campers will deposit all firearms, unloaded, with the Guardian, taking a receipt therefor, and the same will be returned when the owners leave the Valley.

Exhibit 2

Page 52

III.   Persons using the trails in the Valley will not be permitted to take thereon their road or wagon horses, either packed or under the saddle.

IV.   Persons using the trails on foot are forbidden to leave the trail by cutting across zigzags, and are forbidden to disturb the trail walls or to roll stones down the cliff.

V.   The painting or carving of names, dates, devices, or other marks on trees, rocks, buildings, bridges, or any other thing in the Valley, is prohibited.

VI.   Each camping party will notify the Guardian of the time of intended departure from the Valley, and will remove from its camping place all papers, cans, and litter, and leave the ground in a clean condition satisfactory to the Guardian.

VII.   All camp fires and other fires must be kept under control of persons using them, and be so effectually guarded as to prevent conflagration of the grasses, plants, under-brush, and timber.

The club, through its committee, after careful consideration, submitted the following conclusions:

MAY 5, 1894.

*To the Secretary of the Board of Yosemite Commissioners, San Francisco, California:*

SIR : The committee of members appointed by the Sierra Club to confer with the Executive Committee of the Yosemite Commissioners, with a view to securing such action as will prevent or punish vandalism in the Valley, having met the Executive Committee and been asked by them to consider certain rules and regulations to be proposed by them, are of the opinion that such of those rules as tend to the prevention of vandalism are reasonable, judicious, and well calculated to accomplish their object, and therefore deserving the cordial support of the Sierra Club.

But the existing rules for the government of the visitors to the Valley, particularly campers, as well as the additions proposed, however judicious and comprehensive, will not be self-operative, and will fail of their purpose unless some provision be made for enforcing them and punishing those who violate them.  The extent of the Valley and the burden of his other duties make it impossible for the Guardian alone to do this.

This committee therefore respectfully recommend to the consideration of the Board the employment, during the open season, of two or more competent men (who shall have no other employment) to serve as a patrol, furnishing their own arms and mounts, and responsible to the Guardian, under whose orders they would be placed.  To this force the Guardian could intrust the duty of receiving campers on their arrival in the Valley, the charge of their arms, the inspection of their camps, and, in general, the immediate enforcement of the police regulations.  All trails and roads within the limits of the grant could be patroled by such a force at short intervals, securing prompt reports of accidental damages and of depredations.  The discharge of such duties as the Commissioners might devolve on these patrolmen would probably be facilitated by clothing them with the powers of peace officers, and this would doubtless be readily done by the authorities of the county of Mariposa.  The employment of such a force as that recommended would probably reduce to a minimum the acts of vandalism which it has been hitherto found impossible to prevent or to punish.  For such hardy offenders as might still be found transgressing, prompt arrest by the patrol and punishment at the hands of the nearest magistrate would generally be assured.  And this leads the committee to make the additional suggestion to the Commissioners, that it is highly desirable to secure the presence of a resident magistrate in the Valley, at least during the open season, before whom such offenders as may be apprehended could be promptly arraigned, without adding greatly to the expense of the county and without increasing unduly, by delays and long journeys, the penalties incurred by offenders.  In every effort which the Commissioners may make to these ends the committee believes that the cordial support and assistance of the Sierra Club will be given.

The Board of Commissioners have wisely kept in view, in the regulations made by them, and in the improvements and conveniences which they have introduced and maintained in the Valley, the large increase in the number of visitors which will inevitably follow on the filling up of the country and the improvement of the means of travel, and this committee respectfully urges upon the Board that the same consideration favors the establishment, at the earliest day possible, of such regulations as those referred to, and of such provisions for enforcing them as have been suggested—things at present comparatively easy of accomplishment, but which will become more and more difficult of introduction as the volume of travel increases and the custom of license or, at least, lack of restraint grows stronger with time.

This committee desires to express its hearty appreciation of the cordiality with which its oral suggestions made at a recent conference were received by a committee of the Yosemite Commissioners.

Very respectfully,

(Signed:)

GEORGE DAVIDSON.
M. H. MYRICK.
JAMES RUNCIE, per M.
THOS. MAGEE.
ELLIOTT McALLISTER.

Exhibit 2
Page 53

Digitized by Google

## IX.

The Guardian shall, upon complaint of any tourist or visitor, of the conduct or behavior of a guide, inquire into the cause, and advise the complainant of the result, enforcing Rule V if necessary.

