ROB BONTA
Attorney General of California
MARK R. BECKINGTON
R. MATTHEW WISE
Supervising Deputy Attorneys General
TODD GRABARSKY
JANE REILLEY
LISA PLANK
ROBERT L. MEYERHOFF
Deputy Attorneys General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta, in his Official Capacity as
Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RENO MAY, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of the State of California, and Does 1-10,**<br><br>Defendants. | Case Nos. 8:23-cv-01696 CJC (ADSx)<br>8:23-cv-01798 CJC (ADSx)<br><br>**DECLARATION OF DR. BRENNAN RIVAS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date:            December 20, 2023<br>Time:            1:30 p.m.<br>Courtroom:   9B<br>Judge:          Hon. Cormac J. Carney |
| **MARCO ANTONIO CARRALERO, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of California,**<br><br>Defendant. | |

# DECLARATION OF DR. BRENNAN GARDNER RIVAS

I, Dr. Brennan Gardner Rivas, declare under penalty of perjury that the following is true and correct:

1.      I have been retained by the Office of the Attorney General of the California Department of Justice to provide expert opinions and testimony in this case. I submit this declaration on the basis of my training, professional expertise, and research. For this engagement, I was asked to provide expert opinions about historical gun regulations that pertained to public carry laws and sensitive places, with a particular focus on regulations related to travelers, transit companies, and transportation-related spaces.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.      I am a historian and independent scholar. During the 2021-2022 academic year, I was the Lloyd Lewis Fellow in American History at The Newberry Library. From 2020 to 2021, I was a Bill & Rita Clemens Fellow for the Study of Southwestern America within the Clemens Center for Southwest Studies at Southern Methodist University. From 2019 to 2020, I was a Lecturer in American History at Texas Christian University (TCU). I hold a Ph.D in in history from TCU, where my dissertation was on the development, evolution, and enforcement of gun and weapon policy in Texas form the era of Mexican independence to the 1930s.

4.      My expertise includes historical weapon regulations in the United States. I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press. Last year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study" (June 2022), was published in the *UC Davis Law Review*. I am currently completing a book manuscript, based upon

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period. This manuscript has undergone the first round of peer-review and is currently under contract with an academic press.

5.    A true and correct copy of my current curriculum vitae, which details my education, experience, and publications, is attached as **Exhibit 1** to this declaration. It contains all publications that I have authored within the last ten years, including a number of articles related to the regulation of guns, especially as to the history of nineteenth-century weapons policies and the socio-political context that made them possible.

6.    I am being compensated for services performed in the above-entitled case at an hourly rate of $200/hour for research, $250/hour for document preparation, and $350/hour for deposition and trial testimony. My compensation is not contingent on the results of my analysis or the substance of any testimony.

7.    The opinions I provide in this declaration are based on my education, expertise, and research in the fields of transportation, the history of firearms and firearm regulation, and my review and analysis of a wide range of primary and secondary sources.

8.    This declaration is a work of historical scholarship, informed by analysis of primary and secondary sources. Having studied the subject of historical gun regulations for several years now, I have drawn upon knowledge gained from reading numerous peer-reviewed books and articles, in addition to law review articles and media such as blogs and news articles. I have also drawn upon primary sources, such as historical laws and ordinances found in digital databases like Hein Online and Hathi Trust, and historical newspaper articles from databases like Chronicling America, ProQuest Databases, Newspapers.com, America's Historical Newspapers, and more. The writing and composition of scholarly works of history require the historian to evaluate both primary and secondary sources—using

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

secondary sources to contextualize and interpret primary sources in ways that illuminate the past rather than confuse or obscure it.

9.     This declaration also involved new research, particularly in relation to the history of Philadelphia from the latter 1600s through the early 1800s. I consulted scholarly works of history about Philadelphia, particularly those addressing architecture, urban planning, and sites of social gathering. I also consulted relevant primary sources, from paintings of the city and its structures (often reprinted in architecture books) to maps and population statistics. A particularly important source for this study is a multivolume history called *Annals of Philadelphia*. Though it was written and published in the nineteenth century, the author, John F. Watson, related oral histories from longtime residents and reprinted some government records. I also visited some of Philadelphia's historic sites and colonial-era gathering places during July 2023. As one of the United States' oldest and most-studied urban centers, the case study of Philadelphia's transportation and public gathering spaces could be carried much further—and such continued study would likely reinforce conclusions within this report rather than undermine them.

**SUMMARY OF OPINIONS**

10.     First, this declaration sets forth my expert opinion that the search for and analysis of historical analogues for sensitive place laws and transit-specific gun regulations should be undertaken in light of historical transportation infrastructure as well as the types, locations, and sizes of historical public gathering places. A case study of Philadelphia shows that even one of the largest and most cultured cities in colonial and early America lacked indoor gathering spaces akin to modern venues of entertainment, art, and education, and it remained a "walking city" with relatively few intra-city transit options until the nineteenth century. Its outdoor places of public assembly, such as the city center, fairs, and marketplace, were exactly the types of gathering places encompassed within the text of the Statute of Northampton. Thus, to the extent there is any lack of direct analogues to the

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

1  contested statute, this lack stems from unlike circumstances rather than historical

2  Americans' rejection of safety-focused gun regulation.

3      11.    Additionally, this declaration presents evidence drawn from historical

4  research showing that Americans have historically regulated the presence of

5  weapons in sensitive places, including transportation-related spaces. Public carry

6  laws were in force across much of the United States during the nineteenth century

7  and prohibited the carrying of various weapons and particularly the concealed-

8  carrying of them. By 1900, most American states and territories had enacted one,

9  and hundreds of municipalities had enacted similar or overlapping ordinances to

10 apply within their city limits. Public carry laws applied throughout an entire

11 jurisdiction and did not cease to be operative aboard trains, trolleys, streetcars, and

12 ferries. Private transportation companies also held the authority to establish rules

13 about the carrying and shipping of firearms, and there is evidence showing that

14 some rail companies required firearms to be transported unloaded and stowed away

15 from passengers.

16     12.    This declaration proceeds in four parts. First, it describes the nature of

17 public transportation and gathering spaces in eighteenth-century America, using

18 Philadelphia as a case study. Second, it provides an overview of the general history

19 of public carry restrictions in the North American colonies and the United States.

20 Third, it describes the specific application of public carry restrictions to travelers

21 and transportation-related spaces. Fourth, this declaration briefly explains how the

22 lack of relevant extant records hinders our ability to understand the full history of

23 firearms regulation (particularly within transit spaces) in the United States.

**OPINIONS**

24

**I.    Public Transportation and Gathering Spaces in Eighteenth-Century**

25

26     **America**

27     13.    For this declaration, I explored the similarities and differences between

28 the American urban experience today versus in the eighteenth century. This is an

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

undertaking which a historian could spend many years studying and developing—
and indeed, some have written marvelous histories of the evolution of mass transit
and the growth of urban centers. In order to work within the time constraints for a
project of this kind (rather than a peer-reviewed monograph or article), I employed
a case study method.

14.     At the time of the Founding, Philadelphia, Pennsylvania was the
second most populous city in the United States, with approximately 28,000
residents.[1] More than that, Philadelphia had been one of the largest cities within the
entire British Empire during the colonial period. As a result, Philadelphia led the
nation in architecture, voluntary associations, and urban planning. Most Americans
of the eighteenth century lived in small, rural areas very much *unlike* Philadelphia.
That being said, the few large cities of the Founding Era provide a better analogue
to modern life in the United States—where most Americans live in urban areas with
access to transportation infrastructure, public safety agencies, and a population of
5,000 or more[2]—than the small, rural areas where most Americans resided during
the Founding Era. A look at transportation infrastructure in this sophisticated
Founding-Era city, as well as its sites of public assembly, demonstrate that intra-
city transportation and the scale of sensitive places in Philadelphia were quite
different from what was common in the mid-to-late nineteenth century, and
certainly from what we know today.

---

[1] U. S. Bureau of the Census, "Population of the 24 Urban Places: 1790," *Population of the 100 Largest Cities and Other Urban Places In The United States: 1790 to 1990* (June 1998). https://www2.census.gov/library/working-papers/1998/demographics/pop-twps0027/tab02.txt

[2] Approximately 80.0% of Americans live in "urban areas" as defined by the U.S. Bureau of the Census. Following the 2020 census, that agency raised the minimum population threshold for "urban area" from 2,500 to 5,000. This caused a slight decline in the nation's urban population (down from 80.7 to 80.0) even while "the nation's urban population increased by 6.4% between 2010 and 2020." See "Nation's Urban and Rural Populations Shift Following 2020 Census," Press Release Number CB22-CN.25, United States Census Bureau (December 29, 2022), https://www.census.gov/newsroom/press-releases/2022/urban-rural-populations.html; and Michael Ratliffe, "Redefining Urban Areas Following the 2020 Census," (December 22, 2022), https://www.census.gov/newsroom/blogs/random-samplings/2022/12/redefining-urban-areas-following-2020-census.html.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

## A.    Philadelphia: Transit Infrastructure

15.    The city of Philadelphia was established on the western bank of the Delaware River, across from West Jersey, in 1682. Inhabitants built makeshift caves and dwellings for themselves along the riverbank until land could be cleared and surveyed for the construction of homes on town lots. The town grew around a creek useful for docking boats, which came to be known as Dock Creek. In its earliest years, the city consisted of a cluster of buildings—particularly homes and taverns—near Dock Creek. The most notable was the Blue Anchor Inn, which was the site of a ferry connecting both sides of the creek. To the north grew what is now called the Old City, and to the south grew Society Hill. Near the turn of the eighteenth century, a drawbridge replaced the Dock Creek ferry, and by about a century after that, Dock Creek had been filled in and paved over.[3]

16.    Wharves and docks were built along the riverfront allowing goods to be loaded and unloaded. The Society of Traders, a group of investors in Pennsylvania whose offices were in Society Hill, was made up primarily of merchants. The buying and selling, trading and transporting, of goods was the lifeblood of the city economy. Goods were transported across the wharves on carts and deposited at warehouses near the river.[4] Merchants showed and sold their warehoused products and shipped them by wagon or boat to their destinations. By 1726, there were two privately owned wharves in Philadelphia, both being situated between High Street (now Market Street) and Dock Creek.[5] As the population and

---

[3] John F. Watson, *Annals of Philadelphia and Pennsylvania in the Olden Time*, 2 vols. (1850), I: 35-38. See Also Martin P. Snyder, *City of Independence: Views of Philadelphia Before 1800* (New York: Praeger, 1975), 26-27 (on cave structures and scarcity of public buildings).

[4] On Philadelphia as a center of eighteenth-century international and regional trade, see Carl Bridenbaugh and Jessica Bridenbaugh, *Rebels and Gentlemen: Philadelphia in the Age of Franklin* (New York: Oxford University Press, 1962), 5-12.

[5] Watson, *Annals of Philadelphia*, I: 51.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

1    economic significance of the city grew, more were built along the riverbank of the
2    Old City, Society Hill, and even outlying areas.[6]

3        17.    Important public buildings were constructed near the Delaware River,
4    and the city itself initially grew along the riverbank rather than westward toward the
5    Schuylkill River as planned. As quickly as 1685, there were some 600 homes under
6    construction in the Philadelphia area, all of them dotting the blocks nearest the
7    riverbank to provide access to fresh water and infrastructure. To the west of the
8    settled and developed town lots were the Governor's Woods, which extended to the
9    Schuylkill River. By the Revolution, clearing of the forest had reached Broad
10   Street, which is the current site of City Hall.[7] Construction for City Hall began in
11   1871, and prior to that time the site had been set aside as a park and temporarily
12   used for a water pumping station. Even though it is at the heart of the city as
13   envisioned by Penn and early planners, it was at the fringe of settlement until the
14   Founding Era. The first century of development in Philadelphia hugged the
15   coastline rather than expand into the interior. Even though the space between the
16   rivers was ultimately cleared and surveyed, settlement did not immediately follow.
17   So much development had occurred outside of the planned grid by 1854 that a new
18   charter was issued that brought these other settlements under the organization of the
19   city and county of Philadelphia.

20       18.    In the mid-to-late eighteenth century, the Old City remained the heart
21   of Philadelphia—and High Street (now Market Street) was the very heart of the Old
22   City. High Street was home to Philadelphia's main marketplace, which provided
23   food, essentials, and other consumer products to residents near and far. The road
24   itself was the primary east-west thoroughfare from the docks to the interior of the

25

26       [6] Sketches, paintings, and lithographs of eighteenth-century Philadelphia sometimes
     presented a view of the city from the Delaware River, which would have been the arrival point for
27   most immigrants and visitors. Docks covered the riverbank across the eastern edge of the whole
     city. See images in Snyder, *City of Independence*, 30-33, 46, 58, 63.
28       [7] Snyder, *City of Independence*, 35.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

city, so it featured tremendous foot, horse, and wagon traffic. Vendors rented stalls and complied with strict regulations designed to protect the trade in essential goods from bad-faith actors. Market days were limited and specified by local ordinance, and Philadelphians built a watch tower to guard the marketplace.[8] During the colonial period, semiannual "fairs" brought all manner of goods to Philadelphia from outlying areas. The mayor of Philadelphia opened a fair by issuing a proclamation that reiterated the obligation of colonists to keep the King's peace, which mandated "that no person…carry any unlawful weapon, or gallop or strain horses within the built part of the city."[9] By the Revolutionary era, the center of High Street featured covered stalls, sometimes derisively labeled "shambles," where vendors showed and sold their wares to passersby. The marketplace continued several blocks, passing Fourth Street in the late 1780s.[10] In the nineteenth century, Philadelphia City removed the vendor sheds, established market corporations to build fully enclosed market houses, and renamed the roadway Market Street.[11]

19.     With High Street being the center of the Old City, Philadelphians constructed important buildings in its vicinity. The intersection of Second and High Streets was particularly significant, being home to the first Quaker meetings house as well as sites of justice, like the first courthouse and jail.[12] A whipping post and

---

[8] Watson, *Annals of Philadelphia*, I: 59.

[9] Philadelphia City Ordinance, 1753, quoted in Watson, *Annals of Philadelphia*, 364. In his description of the city's markets and the colonial-era fairs (that had ceased to be held by the time of his writing), Watson provided the 1753 mayoral proclamation as an example of how such fairs would be opened. The suggestion is that the process of opening with a proclamation along these lines was standard procedure. It is worth noting that the rules laid out in the proclamation align with the Statute of Northampton and the common law view of keeping the peace. "O yez! &c. Silence is commanded while the Fair is proclaiming, upon pain of punishment! A. B., Esq., Mayor of the city of Philadelphia, doth hereby, in the King's name, strictly charge and command all persons trading and negotiating within the Fair to keep the King's peace, and that no person presume to set up any booth or stall for the vending of strong liquors within this Fair—that none carry any unlawful weapon, or gallop or strain horses within the built part of the city. And if any person be hurt by another, let him repair to the Mayor here present. God save the King!"

[10] On markets, see Helen Tangires, *Public Markets and Civic Culture in Nineteenth Century America* (Baltimore: Johns Hopkins University Press, 2003), 3-47. See esp. Figure 2.2.

[11] Helen Tangires, "Public Markets," *Encyclopedia of Greater Philadelphia* (2016), https://philadelphiaencyclopedia.org/essays/public-markets/#essay.

[12] Watson, *Annals of Philadelphia*, I: 59.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

1   pillory were also installed there, meaning that corporal punishments were

2   administered in an area of civic significance as well as public gathering. The office

3   of town whipper was a paying position, and "The whipping post and pillory display

4   was always on a market day—when the price of eggs went up much."[13] In the same

5   area hung a bell whose ringing notified residents that a proclamation or other

6   important notice was about to be read to the public.[14]

7        20.      Connecting these sites to one another were roads laid out in a

8   purposefully designed grid pattern. Many roads remained unpaved, ostensibly

9   because loamy soil reduced some of the inconveniences arising from water or wet

10  conditions. Still, until the 1760s there was no plan or funding for paving the city's

11  roads. Prior to that, sections of roadway might be cobbled with flagstone for

12  wagons and feature an elevated sidewalk for pedestrians. Carts and wagons

13  crisscrossed the city, running ruts into the roads and struggling across uneven or

14  muddy stretches. When the roads were being paved, the elevation of some of them

15  had to be altered dramatically. High points were lowered, and low-lying roadways

16  were raised up—all of which required considerable earthwork and construction.[15]

17  Goods related to a booming regional and international trade moved along these

18  roads in carts and wagons, including agricultural produce heading from the

19  hinterland to many warehouses and docked ships.[16] Affluent residents traversed the

20  city in carriages, but from the colonial period until well into the nineteenth century,

21  most Philadelphians navigated their city on foot.[17]

22

---

23      [13] Watson, Annals of Philadelphia, I: 103.

24      [14] Snyder, *City of Independence*, 26-29.
        [15] Watson, *Annals of Philadelphia*, I: 233-235.

25      [16] Mary McKinney Schweitzer, "The Economy of Philadelphia and Its Hinterland," in *Shaping a National Culture: The Philadelphia Experience 1750-1800*, ed. Catherine E. Hutchins (Winterthur: Henry Francis du Pont Winterthur Museum, 1994), 99-127.

26      [17] John K. Alexander, "Poverty, Fear, and Continuity: An Analysis of the Poor in Late

27  Eighteenth-Century Philadelphia," in *The Peoples of Philadelphia: A History of Ethnic Groups and Lower-Class Life, 1790-1940*, Allen F. Davis and Mark H. Haller, eds. (Philadelphia: Temple University Press, 1973), 17 ("Since Philadelphia was still a walking city, the least desirable housing

28  areas were at a distance from the center of activity.").

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

21.     Transportation in Philadelphia also embraced regional passenger travel. Within a few years of establishing Philadelphia, ferries connected the commercial center to West Jersey across the Delaware River. During the eighteenth century, stage lines connected the city to New York and Boston. Roadways also stretched into the surrounding countryside enabling farmers to travel into the city to sell or ship their crops. Turnpikes and improvements rescued these roadways from becoming "as claypits, by the continual increase of population and use."[18] There were also packet ships that moved goods, passengers, and letters to port cities elsewhere in the British colonies and later United States.

22.     Ferryboats, packets, and turnpikes exhausted the public transportation options in Philadelphia until the 1830s, when horse-drawn omnibuses began offering alternatives. These vehicles were on wheels and carried paying passengers along fixed routes within the city and its surrounds. Within twenty or thirty years, they were replaced by horsecars, which were similarly drawn by horses, but rather than wagon wheels, they were pulled along tracks built into the road like later streetcars. Omnibuses and horsecars presented a fairly expensive way to travel and were used primarily by the middling and upper classes of Philadelphia rather than its urban poor and laboring class. The first rail lines were built in the Philadelphia area in the 1830s, and the city subsequently became an important rail hub in the Mid-Atlantic region. The most significant developments in intra-city travel occurred well after the Founding period, and much closer to the mid- and late-nineteenth century when technology and demographic growth made urban mass transit both possible and necessary to Philadelphia.[19]

---

[18] Watson, *Annals of Philadelphia*, I: 257 ("Had no turnpikes been made, roads would have become as claypits, by the continual increase of population and use.").

[19] On transportation development in Philadelphia, see Annals, I: 37-39, 211-219; II: 465-470; Charles W. Cheape, *Moving the Masses: Urban Public Transit in New York, Boston, and Philadelphia, 1880-1912* (Cambridge: Harvard University Press, 1980), 157-159; John Hepp, "Public Transportation," *Encyclopedia of Greater Philadelphia* (2013), https://philadelphiaencyclopedia.org/essays/public-transportation/ ; John Hepp, "Omnibuses,"

(continued…)

## B.     Philadelphia: Public Gathering Places

23.     As the leading city of the Founding-Era United States, the scale of public gathering places in Philadelphia diverged sharply from the norm throughout most of the country. Most Americans lived in exceedingly small, rural enclaves oriented around agriculture. In these rural areas of the colonial North America and the early United States, public gatherings were almost always outdoors. Regular church services were held indoors if the congregation had constructed a building, but even then, revivals and visits from preachers might draw large crowds in outdoor areas. The county courthouse was the center of public life, where men transacted business, recorded official documents, and sought legal redress for civil and criminal wrongs. On the days when court was in session, men and women from the surrounding countryside descended upon the small and otherwise deserted county seats. Court day was a time of festivity, entertainment, and fellowship with neighbors. Spectators and witnesses crowded into courtrooms, with others overflowing onto lawns. Livestock and other goods might be displayed for sale at court day, and the small taverns or "ordinaries" of the county seat became full to overflowing. On court days in rural areas, and more frequently in the seaside commercial centers, other activities were likely to take place, such as brawling, cockfighting, horse racing, and all manner of gambling. Court days were primarily about the carrying out of government business, but the rituals of the event also reinforced shared values and social connections among neighbors.[20]

---

*Encyclopedia          of          Greater          Philadelphia*          (2012), https://philadelphiaencyclopedia.org/essays/omnibuses/ .

[20] On Court Day and other occasions in rural communities, see Rhys Isaac, *The Transformation of Virginia, 1740-1790* (Chapel Hill: University of North Carolina Press, 1982), 88-114; Robert M. Ireland, *Little Kingdoms: The Counties of Kentucky, 1850-1891* (Lexington: University Press of Kentucky, 1977), 90-100; A. G. Roeber, "Authority, Law, and Custom: The Rituals of Court Day in Tidewater, Virginia, 1720 to 1750," *The William and Mary Quarterly* 37, no. 1 (January 1980), 29-52; E. Lee Shepherd, " 'This Being Court Day': Courthouses and Community Life in Rural Virginia," *The Virginia Magazine of History and Biography* 103, no. 4 (October 1995), 459-470; Carl Lounsbury, *The Courthouses of Early Virginia: An Architectural History* (Charlottesville: University of Virginia Press, 2005).

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

24.     Large cities like Philadelphia diverged from this pattern. Philadelphia was constantly bustling, and its justice system was active in its policing of residents and visitors alike. Still, most of the public gathering places in early modern Philadelphia were open-air, outdoor spaces. As previously described, High Street near the banks of the Delaware was the beating heart of the city as home to government buildings and the main public market. Residents, visitors, immigrants, and all manner of other travelers walked up and down the nearby wharves and docks, along the intersecting streets, and through the numerous alleyways. Residents likely visited the marketplace several times per week, if not every day, in order to purchase fresh foodstuffs for their households. The commerce along the waterfront generated the wealth that made life in Philadelphia possible, and indirectly propped up other industries, like construction and other skilled trades. The original plan of the city called for five symmetrical squares to serve as parks and public gathering places, but Centre Square at the intersection of Broad and Market Streets was used for a water works facility during the very early 1800s and subsequently became the site of City Hall later in the nineteenth century.

25.     Aside from the older courthouse at High and Second Streets, Philadelphia boasted additional public buildings. As the city expanded in the late 1700s, a new county courthouse and city hall were constructed about six blocks west of the riverfront and just a block south of High Street. The structures straddled the Pennsylvania State House and were temporarily home to the United States Congress and Supreme Court during the early republic period. Continued growth forced Philadelphians to construct yet another city hall in the nineteenth century. That one still stands in Centre Square, several blocks west of the previous site. Philadelphia's iconic City Hall was constructed over a thirty-year period beginning in the 1870s.[21]

---

[21] On the Old Philadelphia County Courthouse (Congress Hall) and Old City Hall (Old Supreme Court), see James D. Kornwolf, *Architecture and Town Planning in Colonial North*

(continued…)

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

26.     As the capital of Pennsylvania, Philadelphia of the eighteenth century became home to the public buildings of state government. The State House, now known as Independence Hall, held chambers and courtrooms for various courts and housed the Legislative Assembly. It was completed in 1735 and was the meeting place of the Second Continental Congress. The main building was flanked by others, creating a government campus unparalleled until the development of the nation's permanent capital in Washington, D.C. The State House complex temporarily housed the national government, including the United States Congress, during the period when Philadelphia served as a national capital.[22] The State House building itself was 40' x 100', with the ground-floor chambers measuring 40' x 40' and separated by a hallway 20' wide. Upstairs was designed for public gatherings, with a long hallway measuring 20' x 100' providing access to five separate rooms.[23] The square surrounding the buildings was an outdoor gathering place for residents and demonstrators, and the site was an important one for civic activities. Some of the rooms were rentable and usable for different functions—for instance, the Library Company and Philosophical Society rented space there prior to completing their own buildings.[24] A large building for its time, the interior of the State House was a space for civic engagement and government functions, and its exterior was a site for large gatherings.

27.     Some of the largest buildings in Founding-Era Philadelphia were the well-established churches near the Delaware River. Christ Church is one of the more famous, and was one of the largest churches and tallest structures in the early United States. The building measured 61' x 118' and its sanctuary may have

---

*America*, 3 vols. (Baltimore: Johns Hopkins University Press, 2002), II: 1172-1173 (map and legend), 1179-1182.

[22] On the history of the State House, see Edward M. Riley, "The Independence Hall Group," *Historic Philadelphia from the Founding until the Early Nineteenth Century: Papers Dealing with its People and Buildings, with an Illustrative Map* (Philadelphia: American Philosophical Society, 1953, repr. 1973), 7-42. See also Kornwolf, *Architecture*, III: 1420.

[23] Kornwolf, *Architecture*, II: 1181.

[24] Charlene Mires, "Independence Hall," *Encyclopedia of Greater Philadelphia* (2012), https://philadelphiaencyclopedia.org/essays/independence-hall/ .

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

accommodated 1,000 worshippers.[25] Still, those dimensions would not be considered particularly large by today's standards, when megachurches can host upwards of 2,000 people per service in stadium seating. The structure of St. Patrick's Cathedral in New York City, constructed more than a century after Christ Church, measures 334' long and upwards of 100' wide at the transepts. Other churches, including the Quaker meeting house, peppered the city and provided opportunity for Philadelphians to worship in accordance with their own consciences. Still, the church-to-population ratio (1 : 2,200) indicates that a substantial portion of Philadelphia's residents did not attend regular church services.[26]

28.     Another class of large buildings in eighteenth-century Philadelphia were private homes. These were certainly not public spaces, although it was not uncommon for the owners of large houses to allow them to be used for public functions at times. For example, the Maryland colonial assembly met in private residences during the seventeenth century, and even purchased one for permanent use as an assembly hall. When the assembly was not in session, the building was let out to innkeepers and functioned as an "ordinary."[27] Philadelphia's mansions undoubtedly hosted balls, parties, weddings, and feasts that brought together dozens or hundreds of guests.

29.     By the mid and late eighteenth century, Philadelphia was home to several large buildings that served various social functions. One of the largest meeting halls in the city during the eighteenth century was Carpenter's Hall, the official headquarters of the carpenter's guild. Today, the first floor is one open room beyond a small entry hall and stairwell. The building's dimensions indicate

---

[25] For dimensions of the building, see Kornwolf, *Architecture*, II: 1193. The figure of 1,000 worshippers is an estimate.

[26] Bridenbaugh and Bridenbaugh, *Rebels and Gentlemen*, 18.

[27] Wesley R. Willoughby, "Community, Identity, and Public Spaces: The Calvert House as the First State House of Maryland," in *Unearthing St. Mary's City: Fifty Years of Archaeology at Maryland's First Capital*, Henry M. Miller and Travis G. Parno, eds. (Tallahassee: University Press of Florida, 2021), 151.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

approximately 2,400 square feet in this room, which can accommodate 125 guests standing and 82 guests seated at dinner tables.[28] But the space was originally divided into two identically sized rooms on either side of a central hallway, effectively cutting the usable square footage by half or more.[29] The first Continental Congress met in one of the first-floor rooms in 1774. The First Bank of the United States rented the space prior to the completion of its building (nearby) in 1797.[30] The upstairs rooms could also be let out, and the Library Company used some of that space prior to the completion of its building in 1791.

30.     The Library Company began as an association of rationalist, scientific thinkers intent upon promoting scientific innovation and discovery in what was one of the largest and most significant cities within the British Empire. The members collected books that could be read and enjoyed by subscribers. They collected thousands of titles during the eighteenth century, and rented space in various buildings before raising the necessary funds to construct their own in 1791. The Library Company collection was open to its members—who were mostly men of education and status in Philadelphia. The Library Company building contained a lecture hall to provide educational opportunities to Philadelphians. The company itself was private, and the benefits of assembly and association within its walls were reserved to members of the middle and upper classes, if not members of the organization itself.[31]

---

[28] The dimensions of the structure are two wings of 30' x 20', plus a central area of 30' x 40'. For its current rental capacity, see https://www.carpentershall.org/hall-rental.

[29] On Carpenter's Hall, see Kornwolf, *Architecture*, II: 1187-1188.

[30] A member of the Carpenter's Company guild was involved in a bank robbery during the time that the First BUS was renting the space. On the Bank of the United States building in Philadelphia, see Kornwolf, *Architecture*, III: 1423-1424.

[31] On the Library Company see George F. Frick, "The Library Company of Philadelphia: America's First Philosophical Society," in Catherine E. Hutchins, ed., *Shaping a National Culture: The Philadelphia Experience, 1750-1800* (Winterthur: Henry Francis du Pont Winterthur Museum, 1994), 181-200.  See also Kenneth Finkel, "Library Company of Philadelphia," *Encyclopedia of Greater Philadelphia* (2017), https://philadelphiaencyclopedia.org/essays/library-company-of-philadelphia/ (estimates that 1/10 of city households were members).

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

31.     Eighteenth-century Philadelphia also had a sizeable hospital and prison. These buildings certainly brought residents together, but under unfortunate circumstances. Almshouses provided some shelter to the poor and tended to be significant structures within the city. They can hardly be interpreted as sites of public gathering and assembly. The College of Philadelphia, also known as Franklin Academy and subsequently renamed the University of Pennsylvania, was established in the eighteenth century. Its initial building measured 70' x 100' and had been built as an assembly hall in the aftermath of the First Great Awakening. A dormitory was also constructed for the students.[32]

32.     The strong Quaker presence in Philadelphia stymied the growth of the theater there during much of the colonial period. The earliest theaters were built outside the city limits to avoid laws prohibiting performances.[33] Even though plays were considered low-brow entertainment and a wasteful way to spend one's money, American audiences of the eighteenth century behaved better than their counterparts in the urban centers of the United Kingdom. London audiences were notorious for rioting, but only one such theater-driven riot occurred during the colonial era.[34] In 1791, Thomas Wignell opened the Chestnut Street Theater, which stood near the State House (Independence Hall) and became the preeminent venue for plays and performances until the structure burned down in 1820. The theater could seat about 1,100 people and fit approximately 2,000 when the pit was full. Elites rented the boxes on the two lower levels but avoided the top tier of boxes, which "was a notorious meeting place for prostitutes and ruffians."[35] Despite that,

---

[32] Kornwolf, *Architecture*, II: 1183-1189.
[33] Odai Johnson and William J. Burling, *The Colonial American Stage, 1665-1774: A Documentary Calendar* (Madison: Fairleigh Dickinson University Press, 2001), 54, 73-78. See also Irvin R. Glazer, *Philadelphia Theatres, A-Z: A Comprehensive Descriptive Record of 813 Theatres Constructed since 1724* (New York: Greenwood Press, 1986), 3.
[34] That riot occurred in New York in 1776. See Johnson and Burling, *Colonial American Stage*, 87-88.
[35] Calvin Lee Printer, "William Warren's Management of the Chestnut Street Theatre Company," Ph.D. diss. (University of Illinois, 1964), 23-24.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

the theater had become by the late eighteenth and early nineteenth century an important social space for Philadelphians to "see and be seen."[36]

33.     A critically important social space in Philadelphia was the tavern. The city was home to dozens of taverns or ordinaries—places where visitors could stay the night, and where residents could meet for a drink. As many as a few dozen men gathered in the barroom of a tavern (depending upon the size of the structure) to exchange ideas and hear the latest news. Tavern culture has been associated with the democratic spirit and the Revolution itself.[37] Downstairs at a tavern were rooms that clubs and societies could rent for parties and special occasions. One of Philadelphia's largest taverns, the Indian King, was three stories tall and had five such rooms on the ground floor; two of them could be joined with adjacent rooms to form larger spaces that could host up to one hundred people.[38] The remaining two floors held eighteen guest rooms, at least some of which would have bunked two or more men together. The building itself measured 40' x 21', so the space must have been fairly crowded during the times when the larger event rooms were rented out.[39]

34.     Although the city council and other government bodies with authority over Philadelphia did not enact weapon-specific regulations for these places of public assembly, city leaders were certainly aware of and sensitive to potentially unruly gatherings there. The city government considered enacting an ordinance in 1732 to put a stop to the large gatherings of children, servants, and slaves that caused a nuisance to other residents by making noise, swearing, etc.[40] The problem

---

[36] Printer, "William Warren's Management of the Chestnut Street Theatre Company," 24-25, quotation at 25.

[37] Peter Thompson, *Rum Punch and Revolution: Taverngoing and Public Life in Eighteenth-Century Philadelphia* (Philadelphia: University of Pennsylvania Press, 1999); David W. Conroy, *In Public Houses: Drink and the Revolution of Authority in Colonial Massachusetts* (Chapel Hill: University of North Carolina Press, 2018).

[38] Thompson, *Rum Punch and Revolution*, 86-88, 59 ("Four of these rooms could be converted to form two even larger rooms capable of seating up to a hundred 'gentlemen'.").

[39] Thompson, *Rum Punch and Revolution*, 59.

[40] Annals of Philadelphia, I: 62. At this time, it remains unclear whether that ordinance was
(continued…)

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

persisted, with numerous complaints "that many disorderly persons meet every [evening] about the Court house of this city, and great numbers of Negroes and others sit there with milk pails, and other things, late at night, and many disorders are there committed against the peace and good government of this City." In 1741, the city government issued an ordinance requiring the dispersal of people from the vicinity of the courthouse, marketplace, and public buildings (most of which were located near Second and High Streets at that time). Constables were charged with enforcing the rule and bringing violators before a magistrate.[41] In 1743, the government enacted an ordinance providing for the construction and manning of chains blocking carriage and cart access to High Street on market days. The leaders considered "the great danger the Inhabitants of this city are in by means of Carts and Carriages driving thro' the streets at the Market Place on Market Days," and intended "to prevent the mischief that may Ensue."[42] Philadelphia militia laws prohibited militia members from meeting on muster[43] days at taverns, ostensibly for fear that they would become inebriated and fail to perform their duties.[44] There was also a consideration to close tavern barrooms on Sundays "as it would prevent youth from committing excesses to their own ruin, the injury of their masters, and the affliction of their parents and friends."[45] In response to an audience at the

---

passed. Volume I of *Annals of Philadelphia* contains some selectively excerpted minutes from city council meetings, and an update on the status of this ordinance was not included.

[41] Watson, *Annals of Philadelphia*, I: 62-63.

[42] Watson, *Annals of Philadelphia*, I: 63.

[43] Militia muster was an important occasion when militia members gathered together for drill and presentation of their weapons. Militia laws generally prescribed when and where musters should take place.

[44] 1793 Pa. ch. 1696, "An Act for the regulation of the militia of the Commonwealth of Pennsylvania," Sec. XXIV, § 17, 473 ("No company or regiment shall meet at tavern on any of the days of exercise, nor shall march to any tavern before they are discharged, and any person who shall bring any kind of spirituous liquors to such place of training, shall forfeit such liquors, so brought, for the use of the poor belonging to the ward, district or township where such offender lives.") (**Exhibit 2**).

[45] Watson, *Annals of Philadelphia*, I: 101.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

Chestnut Street Theater turning into a mob, theater management hired constables to "rigidly enforce decorum" in future.[46]

35.    At times, armed men caused problems in Philadelphia's public spaces. Watch houses and lamps were constructed to provide the necessary infrastructure for policing the public square and protecting the peace. The constables employed by the government, in addition to the residents drafted into night watch service, were the first line of defense against such disturbances. One of the colony's early leaders, skeptical of the Quaker commitment to pacifism, woke residents of the city one morning in 1686 "with sword drawn" and sounding the alarm for an imminent attack. The Quaker residents stood fast to their principles, and John Evans's political career came to a swift end over the ugly joke.[47] William Penn's eldest son, John, became embroiled in conflict over an affray outside a tavern in 1704, and the debacle prompted his permanent departure from colonial leadership. Penn, Jr. argued with members of the night watch about local politics and the formation of a militia, when the encounter turned into a brawl. At some point, he called on his friends to draw their pistols but was given a "severe beating" after the street light was put out. A grand jury heard evidence about the fracas, which ended Penn, Jr.'s career in Pennsylvania even though the case was dropped.[48] In 1716, a man "armed with pistols" attacked the Speaker of the House of the colonial assembly and was indicted. The failure to prosecute and punish him cased "great dissatisfaction" to other members of the Assembly.[49]

36.    By the Civil War Era, the carrying of concealed weapons was more common than it had been in the eighteenth century, and pocket-sized pistols were more readily available to consumers. This posed a special problem in Philadelphia,

---

[46] Printer, "William Warren's Management of the Chestnut Street Theatre Company," 27-28, quotation at 28. It is unclear which building the Chestnut Street Theater Company occupied at this time. The theater burned in 1820 and reopened in 1822. This riot may have occurred at a different, likely smaller theater.
[47] Watson, *Annals of Philadelphia*, I: 26.
[48] Watson, *Annals of Philadelphia*, I: 114-115.
[49] Watson, *Annals of Philadelphia*, I: 97.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

where a sizeable population and the potential for riotous assemblies made weapon-carrying a serious concern. As early as 1850, persons found carrying deadly weapons at any riotous gathering were "deemed guilty of an intention to riot, whether said fire-arms, or deadly weapon, shall be used or not . . . ."[50] State lawmakers subsequently punished the carrying of "any fire-arms, slung-shot, other deadly weapon concealed upon his person" in Philadelphia, "with the intent therewith unlawfully and maliciously to do injury to any other person."[51] In 1881, when a US president had been shot by an armed assassin and concealable revolvers were readily available at cheap prices, the mayor of Philadelphia issued a proclamation reiterating the city's public carry restrictions.[52]

37.     Even though Philadelphia was one of the largest cities in the early United States and featured some of the largest public buildings, its main gathering places were outdoors. The docks, streets, markets, and public squares were the arteries of transit and commerce for residents, and the lifeblood of the city. The scale of urban life in Philadelphia sheds light upon the longstanding Statute of Northampton, enforced in England, its overseas empire, and even in the United States. It broadly prohibited the carrying of arms in "Fairs, Markets, nor in the Presence of the Justices or Ministers nor in no Part elsewhere."[53] The lawns, streets, and marketplaces of Philadelphia were the very spaces which that longstanding rule was designed to protect. These features of village, town, and urban life were notably missing from the demographic and architectural development of the plantation South and the rural backcountry, where farm families lived miles away

---

[50] John Purdon and Frederick C. Brightly, *Digest of the Laws of Pennsylvania* (Philadelphia: Kay & Brother, 1862), 181. The prohibition against carrying concealed weapons in Philadelphia was enacted in May 1850 (see 181 n. 1).
[51] Idem.
[52] Charles, *Armed in America*, 163-165.
[53] 2 Edw. 3, c. 3 (1328) (Eng.) (**Exhibit 3**); see also 25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (if "any Man of this Realm ride armed covertly or secretly with Men of Arms against any other . . . shall be judged Treason."). (**Exhibit 4**).

