1  C. D. Michel – SBN 144258
   cmichel@michellawyers.com
2  Joshua R. Dale – SBN 209942
   jdale@michellawyers.com
3  Konstadinos T. Moros – SBN 306610
   kmoros@michellawyers.com
4  Alexander A. Frank – SBN 311718
   afrank@michellawyers.com
5  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Blvd., Suite 200
6  Long Beach, CA 90802
   Telephone: (562) 216-4444
7
   Donald Kilmer-SBN 179986
8  Law Offices of Donald Kilmer, APC
   14085 Silver Ridge Road
9  Caldwell, Idaho 83607
   Telephone: (408) 264-8489
10 Email: Don@DKLawOffice.com

11 Attorneys for Plaintiffs

12              UNITED STATES DISTRICT COURT

13              CENTRAL DISTRICT OF CALIFORNIA

14                    SOUTHERN DIVISION

15 | RENO MAY, an individual; ANTHONY | Case No.: 8:23-cv-01696 CJC (ADSx)
16 | MIRANDA, an individual; ERIC HANS, |
   | an individual; GARY BRENNAN, an | **REPLY TO DEFENDANT'S**
   | individual; OSCAR A. BARRETTO, JR., | **OPPOSITION TO PLAINTIFFS'**
17 | an individual; ISABELLE R. | **MOTION FOR PRELIMINARY**
   | BARRETTO, an individual; BARRY | **INJUNCTION**
18 | BAHRAMI, an individual; PETE |
   | STEPHENSON, an individual; ANDREW | Hearing Date:    December 20, 2023
19 | HARMS, an individual; JOSE FLORES, | Hearing Time:    1:30 p.m.
   | an individual; DR. SHELDON HOUGH, | Courtroom:       9 B
20 | DDS, an individual; SECOND | Judge:           Hon. Cormac J.
   | AMENDMENT FOUNDATION; GUN |                  Carney
21 | OWNERS OF AMERICA; GUN |
   | OWNERS FOUNDATION; GUN |
22 | OWNERS OF CALIFORNIA, INC.; THE |
   | LIBERAL GUN CLUB, INC.; and |
23 | CALIFORNIA RIFLE & PISTOL |
   | ASSOCIATION, INCORPORATED, |
24 |                                |
   |                 Plaintiffs,    |
25 |              v.                |
26 | ROBERT BONTA, in his official capacity |
   | as Attorney General of the State of |
27 | California, and DOES 1-10, |
28 |                 Defendants.    |

---

MEMO. OF POINTS & AUTHORITIES IN SUPPORT OF MOT. PRELIM. INJ.

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS ........................................................................................ii

TABLE OF AUTHORITIES..................................................................................iii

I.   THE PROPER APPROACH TO THE BRUEN STANDARD ........................ 1

II.   THE LIMITS OF EXPERT TESTIMONY UNDER *BRUEN* ........................ 5

III.   THE CHALLENGED LOCATIONS ARE NOT SENSITIVE........................ 8

    A.   Buildings and Parking Areas Under the Control of a Unit of Local Government (Penal Code § 26230(a)(5)) ................................................. 8

    B.   Places of Worship (Penal Code § 26230(a)(22))................................... 9

    C.   Financial Institutions (Penal Code § 26230(a)(23)) ............................ 10

    D.   Places That Serve Liquor (Penal Code § 26230(a)(9))........................ 13

    E.   Public Transportation (Penal Code § 26230(a)(8))............................. 14

    F.   Health Care Facilities (Penal Code § 26230(a)(7)) ............................ 17

    G.   Parks and Playgrounds (Penal Code § 26230(a)(11-13)) .................... 18

IV.   CONCLUSION ........................................................................................20

TABLE OF CONTENTS

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

*Antonyuk v. Hochul,*

   635 F. Supp. 3d 111 (N.D.N.Y. 2022)........................................................2

*Antonyuk v. Hochul,*

   639 F. Supp. 3d 232 (N.D.N.Y. 2022)..............................................*passim*

*Antonyuk, et al. v. Nigrelli, et al*, Case No. 22-2908 (N.D.N.Y.) ...........................18

*B&L Productions, Inc. v. Bonta,*

   2023 WL 7132054, at *15 (C.D. Cal. Oct. 30, 2023).............................9

*Commodores Ent. Corp. v. McClary,*

   879 F.3d 1114 (11th Cir. 2018).......................................................5, 6

*District of Columbia v. Heller,*

   554 U.S. at 599 (2008) ................................................................1, 3, 4

*Hardaway v. Nigrelli,*

   639 F. Supp. 3d 422 (W.D.N.Y. 2022) ..............................................6, 9

*Kipke v. Moore,*

   2023 WL 6381503, at *11 (D. Md. Sept. 29, 2023) ...........................13

*Koons v. Platkin,*

   649 F. Supp. 3d 14 (D.N.J. 2023). ............................................8, 13, 15

*National Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives,*

   714 F.3d 334 (5th Cir. 2013).................................................................2

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*

   597 U.S. __, 142 S. Ct. 2111(2022)..............................................*passim*

*Shelley v. Kraemer,*

   334 U.S. 1 (1948) ...............................................................................15

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.,*

   600 U.S. 181 (2023) ............................................................................7

iii

*United States v. Herring*,

955 F.2d 703 (11th Cir. 1992).............................................................5, 6

*Wolford v. Lopez*,

No. CV 23-00265 LEK-WRP, 2023 WL 5043805

(D. Haw. Aug. 8, 2023).........................................................2, 9, 13, 19

**Statutes**

Cal. Penal Code § 26150 .........................................................................4

Cal. Penal Code § 26230 ..................................................................*passim*

Mich. Comp. Laws Serv. § 750.234d(1) ...............................................12

Neb. Rev. Stat. § 69-2441......................................................................12