## X.

The Guardian is empowered to suspend a guide from his privilege during the investigation of charges preferred against said guide.   If the guide be found in fault, he shall be dismissed, in accordance with Rule V.

## XI.

The Guardian shall inspect all horses, their trappings, and all vehicles used for hire; and if any such horses, trappings, or vehicles shall by him be deemed unsuitable or unsafe, he shall cause the same to be removed at once from the Valley or Grove.

## XII.

Any person offering for hire, or otherwise, any horse, trapping, or vehicle, or refusing or neglecting to remove the same from the grant after the Guardian shall have condemned the same, shall forfeit his privilege to reside or transact business within the grant.

## XIII.

The Guardian shall direct campers to the grounds set apart for their use while within the grant, and shall establish such rules as will contribute to their comfort.

## XIV.

No camp fires shall be permitted within the grant of either Valley or Grove without the express permission of the Guardian.

## XV.

The Guardian shall promptly cause the arrest of any person violating Rule XIV, and prosecute the offender to the full extent of the law, under Section 6 of the Act of April 2, 1866, as found elsewhere in this book.

## XVI.

No trees shall be cut or injured, or any natural object defaced.

## XVII.

The discharge of firearms, either in the Valley or Grove, is strictly prohibited.

Exhibit 2

Page 54

# Exhibit 3

Exhibit 3
Page 55

V.   STATE PARK RULES AND REGULATIONS.

California State Park System

This is Your Park

All of California's State Parks have been established for the purpose of preserving outstanding examples of nature's handiwork, for future generations, whether it be Redwood groves, beaches or other areas set aside for the use and enjoyment of all of the people.

That this enjoyment may not be destroyed it is necessary that certain restrictions governing the use of the parks be effected.

In order to preserve the natural beauty of the parks so that the public may enjoy them, please observe the following:

Do not pick flowers nor remove shrubs or small trees and please explain to others you may see violating this rule that these areas are being preserved, not only for our use but for posterity.

Do not destroy State property. It is your property.

Place all garbage and other refuse in garbage cans.

Protect human and wild life from danger by driving vehicles within the limit prescribed by the caution signs. Dogs are not permitted to run loose.

Note:   In some parks, dogs are not allowed; therefore, suitable facilities are provided for caring for them at a small cost to the owner.

Firearms are not allowed, and must be sealed or checked at the Warden's Office.

Please confine travel to paths and roads.

Please confine campfires to camp stoves which are provided for this purpose.

Please report to the Warden any suggestions you may have to offer in order that he may use every effort to make your stay in the park enjoyable and comfortable.

Generated on 2023-10-30 19:56 GMT  /  https://hdl.handle.net/2027/mdp.39015968573347
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 3
Page 56

# Exhibit 4

Exhibit 4
Page 57

the research divisions of public and private agencies; (5)
act in the capacity of a research clearing house; (6) for-
mulate plans for advancing the wise use of the resources
of the State and assist in carrying out such plans.

### V.   STATE PARK RULES AND REGULATIONS.

This is a State Park.  It belongs to you.  It was paid for out of the State
money, your money, or given to the State, for the preservation of natural beauty
or historical association, and for the recreation of yourselves and your guests
from other States.

The custodian of the State Park is the State Park Commission established by
your representatives in the General Assembly, whose members are appointed by
the Governor with the approval of the Senate.  They are your servants, to see
that the State Parks are properly cared for, rightly used and not abused.

There is a reason for every rule and regulation made, and they should be com-
plied with, even though the reason is not evident.  If the rules seem onerous
or unnecessary, your criticisms or suggestions made in writing, will receive
careful consideration.

It is desired that this park shall be used for picnic parties, camping and out-
door life by the people of Connecticut, provided the park is used in a whole-
some and reasonable way, and that the trees, shrubs and plants are not injured,
and all rubbish is placed in receptacles prepared for it, or buried or burned.

People using this State park should not monopolize it, nor disturb, nor un-
pleasantly intrude upon other parties using it.  Fires are a source of danger
to the forest, and must not be built in dry times, but at other times they
may be made in stone fireplaces built by the Commission or acceptable to them;
the fire should never be left alone, and must be put out on leaving.

The use of firearms or having them in possession is forbidden, also the kill-
ing or disturbing of wild animals, birds or birds' nests.