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

from one another and public buildings were generally empty outside of scheduled court days.

## II.     Overview of the History of Public Carry Laws in America

38.     As detailed below, Americans of the late eighteenth and nineteenth centuries had laws that broadly prohibited the carrying of firearms and other deadly weapons in public. Early versions of these regulations, particularly those enacted in the eighteenth century by colonial and early American legislatures, tended to draw heavily from legal language with deep roots in the English common law tradition, reaching at least as far back as the Statute of Northampton from 1328.[54] The Statute of Northampton generally prohibited the carrying of arms in "Fairs, Markets, nor in the Presence of the Justices or Ministers nor in no Part elsewhere."[55] The public spaces specifically named and protected under the Statute were the very public areas that people frequented in their daily lives—the town markets and gatherings, and the town itself under the direction of local officials, formed the very heart of community life.

39.     This tradition was absorbed into American law, where numerous colonies and states enacted similar measures that forbade someone to "go or ride" armed in public spaces and called for a weapon-free public square.[56] Under this

---

[54] Patrick J. Charles, "The Faces of the Second Amendment Outside the Home: History versus Ahistorical Standards of Review," *Cleveland State Law Review* 60, no. 1 (2012), 7-40; Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *UC Davis Law Review* 55, no. 5 (June 2022), 2560-2566.

[55] 2 Edw. 3, c. 3 (1328) (Eng.) (**Exhibit 3**); see also 25 Edw. 3, st. 5, c. 2, § 13 (1350) (Eng.) (if "any Man of this Realm ride armed covertly or secretly with Men of Arms against any other… shall be judged Treason"). (**Exhibit 4**).

[56] A non-exhaustive list includes: 1835 Mass. Acts 750 ("If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace.") (**Exhibit 5**); 1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays (… "nor go nor ride armed by night nor by day, in fair or markets, or in other places, in terror of the Country, upon pain of being arrested and committed to prison by any Justice on his own view, or proof of others, there to abide for so long a time as a Jury, to be sworn for that purpose by the said Justice shall direct, and in like manner to forfeit his armour to the commonwealth,") (**Exhibit 6**); Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792) ("…nor (continued…)

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

1    regulatory system, no one was permitted to carry arms into public areas without

2    having a justifiable reason. Anyone violating this rule would have been subject to

3    questioning by local officials and "bound" to the peace through a peace bond or

4    surety.[57]

5         40.    Another type of public carry law that restricted the presence of

6    weapons in public spaces, including those that related to transportation services,

7    took the form of concealed carry laws. States and municipalities enacted regulations

8    like these primarily during the nineteenth century, beginning around the turn of that

9    century. An early example incorporated the policy alongside language drawn from

10   the Statute of Northampton:

---

to go nor ride armed by night nor by day, in fairs, markets nor in the presence of the King's Justices, or other ministers, nor it [sic, likely "in"] no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure,") (**Exhibit 7**); See also 1821 Me. Laws 285, ch. 76, § 1 (simplified to a requirement that officials "cause to be staid and arrested, all affrayers, rioters, disturbers or breakers of the peace, and such as shall ride or go armed offensively, to the fear or terror of the good citizens of this State,") (**Exhibit 8**). This approach can also be found in numerous state penal codes of the nineteenth century. See  1838-1839, Wisconsin, *Statutes of Wisconsin*, "An Act to Prevent the Commission of Crimes," 381 § 16 (**Exhibit 9**); *Revised Statutes of the State of Maine, Passed October 22, 1840* (Augusta: W. R. Smith, 1841), ch. 169, "Of Proceedings for the Prevention of Crimes," 709 § 16 (**Exhibit 10**); *Revised Statutes of the State of Michigan, Passed and Approved May 18, 1846* (Detroit: Bagg & Harmon, 1846), Title 31, ch. 162, "Of Proceedings to Prevent the Commission of Crime," 692 § 16 (**Exhibit 11**); 1847 Virginia, 1847-1848 Session, Title 3, ch. 14, "Of Proceeding to Prevent the Commission of Crimes," 129, §16 (**Exhibit 12**); *Revised Statutes of the Territory of Minnesota, Passed at the Second Session of the Legislative Assembly, Commencing January 1, 1851* (St. Paul: J. M. Goodhue, 1851), ch. 12, "Of Proceedings to Prevent the Commission of Crimes," 528 § 18 (**Exhibit 13**); 1853 Oregon, General Laws, 5th Regular Session, 220 § 17 (**Exhibit 14**).

[57] The peace bond was one of many processes inspired by America's common law heritage. *See* Laura Edwards, *The People and Their Peace: Legal Culture and the Transformation of Inequality in the Post-Revolutionary South* (Chapel Hill: University of North Carolina Press, 2009), 73-74, 96; Saul Cornell, "History, Text, Tradition, and the Future of Second Amendment Scholarship: Limits on Armed Travel under Anglo-American Law, 1688-1868," *Law and Contemporary Problems* 83, no. 3 (Summer 2020), 73-95; Saul Cornell, "Right to Carry Firearms outside of the Home: Separating Historical Myths from Historical Realities," *Fordham Urban Law Journal* 39, no. 5 (October 2012), 1719-1723. Edwards's passage on peace bonds is worth quoting at length: "Peace bonds threw enforcement back on the community, summoning family, friends, and neighbors to police the troublemakers. Bonds required one or more other people to put up the amount, making them liable if the accused broke the peace again. That economic obligation represented the signers' promise to keep the offender in line. Peace bonds put everyone else in the community on notice as well, investing them with the responsibility of policing the peace until the end of the probation period."

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

"That if any person or persons shall publicly ride or go armed to the terror of the people[58], or privately carry any dirk, large knife, pistol or any other dangerous weapon, to the fear or terror of any person, it shall be the duty of any judge or justice, on his own view, or upon the information of any other person on oath, to bind such person or persons to their good behavior, and if he or they fail to find securities, commit him or them to jail, and if such person or persons shall continue so to offend, he or they shall not only forfeit their recognizance, but be liable to an indictment, and be punished as for a breach of the peace, or riot at common law."[59]

Another early example came from Louisiana, whose statute stated, "That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the

---

[58] Early language for these laws, such as this one quoted from Tennessee, often made use of the phrase "to the terror of the people," which was itself an inheritance from the Statute of Northampton. Historical research by trained scholars has shown that, according to common law, the act of carrying deadly weapons in public spaces was inherently terrifying and therefore a breach of the peace. See Saul Cornell, "The Long Arc of Arms Regulation in Public: From Surety to Permitting, 1328-1928," *U.C. Davis Law Review* 55 (June 2022), 2555-2556 ("There was no requirement that one establish an intent to terrify or that the armed travel terrorized any specific person, the injury was to the King's Peace and sovereignty."); Mark Anthony Frassetto, "To the Terror of the People: Public Disorder Crimes and the Original Public Understanding of the Second Amendment," *Southern Illinois University Law Journal* 43 (2018), 65 ("Those who take a textual approach to interpreting the Statute of Northampton…argue that carrying weapons in populated public places was intrinsically terrifying and that the discussion of public terror in judicial opinions and legal treatises was an explanation for the prohibition, rather than a separate element of the crime."); Patrick J. Charles, "The Faces of the Second Amendment Outside the Home, Take Two: How We Got Here and Why It Matters," *Cleveland State Law Review* 64, no. 3 (June 2016), 381-382 ("But those that subscribe to the Standard Model view of the Second Amendment proclaim the Statute of Northampton can only be read as applying to the 'carrying arms in ways that caused public terror.' In making this claim, Standard Model writers have never provided sufficient evidence, at least in total historical context, to support it."); see also Patrick J. Charles, "The Fugazi Second Amendment: Bruen's Text, History, and Tradition Problem and How to Fix It," *Cleveland State Law Review* 71, no. 3 (2023), 635 ("What [English jurists'] restatements inform is that by the early-to-mid-seventeenth century, England's preeminent legal minds understood that the act of carrying dangerous weapons was sufficient to amount to an affray, 'strike a feare' or 'striketh a feare.' ").

[59] Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820 (Vol. I, 1821), 710. Available at the Duke Center for Firearms Law, Repository of Historical Gun Laws: https://firearmslaw.duke.edu/laws/judge-edward-scott-laws-of-the-state-of-tennessee-including-those-of-north-carolina-now-in-force-in-this-state-from-the-year-1715-to-the-year-1820-inclusive-page-710-image-714-vol-1-1821-the/

24

peace, be subject to pay a fine…"[60]  The approach of prohibiting the carrying of concealed weapons spread rapidly.[61]

41.     The language of concealed carry laws might at first suggest that open carry of firearms was accepted and commonplace, but that was not the case. Individuals generally did not view concealed carry laws as giving permission to openly carry in populated places during a person's ordinary activities.[62] For example, in 1843, an appellate court in North Carolina stated, "No man amongst us carries [a firearm] about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment."[63] And a Louisiana case from 1856 held that a partially visible weapon was a violation of the concealed carry law because it was "the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."[64]

### III.    Sensitive Places Laws

42.     In addition to public carry laws, nineteenth century Americans turned to regulations that prohibited firearms and weapons in certain specified locations. One that I have studied in detail is a law from Texas enacted in 1870. This

---

[60] 1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 (**Exhibit 15**).

[61] Examples include:  Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837 (**Exhibit 16**); 1846 Fla., ch. 75, Available at the Duke Center for Firearms Law, Repository of Historical Gun Laws: https://firearmslaw.duke.edu/laws/act-of-jan-5-1847-ch-75-%c2%a7-3-1846-fla-laws-20/; 1838 Vir., ch. 101 (**Exhibit 17**); 1840 Ala., ch. 7 (**Exhibit 18**); 1819 Ind., Acts 39,, Available at the Duke Center for Firearms Law, Repository of Historical Gun Laws: https://firearmslaw.duke.edu/laws/1819-ind-acts-39-an-act-to-prohibit-the-wearing-of-concealed-weapons/; 1821 Miss., ch. 49 (**Exhibit 19**); 1812 Ken., ch. 89 (**Exhibit 20**); 1813 La. Acts 172 (**Exhibit 15**).

[62] Mark Anthony Frassetto, "The Myth of Open Carry," *U.C. Davis Law Review* 55 (June 2022).

[63] *State v. Huntley*, 25 N.C. 418 (1843).

[64] *State v. Smith*, 11 La. Ann. 633 (1856).

sweeping law prohibited weapons in a broad range of sensitive places. [65] The statute provided:

> That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ballroom, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations Subject to Indian depredations ; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

It is important to note that this bill included the terms "firearms" and "gun," which would have applied to rifles and shotguns as well as pistols.

43.     At the time Texas enacted this law, revolvers were flooding American consumer markets. After Samuel Colt's patent on his revolver design expired in 1857, other manufacturers began producing similar models for the United States military during the Civil War. After the war, demobilization ended those contracts, and gunmakers turned to American consumers to buy their pistols. The net result was more and cheaper pistols throughout the country,[66] including in areas plagued by violence and social dislocation, such as postbellum Texas.

44.     The primary exemption created by the 1870 sensitive spaces law was a proviso for "any person or persons whose duty it is to bear arms on such

---

[65] 1870 Tex. Gen. Laws 63, ch. 46, § 1 (**Exhibit 21**).

[66] Colt's Army revolvers cost about $20 at the time of the Civil War, but subsequent entrants into the market sold small pocket pistols for as little as $1.40. For example, *see* digitized Sears and Roebuck catalog (1898), pp. 365-367. Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the catalog but retailed elsewhere for something closer to $18 (*see* p. 367). Meanwhile, the smaller caliber pocket pistols from other brands could be ordered for as little as $1.40 (*see* p. 365). For the 1898 Sears & Roebuck catalog online, *see* https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

occasions in discharge of duties imposed by law."[67] This would have effectively limited the carrying of weapons to peace officers and active-duty soldiers or militiamen engaged in their duties. Armed soldiers or other officials frequently guarded polling stations in Texas during Reconstruction due to the high incidence of voter fraud. The drafters in 1870 likely also envisioned sheriffs, deputies, marshals, and constables who were loyal to the United States as well as the new State Police force and active-duty members of the militia.[68]

45.     Subsequent iterations of the 1870 law incorporated the same exception, though they deviated slightly from the original language and structure. A later reenactment of the same law embedded the exception within one of the several clauses that made up the list of weapon-free spaces. It prohibited the carrying of weapons in various public spaces "or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,)… ."[69] The context surrounding the exception clearly indicates that the drafters intended it to cover the carrying of arms to militia musters or by duly authorized persons performing a public duty; in other words, the exception applied to peace officers as well as soldiers and militiamen in actual service. When state lawmakers issued a revised penal code in 1879, the exception was relocated to a subsequent article which read: "The preceding article shall not apply to peace officers or other persons authorized or permitted by law to carry arms at the places therein designated."[70] Even though the format and phrasing of the exception changed, its substance did not—the exception was for peace officers

---

[67] 1870 Tex. Gen Laws 63, Ch. 46, § 1 (**Exhibit 21**).
[68] On the Texas State Police, an organization that existed during Republican rule in Texas, *see* John G. Johnson, "State Police," *Handbook of Texas Online*, https://www.tshaonline.org/handbook/entries/state-police, published by the Texas State Historical Association.
[69] 1871 Tex. Gen. Laws 25, ch. 34 § 1 (**Exhibit 22**).
[70] Penal Code of the State of Texas, (1879), Title X, Offenses Against the Public Peace, Chapter 4, Unlawfully Carrying Arms, § 321 (**Exhibit 23**).

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

and active-duty militia. The exception would not have reached ordinary, civilian gunowners, as there was no general gun permitting scheme in Texas at the time.

46.     Realizing that the sensitive places statute was not enough to sufficiently curb the violence in their communities, the Texas legislature in 1871 enacted a public carry law designed to work in conjunction with it.[71] Section 1 of the 1871 law prohibited both concealed and open carry of deadly weapons in public altogether while Section 3 expanded the prohibition on carrying deadly weapons in sensitive places. Lawmakers added as sensitive places assemblies for "amusement," like "any circus, show, or public exhibition of any kind," as well as those assemblies "for educational or scientific purposes."[72] In 1879, the statute and its several sections were reformatted in the penal code as a chapter concerning the unlawful carrying of arms.[73] The sensitive places law and its exception became Articles 320 and 321. Even though Texas lawmakers turned to public carry policy to further their goal of reducing bloodshed in their state, they did not abandon the sensitive places law—and neither did officers of the law.

47.     In 1872, a series of convictions for unlawfully carrying arms made their way to the state supreme court. The Defendant William Daniels had been convicted under Section 3 of the 1871 deadly weapon law, which was the updated sensitive places provision. He had gone to a church service with the handle of a butcher knife visible in his waistband. Two other appellants, William English and G. W. Carter, had been convicted under Section 1, which prohibited carrying deadly weapons upon one's person or in one's saddlebags. The three cases were consolidated into one case, called *English v. State*[74], which addressed certain

---

[71] 1871 Tex. Gen. Laws 25, ch. 34 § 1 (**Exhibit 22**). Brennan Gardner Rivas, "An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900," *Southwestern Historical Quarterly* 121, no. 3 (January 2018), 295-297; Mark Anthony Frassetto, "The Law and Politics of Firearms Regulation in Reconstruction Texas," *Texas A&M Law Review* 4, no. 1 (2016), 104-107.

[72] *Id.*

[73] Penal Code of the State of Texas, § 318-323 (**Exhibit 23**).

[74] *English v. State*, 35 Tex. 473 (1872).

questions about Texans' constitutional and fundamental rights to carry weapons. A distinguished attorney who later joined the state supreme court argued that the 1871 deadly weapon law violated the Second Amendment to the US Constitution, that it violated the Article I, Sec. 13 of the Texas Constitution of 1869[75], and that it deprived Texans of their customary right to self-defense.[76] The court profoundly disagreed with these claims.

48.     The Chief Justice stated emphatically that "No kind of travesty, however subtle or ingenious could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit."[77] The court went on to say that: "[W]e do not intend to be understood as admitting for one moment, that the abuses prohibited are in any way protected either under the state or federal constitution. We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."[78]

49.     The decision in *English* ultimately rested upon state police power to affirm the constitutionality of the deadly weapon law. The court held that whatever conduct offends against public morals or public decency comes within the range of legislative authority.[79] The goal of a weapon-free public sphere, then, justified the enactments required to achieve it. Furthermore, the justices did not believe that the

---

[75] "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe."
[76] The opinion did not mention it, but Section 2 of the law provided that anyone convicted of publicly carrying a prohibited weapon could plead self-defense at trial; that exception did not technically apply to the sensitive places provision outlined in Section 3.
[77] *English*, 35 Tex. 473.
[78] *Id* at 478-79.
[79] *Id*. at 473.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

Texas law deviated from the national norm. "It is not our purpose to make an argument in justification of the law. The history of our whole country but too well justifies the enactment of such laws. This law is not peculiar to our own state, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas. It is safe to say that almost, if not every one of the states of this Union have a similar law upon their statute books, and, indeed, so far as we have been able to examine them, they are more rigorous than the act under consideration."[80] A subsequent court, this one staffed with Democrats rather than Republicans, reaffirmed the constitutionality of the deadly weapon law in a case decided in 1875.[81]

50.      In the late 1870s and throughout the 1880s, Texas appellate judges consistently applied the sensitive places law without questioning its constitutionality. In 1878, they decided that a Justice of the Peace court qualified as a "public assembly" when it was in session hearing a cause.[82] The same year, the court determined that a man deputized to carry out a specific arrest did not qualify as a peace officer exempt from the weapon ban at polling places.[83] In 1889, a teacher feared that local residents would interfere with an entertainment event taking place at his school, so he took a pistol with him (and ended up brandishing it). Texas appellate judges forcefully condemned the idea that teachers were authorized to carry weapons in schoolhouses, saying that "such an effect could not be other than pernicious, and should not be tolerated."[84]

---

[80] *Id.* at 479.
[81] *State v. Duke*, 42 Tex. 455 (1875).
[82] *Summerlin v. State*, 1878 3 Tex. Ct. App. 444 (1878).
[83] *Snell v. State*, 4 Tex. App. 171 (1878)

[84] *Alexander v. State*, 11 S.W. 628 (Tex. App. 1889). The passage is worth quoting in full: "We can not believe that it was the purpose and intent of the Legislature to permit school teachers to carry prohibited weapons upon their persons in their school rooms among their pupils, or on the occasion of public assemblies in such school rooms. The law does not in terms accord them such a privilege, and, without a clearly expressed exception in such case, this court will not sanction a defense, the effect of which would be to authorize every school teacher in the State to carry prohibited weapons upon his person in our school rooms. Such an effect could not be other than pernicious, and should not be tolerated."

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

51.     Texas judges also evaluated the sensitive-places cases that involved claims of self-defense and the carrying of weapons to assemblies on private property. In two separate cases (one in 1877 and another in 1878), Texas appellate judges determined that the exception to the deadly weapon law for self-defense applied exclusively to Section 1 of the 1871 statute relating to open and concealed carry, not to Section 3 relating to gatherings and assemblies.[85] A person fearing an imminent and deadly attack could carry a weapon in violation of Section 1 and argue self-defense at trial if or when he/she was arrested for such behavior; but a person carrying a weapon under such circumstances could not then venture into any of the gathering places enumerated in Section 3 because doing so posed too great a danger to the safety of the general public. The court stated, "Nor does it matter how much or with what good reason I may be in dread of an immediate and pressing attack upon my person from a deadly enemy; the imminence of such danger affords no excuse in my wearing deadly weapons to church, or in a ball-room, or other places mentioned where his attack may be made and the lives of innocent people there assembled placed in jeopardy or sacrificed."[86]

52.     In one of these cases, the defendant was tasked with being a "door-keeper and general manager, with authority to preserve peace and good order" at a ball, and toward that end, the owner of the establishment (a woman) had provided him a pistol to keep on his person throughout the evening. The court affirmed his conviction, saying that the exceptions for carrying weapons in one's home or place of business did not apply when other people were gathered there in assemblages that fell under Section 3. The court reasoned that: "The fact that I am owner of the premises gives me no right to carry deadly weapons to the terror, annoyance, and danger of a social gathering which I may have invited to my own house, however

---

[85] *Livingston v. State*, 3 Tex. Ct. App. 74 (1877); *Owens v. State*, 3 Tex. Ct. App. 404 (1878).

[86] *Owens v. State*, 3 Tex. Ct. App. 404 (1878).

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

much I may be protected in carrying them when no one is there or likely to be endangered by them but my own family."[87]

53.    The majority opinion in *NYSRPA v. Bruen* treated the 1871 Texas statute as an outlier, but its discussion was limited to Section 1 of that law banning open and concealed carry of arms in public altogether.[88] Section 3 of the 1871 law prohibiting carry in sensitive places was not unique. *English* recognized as much when it concluded, "This law is not peculiar to our own state, nor is the necessity which justified the enactment (whatever may be said of us to the contrary) peculiar to Texas."[89] That conclusion was not wrong as many states around that time enacted similarly broad sensitive places prohibitions. For example, in 1869, Tennessee lawmakers prohibited the carrying of deadly weapons "concealed or otherwise" at elections or "any fair, race course, or other public assembly of the people."[90] Similarly in 1870, Georgia lawmakers prohibited the carrying of deadly weapons "to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds."[91] Laws in effect in Missouri in 1879 and Oklahoma Territory in 1890 were nearly identical to the sensitive places law from Texas,[92] with the Oklahoma Territory law further banning weapons in "any place where intoxicating liquors are

---

[87] *Id.*
[88] 142 S. Ct. at 2153.
[89] *English*, 35 Tex. at 479.
[90] Ch. 22, 1869 Tenn. Pub. Acts 23[22] (36th Assembly, 1st Sess.), "An Act to Amend the Criminal Laws of the State," §2 (**Exhibit 24**). The section read in full: "That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon." The following section (§3) stated: "That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court."
[91] Act No. 285, 1870 Ga. Laws 421 (**Exhibit 25**). The list of prohibited weapons included "any dirk bowie-knife, pistol or revolver, or any kind of deadly weapon." There was also no implicit or explicit exception for open carry. Violators convicted received a fine ($20-50), imprisonment (10-20 days), or both.
[92] *Revised Statutes of the State of Missouri* (1879), ch.24, §1274 (**Exhibit 26**); 1890 Okla. Stat. 495-96 (**Exhibit 27**).

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

sold."[93]  Vermont and Mississippi both prohibited weapons inside schools, with the Mississippi legislature prohibiting students at colleges from possessing deadly weapons on campuses or within two miles of them (effectively disarming college students within the limits of college towns).[94] Other laws prohibited the carrying of weapons at or near polling places, churches, and parks.[95]

54.    In addition to state legislatures, other jurisdictions had authority to regulate the carry of firearms and other weapons in public spaces.[96] For instance, the statewide 1870 sensitive places law from Texas was quite similar to a municipal ordinance from that same year in the city of San Antonio, one of the leading metropolitan and commercial centers in Texas. That ordinance prohibited the carrying of "a bowie-knife, dirk, or butcher-knife or any fire arms or arms, whether known as six-shooter, gun or pistol of any kind," or any "brass-knuckles, slung shot, club, loaded or sword cane, or any other weapon of offence or defence" into a

---

[93] 1890 Okla. Stat. 495-96, § 7 (**Exhibit 27**).

[94] *Annotated Code of the General Statute Laws of the State of Mississippi* (1892), "Crimes and Misdemeanors," §1030 (**Exhibit 28**) ("A student at any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both."); *Laws of Vermont*, Special Session (1891), No. 85, §2 (**Exhibit 29**) ("A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.").

[95] 1870 La. Acts 159–60, "An Act to Regulate the Conduct and to Maintain the Freedom of Party Election," § 73 (**Exhibit 30**) (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); George Washington Paschal, *A Digest of the Laws of Texas*, 3rd ed. (1873) II: 1317-1318  (**Exhibit 31**) (no carry concealed or unconcealed within a half mile of polling places on election day or registration places on days of voter registration); John Prentiss Poe, *The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888* (Vol. 2, 1888), 1457 (**Exhibit 32**) (no carry by any person in Kent County on days of an election); 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, ch. 189 §1 (**Exhibit 33**) (no carry by any person in Calvert County within 300 yards of polls on election day); 1877 Va. Acts 305, Offenses Against The Peace, § 21 (**Exhibit 34**) (no weapons in church during services, or anywhere beyond one's on premises on Sundays); Oscar F. Greene, *Revised Ordinances of the City of Boulder* (1899), 157 (**Exhibit 35**) (no one save city police officers shall carry weapons into public parks).

[96] *See Id.*, especially examples from City of Boulder and Counties of Kent and Calvert, Maryland.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

series of public spaces within the city. The list included: "any church, or religious assembly, any school-room, or other place where persons are assembled, for educational, literary or scientific purposes, or into any ball room, social or wedding party, or other assembly or gathering, for amusement or instruction, composed of males and females, or to any election precinct in the city, on the day or days of an election, or into any Court room or court of Justice, or to any other place where people or individuals may be assembled, to perform any public duty, or shall go into any other public assembly, or shall enter any bar-room, drinking saloon or any other place where people resort for business or amusement or shall join or accompany any public procession . . . ."[97]

55.     It is likely that yet more municipal governments (in Texas and throughout the country) enacted sensitive places ordinances. These local laws are much more challenging to identify in the historical record, though, because compilations of historical ordinances have often not been preserved or digitized. The best access to municipal ordinances is often local newspapers, many of which have not been digitized, are no longer extant, or are incomplete. A thorough search of newspaper databases may yield more examples of municipal sensitive places laws, and yet more may be contained in the pages of old newspapers housed in archival collections or on microfilm. Identifying additional examples of these regulations would be a time-consuming process that is not possible within the available time frame.

**IV.     Application of Concealed Carry Laws to Travelers and Transportation**

A.     <u>Historical Meaning of Travel</u>

56.     Public carry laws tended to provide a number of exceptions. These exceptions ranged from people fearing an imminent and deadly attack to peace officers and travelers. The statutes themselves varied from one state to another, and

---

[97] "An Ordinance," *San Antonio Express* (San Antonio, Texas), December 23, 1870 (**Exhibit 36**).

many left the definition of terms like "travel," "peace officer," and "journey" quite ambiguous. In Texas, even exempted travelers were required to place their weapons in their baggage, which did not include saddlebags.[98]

57.     Far from a blanket exception for people to go armed at all times outside their homes, the travel exception was narrowly defined by state appellate courts. The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern transportation. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life—courts, magistrates, constables, and the security of being among one's neighbors. To be a traveler was to venture outside one's community sphere and become vulnerable to dangers such as robbers and predatory animals.

58.     This notion of "travel" is important and worth reiterating. It was a designation that applied to people who were isolated from their communities, not people who were embedded safely within them. Americans' representative leaders protected the peace and promoted public safety by pursuing regulatory policies that discouraged or prohibited the presence of weapons in places where people gathered together, interacted, and exchanged goods and services. The sensitive place laws clearly show that nineteenth-century lawmakers were concerned about firearms and other weapons in crowds, and the ways in which they rendered innocent people vulnerable to injury or death. The travel exception to public carry laws was not a contravention of that policy—instead, it was a corollary which allowed for weapon-

---

[98] Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930," PhD diss. (Texas Christian University, 2019), 108-110. John Thomas Shepherd, "Who Is the Arkansas Traveler: Analyzing Arkansas's Journey Exception to the Offense of Carrying a Weapon," Arkansas Law Review 66, no. 2 (2013): 463-484.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

carrying in isolated and potentially dangerous places in contradistinction to those enjoying the protections of community.

59.    An appellate case from 1879 (involving a travel exception) held that: "The court decided the case on the ground that defendant, whilst stopping over at Marianna, could not be said to be on a journey, and should, to avoid a breach of the law, have deposited his pistols with his baggage, and not carried them on his person. This is correct, if the appellant was really wearing them, or either of them, as a weapon. The exception in the statute is to enable travelers to protect themselves on the highways, or in transit through populous places—not to allow them the privilege of mixing with the people in ordinary intercourse, about the streets, armed in a manner which, upon a sudden fit of passion, might endanger the lives of others. Travelers do not need weapons, whilst stopping in towns, any more than citizens do. They should lay them aside, unless the delay be slight, and the journey soon resumed."[99] An Alabama appellate court affirmed the decision of a lower court judge who, even though he acquiesced that the defendant had a right to carry a concealed weapon while traveling on a dangerous stretch of road, instructed the jury that "if they further believed, from all the evidence in the case, that the defendant was in the daily habit of coming to the city, engaging in his business in the city from morning until evening, mingling with the inhabitants of the city in business and social intercourse, and carried a pistol concealed about his person during this time, not being justified or excused otherwise than for the reason of his having to travel" along the dangerous stretch of roadway, "then he would be guilty, as charged in the indictment."[100] A Tennessee decision rejected the idea that a "journey" meeting the standards of a travel exception "should embrace a mere ramble in one's own neighborhood across the lines of contiguous counties."[101] The court's final word was that "The evil intended to be corrected is the carrying of

---

[99] *Carr v. State*, 34 Ark. 448 (1879).
[100] *Eslava v. State*, 49 Ala. 355 (1873).
[101] *Smith v. State*, 50 Tenn. 511 (1872).

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man into a coward."[102] These are only a small sample of the travel-related cases that formed the corpus of traveler-exception jurisprudence associated with nineteenth century concealed weapon laws.[103]

60.     Judges recognized that terms like "travel" and "journey" needed to be interpreted, and that hard-and-fast rules must remain elusive. According to an Arkansas court, "The jury, or court sitting as such, can best judge of all the circumstances, and determine whether the spirit of the law has been violated. No rule with regard to this can be formulated. The intent governs, and the question of fact is, was the defendant really prosecuting his journey, only stopping for a temporary purpose; or had he stopped to stay awhile, mingling generally with the citizens, either for business or pleasure."[104] A contemporary Tennessee court emphasized legislative intent by saying "It is true, the Legislature has not undertaken to define a journey, or to say whether it shall be a long or short one, but has left the courts to interpret it in the light of good sense, and with regard to the spirit and intent of the statute itself, with the positive injunction in the fourth section of the Act that the courts shall give it a liberal construction so as to carry out its true intent and meaning"—which was to reduce the needless carrying of weapons in public.[105]

---

[102] *Smith v. State*, 50 Tenn. 511 (1872).

[103] See also *Darby v. State*, 23 Tex. Ct. App. 407 (1880), "He was not a traveler. He resided in Williamson county, and was merely going from his residence to the county site of said county, a distance of about eighteen miles, intending to return the next day. These facts certainly did not constitute him a traveler, within the common meaning of that word, and within the spirit of the statute." See also Shepherd, "Who Is the Arkansas Traveler," 466-482.

[104] *Carr v. State*, 34 Ark. 448 (1879).

[105] *Smith v. State*, 50 Tenn. 511 (1872), "The evil intended to be corrected is the carrying of deadly weapons on the streets, in society, in the community, or among the people with whom we are in the habit of associating—a habit which will ultimately convert a good man into an assassin, and a brave man into a coward."

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

61.     An illustrative travel-related case arose in Texas in 1889. A man was convicted of violating the state's public carry law (which prohibited openly borne as well as concealed deadly weapons) by carrying a pistol on his travels to a distant town and keeping it on his person while he visited various establishments there. When he appealed his conviction on the ground that he was a traveler in an unfamiliar city, the appellate court disagreed. He had the right to carry the pistol on the road, in the wagon yard upon his arrival in town, and within the town "for a legitimate purpose, such as to procure a conveyance, or provisions, or to transact other business connected with the prosecution of his journey."  But that protection ceased when his purpose changed from business to leisure—it did not confer upon him a right to "idly stroll through its streets and visit its gambling dens and saloons and public places, armed with a pistol."  To do otherwise would "cause our cities and towns to be infested with armed men, while the citizens of such places would be prohibited from carrying arms to protect themselves from these privileged characters."  The judge's statement clearly shows that townspeople and locals going about their everyday lives were not understood to fall within the statute's traveler exemption.

62.     Public carry laws in force during the late eighteenth and nineteenth centuries, whether they employed language from English common law or took the shape of concealed-carry laws, applied to public spaces in American communities large and small. The exceptions which some concealed weapon laws carved out for travelers remained closely guarded by appellate courts and did not apply to everyday travel.

B.     Regulation by Transportation Providers

63.     Until the twentieth century, transportation services were typically operated by private companies vested with the authority to fashion their own rules and regulations for customers. Thus, even if a person deemed a "traveler" upon a "journey" according to law chose to make use of the travel exception by carrying a

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

weapon aboard a train, such carriage would have been subject to any rules laid out by the private transportation company in question. Private companies would have had the authority to decide where and how legally transported weapons could be stowed and carried by customers aboard their vehicles and within their stations.

64.     In their motion, the *Carralero* Plaintiffs identify a South Carolina regulation mandating that ferry operators transport armed men free of charge during times of emergency: "That all persons under arms in times of alarms and expresses, shall have their ferriage free, themselves, servants, and horses." *Carralero* MPA at 17. I found this phrasing in four statutes establishing or relocating ferries in 1725, 1726, and 1731.[106] The acts themselves set aside public monies to establish ferries, vested the operation in commissioners, set standard ferriage rates, and provided additional requirements for the maintenance and operation of the ferry. The adoption of this policy indicates that some ferry operators may have been charging fares to militiamen, posses, or messengers during times of emergency, not that customers carried weapons on their person in times of peace. These laws applied to particular ferries in areas of South Carolina[107] that were coming under plantation agriculture, and they were enacted during the critical period following the Yamasee War (1715-1717) when colonial leaders had to craft a new way of interacting with the Indigenous groups of the region. Prior to the Yamasee War, Carolina relied upon Indian allies, especially the Yamasee, to protect them from non-allied Indians as well as attack from French or Spanish enemies. When the Yamasee rejected the military and trade alliance, Carolinians succeeded in driving the Yamasee into Spanish Florida, but the whole affair exposed the shortcomings of their alliance system. Moving forward, Carolinians maintained a tense but generally amicable relationship with the powerful Lower Creek—but attacks upon outlying plantations

---

[106] These colonial-era regulations were reprinted in the *Statutes at Large* of South Carolina published in 1841. See Thomas Cooper, et al, eds., *Statutes at Large of South Carolina, Volume the Ninth, Containing the Acts Relating to Roads, Bridges, and Ferries, with an Appendix Containing the Militia Acts prior to 1794* (Columbia: A. S. Johnston, 1841), 61, 65, 69, 71.

[107] Prior to 1734, North and South Carolina formed one colony called Carolina.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

1   and settlements was the quintessential indicator of Creek dissatisfaction with

2   Carolinian trade policies. British colonists living in remote or newly established

3   areas (such as those served by new ferries) understood their vulnerability and lived

4   with the realization that an Indian attack could occur at any time.[108] The 1725

5   statute cited by Plaintiffs also provides for the formation of a scouting company "to

6   scout on the out settlements of Ponpon, for the better security of the inhabitants,

7   and to prevent their being surprised by Indians."[109] In sum, this policy was limited

8   in scope to a handful of ferries in Carolina colony that were established during a

9   period of tense diplomatic relations with nearby Indigenous groups.

10         65.    Until well into the nineteenth century, local and regional passenger

11  transportation remained relegated to smaller-scale operations like stagecoaches,

12  riverboats, or ferries. Steam power changed all of that, and as the nineteenth

13  century progressed steamboats and railroads transformed passenger transportation

14  in the United States and across the globe. During that very same time, though,

15  Americans entered into a new era of violence and weapon-carrying. The nineteenth

16  century marked the divergence of the United States from the rest of the western

17  world in terms of homicide rates. When the nations of Western Europe were

18  becoming less violent and homicidal, Americans were becoming more so. Where

19  Americans failed to unite together based upon common interests and principles, and

20  where they viewed governing institutions with skepticism, violence tended to rise.