**Other Authorities**

An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide

Punishment Therefor, Feb. 23, 1859, *reprinted in* LAWS OF THE STATE OF

INDIANA, PASSED AT THE FORTIETH SESSION OF THE GENERAL

ASSEMBLY 129 (1859)..........................................................................16

*Attorney General Bonta's Sponsored Bill to Strengthen California's Concealed*

*Carry Weapons Restrictions Becomes Law*, September 26, 2023. Available at

<https://oag.ca.gov/news/press-releases/attorney-general-bonta%E2%80%99s-

sponsored-bill-strengthen-california%E2%80%99s-concealed-carry> (Last

accessed November 7, 2023)....................................................................8

Britannica Online, *Wells Fargo* (updated November 1, 2023)

<https://www.britannica.com/topic/Wells-Fargo-American-corporation> (last

accessed November 1, 2023)..................................................................12

*Colonial and Early National Transportation, 1700-1800*,

<https://www.roads.maryland.gov/OPPEN/II-Colon.pdf> (last accessed

November 17, 2023)..................................................................................2

iv

TABLE OF AUTHORITIES

D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 233, 242-245, 251, 253, (2018) ........................................................................5

Ed Crews, *Working Carts and Wagons: People Require Something with Wheels*, CW Journal (2009) ........................................................................................2

Federal Reserve Bank of Philadelphia, *The First Bank of the United States: A Chapter in the History of Central Banking* (March 2021) <https://www.philadelphiafed.org/-/media/frbp/assets/institutional/education/publications/the-first-bank-of-the-united-states.pdf> (Last accessed November 1, 2023 ...........................................11

Giffords Law Center, *Guns in Public: Location Restrictions*, available online at <https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/location-restrictions/> (last accessed November 10, 2023) .................................................18

Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 184 (2020) .........15

New York State Department of Transportation, *History of Railroads in New York State*, available online at <https://www.dot.ny.gov/divisions/operating/opdm/passenger-rail/passenger-rail-service/history-railroads> (Last accessed November 9, 2023) ...........................16

Oyez, <https://www.oyez.org/cases/2021/20-843> (as of Aug. 31, 2022). ..............15

United States Census Bureau, *U.S. Territory and Statehood Status by Decade, 1790-1960* (February 21, 2013), available online at <https://www.census.gov/dataviz/visualizations/048/> (last accessed November 10, 2023) ..................................................................................................19

TABLE OF AUTHORITIES

## I.   THE PROPER APPROACH TO THE BRUEN STANDARD[1]

SB2 infringes the right to public carry because: You can't carry on public property. You can't carry when going to pick up your dry cleaning if there is no sign expressly allowing you to do so. You can't carry if you park your car in a lot that is shared with a bank or a bar. You can't carry while supervising your own children at a playground or the library. You can't even carry while hiking alone in the wilderness of a state park. And on goes SB2, leaving little but some streets and sidewalks where the "right to carry" has not been made a crime.[2]

The State's core argument in defense of SB2 is that *Heller's* "sensitive places" language can be interpreted so broadly as to effectively nullify the broad right to public carry that *Bruen* explained. The State argues that it may declare many areas where the public congregates as "sensitive" simply because the modern public space is different from the public spaces of the analogical period. Opp. at 1.

The State distorts *Bruen* beyond reason in an effort to subvert the Supreme Court's express holdings. To be sure, while neither a historical "twin" or "dead ringer" is required for new types of places that did not exist in the past, historical "blank checks" are inappropriate. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. __, 142 S. Ct. 2111, 2133 (2022). For example, the State equates transportation hubs to schools, an outcome that would infringe on the right to carry for everyone who relies on public transportation.[3] The State's rationale for this

---

[1] Plaintiffs join the reply of the *Carralero* plaintiffs, who will be able to respond to more of the State's arguments due to their longer agreed-upon wordcount on reply. Additionally, due to space constraints and the amount of material that needs to be covered, Plaintiffs will not reply to the State as to their compelled speech and due process arguments.

[2] This chilling effect was intentional. Governor Newsom maligned the right to carry at his press conference announcing SB 2, in which he called *Bruen* a "very bad ruling." Complaint, at ¶ 79.

[3] It is clear that public transportation is not some new concept.  Rather, Colonial Williamsburg has recreated various "stage wagon[s], the equivalent of a modern bus. . . . "  *See* Ed Crews, *Working Carts and Wagons: People Require Something with Wheels*, CW Journal (2009)<

*MAY* PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION

argument equating public transportation to schools is because children are present in both places. Opp. at 24-25. But of course, children are present in many public places. That does not make one prohibition "relevantly similar" to another. *Bruen*, 142 S. Ct. at 2132. "[G]enerally, a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul,* 635 F. Supp. 3d 111, 131 (N.D.N.Y. 2022) (quoting *Bruen*, 142 S. Ct. at 2133).

Indeed, the State repeatedly argues that, even though a type of place existed in 1791 or the 19th century, it "did not exist in [its] modern form in the Founding and Reconstruction eras." Opp. at 1; *see also* pp. 14, 23, 25, 26, 28, 31, and 34. This argument was made by New York and rejected by *Bruen* after a survey of the Founding and Reconstruction eras. *Bruen* at 2122. Of course, just about everything evolves over time, and no place is identical to its 18th century counterpart. Modernity *per se* does not trigger the standardless analogical approach that the State needs for its historical arguments to have a glimmer of validity.