The directions of the caretakers should be followed.  If they seem unreason-
able or undesirable, or if suggestions are to be offered, please write to the
Secretary or any member of the Commission.

No park employee is permitted to accept tips.

It is Permitted:

1.  To fish in accordance with the Public Statutes.

2.  To gather nuts, berries or wild flowers except for market.

3.  To use any dead wood for the fireplace.

4.  To camp for two nights without a permit, camping for longer periods
to be by special permit.

27

Exhibit 4
Page 58

V.  STATE PARK RULES AND REGULATIONS.

The following rules and regulations for the government of this Park are hereby
established.  These rules and regulations are promulgated to cover only the
Government owned or controlled lands and waters in the Park area.

1.  PRESERVATION OF NATURAL FEATURES AND CURIOSITIES:  The destruction, injury,
defacement, or disturbance in any way of the public buildings, signs, equipment,
or other property, or the trees, flowers, vegetation, rocks, minerals, animal
or bird or other life is prohibited;  Provided, that the flowers may be gath-
ered in small quantities when in the judgment of the Superintendent, or other
authorized representative of the Florida Park Service, their removal will not
impair the beauty of the Park.  Before any flowers are picked, permit must be
obtained from the Superintendent in charge.

2.  CAMPING:  When the Park is constructed by the Florida Park Service by
means of the Civilian Conservation Corps in cooperation with the National
Park Service, adequate camping places with pure water and other conveniences
will be provided.  Until such time no camping overnight or fires of any sort
will be permitted except by special permit of the Superintendent or his duly
authorized representatives.  In such instances the following rules must be
carefully observed:  Wood for fuel only can be taken from dead or fallen
trees.  Combustible rubbish shall be burned on camp fires, and all other gar-
bage and refuse of all kinds shall be buried.

3.  FIRES:  Fires constitute one of the greatest perils to the Parks; they
shall not be kindled near trees, dead wood, moss, dry leaves, forest mold, or
other vegetable refuse, but in some open space on earth.  Should camp be made
in a locality where no such open space exists or is provided, the dead wood,
grass, moss, dry leaves, etc., shall be scraped away to the earth over an
area for five feet around the fire.

Fires shall be lighted only when necessary and when no longer needed shall be
completely extinguished and all embers and bed smothered with earth or water,
so that there remains no possibility of reignition.

Smoking may be forbidden by the superintendent in any part of the Park during
the fire season when in his judgment the fire hazard makes such action advis-
able.

NOTE:  Especial care shall be taken that no lighted match, cigar, cigarette,
or burning pipe tobacco is dropped in any grass, twigs, leaves, moss or tree
mold.

4.  HUNTING:  The Park is a sanctuary for wild life of every sort, and all
hunting or the killing, wounding, frightening, pursuing, or capturing at any
time of any bird or wild animal, except dangerous animals, when it is necess-
ary to prevent them from destroying human lives or inflicting personal injury
or taking the eggs of any bird, is prohibited within the limits of said Park.
Firearms are prohibited within the Park except upon written permission of the
Superintendent.

5.  FISHING:  Fishing with nets, seines, traps or by the use of drugs or ex-
plosives or in any other way than with rod, hook and line held in hand, or for
merchandise or profit, is prohibited.  Fishing in the Park will be permitted
only during the open season as prescribed by the State of Florida.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2023-10-30 21:34 GMT  /  https://hdl.handle.net/2027/mdp.39015068573347
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Exhibit 4
Page 59

Recommendations.        To make recommendations from time to time as to the best
                        methods of such conservation, utilization and development;

Cooperation.            To cooperate with other agencies, national and State;

Master plan.            To make and adopt an official master plan for the physical
                        and economic development of the State, including, among
                        other things, the general location, character and extent
                        of highways, expressways, parkways, waterways, water front
                        development, flood prevention works, parks, preservations,
                        forests, wildlife refuges.

Restrictions.           Following adoption of the State master plan, no state high-
                        way, park, forest, reservation or other State way, ground
                        or property may be constructed or acquired with State funds,
                        or located, constructed or authorized by any State agency
                        unless the location and extent thereof is first submitted
                        to the Board for its report and advice.