21  The southern society predicated upon racial slavery made slaveholding states more

22  violent places than northern counterparts. Areas that were isolated from governing

23  officials or on the fringe of Anglo-American settlement also experienced more

24  violence than the well-established parts of the country closer to the Atlantic

---

25  [108] On the Yamasee War and the relationship between the Lower Creek and Carolina colony

26  *after* that conflict, see Alan Gallay, *The Indian Slave Trade: The Rise of the English Empire in the American South, 1670-1717* (New Haven: Yale University Press, 2002), 345-357. For a shorter

27  synthesis, see Chester B. DePratter, "The Yamasee Indians," in *The Yamasee War: 1715-1717* (October 2015), available at:

28  https://scholarcommons.sc.edu/cgi/viewcontent.cgi?article=1023&context=archmonth_poster.
       [109] Cooper, ed., *Statutes at Large*, 61.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

seaboard.[110] After the Civil War, pervasive racism, rural poverty, and unrepresentative state and local governments meant that violence remained a staple of southern life. Northern cities and states were not immune from high levels of homicide and crime, either. They saw a sharp uptick in violence and homicide from about 1840 through the end of the Civil War, and then again in the closing decades of the century. Ethnic tension, political conflict, and the effects of industrialization (urbanization, poverty, lack of resources, etc.)—all of which eroded the cohesion of communities and citizens—fueled this trend.[111]

66.    The expansion of America's rail system reasonably suggests that railroad companies might have had policies—written or unwritten, preserved or lost—that affected passengers' access to firearms and deadly weapons while aboard. A nineteenth century jury instruction manual contained a section for "Rules and Regulations of Carrier," which specifically stated that "a railroad company has a right to require of its passengers the observance of all reasonable rules, calculated to insure the comfort, convenience, good order and behavior of all persons on the train, and to secure the proper conduct of its business; and if a passenger wantonly disregards any such reasonable rule, the obligation to carry him farther ceases, and the company may expel him from the train at any regular station, using no more force than may be necessary for that purpose."[112] The North Pennsylvania Railroad's "rules and regulations" document for conductors specifically charged

---

[110] Historian Randolph Roth has shown that four correlates contribute to rates of homicide: stability of government; confidence in government and officials; a sense of patriotism or kinship; and a legitimate social hierarchy. See Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 17-26.

[111] On homicide in American history, particularly as broken down into northern and southern regions, see Roth, *American Homicide*, 297-326, 386-388 (for trends in northern areas); 185 (for data-supported charts showing trends in homicide for large cities across the entire nineteenth century); 184 (complicating data from pp. 185 by showing that some rural northern areas experienced sharp rise in crime after 1865 and therefore emulated what took place in the American South during that time).

[112] Albert W. Brickwood, *Brickwood's Sackett on Instructions to Juries*, 3 vols., 3d. ed. (Chicago: Callaghan & Company, 1908), II: 1174-1175 (Sec 1819, "Right to Prescribe Rules").

passenger conductors with the responsibility of preventing passengers from taking "into the cars guns, dogs, valises, large bundles or baskets."[113]

67.     Extant records for rail companies indicate that regulating the carriage of guns on board was not uncommon. Several companies, including Union Pacific and Central Pacific, North Pennsylvania Railroad, South Carolina Canal and Rail Road Company, International and Great Northern Railroad Company, and Albany Railway had specific gun-carriage policies during the nineteenth century.[114] Some rail companies shipped firearms for hunters but treated them like any other baggage—by separating them from the passengers and placing them in a designated baggage space.[115] But another company prohibited the practice ostensibly out of concern that they would be held liable for lost, damaged, or stolen firearms. In the relevant caselaw, "Courts generally deemed guns baggage when they determined that the weapons were 'necessary' to the object of a trip or 'usual' among similarly situated travelers."[116] Depending upon the size and traffic of the line, some rail cars also had space for passengers to carry their own bags and stow them under their seats or by their feet, particularly if those bags were relatively small. In the event that it was legal and permissible by company policy for a passenger to transport a firearm or other deadly weapon, stowing it away in closed baggage was altogether different from carrying in one's pocket or waistband (which was de facto a violation of the law in many American jurisdictions, as previously described).

---

[113] "Rules and Regulations for Running the Trains on the North Pennsylvania Railroad, adopted June 1, 1875, and approved by the president" (Philadelphia, 1875), 13.

[114] Josh Hochman, "The Second Amendment on Board: Public and Private Historical Traditions of Firearm Regulation," *Yale Law Journal* 133, forthcoming (Draft Copy, July 27, 2023), 11-18, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4522818.

[115] In his detailed description of American rail baggage service, Marshall Monroe Kirkman wrote: "Who has not felt a tremor of apprehension as he saw his baggage melt away into the indiscriminate mass of trunks, band boxes, gripsacks, gunbags, umbrellas, burial cases, canaries and bundles that fill the station?" Kirkman, *The Science of Railways, Revised and Enlarged Edition* (New York: The World Railway Publishing Co., 1898), 389.

[116] Hochman, "Second Amendment on Board," 19-20.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

68.     As American rail infrastructure grew, the new challenges posed by rail travel—particularly the prospect of criminal activity taking place in transit—became more apparent. Conductors were considered the authority figures on trains and streetcars, and some states vested them with the same powers as policemen. In the 1880s, the Georgia legislature declared that "The conductors of a train carrying passengers are invested with all the powers duties, and responsibilities of police officers while on duty on their trains,"[117] and decided a decade later that "the conductors, motormen, and drivers of street railroad cars are invested with all the powers, duties, and responsibilities of police officers while on duty on their trains or cars, and while on duty at the termini of their lines."[118] Included within this power of conductors to police aboard their trains was a responsibility to enforce weapon regulations in effect at the time. As a result of this status, which was in some ways analogous to that of peace officers exempted from certain weapon regulations, conductors were sometimes armed on the job and expected to prevent disorderly behavior aboard trains.[119] Still, there was not a hard-and-fast rule about it, and public sentiment did not necessarily support the carrying of firearms by conductors aboard their trains or cars.[120] There is no evidence that unarmed conductors justified preemptive arming by passengers.

---

[117] John L. Hopkins, Clifford Anderson, and Joseph R. Lamar, *Code of the State of Georgia* (Atlanta: Foote & Davies Co., 1895), 230 (sec. 902).

[118] "Conferring Police Powers on Conductors, etc., of Street Railroads," Georgia - General Assembly, Acts and Resolutions (1890-1891), 230-231.

[119] For example, a Los Angeles trolley conductor carried a pistol in 1908; see "Attempts to Rob Car and Is Killed," *San Francisco Chronicle* (San Francisco, CA), January 12, 1908, 33.

[120] For example, in 1902, an Atlanta trolley car conductor was arrested for drawing a loaded pistol on a passenger whom he had antagonized; news coverage of the incident stated: "The feature of the investigation was that the conductor was on a trolley car crowded with women as well as men, and was armed with a loaded revolver…It was a revelation to many that among the other paraphernalia of a street car conductor a loaded revolver was carried. They had seen bell punches, transfers, etc. but never before a pistol. It is said that McKinney [the conductor who had been arrested] is not the only street car conductor who is in the habit of going thus armed, and within the past six months pistols have been used more than once by street car men." See "Conductor Is Bound Over," *The Atlanta Constitution* (Atlanta, GA), May 17, 1902, 7. It is also worth noting that public sentiment as expressed in newspapers did not support passengers' carrying of weapons aboard transit services—be the conductor armed or not.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

69.     Another approach to policing railways was to authorize rail companies to employ their own police forces. Statutes in Ohio and Pennsylvania from the 1860s show the legislatures of those states setting out parameters in which designated rail police could "possess and exercise all the powers, and be subject to all the liabilities of policemen of cities… ."[121] This approach was not at all unusual at the time, which was one in which powerful corporations engaged in industries as disparate as manufacturing and cattle ranching turned to private detectives and private police for assistance in defending company interests against labor organizers and marketplace competitors. That legislatures made special arrangements for authorizing railway police and holding them accountable only underscores the significance of protecting the peace and safety of passengers in transit.

70.     By the early twentieth century, large railway companies had sizeable departments overseeing their railway special agents. The Union Pacific Railroad (UPRR) maintained records pertaining to the firearms owned by the company, most of which were pistols assigned for use to specified employees. At periodic intervals, the supervisors of the special agents' division undertook inventories of company-owned firearms. Extant records from the early 1930s show that some of the firearms held in the company gun locker were classified as "confiscated guns," presumably confiscated from passengers carrying them illegally.  The UPRR special agents and rail watchmen were expected to be on the lookout for passengers carrying guns; correspondence from the Federal Bureau of Investigation from 1950 shows the FBI requesting the assistance of all law enforcement agencies, including

---

[121] Joseph R. Swan and Milton Sayler, "Policemen for Railroads, An act to authorize the employment of a police force by railroad companies," *Supplement to the Revised Statutes of the State of Ohio, Embracing All Laws of a General Nature, Passed since the Publication of Swan and Critchfield's Revised Statutes, 1860* (Cincinnati, R. Clarke & Co., 1868), 121-122. See also "No. 228, An Act Empowering railroad companies to employ police forces," *Laws of the General Assembly of the State of Pennsylvania, passed at the session of 1865* (Harrisburg: Singerly & Myers, State Printers, 1865), 225-226.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

the UPRR special agents, in tracking down the carriers of certain guns that had been used in the commission of crimes.

C.      Localism and Lack of Extant Sources

71.    The fact that transportation companies had the authority to establish and enforce safety regulations aboard their vehicles highlights the lack of extant sources documenting their internal ridership policies. As mentioned in the preceding section, some researchers have undertaken an exploration of the employee handbooks and other available materials pertaining to railway companies. These efforts have borne some fruit, but such records are no longer extant for most historical transportation service providers.

72.    Although there are numerous archives, libraries, and research centers across the United States that hold collections pertaining to transportation history and the corporate records of transit companies, my brief exploration of their finding aids indicates that most of these records are from 1900 or later.  The availability of records from the twentieth century rather than the nineteenth aligns with the development of more modern business practices and the stabilization of the rail industry after the tumultuous decades of the Gilded Age. The stock manipulations, corruption, and overbuilding that characterized the rail industry from the 1860s through the end of the century led to companies selling out to competitors and going into receivership; when these events took place, records related to assets and finances would have been more likely to be retained than others. As time wore on, companies did not necessarily choose to keep their older records, and those that did sought out archival institutions to take on the responsibility of organizing and maintaining them.  In other words, nineteenth-century rail records are much more rare than twentieth century ones, and they are not particularly likely to contain company ridership policies.

73.    The UPRR records previously cited illustrate some of the difficulties in relying upon extant corporate records to ascertain company gun policies. Even

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

1   though it is one of the oldest, largest, and most influential rail companies in

2   American history, the UPRR special services records for firearms only date back to

3   1931; the models of guns which the company owned demonstrates that company

4   officials purchased much of the corporate arsenal prior to that time, yet no

5   information pertaining to it has been retained in the "Firearms Records" segment of

6   the collection.  More than that, correspondence held within the "Firearms Records"

7   makes reference to a company "Rules" document for employees who carried

8   firearms on the job, yet the rules themselves have not been preserved within the

9   collection. We know that one of those rules was that employees could not carry

10  chambered rounds in their firearms, but the only reason we know of it is because an

11  employee carried a chambered round and accidentally shot himself—prompting a

12  reiteration of that particular requirement from the senior management over the

13  special agents.  The other rules for armed employees remain a matter of speculation

14  because the company archives housed at the California State Railroad Museum

15  contain no reference to them. Instead, the extant records remain heavily focused

16  upon tracking company assets and implementing policies that might limit the

17  company's liability for having an armed segment of its workforce.

18      74.   Local legal records from the nineteenth century present similar

19  challenges for the researcher. It is well-known that historical municipal ordinances

20  and codes have not been digitized systematically as have state-level statutes and

21  codes. But in addition to the significant barrier to online, digital research is the fact

22  that many such records have not been preserved at all. America's larger cities may

23  have archival materials related to codes and ordinances, but those are not

24  necessarily complete (there may be gaps in the record). For the market towns and

25  county seats that thrived in the nineteenth century but have since been relegated to

26  the status of "small towns," ordinances may not have been officially preserved at

27  all; instead, local newspapers published ordinances—but the papers themselves

28  may not be digitized or the preserved copies may not constitute a complete

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

collection. Our ability to know with certainty how municipalities regulated weapon-carrying, including aboard transportation services, is limited by the lack of systematic, comprehensive records.

75.     As one moves back in time to the Founding Era and Early Republic period, the available legal sources become even more patchy. Statewide and colony-wide codes have been preserved, digitized, and searched. But local courts preserved the peace through the application of common law and local custom—and what little documentation they left is housed at courthouses and archives across the country. Local magistrates carried significant responsibility within early American communities in that they preserved the peace by adjudicating civil and criminal matters, in addition to carrying out administrative responsibilities related to infrastructure, taxation, and property conveyances. Their proximity to the people they judged and governed made them sensitive to local sentiment and encouraged them to abide by local, customary visions of what justice entailed rather than enforcing an abstract, monolithic law upon their communities. In these small communities, connected as they were by blood, kinship, and patronage, people knew one another as well as the justices of the peace. Lay justices, often lacking formal legal training, relied heavily upon magistrates' guidebooks and their acquired knowledge of common law as well as colonial/state law. The justice system which they oversaw enforced laws, including those pertaining to carrying weapons, affray, riot, and other disturbances of the peace, in light of a person's

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

reputation, connections, and established behaviors.[122] This "localized law" is as much a part of the American legal inheritance as statewide statute books, and was indeed more salient to the lives of Founding-Era Americans.[123] It cannot be accessed through digital databases of laws and cases, and much of its documentary record has been permanently lost.[124]

## CONCLUSION

76.     This declaration has assembled evidence showing that:

1)  One of the largest and most influential cities in eighteenth-century America, Philadelphia, lacked intracity public transportation services comparable to those currently in use in major cities today. In fact, Philadelphia was a "walking city" in which residents moved about primarily on foot.

2)  Eighteenth-century Philadelphia also lacked indoor public gathering spaces analogous to the kinds of shopping, entertainment, and cultural spaces that pervade American cities today. Most of the city's large structures were churches, government buildings, and private homes. The largest and most significant gathering places, like the public market and green spaces, were outdoors.

---

[122] On the actions and responsibilities of colonial and early American justices of the peace, see Hendrik Hartog, "The Public Law of a County Court: Judicial Government in Eighteenth Century Massachusetts," *American Journal of Legal History* 20, no. 4 (October 1976), 282-329; David Thomas Konig, "Country Justice: The Rural Roots of Constitutionalism in Colonial Virginia," in *An Uncertain Tradition: Constitutionalism and the History of the South*, ed. by Kermit L. Hall and James W. Ely, Jr. (Athens: University of Georgia Press, 1989), 63-82; George L. Haskins, "Lay Judges: Magistrates and Justices in Early Massachusetts," in *Law in Colonial Massachusetts, 1630-1800*, ed. by Daniel R. Coquillette (Boston: The Colonial Society of Massachusetts; distributed by the University of Virginia Press, 1984), 39-56; Sung Yup Kim, " 'In a Summary Way, with Expedition and at a Small Expence': Justices of the Peace and Small Debt Litigation in Late Colonial New York," *American Journal of Legal History* 57, no. 1 (March 2017), 83-117.

[123] On "localized law," see Edwards, *The People and Their Peace*, 57-202, see esp. 57-63.

[124] On the dearth of day-to-day magistrates' records, see Konig, "Country Justice," 69-70 (Explaining that the extant colonial records from Virginia's lowest courts are order books which do not include denied motions and other information irrelevant to the final disposition of the case at hand. In other words, most records are lost forever and those that remain fail to capture substantial portions of the courts' day-to-day work.).

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

3)  Many American jurisdictions had public carry laws that generally prohibited people from carrying deadly weapons within the confines of towns and cities. Even though a sizeable number of these laws specifically prohibited *concealed* carry, the open carrying of pistols, bowie knives and other such weapons was not commonplace.

4)  American jurisdictions also enacted special ordinances and statutes designed to protect public gathering places beyond simply courthouses and polling places. Some protected schools and college campuses, others applied to entire commercial districts and city centers during electoral proceedings, and yet more provided for the disarming of all public gatherings. Taking regulatory action to protect people assembled for entertainment, recreation, education, and civic purposes from potential violence is not unusual or ahistorical.

5)  Public carry laws applied to travelers and transportation spaces, unless one fell within a traveler's exemption. The traveler's exemption specifically applied to long-distance travel as opposed to the moving about within one's home community, town, and country. The limited nature of the travel exception was well established by appellate case law from the nineteenth century, and it did not encompass routine travel in areas where a person had recourse to legal protection.

6)  Companies providing intercity and intracity transportation services during the eighteenth and nineteenth centuries were private corporations endowed with robust property rights. This included the right to refuse service and the right to establish safety policies. Though the lack of extant records prevents the drawing of a full and complete picture, the research that has been done to date shows that rail companies had the authority to regulate (and indeed some regulated) the presence and disposition of guns aboard train cars.

7)  Our ability to understand the full history of firearm regulation in the United States is hindered by a lack of relevant extant records. Transportation companies, including intracity transit services from the nineteenth century, often

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

left no records, or left exclusively financial records that do not address employee responsibilities or ridership policies related to firearms. In this environment, the employee handbooks that remain take on a greater significance for shedding light upon practices across the nineteenth-century transportation industry. The lack of preserved documentation and consequent unknowability of the historical record presents a wider problem for researchers of historical gun and weapon regulation. Transit company ridership rules are not the only sources lost to the record; so are outcomes of criminal misdemeanor trials, issuances of surety bonds, and other proceedings from local justices of the peace who left no documentation of their critically important activities.

82.     In sum, the historical record supports the assertions made within this report. Even the largest and most sophisticated eighteenth-century American cities lacked comparable gathering places and transportation services to those present in today's urban areas, including those located in California. Americans of the nineteenth century had a go-to policy for deadly weapons in public spaces, and it took the form of the public carry law. These laws restricted the carrying of small, concealable deadly weapons in public spaces, and they applied throughout an entire jurisdiction—whether that be a city or a state. The traveler's exemptions outlined by some public carry laws applied specifically to long-distance travel, not the kind of travel within a city or metro area represented by California's public transportation services. While public carry laws generally applied within transportation spaces, the private transportation companies themselves used their robust rights to enact ridership policies and employee requirements that regulated the carrying of firearms on board. Though the full, comprehensive historical record cannot be known due to a lack of preserved historical sources, the documents which do survive show that passengers' lawful access to firearms and weapons aboard transportation vehicles was often regulated.

Declaration of Dr. Brennan Rivas
(Case No. 8:23-cv-01696)

1    I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3        Executed on October  31 , 2023, at Fort Worth, Texas.

4

5                                            *Brennan Gardner Rivas*

6                                         Dr. Brennan Gardner Rivas

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Dr. Brennan Rivas
                                           (Case No. 8:23-cv-01696)

# Exhibit 1

Exhibit 1
Page 52

# Brennan Gardner Rivas
## Curriculum Vitae  ·   Oct 2023

## Employment

Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022

Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
University, Clements Center for Southwest Studies, 2020-2021

Lecturer in American History (full-time), Texas Christian University, Department of History,
2019-2020

## Education

Ph.D., History, Texas Christian University, 2019
Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
the Lone Star State, 1836-1930"
Advisor: Gregg Cantrell

M.A., History, Texas Christian University, 2013
Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"

B.A. with Honors, History, Oklahoma State University, 2010

## Publications

*Refereed Journal Articles*

"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*

"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
on the Place of Guns in American Law and Society* (New York: Oxford University Press,
2023)

"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
(May 2022)

"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*

"Reflections on the American Gun Control Culture," *The Panorama: Expansive Views from the
Journal of the Early Republic*, October 17, 2023.

"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
Press, 2019.

Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
*Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

Exhibit 1
Page 53

## Public History

"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made by History Blog* (Jun 2022)
> ~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with new gun control measures

"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)

"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
> ~ Online collection featuring primary sources from my research; feature exhibit titled "Crafting a Public Carry Law"

"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop, Center for Texas Studies at TCU (Nov 2020)
> ~ Public lecture featuring special insights for genealogical researchers

"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar, Tarleton State University (Sept 2020)
> ~ Research presentation focusing on interpretation of county court records

"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
> ~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards

Firearm Issues Research Grant, 2023-2024
> ~ Awarded by the Harvard Injury Control Research Center, from grant funding from the Robert Wood Johnson Foundation, for research related to firearm issues

Lloyd Lewis Fellowship in American History, 2021-2022
> ~ Awarded by the Newberry Library to scholars using its collection to research topics in American history

Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
> ~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas, the Southwest, or the U.S.-Mexico borderlands who are developing first books

The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
> ~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional professional promise; highest departmental prize for graduate students

Texas Christian University Department of History, Shinko and Thomas McDonald Research Prize in Texas History, 2019, 2017
> ~ Awarded by the TCU Department of History to a graduate student with the best research on antebellum Texas history

## Works in Progress

*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*

Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century Texas and the regulatory strategies which it embraced. Widespread acceptance of strict, ambitious gun control laws in the "Wild West" belies current assumptions about Texas and challenges the reigning interpretation of the Second Amendment as a guarantor of expansive gun rights.

Status: Editing manuscript

Exhibit 1
Page 54

"Going Armed: The Law and Culture of Carrying Deadly Weapons in the Nineteenth Century"
Aim: Scholarly article uncovering the ways in which nineteenth-century gun-toters carried their deadly weapons, and why they generally did so concealed.
Status: Writing in progress

## University Teaching Experience

*Instructor of Record*

Lecturer in American History, Texas Christian University                    2019-2020
  "American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
  "American History since 1877: The Quest for Equality" (HIST 10613)
  "History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University                    2017-2018
  American History to 1877 (HIST 10603)
  American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

Panelist, "Use and Abuse of History in Second Amendment Litigation," and "Going Armed: Nineteenth Century Views on Open Carry," Current Perspectives on the History of Guns and Society, Wesleyan University, Middletown, Connecticut, October 2023

"Masculinity, Honor-Violence, and Gun Reform in the Early U.S.," Race, Gender, and Firearms in the Early Republic, Society for Historians of the Early American Republic Annual Meeting, Philadelphia, Pennsylvania, July 2023

"Second Amendment Panel—Issues in Cases Post-*Bruen*," Strategic Litigation Convening: Anti-Democracy Efforts and Political Violence Post-*Bruen*, Institute for Constitutional Advocacy and Protection, Georgetown Law, Washington, D. C., June 2023

"A Case for More Case Studies," Originalism, the Supreme Court, Gun Laws, and History, Late-Breaking Roundtable, American Historical Association Annual Meeting, Philadelphia, Pennsylvania, January 2023

"Military Disarmament Orders and the Role of Reconstruction Historiography after *Bruen*," Current Perspectives on the History of Guns and Society Symposium, Wesleyan University, Middletown, Connecticut, October 2022

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

3

Exhibit 1
Page 55

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños
    Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018
"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern
    Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016
"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about
    Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History
Orientation Day, 2020
    ~ Advise incoming graduate students on strategies for success in the PhD program,
       emphasizing importance of intellectual development
Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of
History Orientation Day, 2016
    ~ Provide honest and confidential information to prospective graduate students
Graduate Student Mentor, 2015
    ~ Informal departmental program designed to ease the transition for incoming graduate
       students

## Second Amendment Subject Matter Expert

*Duncan et al v. Bonta*, California, Case No. 17-1017-BEN-JLB, S.D. Cal.

*Miller et al v. Bonta*, California, Case No. 3:19-cv-01537-BEN-JLB, S.D. Cal.

*Angelo et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-01878-RDM,
    D. D.C.

*Hanson et al v. District of Columbia et al*, Washington, D.C., Civ. Act. No. 1:22-cv-02256-RC,
    D. D.C.

*Christian et al v. Nigrelli et al*, New York, No. 22-cv-00695 (JLS), W.D. N.Y.

*Frey et al v. Nigrelli et al*, New York, Case No. 21 Civ. 5334 (NSR), S.D. N.Y.

*Brumback et al v. Ferguson et al*, Washington, No. 1:22-cv-03093-MKD, E.D. Wash.

*Sullivan et al v. Ferguson et al*, Washington, Case No. 3:22-cv-5403, W.D. Wash.

*Siegel v. Platkin,* New Jersey, No. 22-CV-7463 (RMB) (AMD), D. N.J.

*NAGR v. Campbell*, Massachusetts, No. 1:22-cv-11431-FDS, D. Mass.

*Oregon Firearms Federation, Inc. v. Kotek*, Oregon, No. 2:22-cv-01815-IM, D. Ore.

*NSSF v. Jennings*, Delaware, No. 22-cv-01499-RGA, D. Del.

*Chavez v. Bonta*, California, No. 3:19-cv-01226-L-AHG, S.D. Cal. (f/k/a *Jones v. Bonta*)

*Nguyen v. Bonta*, California, No. 3:20-cv-02470-WQH-BGS, S.D. Cal.

*Baird v. Bonta*, California, No. 2:19-cv-00617-KJM-AC, E.D. Cal.

*Nichols v. Bonta*, California, No. 3:11-cv-09916-SJO-SS, C.D. Cal.

*Wiese v. Bonta*, California, No. 2:17-cv-00903-WBS-KJN, E.D. Cal.

*Rocky Mountain Gun Owners v. Polis*, Colorado, No. 23-cv-01077-JLK, D. Col.

*Wolford v. Lopez*, Hawaii, No. 1:23-cv-00265-LEK-WRP, D. Haw.

*Novotny v. Moore*, Maryland, No. 1:23-cv-01295-GRL, D. Mary.

*Kipke v. Moore*, Maryland, No. 1:23-cv-01293-GRL, D. Mary.

*Ohio v. Columbus*, Ohio, No. 2022-cv-00657, Ct. Com. Pleas, Fairfield Cty, Ohio

Exhibit 1
Page 56

**Professional Memberships**

Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

Exhibit 1
Page 57

# Exhibit 2

Exhibit 2
Page 58

Article 12. If any inferior officer or private man shall think himself injured by his captain or other superior in the regiment, troop or company to which he belongs, he may complain to the commanding officer of the regiment, who shall summon a regimental court martial, for doing justice, according to the nature of the case.

Article 13. No penalty shall be inflicted at the discretion of court martial other than degrading, cashiering or fining.

Article 15.* The commanding officer of the militia, for the time being, shall have full power of pardoning or mitigating anycensures or penalties ordered to be inflicted on any private or non-commissioned officer, for the breach of any of these articles, by a general court martial; and every offender convicted, as aforesaid, by any regimental court martial, may be pardoned, or have the penalty mitigated by the lieutenant colonel or commanding officer of the regiment, excepting only where such censures or penalties are directed as satisfaction for injuries received by one officer or private man from another; but in case of officers, such sentence to be approved by the commander-in-chief, or the nearest general officer of the militia, who are respectively empowered to pardon or mitigate such sentence, or disapprove of the same.

Article 16. The militia, on the days of exercise, may be detained under arms on duty in the field, any time not exceeding six hours, provided they are not kept above three hours under arms at any one time, without allowing them a proper time to refresh themselves.

Article 17. No company or regiment shall meet at a tavern on any of the days of exercise, nor shall march to any tavern before they are discharged, and any person who shall bring any kind of spirituous liquors to such place of training, shall forfeit such liquors, so brought, for the use of the poor belonging to the ward, district or township where such offender lives.

Article 18. All fines that shall be incurred by any breach of these rules, shall be paid into the hands of the inspectors of the brigades to which the offenders belong, or to such person

*This mistake in numbering occurs in the original.

Exhibit 2
Page 59

# Exhibit 3

Exhibit 3
Page 60

# THE STATUTES:

## REVISED EDITION.

---

## VOL. I.

### HENRY III. TO JAMES II.
### A.D. 1235-6—1685.

---

**By Authority.**

---



### LONDON:
PRINTED BY GEORGE EDWARD EYRE AND WILLIAM SPOTTISWOODE,
PRINTERS TO THE QUEEN'S MOST EXCELLENT MAJESTY.

---

1870.

Digitized by Google

Exhibit 3
Page 61

A.D. 1326–7        1 Edward III.  *Stat.* 2.        143

Iťm le Roi comaunde q̃ les viscontes & Baillifs des franchises, & toutz autr̃s q̃ pnent enditementz a lor tourns, ou ailliours ou enditementz q̃rount faitz, preignent tieux enditementz p roule endente dount Lune ptie demeorge v̂s les enditours, & lautre ptie dev̂s cely qi prendra Lenqueste, issint q̃ les enditementz ne soient beseleez come avant ces houres ount este, & issint q̃ un de lenqueste peut monstrer lune ptie de lendenture a la Justice qᵃnt il vendra pʳ la deliv̂aunce faire.

Item, the King commandeth, that the sheriffs and bailiffs of franchises, and all other that do take indictments in their turns, or elsewhere, where indictments ought to be made, shall take such indictment by roll indented, whereof the one part shall remain with the indictors, and the other part with him that taketh the inquest; so that the indictments shall not be imbezílled as they have been in times past; and so that one of the inquest may shew the one part of the indenture to the justices, when they come to make deliverance.

XVII. Indictments shall be taken by indenture.

---

## 2 EDWARD III.   A.D. 1328.

### 𝕾tatutū editū apuð 𝕹orh'ť', anno r. 𝕽. 𝕰. ť'ríí post conquestū sc'ðo.

#### STATUTE made at NORTHAMPTON ;
#### In the Second Year of the Reign of K. EDWARD the Third after the Conquest.

*Ex magno Rot. Stat. in Turr. Lond.*
*m. 28.*

Nr̃e seignʳ le Roi Edward, le tierz aps̃ le conqueste, a son plement tenuz a Norȟt as trois semeins de Pasch, Lan de son regne secund, desiraunt q̃ la pees de sa ťre, & les leis & estatuz avant ces heures ordenez & usez, soient gardez & meintenuz en touz poyntz, Al honʳ de dieu & de seinte eglise, & a cõe pfit du poeple, p assent des Prelatz, Countes & Barons & autres gᵉntz, & tote la cõe du roialme, au dit plement somons, ordena & establit en meisme le plement les choses sonthescrites en la forme q̃ sensuit.

OUR lord King Edward, the third after the conquest, at his Parliament holden at Northampton, at the three weeks of Easter, in the second year of his reign, desiring that the peace of his land, and his laws and statutes, ordained and used before this time, may be kept and maintained in all points ; to the honour of God and of Holy Church, and to the common profit of the people, by assent of the prelates, earls, barons, and other great men, and all the commonalty summoned to the same Parliament, hath ordained and established in the said Parliament these things underwritten, in form following.

144          2 EDWARD III.     *Stat. Northampt.*          A.D. 1328.

* * * * * *

**II.**
**Pardons for felony.**

Item, whereas offenders have been greatly encouraged, because [the [1]] charters of pardon have been so easily granted in times past, of manslaughters, robberies, felonies, and other trespasses against the peace; it is ordained and enacted, that such charter shall not be granted, but only where the King may do it by his oath, that is to say, where a man slayeth another in his own defence, or by misfortune : [Rep., Stat. Law Rev. Act, 1863.] And also they have been encouraged, because that [[2] the justices of gaol-delivery, and of oyer and terminer, have been procured by great men [2]] against the form of the statute made in the xxvij year of the reign of King Edward, grandfather to our lord the King that now is, wherein is contained, that justices assigned to take assises, if they be laymen, shall make deliverance ; and if the one be a clerk, and the other a layman, that the lay judge, with another of the country associate to him, shall deliver the gaols : Wherefore it is enacted, that such [justices [3]] shall not be made against the form of the said statute ; and that the assises, attaints, and certifications be taken before the justices commonly assigned, which should be good men and lawful, having knowledge of the law, and none other, after the form of another statute made in the time of the said [King Edward the First ;[4]] and that the oyers and terminers shall not be granted but before justices of the one bench or the other, or the justices errants, and that for great [hurt,] or horrible trespasses, and of the King's special grace, after the form of the statute thereof ordained in time of the said grandfather, and none otherwise.

**27 Ed. I. c. 3.**

**Justices of assise and gaol delivery.**

**Oyers and terminers.**

**III.**
**Riding or going armed in affray of the peace.**

Item, it is enacted, that no man great nor small, of what condition

[1] that
[2] *commissions of gaol delivery and of oier and terminer have been granted to persons procured*
[3] *commissions*          [4] *grandfather*

Ensement pr ceo q̃ meffesours ont este esbauditz de ce q̃ chartres de pdoun ont este si legẽment gãntees avant ces heures, des homicides, robies, felonies & autres trespas countre la pees ; acorde est & establi q̃ tiels chartres ne soient mes gãntees fors qen cas ou le Roi le poet faire p son sment, cest assavoir en cas ou home tue autre soi defendant, ou p infortune : [Rep., Stat. Law Rev. Act, 1863.] Et auxint ont este esbauditz de ceo q̃ Justiceries as delivances des gaoles, & a oier & lminer, ont estez gãntees as gentz pcurez countre forme de lestatut fait en temps le Roi Edward, ael nre Seignr le Roi qore est, en quele est contenuz q̃ les Justices as assises pndre assignez sils soient lais, facent les delivances ; et si lun soit clerc, & lautre lais, q̃ le dit lais, associe a lui un autre du pais, facent la delivance des gaols ; p qoi acorde est & establi, q̃ tiels Justiceries ne soient mes gãntees countre la forme du dit estatut, & q̃ les assises, atteintes, & ctifications soient pises devant les Justices cõmunement assignez, q̃ soient bones gentz & loialx & conissantz de la lei, & nemie autres ; solonc la forme dun autre statut fait en temps meisme le ael ; et q̃ les oiers & lminers ne soient grantees forsq, - - - - devant les Justices de lun Baunk & de lautre, ou les Justices errantz ; & ce pr led & orrible trespas, & de lespeciale gace le Roi, solonc forme de statut de ce ordene en temps meisme le ael ; & nemie autrement.

Ensement acorde est & establi, q̃ nul, gãnt ne petit de quele condicion

qil soit, sauve les ȿjantz le Roi en la
p̃sence le Roi, & les Ministres le Roi,
enfesantz execucion des mandementz
le Roi, ou de lour office, & ceux qi
sont en lour compaignies, eidantz as
ditz ministres, & auxint au cri de fait
darmes de pees, & ce en lieux ou tielx
faitz se ferront, soit si hardi de venir
devant les Justices le Roi, ou autres
Ministres le Roi enfesant lour office,
a force & armes ; ne force mesner en
affrai de la pees, ne de chivaucher ne
daler arme, ne de nuit ne de jour, en
faires, marchees, nen p̃sence des Jus-
tices, ne dautres Ministres, ne nule
part aillours, sur peine de pdre lour
armures au Roi & de lour corps a la
prisone a la volunte le Roi. Et q̃
Justices le Roi en lour p̃sences, vis-
countes & autres Ministres le Roi en
lour baillies, seign̾s des fraunchises
& lour baillifs en yceles, & Meire &
Baillifs des Citees & Burghs deinz
meismes les Citees & Burghs, Burgh-
aldres, conestables, & gardeins de la
pees deinz lour gardes, eient poair
affaire execucion de cest acord. Et
ɥ les Justices assignez, a lour venu
en pais, eient poair denquere coment
tjelx Ministres & seign̾s ont use lour
office en ce, & de punir ceux qils
trov̾ont, qi nount mie fait ce q̃ a lour
office appent.

Et p̃ce q̃ la pees ne poet mie estre
bien garde sauntz bons ministres, come

soever he be, except the King's ser-
vants in his presence, and his ministers
in executing of the King's precepts,
or of their office, and such as be in
their company assisting them, and
also [upon a cry made for arms to
keep the peace, and the same in such
places where such acts happen,[1]] be
so hardy to come before the King's
justices, or other of the King's minis-
ters doing their office, with force and
arms, nor bring no force in affray of
the peace, nor to go nor ride armed
by night nor by day, in fairs, markets,
nor in the presence of the justices
or other ministers, nor in no part
elsewhere, upon pain to forfeit their
armour to the King, and their bodies
to prison at the King's pleasure. And
that the King's justices in their pre-
sence, sheriffs, and other ministers ([2])
in their bailiwicks, lords of franchises,
and their bailiffs in the same, and
mayors and bailiffs of cities and
boroughs, within the same cities and
boroughs, and borough-holders, con-
stables, and wardens of the peace
within their wards, shall have power
to execute this act. And that the
justices assigned, at their coming
down into the country, shall have
power to enquire how such officers
and lords have exercised their offices
in this case, and to punish them whom
they find that have not done that
which pertained to their office.

Item, because the peace cannot be
well kept without good ministers, as

[1] *upon a proclamation of deeds of
arms in time of peace, and that in
places where such deeds are to be done,*
—See Lib. Rub. Scac. Westm̃. fo. 122 b.
a writ reciting a grant of K. Richard I.
" q̃d Torneam̃ts sint in Angl in v. placias :
Int̾ Sar̾r & Wilton̄ : Int̾ Warrewich &
Kenelingworth : Int̾ Stanford & Warne-
ford : Int̾ Brakele & Mixeb̾r : Int̾ Blie &
Tykehit̄l. Ita q̃d pax t̾re n̾re n̄o in-
fringet̾r, n̄e potestas Justiciaria minorabit̾r
Nec de forestis n̾ris dãpnũ inferet̾r."