The State's contention that modern public spaces are dramatically different than those of the past is entirely unpersuasive. "The test in *Bruen* does not direct courts to look at when a historical place became akin to the modern place being regulated." *Wolford v. Lopez*, 2023 WL 5043805, at *21 (D. Haw. Aug. 8, 2023). A bar today serves a very similar purpose to a bar in 1791, just as a library today is comparable to libraries of the past. To the extent there is any claimed problem with carrying weapons in places that also existed in the past, "the lack of a distinctly

---

https://research.colonialwilliamsburg.org/Foundation/journal/Spring09/carts.cfm> (last accessed November 17, 2023). Colonial-era "ferries" sprung up as early as the 17th century. *See Colonial and Early National Transportation, 1700-1800*, <https://www.roads.maryland.gov/OPPEN/II-Colon.pdf> (last accessed November 17, 2023). And, of course, passage to the colonies booked on westbound European ships was no private affair. Nor are youngsters some strange new development foreign to the Founding Era. *See, e.g., National Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 714 F.3d 334, 342 (5th Cir. 2013) (Jones, J., dissenting from denial of rehearing) ("the members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar.").

2

similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131.

A room full of books does not become sensitive merely because the government now operates it. While the State has provided extensive information about what it claims has changed about libraries, hospitals, and banks, it has provided no evidence or analysis showing that those changes constitute "a comparable burden on the right of armed self-defense and [that] that burden is comparably justified" as it may have been with analogical regulations imposing such a burden in the past. *Bruen*, 142 S. Ct. at 2118, citing *McDonald*, 561 U.S. at 767, quoting *Heller*, 554 U.S. at 599.

In addition to failing to engage in this "central" analysis of the analogical inquiry, the State has provided surprisingly few analogical examples of any limitation on bearing arms, at any point during the Founding up through Reconstruction, in libraries, hospitals, parks, banks, taverns, gambling halls, or the places appurtenant to those places that would analogically match parking lots. Rather, the limitations to carry identified by the State's experts upon and within these places seem to be almost entirely Post-Reconstruction or 20th century creations.  That may be why, out of the thousands of pages of expert declarations and exhibits the State buried the Court and Plaintiffs, very little of that evidence discussed analogical firearms regulations, instead focusing on non-central topics such as the difficulty in researching history, why the Court should vary its analysis from the analogical standards identified in *Heller* and *Bruen*, and why Frederick Olmsted's opinion about the functionality and design of public parks should substitute for the proper analogical inquiry.

California has ignored even how its own laws have evolved. During the Reconstruction era, California restricted only concealed carry, not open carry. Cramer Decl., ¶ 12. Open carry was generally permitted with no permit

3

requirements. Today, however, California imposes an onerous process to obtain a CCW permit, complete with a police interview, full-day training course, thorough DOJ background check, psychological exam at the issuing authority's discretion, months-long wait times and, in some cities, over $1,000 in expense. Cal. Penal Code § 26150, *et seq*. Thus, to the extent the State argues that its *places* have changed compared to their earlier versions, it is only fair for it to concede that its regulation of the *people* permitted to carry in California has also changed.[4]

The State's brief also ignores *Bruen*'s instruction that only historical *laws*, particularly laws from the Founding era, are appropriate evidence. *Bruen* explicitly and repeatedly makes this clear in referring to a "historical tradition of firearm **regulation**." *Bruen*, 142 S. Ct. at 2129-30 (emphasis added); *see also id*. at 2132, 2135 & 2154. Nevertheless, the State tries to argue that second-hand, hearsay descriptions, like newspapers and journals, are important evidence of regulatory tradition. Opp. at 9; *and see* Schrag Decl., *passim*.  While consideration of other sources may be probative of the "how" and "why" behind the adoption of historical laws, only actual laws can form "an enduring American tradition of state regulation." *Bruen*, 142 S. Ct. at 2155. If it were otherwise, *Bruen*'s analogical reasoning would become open-ended and unworkable; one can only determine if a historical practice is "well-established and representative" based on how many states adopted it as law. *Id*. at 2133.

Both *Heller* and *Bruen* pointed to a few historical places like legislative assemblies, courthouses, and polling places, where the Court believed firearm bans likely could be historically justified. Opp. at 8-9. But the State misunderstands or misconstrues that language of *Bruen*. The Supreme Court did not mean there were few *laws* barring carry in, e.g., polling places, thus meaning that the State need not

---

[4] Notwithstanding the modern hurdles to obtaining a CCW permit, as Plaintiffs' Opening Brief demonstrated using extensive data from other states, Americans with CCW permits are overwhelmingly law-abiding.  *See* Complaint, ¶ 82, and Marvel Decl., *passim*.

*MAY* PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION

show a broad tradition here. Rather, there were many such laws. *See* D. Kopel & J. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 233, 242-245, 251, 253, (2018) (citing polling place carry restrictions in various states). Instead, the Court meant there were relatively few *places* where carry was restricted. *Bruen*, 142 S. Ct. at 2133. Sensitive places are intended to be, at most, the rare exception to a broad right to carry in public. To establish an analogue, the State must still point to a tradition of a type of regulation that was more common than a mere handful of states or territories, and more enduring than a few years.

## II.    THE LIMITS OF EXPERT TESTIMONY UNDER *BRUEN*

California has lined up a baker's dozen of putative academic-historian experts. But adjudicative facts are not determined by majority vote. *See* Rebuttal Declaration of Clayton Cramer.

At best, expert testimony might aid with providing context to understand the "how" and "why" of any unclear and/or ambiguous historical regulations examined as part of a *Bruen* analysis. But that is it. The judgment as to whether a historical law is relevantly similar is a judicial function.  Parsing statutory texts (whether modern or ancient) is the job of lawyers and judges, not historians. The expert's task under the Federal Rules of Evidence cannot be allowed to stray into making speculative excuses as to why sensitive places that existed in the past did not bar carry, but should today. *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018). Thus, a district court must take "adequate steps to protect against the danger that [an] expert's opinion would be accepted as a legal conclusion." *United States v. Herring*, 955 F.2d 703, 709 (11th Cir. 1992).