Ten-year program.       The Board is further directed to prepare and keep up to
                        date a ten year construction and financial program, to be
                        prepared in consultation with the several State depart-
                        ments; to cooperate with municipal, county, regional and
                        other local planning commissions; furnish advice and re-
                        ports to any State officer or department; prepare and sub-
                        mit to the Governor and General Assembly drafts of legisla-
                        tion for carrying out the master plan; encourage the crea-
                        tion of county, municipal and regional planning commiss-
                        ions, and to act as a clearning house for information relat-
                        ing to such planning.

                        VIII.  STATE PARK RULES AND REGULATIONS

                                    This is YOUR PARK

                        All visitors are expected to observe the following rules that
                        we   can fulfill the purpose for which this and other
                        state parks were established, the preservation of a primi-
                        tive landscape in its original condition and a place where
                        you might enjoy the out-of-doors.

                            1.  Do not injure or damage any structure, rock, tree,
                                flower, bird or wild animal within the park.

                            2.  Firearms are prohibited at all times.

                            3.  Dogs must be kept on leash while in the park.

                            4.  There shall be no vending or advertising without per-
                                mission of the Department of Conservation.

                            5.  Camping areas are provided at a fee of twenty-five
                                cents per car or tent for each 24 hours or fraction.

Exhibit 4
Page 60

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2023-10-30 21:35 GMT  /  https://hdl.handle.net/2027/mdp.39015068573347
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

vation as it may deem to be of particular historic in-
terest or which, in its judgment, may be favorably situated
and well adapted for park purposes, and the setting aside
of which for park purposes will not interfere with the
reasonable use of the reservation by the educational in-
stitutions thereon.

## IV.   STATE PARK RULES AND REGULATIONS.

The following rules and regulations have been adopted by the Forestry, Fish and
Game Commission covering the actions of the public on the State parks, and such
rules and regulations have the full force and effect of law and violators are
subject to prosecution:

1. The destruction or injury of any sign, guidepost or property of any kind
is unlawful. This includes the peeling of bark, carving and chopping of trees,
cutting branches, driving nails, digging ground from roots and the removal of
trees, shrubs and plants, picking wild flowers and other injuries.

2. To carry or have firearms in possession in a State park is unlawful.

3. Throwing of tin cans, bottles, papers, junk or refuse of any kind on the
ground or in a lake or stream; or the misuse and abuse of seats, tables and
other park equipment,is prohibited.

4. Washing or the throwing of waste of any kind around well or spring, or the
use of woods as toilets, or the use of toilets for bathhouses, is prohibited.

5. Building or starting fires in the open or in any place except where the
proper provisions have been made, or to leave fires while burning, is pro-
hibited.

6. Dogs in the park must be tied with a chain or controlled on a leash.  They
are not allowed to run loose about the park.

7. Speed limit for motor vehicles on park roads is 25 miles per hour, except
where otherwise posted.

8. Camping, horseback riding or driving of automobiles or other vehicles on
picnic grounds, children's playground, bathing beaches, and areas posted against
such traffic or use is prohibited.

9. Persons desiring to camp in a State park are required to obtain permit be-
fore making camp.  A permit authorizes the holder to camp in the park not to
exceed three days.  When time of permit has expired, campers are required to
move from the park or have permit renewed.  The park superintendent shall re-
cord the name and address of the responsible head of each camping party, the
number of persons, and names and license numbers of cars.

10. Camping in the park by boys under seventeen years of age, unaccompanied
by an adult, and girls under eighteen years of age, unaccompanied by their
parents or chaperon, is prohibited.


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 4
Page 61

Generated on 2023-10-30 21:35 GMT  /  https://hdl.handle.net/2027/mdp.39015066573347
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

2.  To carry or have firearms in possession in a State
park is unlawful.

3.  Throwing of tin cans, bottles, papers, junk or refuse
of any kind on the ground or in a lake or stream; or the
misuse and abuse of seats, tables and other park equip-
ment is prohibited.

4.  Speed limit for motor vehicles on park roads is 20
miles per hour except where otherwise posted.

5.  Dogs in park must be tied with chain or controlled
on a leash.  They are not allowed to run loose about the
park.

6.  The sale of eggs, milk, cream, butter, fruits and
vegetables by farmers is permitted in State parks.  All
other vending or peddling in parks is prohibited.

7.  Building or starting fires in the open or in any
place except where proper provisions have been made or
to leave fires while burning is prohibited.

8.  Washing or the throwing of waste of any kind around
well or spring or the use of woods as toilets or the use
of toilets for bath houses is prohibited.