[2] *of the King*

IV.
The Statute of
Lincoln.
9 Edw. II.
concerning
sheriffs, &c.
confirmed.

K

Digitized by Google

Exhibit 3
Page 64

# Exhibit 4

Exhibit 4
Page 65

**A.D.1351-2.**          25ⁿ Edw. III. *Stat.* 5. c.1, 2.          **319**

In Margine
Rotuli.

### Statutū apud Westm̄ in P'liamento in festo S'ti Hillarii anno regni Regis E. t'cii vicesimo q̄nto tento, f'cm.

A STATUTE made at WESTMINSTER ;
In the Parliament holden in the Feast of Saint Hilary ;
In the TWENTY-FIFTH Year of the Reign of K. EDWARD the THIRD.

---

*Ex magno Rot. Stat. in Turr. Lond. m. 16.*

AU plement somonz a Westm̄, en la feste de Seint Hiller lan du regne n̄re Seign' le Roi Edward Denglet're vintisme quint, & de France douzisme, n̄re ẽ' le Roi del assent des Prelatz, Ducs, Countes, Barons, & de tout la comunalte de son Roialme Denglet're, au dit plement somonz, al hon' de Dieu & de Seinte Eglise, & en amendement de son dit Roialme, ad ordeine & establi les choses soutzescriptes.

En p'mes, p'ce q̄ tresg'untz & tresout'geouses damages & grevances sont faites au poeple p les pno's & p'veo's des vitailles p' les hosteux nre ẽ' le Roi, ma dame la Roigne, & de lo' enfantz, Si est acorde & assentuz en le dit plement, q̄ les pno's & p'veio's des bledz p' les ditz hosteux les p̄ignent p mesure rase, selonc ceo q̄ hōme use pmy le Roialme. Et q̄ touz bledz, feyns, litere & bestaill, & touz aut's vitailles & choses quecliques, queles sont aprendre p' meimes les hosteux, soient p̄'sez a la v̄roie value, p les Conestables & aut's bons gentz des villes ou tieles prises se feront, sanz ce q̄ p manaces, ou duresces soient les preisours chacez a mettre autre pris q̄ lour p̄'ement ne voet, & come curt cōement en les p̄scheins marchees ; et q̄ entre les Purveors et ceux des queux les biens v̄ront prises, en la p̄sence des Conestables & preisours, soient tailles tantost faites, saunz ceo q̄ les gentz des queux les biens v̄ront prises soient ailiours traiz ou t'vailez ; & meimes les tailles ensealez des seals les pnours des choses isint prises, p les queles tailles gre soit fait as ceux des queux les choses v̄ront isint prises : et si nul pnour ou P'veour p' les ditz hosteux face p autre mane, soit meintenant arestu p la ville ou la prise v̄ra faite, et mesne a la p̄scheine gaole, et si de ceo soit atteint, soit la fait de lui come de laron, si la quantite des biens le demand ; solonc ceo q̄n un estatut fait en temps meisme n̄re ẽ' le Roi lan de son regne quint, & en un autre estatut fait en temps laiel n̄re Seign' le Roi s' tieles prises, est contenuz plus au plein : et q̄ desore unit contenuz es cōmissions des tieux P'veours et pnours, lentent et la peine contenuz en cest estatut : et q̄ nule cōmission soit faite forsq̄, soulement souz les g'nt ou prive sealx le Roi ; ne q̄ nul hōme soit tenuz de obeier a autre cōmission nen autre mañe q̄ nest dit en avant ; et q̄ meisme lestatut tiegne liu en touz pointz des's chescun pnour & p'veour, de chescune mañe des vitailles en chescune ptie du Roialme de quele condition q̄l soit.

Auxint p'ceo q̄ div̄ses opinions ount este einz ces heures q̄u cas, q̄nt il avient doit estre dit treson, & en quel cas noun, le Roi a la requeste des Seign's & de la Cōe, ad fait declarissement q̄ ensuit, Cest assavoir ;

---

STATUTE THE FIFTH.

AT the Parliament summoned at Westminster in the Feast of St. Hilary, the Year of the Reign of our Lord King Edward the Third [after the Conquest,] of England the Five and twentieth, and of France the Twelfth ; our said Lord the King, by the assent of the Prelates, Earls, Barons, and of all the Commonalty of his Realm of England summoned to the Parliament, to the honour of God and Holy Church, and in Amendment of his said Realm, hath ordained and established the Things underwritten.

FIRST, Forasmuch as great and outrageous damage and grievance hath been done to the People by the Takers and Purveyors of Victuals, for the Houses of our Sovereign Lord the King, the Queen, and their Children ; It is accorded and assented in the said Parliament, That the Takers (¹) of Corn for the said Houses shall take the same by Measure striked according as it is used through the Land. And that such Corn, Hay, Litter, Bestall and all other Victuals and Things, which shall be taken for the said Houses, shall be [taken²] by the very Value, by the Constable and other good People of the Towns where such Taking shall be made, without that that the Praisers by Menace or Duress shall be driven to set any other Price than their Gift will, and as commonly runneth in the next Markets. And that betwixt the Purveyors and them whose Goods shall be taken in the presence of the Constables and Praisers, Tallies be made incontinently, without that that the People whose Goods shall be taken, shall be drawn or travelled elsewhere, and the same Tallies sealed with the Seals of the Takers of the Things so taken, by which Tallies Gree shall be made to them whose Goods shall be so taken ; and if any Purveyor or Taker for the said Houses, do in any other Manner, he shall be [maintenant ³] arrested by the Town where the Taking shall be made, and brought to the next Gaol ; and if he be thereof attainted, it shall be done of him as of a Thief, if the Quantity of the Goods the same require ; according as in a Statute made in the Time of our Sovereign Lord the King that now is, the Fifth Year of his Reign, and in another Statute made in the Time of the King's Grandfather upon such Takings, is contained more at the full : and that from henceforth in the Commissions of such Takers and Purveyors, the Intent and Pain limited in this Statute shall be contained : and that no Commission be made, but only under the King's great Seal or Privy Seal ; nor that no Man be bound to obey [any such Commissions, other or in what Manner ⁴] than is aforesaid ; and that the same Statute take place in all Points against every Taker and Purveyor of every Manner of Victual in every part of the Realm, of what Condition soever he be.

ITEM, Whereas divers Opinions have been before at this Time [in what Case Treason shall be said, and in what not ; ⁵] the King, at the Request of the Lords and of the Commons, hath made a Declaration in the Manner as hereafter followeth, that is to say ; When a Man

¹ *and Purveyors*
² *praysed*
³ *immediately*
⁴ *any other Commyssions, or in other manner MS. Tr. 2.*
⁵ *what case should be adjudged Treason, and what not ;*

I.
Corn shall be taken by Purveyors by Measure striked

Things taken by Purveyors shall be appraised at the very Value.

Tallies of the Goods taken.

Punishment for undue Purveyance as under Stat. 5 E. III. c. 2.

Purveyors' Commissions shall be under the Great or Privy Seal.

II.
Declaration what Offences shall be adjudged Treason.

Exhibit 4
Page 66

320                    25° Edw. III. *Stat.* 5. c. 2, 3.                    A.D. 1351-2.

*Marginalia (left):*
Compassing the Death of the King, Queen, or their eldest Son; violating the Queen, or the King's eldest Daughter unmarried, or his eldest Son's Wife; levying War; adhering to the King's Enemies; counterfeiting the King's Seals, or Money; importing counterfeit Money; killing the Chancellor, Treasurer, or Judges in Execution of their Duty. The King shall have the Forfeiture of all the Offenders' Lands. Petit Treason. Forfeiture of the Lands to the Lords. New Questions of Treason shall be decided in Parliament.

doth compass or imagine the Death of our Lord the King, or of our Lady his [Queen '] or of their eldest Son and Heir; or if a Man do violate the King's [Companion,'] or the King's eldest Daughter unmarried, or the Wife (') the King's eldest Son and Heir; or if a Man do levy War against our Lord the King in his Realm, or be adherent to the King's Enemies in his Realm, giving to them Aid and Comfort in the Realm, or elsewhere, and thereof be [probably '] attainted of open Deed by [the People '] of their Condition: And if a Man counterfeit the King's Great or Privy Seal, or his Money; and if a Man bring false Money into this Realm, counterfeit to the Money of England, as the Money called Lushburgh, or other, like to the said Money of England, knowing the Money to be false, to merchandise or make Payment in Deceit of our said Lord the King and of his People; and if a Man slea the Chancellor, Treasurer, or the King's Justices of the one Bench or the other, Justices in Eyre, or Justices of Assise, and all other Justices assigned to hear and determine, being in their Places, doing their Offices: And it is to be understood, that in the Cases above rehearsed, [that '] ought to be judged Treason which extends to our Lord the King, and his Royal Majesty: And of such Treason the Forfeiture of the Escheats pertaineth to our Sovereign Lord, as well of the Lands and Tenements holden of other, as of himself: And moreover there is another manner of Treason, that is to say, when a Servant slayeth his Master, or a Wife her Husband, or when a Man secular or Religious slayeth his Prelate, to whom he oweth Faith and Obedience; and [of such Treason the Escheats ought to pertain '] to every Lord of his own Fee: And because that many other like Cases of Treason may happen in Time to come, which a Man cannot think nor declare at this present Time; It is accorded, That if any other Case, supposed Treason, which is not above specified, doth happen (') before any Justices, the Justices shall tarry without any going to Judgement of the Treason, till the [Cause '] be shewed and declared before the King and his Parliament,'] whether it ought to be judged Treason or [other '] Felony. And if percase any Man of this Realm ride armed [covertly '] or secretly with Men of Arms against any other, to slay him, or rob him, or take him, or retain him till he hath made Fine or Ransom for to have his Deliverance, it is not the Mind of the King nor his Council, that in such Case it shall be judged Treason, but shall be judged Felony or Trespass, according to the Laws of the Land of old Time used, and according as the Case requireth. And if in such Case, or other like, before this Time any Justices have judged Treason, and for this Cause the Lands and Tenements have come into the King's hands as Forfeit, the chief Lords of the Fee shall have the Escheats of the Tenements holden of them, whether that the same Tenements be in the King's hands, or in others, by Gift or in other Manner; Saving always to our Lord the King the Year, and the Waste, and the Forfeitures of Chattels, which pertain to him in the Cases above named; and that [the Writs''] of Scire facias be granted in such Case against the Land-tenants, without come forfaita, and without allowing [any Protection''] in the said Suit; and that of the Lands which be in the King's hands, Writs be granted to the Sheriffs of the Counties where the Lands be, to deliver them out of the King's hands without Delay.

*Marginalia (left):*
Certain Offences not Treason.

In such Cases already happened, the Chief Lords shall have the Escheats.

Saving the King's Year and Waste.

Scire facias to Terre-tenants, &c.

*Marginalia (left):*
III.
Challenge of an Indictor upon an Inquest.

ITEM, It is accorded, That no Indictor shall be put in Inquests upon Deliverance of the Indictees of Felonies or Trespass, if he be challenged for that same cause by him which is so indicted.

' Wife                        ' of
' provenably MS. Tr. 2.            ' People           ' it
' such Manner of Treason giveth Forfeiture of Escheats
' of new, MS. Tr. 2.              ' Case
' before the King in his Parliament, and it be declared
'' else                        '' openly
'' Writs        '' the Protection of our Lord the King

q'nt home fait compasser ou ymaginer la mort n're Seign' le Roi, ma dame sa compaigne, ou de lour fitz primer & heir; ou si home violast la compaigne le Roi, ou leisnesce filt le Roi nient marie, ou la compaigne leisne fitz & heir du Roi; & si home leve de guerre contre n're dit Seign' le Roi en son Roialme, ou soit aherdant as enemys n're Seign' le Roi en le Roialme, donant a eux eid ou confort en son Roialme ou p'aillours, & de ceo p'ablement soit atteint de ov't faite p gentz de lour condicion: et si home contreface [les g'nt ou prive seals le Roi,'] ou sa monoie, et si home apport faus monoie en ceste Roialme contrefaite a la monoie Denglet're, sicome la monoie appelle [Lucynburgh'] ou autre semblable a la dite monoie Denglet're, sachant la monoie estre faus, p' marchander, ou paiement faire en deceit n're dit Seign' le Roi & son poeple; et si home tuast Chanceller, Tresorer, ou Justice n're Seign' le Roi del un Baunk ou del autre, Justice en Eir & des assises & toutes aut's Justices assignez a oier & t'miner esteantz en lours places en fesantz lours offices: et fait a entendre p les cases suisnomez doit estre ajugge treson [q restent''] a n're Seign' le Roi & a sa roial majeste; et de tiele malte de treson la forfait're des eschetes apptient a n're Seign' le Roi, si bien des t'res & tenz tenuz des aut's, come de lui meismes: et oveso, ceo il yad autre malte de treson, cest assavoir q'nt un s'vant tue son meistre, une feme q tue son baron, q'nt home seculer ou de religion tue son Prelat, a qi il doit foi & obedience; & tiele malte de treson donn forfait'e des eschetes a chescun Seign' de son fee p're: et p' ceo q pluisurs aut's cases de semblable treson p'ront escheer en temps a venir, queux home ne p'ra penser ne declarer en p'sent, assentu est q si autre cas suppose treson q nest especifie p amount aviegne de novel devant ascunes Justices, demoerge la Justice saunz aler au juggement de treson, tanq p devant n're Seign' le Roi [en''] son p'lement soit le cas monstree & declarre le quel ceo doit estre ajugge treson ou autre felonie. Et si p cas ascun home de cest Roialme chivach arme descovert ou secrement od gentz armes contre aucun autre, p' lui tuer ou derober, ou p' lui p̃ndre & retenir tanqil face fyn ou raunceon p' sa deliv'rance avoir, nest pas lentent du Roi & de son conseil q en tiel cas soit ajugge treson, einz soit ajugge felonie ou t'spas solonc la lei de la p're auncienement usee, & solonc ceo q le cas demand: et si en tieu cas, ou autre semblable devant ces heures, ascune Justice eit ajugge treson, & p celle cause les t'res & tenz soient devenuz en la main n're Seign' le Roi come forfaitz, cient les chiefs Seign's de fee lours eschetes des teñz de eux tenuz, le quel q les teñz soient en la main n're Seign' le Roi, ou en la main des aut's, p donn ou en autre malte; Sauvant totefoitz a n're Seign' le Roi lan & le wast, & aut's forfait'es des chateux q a lui attenent en les cases suisnomez; et q briefs de Scire fac' v's les t'res tenantz soient g'ntez en tieu cas, saunz autre originale & saunz allower la p'teccion n're Seign' le Roi en la dite seute; et q de les t'res q sont en la main le Roi, soit g'nte brief as vicontes des Countees la ou les t'res sront de' ostler la main le Roi saunz outre delaie.

Auxint acorde est, q nul enditour soit mys en enquest s' la deliv'ance del endite de t'spas ou de felonie, sil soit chalange p tiele cause p celui qest endite.

' le grant seal le Roi, *Rot. Parl.* 25 *E.3. P. II. nu.* vij. (17.)
' Luxseburgh *Rot. Parl.*          ' q ce estent *Rot. Parl.*
' & *Rot. Parl.*

Exhibit 4
Page 67

# Exhibit 5

Exhibit 5
Page 68

THE

# REVISED STATUTES

OF THE

## Commonwealth of Massachusetts,

PASSED NOVEMBER 4, 1835;

TO WHICH ARE SUBJOINED,

AN ACT IN AMENDMENT THEREOF, AND AN ACT EXPRESSLY TO
REPEAL THE ACTS WHICH ARE CONSOLIDATED THEREIN,

BOTH PASSED IN FEBRUARY 1836;

AND TO WHICH ARE PREFIXED,

## THE CONSTITUTIONS

OF THE

### United States and of the Commonwealth of Massachusetts.

PRINTED AND PUBLISHED, BY VIRTUE OF A RESOLVE OF NOV. 3, 1835;

UNDER THE SUPERVISION AND DIRECTION OF

### THERON METCALF AND HORACE MANN.



### Boston:
PUBLISHED BY DUTTON & WENTWORTH, STATE PRINTERS.
Nos. 10 & 12 Exchange Street.

1836.

Exhibit 5
Page 69

said, may, on giving the security required, appeal to the court of common pleas, next to be held in the same county, or, in the city of Boston, to the municipal court.

*On appeal, witnesses to recognize.*

SECT. 10.   The magistrate, from whose order an appeal is so taken, shall require such witnesses, as he may think necessary to support the complaint, to recognize for their appearance at the court to which the appeal is made.

*Proceedings on appeal.*

SECT. 11.   The court, before which such appeal is prosecuted, may affirm the order of the justice, or discharge the appellant, or may require the appellant to enter into a new recognizance, with sufficient sureties, in such sum, and for such time, as the court shall think proper, and may also make such order, in relation to the costs of prosecution, as may be deemed just and reasonable.

*Recognizance, when to remain in force.*

SECT. 12.   If any party appealing shall fail to prosecute his appeal, his recognizance shall remain in full force and effect, as to any breach of the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs, which shall be ordered, by the court appealed to, to be paid by the appellant.

*Persons committed for not recognizing, how discharged.*

SECT. 13.   Any person, committed for not finding sureties, or refusing to recognize, as required by the court or magistrate, may be discharged by any judge or justice of the peace, on giving such security as was required.

*Recognizances to be transmitted to the court.*

SECT. 14.   Every recognizance, taken pursuant to the foregoing provisions, shall be transmitted by the magistrate to the court of common pleas for the county, or, in the city of Boston, to the municipal court, on or before the first day of the next term, and shall be there filed of record by the clerk.

*— when to be required on view of the court or magistrate.*

SECT. 15.   Every person who shall, in the presence of any magistrate mentioned in the first section of this chapter, or before any court of record, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person, who in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, or being of good behavior, for a term not exceeding three months, and in case of refusal, may be committed, as before directed.

*Persons who go armed may be required to find sureties for the peace, &c. 1794, 26, § 2.*

SECT. 16.   If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

*Court may remit part of penalty. 7 Mass. 397. 1810. 80.*

SECT. 17.   Whenever, upon a suit brought on any such recognizance, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty, on the petition of any defendant, as the circumstances of the case shall render just and reasonable.

*Surety may surrender his*

SECT. 18.   Any surety in a recognizance to keep the peace, or for good behavior, or both, shall have the same authority and right

Exhibit 5
Page 70

# Exhibit 6

Exhibit 6
Page 71

[ 35 ]

fame offenders come not as afore is faid, and the proclamation made and returned, they fhall be convict and at-tainted of the riot, affembly, or rout aforefaid : And moreover the Juftices of Peace in every county or corporation, where fuch riot, affembly, or rout of people fhall be made, in cafe the fame be made in their prefence, or if none be prefent, then the Juftices having notice thereof, together with the fheriff, under fheriff, or ferjeant, of the fame county or corporation, fhall do execution of this act, every one upon pain of twenty pounds, to be paid to the Commonwealth, as often as they fhall be found in default of the execution of the faid act ; and on fuch default of the juftices and fheriff, under fheriff, or ferjeant, a commiffion fhall go from the General Court at the inftance of the party grieved, to enquire as well of the truth of the cafe, and of the original matter for the party complain-ant, as of the default or defaults of the faid juftices, fheriff, under fheriff, or ferjeant, in this behalf fuppofed, to be directed to fufficient and indifferent perfons at the nomination of the Judges ; and the faid commiffioners prefently fhall return into the General Court the inquefts and matters before them in this behalf taken and found : But no perfons convicted of a riot, rout, and unlawful affembly, fhall be imprifoned for fuch offence by a longer fpace of time than one year. Perfons legally convicted of a riot, rout, or unlawful affembly, otherwife than in the manner directed by this act, fhall be punifhed by imprifonment and amercement, at the difcretion of a jury, under the like limitation.

## C H A P. XLIX.

### An ACT forbidding and punifhing AFFRAYS.

BE it enacted by the General Affembly, That no man, great nor fmall, of what condition fover he be, except the Minifters of Juftice in executing the precepts of the courts of juftice, or in executing of their office, and fuch as be in their company affifting them, be fo hardy to come before the juftices of any court, or either of their Minifters of Juftice, doing their office, with force and arms, on pain, to forfeit their armour to the Commonwealth, and their bodies to prifon, at the pleafure of a court; nor go nor ride armed by night nor by day, in fairs or markets, or in other places, in terror of the county, upon pain of being arrefted and committed to prifon by any Juftice on his own view, or proof by others, there to abide for fo long a time as a jury, to be fworn for that purpofe by the faid Juftice, fhall direct, and in like manner to forfeit his armour to the Commonwealth; but no perfon fhall be impri-foned for fuch offence by a longer fpace of time than one month;

## C H A P. L.

### An ACT againft CONSPIRATORS.

BE it declared and enacted by the General Affembly, That confpirators be they that do confederate and bind themfelves by oath, covenant, or other alliance, that every of them fhall aid and bear the other falfely and ma-licioufly, to move or caufe to be moved any enticement or information againft another on the part of the Common-wealth, and thofe who are convicted thereof at the fuit of the Commonwealth, fhall be punifhed by imprifonment and amercement, at the difcretion of a jury.

## C H A P. LI.

### An ACT againft conveying or taking PRETENSED TITLES.

BE it enacted by the General Affembly, That no perfon fhall convey or take, or bargain to convey or take, any pretended title to any lands or tenements, unlefs the perfon conveying or bargaining to convey, or thofe under whom he claims fhall have been in poffeffion of the fame, or of the reverfion or remainder thereof one whole year next before ; and he who offendeth herein knowingly, fhall forfeit the whole value of the lands or tenements; the one moiety to the Commonwealth, and the other to him who will fue as well for himfelf as for the Commonwealth : But any perfon lawfully poffeffed of lands or tenements, or of the reverfion or remainder thereof, may neverthelefs take or bargain to take the pretenfed title of any other perfon, fo far and fo far only as it may confirm his former eftate.

## C H A P. LII.

### An ACT to punifh BRIBERY and EXTORTION.

BE it enacted by the General Affembly, That no Treafurer, Keeper of any Public Seal, Councillor of State, Counfel for the Commonwealth, Judge, or Attornies at law, practifing either in the General Court, High Court of Chancery, Court of Appeals, Court of Admiralty, or Inferior Courts, Clerk of the Peace, Sheriff, Coroner, Efcheator, nor any officer of the Commonwealth, fhall, in time to come, take, in any form, any manner of gift, brokage, or reward for doing his office, other than is, or fhall be allowed by fome act of General Affembly, paffed after the Inftitution of the Commonwealth, that is to fay, after the fifteenth day of May, in the year of our Lord, one thoufand feven hundred and feventy fix ; and he that doth, fhall pay unto the party grieved, the treble value of that he hath received, fhall be amerced and imprifoned at the difcretion of a jury, and fhall be difcharged from his office forever; and he who will fue in the faid matter, fhall have fuit as well for the Commonwealth as for himfelf, and the third part of the amercement.

CHAP.

Exhibit 6
Page 72

# Exhibit 7

Exhibit 7
Page 73

# A

# COLLECTION

## OF THE

# STATUTES

### OF THE PARLIAMENT O.

# ENGLAND

#### IN FORCE IN THE STATE OF

# NORTH-CAROLINA.



---

PUBLISHED ACCORDING TO A RESOLVE OF THE GENERAL ASSEMBLY.

By FRANCOIS-XAVIER MARTIN, Esq.

COUNSELLOR AT LAW.

---

*NEWBERN:*

FROM THE EDITOR's PRESS.

1792.

Exhibit 7
Page 74

( 60 )

## C H A P.    VIII.

*Nothing shall be taken for Beaupleader.*

ITEM, Whereas some of the realm have grievously complained, that they be grieved by Sheriffs, naming themselves the King's approvers, which take money by extortion for Beaupleader, the King will, that the statute of Marlebridge shall be observed and kept in this point.

## C H A P.    XIV.

*None shall commit Maintenance.*

ITEM, Because the King desireth that common right be administered to all persons, as well poor as rich, he commandeth and defendeth, that none of his Counsellors, nor of his house, nor none other of his Ministers, nor no great man of the realm by himself, nor by other, by sending of letters, nor otherwise, nor none other in this land, great nor small, shall take upon them to maintain quarrels nor parties in the country, to the let and disturbance of the common law.

Statutes made at Northampton, tribus Septimanis Paschae, in the Second Year of the Reign of Edward the Third, and in the Year of our Lord 1328.

## C H A P.    I.

*A Confirmation of the Great Charter and the Charter of the Forest.*

[*Unnecessary to be inserted.*]

## C H A P.    III.

*No Man shall come before the Justices, or go or ride armed.*

ITEM, It is enacted, that no man great nor small, of what condition soever he be, except the King's servants in his presence, and his Ministers in executing of the King's precepts, or of their office, and such as be in their company assisting them, and also upon a cry made for arms to keep the peace, and the same in such places where such acts happen, be so hardy to come before the King's Justices, or other of the King's

Exhibit 7
Page 75

( 61 )

Ministers doing their office with force and arms, nor bring no force in an affray of peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the King's Justices, or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's Justices in their presence, Sheriffs and other ministers, in their bailiwicks, Lords of Franchises, and their bailiffs in the same, and Mayors and Bailiffs of cities and boroughs, within the same cities and boroughs, and borough-holders, constables and wardens of the peace within their wards shall have power to execute this act. And that the Justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertain to their office.

## C H A P.   V.

### The Manner how Writs shall be delivered to the Sheriff to be executed.

ITEM where it was ordained by the statute of Westminster the second, that they which will deliver their writs to the Sheriff shall deliver them in the full county, or in the rere county, and that the Sheriff or Under-Sheriff shall thereupon make a bill : it is accorded and established, that at what time or place in the county a man doth deliver any writ to the Sheriff or to the Under-Sheriff, that they shall receive the same writs, and make a bill after the form contained in the same statute, without taking any thing therefore. And if they refuse to make a bill, others that be present shall set to their seals, and if the Sheriff or Under-Sheriff do not return the said writs, they shall be punished after the form contained in the said statute. And also the Justices of Assize shall have power to enquire thereof at every man's complaint, and to award damages, as having respect to the delay, and to the loss and peril that might happen.

## C H A P.   VI.

### Justices shall have Power to punish Breakers of the Peace.

ITEM, as to the keeping of the peace in time to come, it is ordained and enacted that the statutes made in time past, with the statute of Winchester, shall be observed and kept in every point : and where it is contained in the end of said statute of Winchester, that the Justices assigned shall have power to enquire of defaults, and to report to the King in his next parliament, and the King to remedy it, which no man hath yet seen, the same Justices shall have power to punish the offenders and disobeyers.

O

Exhibit 7
Page 76

# Exhibit 8

Exhibit 8
Page 77

POWER OF JUSTICES.                                    285

## CHAPTER LXXVI.

An Act describing the power of Justices of the Peace in Civil and
Criminal Cases.

SEC. 1.  BE *it enacted by the Senate, and House of Repre-* *General juris-*
*sentatives, in Legislature assembled,* That it shall be within *diction of Jus-*
*tices of the*
the power, and be the duty of every Justice of the Peace *Peace, and their*
*duty in crimin-*
within his county, to punish by fine not exceeding five dol- *al cases, in ar-*
*resting, trying,*
lars, all assaults and batteries that are not of a high and ag- *recognizing and*
gravated nature, and to examine into all homicides, mur- *committing of-*
*fenders.*
ders, treasons, and felonies done and committed in his coun-
ty, and commit to prison all persons guilty, or suspected to be
guilty of manslaughter, murder, treason or other capital of-
fence ; and to cause to be staid and arrested, all affrayers, riot-
ers, disturbers or breakers of the peace, and such as shall
ride or go armed offensively, to the fear or terror of the good
citizens of this State, or such others as may utter any menaces
or threatening speeches; and upon view of such Justice,
confession of the delinquent, or other legal conviction of any
such offence, shall require of the offender to find sureties to
appear and answer for his offence, at the Supreme Judicial
Court, or Circuit Court of Common Pleas, next to be held
within or for the same county, at the discretion of the Justice,
and as the nature or circumstances of the case may require :
and for his keeping the peace, and being of the good behaviour,
until the sitting of the Court he is to appear before ; and to
hold to bail all persons guilty or suspected to be guilty of less-
er offences which are not cognizable by a Justice of the
Peace ; and require sureties for the good behaviour of dan-
gerous and disorderly persons ; and commit all such persons
as shall refuse so to recognize, and find such surety or sure-
ties as aforesaid ; and take cognizance of, or examine into all
other crimes, matters and offences, which by particular laws
are put within his jurisdiction.

SEC. 2.  *Be it further enacted,* That all fines and forfeitures *Breaches of the*
*bye-laws of*
accruing for the breach of any bye-law, in any town within *towns may be*
*prosecuted be-*
this State, may be prosecuted for, and recovered before any *fore Justices of*
*the Peace.*
Justice of the Peace in the town or county where the offence
shall be committed, by complaint or information, in the same
way and manner other criminal offences are prosecuted be-
fore the Justices of the Peace within this State.

SEC. 3.  *Be it further enacted,* That any person aggrieved *Persons ag-*
*grieved may*
at the sentence given against him, by any justice of the Peace, *appeal to the*
*C. Court of*
may appeal therefrom to the next Circuit Court of Common *Com. Pleas.*
Pleas to be held within the same county, and shall, before his
*Must recognize*
appeal is granted, recognize to the State in such reasonable *with sureties,*
sum, not less than twenty dollars, as the Justice shall order,
with sufficient surety or sureties for his prosecuting his appeal ;
*and produce*
and shall be held to produce the copy of the whole process, *copies of case*
*at C. C. Com-*
and all writings filed before the Justice, at the Court appeal- *mon Pleas.*

Exhibit 8
Page 78

286                    POWER OF JUSTICES.

*Failing to prosecute his appeal, his default to be entered.*
ed to. And if he shall not there prosecute his appeal, and produce the copies as aforesaid, the Court shall order his default to be noted upon their record. And the said Court may
*Court may order such case to be laid before Grand Jury, or arrest appellant, and affirm sentence, &c.*
order the same case to be laid before the Grand Jury, or may issue an attachment against the body of such appellant, and cause him thereby to be brought before them, and when he is so in Court, shall affirm the sentence of the Justice against him, with all additional costs.

*Justices may command assistance of sheriff, deputies and constables at riots, affrays, &c.*
SEC. 4. *Be it further enacted,* That each Justice shall have authority to command the assistance of every Sheriff, Deputy Sheriff, Constable, and all other persons present at any affray, riot, assault or battery, and may fine any person refusing such assistance, in a sum not exceeding six dollars ; to be disposed of for the use of the town where the offence shall be committed ; and levied by warrant of distress on the offender's goods and chattels, and for want thereof on his body.

*Justices may, on their own view, (in absence of sheriffs, deputies or constables,) require any person to apprehend offenders.*
SEC. 5. *Be it further enacted,* That any Justice of the Peace for the preservation thereof, or upon view of the breach thereof, or upon view of any other transgression of law, proper to his cognizance, done or committed by any person or persons whatever, shall have authority, (in the absence of the Sheriff, Deputy Sheriff or Constable,) to require any person or persons to apprehend and bring before him such offender or offenders. And every person so required, who shall refuse or
*Penalty for refusing to obey such Justice.*
neglect to obey the said Justice, shall be punished in the same manner as for refusing or neglecting to assist any Sheriff, Deputy Sheriff or Constable in the execution of his office as aforesaid. And no person who shall refuse or neglect to obey such
*If the Justice be known or declared—plea of ignorance of his office not admissible.*
Justice, to whom he shall be known, or declare himself to be a Justice of the Peace, shall be admitted to plead excuse on any pretence of ignorance of his office.

*Justices may grant subpoenas for witness es in criminal cases:*
SEC. 6. *Be it further enacted,* That Justices of the Peace within their respective counties, be, and they are hereby authorized and empowered to grant subpœnas for witnesses in all criminal causes pending before the Supreme Judicial Court and Circuit Court of Common Pleas, and before themselves
*But not on behalf of the State without consent of Attorney General, or County Attorney, except before himself.*
or any other Justice : *Provided,* That no Justice of the Peace shall grant subpœnas for witnesses to appear in any Court, except before himself, to testify on behalf of the State, unless by the request of the Attorney General or County Attorney. And all Sheriffs, Constables and other officers are directed and empowered to serve any warrant issuing from a Justice of the Peace.

*Justices to account annually to State, County and Town Treasurers for all fines, &c.*
SEC. 7. *Be it further enacted,* That the Justices of the Peace shall account annually with the Treasurer of the State, the Treasurer of their respective counties, and the town Treasurer, as the case may be, for all fines by them received or
*Penalty for neglect.*
imposed, upon pain of forfeiting the sum of thirty dollars, to be sued for and recovered by the Treasurer of the State, the county or town Treasurer for the time being, to which the said fines may respectively belong.

Exhibit 8
Page 79

## POWER OF JUSTICES.

287

Sec. 8.  *Be it further enacted,* That all civil actions, where-in the debt or damage does not exceed twenty dollars, (and wherein the title of real estate is not in question, and special-ly pleaded by the defendant,) shall, and may be heard, tried, adjudged and determined by any Justice of the Peace within his county ; and the Justices are severally empowered to grant summons, capias and attachment, at the request of any per-son applying for the same, directed to some proper officer within the same county, empowered by law to execute the same.  And such summons or capias and attachment shall be duly served by such officer, seven days at the least before the day therein set for trial, otherwise the party sued shall not be held to answer thereon ; and if after such process shall be duly served, the party sued, after being duly called, shall not appear to answer to the same suit, the charge against him in the declaration shall be taken to be true, and the Justice shall give judgment against him for such damages as  he shall find the plaintiff to have sustained, with costs ; and if the person sued shall appear to  defend the suit or oppose the same, the Justice shall award such damages as he shall find the plaintiff to have sustained : *Provided,* That no more damages than the sum of twenty dollars  shall be awarded in any action origin-ally brought or tried before a Justice of the Peace ; but if the plaintiff shall not support his action, shall fail to prosecute, or become nonsuit, the Justice shall award to the party sued, his reasonable costs,  taxed as the law directs.   And upon all judgments given  by a Justice of the Peace in civil actions, he shall award execution thereon in form by law prescribed.

*Justice's juris-diction in civil actions, (where title to real es-tate is not in question,) to extend to 20 dollars.*

*Justices may is-sue summons, capias, attach-ment, &c.*

*—to be served seven days be-fore trial.*

*Proceedings be-fore Justice.*

*Judgment, &c. if plaintiff pre-vail.*

*Damage not to exceed 20 dol-lars.*

*Judgment in case defendant prevail.*

*Execution.*

Sec. 9.  *Be it further enacted,* That the amount of the sum or several sums, specified, expressed  or supposed to be de-manded by the plaintiff in his declaration, shall not be con-sidered as any objection against the Justice's jurisdiction, pro-vided the ad damnum, or damage  is not laid  or stated to ex-ceed twenty dollars.

*Justice to have jurisdiction where the ad damnum does not exceed 20 dollars.*

Sec. 10.  *Be it further enacted,*  That any party aggrieved at the judgment of  any Justice of  the Peace, in a civil action, where  both parties  have appeared  and plead,  may appeal therefrom to the  next Circuit Court of Common Pleas  to be held within the  same county ;  and shall before  his appeal is allowed, recognize with  a  surety or sureties, in such reasona-ble sum as the Justice shall  order, not exceeding thirty dol-lars, to pay all intervening  damages and costs, and  to prose-cute his appeal with effect ;  and  shall be held to produce a copy of the whole case,  at the Court appealed to, and  both parties shall be allowed to offer any  evidence upon the trial at the Circuit Court of Common Pleas, in the same manner as if the cause had been  originally commenced there   And no other appeal shall be had on such action after one trial at the Circuit Court of Common Pleas.  And the Circuit Court of Common Pleas, when any person recognized as before men-

*Party aggriev-ed may appeal to C. C. Com. Pleas.*

*—Must recog-nize to prose-cute.*

*and produce co-pies at C. C. C. Pleas. Proceedings in that Court.*

*No further ap-peal.*

*Defendant in trespass failing to bring fur-*

Exhibit 8
Page 80

288                                    POWER OF JUSTICES.

ward the ac-
tion according
to his recog-
nizance.--Plain-
tiff to have his
damages.

tioned to bring forward an action of trespass, doth neglect to
do it, upon complaint thereof made in writing by the plaintiff,
shall give judgment for such sum in damages, as the plaintiff
hath declared for, together with all reasonable costs which ac-
crued both in the same Court and before the Justice.   And
the Circuit Court of Common Pleas shall, when any appellant
thereto shall fail to prosecute his appeal, or if he shall neglect
to produce a copy of the case, affirm the former judgment up-
on the appellee's complaint, and award such additional dama-
ges as shall have arisen in consequence of the said appeal, and
cost.

Appellant fail-
ing to prose-
cute, on com-
plaint judg-
ment may be
affirmed.

In action of
trespass when
defendant
pleads title to
real estate--
mode of pro-
ceeding before
Justice.