To uphold a challenged law, the government must produce evidence to demonstrate that its law is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. Expert opinion about why regulations did not exist in the past does not help the government meet its burden. Rather, *Bruen* requires the State – as a party -- to present its collection of historical

5

laws, and thereafter for the Court to determine whether: (1) those proposed analogues are indeed well-established and representative, and (2) whether they are relevantly similar enough to uphold the State's law. *Id*. at 2132-33.

Statutory interpretation is a legal question for a judge, not a factual question. *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1129 (11th Cir. 2018). Thus, a district court must take "adequate steps to protect against the danger that [an] expert's opinion would be accepted as a legal conclusion." *United States v. Herring*, 955 F.2d 703, 709 (11th Cir. 1992). While "[i]t is reasonable to ask whether lawyers and judges can adequately perform historical inquiry of this sort," "[t]hose who oppose originalism exaggerate the task." Antonin Scalia and Bryan Garner, *Reading the Law: The Interpretation of Legal Texts*, *at* 401. In some cases, it might be difficult, "[b]ut that is the exception, not the rule. In most cases—and especially the most controversial ones—the originalist answer is entirely clear." *Id.*

Indeed, as a New York district court reasoned, "[t]he Court's view of the State's expert's declaration is that live testimony and cross examination are not needed …The historical record itself, and not expert arguments or opinions, informs the analysis." *Hardaway v. Nigrelli,* 639 F. Supp. 3d 422, 428 (W.D.N.Y. 2022)*.* Likewise, the *Antonyuk* court explained that "[t]he State Defendants are fully capable of meeting their burden of producing analogues (especially when prodded to do so), and judges appear uniquely qualified at interpreting the meaning of statutes." *Antonyuk v. Hochul,* 639 F. Supp. 3d 232, 297 n. 72 (N.D.N.Y. 2022).

Unsurprisingly, the *Bruen* Court managed to analyze the historical laws the government presented in that case without a battle of experts or lengthy academic exegeses from history professors, finding that New York's modern carry law was not "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2156.

The State and its historian-experts are aware of their predicament. For example, after laboring through a detailed and interesting (although irrelevant)

6

expose of Colonial and Founding-era Philadelphia, one expert summarily concedes that the City "did not enact weapon-specific regulations for these places of public assembly." Rivas Decl., ¶ 34. Nevertheless, she continues with the unsupported supposition that, even though nearly all the laws she identifies thereafter refer to concealed carry prohibitions, it would not be reasonable to infer that people had "permission to openly carry in populated places during a person's ordinary activities." *Id.*, at ¶ 41. Dr. Rivas is entitled to her opinion, but that opinion leads to the conclusion that there historically was no general right to carry, an opinion the Supreme Court already rejected in *Bruen*.  Just as "[a] dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion," *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 230 (2023), defense experts that are openly hostile to *Bruen* are not the best source of authority for the legal relevance of potential historical analogues.

Defense experts lament that their review of firearm regulation in the 18th and 19th centuries cannot be rushed. *See, e.g., id.*, ¶¶ 71-75; Schrag Decl., *passim*; *see also* Opp. at 10 ("Identifying relevant laws and understanding their context is a time-consuming, labor-intensive task").  But if the State cannot meet its burden under *Bruen,* then a preliminary injunction must issue.  Constitutional rights cannot be put on hold while historians spend untold months or years sifting the historical record. The Supreme Court has reminded us at least three times that Second Amendment rights are not second-class.

This is especially so when it is the State enacted the challenged law in direct response to the *Bruen* decision, and could have waited until the historical record was developed and clear. As the *Koons* court observed:

> [New Jersey] had—or should have had—the historical materials and analyses the State relied upon when it began its legislative response to *Bruen*. After all, the Supreme Court was clear that in order for any gun control legislation to pass constitutional muster under the Second Amendment, such legislation must be consistent with historical

7

tradition. The State has had six months since *Bruen* to identify well-established and representative historical analogues.

649 F. Supp. 3d 14, 25 (D.N.J. 2023). Similarly, California waited over a year following *Bruen* to enact SB 2, yet its experts still plead for more time. But constitutional rights, and this Court's procedures for upholding them, are the priority at issue in this motion.

And despite the State experts' claims they need more time to support the constitutionality of the law, SB 2's sponsor Senator Portantino even boasted that California's version is "constitutional and consistent with the Supreme Court's guidance in the *Bruen* decision."[5] If that is true, the Attorney General should have borrowed the Senator's analogical research underpinning his writing of the law to oppose this motion instead of arguing how difficult it purportedly is to engage in the analogical inquiry that the State is manifestly obligated to carry the burden on to defeat this motion.

## III.   THE CHALLENGED LOCATIONS ARE NOT SENSITIVE

### A.   Buildings and Parking Areas Under the Control of a Unit of Local Government (Penal Code § 26230(a)(5))

Notwithstanding the State's misrepresentation of Plaintiffs' position, Plaintiffs have not sought to carry inside *government* buildings like courts and city halls. As expressly stated in pages 12 through 14 of their Opening Brief, Plaintiffs have challenged this section as it applies to parking areas and public appurtenant areas adjacent to where legislative, judicial, or other governmental business is conducted.[6]

---

[5] Press Release, *Attorney General Bonta's Sponsored Bill to Strengthen California's Concealed Carry Weapons Restrictions Becomes Law*, September 26, 2023. Available at <https://oag.ca.gov/news/press-releases/attorney-general-bonta%E2%80%99s-sponsored-bill-strengthen-california%E2%80%99s-concealed-carry> (Last accessed November 7, 2023).

[6] Plaintiffs also challenge this section to the extent it applies to places already prohibited by separate provisions of SB 2, e.g., public libraries are both prohibited under section 26230(a)(22) and are also buildings "under the control of a unit of local government" under section 26230(a)(5).