9.  Persons desiring to camp in State parks are required
to obtain permit before making camp.  A permit will be
issued to camp 7 days or less on a single site in parks
within Oakland, Livingston, Macomb, St. Clair, Ottawa and
Bay counties.  The time limit in all other parks will be
15 days on a single site.  When time of permit has ex-
pired, campers are required to move from the park.  To
again camp in parks new permits must be obtained.

10.  Camping, horseback riding or driving of automobiles
or other vehicles on areas (picnic ground, children's
playground, bathing beaches, etc.) posted against such
traffic or utilization is prohibited.

11.  Camping in the park by boys under seventeen years
of age unaccompanied by an adult or adults and girls
under eighteen years of age unaccompanied by their parents
or chaperon is prohibited.

12.  Disorderly conduct in the way of drunkenness, vile
language, fighting and personal exposure by change of
clothing in automobiles, woods, park or any other place
where person is not properly sheltered is prohibited.

Sec. 3-a – Act 17, Public Acts 1921, as amended by Act
337, P.A. 1927, provides that (any person who shall do
or perform any act prohibited by such rules and regula-
tions concerning the use and occupancy of lands and pro-
perty under the control of said commission of conserva-
tion, which shall have been made, promulgated and pub-

Generated on 2023-10-30 21:36 GMT  /  https://hdl.handle.net/2927/mdp.39015066573347
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 4
Page 62

# Exhibit 5

Exhibit 5
Page 63

5. Papers, garbage, and refuse of all kinds shall be placed in the receptacles provided for that purpose.

6. No person shall post or affix, or cause to be posted or affixed any printed or written bill, placard, sign, advertisement, or other notice upon any tree, post, fixture or structure within the park system. Nor shall any person deface, damage, or destroy any notice of the rules, regulations, ordinances or signs for the Government of said park system which shall have been posted by order of the Commission.

7. No picnics shall be held upon park property except at such places as are designated by signs.

8. The following acts and activities are prohibited within the park areas under jurisdiction of this Commission except by permit:-
The possession of any firearms and fireworks of any kind; making or building fires except in fireplaces provided by park authorities; carrying any musical instrument; carrying or displaying flags, banners, placards of any kind; delivering speeches or orations; holding parades or other demonstrations; conducting religious or other ceremonies; soliciting alms or contributions for any purpose; the taking of commercial equipment for the taking of motion and sound pictures.

9. No person shall disobey an order of a park patrolman or other park official when such official is engaged in the enforcement of a State or park ordinance; nor shall he use bad, obnoxious or indecent language, nor act in a disorderly or suspicious manner.

10. No intoxicating liquors or beverages shall be brought, caused to be brought, or drunk within the limits of the State parks, nor shall any intoxicated person enter or remain upon any portion of the park system, except that intoxicating liquors and beverages may be sold by such persons and at such places as may be specifically authorized by the Niagara Frontier State Park Commission.

11. No booth, tent, stall, stand, or other structure shall be erected for any purpose, and no begging, hawking, peddling, advertising, or soliciting shall be done; nor any article or service be advertised, or caused to be advertised or offered for sale, or hire, within the property limits of lands under the jurisdiction of this Commission, except by written permit of the Commission.

12. No commercial vehicles, or any vehicle displaying any advertising placard or advertisement of any kind, shall be driven within the park or over the parkways of said park system for advertising, demonstration, or other purposes.

13. Motorists shall obey all signs regulating traffic placed in the parks and along the parkways under the jurisdiction of this Commission. In no instance shall a vehicle be operated at a greater rate of speed than thirty (30) miles per hour. Where one direction in roads is designated, traffic in the opposite direction is prohibited. Bus and taxicab parking areas will not be for the use of privately owned vehicles. All vehicles must be parked in parking areas provided.

190

Generated on 2023-10-30 21:39 GMT / https://hdl.handle.net/2027/mdp.39015068573180
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 5
Page 64

(f)  Every person twelve years of age or older in each party making use of
Park camping facilities, cabins or campsites must register with the rental
clerk.

5.  COMMERCIAL ENTERPRISES.

(a)  No person shall, without a permit from the Commissioners, sell or
offer for sale within the Park on lands owned by the State, any property
or privilege whatsoever, nor shall any person to whom property of the Park
has been intrusted for personal use, hire, lease or rent out the same to
another person.