SEC. 11.   *Be it further enacted,* That when an action of tres-
pass shall be brought before any Justice of the Peace, and
the defendant shall plead the general issue, he shall not be
allowed to offer any evidence that may bring the title of real
estate in question.   And when the defendant in any such ac-
tion shall plead the title of himself or any other person in jus-
tification, the Justice upon having such plea plead, shall order
the defendant to recognize to the adverse party in a reasona-
ble sum, with sufficient surety or sureties to enter the said ac-
tion at the next Circuit Court of Common Pleas to be holden
within the same county, and to prosecute the same in the
same manner as upon an appeal from a Justice's judgment;
and if such pleader shall refuse so to recognize, the Justice
shall render judgment against him, in the same manner as if
he had refused to make answer to the same suit.   And either

Appeal allowed
in such cases
from C. C. C.
Plea to S. J.
Court.

party in such cause, shall be allowed to appeal from the judg-
ment of the Circuit Court of Common Pleas, in the same man-
ner as if the suit had been originally commenced there.

General issue
may be plead
in all actions
before Justices
and special
matter given in
evidence except
where *title* to
real estate is
relied on by de-
fendant.

SEC. 12.   *Be it further enacted,* That in all civil actions tria-
ble before a Justice of the Peace, except such actions of tres-
pass wherein the defendant means to avail himself, by plead-
ing the title of himself or any other person under whom he
claims in justification of the trespass or trespasses alleged to
be committed on real estate; the defendant shall be entitled
to all evidence, under the general issue, which by law he might
avail himself of under any special plea in excuse or justifica-
tion, any law, usage or custom to the contrary notwithstand-
ing.

Justices may
grant subpœ-
nas in *all* civil
actions.

SEC. 13.   *Be it further enacted,* That each Justice of the
Peace may grant subpœnas for witnesses in all civil actions
and causes pending before the Supreme Judicial Court, Cir-
cuit Court of Common Pleas, Court of Sessions, and before
him or any other Justices, and in all civil actions and causes

May adjourn
their Courts by
proclamation:

No Justice to
be of counsel
in any suit be-
fore himself.

pending before arbitrators or referees.   And every Justice of
the Peace shall have power by public proclamation to adjourn
the trial of any action brought before him, from time to time,
when equity may require it; but he shall not be of counsel to
either party, or undertake to advise or assist any party in suit
before him.

Exhibit 8
Page 81

POWER OF JUSTICES.                    289

SEC. 14.  *Be it further enacted,* That when an executor or administrator shall be guilty of committing waste, whereby he is rendered unable to pay the judgment recovered before any Justice of the Peace, against the goods and estate of the deceased in his hands, out of the same, the Justice may proceed against the proper goods and estate of such executor or administrator, in the same manner as the Circuit Court of Common Pleas are empowered to do.

SEC. 15.  *Be it further enacted,* That each Justice of the Peace shall keep a fair record of all his proceedings; and when any Justice of the Peace shall die before a judgment given by him is paid and satisfied, it shall be in the power of any Justice of the Peace in the same county to grant a scire facias upon the same judgment, to the party against whom such judgment was rendered up, for him to show cause if any he hath, why execution should not be issued against him. And although the costs and debt awarded by the deceased Justice when added together, shall amount to more than twenty dollars, it shall be no bar upon such scire facias, but judgment shall be given thereon for the whole debt and cost, together with the cost arising upon the scire facias.  *Provided always,* That either party may appeal from the judgment as in other personal actions, where judgment is given by a Justice of the Peace.   And every Justice of the Peace who shall have complaint made to him, that a judgment given by a Justice of the same county then deceased, remains unsatisfied, shall issue his summons to the person in whose possession the record of the same judgment is, directing him to bring and to produce to him the same record; and if such person shall contemptuously refuse to produce the same record, or shall refuse to be examined respecting the same, upon oath, the Justice may punish the contempt by imprisonment, until he shall produce the same, or until he submits to be examined as aforesaid; and when the Justice is possessed of such record, he shall transcribe the same upon his own book of records, before he shall issue his scire facias; and shall deliver the original back again to the person who shall have produced it, and a copy of such transcription, attested by the transcribing Justice, shall be allowed in evidence in all cases, where an authenticated copy of the orignal might be received.

SEC. 16.  *Be it further enacted,* That all Justices of the Peace before whom actions may be commenced under former commissions, and such commissions shall expire before judgment shall be rendered thereon, or judgment being rendered, the same remains in whole or in part unsatisfied, such Justices of the Peace who shall hereafter have their said commissions seasonably renewed, and being duly qualified agreeably to the Constitution of this State, to act under such commissions, be and they hereby are authorized and empowered to render judgment, and issue execution on all such ac-

*(marginal notes)* In case of waste by executor or administrator, Justice may proceed as C. C. C. Pleas may in such cases.

Justice to keep record of his proceedings.

When Justice shall die before a judgment given by him is satisfied, what proceedings to be had.

Appeal allowed to either party.

Justice to whom complaint is made in such cases, may summon the person possessing the record to produce it.

Punishment for refusal so to do.

Duty of the Justice when the record is produced, to transcribe it into his own records.

Copy of such transcript to be evidence.

Justices, whose commissions expire before judgment or satisfaction, may proceed, under a new commission, seasonably obtained, to render judgment, &c.

37

Exhibit 8
Page 82

tions, commenced as aforesaid, in the same manner as if the
commissions under which such actions may be commenced,
were in full force.

[Approved March 15, 1821.]

— :oo: —

## CHAPTER LXXVII.

An Act providing a speedy Method of recovering Debts, and for pre-
venting unnecessary costs attending the same.

Justices may
take recogniz-
ances for debts.

SEC. 1. BE it enacted by the Senate and House of Representa-
tives, in Legislature assembled, That every Justice of the Peace
in this State shall have power within his county to take re-
cognizances for the payment of debts of any person who
shall come before him for that purpose: which recognizance
may be in substance as follows:—

Form of recog-
nizance.

Know all men, that I, A. B. of        , in the County of        ,
do owe unto C. D. of        , the sum of        , to be paid to the
said C. D. on the        day of        ; and if I shall fail of
the payment of the debt aforesaid, by the time aforesaid, I
will and grant that the said debt shall be levied of my goods
and chattels, lands and tenements, and in want thereof of my
body.  Dated at        , this        day of        , in the year of our
Lord        .  Witness, my hand and seal        A. B.
ss.  Acknowledged the day and year last abovesaid.
Before E. F. Justice of the Peace.

To be recorded
by the Justice.

SEC. 2.  Be it further enacted, That every Justice of the
Peace taking any such recognizance, shall immediately re-
cord the same at large in a book to be kept by him for that
purpose;  and after the same is recorded, may deliver it to

Execution may
issue thereon
within 3 years.

the Conusee;  and upon the Conusee's lodging the same with
the said Justice, at any time within three years from the time
when the same is payable, and requesting a writ of execu-
tion, it shall be the duty of such Justice to issue a writ of ex-
ecution thereon for such sum as shall appear to be due on the
same;  which writ of execution shall be in substance as fol-
lows:

State of Maine.

(SEAL.)  To the Sheriff of the County of        , or his depu-
ty, or either of the Constables of the town of        , in said
County,                                                                   Greeting.

Form of execu-
tion.

Because A. B. of        , in the County of        , on the
day of        , in the year of our Lord        before E. F. Esq.
one of the Justices of the Peace for the said County of        ,
acknowledged that he was indebted to C. D. of        , in the
county of        in the sum of        which he ought to have paid
on the        day of        , and        remains unpaid as it is said
        : We command you therefore, that of the goods, chat-
tels or real estate of the said A. B. within your precinct, you
cause to be paid and satisfied unto the said C. D. at the value

Exhibit 8
Page 83

# Exhibit 9

Exhibit 9
Page 84

 

DATE DOWNLOADED: Tue Oct 24 18:03:44 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
Statutes of the Territory of Wisconsin, Passed by the Legislative Assembly Thereof,
at a Session Commencing in November 1838 (1839).

ALWD 7th ed.
. Statutes of the Territory of Wisconsin, Passed by the Legislative Assembly Thereof,
at a Session Commencing in November 1838 (1839).

APA 7th ed.
(1839). Statutes of the Territory of Wisconsin, Passed by the Legislative Assembly
Thereof, at Session Commencing in November 1838. Albany, N.Y., Printed by Packard,
Van Benthuysen.

Chicago 17th ed.
Statutes of the Territory of Wisconsin, Passed by the Legislative Assembly Thereof,
at a Session Commencing in November 1838. Albany, N.Y., Printed by Packard, Van
Benthuysen.

McGill Guide 9th ed.
Statutes of the Territory of Wisconsin, Passed by the Legislative Assembly Thereof,
at a Session Commencing in November 1838 (Albany, N.Y.: Printed by Packard, Van
Benthuysen., 1839)

AGLC 4th ed.
Statutes of the Territory of Wisconsin, Passed by the Legislative Assembly Thereof,
at a Session Commencing in November 1838 (Printed by Packard, Van Benthuysen., 1839

MLA 9th ed.
Statutes of the Territory of Wisconsin, Passed by the Legislative Assembly Thereof,
at a Session Commencing in November 1838. Albany, N.Y., Printed by Packard, Van
Benthuysen. HeinOnline.

OSCOLA 4th ed.
Statutes of the Territory of Wisconsin, Passed by the Legislative Assembly Thereof,
at a Session Commencing in November 1838. Albany, N.Y., Printed by Packard, Van
Benthuysen.          Please note: citations are provided as a general guideline.
Users should consult their preferred citation format's style manual for proper
citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

Exhibit 9
Page 85

### STATUTES OF WISCONSIN.

381

the condition, without an affirmation of the judgment or order of the magistrate, and shall also stand as a security for any costs which shall be ordered by the court appealed to, to be paid by the appellant.

§ 13. Any person committed for not finding sureties, or refusing to recognize as required by the court or magistrate, may be discharged by any judge or justice of the peace on giving such security as was required. *Not recognizing, how discharged.*

§ 14. Every recognizance taken in pursuance of the foregoing provisions shall be transmitted by the magistrate to the district court for the county on or before the first day of the next term, and shall be there filed of record by the clerk. *Recognizances transmitted to court.*

§ 15. Any person who shall, in the presence of any magistrate mentioned in the first section of this statute, or before any court of record, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such court or magistrate, shall contend, with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace and being of good behavior, for a term not exceeding six months, and in case of refusal may be committed as before directed. *When required on view of court, &c.*

§ 16. If any person shall go armed with a dirk, dagger, sword, pistol or pistols, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family, or property, he may, on complaint of any other person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term not exceeding six months, with the right of appealing as before provided. *Persons going armed to give security, &c.*

§ 17. Whenever, upon a suit brought on any such recognizance, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty on the petition of any defendant, as the circumstances of the case shall render just and reasonable. *Part of penalty remitted.*

§ 18. Any surety in a recognizance to keep the peace or for good behavior or both, shall have the same authority and right to take and surrender his principal as if he had been bail for him in a civil cause, and upon such surrender shall be discharged and exempt from all liability for any act of the principal subsequent to such surrender, which would be a breach of the condition of the recognizance; and the person so surrendered may recognize anew, with sufficient sureties, before any justice of the peace for the residue of the term, and thereupon shall be discharged. *Surety may surrender principal.*

## AN ACT making general provisions concerning crimes and punishments.

§ 1. That every person who shall be aiding in the commission of any offence, which shall be a felony either at common law or by any statute now made, or which shall be hereafter made, or who shall be accessory thereto before the fact, by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the same manner as is or shall be prescribed for the punishment of the principal felon. *Accessory to felony before the fact, how punished.*

Exhibit 9
Page 86

# Exhibit 10

Exhibit 10
Page 87

refusing to recognize, as required by the court or magistrate, may be discharged by any judge or justice of the peace, on giving such security, as was required.

SECT. 14. Every recognizance, taken pursuant to the foregoing provisions, shall be transmitted to the district court, on or before the first day of the next ensuing term, and shall there be filed by the clerk, as of record.

SECT. 15. Whoever, in the presence of any magistrate, mentioned in the second section of this chapter, or before any court of record, shall make any affray or threaten to kill or beat another, or commit any violence against his person or property, or shall contend, with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, or being of the good behavior for a term, not exceeding three months, and, in case of refusal, may be committed to prison as before directed.

SECT. 16. Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

SECT. 17. In a suit, on such recognizance taken in a criminal case, if a forfeiture is found or confessed, the court, on petition, may remit the penalty, or such part of it as they may think proper, on such terms as they may think right.

SECT. 18. Any surety in a recognizance may surrender the principal in the same manner, as if he had been his bail in a civil cause, and, on such surrender, shall be discharged from all liability for any act of the principal after such surrender, which would be a breach of the recognizance; and, upon such surrender, the principal may recognize anew with sufficient surety or sureties for the residue of the term, before any justice of the peace, and shall thereupon be discharged.

*Marginal notes:*

CHAP. 169.

may be taken after commitment.

Return of such recognizance.

When magistrate may require sureties, without a formal complaint, &c.

Persons going armed, without reasonable cause. 1821, 76, § 1.

Power of court, to remit the penalty of a recognizance. 1821, 50, § 4.

Sureties on recognizances may surrender their principals as in case of bail in civil actions.

---

## CHAPTER 170.

### OF THE POWER AND PROCEEDINGS OF JUSTICES OF THE PEACE IN CRIMINAL CASES.

SECT. 1. Justices may require aid, on view, without a warrant.
   2. Their jurisdiction.
   3. When a justice shall issue his warrant.
   4. Examination, on trial, of the party accused.
   5. Of commitment or binding over to a higher court.

SECT. 6. Duty of justices, as to arrests, and examinations into treasons, felonies, &c.
   7. Trial and sentence within their jurisdiction.
   8. Respondent may appeal; but required to recognize.
   9. To carry up copies of the case.

Exhibit 10
Page 88

# Exhibit 11

Exhibit 11
Page 89

692                                    ARREST &c. OF OFFENDERS.

TITLE XXXI.
CHAPTER 163.

Breach of peace
in presence of
magistrate, &c.

SEC. 15. Every person who shall, in the presence of any magistrate mentioned in the first section of this chapter, or before any court of record, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered, without process or any other proof, to recognize for keeping the peace, for a term not exceeding six months, and in case of refusal, may be committed as before directed.

Person going
armed to find su-
reties for the
peace.

SEC. 16. If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

Court may remit
part of penalty.
7 Mass., 307.

SEC. 17. Whenever upon a suit brought on any recognizance entered into in pursuance of this chapter, the penalty thereof shall be adjudged forfeited, the court may remit such portion of the penalty, on the petition of any defendant, as the circumstances of the case shall render just and reasonable.

Surety may sur-
render his prin-
cipal, effect of
surrender.

SEC. 18. Any surety in a recognizance to keep the peace, shall have the same authority and right to take and surrender his principal as in other criminal cases, and upon such surrender shall be discharged and exempt from all liability for any act of the principal subsequent to such surrender, which would be a breach of the condition of the recognizance; and the person so surrendered may recognize anew, with sufficient sureties, before any justice of the peace or circuit court commissioner for the residue of the term, and shall thereupon be discharged.

CHAPTER 163.

OF THE ARREST AND EXAMINATION OF OFFENDERS, COMMITMENT FOR TRIAL AND TAKING BAIL.

What officers
may issue pro-
cess for the arrest
of offenders, &c.

SECTION 1. For the apprehension of persons charged with offences, excepting such offences as are cognizable by justices of the peace, the justices of the supreme court, judges of the county courts, circuit court commissioners, mayors and recorders of cities, and all justices of the peace, shall have power to issue process and to carry into effect the provisions of this chapter.

Complaint, &c.
to be examined.

SEC. 2. Whenever complaint shall be made to any such magistrate, that a criminal offence, not cognizable by a justice of the peace, has been committed, he shall examine on oath the complainant, and any witnesses who may be produced by him.

Proceedings if it
appear that an
offence has been
committed.

SEC. 3. If it shall appear from such examination, that any criminal offence, not cognizable by a justice of the peace, has been committed, the magistrate shall issue a warrant, directed to the sheriff or any constable of the county, reciting the substance of the accusation, and

Exhibit 11
Page 90

# Exhibit 12

Exhibit 12
Page 91

# ACTS

OF THE

## GENERAL ASSEMBLY

OF

## VIRGINIA,

PASSED AT THE SESSION COMMENCING DECEMBER 6, 1847, AND ENDING APRIL 5, 1848,

IN THE

### SEVENTY-SECOND YEAR OF THE COMMONWEALTH.

———————

RICHMOND:

SAMUEL SHEPHERD—PRINTER TO COMMONWEALTH.

1848.

Exhibit 12
Page 92

15. Every person who shall, in the presence of any magistrate, mentioned in the first section of this act, or before any court of record, make an affray, or threaten to kill or beat another, or to commit any violence or outrage against his person or property, and every person who, in the presence of such court or magistrate, shall contend with hot and angry words, to the disturbance of the peace, may be ordered without process or any other proof, to recognize for keeping the peace, or being of good behaviour, for a term not exceeding six months, and in case of refusal may be committed as before directed. *Recognizances required for offences in presence of magistrate or court.*

16. If any person shall go armed with any offensive or dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace for a term not exceeding twelve months, with the right of appealing as before provided. *Persons armed, required to find sureties.* *Appeal allowed.*

17. Such persons as are not of good fame may be required to give sufficient surety of their good behaviour for such term, not exceeding twelve months, as the magistrate requiring it may order. *Persons not of good fame to give surety.*

## CHAP. XV.

### OF ARREST AND COMMITMENT.

SECTION
1. Officers empowered to act.
2. Complaints, warrants and summonses.
3. Offence committed in another county.
4. In what county warrant may be executed.
5. Prisoner, when to be brought before magistrate on arrest.
6. Magistrate, if he take bail, to return recognizance, &c.
7. Officer, how to proceed if prisoner not bailed.
8. Prisoner, when to be carried to county whence warrant issued.
9. Same subject.
10. Magistrate may adjourn examination.
11. In case of default, recognizance to be certified.
12. Proceedings when party fails to recognize.
13. 14. 15. } Manner of conducting examination.
16. Testimony to be reduced to writing.

SECTION
17. When prisoner to be discharged.
18. When to be bailed or committed.
19. If party entitled to examination, &c.
20. If not so entitled, and triable on indictment, &c.
21. If party charged be free negro, &c.
22. Duty of magistrate, &c.
23. Witnesses to recognize.
24. Witnesses, when to recognize with sureties.
25. Recognizances of minors, &c.
26. Witnesses refusing to recognize.
27. Magistrate may associate others.
28. Prisoner by whom let to bail.
29. Recognizances, &c. to be returned.
30. Commitments, &c. when to be discharged.
31. Orders therefor, how to be filed &c.
32. 33. 34. 35. } Proceedings on forfeited recognizances.
36. Right of surety to surrender principal.
37. To whom to be surrendered.
38. When to the court.

1. For the apprehension of persons charged with offences, the judges of the general court, and all justices of the peace in vacation as well as in term time, are authorized to issue process to carry into effect the provisions of this act. *Process to arrest for offences, by whom issued.*

2. Upon complaint made to any such magistrate that a criminal offence has been committed, he shall examine on oath the complainant and any witnesses produced by him, and shall reduce the complaint to writing, and cause the same to be subscribed by the complainant; and if it shall appear that any such offence has been com- *Examination on complaint.*

17

Exhibit 12
Page 93

130                              *Arrest and Commitment.*

*Warant for arrest.*  mitted, or there is just cause to believe that any such offence has been committed, the court or justice shall issue a warrant reciting the substance of the accusation, and requiring the officer to whom it shall be directed, forthwith to take the person accused and bring him before the said court or justice, or before some other court or magistrate of the county or corporation, to be dealt with according to law, and in the same warrant may require the officer to summon such *Summons for witnesses.* witnesses as shall be therein named, to appear and give evidence on the examination.

*Offence committed in another county, prisoner to be conveyed there.*  3. If the offence charged in the warrant be committed in any county or corporation other than that in which the warrant shall be issued, the magistrate or court before whom the person arrested may be brought, shall by warrant commit the prisoner to the custody of the officer having him in charge, or some other officer, to be by him conveyed to the county or corporation in which the offence was committed, and there taken before some magistrate thereof, and for that *Proceedings under warrant.* purpose such officer may command the necessary aid; and the warrant with the proper return thereon, signed by the officer, shall be delivered to such magistrate, who shall proceed with the case in the same manner as if the arrest had been by virtue of a warrant origi- *When party may be bailed and discharged.* nally issued by him, or if the offence charged is not punishable with death or by confinement in the penitentiary, such magistrate or court may take from the person so arrested a recognizance, with sufficient sureties for his appearance at the court having cognizance of the offence, and next to be holden in the county where it shall be alleged to have been committed, and the person arrested shall there- *Return of warrant and bail to proper court.* upon be discharged; and the magistrate or court so letting such person to bail, shall certify that fact upon the warrant, and shall cause the same, together with the recognizance taken, to be delivered without delay to the clerk of the court before which the accused was recognized to appear.

*Where warrant may be executed.*  4. If any person against whom a warrant shall be issued for an alleged offence committed within any county or corporation, shall either before or after the issuing such warrant escape from or be out of the same, the officer to whom such warrant may be directed may pursue and apprehend the party charged in any county or corporation of this state, and for that purpose may command and exercise the same authority as in his own county or corporation.

*Right to be brought before magistrate where arrested.*  5. In all cases where the offence charged in the warrant is not punishable with death, or by confinement in the penitentiary, if the person arrested shall request that he may be brought before a magistrate of the county or corporation in which the arrest was made, for the purpose of entering into a recognizance, without a trial or examina- *May be bailed.* tion, the officer who made the arrest shall carry him before a magistrate of that county or corporation, who may take from the person arrested a recognizance, with sufficient sureties, for his appearance at the court having cognizance of the offence, and next to be holden in the county or corporation where it shall be alleged to have been committed, and the party arrested shall thereupon be liberated.

*Return of recognizance and warrant.*  6. The magistrate who shall so let the person arrested to bail, shall certify that fact upon the warrant, and shall deliver the same with the recognizance by him taken to the person who made the arrest, who shall cause the same to be delivered without delay to the clerk of the *Witnesses to be recognized.* court before which the accused was recognized to appear; and on application of the complainant, the magistrate who issued the warrant, shall cause such witnesses as he may think necessary to be summoned to the same court.

Exhibit 12
Page 94

7. If the magistrate in the county or corporation where the arrest was made shall refuse to let to bail the person so arrested and brought before him, or if no sufficient bail shall be offered, the officer having him in charge shall take him before the magistrate who issued the warrant, or before some other magistrate of the county or corporation in which the warrant was issued, to be proceeded with as hereafter directed. *Proceedings when bail is refused.*

8. When the offence charged in any warrant is punishable with death or by confinement in the penitentiary, the officer making the arrest in some other county or corporation shall convey the prisoner to the county or corporation where the warrant was issued, and he shall be proceeded with in the manner hereinafter directed. *Prisoner, when to be carried to county whence warrant issued.*

9. Every person arrested by warrant for any offence where no other provision is made for his examination thereon, shall be brought before the magistrate who issued the warrant, or before some other magistrate of the same county or corporation, and the warrant, with a proper return thereon, signed by the person who made the arrest, shall be delivered to the magistrate. *Where no other provision, like proceedings.*

10. Any magistrate may adjourn an examination or trial pending before himself, from time to time, as occasion shall require, not exceeding ten days at any one time, without the consent of the accused, and to the same or a different place in the county, as he shall think proper; and in such case, if the party is charged with a felonious offence, he shall be committed in the mean time, otherwise he may be recognized in a sum and with securities to the satisfaction of the magistrate, for his appearance for such further examination, and for want of such recognizance he shall be committed to prison. *Adjournment of examination both for time and place. Prisoner, when committed or bailed.*

11. If the person so recognized shall not appear before the magistrate at the time appointed for his further examination, according to the condition of such recognizance, the magistrate shall record the default, and shall certify the recognizance, with the record of such default, to the county court at its next term, and like proceedings shall be had thereon, as upon the breach of the condition of a recognizance for appearance before that court. *Breach of recognizance to be certified to court. Proceedings thereon.*

12. When such person shall fail to recognize, he may be committed to prison by an order under the hand of the magistrate, stating concisely that he is committed for further examination on a future day, to be named in the order, and on the day appointed he may be brought before the magistrate by his verbal order to the same officer by whom he was committed, or by an order in writing to a different person. *Proceedings when party fail to recognize. Orders of magistrates, when verbal, when written.*

13. The magistrate before whom any person is brought upon a charge of having committed an offence, shall, as soon as may be, examine the complainant, and the witnesses to support the prosecution, on oath, in the presence of the party charged, touching any matters connected with such charge as may be deemed pertinent. *Mode of examination; testimony for prosecution.*

14. After the testimony to support the prosecution, the witnesses for the prisoner, if he have any, shall be sworn and examined, and he may be assisted by counsel in such examination, and also in the cross-examination of the witnesses in support of the prosecution. *Testimony for prisoner. Counsel allowed.*

15. The magistrate while examining any witness, may at his discretion, exclude from the place of examination all the other witnesses; he may also, if requested, or if he think proper, direct the witnesses for or against the prisoner, to be kept separate, so that they cannot converse with each other until they shall have been examined. *Witnesses may be excluded or kept separate.*

16. The testimony of the witnesses examined shall be reduced to writing by the magistrate, or under his direction, when he shall think *Testimony to be reduced to writing.*

Exhibit 12
Page 95

132                           *Arrest and Commitment.*

it necessary, and shall be signed by the witnesses if required by the magistrate.

*When prisoner to be discharged.*
17. If it shall appear to the magistrate upon the whole examination that no offence has been committed, or that there is not probable cause for charging the prisoner with the offence, he shall be discharged.

*When to be bailed or committed.*
18. If it shall appear that an offence has been committed, and that there is probable cause to believe the prisoner guilty, and if the offence be bailable by the magistrate, and the prisoner offer sufficient bail, it shall be taken and the prisoner discharged; but if no sufficient bail be offered, or the offence be not bailable by the magistrate, the prisoner shall be committed to prison for trial or examination.

*If entitled to examining court, to be bailed or committed therefor.*
19. If the offence be one for which the party charged may be entitled to the benefit of an examining court before trial, the magistrate shall bail or commit him for examination before the next succeeding court of his county or corporation.

*If not, and triable on indictment, like proceedings therefor.*
20. If the offence be one for which the party charged may not be entitled to the benefit of an examining court, and may be tried on an indictment, the magistrate shall bail or commit him to answer any indictment which may be found against him therefor at the next court of his county or corporation in which a grand jury may be impannelled for such county or corporation.

*If party charged be a slave or free negro.*
21. If the offence be felony, and the party charged a slave, free negro or mulatto, except in the case of free negroes and mulattoes charged with felonious homicide, or any offence punishable with death, the magistrate shall bail or commit him for trial at his next succeeding county or corporation court.

*Return of magistrate where, when and how made.*
22. If the party charged be bailed or committed for examination or trial, or to answer an indictment as aforesaid, it shall be the duty of the magistrate to return to the clerk of his county or corporation court, on or before the first day of the next term thereof, a certificate stating the nature of the offence, and that the party charged was so bailed or committed therefor; and it shall be the duty of the said clerk forthwith to inform the attorney for the commonwealth in said court that such certificate had been so returned, and to exhibit it to the said court as soon as may be after it shall have been received by him.

*Clerk to inform prosecuting attorney.*
*To exhibit return to court.*

*Witnesses to be recognized.*
23. When the prisoner is admitted to bail or committed by the magistrate, he shall also bind by recognizance such witnesses against the prisoner as he shall deem material, to appear and testify at the next court having cognizance of the offence, and in which the prisoner shall be held to answer.

*When, with sureties.*
24. If the magistrate shall be satisfied that there is good cause to believe that any such witness will not perform the condition of his recognizance, unless other security be given, such magistrate may order the witness to enter into a recognizance with such sureties as may be deemed necessary for his appearance at court.

*Recognizances of femes covert, minors or slaves.*
25. When any married woman or minor or slave is a material witness, any other person may be allowed to recognize for the appearance of such witness, or the magistrate may in his discretion, take the recognizance of such married woman or minor, in a sum not exceeding fifty dollars, which shall be valid and binding in law, notwithstanding the disability of coverture or minority.

*Witnesses refusing to recognize, committed.*
26. All witnesses required to recognize either with or without sureties, shall if they refuse, be committed to jail by the magistrate, there to remain until they comply with such order, or be otherwise discharged according to law.

Exhibit 12
Page 96

27. Any magistrate to whom complaint is made, or before whom any prisoner is brought, may associate with himself one or more of the magistrates of the same county, and they may together execute the powers and duties before mentioned.

<span style="float:right">Magistrate may associate others.</span>

28. The circuit superior courts of law and chancery, and the county courts of the several counties, and any judge or justice thereof in vacation, on application of any prisoner committed for a bailable offence, or of any person committed for not finding sufficient securities to recognize for him, may enquire into the case and admit such prisoner or person to bail: *Provided*, That no person shall be admitted to bail by a justice of the peace in a less sum than was required by the order of commitment.

<span style="float:right">Who may let to bail.</span>

29. All examinations and recognizances taken by any magistrate, pursuant to the provisions of this act, shall be certified and returned by him to the clerk of the court before which the party charged is bound to appear, on or before the first day of the sitting thereof; and if such magistrate shall refuse or neglect to return the same, he may be compelled forthwith by rule of court, and in case of disobedience, may be proceeded against by attachment as for a contempt.

<span style="float:right">Examinations and recognizances to be returned to clerk of court. Magistrate compellable to make return.</span>

30. When any person shall be committed to prison, or be under recognizance to answer to any charge of assault and battery, or other misdemeanor, for which the party injured may have a remedy by civil action, except when the offence was committed by or upon any sheriff or other officer of justice, or riotously, or with intent to commit a felony, if the party injured shall appear before the magistrate who made the commitment or took the recognizance, and acknowledge in writing that he has received satisfaction for the injury, the magistrate may in his discretion, on payment of the costs that have accrued, discharge the recognizance, or supersede the commitment, by an order under his hand, and may also discharge all recognizances, and supersede the commitment of all witnesses in the case.

<span style="float:right">Commitments when to be discharged if injured party satisfied.</span>

31. Every such order of the magistrate discharging the recognizance of the party or witnesses, shall be filed in the office of the clerk before the sitting of the court at which they are bound to appear, and every order superseding the commitment of the party charged, or of any witness, shall be delivered to the keeper of the jail in which he is confined, who shall forthwith discharge him; and every such order, if so filed and delivered, and not otherwise, shall for ever bar all remedy by civil action for such injury.

<span style="float:right">Orders for discharge, how to be filed.

Bar to civil action.</span>

32. When any person under recognizance in any criminal prosecution, either to appear and answer or to prosecute an appeal, or to testify in any court, shall fail to perform the condition of such recognizance, his default shall be recorded, and process shall be issued against the persons bound by the recognizance, or such of them as the prosecuting attorney shall direct.

<span style="float:right">Process against person forfeiting recognizance.</span>

33. Any surety in such recognizance may, by leave of the court, after default, and either before or after the process has been issued against him, pay into court the amount for which he was bound as surety, with such costs as the court shall direct, and be thereupon for ever discharged.

<span style="float:right">Sureties discharged by paying amount for which bound and costs.</span>

34. When any action is brought on behalf of the commonwealth against a principal or surety in any recognizance, entered into either by a party or a witness, in any criminal prosecution, and the penalty of such recognizance shall be adjudged to be forfeited, the court may, on application of the party defendant, and if a county court, with the assent of the prosecuting attorney, remit any part or the whole of such penalty, and may render judgment thereon for the

<span style="float:right">When and how penalty on forfeited recognizance may be remitted.</span>

Exhibit 12
Page 97

134　　　　　　　　　　　　　　*Coroners' Inquests.*

commonwealth upon such terms and conditions as shall seem just and reasonable.

**What neglect or omission no bar to action and no arrest of proceedings.**

35. No such action brought on a recognizance, as mentioned in the preceding section, shall be barred or defeated, nor shall judgment thereon be arrested, by reason of any neglect or omission to note or record the default of any principal or surety, at the term when such default shall happen, nor by reason of any defect in the form of the recognizance, if it sufficiently appear from the tenor thereof at what court the party or witness was bound to appear, and that the court or magistrate before whom it was taken, was authorized by law to require and take such recognizance.

**Right of surety to surrender principal.**

36. Every surety in a recognizance shall have the same authority to take and surrender his principal, as if he had been bail for him in a civil cause, and upon such surrender shall be discharged and exempt from all liability for any act of the principal subsequent to such surrender, which would be a breach of the condition of the recognizance.

**To whom to be surrendered.**

37. If the recognizance be entered into before a judge or justice of the peace, the surrender shall be made to the judge or justice before whom the same was entered into, or to some other justice of the same county, and the person so surrendered, may recognize anew, with sufficient sureties, for the residue of the term, and thereupon shall be discharged, and upon his failure so to recognize, shall be committed for the residue of the term as before directed.

**When surrender may be to court.**

**When to sheriff, sergeant or jailor.**

38. If the recognizance be entered into before a court, the surrender shall be made to the court if in session, and thereupon such order shall be taken in the case as the court may deem proper, and if the court be not in session, the surrender shall be made to the sheriff, sergeant or jailor of the county or corporation, and such sheriff, sergeant or jailor shall receive such defendant and commit him to the jail of his county or corporation, and give his receipt for his body, which shall be transmitted to the clerk of the court wherein the recognizance was entered into, and the court at its next session shall take such order in the case as to it may seem proper.

---

## CHAP. XVI.

### OF CORONERS' INQUESTS.

| Section | Section |
|---|---|
| 1. Coroners' inquests, when to be taken. | 8. Inquisition how taken; form thereof. |
| 2. Coroner to issue his warrant for jury; form of it. | 9. } Coroner's duty in case of murder, &c. |
| 3. Duty of officer to whom warrant directed, &c. | 10. } |
| 4. Jurors, how impanneled and sworn. | 11. Coroner, when to bury the body, &c.; costs how paid. |
| 5. Witness, how summoned; attendance, how enforced. | 12. Inquest may be held on Sunday. |
| 6. Oath of witnesses. | 13. Fine on coroner for neglect of duty. |
| 7. Testimony to be reduced to writing. | 14. When justice may discharge duty of coroner. |
| | 15. *Post mortem* examination. |

**Coroners' inquests when to be taken.**

1. Coroners shall take inquests upon the view of the dead bodies of such persons only as shall be supposed to have come to their death by violence, and not when the death is believed to have been occasioned by casualty.

**Coroner to issue warrant for jury.**

2. As soon as any coroner shall have notice of the dead body of any person, supposed to have come to his death by violence, found or

Exhibit 12
Page 98

# Exhibit 13

Exhibit 13
Page 99

526                          PROCEEDINGS TO PREVENT CRIMES.

as are necessary to bring the case within the provisions of law, issue a warrant to bring the person so charged before the same, or some other court or magistrate within the territory, to answer such complaint as in other cases.

**When person charged to give recognizance.**
SEC. 4. If, upon examination of the person charged, it shall appear to the court or magistrate, that there is reasonable cause to believe that the complaint is true, and that such person may be lawfully demanded of the governor, he shall, if not charged with a capital crime, be required to recognize with sufficient sureties, in a reasonable sum, to appear before such court or magistrate at a future day, allowing a reasonable time to obtain the warrant of the executive, and to abide the order of the court or magistrate; and if such person shall not so recognize, he

**When to be committed.**
shall be committed to prison, and be there detained until such day, in like manner as if the offence charged had been committed within this territory; and if the person so recognizing shall fail to appear according to the condition of his recognizance, he shall be defaulted, and the like

**Forfeiture of recognizance.**
proceedings shall be had as in the case of other recognizances entered into before such court or magistrate; but if such person be charged with a capital crime, he shall be committed to prison, and there detained until the day so appointed for his appearance before the court or magistrate.

**When discharged.**
SEC. 5. If the person so recognized or committed, shall appear before the court or magistrate upon the day ordered, he shall be discharged unless he be demanded by some person authorized by the war-

**May be delivered on warrant of executive, &c.**
rant of the executive to receive him, or unless the court or magistrate shall see cause to commit him, or to require him to recognize anew, for his appearance at some other day and if, when ordered, he shall not so recognize, he shall be committed and detained as before provided; whether the person so discharged shall be recognized, committed, or discharged, any person authorized by the warrant of the executive, may at all times, take him into custody, and the same shall be a discharge of the recognizance, if any, and shall not be deemed an escape.

**Complainant liable for costs, &c.**
SEC. 6. The complainant in such case, shall be answerable for the actual costs and charges, and for the support in prison, of any person so committed, and shall advance to the jailor one week's board, at the time of commitment, and so from week to week, so long as such person shall remain in jail, and if he fail so to do, the jailor may forthwith discharge such person from his custody.

---

# CHAPTER 112.

## OF PROCEEDINGS TO PREVENT THE COMMISSION OF CRIMES.

SECTION
1. What officers to cause public peace to be kept.
2. Proceedings when complaint is made to magistrate.

SECTION
3. Magistrate when to issue warrant.
4. Proceedings upon examination, before magistrate.
5. Defendant may have counsel.

Digitized by Google

Exhibit 13
Page 100

## PROCEEDINGS TO PREVENT CRIMES.

SECTION

6. Defendant when to enter into recognizance.
7. Defendant when to be discharged.
8. Defendant when to be committed.
9. Defendant when to be discharged.
10. Costs by whom paid.
11. Appeal when allowed.
12. When magistrate may require witnesses to recognize.
13. District court how to proceed upon such appeal.
14. When appellant fails to prosecute appeal, recognizance to be in force.