8

California argues that it may ban carry at any place where it acts as a proprietor, relying on pre-*Bruen* authority. Opp. at 11-12. However, "[w]hether the government acted as a proprietor may have been relevant when assessing Second Amendment challenges under a means-end scrutiny test, but it has no place under the first step of the *Bruen* analysis." *Wolford*, 2023 WL 5043805, at *20.

Several courts have already rejected this exact argument. *See, e.g.,* Opening Brief at 13-14. So has this District. The State argued its gun show ban on the Orange County Fairgrounds was constitutional because it was within the government's "authority to set limits on the use of its property when acting as a proprietor." *B&L Productions, Inc. v. Bonta*, 2023 WL 7132054, at *15 (C.D. Cal. Oct. 30, 2023) (quoting Defendants' Supplemental Reply 3:16-18). This District disagreed: "there is no historical basis for a public space such as the Orange County Fairgrounds to be designated as a sensitive space." *Id*. at *16.

## B.    Places of Worship (Penal Code § 26230(a)(22))

The State has marshalled only a handful of historical restrictions on carry in places of worship, but the earliest occurred after the Fourteenth Amendment. Opp. at 12 (citing laws from a small minority of jurisdictions, from 1870 through 1905). Some of these laws were from pre-statehood territories of Arizona and Oklahoma, which *Bruen* expressly warned against relying on as part of the analogical inquiry. *Bruen*, 142 S. Ct. at 2121. But the more serious issue is that these laws are just "spasmodic enactments involving a small minority of jurisdictions governing a small minority of populations. And they were passed nearly a century after the Second Amendment's ratification in 1791." *Hardaway*, 639 F. Supp. 3d at 442; *see also Antonyuk*, 639 F. Supp. 3d at 320 (states barring church carry in the 19th century amounted to just 12.9 percent of the population). These sparse laws contrast with colonial-era requirements that mandated carry in places of worship. *Id. See Bruen*, 142 S. Ct. at 2154 ("late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.")

9

In response to the Founding era mandatory carry laws, the State attempts to portray these laws as racist because they were meant to enable defense against slave uprisings and Indian attacks. Opp. at 14. [7]  For starters, it is difficult to see how it is racist to defend oneself from attack, even if racist or segregationist laws were responsible for the perceived danger. Furthermore, the State fundamentally mischaracterizes these laws. Defending against foreseeable and commonplace Indian attacks because such attacks had happened in the past is no more "racist" than a Jewish man wanting to carry in his synagogue because he fears anti-Semitic violence. *See* Davidovitz Decl., ¶ 11.

Critically, *Bruen* instructs that, when "earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Bruen*, 142 S. Ct. at 2131. Places of worship have long been enticing targets for those bent on violence against particular groups, from the colonial era to today, like the Pittsburgh synagogue shooting in 2018 or the Charleston church shooting in 2015. Of course, the founding era did not address this problem by foolishly declaring churches a "gun free zone."[8]  Instead, they armed parishioners to combat the problem.

## C.     Financial Institutions (Penal Code § 26230(a)(23))

The State and its experts admit that there is no historical tradition of barring the carrying of arms in banks. Banks have existed since the Founding[9] (and long

---

[7] *Contra Duncan v. Bonta*, 2023 WL 6180472, at *22 (S.D. Cal. Sept. 22, 2023) ("The State's historical list also includes, surprisingly, 38 laws that applied only to particular groups, such as slaves, Blacks, or Mulattos. Those laws are not relevant to the magazine prohibition challenged in this case . . . Even if they were, this Court would give such discriminatory laws little or no weight.")

[8] The State also argues that their law allows for church carry if the church allows it. That fails for the same reason the Vampire Rule does. *See* Opening Brief, at 24-26.

[9] *See, e.g.*, Federal Reserve Bank of Philadelphia, *The First Bank of the United States: A Chapter in the History of Central Banking* (March 2021) <https://www.philadelphiafed.org/-

*MAY* PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION

before), yet regulations on carrying arms in them at the time were nonexistent. The State does not dispute that no restrictions on carrying arms in banks existed, but instead demurs that because banks did not "occupy a central place in the American economy" in the past (a dubious assertion, particularly in the Jacksonian era), they were not "sensitive" until now. Opp. at 14-16.

California is not entitled to the "more nuanced approach" identified in *Bruen* as reserved only for cases "implicating unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132. The intersection of banks and gun-related crime is not a new problem.  Places where money and valuables were kept—banks, armories, private bailors,  private safes, saddlebags, wagon coaches, trains, and the like—have existed since before Reconstruction.  So have robberies of these places. Yet California has failed to point to a single law in the 18th or even 19th centuries that restricted the peaceable carry of firearms in banks, let alone a historical tradition of such laws. That modern retail banking institutions may be different than the banking establishments of yesteryear (indeed, every sort of modern institution no doubt is different in some way than historical versions that preceded it) does not outweigh the absence in the entirety of any analogues regulating firearms therein.  *Bruen* made it clear that, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131.

California also proffers no laws barring carry in private banks, even though banks proliferated in the 19th century.[10] California is certainly not shy about relying

_____
/media/frbp/assets/institutional/education/publications/the-first-bank-of-the-united-states.pdf> (Last accessed November 1, 2023).

[10] *See, e.g.,* Britannica Online, *Wells Fargo* (updated November 1, 2023) <https://www.britannica.com/topic/Wells-Fargo-American-corporation> (last

*MAY* PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION

on a plethora of laws and ordinances that came as late as the 20th century. *See, e.g.,* Opp. at 12-13 (citing a collection of laws and ordinances ranging from 1870 through 1905). Yet it has cited none concerning restrictions on carry in banks, whether private or public. California has wholly failed to meet its burden under *Bruen*.