(b)  No person shall take photographs or moving pictures within the Park
camping areas for the purpose of selling negatives or prints therefrom
without having first obtained a permit from the Commissioners.

(c)  No person shall operate a bus, taxicab or other vehicle for the trans-
portation of passengers or property for hire on the Park controlled roads
without having obtained a permit from the Commission.

6.  FIREARMS.

(a)  No firearms may be used or possessed within the Park area by visitors
or used by residents except by special permission of the Commissioners.

(b)  No target or trapshooting allowed in the Park except by written per-
mission of the Commissioners, or an executive officer.

7.  HUNTING AND FISHING.

(a)  No person shall hunt, pursue with dogs, trap or in any other way
molest any of the wild birds or beasts found within the Park except by
permission of, and in a manner specified by the commission.

(b)  No person shall fish in any of the Park streams except by written
permission of the Commissioners.

8.  PUBLIC NUISANCE.

(a)  Gambling in the Park is prohibited and no person shall bring into
the Park or have in his possession while there, any implement or device
commonly used or intended for gambling purposes.

(b)  No person shall sell or attempt to sell any beer, wine, whiskey or
other intoxicating liquor or beverage within the area of the Park except
by permission of the Commissioners.

9.  SIGNS.

No sign  or notice shall be erected or posted at any place in the Park on
lands owned by the State, without permission in writing from the Commis-
sioners.

195


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 5
Page 65

5. HUNTING AND FIREARMS - No person shall carry or have in his possession any gun, firearms, ammunition, or explosives and no person shall hunt or trap within or from the park areas except when especially authorized by the Commission to do so. No person shall engage in fishing, spearing or netting in waters restricted by the Commission against such uses.

6. FIRE DANGER - No person shall start or maintain a fire except in the fireplaces provided for that purpose or at places especially indicated by the official in charge of the park and all fires shall be continuously under the care of a competent person. No person shall allow any fire to injure or destroy any shrub, tree or branches thereof or discard or throw away lighted matches, cigarettes or cigars in such a manner as to create a fire risk of any sort. In addition to the fines or penalties provided for the violation of these Rules and Regulations, any person responsible for fire damage or loss of park property, including trees and vegetation, shall pay to the Commission the full cost of restoring such property to its original condition.

7. SPORTS - Boating or landing of boats within a bathing area is forbidden and all persons operating boats shall conform strictly to the instructions of the official in charge of the park as to the limits of such areas. No person shall operate toilets on a boat or throw refuse or litter into the water in the near vicinity of such bathing areas. Any person bathing in waters not specifically designated as bathing areas and protected by lifeguard service shall do so entirely at their own risk, and if observed, may be ordered by park officials to cease such bathing. Bathing without proper bathing suits, or undressing and dressing outside of duly provided bath-houses and/or in the public view is prohibited. Games of various kinds shall be played only at places provided for such games. No camp shall be maintained in any park except under permit obtained from the park superintendent and at such places and for such periods as he may designate. No skating or use of frozen-over waters shall be permitted except after the ice has been declared safe by the park official in charge.

8. MEETINGS - No person or organization shall hold or conduct any meeting involving ceremonies, speeches, religious services, performances or entertainments except after obtaining a permit to do so.

9. OMNIBUSES, TAXIS, AND TRUCKS - No omnibuses, taxis or trucks shall operate within property controlled by the Commission except by duly authorized permit and the procedure and conduct of persons operating such vehicles shall at all times be strictly in accordance with the instructions of the park official in charge. The rate of speed for any motor vehicle being operated within the park area shall not be such as will endanger the public and in no case in excess of 30 miles per hour.

10. LOST AND FOUND ARTICLES - Any person finding or taking possession of any personal property of which such person is not the owner, shall deliver the same immediately to the Park Superintendent or to the headquarters of the Commission at Ithaca, N. Y., and losers of such property shall apply to the said Superintendent or park headquarters for restoration of articles.

Generated on 2023-10-30 21:40 GMT / https://hdl.handle.net/2027/mdp.39015068573180
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 5
Page 66

Commission for all damages and loss suffered by it in excess of money so for-
feited and retained; but neither such forfeiture and retention by the Commis-
sion of the whole or any part of such moneys nor the recovery or collection
thereby of such damages, or both, shall in any manner relieve such person or
persons from liability to punishment for any violation of any provision of
any Central New York State Parks Commission Ordinance.