SECTION

15. After commitment, how defendant may be discharged.
16. Recognizance to be transmitted to district court.
17. When person may be ordered to recognize without warrant.
18. Persons carrying offensive weapons, how punished.
19. Suit brought on recognizance.
20. Surety may take and surrender principal in recognizance.

SEC. 1.   The judges of the several courts of record, in vacation as well as in open court, and all justices of the peace, shall have power to cause all laws made for the preservation of the public peace, to be kept, and in the execution of that power, may require persons to give security to keep the peace, or for their good behavior, or both, in the manner provided in this chapter.

*What officers to cause public peace to be kept.*

SEC. 2.   Whenever complaint shall be made to any such magistrate, that any person has threatened to commit an offence against the person or property of another, the magistrate shall examine the complainant and any witness who may be produced, on oath, and reduce such complaint to writing and cause the same to be subscribed by the complainant.

*Proceedings when complaint is made to magistrate.*

SEC. 3.   If upon examination, it shall appear that there is just cause to fear that any such offence may be committed, the magistrate shall issue a warrant under his hand, reciting the substance of the complaint, and requiring the officer to whom it may be directed, forthwith to apprehend the person complained of, and bring him before such magistrate or some other magistrate or court, having jurisdiction of the cause.

*Magistrate when to issue warrant.*

SEC. 4.   The magistrate before whom any person is brought on charge of having made threats as aforesaid, shall as soon as may be, examine the complainant and the witnesses to support the prosecution, on oath, in the presence of the party charged, in relation to any matters connected with such charge, which may be deemed pertinent.

*Proceedings upon examination before magistrate.*

SEC. 5.   After the testimony to support the prosecution, the witnesses for the prisoner, if he have any, shall be sworn and examined, and he may be assisted by counsel in such examination, and also in the cross examination of the witnesses in support of the prosecution.

*Defendant may have counsel.*

SEC. 6.   If upon examination it shall appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be required to enter into a recognizance and with sufficient sureties, in such sum as the magistrate shall direct, to keep the peace towards all the people of this territory, and especially towards the persons requiring such security, for such term as the magistrate shall order, not exceeding six months; but he shall not be ordered to recognize for his appearance at the district court, unless he is charged with some offence for which he ought to be held to answer at said court.

*Defendant when to enter into recognizance.*

SEC. 7.   Upon complying with the order of the magistrate, the party complained of shall be discharged.

*Defendant when to be discharged.*

SEC. 8.   If the person so ordered to recognize shall refuse or neglect to comply with such order, the magistrate shall commit him to the county jail during the period for which he was required to give security, or until he shall so recognize, stating in the warrant the cause of commitment, with the sum and time for which security was required.

*Defendant when to be committed.*

SEC. 9.   If, upon examination, it shall not appear that there is just cause to fear that any such offence will be committed by the party complained of, he shall be forthwith discharged; and if the magistrate shall

*Defendant when to be discharged.*

Digitized by Google

Exhibit 13
Page 101

528                    PROCEEDINGS TO PREVENT CRIME.

deem the complaint unfounded, frivolous, or malicious, he shall order
the complainant to pay the costs of prosecution, who shall thereupon be
answerable to the magistrate and the officer for their fees as for his
own debt.

**Costs by whom paid**

Sec. 10.   When no order respecting the costs is made by the mag-
istrate, they shall be allowed and paid in the same manner as costs be-
fore justices in criminal prosecutions; but in all cases where a person
is required to give security for the peace or for his good behavior, the
magistrate may further order the costs of prosecution or any part there-
of to be paid by such person, who shall stand committed until such
costs are paid, or he is otherwise legally discharged.

**Appeal when al-
lowed.**

Sec. 11.   Any person aggrieved by the order of any justice of the
peace requiring him to recognize as aforesaid, may, on giving the se-
curity required, appeal to the district court next to be holden in the
same county, or that county to which said county is attached for judi-
cial purposes.

**When magistrate
may require wit-
ness to recognize.**

Sec. 12.   The magistrate from whose order an appeal is so taken,
shall require such witnesses as he may think necessary to support the
complaint, to recognize for their appearance at the court to which ap-
peal is made.

**District court how
to proceed upon
such appeal.**

Sec. 13.   The court before which such appeal is prosecuted, may
affirm the order of the justice or discharge the appellant, or may re-
quire the appellant to enter into a new recognizance, with sufficient
sureties, in such sum and for such time as the court shall think proper,
and may also make such order in relation to the costs of prosecution as
he may deem just and reasonable.

**When appellant
fails to prosecute
appeal, recogni-
zance to be in force.**

Sec. 14.   If any party appealing, shall fail to prosecute his appeal,
his recognizance shall remain in full force and effect as to any breach of
the condition, without an affirmation of the judgment or order of the
magistrate, and shall also stand as a security for any costs which shall
be ordered by the court appealed to, to be paid by the appellant.

**After commitment,
how defendant may
be discharged.**

Sec. 15.   Any person committed for not finding sureties, or refusing
to recognize as required by the court or magistrate, may be discharged
by any judge or justice of the peace on giving such security as was re-
quired.

**Recognizance to be
transmitted to dis-
trict court.**

Sec. 16.   Every recognizance taken in pursuance of the foregoing
provision, shall be transmitted by the magistrate to the district court for
the county, on or before the first day of the next term, and shall be
there filed of record by the clerk.

**When person may
be ordered to re-
cognize without
warrant.**

Sec. 17.   Any person who shall in the presence of any magistrate
mentioned in the first section of this chapter, or before any court of rec-
ord make an affray, or threaten to kill or beat another, or to commit any
violence or outrage against his person or property, and every person,
who, in the presence of such court or magistate, shall contend with hot
and angry words, to the disturbance of the peace, may be ordered with-
out process or any other proof, to recognize for keeping the peace, and
being of good behavior, for a term not exceeding six months, and in case
of a refusal, may be committed as before directed.

**Persons carrying
offensive weapons
how punished.**

Sec. 18.   If any person shall go armed with a dirk, dagger, sword,
pistol or pistols, or other offensive and dangerous weapon, without reas-
onable cause to fear an assault or other injury or violence to his person,
or to his family, or property, he may, on complaint of any other person
having reasonable cause to fear an injury or breach of the peace, be re-
quired to find sureties for keeping the peace, for a term not exceeding
six months, with the right of appealing as before provided.

**Suit brought on re-
cognizance,**

Sec. 19.   Whenever upon a suit brought on any such recognizances,
the penalty thereof shall be adjudged forfeited, the court may remit such

Digitized by Google

Exhibit 13
Page 102

# Exhibit 14

Exhibit 14
Page 103

ney to sue for and recover the same in the name of the county in CHAP. 11.
which such game was played, or money lost, to go for the use of
common schools.

SEC. 9. All notes, bills, bonds, mortgages or other securities or Gaming se-
conveyances whatever, in which the whole or any part of the con-  curities void.
sideration shall be for any money or goods won by playing or
gaming at cards, dice or any other game whatever, or by betting
on the sides or hands of any persons gaming, or for re-imbursing
or repaying any money knowingly lent or advanced at the time
and place of such gaming or betting, or lent and advanced for any
gaming or betting to any person so gaming or betting, shall be
void and of no effect, as between the parties to the same, and as to
all persons, except such as shall hold or claim under them in good
faith, and without notice of the illegality of the consideration of
such contract or conveyance.

# CHAPTER XI.

### OFFENCES AGAINST CHASTITY, MORALITY AND DECENCY.

SEC.  1. Punishment for adultery.
      2. For polygamy.
      3. Excepted cases.
      4. Punishment for fornication and lasciviousness.
      5. For seduction under promise of marriage.
      6 & 7. For concealing death of bastard.
      8. For keeping house of ill fame.
      9. Lease of such house when void.
      10. Punishment for publishing obscene books.
      11. For incest.
      12. For sodomy.
      13. For ille;al disinterment.
      14. For injuring grave-stones.
      15. For making roads through grave-yards.
      16. For cruelty to animals.
      17. For disturbing religious meetings.
      18. Civil process not to be served on Sunday.
      19. Jurisdiction of justice of peace under this chapter.

SEC. 1. Every person who shall commit the crime of adultery, Adultery.
shall be punished, on conviction, by imprisonment in the peniten-
tiary, not more than two years nor less than six months, or by fine
not exceeding one thousand nor less than one hundred dollars;
and when the crime is committed between a married woman and a
man who is unmarried, the man shall be deemed guilty of adultery,
and be liable to the same punishment; but no prosecution for adul-
tery shall be commenced, except on the complaint of the husband or
the wife, and no such prosecution shall be commenced after one
year from the time of committing the offence.

SEC. 2. If any person, who has a former husband or wife living, Polygamy.
shall marry another person, or shall continue to cohabit with such
second husband or wife, he or she shall, except in cases mentioned
in the third section, be deemed guilty of the crime of polygamy,
and shall be punished, on conviction, by imprisonment in the peni-
tentiary, not more than four years nor less than one year, or by
fine not exceeding one thousand nor less than five hundred dollars.

14


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Generated on 2023-10-24 22:13 GMT  /  https://hdl.handle.net/2027/mdp.35112105064853
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Exhibit 14
Page 104

Generated on 2023-10-24 22:15 GMT  /  https://hdl.handle.net/2027/mdp.35112185864853
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

210                    OFFENCES AGAINST CHASTITY, MORALITY AND DECENCY.

**CHAP. 11.**
**Excepted cases.**

SEC. 3. The provisions of the preceding section shall not extend to any person whose husband or wife shall have been continually remaining beyond sea, or shall have voluntarily withdrawn from the other, and remained absent for the space of seven years continuously, the party marrying again not knowing the other to be living within that time; nor to any person who has been legally divorced from the bonds of matrimony.

**Fornication.**

**Lascivious-ness.**

SEC. 4. If any man and woman, not being married to each other, shall lewdly and lasciviously cohabit and associate together, or if any man or woman, married or unmarried, shall be guilty of open and gross lewdness and lascivious behavior, every such person shall, on conviction, be punished by fine not exceeding three hundred, nor less than fifty dollars, or by imprisonment in the county jail, not exceeding three months.

**Seduction under pro-mise of mar-riage.**

SEC. 5. Any unmarried man who, under promise of marriage, or any married man who shall seduce and have illicit connection with any unmarried female of previous chaste character, upon conviction, shall be punished by imprisonment in the penitentiary not more than five years, nor less than one year, or by imprisonment in the county jail not more than one year, nor less than six months, or by fine not exceeding one thousand, nor less than five hundred dollars; but no conviction shall be had under the provisions of this section, on the testimony of the female seduced, unsupported by other evidence, nor unless the indictment shall be found within two years after the commission of the offence; *provided*, that the subsequent intermarriage of the parties may be pleaded in bar of a conviction.

**Concealing death of bas-tard.**

SEC. 6. If any woman shall conceal the death of any issue of her body, which if born alive would be a bastard, so that it may not be known whether such issue was born alive or not, or whether it was not murdered, she shall, on conviction, be punished by impri-sonment in the penitentiary not more than one year, nor less than six months, or by fine not exceeding three hundred, nor less than one hundred dollars.

**Ib. Indict-able with murder.**

SEC. 7. Any woman who shall be indicted for the murder of her infant bastard child, may also be charged in the same indictment with the offence described in the last preceding section; and if on the trial, the jury shall acquit her of the charge of murder, and find her guilty of the other offence, judgment and sentence may be awarded against her for the same.

**Keeping house of ill fame.**

SEC. 8. Every person who shall keep a house of ill fame, resorted to for the purpose of prostitution or lewdness, on conviction, shall be punished by imprisonment in the county jail not more than one year, nor less than six months, or by fine not exceeding five hun-dred nor less than one hundred dollars.

**Ib. Lease of when void.**

SEC. 9. Whenever the lessee of any dwelling-house shall be con-victed of the offence mentioned in the next preceding section, the lease or contract for letting such house, shall, at the option of the lessor, become void; and such lessor shall thereupon have the like remedy to recover the possession, as against a tenant for holding over after the expiration of his term.

**Publishing obscene books, &c.**

SEC. 10. If any person shall import, print, publish, sell or dis-tribute any book or any pamphlet, ballad, printed paper or other

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 14
Page 105

thing containing obscene language or obscene prints, pictures, fig- CHAP. 11.
ures, or other descriptions, manifestly tending to the corruption of
the morals of youth, or shall introduce into any family, school or
place of education, or shall buy, procure, receive, or have in his
possession, any such book, pamphlet, ballad, printed paper or other
thing, either for the purpose of loan, sale, exhibition or circulation,
or with intent to introduce the same into any family, school, or
place of education, he shall, on conviction, be punished by impris-
onment in the county jail not more than six, nor less than three
months, or by a fine not more than three hundred, nor less than
fifty dollars.

SEC. 11. All persons being within the degree of consanguinity, Incest.
within which marriages are prohibited, or declared by law to be
incestuous and void, who shall intermarry with each other, or who
shall commit adultery or fornication with each other, shall be pun-
ished on conviction, by imprisonment in the penitentiary not more
than two years, nor less than six months.

SEC. 12. Every person who shall commit sodomy, or the crime Sodomy.
against nature, either with mankind or any beast, shall, on convic-
tion, be punished by imprisonment in the penitentiary not more
than five years nor less than one year.

SEC. 13. If any person, not being lawfully authorized, shall wil- Illegal disin-
fully dig up, disinter, remove or convey away any human body, terments.
or the remains thereof, or shall knowingly aid in such disinterment,
removal or conveying away, every such offender and every acces-
sory thereto, either before or after the fact, shall, on conviction, be
punished by imprisonment in the penitentiary not more than two
years, nor less than six months, or by fine not exceeding one thou-
sand, nor less than fifty dollars.

SEC. 14. If any person shall wilfully or with evil intent, destroy, Injuring
mutilate, deface or remove any tomb, monument, grave-stone or grave stones,
other structure, or thing placed, designed for a memorial of the &c.
dead, or any fence, railing, curb, or other thing intended for the
protection or for the ornament of any tomb, monument, grave-stone
or other structure before mentioned, or of any inclosure for the bu-
rial of the dead, or shall wilfully and with evil intent, destroy, mu-
tilate, remove, cut, break or injure any tree, shrub or plant, placed
or being within any such inclosure, the person so offending, shall,
on conviction, be punished by a fine not exceeding one thousand,
nor less than twenty-five dollars.

SEC. 15. If any person shall open or make any highway or town- Making roads.
way, or shall construct any railroad, turnpike, canal, or any other &c. through
thing in the nature of a public easement, over, in, through, or upon grave-yards.
such part of any inclosure, being the property of a town, village,
or religious society, or of private proprietors, as may be used for
the burial of the dead, unless an authority for that purpose shall
have been specially granted by law, or unless the consent of such
town, village, religious society, or private proprietors respectively,
shall have first been obtained, he shall be liable to punishment by
imprisonment in the county jail not more than one year, nor less
than six months, or by fine not more than five hundred, nor less
than one hundred dollars.

SEC. 16. Every person who shall cruelly beat or torture any Cruelty to
animals.

Generated on 2023-10-24 22:13 GMT  /  https://hdl.handle.net/2027/mdp.35112105064853
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN



Exhibit 14
Page 106

212      OFFENCES AGAINST THE PUBLIC HEALTH.

CHAP. 12. horse, ox or other animal, whether belonging to himself or another, shall be liable to punishment by imprisonment in the county jail, not more than thirty nor less than ten days, or by fine not exceeding fifty, nor less than five dollars.

Disturbing religious meetings.      SEC. 17. Every person, who, on the Lord's day, or at any other time, shall wilfully interrupt or disturb any assembly of people, met for the worship of God, within the place of such meeting, or out of it, shall be liable to fine not exceeding fifty, nor less than five dollars, or by imprisonment in the county jail not exceeding thirty days.

Civil process not to be executed on Sunday.      SEC. 18. No person shall serve or execute any civil process from the midnight preceding to the midnight following the Lord's day, but such service shall be void, and the person serving or executing such process, shall be liable in damages to the party aggrieved, in like manner as if he had not had any such process.

Jurisdiction of justice.      SEC. 19. Justices of the peace shall have jurisdiction of the offences mentioned in the seventeenth and eighteenth sections of this chapter.

# CHAPTER XII.

### OFFENCES AGAINST THE PUBLIC HEALTH.

SEC. 1. Punishment for selling unwholesome food.
    2. For adulterating food, liquors, &c.
    3. For adulterating medicines and drugs.
    4. For inoculating with small pox.
    5. For selling poisons without labels.

Selling unwholesome provisions, &c.      SEC. 1. If any person shall, knowingly, sell any kind of diseased, corrupted, or unwholesome provisions, whether for meat or drink, without making the same fully known to the buyer, he shall be punished, on conviction, by imprisonment in the county jail, not more than one year, nor less than three months, or by fine, not exceeding five hundred, nor less than ten dollars.

Adulterating food or liquors.      SEC. 2. If any person shall fraudulently adulterate, for the purpose of sale, any substance intended for food, or any wine, spirits, malt liquors, or other liquor intended for drinking, with any substance injurious to health, he shall, on conviction, be punished by imprisonment in the county jail not more than one year, nor less than three months, or by fine not exceeding one thousand, nor less than fifty dollars, and the articles so adulterated shall be forfeited and destroyed.

Adulterating medicine.      SEC. 3. If any person shall fraudulently adulterate, for the purpose of sale, any drug or medicine, or knowingly offer any adulterated drug or medicine for sale, in such a manner as to render the same injurious to health, he shall, on conviction, be punished by imprisonment in the county jail not more than one year, nor less than three months, or by fine not exceeding five hundred, nor less than fifty dollars, and such adulterated drugs and medicines shall be forfeited and destroyed.

Inoculating with small pox.      SEC. 4. If any person shall inoculate himself, or any other person, or shall suffer himself to be inoculated with the small pox,

Generated on 2023-10-24 22:16 GMT / https://hdl.handle.net/2027/mdp.35112105064853
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

Exhibit 14
Page 107

# Exhibit 15

Exhibit 15
Page 108

# ACTS

## PASSED

## *AT THE SECOND SESSION*

OF THE

## FIRST LEGISLATURE

OF THE

## STATE OF LOUISIANA.

Exhibit 15
Page 109

172

greeable to the assessment; and the said trustees shall at the end of the time for which they were elected, render an account of the same to the parish judge, and should any sums be unappropriated, the same shall be paid into the hands of the parish judge in trust for the succeeding trustees, and in case of default of the trustees whose term of time is thus expired, it shall be the duty of the parish judge to summon them to a settlement, enter judgment and issue execution for arrearages if necessary.

*Render account*

*Penalty for default.*

SECT. 3. *And be it further enacted,* That the trustees shall appoint one clerk and one collector, whose term of service shall expire at the same time with that of the trustees, which said officers shall be entitled to such fees as the said trustees may deem proper to allow them.

*Clerk and collector.*

*Fees.*

STEPHEN A. HOPKINS,
*Speaker of the house of representatives.*
J. POYDRAS,
*President of the senate.*
APPROVED, March 25th, 1813.
WILLIAM C. C. CLAIBORNE,
*Governor of the state of Louisiana.*

## AN ACT

*Against carrying concealed weapons, and going armed in public places in an unnecessary manner.*

Whereas assassination and attempts to commit the same, have of late been of such frequent occurrence as to become a subject of serious alarm to the peaceable and well disposed inhabitants of this state; and whereas the same is in a great measure to be attributed to the dangerous and wicked practice of carrying about in public places concealed and deadly weapons, or going to the same armed in an unnecessary manner, therefore;

*Preamble*

SECT. 1. *Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened,* That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol or any other deadly weapon concealed in his bosom, coat or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine not to exceed fifty dol-

*Penalty for carrying concealed weapons.*

Exhibit 15
Page 110

## 173

esclaves) et pour son usage, d'une piastre sur chaque
mille piastres, suivant le tableau des taxes; et lesdite
administrateurs, à l'expiration du terme pour lequel
ils auront été élus, en rendront compte au juge de Redition de
paroisse, et, s'il restait en caisse des fonds disponi- compte.
bles, ils seront versés entre les mains du juge de pa-
roisse qui les gardera jusqu'à la nomination d'autres
administrateurs, à l'ex-
piration du terme pour lequel ils auront été élus, né- Peines pour
gligeaient de rendre le compte susdit, il sera du de- defaut.
voir du juge de paroisse de les sommer de rendre
leurs comptes et de les poursuivre en justice et de
lancer contre eux des mandats d'execution pour les
sommes arriérées, s'il le juge necessaire.

SECT. 3. Et il est de plus decreté, Que lesdits ad- Commis et
ministrateurs nommeront un commis et un collecteur collecteur.
de taxe, dont le tems de service finira en même tems
que celui des administrateurs et qui auront droit à la Compensa-
compensation que les administrateurs jugeront à pro- tion,
pos de leur accorder.

STEPHEN A. HOPKINS,

*Orateur de la Chambre des Représentans,*

J. POYDRAS,

*Président du Senat.*

Approuvé le 25 Mars 1813.

Wm C. C. CLAIBORNE,

*Gouverneur de l'Etat de la Louisiane.*

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

<div align="center">

ACTE

</div>

*Pour défendre de porter des armes cachées et de se
présenter armé d'une manière inutile dans les en-
droits publics.*

Vu qu'il s'est commis dernièrement des assassinats Preambule.
et qu'il a été essayé d'en commettre d'autres de ma-
nière à causer de serieuses allarmes aux habitans pai-
sibles et bien disposes de cet etat, et vu qu'on doit en
grande partie attribuer la cause de ces assassinats à la
coûtume pernicieuse et condamnable de porter dans
des endroits publics, des armes cachees et dange-
reuses, ou de s'y rendre armé d'une manière inutile,

SECT. 1ère. Il est décrété par le senat et la cham-
bre des Représentans de l'Etat de la Louisiane réunis
en Assemblée Générale, Qu'à dater de la passation
de cet acte, toute personne qui sera trouvée armée
d'aucune arme cachee, tels que poignard, digue,
couteau, pistolet ou toute autre arme meurtrière dans Peines con-
son habit ou ailleurs sur lui et qui ne seront point os- tre ceux qui
tensibles, toute personne coupable de cette contra- portent des
vention, sera, sur conviction du fait, devant un juge chées, en-
de-paix, condamné à une amende qui n'excédera pas armes

Exhibit 15
Page 111

## 174

How dis-
tributed.

For the
second of-
fence.

lars nor less than twenty dollars, one half to the use
of the state, and the balance to the informer; and
should any person be convicted of being guilty of a
second offence before any court of competent jurisdic-
tion, shall pay a fine not less than one hundred dol-
lars to be applied as aforesaid, and be imprisoned for
a time not exceeding six months.

Penalty
for stabbing
&c.

Sect. 2. *And be it further enacted*, That should
any person stab or shoot, or in any way disable ano-
ther by such concealed weapons, or should take the
life of any person, shall on conviction before any com-
petent court suffer death, or such other punishment
as in the opinion of a jury shall be just.

Suspect-
ed persons
may be
searched.

Fine.

Sureties
of the
peace.

Sect. 3. *And be it further enacted*, That when
any officer has good reason to believe that any person
or persons have weapons concealed about them, for
the purpose of committing murder, or in any other
way armed in such a concealed manner, on proof
thereof being made to any justice of the peace, by
the oath of one or more credible witnesses, it shall
be the duty of such judge and justice to issue a war-
rant against such offender and have him searched,
and should he be found with such weapons, to fine
him in any sum not exceeding fifty dollars nor less
than twenty dollars, and to bind over to keep the
peace of the state, with such security as may appear
necessary for one year; and on such offender failing to
give good and sufficient security as aforesaid; the
said justice of the peace shall be authorised to com-
mit said offender to prison for any time not exceeding
twenty days.

STEPHEN A. HOPKINS,
*Speaker of the house of representatives.*
J. POYDRAS,
*President of the senate.*
Approved, March 25th, 1813.
WILLIAM C. C. CLAIBORNE,
*Governor of the state of Louisiana.*

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## AN ACT

*To establish a permanent seat of justice in and for
the parish of St. Tammany.*

Commis-
sioners.

Sect. 1. *Be it enacted by the senate and house of
representatives of the state of Louisiana, in general
assembly convened,* That Thomas Spell, Robert Ba-
dony, Benjamin Howard, Joseph Hertraire and Ben-

Exhibit 15
Page 112

# Exhibit 16

Exhibit 16
Page 113

280          CRIMINAL JURISPRUDENCE.   [CHAP. XLIV.

SEC. 12.  Every person who shall be convicted of any misdemeanor, the punishment of which is not defined in this or some other statute, shall be punished by imprisonment, not exceeding one year, or by fine not exceeding two hundred and fifty dollars, or by fine and imprisonment both.

SEC. 13.  Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor, and upon conviction thereof, in the county in which the said offence shall have been committed, shall be fined in any sum not less than twentyfive dollars, nor more than one hundred dollars, one half to be paid into the county treasury, the other half to the informer, and shall also be imprisoned not less than one, nor more than six months.

### ART. II.—LIBEL.

SECTION
1. Definition of.
2. Punishment of.
3. The truth of the libel may be given in evidence.
4. Proclaiming a person a coward, for not fighting a duel, &c.

SECTION
5. Publisher or printer required to testify.
6. Punishment of publisher or printer refusing to testify.
7. Their testimony not to be used against themselves.

SEC. 1.  A libel is a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, veracity, virtue or reputation, or to publish the natural defects, of one who is living, and thereby expose him to public hatred, contempt and ridicule.

SEC. 1.  Every person, whether writer, printer or publisher, convicted of the crime of libel, shall be fined in any sum not exceeding five thousand dollars, and may also be imprisoned, not exceeding one year, at the discretion of the jury who shall pass on the case ; and when any such case shall be decided without the intervention of a jury, then at the discretion of the court.

SEC. 3.  In all prosecutions for libel, under the provisions of the preceding sections, the truth thereof may be given in evidence in justification.

SEC. 4.  If any person shall, in any newspaper, handbill or other advertisement, written or printed, publish or proclaim any other person as a coward, or use any other opprobrious or abusive language, for not

Exhibit 16
Page 114

# Exhibit 17

Exhibit 17
Page 115

# ACTS

OF THE

# GENERAL ASSEMBLY

OF

# VIRGINIA,

PASSED AT THE SESSION OF **1838**,

COMMENCING 1ST JANUARY, 1838, AND ENDING 9TH APRIL, 1838,

IN THE

SIXTY-SECOND YEAR OF THE COMMONWEALTH.

—————

**RICHMOND:**
PRINTED BY THOMAS RITCHIE,
*Printer to the Commonwealth.*
————
1838.

Exhibit 17
Page 116

CHAP. 99.—An ACT to prevent free persons of colour who leave the state
from returning to it in certain cases.

( Passed April 7, 1838. )

**Free negroes leaving state to be educated not permitted to return.**

1. *Be it enacted by the general assembly,* That if any free person of colour, whether infant or adult, shall go or be sent or carried beyond the limits of this commonwealth for the purpose of being educated, he or she shall be deemed to have emigrated from the state, and it shall not be lawful for him or her to return to the same;

**Infants so returning how dealt with.**

and if any such person shall return within the limits of the state contrary to the provisions of this act, he or she being an infant, shall be bound out as an apprentice until the age of twenty-one years, by the overseers of the poor of the county or corporation where he or she may be, and at the expiration of that period, shall be sent out of the state agreeably to the provisions of the laws now in force, or which may hereafter be enacted to prohibit the migration of free

**Adults how punished.**

persons of colour to this state; and if such person be an adult, he or she shall be sent in like manner out of the commonwealth; and if any person having been so sent off, shall thereafter return within the state, he or she so offending shall be dealt with and punished in the same manner as is or may be prescribed by law in relation to other persons of colour returning to the state after having been sent therefrom.

**Commencement.**

2. This act shall be in force from and after the first day of August next.

CHAP. 100.—An ACT abolishing the punishment of burning in the hand in all cases.

(Passed February 8, 1838.)

**Burning in hand abolished.**

1. *Be it enacted by the general assembly,* That so much of any law of this commonwealth as authorizes or inflicts the punishment of burning in the hand in any case whatever, shall be, and the same is hereby repealed. And every person who may be hereafter convicted of any offence within the benefit of clergy, shall be punished in the mode now prescribed by law, except only the burning in the hand.

**Commencement.**

2. This act shall be in force from the passing thereof.

CHAP. 101.—An ACT to prevent the carrying of concealed weapons.

[Passed February 2, 1838.]

**Penalty for carrying concealed weapons.**

1. *Be it enacted by the general assembly,* That if any person shall hereafter habitually or generally keep or carry about his person any pistol, dirk, bowie knife, or any other weapon of the like kind, from the use of which the death of any person might probably ensue, and the same be hidden or concealed from common observation, and he be thereof convicted, he shall for every such offence forfeit and pay the sum of not less than fifty dollars nor more than five hundred dollars, or be imprisoned in the common jail for a term not less than one month nor more than six months, and in each instance at the discretion of the jury; and a moiety of the penalty recovered in any prosecution under this act, shall be given to any person who may voluntarily institute the same.

**Courts to ascertain if murders or felonies be perpetrated by concealed weapons.**

2. *And be it further enacted,* That if any person shall hereafter be examined in any county or corporation court upon a charge of murder or felony, perpetrated by shooting, stabbing, maiming, cutting or wounding, and it shall appear that the offence charged was

Exhibit 17
Page 117

in fact committed by any such weapon as is above mentioned, and
that the same was hidden or concealed from or kept out of the view
of the person against whom it was used, until within the space of
one half hour next preceding the commission of the act, or the in-
fliction of the wound, which shall be charged to have caused the
death, or constituted the felony, it shall be the duty of the examin-
ing court to state that the fact did so appear from the evidence;
and if the court shall discharge or acquit the accused, such dis- *Acquittal no bar
charge or acquittal shall be no bar to an indictment for the same* to indictment in
*superior court.*
offence in the superior court having jurisdiction thereof, provided
the same be found within one year thereafter.   And whether the *Offence how
accused shall be by such court sent on for further trial or dis-* charged in indict-
*ment.*
charged, it shall be lawful to charge in the indictment that the of-
fence was committed in any of the modes herein before described;
and upon the trial it shall be the duty of the jury (if they find the *Verdict of jury
accused not guilty of the murder or felony) to find also whether the* will to contain.
act charged was in fact committed by the accused, though not felo-
niously, and whether the same was committed or done with or by
means of any pistol, dirk, bowie knife, or other dangerous wea-
pon, which was concealed from or kept out of the view of the per-
son on or against whom it was used, for the space before mentioned,
next preceding such use thereof; and if the jury find that the act *Penalty.*
was so committed, they shall assess a fine against the accused, and
it shall be lawful for the court to pronounce judgment as in cases of
misdemeanor.

3. This act shall be in force from and after the first day of June *Commencement.*
next.

CHAP. 102.—An ACT to extend the act for the temporary relief of the banks
of this commonwealth.

(Passed February 20, 1838.)

1. *Be it enacted by the general assembly*, That the first, second *Laws for tempo-
and seventh sections of the act passed on the twenty-fourth day of* rary relief of banks
*extended.*
June, eighteen hundred and thirty-seven, entitled, "an act for the *See post. ch. 102.
temporary relief of the banks of this commonwealth, and for other* Acts extra session
*1837, pp. 3, 4,*
purposes," shall be, and the same are hereby continued in force till § 1, 2, 7.
the twentieth day of March next.

2. *Be it further enacted*, That so much of the provisions of the *Part of act in-
act, entitled, "an act increasing the banking capital of the com-* creasing banking
*capital suspended.*
monwealth," passed March the twenty-fifth, eighteen hundred and *Acts 1836-7, pp.
thirty-seven, as relates to the Bank of Virginia, the Farmers bank* 63-74.
of Virginia, and the Bank of the Valley of Virginia, shall be and
the same is hereby suspended until the first day of April next.

3. This act shall commence and be in force from the passage *Commencement.*
thereof.

CHAP. 103.—An ACT further to extend the act for the temporary relief of the
banks of this commonwealth.

[Passed March 16, 1838.]

1. *Be it enacted by the general assembly*, That the first, second *Laws for tempo-
and seventh sections of the act passed on the twenty-fourth day of* rary relief of banks
*further extended.*
June, eighteen hundred and thirty-seven, entitled, "an act for the
temporary relief of the banks of this commonwealth," be and the
same is hereby continued in force till the expiration of the present
session of the legislature, any law to the contrary notwithstanding.

2. This act shall be in force from its passage.            *Commencement.*

Exhibit 17
Page 118

# Exhibit 18

Exhibit 18
Page 119

Case 8:23-cv-01696-CJC-ADS   Document 21-9   Filed 11/03/23   Page 120 of 184   Page ID #:873

sons, and each and every individual of said company, corporation, or unchartered banking association, so making, issuing, emitting, or putting in circulation, such note, bill, bond, draft, check, post note, or other paper, shall be held to be guilty of a misdemeanor, and shall be liable to be indicted therefor, and, upon conviction,

*Penalty.* shall be fined for every such offence, at the discretion of the jury trying the same, not less than one hundred, nor more than five hundred dollars, and, upon failure to pay the fine, shall be imprisoned in the county jail for a term not exceeding twelve months.

*Signing such note, bill, &c. as president, cashier, or otherwise, for any such company* § 2. If any person or persons shall sign any note, bill, bond, draft, check, post note, or any paper of other name or description whatsoever, as cashier, or president, or under any other name, or in the name of any company, incorporation, or unchartered banking association, to be put in circulation to answer the purposes of money, such president, or cashier, or other person, under any other name, so signing said note, bill, bond, draft, check, post note, or paper as aforesaid, shall be deemed guilty of a misdemeanor, and shall be liable to

*Penalty.* be indicted, and, upon conviction, shall be fined for every such offence, in a sum not less than one hundred, nor more than five hundred dollars, at the discretion of the jury trying the same, and the signatures of the person or persons, so charged, to the note, bond, bill, draft, check, post note, or paper aforesaid, shall be taken and held to be proof of such signing, unless the fact of signing be denied on oath by the defendant.

*Unlawful to pass any such paper.* § 3. It shall be unlawful for any person or persons, within the limits of this state, to pass off, issue, emit, or put in circulation, any note, bill, bond, check, draft, or post note, of any incorporation, company, or unchartered banking association; and any person or persons, violating the provisions of this section, shall be deemed guilty

*Penalty.* of a misdemeanor, and shall be liable to be indicted, and, upon conviction, shall be fined for every such note, bill, bond, check, draft, post note, or other paper so issued, emitted, passed off, or put in circulation, not less than twenty, nor more than one hundred dollars, at the discretion of the jury trying said offence.

*Carrying concealed weapons, unless there be cause to apprehend an attack, or person be travelling.* § 4. Every one, who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of fire arms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be traveling, or setting out on a journey, shall, on conviction, be fined not less than fifty nor more than three hundred

*Burthen of proof, as to excuse—but none sufficient as to air gun, bowie knife, &c.* dollars: It shall devolve on the person setting up the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

*Illegal voting at elections.* § 5. If any person shall, at the same election, vote more than once for the same candidate for the same office, or for different candidates for the same office, either in the same or in different precincts, or vote, when he is not legally authorized so to do, he shall, upon con-

*How punished.* viction, be adjudged guilty of a misdemeanor, and fined in the sum of two hundred dollars, and be imprisoned in the county jail not exceeding one year.

*Apothecary selling poisonous drugs, without label.* § 6. Every apothecary, druggist, or other person, who shall sell and deliver any arsenic, corrosive sublimate, prussic acid, or other substance, either solid or liquid, usually denominated poisonous,

Exhibit 18
Page 120

# Exhibit 19

Exhibit 19
Page 121

Case 8:23-cv-01696-CJC-ADS   Document 21-9   Filed 11/03/23   Page 122 of 184   Page ID
#:875

432          LAWS OF THE STATE OF MISSISSIPPI.

1821

## CHAP. XLIX.

An Act, to prohibit the carrying or wearing of concealed weapons.

SEC. 1. *Be it enacted by the Senate and House of Representatives of the State of Mississippi, in General Assembly convened,* That from and after the passage of this act, any person or persons convicted before any magistrate of his or their wearing or carrying any pistols, dirk or other such offensive weapons, concealed about his or their persons, shall forfeit and pay the sum of fifty dollars for every such offence, to be applied to the use of the literary fund : *Provided,* That in all cases of persons travelling, they shall not be bound by the provisions of this act.

COWLES MEAD,
*Speaker of the House of Representatives.*
JAMES PATTON,
*Lieutenant-Governor and President of the Senate.*
APPROVED, NOVEMBER 28, 1821.
GEO. POINDEXTER.

––––––

## CHAP. L.

An Act, to regulate the salaries of the district attorneys of the third and fourth Judicial Districts.

Salaries fixed.

SEC. 1. *Be it enacted by the Senate and House of Representatives of the State of Mississippi, in General Assembly convened,* That the district attorneys of the third and fourth judicial districts of this State, shall hereafter receive for their services the sum of six hundred dollars per annum, payable quarter yearly, out of any money in the treasury, not otherwise appropriated.

Repealing clause.

SEC. 2. *And be it further enacted,* That so much of the acts as allows the district attorney of the third judical district, the sum of four hundred dollars, and the district attorney of the fourth judicial district, the sum of eight hundred dollars, be, and the same is hereby repealed.

COWLES MEAD,
*Speaker of the House of Representatives.*
JAMES PATTON,
*Lieut. Gov. and President of the Senate,*
APPROVED, NOVEMBER 28, 1821.
GEO. POINDEXTER.