Furthermore, California would fail to show even a *modern* tradition of such restrictions, even if such a tradition were relevant. Prior to *Bruen*, <u>not one state</u> completely restricted the legal carrying of firearms in banks—not even California—and to Plaintiffs' knowledge only two states partially restricted the practice. *See* Mich. Comp. Laws Serv. § 750.234d(1) (allowing concealed carry but not open carry); Neb. Rev. Stat. § 69-2441(a) (allowing open carry but not concealed carry). Prior to *Bruen*, even as concealed carry proliferated across the states, no state banned carry in banks. There is no historical tradition of banning carry in banks, period.

Moreover, the State provides no constitutional justification for why banks are so sensitive that they cannot, like other privately-owned businesses, decide for themselves how to secure their premises.  Banks have a storied history of assessing the risks of their trade and deciding what security measures should be undertaken in their branches, e.g. armed security guards, security gates for entry, security cameras, Lexan barriers for tellers, etc.[11]

The State's remaining arguments are neither serious nor persuasive. For instance, the State warns of "coordinated attacks by groups, including those with links to terrorism." Opp. at 15. It strains credulity to believe that terrorists, hostage takers, and bank robbers are going to make sure to get their CCW permits before

accessed November 1, 2023) ("The founders . . . established Wells, Fargo & Company in March 1852 to handle the banking and express business prompted by the California Gold Rush.").

[11]  Nor does the State mandate these other security measures, despite banks' now purportedly sensitive nature.  Banks decide on a branch-by-branch basis where to implement these measures, and which ones to implement.

12

committing violent felonies. Indeed, California has no evidence of even a single bank robbery or other crime at a bank committed by a CCW permit holder. That banks are targets for criminals is ironically the very reason Plaintiffs desire to be armed when doing business there.

### D. Places That Serve Liquor (Penal Code § 26230(a)(9))

As stated in the Opening Brief at page 16, Plaintiffs have not sought to carry while drinking or intoxicated. But the State goes far beyond claiming that it may ban the carrying of arms by intoxicated individuals. Rather, it claims an "abundance of historical laws restricting the carrying of firearms in alcohol-rich environments." *Id*. at 21. But not one of the cited historical laws was a state law that barred the carrying of firearms by civilians who were not intoxicated. The State's Founding era examples prohibited the sale of alcohol to *militiamen*, not the carry of firearms by ordinary *civilians* not actively in militia service. The only other laws the State cites are from two territories in the 19th century, Oklahoma and New Mexico. *Id*. at 22. As explained, territorial laws are of little to no value here, and the "Supreme Court has already identified Oklahoma as a non-representative jurisdiction." *Kipke v. Moore*, 2023 WL 6381503, at *11 (D. Md. Sept. 29, 2023).

The State also cites a handful of local ordinances, all from after 1868. These are insufficient to establish a historical tradition, which is why several other courts have rejected arguments based on such ordinances. *Antonyuk*, 639 F.Supp.3d at 333; *Koons*, 649 F. Supp. 3d at 25; *Wolford*, 2023 WL 5043805, at *18; *Kipke*, 2023 WL 6381503, at *11.

As for claimed fears of intoxicated armed individuals at bars and nightclubs, Opp. at 23, section 26230(a)(9) is not in any way limited to just places that "feature large crowds[12] assembled for long periods of time." *Id*. Rather, it applies to every

---

[12] *Bruen* rejected the argument that Manhattan was sensitive "simply because it is crowded and protected generally by the New York City Police Department." *Bruen*, 142 S. Ct. at 2119.

*MAY* PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION

place that sells alcohol for consumption on the premises, including restaurants that offer beer and wine. While Plaintiffs do not concede bars and nightclubs are sensitive, the local restaurants that Plaintiff Miranda frequents like Chili's, Applebee's, and Buffalo Wild Wings are not crowded nightclubs. Miranda Decl., at ¶ 7;. Similarly, Dr. Hough should be able to carry when dining out with his wife, as he has for years. Hough Decl., at ¶ 8. "This overbreadth in the regulation would be particularly burdensome on . . . those license holders who, for whatever reason . . . never consume alcohol at restaurants." *Antonyuk*, 639 F.Supp.3d at 333.[13]

No state during the Founding era banned the carry of firearms by sober individuals in places that served alcohol. Exceedingly few jurisdictions did so even in the late 19th century. When "earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Bruen*, 142 S. Ct. at 2131.

### E.   Public Transportation (Penal Code § 26230(a)(8))

Other than the "Vampire Rule,"[14] nothing in SB 2 so thoroughly eviscerates

---

[13] SB 2 is so burdensome on the right, it wouldn't just restrict CCW holders like Miranda from carrying for self-defense in a restaurant like Applebee's, it would effectively restrict them from lawfully carrying to and from the restaurant, merely because alcohol is served inside. Although SB 2 purports to allow storage in a vehicle in an otherwise prohibited parking lot, it has no mechanism for lawfully transferring a firearm from a person's body to a vehicle's locked storage at the location.  The ability of a person to engage in the ordinary activities of life and enjoy the right to self-defense even while traveling to and from those activities—going to a restaurant, going to the bank and withdrawing money for the weekend, visiting a relative who is palliating in a hospital, taking the family to attend an annual county fair—is effectively destroyed by SB 2.

[14] Due to space constraints, only a brief reply to the State's specious arguments about the Vampire Rule is necessary.  Simply, the State is incorrect in its assertion that this provision of SB2 involves no state action. Opp. at 42. As of today, Plaintiffs can generally carry in private businesses open to the public. Once SB 2 takes effect, Plaintiffs will only be able to carry in the very few businesses willing to post a sign affirmatively allowing carry. The State will have made that happen, not any private business. "The right to armed self-defense follows the individual everywhere he or she lawfully goes. Here, the State, not private landowners, burdens carriers' lawful entry onto the property of another with a 'no-carry' default. The Default Rule is thus state action insofar as the State is construing the sound of silence." *Koons*, 2023 WL 3478604, at *61. *Koons* also thoroughly

---

14

the right to carry as much as its prohibition on carrying arms while using public

transportation. The irony is that individuals who rely on public transportation, often

of lower income, are the very people most likely to need to exercise the right of

self-defense. In deciding *Bruen*, at least one Justice in the majority had in mind

someone who gets off work at midnight, commutes home on public transportation,

and then walks some distance through a high-crime area to get home. Transcript of

Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen* (20-843), Oyez,

<https://www.oyez.org/cases/2021/20-843> (as of Aug. 31, 2022). Under SB 2,

such individuals are effectively disarmed for their entire trip.