### Ordinance No. 4

#### Prohibited Uses

Section 1. Boating. Boating of any kind in a bathing area is forbidden except
such boating as is necessary to keep such areas properly protected and policed.
The use of privately owned boats or canoes on any park waters is prohibited.

Section 2. Protection of Bathing Area. No person shall throw, cast, lay or
deposit any glass, crockery, or any part thereof or any metallic substance on
any bathing area in or adjoining any park.

Section 3. Firearms. No person except employees or officers of the Commis-
sion shall carry firearms of any description within the park.

Section 4. Explosives. No person shall bring into or have in any park any
explosive or explosive substance.

Section 5. Fires, Lighted Cigars, etc. No person shall kindle, build, main-
tain or use a fire other than in places provided or designated for such purpose
except by special permit. Any fire shall be continuously under the care and
direction of a competent person over sixteen years of age from the time it is
kindled until it is extinguished. No person shall throw away or discard any
lighted match, cigar, cigarette, or other burning object within, on or against
any structure, boat, vehicle or enclosure, or under any tree or in underbrush
or grass.

Section 6. Alms and Contributions. No person shall solicit alms or contri-
butions for any purpose.

Section 7. Commercial Enterprises. No person shall, without a permit, do any
of the following: - Sell or offer for sale, hire, lease or let out, any object
of merchandise, or any other thing, whether corporeal or incorporeal; take
photographs within the limits of any park for the purpose of selling the nega-
tives thereof, or prints therefrom, or for the purpose of exhibiting negatives
thereof, or prints therefrom in public; while operating a boat for hire, land
or receive passengers at any dock or wharf under the jurisdiction of the
Commission. No person to whom property of the park has been entrusted for
personal use shall hire, lease or let out the same to any other person.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 5
Page 67

Discharge of fire-arms.

Rule 39. No person shall be permitted to discharge firearms from the main shore of a reservoir, or from the islands within such reservoir, or from boats thereon across the waters of any public park, except during the hunting season authorized by the statutes, and parties guilty of reckless shooting on or around such reservoirs shall be arrested and fined in accordance with the provisions of this act.

Disposal of garbage.

Rule 40. No lessee of a state lot, cottage owner, or other occupant of a cottage located upon state or adja-cent lands shall deposit garbage upon the rear of such lot or throw the same into the lake, but such garbage shall be burned or removed from the premises so as not to be a nuisance to the cottage owners either on or off the state land.

State landings may be used by all boats.

Rule 41. No boat line company or individual shall have control of any state landing to the exclusion of other boat lines, or individuals owning and operating boats upon the waters of any state reservoir, and all boats shall have the right to land at any dock or landing for temporary purposes, but passenger boats operated for hire may only discharge passengers at private docks or landings, and shall not take on passengers from such docks or landings without the permission of the owner or owners thereof.

Permit to build boat house or private landing required.

Rule 42. No boat owner or lessee of a state lot shall build a boat house or dock landing over the water of any state reservoir that has been dedicated and set apart as a public park and pleasure resort, except by the written per-mission of the conservation commissioner who shall first approve the plans for such boat house or dock landing be-fore work thereon shall be commenced.

Permission to cut trees.

Rule 43. No trees shall be cut by the lessees of state lots to make room for the erection of cottages or other buildings without permission of the conservation commissioner or his authorized agent.

Duty of lessees as to woods, refuse, etc.

Rule 44. Lessees of state lands or state lots shall keep the woods and poisonous vines cut on their leases and shall keep their lots, cottages and other buildings free from rubbish, garbage and all other unsightly things.

Oils, gasoline and other inflammable substances shall be stored in such a manner as not to endanger cottages and their occupants, or other property either on or off the state land.

Limitation of speed of water craft in canal.

Rule 45. Boats running in any canal connecting with a reservoir park, shall limit their speed while in the canal to four miles per hour and parties operating boats, and water craft of all kind, upon any state reservoir, dedi-cated and set apart as a public park and pleasure resort, shall limit the speed thereof to five miles an hour when

310

Exhibit 5

Page 68

Generated on 2023-10-30 21:42 GMT / https://hdl.handle.net/2027/mdp.39015068573032
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

ance of roads within the limits of such park, and for the
development of such park; No money may be appropriated for
expenditures beyond the territorial limits of such county
(P. L. 1925).