Exhibit 19
Page 122

# Exhibit 20

Exhibit 20
Page 123

A

# DIGEST

OF THE

# STATUTE LAW OF KENTUCKY:

BEING A COLLECTION OF ALL THE

## ACTS OF THE GENERAL ASSEMBLY,

OF A PUBLIC AND PERMANENT NATURE,

FROM THE COMMENCEMENT OF THE GOVERNMENT TO MAY SESSION 1822.

ALSO, THE

## English and Virginia Statutes,

YET IN FORCE; TOGETHER WITH SEVERAL

## ACTS OF CONGRESS.

WITH REFERENCES TO REPORTS OF

# JUDICIAL DECISIONS

IN THE COURT OF APPEALS OF KENTUCKY AND SUPREME COURT

OF THE UNITED STATES.

IN TWO VOLUMES.

BY WILLIAM LITTELL AND JACOB SWIGERT.

PUBLISHED UNDER THE PATRONAGE OF THE LEGISLATURE.

## VOLUME I.

FRANKFORT:

PRINTED BY KENDALL AND RUSSELL,
PRINTERS FOR THE STATE.

1822.

Exhibit 20
Page 124

[ 100 ]

Governor to accept of the services of any volunteer company or compa-
accept of nies (not exceeding three thousand as aforesaid) who shall
the services tender their services within such time, and for such term,
of volunteer
companies & not exceeding six months, as the Governor in his discre-
to commissi tion, shall proclaim and appoint. And the Governor shall
on officers designate and commission for that purpose, all officers ne-
ceffary and proper for the command of such volunteers.

Sec. 3. *Be it further enacted*, That all volunteer officers,
non-commiffioned officers, muficians and privates, whose
service may be rendered and accepted under the provifions
of this act, shall, at such place or places of redezvous as the
Volunteers to Governor shall appoint within this state, be entitled to re-
to receive mo ceive in advance, the sum of ten dollars, to be taken and
ney in advance confidered as a part of their pay.

Sec. 4. *Be it further enacted*, That the forces to be raised
and organized, as provided by this act, shall be disposed of
according to the discretion of their Governor (that discretion
Forces when subject only to the requisitions of the general government)
raised how to and shall be liable to be marched to any place, and engaged
be diposed of in the service of the U. States, as the exigencies of the pres-
ent war may, in the opinion of the executive, require.

Sec. 5. *Be it further enacted*, That the governor of this
The Governor commonwealth, for the purpose of carrying into effect the
authorized to third section of this act, shall be authorized to draw from the
draw money Treasury of this state, any sums of money that may be
from the trea
sury or bor necessary therefor; or in case of deficiency in the public
row from funds, to borrow from any Bank or individuals, upon the
banks best terms he can obtain such additional sums as may be
necessary for the purpose aforesaid.

Sec. 6. *Be it further enacted*, That the powers vested in
the Governor by the first and second sections of this act,
shall be exercised and carried into effect by him to such ex-
tent, and in such a manner and time, as his own discretion
and the emergency of public affairs may dictate.

## CHAP. LXXXIX.

*AN ACT to prevent persons in this Commonwealth from
wearing concealed Arms, except in certain cases.*

Approved, February 3, 1813.

Sec. 1. *B*E it enacted by the general assembly of the com-
monwealth of Kentucky, That any person in
this commonwealth, who shall hereafter wear a pocket
pistol, dirk, large knife, or sword in a cane, concealed
as a weapon, unless when travelling on a journey, shall be
fined in any sum, not less than one hundred dollars; which

Exhibit 20
Page 125

[ 101 ]

may be recovered in any court having jurisdiction of like
sums, by action of debt, or on the presentment of a grand
jury—and a prosecutor in such presentment shall not be
necessary. One half of such fine shall be to the use of the
informer, and the other to the use of this commonwealth.

This act shall commence and be in force, from and after
the first day of June.

## CHAP. XC.

### AN ACT to amend the Militia Law.

Approved February 3, 1813.

Sec. 1. BE it enacted by the General Assembly of the
Commonwealth of Kentucky, That if any
non-commissioned officer, musician or private, failing to
march, or furnishing an able bodied substitute in his place,
when ordered and lawfully called on, or leaving the ser-
vice without a discharge from the proper officer, shall be
considered as a deserter, & treated as followeth, to wit: Any
person may apprehend such deserter, and deliver him to
the officer commanding such detachment, or any recruiting
officer within this commonwealth, and take his receipt for
the same; which receipt shall describe the name of such
deserter, and the length of time he was to serve, and by
whom he was delivered—which receipt shall be assignable;
and the reward for taking and so delivering such deserter,
as aforesaid, shall be a credit for a tour or tours of duty for
the length of time such deserter was bound to serve; and
said deserter shall serve out the term of time aforesaid be-
fore he shall be discharged, in addition to the time he was
to serve, if such term of time is then required; otherwise
shall serve said tour or tours, when required so to do. And
any person holding such receipt, when he is called on to
perform a tour or tours of duty, and producing the same
to the captain calling on him, it shall be the duty of said
captain to receive the same, and give the owner thereof a
credit for as many tours as is therein contained.

Sec. 2. And where any delinquent militia-man shall be-
long to any society who hold a community of property,
the sheriff shall call on the agent or superintendent of the
common stock, or firm of said society, or compact, for the
same; and if he fails to pay the same as before described,
the sheriff shall make distress, and sell so much of the pro-
perty belonging to said stock, as will satisfy the fine, cost,
&c. as is before directed.

Sec. 3. And be it further enacted, That brigade inspec-
tors and brigade quarter masters, when not taken from the
line, shall each be entitled to the rank, pay, and emoluments

*Persons fail*
*ing to per*
*form tour of*
*duty consider*
*ed a deserter*

*Brigade in*
*spectors quar*
*ter masters,*
*adjutants and*
*pay masters*

Exhibit 20
Page 126

[ 102 ]

of a major of infantry ; and adjutants, regimental pay-masters, and quarter masters, when not taken from the line, shall each be entitled to the rank, pay, and emoluments of lieutenants of infantry ; and whether taken from the line or not, shall recieve the additional pay of ten dollars per month, and for forage for one horse.

**Persons who may scruple to bear arms shall furnish a substitute**

Sec. 4. *And be it further enacted,* That where any non-commissioned officer or private who may conscientiously scruple to bear arms, is legally called on to perform a tour of duty, in the service of this state or the United States, shall perform the same by himself or an able bodied substitute; and, upon failure, the commanding officer of the company shall hire a substitute, and the person failing to perform his tour, shall pay the price said officer may agree to give said substitute, not exceeding one hundred dollars; which sum may be recovered by action of debt, before any court having jurisdiction of like sums.

**Oaths**

Sec. 5. *And be it further enacted,* That while the militia are either in the actual service of this state or the United States, the several oaths which militia officers are required by law to take, may be administered by any commissioned officer belonging to the same corps.

**Former law repealed**

Sec. 6. *And be it further enacted,* That so much of the militia law, as requires the commandants of companies to lay of their companies into ten classes for an equal routine of duty, shall be and the same is hereby repealed,

**Companies how to be classed**

Sec. 7. *And be it further enacted,* That hereafter, when the captains of companies are commanded to detach any number of men from their respective companies for the service of this state or the United States, it shall be the duty of each captain to lay off his company by lot, into as many classes, as the number of men he is ordered to detach ; and the class or classes failing voluntarily to furnish a man, shall determine by lot which man shall do the duty required ; and the man, which each class may voluntarily furnish, and also the man selected by lot, shall be entitled to a credit for as many tours of duty as they may serve. But it is clearly to

**Restrictions**

be understood, that no man shall be called on to perform a tour of duty, who has been drafted on the late six months' expedition, and served his tour by himself or substitute, or has volunteered and served said tour. And whereas, a number of volunteers have served tours of thirty days, or more, either as mounted rifle-men, pack-horse drivers, or guards on the frontiers, and have got a discharge for the same, they nor either of them shall be called on to serve a tour until every other man fit for such service, belonging to their respective companies, shall have served a tour or tours,

Exhibit 20
Page 127

# Exhibit 21

Exhibit 21
Page 128

# GENERAL LAWS

OF THE

## TWELFTH LEGISLATURE,

OF THE

# STATE OF TEXAS.

CALLED SESSION.

BY AUTHORITY.



AUSTIN:

PRINTED BY TRACY, SIEMERING & CO.

1870.

Exhibit 21
Page 129

GENERAL LAWS. 63

## CHAPTER XLVI.

### AN ACT REGULATING THE RIGHT TO KEEP AND BEAR ARMS.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law.

SEC. 2. That this act take effect and be in force in sixty days from the passage thereof.

Approved August 12, 1870.

---

## CHAPTER XLVII.

### AN ACT AUTHORIZING THE GOVERNOR TO ORDER AN ELECTION TO BE HELD IN HILL COUNTY FOR THE PERMANENT LOCATION OF THEIR COUNTY SEAT.

SECTION 1. *Be it enacted by the Legislature of the State of Texas,* That the Governor of the State of Texas be, and is hereby authorized to order an election to be held in the county of Hill, on the second Monday in September, A. D. 1870, (or as soon thereafter as possible), for the permanent location of the county seat of the

Exhibit 21
Page 130

64 GENERAL LAWS.

county of Hill; said election shall be held at such places and under such rules and regulations as the Governor may prescribe.

SEC. 2. That the returns of said election shall be made to the Secretary of State, within twenty days after said election shall have been held, and the town receiving two-thirds of the votes cast shall be the permanent county seat of the county of Hill, but should no place receive two-thirds of the votes cast, the present county seat shall remain the permanent one.

SEC. 3. That the Governor shall, within twenty days after the returns of said election shall have been received, notify the Police Court of the county of Hill of the result of said election.

SEC. 4. That this act be in force from and after passage.

Approved August 12, 1870.

---

## CHAPTER XLVIII.

AN ACT MAKING APPROPRIATIONS FOR THE PAYMENT OF THE EXPENSES OF MAINTAINING RANGING COMPANIES ON THE FRONTIER.

SECTION 1. *Be it enacted by the Legislature of the State of Texas*, That the sum of seven hundred and fifty thousand dollars, or so much thereof as may be necessary, be and the same is hereby appropriated, out of any moneys in the State Treasury (derived from the sale or hypothecation of the bonds of the State issued for frontier protection), for the purpose of paying all expenses connected with the organization, arming and maintenance of the ranging companies on the frontier, called into service under the provisions of the act approved June 13, 1870.

SEC. 2. That this appropriation shall be expended under the direction of the Governor; and the Comptroller of Public Accounts shall, under the special direction of the Governor, audit all claims and accounts incurred for the purposes hereinbefore mentioned, and shall draw his warrant on the Treasurer for the payment of the same.

SEC. 3. That this act shall take effect from and after its passage.

Approved August 12, 1870.

Exhibit 21
Page 131

# Exhibit 22

Exhibit 22
Page 132

GENERAL LAWS.                           25

# CHAPTER XXXIV.

### AN ACT TO REGULATE THE KEEPING AND BEARING OF DEADLY WEAPONS.

SECTION 1.  *Be it enacted by the Legislature of the State of Texas,* That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeenor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; *provided,* that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; *provided further,* that members of the Legislature shall not be included under the term "civil officers" as used in this act.

SEC. 2.  Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

SEC. 3.  If any person shall go into any church or religious assembly, any school room, or other place where persons are assem-

Exhibit 22
Page 133

## GENERAL LAWS.

bled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.

SEC. 4. This act shall not apply to, nor be enforced in any county of the State, which may be designated, in a proclamation of the Governor, as a frontier county, and liable to incursions of hostile Indians.

SEC. 5. All fines collected under the provisions of this act shall be paid into the treasury of the county, and appropriated exclusively to the keeping in repair and maintenance of public roads, and all weapons forfeited to the county under the provisions of this act shall be sold as may be prescribed by the county court, and the proceeds appropriated to the same purpose.

SEC. 6. It shall be the duty of all sheriffs, constables, marshals, and their deputies, and all policemen, and other peace officers, to arrest any person violating the first or third sections of this act, and to take such person immediately before a justice of the peace of the county where the offense is committed, or before a mayor or recorder of the town or city in which the offense is committed, who shall investigate and try the case without delay. On all such trials the accused shall have the right of a trial by jury, and of appeal to the district court; but, in case of appeal, the accused shall be required to give bond with two or more good and sufficient sureties in a sum of not less than one hundred nor more than two hundred dollars, if convicted under the first section and in a sum of not less than two hundred nor more than one thousand dollars, if convicted under the third section of this act; said bond to be payable to the State of Texas, and approved by the magistrate, and conditioned that the defendant will abide the judgment of the district court that may

Exhibit 22
Page 134

be rendered in the case; and in case of forfeiture the proceedings thereon shall be as is or may be prescribed by law in similar cases; and all moneys collected on any bond or judgment upon the same, shall be paid over and appropriated as provided in the fifth section of this act.

SEC. 7.   Any officer named in the sixth section of this act who shall refuse or fail to arrest any person whom he is required to arrest by said section on his own information, or where knowledge is conveyed to him of any violation of the first or third sections of this act, shall be dismissed from his office on conviction in the district court, on indictment or information, or by such other proceedings or tribunal as may be provided by law, and in addition, shall be fined in any sum not exceeding five hundred dollars, at the discretion of the court or jury.

SEC. 8.   That the district courts shall have concurrent jurisdiction under this act, and it is hereby made the duty of the several judges of the district courts of this State to give this act especially in charge to the grand juries of their respective counties.

SEC. 9.   It is hereby made the duty of the Governor to publish this act throughout the State; and this act shall take effect and be in force from and after the expiration of sixty days after its passage.

Approved April 12, 1871.

———

## CHAPTER XXXV.

AN ACT TO AUTHORIZE THE COUNTY COURT OF ROBERTSON COUNTY TO LEVY AND COLLECT A SPECIAL TAX FOR THE TERM OF TWO YEARS TO BUILD A COURT HOUSE AND JAIL IN THE CITY OF CALVERT, THE COUNTY SEAT OF SAID COUNTY.

SECTION 1.   *Be it enacted by the Legislature of the State of Texas*, That the County Court of Robertson county be and the same is hereby authorized to levy and collect, annually, for the term of two years, a special *ad valorem* tax upon all property, real, personal and mixed, in said county, not to exceed one half of one per centum in addition to all general and special taxes now authorized to be levied and collected by law, which tax shall be levied and collected the same as other taxes, and shall be appropriated and paid out solely for the purpose of building a substantial court house and jail at Calvert, the county seat of Robertson county, Texas.

SEC. 2.   That this act shall take effect and be in force from and after its passage.

Approved April 12, 1871.

Exhibit 22
Page 135

# Exhibit 23

Exhibit 23
Page 136

EXHIBIT D

42

TITLE IX.—OFFENSES AGAINST PUBLIC PEACE.—CH. 3, 4.

who continue so unlawfully assembled, or engaged in a riot, after being warned to disperse, shall be punished by the addition of one-half the penalty to which they would otherwise be liable, if no such warning had been given.

## CHAPTER THREE.

### AFFRAYS AND DISTURBANCES OF THE PEACE.

| | Article | | Article |
|---|---|---|---|
| "Affray" defined | 313 | Shooting in public place | 316 |
| Disturbance of the peace | 314 | Horse-racing on public road or street | 317 |
| "Public place" defined | 315 | | |

**"Affray" defined.**
P.C. 381.

ARTICLE 313. If any two or more persons shall fight together in a public place, they shall be punished by fine not exceeding one hundred dollars.

**Disturbance of the peace.**
(Act June 20, 1876, p. 24.)
P.C. 382.

ART. 314. If any person shall go into any public place, or into or near any private house, or along any public street or highway near any private house, and shall use loud and vociferous or obscene, vulgar or indecent language, or swear, or curse, or expose his person, or rudely display any pistol or other deadly weapon in such public place, or upon such public street or highway, or near such private house, in a manner calculated to disturb the inhabitants thereof, he shall be fined in a sum not exceeding one hundred dollars.

**"Public place" defined.**
P.C. 383.

ART. 315. A public place within the meaning of the two preceding articles, is any public road, street or alley, of a town or city, inn, tavern, store, grocery, work-shop, or any place to which people commonly resort for purposes of business, recreation or amusement.

**Shooting in public place.**
(Act Nov. 12, 1866, p. 210.)

ART. 316. If any person shall discharge any gun, pistol, or fire-arms of any description, on or across any public square, street or alley in any city, town or village in this state, he shall be fined in a sum not exceeding one hundred dollars.

**Horse-racing on public road or street.**
(Act May 19, 1873, pp. 83–4.)

ART. 317. Any person who shall run, or be in any way concerned in running any horse race in, along, or across any public square, street or alley in any city, town or village, or in, along or across any public road within this state, shall be fined in a sum not less than twenty-five nor more than one hundred dollars.

## CHAPTER FOUR.

### UNLAWFULLY CARRYING ARMS.

| | Article | | Article |
|---|---|---|---|
| Unlawfully carrying arms | 318 | Arrest without warrant | 322 |
| Not applicable, when and to whom | 319 | Officer failing to arrest, punishable | 323 |
| Carrying arms in church or other assembly | 320 | Not applicable to, frontier counties | 323 |
| Not applicable, to whom | 321 | | |

**Unlawfully carrying arms.**
(Act April 12, 1871, p. 25.)

ARTICLE 318. If any person in this state shall carry on or about his person, saddle, or in his saddle-bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by fine of not less than twenty-five nor more than one hundred dollars; and, in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

**Not applicable when and to whom.**
(Act April 12, 1871, p. 25.)

ART. 319. The preceding article shall not apply to a person in actual service as a militiaman, nor to a peace officer or policeman, or person summoned to his aid, nor to a revenue or other civil officer engaged in the discharge of official duty, nor to the carrying of arms on one's own prem-

Exhibit 23
Page 137

TITLE IX.—OFFENSES AGAINST PUBLIC PEACE.—CH. 4.          43

ises or place of business, nor to persons traveling, nor to one who has reasonable ground for fearing an unlawful attack upon his person, and the danger is so imminent and threatening as not to admit of the arrest of the party about to make such attack, upon legal process.

ART. 320.   If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball-room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this state are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other fire-arm, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of a knife manufactured and sold for the purposes of offense and defense, he shall be punished by fine not less than fifty nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person. *Carrying arms in church or other assembly. (Act April 12, 1871, p. 25.)*

ART. 321.   The preceding article shall not apply to peace officers, or other persons authorized or permitted by law to carry arms at the places therein designated. *Not applicable to whom. (Act April 12, 1871, p. 25.)*

ART. 322.   Any person violating any of the provisions of articles 318 and 320, may be arrested without warrant by any peace officer, and carried before the nearest justice of the peace for trial; and any peace officer who shall fail or refuse to arrest such person on his own knowledge, or upon information from some credible person, shall be punished by fine not exceeding five hundred dollars. *Arrest without warrant. Officer failing punished. (Act April 12, 1871, p. 25.)*

ART. 323.   The provisions of this chapter shall not apply to or be enforced in any county which the governor may designate, by proclamation, as a frontier county and liable to incursions by hostile Indians. *Not applicable to frontier counties. (Act April 12, 1871, p. 25.)*

Exhibit 23
Page 138

# Exhibit 24

Exhibit 24
Page 139

108                                 ELECTIONS.

Election polls.    SEC. 2. That said election shall be held at the different
places in the cities and counties, as now provided by law, in
this State, and according to the Constitution and existing
laws governing elections in this State, so far as applicable,
and the returning officers shall make their returns in the
manner, and to the persons, as now provided by law.

### 1869–70—CHAPTER XXII.

[Enacted Dec. 1, 1869.]

Voters to bal-
lot in their
own districts.

SECTION 1. That all voters in this State shall be required
to vote in the civil district or ward in which they may re-
side.   Any person violating this act shall be guilty of a mis-
demeanor, and, upon conviction thereof, shall not be fined
less than twenty nor more than fifty dollars: *Provided*, that

Sheriffs ex-
cepted.

Sheriffs and other officers holding elections shall be permitted
to vote at any ward or precinct in which they may hold an
election.

Deadly or dan-
gerous weap-
ons.

SEC. 2. That it shall not be lawful for any qualified voter
or other person attending any election in this State, or for
any person attending any fair, race course, or other public
assembly of the people, to carry about his person, concealed
or otherwise, any pistol, dirk, Bowie-knife, Arkansas tooth-
pick, or weapon in form, shape, or size resembling a Bowie-
knife or Arkansas tooth-pick, or other deadly or danger-
ous weapon.

Penalty.

SEC. 3. That all persons convicted under the second sec-
tion of this act shall be punished by fine of not less than fifty
dollars, and by imprisonment, or both, at the discretion of
the court.

Saloons to be
closed.

SEC. 4. That no liquor shop in this State shall be kept
open on election days, nor shall any person, on said days,
give or sell intoxicating liquors to any person for any pur-
pose at or near an election ground.[1]

Powers of
grand jury.

SEC. 5. That the grand juries of this State shall have
inquisitorial powers concerning the commission of the offenses
created by these acts, and may send for witnesses, as in cases
of gaming, illegal voting, tippling, and offenses now pre-
scribed by law.

Duty of the
judges.

SEC. 6. That it shall be the duty of the Circuit and Crim-
inal Judges of this State to give the above in special charge
to the several grand juries of the courts.

No exemption
from execu-
tion.

SEC. 7. That there shall be no property exempt from
execution for fines and costs for this offense: *Provided*, that

Failure to
open poll.

if from any cause, there should be a failure to hold an elec-
tion in any civil district or ward, then nothing in this act
shall be so construed as to prevent any voter from voting in

---

[1] See the act next following.

Digitized by Google

Original from
THE OHIO STATE UNIVERSITY

Exhibit 24
Page 140

# Exhibit 25

Exhibit 25
Page 141

# ACTS AND RESOLUTIONS

OF THE

# GENERAL ASSEMBLY

OF THE

# STATE OF GEORGIA,

PASSED IN ATLANTA, GEORGIA,

AT THE

# SESSION OF 1870.

COMPILED AND PUBLISHED BY AUTHORITY.

ATLANTA, GEORGIA:
PRINTED BY THE PUBLIC PRINTER.
1870.

Exhibit 25
Page 142

PUBLIC LAWS.—Penal Code—Amendments to. 421

To preserve the peace and harmony of the people of this State, etc.

# TITLE XVI.

## PENAL CODE—AMENDMENTS TO.

SECTIONS.
1. Carrying deadly weapons to certain places prohibited.
2. Violation—misdemeanor—penalty.
3. Chain-gang punishment prohibited.
4. Punishment in lieu of chain-gang.

SECTIONS.
5. Section 415 of the Code changed— nolle prosequi.
6. All indictments, etc., submitted to a jury.

### (No. 285.)

*An Act to preserve the peace and harmony of the people of this State, and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That, from and immediately after the passage of this act, no person in said State of Georgia be permitted or allowed to carry about his or her person any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon, to any court of justice, or any election ground or precinct, or any place of public worship, or any other public gathering in this State, except militia muster-grounds. *[margin: Carrying deadly weapons to certain places prohibited. Exception.]*

SEC. 2. *Be it further enacted,* That if any person or persons shall violate any portion of the above recited section of this act, he, she or they shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the court. *[margin: Violation a misdemeanor—penalty]*

SEC. 3. All laws and parts of laws militating against this act are hereby repealed.

Approved October 18, 1870.

### (No. 286.)

*An Act to alter and amend section 4245 of Irwin's Revised Code, by striking out of said section the words "to work in a chain-gang on the public works," and for other purposes.*

SECTION 1. *Be it enacted, etc.,* That the words "to work in a chain-gang on the public works," which occur in fourth and fifth lines of section 4245 of Irwin's Code, be, and the same are hereby, *[margin: Chain-gang punishment prohibited]*

Exhibit 25
Page 143

422        PUBLIC LAWS.—Penal Code—Amendments to.

stricken from said section, and chain-gangs shall no longer exist, or be tolerated in the State of Georgia, for persons convicted of misdemeanors.

Punishment in lieu of chain-gang.

SEC. 2. *Be it further enacted,* That said section be further amended, by substituting for the words herein stricken out, the words "to work on the city or town streets, or county roads, not longer than six months; but in no case shall such prisoners be chained or otherwise confined in a gang, but shall be guarded."

SEC. 3. *Be it further enacted,* That all laws and parts of laws in conflict with this act be, and they are hereby, repealed.

Approved October 27, 1870.

---

(No. 287.)

*An Act to repeal section four hundred and fifteen (415) of Irwin's Revised Code, in relation to entering nolle prosequis, and to prescribe the mode of settlement in criminal cases.*

Section 415 of Code, as to nolle prosequi, repealed.

SECTION 1. *Be it enacted, etc.,* That section four hundred and fifteen (415) of Irwin's Revised Code of Georgia, which said section authorizes Solicitors-General in this State to enter a *nolle prosequi* on indictments, be, and the same is hereby repealed, and no *nolle prosequi* shall be allowed, except it be in open court, for some fatal defect in the bill of indictment, to be judged of by the court,

Judge shall order second bill.

in which case the presiding Judge shall order another bill of indictment to be forthwith submitted to the grand jury.

SEC. 2. *And be it further enacted by the authority aforesaid,* That

All indictments submitted to jury.

all cases of indictments, or special presentments, shall be submitted to and passed upon by the jury, under the direction of the presiding Judge, unless there is a settlement thereof between the

Settlement—when good.

prosecutor and defendant, which settlement shall be good and valid only by the approval and order of the court on examination into the merits of the case.

SEC. 3. *And be it further enacted, etc.,* That all laws and parts of laws conflicting with this act be, and the same are hereby, repealed.

Approved October 28, 1870.

Exhibit 25
Page 144

# Exhibit 26

Exhibit 26
Page 145

SEC. 1271.  *Abandonment of children.*—If any father or mother of any child under the age of six years, or any other person to whom such child shall have been confided, shall expose such child in a street, field or other place, with intent wholly to abandon it, he or she shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding five years, or in the county jail not less than six months.   (G. S. 781, § 39.)

SEC. 1272.  *Mistreatment of apprentices.*—If any master or mistress of an apprentice or other person having the legal care and control of any infant, shall, without lawful excuse, refuse or neglect to provide for such apprentice or infant, necessary food, clothing or lodging, or shall unlawfully and purposely assault such apprentice or infant, whereby his life shall be endangered, or his health shall have been or shall be likely to be permanently injured, the person so offending shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding three years, or by imprisonment in the county jail not exceeding one year, or by a fine of not more than one thousand dollars, or by both such fine and imprisonment. (New section.)

SEC. 1273.  *Abandonment of wife or child.*—If any man shall, without good cause, abandon or desert his wife, or abandon his child or children under the age of twelve years born in lawful wedlock, and shall fail, neglect or refuse to maintain and provide for such wife, child or children, he shall, upon conviction, be punished by imprisonment in the county jail not more than one year, or by a fine of not less than fifty, nor more than one thousand dollars, or by both such fine and imprisonment.   No other evidence shall be required to prove that such husband was married to such wife, or is the father of such child or children, than would be necessary to prove such fact or facts in a civil action. (Laws 1867, p. 112, amended—*m*.)

SEC. 1274.  *Carrying deadly weapons, etc.*—If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of firearms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the county jail not exceeding three months, or by both such fine and imprisonment.   (Laws 1874, p. 43; laws 1875, p. 50, and laws 1877, p. 240, amended.)

SEC. 1275.  *Above section not to apply to certain officers.*—The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.   (New section.)

SEC. 1276.  *Fire arms not to be discharged near court house.*—Hereafter it shall be unlawful for any person in this state, except he be a sheriff or other officer in the discharge of official duty, to discharge or fire off any

_____

(*m*)  Wife held to be a competent witness to prove fact of abandonment.   43 Mo. 429.   The fact that the defendant has brought suit for divorce is no defense.   62 Mo. 172.

Exhibit 26
Page 146

# Exhibit 27

Exhibit 27
Page 147

# THE

# STATUTES OF OKLAHOMA

## 1890.

Compiled under the supervision and direction of Robert Martin,
Secretary of the Territory,

—BY—

WILL T. LITTLE,  L. G. PITMAN and R. J. BARKER,

—FROM—

The Laws Passed by the First Legislative Assembly of the Territory.

GUTHRIE, OKLAHOMA:
THE STATE CAPITAL PRINTING CO.,
PUBLISHERS.
1891.

Exhibit 27
Page 148

CRIMES AND PUNISHMENT. 495

(2430) § **6**. Every person who, with intent to extort any money or other property from another, sends to any person any letter or other writing, whether subscribed or not, expressing or implying, or adapted to imply, any threat, such as is specified in the second section of this article, is punishable in the same manner as if such money or property were actually obtained by means of such threat.

Chap. 25.

Sending threatening letter.

(2431) § **7**. Every person who unsuccessfully attempts by means of any verbal threat such as is specified in the second section of this article, to extort money or other property from another is guilty of a misdemeanor.

Attempting to extort money.

### ARTICLE 47.—CONCEALED WEAPONS.

| SECTION. | SECTION. |
|---|---|
| 1. Prohibited weapons enumerated. | 6. Degree of punishment. |
| 2. Same. | 7. Public buildings and gatherings. |
| 3. Minors. | 8. Intent of persons carrying weapons. |
| 4. Public officials, when privileged. | 9. Pointing weapon at another. |
| 5. Arms, when lawful to carry. | 10. Violation of certain sections. |

(2432) § **1**. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

Prohibited weapons enumerated.

(2433) § **2**. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

Same.

(2434) § **3**. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

Minors.

(2435) § **4**. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: *Provided, however,* That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

Public officials, when privileged.

(2436) § **5**. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

Arms, when lawful to carry.

(2437) § **6**. Any person violating the provisions of any one of the foregoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent con-

Degree of punishment.

Exhibit 27
Page 149

496 CRIMES AND PUNISHMENT.

Chap. 25. viction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

Public buildings and gatherings.
(2438) § 7.  It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, or for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

Intent of persons carrying weapons.
(2439) § 8.  It shall be unlawful for any person in this Territory to carry or wear any deadly  weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

Pointing weapons at another.
(2440) § 9.  It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

Violation of section seven.
(2441) § 10.   Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars,  nor more than five hundred and shall be imprisoned in  the county jail for not less than three nor more than twelve months.

## ARTICLE 48.—FALSE PERSONATION AND CHEATS.

SECTION.
1. False impersonation, punishment for.
2. False impersonation and receiving money.
3. Personating officers and others.
4. Unlawful wearing of grand army badge.
5. Fines, how paid.
6. Obtaining property under  false pretenses.

SECTION.
7. False representation of charitable purposes.
8. Falsely representing banking corporations.
9. Using false check.
10. Holding mock auction.

Punishment for false impersonation.
(2442) § 1.  Every person who falsely personates another, and in such assumed character, either:

First.  Marries or pretends to marry, or to sustain the marriage relation toward another, with or without the connivance of such other person; or,

Second.  Becomes bail or surety for any party, in any proceeding whatever, before any court or officer authorized to take such bail or surety; or,

Third.  Subscribes, verifies, publishes, acknowledges or proves, in the name of another person, any written instrument, with intent that the same may be delivered or used as true; or,

Fourth.  Does any other act whereby, if it were done by the person falsely personated, he might in any event become liable to any  suit or prosecution, or to pay any sum of money, or to incur any charge, forfeiture or penalty, or whereby any benefit might accrue to the party personating, or to any other person.

Exhibit 27
Page 150

# Exhibit 28

Exhibit 28
Page 151

**1025** (2766). **The same; opening graves for certain purposes.**—Every person who shall open a grave or other place of interment with intent to move the dead body of any human being for the purpose of selling the same, or for the purpose of dissection, or to steal the coffin or any part thereof, or the vestments or other articles interred with the dead body, or any of them, shall, upon conviction, be punished by imprisonment in the penitentiary not exceeding two years, or in the county jail not more than six months, or by fine of not more than three hundred dollars, or both.

**1026** (2985). **Deadly weapons; carrying of concealed.** (Laws 1888, p. 89).—Any person who carries concealed, in whole or in part any bowie-knife, dirk-knife, butcher-knife, pistol, brass or metallic knuckles, slung-shot, sword, or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and, on conviction, shall be punished by a fine of not less than twenty-five dollars nor more than one hundred dollars, or be imprisoned in the county jail not less than one month nor more than three months, or both.

**1027. The same; not applicable to certain persons.**—Any person indicted or charged for a violation of the last section may show as a defense—

(*a*) That he was threatened, and had good and sufficient reason to apprehend a serious attack from an enemy, and that he did so apprehend; or

(*b*) That he was traveling and was not a tramp, or was setting out on a journey, and was not a tramp; or

(*c*) That he was a peace officer or deputy in the discharge of his duties; or

(*d*) That he was at the time in the discharge of his duties as a mail carrier; or

(*e*) That he was at the time engaged in transporting valuables for an express company or bank; or

(*f*) That he was in lawful pursuit of a felon.

And the burden of proving either of said defenses shall be on the accused.

The "traveling or setting out on a journey" in the statute means a travel of such distance as to take one beyond the circle of his friends and acquaintances. McGuirk v. State, 64 Miss., 209.

The pursuit of a fugitive daughter, begun without knowing where it will lead, is "traveling on a journey." Haywood v. State, 66 Miss., 402.

"Threatened with an attack" does not contemplate mere denunciation, but menace such as to cause a reasonable apprehension of an attack that might properly be resisted with the deadly weapon. Tipler v. State, 57 Miss., 685.

Even if the accused be "threatened" and entertain the "apprehension," it will be no defense if he carried the weapon for some other reason, and for some other purpose. McGuirk v. State, 64 Miss., 209.

The threats must not be too remote. McGuirk v. State, 64 Miss., 210.

The act of 1888, amendatory of the Code, 1880, on the subject of carrying weapons concealed, was ex post facto in its application to offenses previously committed. (1) It cut off a defense, and (2) it changed, but did not mitigate, the penalty. Lindsey v. State, 65 Miss., 542; Hodnett v. State, 66 Miss., 26.

The statute makes the fact of carrying a weapon concealed criminal, regardless of intent. Strahan v. State, 68 Miss., 347.

**1028** (2986). **The same; and cartridges not sold to infant or drunk person.**—It shall not be lawful for any person to sell, give, or lend to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any deadly weapon, or other weapon the carrying of which concealed is prohibited, or pistol cartridge; and, on conviction thereof, he shall be punished by a fine not less than twenty-five dollars nor more than two hundred dollars, or imprisoned in the county jail not exceeding three months, or both.

**1029** (2987). **The same; father not to suffer infant son to have or carry.**—Any father who shall knowingly suffer or permit any son under the age of sixteen

326

Exhibit 28
Page 152

years to have or to own, or to carry concealed, in whole or in part, any weapon the carrying of which concealed is prohibited, shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than twenty dollars nor more than two hundred dollars, or may be imprisoned not more than sixty days in the county jail, or both.

**1030** (2988). **The same; college students not to have, etc.**—A student of any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher, instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both.

**1031** (2804). **The same; exhibiting in rude, angry, or threatening manner, etc.**—If any person, having or carrying any dirk, dirk-knife, sword, sword-cane, or any deadly weapon, or other weapon the carrying of which concealed is prohibited, shall, in the presence of three or more persons, exhibit the same in a rude, angry, or threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person so offending, upon conviction thereof, shall be fined in a sum not exceeding five hundred dollars or be imprisoned in the county jail not exceeding three months, or both. In prosecutions under this section it shall not be necessary for the affidavit or indictment to aver, nor for the state to prove on the trial, that any gun, pistol, or other fire-arm was charged, loaded, or in condition to be discharged.

The omission of the word "manner," after the words "rude, angry, and threatening," in an indictment, is a formal defect, and may be amended as such. In such indictment it is unnecessary to aver that the defendant was "carrying" the weapon. Gamblin v. State, 45 Miss., 658.

**1032** (2769). **Disturbance of family; noises and offensive conduct.**—A person who willfully disturbs the peace of any family or person by an explosion of gunpowder or other explosive substance, or by loud or unusual noise, or by any tumultuous or offensive conduct, shall be punished by fine and imprisonment, or either; the fine not to exceed one hundred dollars, and the imprisonment not to exceed six months in the county jail.

What constitutes the offensive conduct, or the nature or character of the offensive conduct, should be stated in the affidavit or indictment. Finch v. State, 64 Miss., 461.

This section and the next one are intended to protect the peace of families. An affidavit or indictment averring the disturbance merely of an individual, charges no offense under either section. Brooks v. State, 67 Miss., 577.

**1033** (2770). **The same; using abusive, etc., language, etc.**—Any person who enters the dwelling-house of another, or the yard or curtilage thereof, or upon the public highway, or any other place near such premises, and in the presence or hearing of the family of the possessor or occupant thereof, or of any member thereof, or of any female, makes use of abusive, profane, vulgar, or indecent language, or is guilty of any indecent exposure of his person at such place, shall be punished for a misdemeanor.

Place is material. An indictment charging the use of abusive language in a yard, is not sustained by proof of its use near the yard. Quin v. State, 65 Miss., 479.

**1034** (2767). **Disturbance of worship; proceedings and penalty.**—If any person shall willfully disturb any congregation of persons lawfully assembled for reli-

Exhibit 28
Page 153

# Exhibit 29

Exhibit 29
Page 154

 

DATE DOWNLOADED: Sat Feb  4 11:10:25 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1891-1892 95 .

ALWD 7th ed.
, , 1891-1892 95 .