California fails to cite a single historical law barring carry on public

transportation.[15] The State argues instead that some private companies that

provided transportation prohibited carry. Opp. at 24. But it cannot validly rely

entirely on the action of private companies in the 19th century as its historical

analogue to establish "enduring American tradition of state regulation." *Bruen*, 142

S. Ct. at 2155.  *See also Shelley v. Kraemer,* 334 U.S. 1 (1948) (private property

regulations inextricably intertwined with state action is still subject to fundamental

rights analysis.)

Moreover, such private sector practices were hardly common,

notwithstanding the State's representations. The State cites Dr. Rivas's declaration,

which, in turn, cites to a forthcoming law review article which states that "[a]t least

six U.S. railroads between 1835 and 1900 acted pursuant to this authority to restrict

the right to bear arms of their passengers." Rivas Decl., at ¶ 67. But six railroad

---

rebutted the amicus brief of Ian Ayres and Fredrick Vars, who have submitted a
similar brief in this case. *See id*. at *57 n.34. Ian Ayres has written elsewhere that
the point of the Vampire Rule is to make carry inconvenient, so less people carry.
Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No
Carry" Defaults on Private Land*, 48 J.L. Med. & Ethics 183, 184 (2020).

[15] Even California never had such a restriction before *Bruen*. Complaint, ¶¶
60-61.

companies is a miniscule fraction of how many existed in total.[16] And of those six, not all banned carry. The South Carolina Canal and Rail Road Company required only inspection of firearms before boarding. Hochman, at p. 13. Another allowed firearms so long as they were unloaded. *Id*., at p. 14. For the Albany Railway and International & Great Northern Railroad Company, there do not appear to have been clear rules against carry of firearms, just reports of company employees that refused to allow certain passengers to carry. *Id*. at 15-16. Finally, Hochman concedes that "[t]his all said, some states recognized an affirmative grounds for an individual to carry arms while on a journey—the 'traveler's exception.'" *Id*. Those laws—public laws[17]—are the relevant historical analogues, not the actions of a few private rail companies.

The State's other expert on this topic, Dr. Salzmann, states that many of the rail company "rule books and timetables do not mention firearms at all . . . I found mentions of firearms in approximately fifteen percent of [the 70 documents examined]." Salzmann Decl., ¶ 70. He then cites just two 19th century examples of rail companies prohibiting the carry of firearms, along with some 20th century restrictions. *Id*. at ¶¶ 73-74. Thus, even if private company rules were relevant under *Bruen*, the State has failed to establish a historical tradition of railroad companies barring the carry of firearms, in addition to failing to establish a

---

[16] Just in New York, "[t]he list of railroads that operated in and through New York included such important carriers as the New York Central, Erie, Long Island, Pennsylvania, New Haven, Lackawanna, Lehigh Valley, Ontario and Western, Delaware and Hudson, Rutland, Boston and Maine, and others (including smaller regional and short line carriers)." New York State Department of Transportation, *History of Railroads in New York State*, available online at <https://www.dot.ny.gov/divisions/operating/opdm/passenger-rail/passenger-rail-service/history-railroads> (Last accessed November 9, 2023).

[17] *See, e.g*., An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor, Feb. 23, 1859, *reprinted in* LAWS OF THE STATE OF INDIANA, PASSED AT THE FORTIETH SESSION OF THE GENERAL ASSEMBLY 129 (1859) ("[E]very person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.").

*MAY* PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION

historical tradition of state regulation.

The State's other arguments regarding public transportation are the same arguments presented for many other provisions: public transportation is crowded, and children are present. Opp. at 24-25. None of that establishes the historical tradition of firearm regulation as *Bruen* requires.

## F.   Health Care Facilities (Penal Code § 26230(a)(7))

This provision of SB 2 is especially broad. No Plaintiff has sought to carry firearms onto the operating room table. Plaintiffs also do not challenge the right of private businesses to not allow firearms on their premises, including in places where firearms pose unique problems (such as MRI rooms). But subsection (a)(7) is far broader than simply protecting private property rights. CRPA member Davidovitz would be forbidden from taking his grandchildren to therapy sessions while carrying, which he does in part to protect them. Davidovitz Decl., ¶ 9. Even if just waiting in the parking lot until the sessions were over, that too would be forbidden. Just like many other subsections, (a)(7) forbids carrying even on just the parking lots[18] serving medical facilities.

Things get more absurd for Plaintiff Hough, who is a dentist and as of now, carries at his office for the defense of himself and his staff. SB 2 will end that, even in his own business. Indeed, for all the State's feigned concern about private property rights when it comes to the Vampire Rule, Opp. at 39-44, SB 2 contains no exceptions for the owners and operators of various designated "sensitive places," including healthcare facilities like Dr. Hough's dental practice.

Like banks and bars, hospitals have existed since the Founding, and the State does not dispute that there were no laws prohibiting the carrying of weapons within them during the Founding era. *Id*. at 28-29. Rather, the State claims that hospitals transitioned into their modern form later in the 19th century, but even then, does not

---

[18] The State argues the parking lot provisions are constitutional but cites almost entirely pre-*Bruen* caselaw for that argument. Opp. at 36-37.