**Alteration of roads leading to parks.**   Whenever a public road or highway within a park or public
ground, title to which is vested in the State, is laid
out, located, relocated, altered or vacated in such manner
that a public road or highway approaching, leading to or
contiguous to such park or public ground becomes useless,
inconvenient or burdensome, the same may be altered, re-
located, or vacated by the officers charged with its main-
tenance for the purpose of making it convenient and suit-
able as an approach to the roads within the park or public
grounds, upon the consent and agreement of: (a) the com-
missioners or officers charged with the care and management
of the park or public grounds; (b) the officials charged
with the duty of maintaining the roads or highways; and (c)
the owners of the majority of the frontage of land abut-
ting upon the relocated portion of the roads or highway
approaching, leading into or contiguous to the public or
park grounds. Such road or highway, when altered or re-
located, to be maintained and repaired in the same manner
as township roads (P. L. 1919, 1931).

**Park roads.**   The Department of Highways, with the approval of the Gov-
ernor, may build, rebuild, construct, and maintain that
portion of any or all roads running through or over the
lands of any State park; the cost and expense to be paid
out of any moneys appropriated to the Department of High-
ways for the construction, reconstruction or maintenance of
State highways (P. L. 1927).

**No race discrimination.**   All persons within the jurisdiction of the Commonwealth are
entitled to the full and equal accommodations, advantages,
facilities, and privileges of any places of public accom-
modation, resort or amusement, subject only to the condi-
tions and limitations established by law and applicable
alike to all persons (P. L. 1887, 1935).

**Hunting in parks prohibited.**   It is unlawful for any person at any time of the year to
discharge a shotgun, rifle or firearm of any description,
except in defense of person or property, or by written con-
sent of the owner or person controlling the same, upon the
grounds belonging to or connected with and controlled by
those operating a public or private park or resort, set
apart to the use of the public either free or otherwise,
and upon which human beings congregate in the open in quest
of health, recreation or pleasure -- such lands being sur-
rounded by a marker, either a fence or single wire or a
marker of any description that will clearly designate the
boundaries thereof, and a line of notices printed upon

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 5
Page 69

excess of revenues derived for school purposes, except
upon resolution of the park board advising the school
board of its willingness to contribute the necessary funds
for the maintenance of such additional schools;

| | |
|---|---|
| Encourage summer homes; leases. | To encourage the erection of summer cottages and summer homes, may make term permits or leases for such purposes, but no lease may be made on the slopes of Sylvan Lake or within view of the Lake; the minimum rental for a site to be $10 annually, and the Board may cancel the lease in case of failure to comply with such permit or lease, or to pay the rental. No leases may be made for homes along the highway but only upon locations designated by the Board; |
| Sale of timber. | May contract for and sell timber on any of the State lands in the Park, but not in excess of 100,000 lumber feet in any one year. No trees may be cut adjacent to the highway, except as may be necessary to improve the appearance of growing conditions. Proceeds derived from the sale of timber are to be placed in the General Fund of the State, except where such timber is from school land, in which case the proceeds are to be credited to the permanent school fund and applied to the purchase price of said land; |
| Superintendent.<br><br><br><br>Park Forester. | Is directed to employ a Superintendent to care for the park property, manage and execute park enterprises and activities, direct and supervise other employees, and perform such other duties as the Board requires. The Board may also employ such other personnel as may be necessary, including a park Forester, or the Superintendent may be required to act as such; |
| Rules and regulations.<br>Game warden. | May make and enforce necessary rules and regulations, and designate one or more employees as game wardens to enforce the provisions of the Act or any of the laws of the State; |
| Annual reports to Governor. | Must annually file with the Governor a report of all funds received from any source during the preceding year and a statement of all moneys paid out; including a report of all lands purchased, the price paid therefor, the lands rented and rental paid therefor; also a detailed report of all property sold or disposed of and the price received therefor. |
| State-wide park plan. | Is directed to formulate and recommend a State-wide plan for a State park system, embracing the different scenic and recreational areas in different sections of the State and report to the next Legislature. |
| Hunting regulated,<br><br>Firearms; dogs. | Hunting, trapping, killing or capturing game animals or game birds within the boundaries of the park is unlawful except under such regulations as may be prescribed by the Board. It is also unlawful to carry firearms therein or or permit dogs to run at large. |


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 5
Page 70