Chicago 17th ed.
"," Vermont - 12th Biennial Session; Special Session - 1891 : 95-96

AGLC 4th ed.
" Vermont - 12th Biennial Session; Special Session - 1891 95

OSCOLA 4th ed.
" 1891-1892 95

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

Exhibit 29
Page 155

SEC. 5.  This act shall take effect on the first day of May, 1893.

Approved November 22, 1892.

---

No. 84.—AN ACT IN AMENDMENT OF SECTION 4074 OF THE REVISED LAWS, RELATING TO GAMES.

*It is hereby enacted by the General Assembly of the State of Vermont:*

Section four thousand and seventy-four of the Revised Laws is hereby amended by inserting therein, after the word "billiard table," in the first line of said section, the words "pool table."

Approved November 15, 1892.

---

No. 85.—AN ACT AGAINST CARRYING CONCEALED WEAPONS.

*It is hereby enacted by the General Assembly of the State of Vermont:*

SECTION 1.  A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.

SEC. 2.  A person who shall carry or have in his possession while a member of and in attendance upon any school, any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon shall, upon conviction thereof, be fined not exceeding twenty dollars.

Approved November 19, 1892.

---

No. 86.—AN ACT TO PREVENT FRAUD AT AGRICULTURAL FAIRS AND EXHIBITIONS OF HORSES.

| SECTION. | SECTION. |
|---|---|
| 1. Societies authorized to hold public fairs may offer premiums or purses for competition of horses in respect to speed, and may make rules for the conduct of their exhibitions. | 2. Societies may classify horses respecting previous exhibitions of speed. 3. Penalty for entering disguised horse, representing animal to be another horse; or entering horse in a class in which he is not eligible. 4. When to take effect. |

*It is hereby enacted by the General Assembly of the State of Vermont:*

SECTION 1.  Agricultural societies, corporations and associations, authorized under the laws of this State to hold public fairs

Exhibit 29
Page 156

for the competition of horses or horse kind in respect to speed, are hereby authorized to offer premiums or purses for success in such competition, and to conduct and manage their exhibitions in accordance with their own rules and regulations, publicly advertised, and not in conflict with the laws of this State.

SEC. 2.   Such societies, corporations and associations are hereby authorized to establish and designate classes of horses or horse kind, with respect to the previous exhibitions of speed of such animals, or to any other reasonable and lawful grounds of classification, particularly set forth in such publicly advertised rules or regulations.

SEC. 3.   Whoever, for the purpose of competing for any purse or premium, offered by any such society, corporation or association within this State, shall knowingly and designedly enter or drive any horse or animal of the horse kind that shall have been painted or disguised ; or who, for such purpose, shall falsely and fraudulently represent any animal of the horse kind to be another or different animal from the one it really is ; or who knowingly or designedly, for the purpose of competing for any such premium or purse, shall enter or drive any horse, or animal of the horse kind, in a class where it is not entitled to be entered, under the said rules and regulations of the society, corporation or association offering such premium or purse, shall be deemed guilty of an offense under section four thousand one hundred and fifty-four (4154) of the Revised Laws of Vermont ; and upon conviction, shall be punished by a fine of not more than five hundred dollars, or by imprisonment not exceeding six months.

SEC. 4.   This act shall take effect from its passage.

Approved November 16, 1892.

---

No. 87.—AN ACT TO PREVENT FRAUD IN THE SALE OF LARD.

*It is hereby enacted by the General Assembly of the State of Vermont:*

SECTION 1.   No manufacturer or other person shall sell, deliver, prepare, put up, expose or offer for sale any lard, or any article intended for use as lard, which contains any ingredient but the pure fat of swine, in any tierce, bucket, pail, or other vessel or wrapper, or under any label bearing the words "pure," "refined," "family," or either of them, alone or in combination with other words, unless every vessel, wrapper or label, in or under which such article is sold, delivered, prepared, put up or exposed for sale, bears on the top or outer side thereof, in letters not less than one-half inch in length and plainly exposed to view, the words "compound lard."

Exhibit 29
Page 157

# Exhibit 30

Exhibit 30
Page 158

 

DATE DOWNLOADED: Fri Feb 10 12:19:32 2023
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1870 145 .

ALWD 7th ed.
, , 1870 145 .

Chicago 17th ed.
"," Louisiana - 1st Legislature, 3rd Session; 1st Legislature, 2nd Session : 145-161

AGLC 4th ed.
" Louisiana - 1st Legislature, 3rd Session; 1st Legislature, 2nd Session 145

OSCOLA 4th ed.
" 1870 145

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

Exhibit 30
Page 159

158

**False certificates, etc.**

Sec. 63. *Be it further enacted, etc.*, That any person who shall vote or attempt to vote on any false or fraudulent paper or certificate of registration, or upon any paper or certificate of registration issued to a person other than the one voting or attempting to vote on said paper or certificate of registration, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a term not less than one year nor more than three years.

**Bribery and violence.**

Sec. 64. *Be it further enacted, etc.*, That any person who shall induce, by offer of reward, by threats of violence, or otherwise, any person to vote or attempt to vote on any false or fraudulent paper or certificate of registration, or upon any papers or certificate of registration belonging to a person other than the one voting or attempting to vote on said paper or certificate of registration, shall be deemed guilty of a felony, and on conviction thereof shall be punished by a fine not exceeding five hundred dollars nor less than one hundred dollars, and by imprisonment in the penitentiary for a period not exceeding three years nor less than one year.

**Twice voting.**

Sec. 65. *Be it further enacted, etc.*, That any person who shall vote or attempt to vote more than once at the same election, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the penitentiary for a term of not less than three years.

**Arrest of offenders.**

Sec. 66. *Be it further enacted, etc.*, That it shall be the duty of any commissioner of election to forthwith arrest any person who shall vote or attempt to vote more than once, and commit him to the parish prison, and to immediately file an information against such person with the district attorney or district attorney *pro tempore* whose duty it shall be to prosecute such person before the proper court; and upon his failure so to do, the Attorney General shall appoint some attorney to prosecute such person, and also to prosecute such district attorney or district attorney *pro tempore* for such failure. Any supervisor of registration, commissioner of election, district attorney, or district attorney *pro tempore* who shall refuse, neglect or fail to comply with the provisions of this section of this act, shall be deemed guilty of a misdemeanor in office, and upon conviction thereof shall be removed from office, and punished by a fine of not less than one hundred dollars, and imprisonment for not less than three nor more than six months.

**Influencing voters.**

Sec. 67. *Be it further enacted, etc.*, That any person who shall, by threats of discharge from employment, of withholding wages, or proscription in business, influence or attempt to influence any voter in the casting of his vote at any election, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, which shall go to the school fund of the parish, and by imprisonment in the parish prison for not less than three months.

**Discharge from employment of voter.**

Sec. 68. *Be it further enacted, etc.*, That any person who shall discharge from his employment any laborer, employe, tenant or mechanic, who shall have been working for such person under contract, written or oral, for a specified time before such time shall have expired, or who shall withhold from any laborer, employe, tenant or

Exhibit 30
Page 160

159

mechanic any part of the wages due to such laborer, employe, tenant or mechanic, on account of any vote which such laborer, employe, tenant or mechanic has given or purposes to give, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than five hundred dollars, one half of which shall go to the school fund of the parish in which the offense was committed, and by imprisonment in the parish prison for not less than three months.

SEC. 69. *Be it further enacted, etc.,* That any person who shall molest, disturb, interfere with, or threaten with violence, any commissioner of election or person in charge of the ballot boxes, while in charge of the same, between the time of the close of the polls and the time that said ballot boxes are delivered to the supervisor of registration, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, or by imprisonment in the penitentiary not less than one year, or both, at the discretion of the court. *Interference with commissioners, etc.*

SEC. 70. *Be it further enacted, etc.,* That any person not authorized by this law to receive or count the ballots at an election, who shall, during or after any election, and before the votes have been counted by the supervisors of registration, disturb, displace, conceal, destroy, handle or touch any ballot, after the same has been received from the voter by a commissioner of election, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be punished by a fine of not less than one hundred dollars, or by imprisonment for not less than six months, or both, at the discretion of the court. *Disturbing the counting of ballots.*

SEC. 71. *Be it further enacted, etc.,* That any person not authorized by this law to take charge of the ballot boxes at the close of the election who shall take, receive, conceal, displace or [in] any manner handle or disturb any ballot box at any time between the hour of the closing of the polls and the transmission of the ballot box to the supervisor of registration, or during such transmission, or at any time prior to the counting of the votes by the supervisor of registration, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, or by imprisonment in the penitentiary not less than one year, or both, at the discretion of the court. *Interference with ballot boxes.*

SEC. 72. *Be it further enacted, etc.,* That if any person shall by bribery, menace, willful falsehood, or other corrupt means, directly or indirectly attempt to influence any elector of this State in the giving his vote or ballot, or to induce him to withhold the same, or disturb or hinder him in the free exercise of the right of suffrage at any election in this State, he shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than five hundred dollars, and be imprisoned in the parish prison for a term not exceeding six months, and shall also be ineligible to any office in the State for the term of two years. *Interference with free exercise of right of suffrage.*

SEC. 73. *Be it further enacted, etc.,* That it shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dol- *Weapons.*

Exhibit 30
Page 161

160

lars, and by imprisonment in the parish jail for not less than one month; provided, that the provisions of this section shall not apply to any commissioner or officer of the election or supervisor or assistant supervisor of registration, police officer or other person authorized to preserve the peace on days of registration or election.

**Liquors.** Sec. 74. *Be it further enacted, etc.,* That no person shall give, sell or barter any spirituous or intoxicating liquors to any person on the day of election, and any person found guilty of violating the provisions of this section shall be fined in a sum of not less than one hundred dollars, nor more than three hundred dollars, which shall go to the school fund.

**Corruptly voting.** Sec. 75. *Be it further enacted, etc.,* That whoever, knowing that he is not a qualified elector, shall vote or attempt to vote at any election, shall be fined in a sum not to exceed one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Double vote.** Sec. 76. *Be it further enacted, etc.,* That whoever shall knowingly give or vote two or more ballots folded as one at any election, shall be fined in a sum not to exceed one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Bribery to influence voters.** Sec. 77. *Be it further enacted, etc.,* That whoever, by bribery or by a promise to give employment or higher wages to any person, attempts to influence any voter at any election, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the parish prison for not less than three months.

**Obtaining illegal voting.** Sec. 78. *Be it further enacted, etc.,* That whoever willfully aids or abets any one, not legally qualified, to vote or attempt to vote at any election, shall be fined in a sum of not less than fifty dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Disorderly houses.** Sec. 79. *Be it further enacted, etc.,* That whoever is disorderly at any poll or voting place during an election, shall be fined in a sum not less than twenty dollars, to be recovered by prosecution before any court of competent jurisdiction.

**Meetings of citizens.** Sec. 80. *Be it further enacted, etc.,* That whoever shall molest, interrupt or disturb any meeting of citizens assembled to transact or discuss political matters, shall be fined in a sum not less than fifty dollars, to be recovered by prosecution before any court of competent jurisdiction.

Any sheriff, constable or police officer present at the violation of this section shall forthwith arrest the offender or offenders, and convey him or them, as soon as practicable, before the proper court.

**Imprisonment.** Sec. 81. *Be it further enacted, etc.,* That the court imposing any fine, as directed in sections seventy-four, seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine and eighty of this act, shall commit the person so fined to the parish prison until the fine is paid; *Provided,* That said imprisonment shall not exceed six months.

**Perjury.** Sec. 82. *Be it further enacted, etc.,* That in cases where any oath or affirmation shall be administered by any supervisor of registration, assistant supervisor of registration or commissioner of election, in the performance of his duty as prescribed by law, any person swearing or affirming falsely in the premises shall be deemed guilty of perjury, and subjected to the penalties provided by the law for perjury.

**Duty of Governor to insure peace.** Sec. 83. *Be it further enacted, etc.,* That the Governor shall take all necessary steps to secure a fair, free and peaceable election; and shall, on the days of election, have paramount charge and con-

Exhibit 30
Page 162

161

trol of the peace and order of the State, over all peace and police officers, and shall have the command and direction in chief of all police officers, by whomsoever appointed, and of all sheriffs and constables in their capacity as officers of the peace.

SEC. 84. *Be it further enacted, etc.* That to defray the expenses of the next revision of registration, and of the next general election, Expenses there is hereby appropriated out of any funds in the treasury not otherwise appropriated, the sum of fifty thousand dollars ($50,000), or so much thereof as may be necessary.

SEC. 85. *Be it further enacted, etc.,* That all laws or parts of laws contrary to the provisions of this act, and all laws relating to the Repeal. same subject matter are hereby repealed, and that this act shall take effect from and after its passage.

(Signed)            MORTIMER CARR,
           Speaker of the House of Representatives.

(Signed)            OSCAR J. DUNN,
           Lieutenant Governor and President of the Senate.

Approved March 16, 1870.

(Signed)            H. C. WARMOTH,
           Governor of the State of Louisiana.

A true copy:

           GEO. E. BOVEE,
           Secretary of State.

------

[No. 101.]            AN ACT

To define and regulate the cost of the Clerks, Sheriffs, Recorders and Notaries Public throughout the State of Louisiana, and providing forfeitures and penalties for overcharging or failing to perform their duties, and the mode of collecting their fees.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That the Fees of clerks. clerks of the district courts throughout the State shall be entitled to demand and receive the following fees of office, and no more; and they shall not be entitled to charge any other fees of office than those specially set forth therein, for any services as clerks which they may be required to render:

For indorsing, registering and filing petition, for all, ten cents.

For indorsing, registering and filing answer, for all, ten cents.

For issuing citation, with copy of same, with certificate and seal on each, fifty cents, one charge for both.

For issuing attachment, with copy of same, with certificates and seals on both, one dollar, one charge for both.

For issuing *fieri facias,* with seal, fifty cents.

For issuing writ of seizure and sale, with seal, one dollar.

For issuing writ of sequestration, with copy of same, with certificates and seals, one dollar, one charge for both.

For issuing writ of *certiorari,* with copy of same, with certificates and seals, one dollar, one charge for both.

21

Exhibit 30
Page 163

# Exhibit 31

Exhibit 31
Page 164

Texas. Laws, statutes, etc. Digests

# A DIGEST

OF THE

# LAWS OF TEXAS:

## CONTAINING THE LAWS IN FORCE,

AND

## THE REPEALED LAWS

ON WHICH RIGHTS REST,

FROM 1864 TO 1872,

## CAREFULLY ANNOTATED.

BY GEORGE W. PASCHAL,

*OF AUSTIN, TEXAS,*

LATE REPORTER OF THE SUPREME COURT OF TEXAS, AUTHOR OF PASCHAL'S ANNOTATED CONSTITUTION, PASCHAL'S DIGEST OF DECISIONS, ETC., ETC.

### Third Edition—Volume II.

WASHINGTON, D. C.:

## W. H. & O. H. MORRISON,

LAW BOOKSELLERS AND PUBLISHERS.

1873.

Generated on 2023-02-10 14:51 GMT / https://hdl.handle.net/2027/hvd.hl3e66
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
HARVARD UNIVERSITY

Exhibit 31
Page 165

CRIMINAL CODE. 1317

ceeding one thousand dollars, and imprisoned in the penitentiary for a period not exceeding three years.

CHAPTER IV.—RIOTS AND UNLAWFUL ASSEMBLIES AT ELECTIONS, VIOLENCE USED TOWARDS ELECTORS.

11 July, 1870. Art. 6476 for caption.

ART. 6485. [28] Any person who may, by threats, intimidation, or violence, resist or impede a registrar, or board of appeals or revision, in the discharge of their duties, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine of not less than fifty, nor more than one hundred dollars, and by imprisonment of not less than sixty days, or more than six months, in the county jail.

Punishment of threats and intimidation impeding registration. Art. 6684.

ART 6486. [28] Any registrar who, by violence or threats, is impeded in the discharge of his duty, shall report the same to the sheriff, who shall furnish a sufficient force to enable him to proceed in the discharge of his duty.

Registrars to report violence.

ART. 6487. [38] Any person or persons who shall disturb the registrars or boards of revision in the full and fair discharge of their duties, by acts of intimidation, by inciting or encouraging a tumult or mob, or who shall cause such disturbance, or encourage, or abet any tumult, mob, or violence in the vicinity of any place of registry, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding five hundred dollars, or by imprisonment in the penitentiary for a period not exceeding two years, nor less than six months

Disturbers of registrars punished.

Fine or imprisonment.

ART. 6488. [46] (cl. 1) Any person who shall, by threats of discharge from employment, of withholding wages, or of proscription in business, influence, or attempt to influence, any voter in the casting of his vote at any election, shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than five hundred dollars, one-half of which shall go to the informer, and the other half to the school fund of the state, and by imprisonment in the county prison for not less than three months.

Intimidation of voter by threats punished as misdemeanor. Art. 1893.

Fine not less than $500.

and 3 months imprisonment.

ART. 6489. [43] (cl. 2) Any person who shall discharge from his employment any laborer, employé, tenant, or mechanic, who shall have been working for such person under contract, written or oral, for a specified time, before such time shall have expired, or who shall withhold from any laborer, employé, tenant, or mechanic, any part of the wages due to such laborer, employé, tenant, or mechanic, on account of any vote which such laborer, employé, tenant, or mechanic has given, or purposes to give, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine of not less than five hundred dollars, one-half of which shall go to the informer, and the other half to the school fund of the state, and by imprisonment in the county jail for not less than three months.

Punishment for discharging laborer on account of his vote; made a misdemeanor and punished by

fine not less than $500

and 3 months' imprisonment.

ART. 6490. [55] (1) It shall be unlawful for any person to carry any gun, pistol, bowie-knife, or other dangerous weapon, concealed or unconcealed, on any day of election, during the hours the polls are open, within a distance of one half mile of any place of election. (2) Any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the county jail for not less

Carrying weapons at election punished. Art. 1891.

Penalty for violating this section.

Generated on 2023-02-10 14:52 GMT / https://hdl.handle.net/2027/hvd.hl3e66
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from HARVARD UNIVERSITY

Exhibit 31
Page 166

1318                        CRIMINAL CODE.

*Officers of election and police exempted.*

than one month: *Provided,* That the provisions of this section shall not apply to any officer of the election, police officer, or other person authorized to preserve the peace on the days of election.

*Selling liquor on days of election.*

ART. 6491. [56] No person shall give, sell, or barter any spirituous or intoxicating liquor to any person on the days of election ; and any person found guilty of violating the provisions of this section shall be fined in a of sum not less than one hundred dollars, nor more than three hundred dollars, which shall go to the school fund.

*School fund.*

*15 Aug., 1870; art. 6481 for caption. Disturbing election by mob punished. Arts. 1891-1894.*

ART. 6492. [49] Any person or persons who shall disturb an election, by inciting or encouraging a tumult or mob, or shall cause such disturbance in the vicinity of any poll or voting place, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by a fine not exceeding five hundred dollars, nor less than two hundred dollars, and by imprisonment in the penitentiary for a period not exceeding two years, nor less than six months.

*11 July, 1870. Art. 6476 for caption.*

CHAPTER V.—MISCELLANEOUS OFFENSES AFFECTING THE RIGHT OF SUFFRAGE.

*Alterations, changes, and mutilations of registration books punished by fine or imprisonment. Art. 1900.*

ART. 6493. [26] If any person shall alter, change, mutilate, or in any manner deface any book of registration, or shall take and carry away the same from the office of the clerk of the district court, registrar, or judge of election, or other place where the same may be lawfully deposited, or from the lawful possession of any person whomsoever, with intent to destroy, suppress, alter, or conceal, or in any wise mutilate or destroy the same, so as to prevent the lawful use of such book or books of registration, such person shall be deemed guilty of felony, and, upon conviction thereof, shall be punished as prescribed in section twenty-five of this act.

*Art. 6480.*

*Punishment for false registration and illegal voting. Perjury. Art. 1898.*

ART. 6494. [32] (cl. 1) Any person who shall take and subscribe the registration oath falsely shall, upon conviction thereof, be punished as provided by law for the crime of perjury, and any person who shall knowingly and willfully vote, or attempt to vote, upon the registration certificate of another, or of one who may be dead, shall, upon conviction thereof, forfeit and pay a fine of five hundred dollars, and in default thereof shall be imprisoned in the county jail for a term not exceeding one year.

*Penalty.*

*Giving false name punished by fine or imprisonment.*

ART. 6495. [32] (cl. 2) Any person giving a false name, with intent to deceive a registrar, shall, upon conviction thereof, be deemed guilty of a misdemeanor, and fined in a sum not to exceed one hundred dollars, or be punished by imprisonment in the county jail for a term not to exceed one year.

*15 Aug., 1870. Art. 6481 for caption. Disturbing ballots punished by fine or imprisonment.*

ART. 6496. [47] Any person not authorized by this law to receive or count ballots at an election, who shall, during or after any election, and before the votes have been counted by the judges of election, disturb, displace, conceal, destroy, handle, or touch any ballot, after the same has been received from the voter by the judge of election, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be punished by a fine of not less than one hundred dollars, or by imprisonment for not less than six months, or both, at the discretion of the court.

*At discretion.*

*Repeaters punished by fine and imprisonment. Art. 1897.*

ART. 6497. [48] Any person who shall vote, or attempt to vote, more than once at the same election, shall be deemed guilty of a felony, and, upon conviction thereof, shall be pun-

Generated on 2023-02-10 14:52 GMT  /  https://hdl.handle.net/2027/hvd.hl3e66
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google


Digitized by Google

Original from
HARVARD UNIVERSITY

Exhibit 31
Page 167

# Exhibit 32

Exhibit 32
Page 168

20013470

# THE MARYLAND CODE.

# Public Local Laws,

### CODIFIED BY

## JOHN PRENTISS POE.

**ADOPTED BY THE GENERAL ASSEMBLY OF MARYLAND
MARCH 14, 1888.**

*Including also the Public Local Acts of the Session of 1888
incorporated therein.*

BY AUTHORITY OF THE  STATE OF MARYLAND.

## VOLUME II,

CONTAINING ARTICLE 11, FREDERICK COUNTY, TO ARTICLE 24,
WORCESTER COUNTY.

BALTIMORE:
KING BROS., PRINTERS AND PUBLISHERS.
1888.

Exhibit 32
Page 169

### 1874, ch. 250.

**99.** It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

Ibid.

**100.** The fines collected under the preceding section shall be paid by the officer collecting the same, to the school commissioners of the county, for school purposes.

Ibid.

**101.** Any constable of said county, or the sheriff thereof, who shall refuse to arrest any person violating section 99, upon information of such offence, shall be deemed guilty of a misdemeanor, and on conviction thereof before the circuit court shall be fined not less than twenty nor more than fifty dollars, and shall forthwith be discharged from office.

## FENCES.

### P. L. L., (1860,) art. 14, sec. 91.

**102.** Wherever joint fences have been or may be established in said county, for the mutual advantage of different owners or possessors of adjoining lands, each party shall keep in good repair his proper proportion thereof, in manner following, that is to say: all post and rail or plank fences shall be at least four feet six inches high, and not more than four inches between the lower and second, and not more than five inches between the second and third rails; and all worm or other fences shall be five feet high; the height of said fences to be in every case computed from the ground or base of any embankment upon which they may be erected.

Ibid. sec. 92.

**103.** If either of the parties so making or keeping a joint fence shall not comply with the provisions of the preceding

92

Exhibit 32
Page 170

# Exhibit 33

Exhibit 33
Page 171

HENRY LLOYD, Esquire, Governor.      315

G. L. Copeland; and also to issue his warrant upon the Treasurer for the sum of sixty dollars, payable to the order of Abram Zarks; and also to issue his warrant upon the Treasurer for the sum of sixty dollars, payable to the order of C. E. Gordon; the said sums of money having been paid for State license erroneously issued to said persons by the Clerk of the Circuit Court of Anne Arundel county.

SEC. 2. *And be it enacted*, That this act shall take effect from the date of its passage.

Approved April 7, 1886.

----

## CHAPTER 189.

AN ACT to prevent the carrying of guns, pistols, dirk-knives, razors, billies or bludgeons by any person in Calvert county, on the days of election in said county, within one mile of the polls.

SECTION 1. *Be it enacted by the General Assembly of Maryland*, That from and after the passage of this act, it shall not be lawful for any person in Calvert county to carry, on the days of election and primary election, within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor, and on conviction thereof by the Circuit Court of Calvert county having criminal jurisdiction thereof, or before any Justice of the Peace in said county, shall be fined not less than ten nor more than fifty dollars for each offence, and on refusal or failure to pay said fine, shall be committed to the Jail of the county until the same is paid.

*Unlawful to carry weapons to the polls.*

SEC. 2. *And be it enacted*, That the fines collected under this act shall be paid by the offi-

Exhibit 33
Page 172

# Exhibit 34

Exhibit 34
Page 173

# ACTS

AND

## JOINT RESOLUTIONS

PASSED BY

# THE GENERAL ASSEMBLY

OF THE

## STATE OF VIRGINIA

DURING THE

## SESSION OF 1877-78.

RICHMOND:

R. F. WALKER, SUPERINTENDENT PUBLIC PRINTING.

1878.

Exhibit 34
Page 174

304                              ACTS OF ASSEMBLY.

Penalty        ished by a fine not exceeding one hundred dollars, or by
               imprisonment in jail not exceeding six months.

### Cruelty to animals; profanity and drunkenness.

Cruelty to ani-    15. If a person cruelly beat or torture any horse, animal
mals'          or other beast, whether his own or that of another, he shall
Penalty        be fined not exceeding fifty dollars.
Profanity and      16. If any person, arrived at the age of discretion, pro-
drunkenness    fanely curse or swear, or get drunk, he shall be fined by a
Penalty        justice one dollar for each offence.

### Violation of the Sabbath.

Violation of       17. If a person, on a Sabbath day, be found laboring at
Sabbath        any trade or calling, or employ his apprentices or servants
               in labor or other business, except in household or other work
Penalty        of necessity or charity, he shall forfeit two dollars for each
               offence; every day any servant or apprentice is so employed
               constituting a distinct offence.

### Exceptions as to the mail, and as to certain persons.

Transportation     18. No forfeiture shall be incurred under the preceding
of mail ex-    section for the transportation on Sunday of the mail, or of
cepted         passengers and their baggage. And the said forfeiture shall
Exception as   not be incurred by any person who conscientiously believes
to certain reli-
gionists       that the seventh day of the week ought to be observed as
               a Sabbath, and actually refrains from all secular business
Proviso        and labor on that day: provided he does not compel an
               apprentice or servant, not of his belief, to do secular work
               or business on Sunday, and does not on that day disturb any
               other person.

Sale of intoxi-    19. No bar-room, saloon, or other place for the sale of
cating liquors  intoxicating liquors, shall be opened, and no intoxicating
prohibited be-  bitters or other drink shall be sold in any bar-room, restau-
tween certain
hours          rant, saloon, store, or other place, from twelve o'clock on
               each and every Saturday night of the week, until sunrise of
               the succeeding Monday morning; and any person violating
               the provisions of this section, shall be deemed guilty of a
               misdemeanor, and, if convicted, shall be punished by fine
Penalty        not less than ten nor more than five hundred dollars; and
               shall, moreover, at the discretion of the court, forfeit his
Proviso        license: provided that this law shall not apply to any city
               having police regulations on this subject, and an ordinance
               inflicting a penalty equal to the penalty inflicted by this
               section.

Disturbance of     20. If a person willfully interrupt or disturb any assembly
religious wor-  met for the worship of God, or being intoxicated, if he dis-
ship           turb the same, whether willfully or not, he shall be confined
Penalty        in jail not more than six months, and fined not exceeding one
               hundred dollars, and a justice may put him under restraint
               during religious worship, and bind him for not more than one
               year to be of good behavior.

Exhibit 34
Page 175

21. If any person carrying any gun, pistol, bowie-knife, dagger, or other dangerous weapon, to any place of worship while a meeting for religious purposes is being held at such place, or without good and sufficient cause therefor, shall carry any such weapon on Sunday at any place other than his own premises, shall be fined not less than twenty dollars. If any offence under this section be committed at a place of religious worship, the offender may be arrested on the order of a conservator of the peace, without warrant, and held until warrant can be obtained, but not exceeding three hours. It shall be the duty of justices of the peace, upon their own knowledge, or upon the affidavit of any person, that an offence under this section has been committed, to issue a warrant for the arrest of the offender. *Carrying dangerous weapons at a place of worship on Sunday*

*Penalty*

*Offenders subject to arrest without warrant*

*Duty of justice where he knows of offence under this section*

### Protection of religious assemblies; prohibition against sale of liquors or other things near such meetings; proviso.

22. If any person shall erect, place, or have any booth, stall, tent, carriage, boat, vessel, vehicle, or other contrivance whatever, for the purpose or use of selling, giving, or otherwise disposing of any kind of spirituous and fermented liquors, or any other articles of traffic; or shall sell, give, barter, or otherwise dispose of any spirituous or fermented liquors, or any other articles of traffic within three miles of any camp-meeting, or other place of religious worship, during the time of holding any meeting for religious worship at such place, such person, on conviction before a justice of the peace, for the first offence, shall be fined not less than ten dollars, nor more than twenty dollars, and stand committed to jail until the fine and costs are paid; and for the second offence, shall be fined as aforesaid, and be imprisoned not less than ten nor more than thirty days. *Sale of liquors, &c., prohibited*

*Penalty*

*Penalty for second offence*

23. If any person shall commit any offence against the provisions of the preceding section, he shall, in addition to the penalties therein mentioned, forfeit all such spirituous or fermented liquors, and other articles of traffic, and all the chests and other things containing the same, belonging to and in the possession of the person so offending, together with such booth, stall, tent, carriage, boat, vessel, vehicle, or other contrivance or thing prepared and used in violation of said section; and it shall be the duty of any sheriff, deputy sheriff, or constable, if he sees any person violating the preceding section, to arrest the offender and carry him before a justice of the peace. The sheriff, deputy sheriff, or constable, when he arrests the offender, shall seize the property hereby declared to be forfeited, or shall seize the same on a warrant against the offender, if such offender cannot be found; and the justice of the peace before whom such offender is convicted, or before whom the warrant is returned that the offender cannot be found, shall enter judgment of condemnation against such property, and issue a fieri facias for the *Additional penalty*

*Duty of sheriff, &c., to arrest offender and seize the property*

*Judgment of condemnation*

39

Exhibit 34
Page 176

306          ACTS OF ASSEMBLY.

Fi. fa. to issue
Proviso

sale thereof: provided the person who has been returned not found, and whose property has been condemned in his absence, may appear at any time before the sale of the property and have the case tried as if he had appeared at the return of the warrant.

To whom provisions not to apply

24. The provisions of the two preceding sections shall not apply to any licensed tavern-keeper, merchant, shop-keeper, farmer, or other person in the usual and lawful transaction of his ordinary business, in the usual place of transacting such business, or to any person having permission, in writing from the superintendent of such meeting, to sell such articles as may be named in such permission: provided this permission shall not extend to the sale of any spirituous or fermented liquors.

Proviso

### Right of appeal.

Right of appeal preserved

25. Nothing in this chapter shall prevent the courts of record from exercising their common law or statutory jurisdiction in all cases for disturbing public worship: provided that the party convicted under the twenty-second or twenty-third sections of this chapter shall have the right to appeal to the next county court for the county where the conviction is had, upon giving bail for his appearance at court, and upon such appeal shall be entitled to a trial by jury: and provided further, that when any person or persons are proceeded against under the twenty-second or twenty-third sections of this chapter, he or they shall not be held to answer for the same offence before any grand jury or court of record, except as herein provided.

Proviso

Persons proceeded against not subject to answer before grand jury

### Temporary police force for religious meetings.

Temporary police authorized

26. The supervisor, or any justice of the magisterial district where the meeting is held, shall have power to appoint a temporary police to enforce the provisions of this chapter.

---

## CHAPTER VIII.

#### OF OFFENCES AGAINST PUBLIC HEALTH.

### Selling unsound provisions.

Sale of unsound provisions

1. If a person knowingly sell any diseased, corrupted, or unwholesome provisions, whether meat or drink, without making the same known to the buyer, he shall be confined in jail not more than six months, and fined not exceeding one hundred dollars.

Penalty

Exhibit 34
Page 177

# Exhibit 35

Exhibit 35
Page 178

# REVISED

# ORDINANCES

— OF THE —

# CITY OF BOULDER

Published by Authority of the City.

OSCAR F. A. GREENE,

COMPILER.

1899:
Printed by Ricketts & Kerr, at The News Office,
BOULDER, COLORADO.

Exhibit 35
Page 179

MAR 11 1909

Exhibit 35
Page 180

thirty-two in township one north of range seventy west, is
hereby named and shall hereafter be known as VALVER-
DAN PARK.

### 510.  Washington Park.

SEC. 5.   That the city property in the west half of the
south-west quarter of section twenty-five in township one
north of range seventy-one west, shall be named and here-
after known as WASHINGTON PARK.


### PARKS.

An Ordinance for the Protection of the Several Parks Belonging to the
City and of the Buildings and Reservoirs and Trees and Other
Improvements at and Within Said Parks, and to Pro-
vide Penalties for Injuring the Same.
Passed October 4, 1898.

(With amendment as noted.)


### 511.  No firearms or shooting in.

SECTION 1.   Any person other than the police officers
of the city who shall take or carry or cause to be taken
or carried into any of the parks belonging to the City of
Boulder, any gun, pistol, revolver, or other firearm, or who
shall shoot any firearm at or towards or over or into or
upon any of said parks, shall be deemed guilty of a
misdemeanor.   (As amended August 2, 1899.)

### 512.  No powder or explosives in.

SEC. 2.   Any person who shall take or carry or cause
to be taken or carried into any of said parks, any powder
of any quality or kind or any explosive or dangerous or
inflammable or combustible substance, shall be deemed
guilty of a misdemeanor.

### 513.  No fires or explosives.

SEC. 3.   Any person who shall start any fire or cause
or permit to be started any fire in any of said parks, not

Exhibit 35
Page 181

· 158                    PARKS—COTTAGES.

being thereunto first authorized by the Mayor, or who shall in any of said parks fire or explode any fire-crackers, torpedoes, or any other substance or thing containing powder or other explosive substance, shall be deemed guilty of a misdemeanor.

### 514.  Injury to property.

SEC. 4.  Any person who shall deface, tear down, destroy or injure in any manner whatsoever any fence, building, furniture, seat, structure, excavation, post, bracket, lamp, awning, fire plug, hydrant, water pipe, tree, shrub, plant, flower, railing, bridge, culvert, or any other property whatsoever belonging to the city or to any private corporation or persons in, at or upon any of said parks, shall be deemed guilty of a misdemeanor.

### 515.  Injury continued.

SEC. 5.  Any person who shall injure or damage in any manner whatsoever any property of the city at, in or upon any of said parks by cutting, hacking, bending, breaking, burning, daubing with paint or other substances, hitching of horses or other animals, or by means of fire, or by effecting such acts in any other manner, shall be deemed guilty of a misdemeanor.

### 516.  Violation—Misdemeanor Penalty.

SEC. 6.  Any person upon conviction of any misdemeanor specified in any of the five preceding sections herein shall be fined not less than five and not more than three hundred dollars.

PARKS.

An Ordinance in Relation to Cottages in Texado Park.
Passed April 17th, 1899.

WHEREAS, a contract was made on, to-wit, the 19th day of March, A. D. 1898, at Boulder, Colorado, by and

Exhibit 35
Page 182

# Exhibit 36

Exhibit 36
Page 183

# An Ordinance

## Concerning the carrying of Arms or Deadly Weapons.

Be it ordained by the City Council of the City of San Antonio,

SECTION I. That if any person shall, within the Corporate limits of the City of San Antonio, go into any church, or religious assembly, any school-room, or other place where persons are assembled, for educational, literary or scientific purposes, or into any ball room, social or wedding party, or other assembly or gathering, for amusement or instruction, composed of males and females, or to any election precinct in the city, on the day or days of any election, or into any Court room or court of Justice, or to any other place where people or individuals may be assembled, to perform any public duty, or shall go into any other public assembly, or shall enter any bar-room, drinking saloon or any other place where people resort for business or amusement, or shall join or accompany any public procession, having about his or her person, a bowie-knife, dirk, or butcherknife or any fire-arms or arms, whether known as six-shooter, gun or pistol of any kind, or having about his or her person, what is known as brass-knuckles, slung shot, club, loaded or sword cane, or any other weapon of offence or defence. Such person shall be deemed guilty of a misdemeanor, and upon conviction thereof, before the Recorder of the city, shall be fined not less than five dollars nor more than one hundred dollars and costs, and in default of payment, shall be confined in the city prison, or placed at hard labor on the public works of the city, for not less than five days, nor more than thirty days, to be determined by the Recorder; Provided, this Ordinance shall not apply to any legally authorized conservator of the peace, when he may be in the lawful discharge of his duty.

SEC. 2. It shall be the duty of the Police of the city to strictly enforce this Ordinance, and promptly to arrest and disarm any person violating the same; Provided, that in all cases where arms are taken possession of by the police, as herein provided, they shall be returned to the owner when he leaves the city.

SEC. 3. This ordinance shall take effect and be in force from and after its publication.

Approved, San Antonio, December 14th, A. D. 1870.

WM. C. A. THIELEPAPE,
Mayor City of San Antonio.

Attest:
G. W. BARTHOLOMEW, Jr., City Clerk.
20-12-75d103.

Exhibit 36
Page 184