*MAY* PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION

provide corresponding analogues of prohibition on carrying in medical facilities during that time. *Id*. Instead, the State cites the laws of just two states and one territory which prohibited firearms in places where people gathered for "scientific purposes," while acknowledging none expressly included medical facilities. *Id*. at 30. This Court need not wrestle with that vague phrase and its analogical value because, regardless, the State has not presented near enough laws to constitute a representative tradition.

Lastly, the State argues that California's teaching hospitals are similar to schools. *Id*. But that is a bit like New York's claim that the entire Syracuse Zoo is off limits for firearms because sometimes veterinary students visit the animals. *See Antonyuk, et al. v. Nigrelli, et al*, Case No. 22-2908 (N.D.N.Y.), Document 90, at 23 ("the Rosamond Gifford Zoo's campus is a teaching hospital for Cornell University…."). Moreover, SB 2 does not only ban carry at teaching hospitals. It bans carry at all medical facilities, their affiliated buildings, nursing homes, and the parking areas of all such facilities. There is no tradition–historical or even modern[19] –for that.

## G.   Parks and Playgrounds (Penal Code § 26230(a)(11-13))

The State boasts that, "[b]y 1900, the carrying of firearms was prohibited in more than two dozen parks across at least ten different states." Opp. at 33. But this is hardly impressive. Even if a time period as late has 1900 were relevant, there were 45 total states in 1900, of which the state claims about 20 percent banned the carrying of firearms in some specified parks, and not all parks generally.[20] Even if

---

[19] Today, only 12 states have passed laws restricting carry in hospitals, and several (including California) only passed such laws as part of their response to *Bruen*. Giffords Law Center, *Guns in Public: Location Restrictions*, available online at <https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/location-restrictions/> (last accessed November 10, 2023).

[20] United States Census Bureau, *U.S. Territory and Statehood Status by Decade, 1790-1960* (February 21, 2013), available online at <https://www.census.gov/dataviz/visualizations/048/> (last accessed November 10, 2023).

*MAY* PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION

such statistics applied to the relevant analogical period, that does not make for a representative historical tradition. *Bruen*, 142 S. Ct. at 213; *see also Wolford*, 2023 WL 5043805, at *24 ("As to the other fifteen [park] laws passed at least twenty years after the Fourteenth Amendment's ratification, this Court is constrained from placing too much 'weight' on 'postenactment history'. . . .").

Even if the State's cited laws were relevant, they would at most support California barring carry in particular parks, not all parks in general. Yet SB2 prohibits someone like Plaintiff Brennan from carrying while hiking alone in the wilderness of a State Park, Brennan Decl., ¶ 9, just as much as it prohibits someone carrying while going for a walk in a suburban park. History supports neither restriction, but the State has especially failed to show a historical tradition of carrying in "public parks *outside of* a city (where people are generally free to roam over vast expanses of mountains, lakes, streams, flora and fauna)." *Antonyuk*, 639 F. Supp. 3d at 325.

The State does not stop grasping for straws. It discusses a national park ban enacted in 1936 which was eventually repealed. Opp. at 33. A law that came as late as 1936, especially one not even in effect anymore, could not possibly constitute a relevant historical tradition under *Bruen*. The State's expert similarly focuses almost entirely on historical prohibitions of firearms in parks after 1900. Glaser Decl., *passim*.

As to playgrounds, Plaintiffs acknowledge that a few district courts have upheld restrictions on carrying in them, as the State notes. Opp. at 31-32. Plaintiffs contend these courts were wrong. Playgrounds may be superficially "like" schools in that they cater to children, but the similarities end there. At schools, children are under the supervision of faculty, and sometimes the protection of armed resources officers. Unauthorized persons are generally not allowed to wander through elementary school campuses the way they are playgrounds. There is no *in loco parentis* entrustment of children to the state. In fact, the only adults typically at a

19

playground to protect children in the event of deranged criminal attack are their parents, grandparents, or guardians. Harms Decl. ¶ 8; Bahrami Decl. ¶ 9. *See also* Davidovitz Decl., ¶ 9.  There is no historical basis for a law that prevents armed parents (who often are concealed carry license holders) from protecting their own children from attack by violent criminals who, undeterred by other laws against crime, won't abide by a "sensitive places" firearm ban in a park.

## IV.   CONCLUSION

For the reasons above, the arguments in the *Carralero* plaintiffs' reply brief, and the arguments in Plaintiffs' Opening Brief, Plaintiffs respectfully request this Court to grant their motion for preliminary injunction.

Respectfully Submitted,

Dated:  November 20, 2023      **MICHEL & ASSOCIATES, P.C.**

*/s/ C.D. Michel*
C.D. Michel
Counsel for Plaintiffs

Dated:  November 20, 2023      **LAW OFFICES OF DON KILMER**

*/s/ Don Kilmer*
Don Kilmer
Counsel for Plaintiff The Second Amendment Foundation

*MAY* PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION

**ATTESTATION OF E-FILED SIGNATURES**

I, C.D. Michel, am the ECF User whose ID and password are being used to file this REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION. In compliance with Central District of California L.R. 5-4.3.4, I attest that all signatories are registered CM/ECF filers and have concurred in this filing.

Dated: November 20, 2023              _/s/ C.D. Michel_____
                                                      C.D. Michel


**LOCAL RULE 11-6.2 CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,913 words, which complies with the word limit set by this Court's order on September 28, 2023 [Dkt. 12].

Dated: November 20, 2023              _/s/ C.D. Michel_____
                                                      C.D. Michel

_MAY_ PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION

**CERTIFICATE OF SERVICE**
IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case Name: *May, et al. v. Bonta*
Case No.: 8:23-cv-01696 CJC (ADSx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Robert L. Meyerhoff, Deputy Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Email: Robert.Meyerhoff@doj.ca.gov
        *Attorney for Defendant*

I declare under penalty of perjury that the foregoing is true and correct.

Executed November 20, 2023.

Christina Castron

CERTIFICATE OF SERVICE