C. D. Michel – SBN 144258
cmichel@michellawyers.com
Sean A. Brady – SBN 262007
sbrady@michellawyers.com
Konstadinos T. Moros – SBN 306610
kmoros@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile:       (562) 216-4445

Donald Kilmer-SBN 179986
Law Offices of Donald Kilmer, APC
14085 Silver Ridge Road
Caldwell, Idaho 83607
Telephone: (408) 264-8489
Email: Don@DKLawOffice.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

| | |
|---|---|
| RENO MAY, an individual; ANTHONY MIRANDA, an individual; ERIC HANS, an individual; GARY BRENNAN, an individual; OSCAR A. BARRETTO, JR., an individual; ISABELLE R. BARRETTO, an individual; BARRY BAHRAMI, an individual; PETE STEPHENSON, an individual; ANDREW HARMS, an individual; JOSE FLORES, an individual; DR. SHELDON HOUGH, DDS, an individual; SECOND AMENDMENT FOUNDATION; GUN OWNERS OF AMERICA; GUN OWNERS FOUNDATION; GUN OWNERS OF CALIFORNIA, INC.; THE LIBERAL GUN CLUB, INC.; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, | Case No.: 8:23-cv-01696 CJC (ADSx) **REBUTTAL DECLARATION OF CLAYTON CRAMER** Hearing Date:   December 20, 2023 Hearing Time:   1:30 p.m. Courtroom:       9 B Judge:              Hon. Cormac J. Carney |
| Plaintiffs, v. | |
| ROBERT BONTA, in his official capacity as Attorney General of the State of California, and DOES 1-10, | |
| Defendants. | |

REBUTTAL DECLARATION OF CLAYTON CRAMER

# TABLE OF AUTHORITIES

**Cases**

*Carr v. State*,

 34 Ark. 448 (Ark. 1879)....................................................................40, 41

*Cockrum* v. *State*,

 24 Tex. 394, 401 (1859). .........................................................................39

*English v. State*,

 35 Tex. 473, 489 (1872). ....................................................................39, 40

*Eslava v. State*,

 49 Ala. 355 (Ala. 1873)............................................................................41

*New York State Rifle & Pistol Assn, Inc. v. Bruen*,

 142 S. Ct. 2111, 2139,2121(2022) ................................................*passim*

*State v. Huntley*,

 25 N.C. 418, 422, 423 (1843)............................................................31, 37

*State v. Smith*,

 11 La.Ann. 633, 634 (1856). ............................................................31, 38

*Wright v. Commonwealth*,

 77 Pa. St. 470, 471 (1875).................................................................33, 34

**Statutes**

1 Colonial Laws of New York from the Year 1664 to the

 Revolution 49-50 (1894). ..........................................................................6

1 Laws of the Commonwealth of Massachusetts 36-7 (1807) ................................12

1 Statutes: Revised Edition (1870). .......................................................................47

2 Edw. III, Stat. Northampt., § 3 (1328)................................................................47

23 State Records of North Carolina, Ch. 25 at 29 (1904). ......................................6

28 Journals of the Continental Congress 378 (1785). .............................................5

3 Statutes of the Realm (1819) ..............................................................................10

4 Statutes of the Realm (1819) ..............................................................................10

REBUTTAL DECLARATION OF CLAYTON CRAMER

7 Edw. II (1313). ................................................................................................47

A Collection of all the Public Acts of Assembly, of the Province of North-Carolina:
Now in Force and Use... 215 (1751). ....................................................................6

Aaron Learning and Jacob Spicer, The Grants, Concessions, and Original
Constitutions of the Province of New-Jersey 78 (1752). ........................................6

Acts Passed at the First Session of the Twenty First General Assembly for the
Commonwealth of Kentucky 100-101 (1813). ..............................................28, 44

Ala. Code § 3274 (1852) ...............................................................................28, 44

Allen D. Candler, comp., 18 Colonial Records of the State of
Georgia 7, 11 (1910).; .........................................................................................5

Allen D. Candler, comp., 19(part 1) The Colonial Records of the State of
Georgia 188 (1910). .............................................................................................5

Allen D. Candler, comp., 19(part 2) The Colonial Records of the State of
Georgia 104 (1910). .............................................................................................5

Cal. Laws ch. 63 at 67 (1870).......................................................................28, 44

Cal. Laws, ch. 128 at 115 (1864)..................................................................28, 44

Cal. Laws ch. 339 § 5 at 696 (1923).....................................................................26

Cal. Laws, ch. 485 at 748 (1863)..................................................................28, 44

Charles J. Hoadly, ed., Records Of The Colony And Plantation Of New Haven, From
1638 To 1649 96-97 (1857)...................................................................................6

Connecticut, Acts and Laws of the State of Connecticut, in America 144 (1791).....6

Henning's General Laws of California, Act 1182 at 532 (1917). ........................28, 44

James T. Mitchell and Henry Flanders, ed., 9 Statutes at Large of Pennsylvania from
1682 to 1801 Ch. 750 at 77 (1898). .......................................................................6

Laws and Acts of Rhode Island, and Providence Plantations Made from the First
Settlement in 1636 to 1705, reprinted in John D. Cushing, ed., The Earliest Acts
and Laws of the Colony of Rhode Island and Providence Plantations, 1647-
1719 106 (1977). ................................................................................................15

REBUTTAL DECLARATION OF CLAYTON CRAMER

Laws of the Government of New-Castle, Kent and Sussex Upon Delaware 150, 154 (1741)..................................................................15

Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly 39 (1820); ................................................................28, 54

Laws of the State of New Jersey 279 (1800)...........................................13

Militia Laws of the United States, and of the Commonwealth of Massachusetts. to Which Are Added, Judicial Decisions on the Same 87-88 (1815)......................13

Nathaniel B. Shurtleff, ed., 1 Records of the Governor and Company of the Massachusetts Bay in New England 190 (1853) ..................................................6

New Hampshire, Acts and Laws, Passed by the General Court or Assembly of the Province of New-Hampshire in New-England 91 (1716).......................................6

New Jersey, Acts of the Council and General Assembly of the State of New-Jersey… 65 (1784). ........................................................................6

New Jersey, The Laws and Acts of the General Assembly of His Majesties Province of Nova Caesarea or New-Jersey... 139 (1717).........................................6

Penn. Const. Article IX, §21 (1790). ......................................................34

Public Records of the Colony of Connecticut 15 (1850). ...........................................5

Revised Laws of Indiana, in Which Are Comprised All Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General Assembly at Their Fifteenth Session 192 (1831)................................................28, 44

Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837 Div. VIII, Art. I, § 13, at 280 (1838) ................................................................28, 44

Tex. Laws ch. 34 at 25 (1871) ................................................................28, 44

William Brigham, ed., The Compact with the Charter and Laws of the Colony of New Plymouth 285-286 (1836). ...........................................6

William Hand Browne, ed., 3 Archives of Maryland 345 (1885). ...........................6

iii

William Walter Hening, 12 Statutes at Large; Being a Collection of

All the Laws of Virginia… 10 (1823). ...................................................................6

William Walter Hening, 7 Statutes at Large; Being a Collection of All

the Laws of Virginia… 94-95 (1820). ...................................................................6

**Other Authorities**

11 Public Records of the Colony of Connecticut 313 (1880) .............................17, 18

7 Debates Of The Convention To Amend The Constitution Of Pennsylvania:

Convened At Harrisburg, November 12, 1872 258 (1873)..................................35

Benjamin Franklin, Some Account of the Pennsylvania Hospital From Its First Rise

to the Beginning of the Fifth Month, Called May, 1754 4-5 (1817)....................22

Central Pacific Railroad and leased lines rules, regulations and instructions for the

use of agents, conductors, etc. 204 (1882)...........................................................43

Clayton E. Cramer, Guns on Campus, 27:4 Academic Questions 411-425 (Dec.

2014)......................................................................................................................7

Derick Moore, U.S. Census Bureau, U.S. Population Estimated at 334,233,854 on

Jan. 1, 2023,...........................................................................................................3

Duane Hamilton Hurd, 1 History of Norfolk County, Massachusetts…

312 (1884). ..........................................................................................................18

E. Fuller Torrey and Judy Miller, The Invisible Plague: The Rise of

Mental Illness from 1750 to the Present 122 (2001)...........................................19

Eric Nellis and Anne Decker Cecere, Eighteenth-Century Records of the Boston

Overseers of the Poor 976-979 (2006)................................................................21

G. Lewis, A. David, S. Andreasson, P. Allebeck, Schizophrenia and city life, Lancet,

[July 18, 1992] 340(8812):137-40 ......................................................................18

Herbert Goldhamer and Andrew W. Marshall, Psychosis and Civilization: Two

Studies in the Frequency of Mental Disease (1953). ..........................................19

REBUTTAL DECLARATION OF CLAYTON CRAMER

Humphry William Woolrych, A PRACTICAL TREATISE ON
   MISDEMEANOR 221-2 (1842)...................................................................48

Irvine Loudon, The Nature of Provincial Medical Practice in Eighteenth-Century
   England, 29 Medical History 1 (1985)......................................................20

Isaac, Rhys. *The Transformation of Virginia, 1740-1790*, University of North
   Carolina        Press,        1999. *ProQuest        Ebook        Central*,
   http://ebookcentral.proquest.com/lib/cwidaho/detail.action?docID=4321901.
   Created from cwidaho on 2023-11-07 15:53:40. ......................................4

James W. North, The History of Augusta, From the Earliest Settlement to the Present
   Time… 87 (1870)....................................................................................18

Jesse Chickering, A Statistical View Of The Population Of Massachusetts,
   From 1765 To 1840 7 (1846). ...............................................................19

John Carpenter, Liber Albus: The White Book of the City Of London 229 (1861).10

John Swett, American Public Schools: History and Pedagogics 7-33 (1900)............5

John Sylvester Davies, An English Chronicle of the Reigns of Richard II., Henry the
   Fourth., Henry V., and Henry VI. written before the year 1471… 173 (1856). ...11

Joshua Hempstead, Diary of Joshua Hempstead of New London, Connecticut 139,
   141-2 (1901).........................................................................................17

Laws of Illinois College, 1850, in Illinois State Historical Society, Papers in Illinois
   History and Transactions 254 (1906). ......................................................7

Laws of Yale-College, in New- Haven, in Connecticut, Enacted by the President and
   Fellows, The Sixth Day of October, A. D. 1795 25-26 (1800). .............................7

Leonard MacNally, 1 The Justice of the Peace for Ireland: Containing the Authorities
   and Duties of That Officer 32 (1808)......................................................48

Lloyd Vernon Briggs, History of the Psychopathic Hospital, Boston,
   Massachusetts 4 (1922)..........................................................................19

Martin, A Collection of Statutes of the Parliament of England in Force in the State of
   North Carolina iii (1792)...............................................................36, 37

Oakland College (Miss.), Constitution and Laws of the Institution of learning Under the Care of the Mississippi Presbytery 10 (1831). ...................................7

Of Patients, Charter, Laws, and Rules of The Pennsylvania Hospital 25 (1859). ...22

Rhys Isaac, The Transformation of Virginia, 1740-1790 98-101 (1979)...................3

Thomas George Morton, History of the Pennsylvania Hospital 4 (1895). ..............18

Thomas K. Walsh, Succoring the Needy: Almshouses and the Impotent Poor in Reformation England, c. 1534-1640 126 (M.A. thesis, Dalhousie University, Feb. 2015).............................................................................................22

U.S. Bureau of the Census, Table 2. Population of the 24 Urban Places: 1790,......3

U.S. Census Bureau, 1790 Fast Facts,.......................................................................3

U.S. Census Bureau, New Mexico ...................................................................15, 50

U.S. Patent Office, Improvement In *Fire-Arms* ......................................................49

William Blackstone, 2 Commentaries on the Laws of England 110 (1838). ...........48

William Rawle, A View of the Constitution of the United States of America 125-126 (1829). ...................................................................................14

vi

Rebuttal to Holly Brewer[1]

I.      Summary

1.      Brewer attempts to show that institutions similar to those declared "sensitive areas" by SB 2 did not exist in the Founding Era, and that the lack of laws regulating arms in these non-existent institutions therefore allows modern laws with no pre-1791 equivalent.

2.      An astonishing number of her sources either do not support or sometimes contradict her claims.

3.      Brewer seems to argue that the presence of children changes the risk in a public safety equation.  If CCW holders represent some special danger to children, why does California even issue CCWs?  Are those so licensed unusually dangerous?  Because the tragic and too frequent school mass murders take place in locations already declared gun-free zones (which do not seem to discourage mass murderers), the case is at least equally valid that CCW licensees should be *encouraged* to be armed where children are present.

II.     Brewer's Declaration

**A.     Public Libraries**

4.      Brewer claims in ¶¶12-14 that public libraries and museums did not exist in the Founding Era and characterizes my claim on this as "erroneous."  (I assume this criticism is aimed at my declaration; historians usually *cite* facts and disagreements.)  My declaration was very clear that there were no public libraries in the period before 1791 and few in the early Republic:

> There is the Library Company of Philadelphia founded by Benjamin Franklin in 1731, but this was "was a subscription library and supported by members." "The first free modern public library was

---

[1] Attached to my rebuttal declaration is an appendix examining some of the historical laws the Attorney General cited in his opposition brief in misleading or out-of-context ways, as his own compendium reveals. The appendix was prepared by the Plaintiffs' counsel in consultation with me. I reviewed it in its entirety, including both the Attorney General's description of the historical laws cited, as well as the full copies of the historical laws or other sources in the Attorney General's submitted compendium volumes, and hereby confirm the appendix as being true and correct.

REBUTTAL DECLARATION OF CLAYTON CRAMER

opened in 1833" in Peterborough, N.H. This was "was the first
institution funded by a municipality with the explicit purpose of
establishing a free library open to all classes of the community."
Boston opened a public library in 1848.[2]

5.     The point of establishing that public libraries did not exist was to show
that laws similar to SB 2 could not have existed before 1791.  Brewer seems to have
misunderstood my declaration. Moreover, my understanding is that SB 2 makes
private libraries off-limits for carry by default as well through a separate provision.

**B.     Museums**

6.     Again, Brewer asserts at 15 that public museums did not exist but that
institutions that assert pre-1791 roots were private entities.  This I do not dispute.
Again, the absence of such public institutions means that there were no similar pre-
1791 laws regulating firearms possession.  While private institutions might well have
had rules concerning firearms possession, these were not laws. Brewer also fails to
give examples of firearms rules of these institutions. Regardless, SB 2 is not limited
to public museums.

**C.     Zoos**

7.     Brewer at ¶16 again admits the absence that there were "no playgrounds
or public zoos during the Founding era, neither in the colonies nor the new United
States."  Thus, there were no laws regulating firearms possession.  At best, she points
to "the royal zoo in London (in the Tower of London), which was open to the public
in some cases and at some times, but certainly had guards and restrictions" yet fails
to give any examples of such rules.  She relies on the unfalsifiable claim: "Being
surrounded by guards and with quietly made policies, it had no need for a public
statute to regulate the weapons of those who entered."  She even admits in n. 6, that,
"Such menageries were also, of course, across the ocean in the 1790s, no longer part
of the same country," and thus irrelevant to American traditions.

---

[2] Declaration Of Clayton Cramer Iso Pls.' Mot. Prelim. Inj, ¶80.

2

REBUTTAL DECLARATION OF CLAYTON CRAMER

8.      At ¶17: "The *Carrelero* Plaintiffs additionally contend that venues analogous to stadiums, arenas and amusement parks were "widespread" during the Founding era…"  I agree with Brewer's criticism.  Much of my declaration was a demonstration that such public venues were rare or non-existent; hence, the absence of laws regulating arms possession before 1791.

At ¶18:

> The one purported Founding era analog to any of these places that they identify is horse races, and they cite two examples of these races in New Jersey and Virginia, respectively. Horse races were common, but with their attendees usually counted in the dozens, or possibly a hundred or more. Usually they were run on private estates, but sometimes on public greens, such as at Williamsburg in Virginia. Children might have been present occasionally, but so too would the town watch/militia be present at such public events, serving formally as a kind of security. On private estates, the crowds were doubtless even smaller, and they would have made their own rules.

9.      The 1979 edition of Brewer's source "Rhys Isaac, *The Transformation of Virginia, 1740-1790* (Chapel Hill: UNC Press, 1980), 98-101" is a section on horse racing that says *nothing* about numbers in attendance, militia, public greens, or private estates.  It does mention races at Fredericksburg and Williamsburg.[3]

10.     While Brewer's claim seems logical, her source does not support her characterization of it.  Even if the number of attendees is correct, the U.S. population in 1790 was 3,929,214;[4] on January 1, 2023, the Census Bureau estimates 334,233,854.[5]  There were five U.S. cities with populations larger than 10,000 at the 1791 census;[6] everything was on a much smaller scale back then.

11.     At ¶19:

---

[3] Rhys Isaac, THE TRANSFORMATION OF VIRGINIA, 1740-1790 98-101 (1979).

[4] U.S. Census Bureau, *1790 Fast Facts,* https://www.census.gov/history/www/through_the_decades/fast_facts/1790_fast_facts.html, last accessed October 18, 2023.

[5] Derick Moore, U.S. Census Bureau, U.*S. Population Estimated at 334,233,854 on Jan. 1, 2023*, https://www.census.gov/library/stories/2022/12/happy-new-year-2023.html, last accessed October 18, 2023.

[6] U.S. Bureau of the Census, *Table 2.  Population of the 24 Urban Places:  1790*, https://www2.census.gov/library/working-papers/1998/demographics/pop-twps0027/tab02.txt, last accessed November 7, 2023.

3

REBUTTAL DECLARATION OF CLAYTON CRAMER

Cock-fights were another kind of event popular during the colonial and early national era, but they too would have been fought on private estates, and sometimes behind private taverns, such as the one that archeologists located behind a tavern in Williamsburg, Virginia. While doubtless a few young people attended such events, these were *events, like horse races, that involved particularly the elite (and adults)*, and at which they gambled. [emphasis added]

12.    Again, Brewer cites THE TRANSFORMATION OF VIRGINIA, 1740-1790 but this time, pp. 98-105.  But again, her source disagrees with her.  Cock-fighting is on pp. 101-104; 98-100 have no mention of cock-fighting.  Concerning the elite nature of these events, Isaac reports:

The excitement engendered by the mortal combat between the birds extended to all ranks of society. Philip Fithian recorded the keen engagement of slaves. "Easter Monday," he entered in his diary, "a general holiday; *Negroes now are all disbanded till Wednesday morning & are at Cock Fights through the County."* On the following Sunday he observed "before Breakfast . . . *a Ring of Negroes at the Stable, fighting Cocks*." [7] [emphasis added]

13.    Yes, "Negroes" as elites.

14.    At n. 8:

I would add that cock-fights (fights between roosters who had spears on their ankles and then fought to their death) were attended by very small crowds as compared with today's spectator sporting events. They would have been rarely attended by children. One account did acknowledge the presence of a fifteen year old: "While the bettors urged the cocks on to battle, a child of fifteen, who was near . . . leaped for joy and cried, 'Oh! it is a charming diversion!'" (p. 103).

15.    The quote about the child is correct, but there is nothing in the cited pages indicating that they "would have been rarely attended by children."

16.    At ¶20:

It is not really fair to compare the limited and small sporting events of the eighteenth century, which were horse races or cock fights, to modern amusement parks and stadiums, which involve vastly more people and prominently include children as part of the crowds.

---

[7] Isaac, Rhys. *The Transformation of Virginia, 1740-1790*, University of North Carolina Press, 1999. *ProQuest Ebook Central*, http://ebookcentral.proquest.com/lib/cwidaho/detail.action?docID=4321901. Created from cwidaho on 2023-11-07 15:53:40.

4

REBUTTAL DECLARATION OF CLAYTON CRAMER

17.     What we are looking for is not "fairness" but whether a modern law has a pre-1791 equivalent or analog.  Brewer is admitting that these modern events have no Founding Era analog.  The absence of laws regulating arms at these events simply adds to the failure of SB2 to have a pre-1791 equivalent.

**D.     Schools**

18.     At ¶21:

> The best historical analogue to all of these sites, from public libraries to amusement parks, were the new public schools that began to be funded and built in the wake of the American Revolution. The American Revolution initiated a state-led movement to provide access to education for most children, though of course it did not happen in the same way in every state, and there were racial and gender exceptions, beginning first on the level of public universities.

19.     Brewer's knowledge of the history of American public education is deficient.  New England colonies created public schools starting in 1635,[8] although some of these institutions were "supported in part by tuition fees, and were also applied to schools under church control."[9]  The higher levels of primary education were grammar schools modeled on their English equivalents and they "were supported in part by tuition fees and in part by town appropriations."[10]

20.     The idea that the post-Revolutionary public school system was "state-led" also calls into question Brewer's knowledge of this subject.  A case can be made that the Land Ordinance (1785) by reserving the 16th section of each township "for the maintenance of public schools"[11] shows that the national government led the movement. And secondary sources have long recognized this leadership role.[12]

21.     While neither set of Plaintiffs challenge restrictions as to schools for purposes of preliminary injunction, Brewer writes at ¶22:

> As these public schools began, they were in fact accompanied by relatively systematic rules barring weapons. Students attending college

---

[8] John Swett, AMERICAN PUBLIC SCHOOLS: HISTORY AND PEDAGOGICS 7-33 (1900).
[9] Id., at 10.
[10] Id, at 9.
[11] 28 JOURNALS OF THE CONTINENTAL CONGRESS 378 (1785).
[12] Swett, *op. cit.,* 39-40.

REBUTTAL DECLARATION OF CLAYTON CRAMER

in this era were explicitly excluded from having to participate in the militia by most state militia statutes.

Brewer gives no source for this claim.  Laws requiring males as young as 15 to possess arms for militia duty were the norm in the Founding Era.[13]

Contrary to Brewer's claim that "Students attending college in this era" were exempted from militia duty, such exemptions were the exception, not the norm. Some states exempted faculty (but not students) from this obligation to be armed for militia duty, such as New Jersey in 1778.[14]  A few states, such as Connecticut in 1786, exempted both faculty and students (along with a few other occupations) from militia duty, and therefore the obligation to be armed,[15] but these appear to be the exception.  Even states that sometimes exempted students as well as faculty from the duty to be armed for militia duty, such as Virginia did in 1757,[16] more often exempted only faculty.[17]  In this period, students were generally obligated to arm themselves for militia duty.  presumably, because militia could be called on short notice for an emergency, college students subject to militia duty must have had access to their muskets.

---

[13] PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 15, 542 (1850).; Allen D. Candler, comp., 18 COLONIAL RECORDS OF THE STATE OF GEORGIA 7, 11 (1910).; Allen D. Candler, comp., 19(part 1) THE COLONIAL RECORDS OF THE STATE OF GEORGIA 188 (1910).; Allen D. Candler, comp., 19(part 2) THE COLONIAL RECORDS OF THE STATE OF GEORGIA 104 (1910).; William Hand Browne, ed., 3 ARCHIVES OF MARYLAND 345 (1885).; Nathaniel B. Shurtleff, ed., 1 RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 190 (1853); New Hampshire, ACTS AND LAWS, PASSED BY THE GENERAL COURT OR ASSEMBLY OF THE PROVINCE OF NEW-HAMPSHIRE IN NEW-ENGLAND 91 (1716).; Charles J. Hoadly, ed., RECORDS OF THE COLONY AND PLANTATION OF NEW HAVEN, FROM 1638 TO 1649 96-97, 131, 201 (1857).; Aaron Learning and Jacob Spicer, THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW-JERSEY 78, 135 (1752).; New Jersey, THE LAWS AND ACTS OF THE GENERAL ASSEMBLY OF HIS MAJESTIES PROVINCE OF NOVA CAESAREA OR NEW-JERSEY... 139 (1717).; 1 COLONIAL LAWS OF NEW YORK FROM THE YEAR 1664 TO THE REVOLUTION 49-50 (1894).; 23 STATE RECORDS OF NORTH CAROLINA, Ch. 25 at 29 (1904).; A COLLECTION OF ALL THE PUBLIC ACTS OF ASSEMBLY, OF THE PROVINCE OF NORTH-CAROLINA: NOW IN FORCE AND USE... 215 (1751).; James T. Mitchell and Henry Flanders, ed., 9 STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801 Ch. 750 at 77 (1898).; William Brigham, ed., THE COMPACT WITH THE CHARTER AND LAWS OF THE COLONY OF NEW PLYMOUTH 285-286 (1836)..

[14] New Jersey, ACTS OF THE COUNCIL AND GENERAL ASSEMBLY OF THE STATE OF NEW-JERSEY… 65 (1784).

[15] Connecticut, ACTS AND LAWS OF THE STATE OF CONNECTICUT, IN AMERICA 144 (1791).

[16] William Walter Hening, 7 STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA… 94-95 (1820).

[17] William Walter Hening, 12 STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA… 10 (1823).

REBUTTAL DECLARATION OF CLAYTON CRAMER

22.     Brewer cites college rules (not laws) from Yale, University of North Carolina, and the University of Virginia forbidding students from keeping or carrying weapons: "These policies were implemented for the maintenance of public safety." Reviewing these rules suggests other possible motives.  Yale's prohibition on keeping "any kind of fire-arms, or gun-powder" is adjacent to "If any Scholar shall go a-fishing or sailing, or more than two miles from the College…" and "or shall undress himself for swimming in any place, exposed to public view," playing hand or foot-ball, and requiring "in studying time, shall abstain from hallooing, singing, noisiness and loud talking, in the College, or College-yard…"  These are all nuisances.  The prohibition on possessing or firing "gun-powder" may simply be another attempt at dealing with student hijinks.[18]

23.     The North Carolina rule is curious: "No Student shall keep a dog, or fire arms, or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk, sword-cane, or any deadly weapon; nor shall he use fire arms without permission from the President."  Why would a student need permission to use something he was not allowed to possess?

24.     Brewer cites for the Virginia rule: "University of Virginia Board of Visitors    Minutes    (October    4–5,    1824)    1,    6–7    (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-ofvisitors-minutes-october-4-5-1824/.."  There is no such rule at that URL.

Had Brewer examined the secondary literature on this subject[19] she would have seen that others have found other college rules restricting weapons possession by students, but also a more nuanced set of rules as well.  Oakland College of Mississippi, like many of the other schools of this period, prohibited "wearing or carrying a dirk or other deadly weapon" but did not actually prohibit possession of

---

[18] LAWS OF YALE-COLLEGE, IN NEW- HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A. D. 1795 25-26 (1800).

[19] Clayton E. Cramer, *Guns on Campus*, 27:4 ACADEMIC QUESTIONS 411-425 (Dec. 2014).

7

REBUTTAL DECLARATION OF CLAYTON CRAMER

such weapons in one's residence.[20]  Similarly, Illinois College's 1850 student code prohibited carrying deadly weapons, but appears not to have regulated possession in one's room.[21]

25.   Hundreds of members of the Oberlin College community, including both students and professors, armed themselves with rifles and handguns on a few minutes' notice as part of their successful effort to prevent a deputy U.S. marshal and two private slavecatchers from taking a runaway slave back South.[22]  Nor were these armed students a violation of the college's rules.  The only weapon restrictions in the Oberlin College regulations were that, "No student when in Town, shall use firearms, or burn gun-powder in any way, without permission from a member of the Faculty."[23]

26.   Even if colleges generally prohibited students from possessing arms, these rules would not qualify as laws.  Students alone were subject to them.  Since Tinker v. Des Moines Independent Community School District (1969), the idea that the Bill of Rights ceases to protect the rights of a student is completely dead.

<u>Rebuttal to Patrick J. Charles</u>

III.   Summary

27.   Charles severely and repeatedly misstates historical laws.

28.   He repeatedly points to laws that *Bruen* has already rejected as irrelevant.

29.   His claims about mandatory bringing of guns to church laws are historically wrong.

IV.   Ancient and Discredited History

---

[20] Oakland College (Miss.), CONSTITUTION AND LAWS OF THE INSTITUTION OF LEARNING UNDER THE CARE OF THE MISSISSIPPI PRESBYTERY 10 (1831).

[21] *Laws of Illinois College, 1850*, in Illinois State Historical Society, PAPERS IN ILLINOIS HISTORY AND TRANSACTIONS 254 (1906).

[22] Nat Brandt, THE TOWN THAT STARTED THE CIVIL WAR 71-88 (1990),

[23] Oberlin College, LAWS AND REGULATIONS OF OBERLIN COLLEGE, 11 (11th ed. 1859).

8

REBUTTAL DECLARATION OF CLAYTON CRAMER

### A.    Statute of Northampton

30.    Charles at ¶9 starts his declaration with the Statute of Northampton (1328), which *Bruen* specifically rejected because of temporal distance to 1791 and evidence that it was not a general prohibition on being armed in public: "Rather, it appears to have been centrally concerned with the wearing of armor…. If it did apply beyond armor, it applied to such weapons as the "launcegay," a 10- to 12-foot-long lightweight lance."[24]   Why Charles is making a claim already rejected by *Bruen* eludes me.

### B.    Disruptions to Governmental Function

31.    Charles at ¶9 next points to a 1351 Royal Proclamation that he characterizes as a ban on public carry.  Reading the full text reveals a narrow ban on disrupting governmental functions such as a legislature or court:

> FORASMUCH as heretofore at the Parliaments and Councils of our Lord the King, broils, riots, and disputes, have arisen and been " moved, for that people have gone to the places where such Parliaments and Councils have been summoned and assembled, armed with haketons, with plates, with swords, and with long daggers, and with other manner of arms; by reason whereof the business of our Lord the King and of his realm has both beer impeded," and the great people and others who have come there, by command of the King, have been alarmed thereat ; —our Lord the King, desiring to provide a remedy against such evils, doth forbid that any one, on pain of forfeiture of so much as unto the King he may forfeit, of whatsoever estate or condition he be, shall go armed with haketon, or with plate, or with habergeon 2 [ or with sword] , or with long dagger, or with any other manner of arms suspected, within the City of London, or within the suburbs, or in any other places between the said city and the Palace of Westminster, " or anywhere in the Palace…[25]

### C.    Other Ancient Laws

32.    Charles at ¶9 points to a 1419 law that does indeed appear to prohibit the carrying of arms in London.  *Bruen*, however, rejects the relevance of these ancient laws:

---

[24] *New York State Rifle & Pistol Assn, Inc. v. Bruen*, 142 S. Ct. 2111, 2139, 2140 (2022).
[25] Memorials of London And London Life, in the XIIIth. XIVth, AND XVth Centuries 268 (1868)

REBUTTAL DECLARATION OF CLAYTON CRAMER

We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal. "Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." Heller, 554 U.S. at 634-635, 128 S.Ct. 2783 (emphasis added). The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years. It is one thing for courts to "reac[h] back to the 14th century" for English practices that "prevailed up to the `period immediately before and after the framing of the Constitution.'"… It is quite another to rely on an "ancient" practice that had become "obsolete in England at the time of the adoption of the Constitution" and never "was acted upon or accepted in the colonies."[26]

33.     Charles also asserts that similar laws are present at "229, 555, 556, 558, 560, 580." P. 229 is devoted entirely to regulation of "Corn-dealers."[27] 'Pp. 555-580 are within an index.[28]

34.     Charles at ¶10 both acknowledges that English law was essentially silent as to sensitive places but offers a tantalizing exception:

35.     Review of the official STATUTES OF THE REALM (revised ed. 1870) shows no such law.  The statutes listed under 4 Hen. IV are dated 1402, and none contain this text or anything even close to it.  Searching for the word "Congregations" found matches only in 14 Charles II. c. 4 and 15 Charles II c. 6, 7.  Neither contained this text.   Nor did the 1819 editions.[29]   I did eventually find the statute in an unofficial version:

CAP. XXIX.

Welshmen shall not be armed.

That from henceforth no man be armed nor bear defensible armour to merchant towns churches nor congregations in the same, nor in the high ways, in affray of the peace or the King's liege people, upon pain of imprisonment, and to make fine and random at the King's will, except those which be lawful liege people to our sovereign lord the King.[30]

---

[26] *New York State Rifle & Pistol Assn, Inc. v. Bruen*, 142 S. Ct. 2111, 2139, 2136 (2022).
[27] John Carpenter, LIBER ALBUS: THE WHITE BOOK OF THE CITY OF LONDON 229 (1861).
[28] Id., at 555, 556, 558, 560, 580.
[29] 3 STATUTES OF THE REALM (1819); 4 STATUTES OF THE REALM (1819).
[30] 2 Statutes at Large, From the 15th Year of K. Edward III. To The 13th Year of K. Henry IV. Inclusive C. 29 at 443 (1762).

10

36.    This is part of a series of laws generally impairing Welshmen: "Englishmen shall not be convict by Welshmen in Wales," "There shall be no wasters, vagabonds, &c in Wales," "There shall be no congregations in Wales."[31]  The closing clause of the supposed law "except those which be lawful liege people to our sovereign lord the King," shows that Englishmen were exempt from this prohibition.

37.    This ban on armed Welshmen is no surprise:

> The laws of the early part of this reign were not conciliatory towards the Welsh. By stat. 2 Hen. IV. Jan. 1401, no person born in Wales of Welsh parentage could purchase land or tenement in or near the cities in the Marches of Wales: he could not henceforth receive the freedom of any city or borough. All Welsh citizens were to produce security for their conduct: they were not to be admitted to any municipal office, nor to wear armour in their town or borough. ( Stat. Realm, ii . 124.) No Welshman might purchase land in England , &c . (129.) By stat. 4 Hen. IV., Sept. 30, 1402, Englishmen could not be tried by a Welsh jury in Wales ; minstrels, rhymers, wasters, and other vagabonds, were condemned; meetings were not allowed ; no Welshman might carry arms…[32]

38.    Charles has used an unofficial collection of statutes that does not match the official collection, identified it with the wrong year, and left out the title and closing clause that establishes that only those not bound to the king by oath of loyalty were prohibited from being armed.

### D.    American Laws

39.    Charles at ¶11 admits that:

> As to whether this broad, English understanding of what constituted a "sensitive place"—that is where arms bearing could be restricted— traveled across the Atlantic, local enforcement records did not survive for historical posterity, and therefore it is impossible for historians or anyone to reconstruct exactly how often, when, and where armed carriage restrictions were enforced.

40.    Having admitted that such records are hard to find, Charles in ¶12 cites two works by him to prove that such laws existed:

---

[31] Id., c. 26, 27, 28 at 443.
[32] John Sylvester Davies, *An English Chronicle of the Reigns of Richard II., Henry the Fourth., Henry V., and Henry VI. written before the year 1471…* 173 (1856).

11

REBUTTAL DECLARATION OF CLAYTON CRAMER

A by-now-familiar thread runs through these three statutes: They prohibit bearing arms in a way that spreads "fear" or "terror" among the people. As we have already explained, Chief Justice Holt in *Sir John Knight's Case* interpreted this *in Terrorem Populi* element to require something more than merely carrying a firearm in public. See *supra*, at 2140-2141. Respondents give us no reason to think that the founding generation held a different view. Thus, all told, in the century leading up to the Second Amendment and in the first decade after its adoption, there is no historical basis for concluding that the pre-existing right enshrined in the Second Amendment permitted broad prohibitions on all forms of public carry.[33]

41.    Charles in ¶12 then cites a long list of statutes that he claims prohibited carrying arms "in urban and densely populated locations…." The titles of the acts alone should make one suspicious of their purpose. Here is the actual text of these laws:

42.    "AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES, AND THE EVIL CONSEQUENCES THEREOF, SEPTEMBER SESSION, CHAPTER VIII (Mass. 1786)…"  This statute prohibits "if any persons to the number of twelve, or more, being armed with clubs, or other weapons; or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously, or tumultuously assembled."[34]  Only a party of twelve or more armed with clubs were prohibited.  Other arms are not listed and an individual (or even eleven people armed with clubs) did not violate the law.

43.    "AN ACT FOR THE MORE SPEEDY AND EFFECTUAL SUPPRESSION OF TUMULTS AND INSURRECTIONS IN THE COMMONWEALTH, SEPTEMBER SESSION, CHAPTER IX (Mass. 1787)…" This statute passed February 20, 1787, was very clearly a response to Shay's Rebellion:

WHEREAS in a free government, where the people have a right to bear arms for the common defence, and the military power is held in subordination to the civil authority, it is necessary for the safety of the state that the virtuous citizens thereof should hold themselves in readiness, and when called upon, should exert their efforts to support the civil government, and oppose the attempts of factious and wicked men who may wish to subvert the laws and constitution of their country ; and

---

[33] *New York State Rifle & Pistol Assn, Inc. v. Bruen*, 142 S. Ct. 2111, 2139, 2144 (2022).
[34] 1 *Laws of the Commonwealth of Massachusetts* 36-7 (1807).

REBUTTAL DECLARATION OF CLAYTON CRAMER

whereas a delay in suppressing tumults and insurrections, in divers counties of the state, has been attended with alarming consequences, such tumults and insurrections having lately grown into the unnatural and dangerous rebellion, which now exists in the commonwealth: for the prevention of like consequences in future:

SECTION 1. BE it enacted by the Senate and House of Representatives, in General Court assembled, and by the authority of the same, *That whenever an insurrection shall have taken place in either of the counties of the commonwealth, to obstruct the course of justice, or the due execution of the laws, or there is reason to apprehend that a dangerous insurrection for such purposes will be excited,* it shall be the duty of the civil officers in such county, as well the sheriff as the justices of the several courts of judicature within such county, immediately to give information thereof to his Excellency the Governor, for the time being; who is hereby requested thereupon to exercise the powers vested in him by the constitution, and to give immediate directions to the major-general or commanding officer of the division where such insurrection exists or is apprehended, and if he shall think it necessary, to the major-general or commanding officer of any other division or divisions, to detach from his or their division or divisions, such part of the militia for the support of the civil authority, as he shall judge fully adequate for that purpose, and for the apprehension and safe keeping of those who may be concerned in such insurrection. [35] [emphasis added]

44.    "AN ACT TO PREVENT ROUTS, RIOTS, AND TUMULTUOUS ASSEMBLIES (N.J. 1797)…"

That from and after the publication of this act, if any persons, to the number of twelve or more, being armed with clubs, guns, swords, or other weapons, or if any number of persons, consisting of thirty or more, shall be unlawfully, routously, riotously, or tumultuously assembled…[36]

45.    This law did not prohibit individuals or even groups as large as eleven from carrying arms.

46.    "AN ACT TO PREVENT HUNTING WITH FIRE-ARMS IN THE CITY OF NEW-YORK, AND THE LIBERTIES THEREOF (NY 1763); AN ACT AGAINST RIOTS AND RIOTERS (Pa. 1705)…"  This New York law prohibited hunting in the city.  The full text is clear that while carrying or discharge of firearms was restricted, it was a very narrow limitation:

WHEREAS it has long been the practise of great Numbers of Idle and disorderly persons in and about the City of New York, and the Liberties thereof to hunt with Fire arms, and to tread down the Grass and Corn

---

[35] MILITIA LAWS OF THE UNITED STATES, AND OF THE COMMONWEALTH OF MASSACHUSETTS. TO WHICH ARE ADDED, JUDICIAL DECISIONS ON THE SAME 87-88 (1815).
[36] LAWS OF THE STATE OF NEW JERSEY 279 (1800).

13

REBUTTAL DECLARATION OF CLAYTON CRAMER

and other Grain standing and Growing in the Fields and Inclosures there, to the Great Danger of the Lives of his Majesty's Subjects, the Ruin and destruction of the most valuable improvements, the grievous Injury of the Proprietors and the great discouragement of their Industry. IN ORDER therefore the more Effectually to punish and prevent such abuses as aforesaid BE IT ENACTED by his Honour the Lieutenant Governor the Council and the General Assembly and it is hereby Enacted by the authority of the same that if any Person or Persons whatsoever other than the Owner Proprietor or Possessor or his or her white servant or servants Do and shall at any time or times from and after the Publication of this Act *carry shoot or discharge any Musket Fowling piece or other fire arm whatsoever into upon or through any Orchard Garden Cornfield or other inclosed Land whatsoever within the City of New York or the Liberties thereof without Licence in writing first* had and Obtained for that purpose from such Owner Proprietor or Possessor of such *Orchard, Garden Cornfield or other inclosed Land* or shall *enter into or pass through any orchard Garden Cornfield or Mowing Ground in any of the aforesaid places without Fire arms…*[37] [emphasis added]

47.     This law prohibited shooting into or trespassing (even if unarmed) into private property and not as Charles describes these laws prohibiting carrying arms in "urban and densely populated locations."

48.     In ¶12, Charles quotes out of context

WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES 126 (2d ed., 1829) (noting that the Second Amendment "ought not…in any government…be abused to the disturbance of the public peace," which included the assembling "of persons with arms, for an unlawful purpose"). This is because it had long been understood that any armed assemblage required the consent of government officials.

49.     Reading Rawle's actual discussion shows that Charles has grossly misquoted him:

The corollary, from the first position, is, that *the right of the people to keep and bear arms shall not be infringed*. The prohibition is general. No clause in the Constitution could by any rule of construction be conceived to give to congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretence by a state legislature. But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both….

This right ought not, however, in any government, to be abused to the disturbance of the public peace. An assemblage of persons with arms, for an unlawful purpose, is an indictable offence, and even the carrying of arms abroad by a single individual, attended with circumstances

[37] 4 COLONIAL LAWS OF NEW YORK Ch. 1233 at 748-749 (1894).

14

1
2

giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace. If he refused he would be liable to imprisonment.[38] [emphasis in the original]

3

50.    An individual carrying arms "attended with circumstances giving just

4

reason to fear that he purposes to make an unlawful use of them," might be required

5

to post a surety bond.  But absent those circumstances, "The prohibition is general."

6

### E.    Drunkenness and Arms

7

51.    Starting at ¶22, Charles attempts to establish that laws prohibiting the

8

possession of alcohol at, or vending of alcohol adjacent to, militia musters create

9

some sensitive places doctrine relevant to SB 2.  If California wishes to use this

10

reasoning, they are free to prohibit alcohol at government-sponsored military

11

training.  Because federal law pre-empts state law at military bases, such a law is

12

likely limited to California National Guard trainings, assuming that there is not

13

already such a law or regulation in place.  These laws did not prohibit armed persons,

14

regardless of militia status, from drinking at a tavern.  Armed non-militia members

15

could drink adjacent to a militia muster, even if they could not buy it there.

16

52.    At ¶24, Charles cites laws that apply outside the militia muster context.

17

Of these, only two predate the 1868 date that *Bruen* requires.  One is an 1852 New

18

Mexico Territory law that prohibits carrying weapons to balls or Fandangos where

19

alcohol is served.  The other is an 1867 Kansas law that prohibits "any person under

20

the influence of intoxicating drink" from carrying deadly weapons.

21

53.    The population of New Mexico Territory at the 1860 census was 93,516;

22

the State of Kansas at the 1870 census, 364,399.[39]  Nex Mexico Territory at the 1860

23

census was 0.2% of the U.S. population.  At the 1870 census, New Mexico Territory

24

was 91,874.  The total of New Mexico Territory and Kansas was 456,273, or 1.2% of

25

the U.S. population.

26
27
28

[38] William Rawle, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 125-126 (1829).

[39] U.S. Census Bureau, *New Mexico*, https://www2.census.gov/library/publications/decennial/1940/population-volume-1/33973538v1ch07.pdf, last accessed November 9, 2023.

REBUTTAL DECLARATION OF CLAYTON CRAMER

54.     Additionally, these two laws differ in one substantial manner.   The Kansas law prohibited carrying arms while intoxicated; the New Mexico law prohibited being armed where alcohol was available.   Even ignoring *Bruen*'s rejection of interest-balancing, the former at least has some obvious connection to public safety; drunks make horrible decisions.   A person who is not drinking is not a public safety hazard; a case could be made that in a facility where some persons are impaired by alcohol, having one person armed might well provide the opportunity to turn a knife fight from a murder into an assault with a deadly weapon.

### F.     Churches

55.     Charles in ¶28 claims: "First and foremost, it must be noted that many "bring your arms to church" laws are *antecedents* of slavery and were principally intended to quell potential slave revolt."   [emphasis added]   No, they were *consequences*.   While many colonial laws requiring guns at church are tied to slavery, others were based on fear of Indian attack.   The 1636-7 Massachusetts law requiring pretty much every man to come to church armed immediately follows a paragraph starting with "Wheeras many complaints have bene made to this Court, both formerly & at Psent, of the great neglect of all sorts of people of vseing the lawfull & necessary meanes of their safety, especially in this time of so much danger frō the Indians…"[40]

56.     In both cases, slaves and Indians, the colonists had good reason to fear attack.

<u>Rebuttal to Mary Fissell</u>

V.     Summary

57.      Dr. Fissell presents an interesting history of colonial medical care which is largely irrelevant to this case.   She lists no rules or statutes prohibiting arms of any sort in hospitals.   She has logical explanations for the absence of such, but other evidence suggests that her reasoning is based on false premises.   My understanding

---

[40] 1 Records of the Governor and Company of the Massachusetts Bay in New England 190 (1853).

16
REBUTTAL DECLARATION OF CLAYTON CRAMER

is that the burden is on the state to demonstrate that *laws* (and not institutional *rules*) prohibited arms possession in the Founding Era.

58.     Of course, hospitals are free today to impose rules banning weapons and require no statutory authority.  Where I live in Idaho, hospitals and related facilities are festooned with signs prohibiting weapons.  Refusal to follow the institution's rules are grounds for removal for trespass.  Why California hospitals need a statute on this subject is a bit mystifying.

VI.     Hospital Need in Colonial America

## A.     The Rarity of Hospitals in Colonial America

59.     Dr. Fissell claims in ¶1 that "Such institutions were scarce because America was largely a rural country, composed of villages and towns that lacked sufficient population to support a hospital."  While certainly true, there were other reasons for the dearth of hospitals.  One of my specializations is the history of mental illness treatment in America, so much of my commentary reflects my knowledge in that area.   In the case of mental illness, some colonies relied on family institutionalization.

60.     In New England, where historians have done the most thorough research, mentally ill colonists seldom appear to be a matter of legal action.  The law did occasionally lock up a mentally ill person who committed a serious crime for the safety of the community.  The few examples from the records are somewhat startling for their compassionate, family-based approach.  One example is Connecticut, which tried one Roger Humphry, who "while a soldier in the army in the year 1757, become delirious and distracted and in his distraction killed his mother…."  At trial in Hartford, he "was found not guilty altogether on the account of his distraction…."[41] Roger was at first confined to the jail in Hartford, but upon the request of Roger's

---

[41] 11 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 313 (1880).  Sarah Frazier of Connecticut, who killed an Indian woman with an ax, was found not guilty by reason of "distraction" in 1724.  Joshua Hempstead, DIARY OF JOSHUA HEMPSTEAD OF NEW LONDON, CONNECTICUT 139, 141-2 (1901).

REBUTTAL DECLARATION OF CLAYTON CRAMER

father Benajah Humphry, the legislature granted permission for Benajah to take his son home to Symsbury. Benajah was "hereby directed and ordered to take and safely keep said Roger and provide for him." The legislature also instructed the Symsbury town government to supervise the securing of Roger. Benajah was to pay for keeping his son secure — but the legislature granted him £40 to help, a sizeable grant, equivalent to roughly a year's wages.

61.  This must have been a very painful situation — Benajah's wife was dead; his son was insane; and he had taken it upon himself (with help from the colonial government) to maintain, effectively, an insane asylum for one.[42] We have similar examples of public funds to build family-operated individual insane asylums in Amesland, Pennsylvania in 1676[43] and in Braintree, Massachusetts in 1689 and in 1699.[44]

62.  There are doubtless many more instances of persons whose mental illness, while serious, did not prevent them from being cared for at home. John Howard, born in 1733, came from a comfortable family in Maine and showed great promise. But during the French & Indian War, while on an expedition to Canada, he fired on one occasion when in the woods at what he supposed to be a bear; it proved to be one of the party, and that he had unfortunately taken his life. No blame was imputed to Howard, but the occurrence so affected him that he sank into hopeless insanity. "He lived long at the fort, gentle and inoffensive, but possessed of immense imaginary wealth."[45]

**B.    Urbanization and Increased Need For Mental Hospitals**

63.  Dr. Fissell explains that "Inpatient mental health care was very rare in the American colonies and early republic." True, but why? Urbanization may have

---

[42] 11 PUBLIC RECORDS OF THE COLONY OF CONNECTICUT 313 (1880). In 1761, Benajah again requested assistance from the legislature in caring for his son, and they gave him twenty pounds more. *Id.*, at 590-1.

[43] Thomas George Morton, HISTORY OF THE PENNSYLVANIA HOSPITAL 4 (1895).

[44] Duane Hamilton Hurd, 1 HISTORY OF NORFOLK COUNTY, MASSACHUSETTS… 312 (1884).

[45] JAMES W. NORTH, THE HISTORY OF AUGUSTA, FROM THE EARLIEST SETTLEMENT TO THE PRESENT TIME… 87 (1870).

18

increased mental illness rates as well.  While we do not know if this was true in the eighteenth century, some recent studies suggest that being born or growing up in an urban area increases one's risk of developing schizophrenia and other psychoses.[46]  In the twentieth century, comparison of insanity rates revealed that urban areas had much higher rates of mental hospital admissions for schizophrenia and bipolar disorder — almost twice as high for New York City compared to the rest of New York State.  State by state comparisons in the nineteenth and twentieth centuries also revealed that more urban states, such as California and the northeastern states, had much higher rates of mental illness.[47]

64.    Older statistical examinations of mental hospital admissions argue that at least in the period from 1840 to 1940, while mental hospital admissions increased (because of increased availability), there was no large and obvious increase in insanity.[48]    A more recent study of mental illness data shows, much more persuasively, that psychosis rates rose quite dramatically between 1807 and 1961 in the United States, England & Wales, Ireland, and the Canadian Atlantic provinces.  A study of Buckinghamshire, England shows more than a ten-fold increase in psychosis rates from the beginning of the seventeenth century to 1986.[49]

65.    In 1764, Thomas Hancock left £600 to the city of Boston to build a mental hospital for the inhabitants of Massachusetts.  The city declined to accept this gift, on the grounds that there were not enough insane persons to justify building such

---

[46] G. Lewis, A. David, S. Andreasson, P. Allebeck, SCHIZOPHRENIA AND CITY LIFE, LANCET, [July 18, 1992] 340(8812):137-40, abstract available at http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=1352565, last accessed September 13, 2006; M. Marcelis, F. Navarro-Mateu, R. Murray, J.P. Selten, J. Van Os, Urbanization and psychosis: a study of 1942-1978 birth cohorts in The Netherlands, PSYCHOLOGICAL MEDICINE, [July 1998] 28(4):871-9, abstract available at http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&list_uids=9723142, last accessed September 13, 2006; E. Fuller Torrey and Judy Miller, THE INVISIBLE PLAGUE: THE RISE OF MENTAL ILLNESS FROM 1750 TO THE PRESENT 122 (2001).

[47] THE INVISIBLE PLAGUE, op. cit., 291-2.

[48] Herbert Goldhamer and Andrew W. Marshall, PSYCHOSIS AND CIVILIZATION: TWO STUDIES IN THE FREQUENCY OF MENTAL DISEASE (1953).  THE INVISIBLE PLAGUE, op. cit. 295-297, discusses the many problems with Goldhamer and Marshall's use of the data.

[49] THE INVISIBLE PLAGUE, op. cit., 120-123, 298-9.

19

REBUTTAL DECLARATION OF CLAYTON CRAMER

a facility.[50]  Massachusetts had a population of 244,149 in 1765;[51] if the population of the time suffered the same schizophrenia rates as today, that would mean that there were 610 to 1562 schizophrenics in the province.  Even accounting for the greater tolerance of small town life for the mentally ill, this lends credence to Torrey and Miller's claim of rising psychosis rates.

66.     Urban life today is not the same as urban life then, and even the scale of what constitutes "urban" is dramatically different — but it is an intriguing possibility that the increased rates of mental illness at the close of the Colonial period were the result of urbanization.

### C.     Hospital Capabilities

67.     Another reason that hospitals were scarce in the colonial period were the limits of the medical profession's toolbox.  Without X-ray machines, and IVs, what could a hospital do, other than bed rest?  Bed rest could be done at home just as well.  Surgical procedures were limited by the lack of anesthetics and the likely death from sepsis if major surgery were attempted.  "Surgery, in particular, has been too often portrayed as an agonizing business of 'heroic' and desperate capital operations; here it will be shown that such operations were rare events, and over ninety-five per cent of country surgical practice consisted of simple, but often effective, procedures."[52]

Where Are the Rules or Laws?

68.     Dr. Fissell does not ever point to institutional rules or laws regulating arms possession seem.  Why?

---

[50] Lloyd Vernon Briggs, HISTORY OF THE PSYCHOPATHIC HOSPITAL, BOSTON, MASSACHUSETTS 4 (1922).
[51] Jesse Chickering, A STATISTICAL VIEW OF THE POPULATION OF MASSACHUSETTS, FROM 1765 TO 1840 7 (1846).
[52] Irvine Loudon, *The Nature of Provincial Medical Practice in Eighteenth-Century England*, 29 MEDICAL HISTORY 1 (1985).

20

REBUTTAL DECLARATION OF CLAYTON CRAMER

### D.     Poverty

69.     In ¶6, she argues that one explanation is that almshouses and poorhouses "began as refuges for the desperately indigent, but since sickness was often a key cause of poverty," poor people would likely have no firearms.  While this might be a useful explanation for a relatively valuable item such as a pistol, knives and other inexpensive arms seem not to have been the subject of rules or laws.  This suggests that the absence of rules and laws may not be attributable to poverty of these down-and-out patients.

### E.     Strict Rules

70.     Dr. Fissell in ¶7 points to the strict disciplinary rules of almshouses.  Modern hospitals are also pretty strong on rules: bans on possession of arms by patients and visitors (rules often not enforced by statute); limits on the number of visitors; no alcoholic beverages; no smoking.   If these strict rules prohibited possession of arms, it is odd that they have left no tracks, when other rules appear which Dr. Fissell lists.

71.     One list of inmate rules for Boston's poorhouse is detailed and restrictive, but which makes no reference to arms, knives, or anything that might be considered a weapon.[53]

### F.     Well-Behaved Patients

72.     In ¶8, she points to voluntary hospitals where admission "were not based solely upon medical considerations, but on relationships of patronage and charity…. No mention was made of specific rules governing patients' behavior in voluntary hospitals, because it was assumed that those who had managed to navigate the networks of charity and patronage to gain admission were going to be well-behaved."

73.     This would be a more persuasive argument except for one of the examples that Dr. Fissell gives: Pennsylvania Hospital.  While the hospital was

---

[53] Eric Nellis and Anne Decker Cecere, EIGHTEENTH-CENTURY RECORDS OF THE BOSTON OVERSEERS OF THE POOR 976-979 (2006).

REBUTTAL DECLARATION OF CLAYTON CRAMER

clearly intended to care for both physical and mental illnesses, the concern about the mentally ill seems to have been strongest selling point — at least as judged by the petition requesting governmental assistance.   The petition to the Pennsylvania Assembly showed concern for both the well-being of the mentally ill, and the dangers to the community as a whole:

> That with the numbers of people the number of lunaticks, or persons distempered in mind, and deprived of their rational faculties, hath greatly increased in this province.
>
> That some of them going at large, are a terrour to their neighbours, who are daily apprehensive of the violences they may commit; and others are continually wasting their substance, to the great injury of themselves and families, ill disposed persons wickedly taking advantage of their unhappy condition, and drawing them into unreasonable bargains, &c.[54]

74.    These were people who would seem not likely to fit into the "well-behaved" category.  If there was a need to disarm patients such as these, one might expect some evidence in rules or Pennsylvania statutes.  There are certainly no such rules as late as the Charter, Laws, and Rules of The Pennsylvania Hospital (1859), when revolvers were readily available for purchase with no background checks.[55]

### G.    English Practice

75.    One Reformation-era almshouse in England, Charterhouse, was unique in several ways: "Wearing weapons was likewise forbidden, a rule *unique* to the Charterhouse and likely stemming from the fact that it was largely populated with ex-military men."[56] [emphasis added]  Whether this remained English and American practice two centuries later is unknown, but it certainly suggests that Fissell's assumptions on this matter require examination.

---

[54] Benjamin Franklin, SOME ACCOUNT OF THE PENNSYLVANIA HOSPITAL FROM ITS FIRST RISE TO THE BEGINNING OF THE FIFTH MONTH, CALLED MAY, 1754 4-5 (1817).
[55] *Of Patients,* CHARTER, LAWS, AND RULES OF THE PENNSYLVANIA HOSPITAL 25 (1859).
[56] Thomas K. Walsh, SUCCORING THE NEEDY: ALMSHOUSES AND THE IMPOTENT POOR IN REFORMATION ENGLAND, c. 1534-1640 126 (M.A. thesis, Dalhousie University, Feb. 2015), https://dalspace.library.dal.ca/bitstream/handle/10222/56285/Walsh-Thomas-MA-Hist-February-2015.pdf?sequence=1, last accessed November 11, 2023.

REBUTTAL DECLARATION OF CLAYTON CRAMER

<u>Rebuttal to Leah Glaser</u>

VII.   Summary

76.   Glaser's declaration fails to identify any laws before 1868 that restrict possession of a firearm.

VIII.  Relevance

77.   Dr. Glaser's declaration, while interesting as a history of parks, is of no relevance to any case involving the standards set down by *Bruen*.  The only firearms restrictions that she identifies in her declaration is in 40, which is a prohibition on discharge of firearms in 1894.  Her attached exhibits 4 and 5 list rules that prohibit firearms possession, asserting that in Exhibit 4 section IV item N2: "To carry or have firearms in possession in a state park is unlawful," yet she does not cite any state law to that effect.  Her Exhibits 4 and 5 were published in 1936 (see n. 39).  None of her firearms possession restrictions pre-date 1868.

<u>Rebuttal to Michael Kevane</u>

IX.   Summary

78.   Dr. Kevane's declaration fails to identify Founding Era or pre-1868 laws restricting firearms possession in the public library system.

X.   Relevance

79.   Dr. Kevane's declaration, while interesting as a history of libraries, is no relevance to any case involving the standards set down by *Bruen*.  He identifies no firearms restrictions associated with libraries.  He admits in ¶¶8-11 that there were no public libraries in America until 1833, well past the Founding Era.  Even in the 1833-1868 period, he identifies not even one firearms restriction.

<u>Rebuttal to Jeanne Kisacky</u>

XI.   Summary

80.   Dr. Kisacky's declaration fails to identify Founding Era or pre-1868 laws restricting firearms possession in hospitals, either as statutes or even as institutional rules.  I am hard pressed to see what purpose it was supposed to have for this case.

23

REBUTTAL DECLARATION OF CLAYTON CRAMER

XII.   Relevance

81.   Dr. Kisacky's declaration, while interesting as a history of hospitals, is of no relevance to any case involving the standards set down by *Bruen*.

82.   She identifies no firearms restrictions associated with hospitals in any era.

83.   In paragraph 18 she cites how "At the New York Hospital, 'any patient misbehaving by going out without leave, getting drunk, swearing, or be [sic] guilty of other disorderly conduct,' could be confined or discharged regardless of condition." Notably missing in this rule are firearms and weapons.

<u>Rebuttal to Peter C. Mancall</u>

XIII.  Summary

84.   Dr. Mancall's declaration fails to identify any laws restricting firearms possession in drinking establishments or gambling establishments.  I am hard pressed to see what purpose it was supposed to have for this case.

XIV.   Taverns

85.   Dr. Mancall's declaration, in 10-15 discusses the licensing of taverns and:

> In an age of widespread availability of alcohol and the potential for social chaos and violence, municipal authorities focused on the most lethal weapons of that era—swords. But it is reasonable to conclude from the context that legislators would have banned any weapon that contributed to violence in these establishments. They outlawed swords because it was much easier for a drunken man (or woman) to slash or stab someone in a tavern.

86.   Yet he lists not a single statute regulating the carrying of swords.  At best, he quotes a secondary source: "Since gentlemen sometimes wore their swords in the ordinaries, despite laws to the contrary, aggressive banter could have fatal consequences."  The logical next step for an historian would be to look in Rhys Isaac's book to see what Isaac's source was for this claim.  I must conclude that he either made no attempt or found nothing there to support his claim about prohibitions on swords in taverns.

REBUTTAL DECLARATION OF CLAYTON CRAMER

XV.   Gambling

87.   Dr. Mancall in 16-30 makes a strong case for banning alcohol gambling establishments but cites no laws restricting firearms in gambling establishments.

Rebuttal to Sharon Ann Murphy

XVI.  Summary

88.   Dr. Murphy's declaration fails to identify any laws restricting firearms possession in financial institutions.  I am hard pressed to see what purpose it was supposed to have for this case.

XVII. Financial Institution

89.   Dr. Murphy's declaration discusses in detail the development of banking, and a fascinating history of early American bank robberies and robberies in transit, including stagecoach robberies, but fails to identify even one statute or even institutional rule that restricted firearms in banks and other financial institutions.

Rebuttal to Joshua Salzmann

XVIII.   Summary

90.   Dr. Salzmann's declaration fails to identify any *laws* restricting firearms possession specific to transportation infrastructure.  Mostly, he points to *rules* of private companies that in the mid-twentieth century (far past the dates of importance to *Bruen*) prohibited passengers from bringing guns into passenger cars.  Before those twentieth century rules, he only has rules for checking guns as baggage and presents no evidence that railroads required passengers to do so.

91.   Salzmann's list of *rules* are overwhelmingly after the *Bruen* cutoff date of 1868.  Salzmann attempts to explain this absence of *rules* as an artifact of the overriding state and local bans on carrying of weapons which would have made railroad company rules unnecessary.  The problem is that many states by the twentieth century had licensing laws for concealed carry.  Even state laws that were general prohibitions on concealed carry often exempted "travelers" from those bans.  See n.

REBUTTAL DECLARATION OF CLAYTON CRAMER

65, below.  A person on a train would be a "traveler" by any rational understanding of that word.

XIX.  Transportation Systems

92.    Dr. Salzmann's declaration discusses in detail the development of transportation systems in America but does not get around to the issue in this case until 2/3 of the way through.

93.    Starting at ¶69, he purports to list firearms restrictions on transit systems.  He admits that he "was not able to perform an exhaustive search and analysis of all historic railroad rule books that are still in existence today."

94.    In ¶70:

> First, many rule books and timetables do not mention firearms at all. I examined approximately seventy documents, in both online and brick and mortar archives, dating from the middle of the 19th century to the late 20th century, and I found mentions of firearms in approximately fifteen percent of those books. One possible explanation for this is that municipal and state laws, not railroad policies, dealt with the question of concealed carry.

95.    This is an interesting claim.  Open carry remained, and remains lawful, in much of the United States, including California cities until 1967, throughout the period for which he examined rule books.  States begin to issue licenses to carry concealed weapons during this period (one example close to home is California's 1923 concealed weapon license law[57]) and thus a lack of railroad rules explains nothing.

96.    In ¶71:

> Second, some railroads made references to the practice of transporting guns as luggage stowed on baggage cars, and they noted proper safety procedures for transporting guns. There were no instances in which I saw reference to passengers or employees- other than railroad police- being allowed to take loaded weapons on train cars. The 1880 timetable for the Union Pacific Railroad, for example, stated that "Dogs and Guns will be transported in baggage car, by special arrangement of owner with train baggageman, the rate charged on the former never to exceed one-half cent per mile, for distances over 50 miles, and on the latter, 5 cents for each passenger division.

---

[57] Cal. Laws ch. 339 § 5 at 696 (1923).

REBUTTAL DECLARATION OF CLAYTON CRAMER

97.     A hunter travelling by train would likely not carry a rifle with him, or even a handgun.  Stowing it as luggage would certainly explain these rules.  The lack of "reference to passengers or employees-other than railroad police-being allowed to take loaded weapons on train cars," is an absence of evidence, not evidence of absence issue.  Unless there was a prohibition on carrying guns on the train, there is no evidence that the practice was prohibited.  Of course, these were only institutional rules, not laws.

98.     Starting at ¶73, Salzmann finally lists railroad rules that limit possession of loaded firearms.  The first of these, in 1883, is past the date *Bruen* considers relevant, and again, these are not laws but the rules of private companies.

99.     In ¶76, Salzmann quotes "Rules and Regulations for the Government of Employees," that ""prohibited ... carrying concealed weapons while on duty or about the company's property."  Again, too late and as the title makes clear this regulates employees, not passengers.  He also quotes from a 1943 Santa Fe Railroad rule, again too late, but this at least prohibits passengers from having "guns into passenger cars unless they are disconnected" by which I assume they mean unloaded, but perhaps disassembled.  This is an odd terminology; searching for the words "firearm" and "disconnected" in the Google books repository in the 20th century finds no matches for this phrasing.[58]  Arguendo, I will assume that this mean unloaded.  It is odd that Salzmann found no other matches that used this terminology, or that prohibited carrying handguns.

100.   In ¶78, Salzmann observes: "In light of the fact that many railroad rule books and timetables did not make any comment on the matter of guns on trains, it is also necessary to consider state and municipal laws that would have applied to travelers to understand the rules about carrying guns on mass transit."  This might

---

[58] https://www.google.com/search?q=firearm+disconnected&sca_esv=581711571&tbs=cdr:1,cd_min:1900,cd_max:1999,bkv:a&tbm=bks&sxsrf=AM9HkKl1H70r1O5JNs0k4_aTuLDl58u6Fg:1699799197906&source=lnt&sa=X&ved=2ahUKEwiws4W71b6CAxW-m2oFHWVXBVsQpwV6BAgBEAY&biw=1920&bih=965&dpr=2, last accessed November 12, 2023.

REBUTTAL DECLARATION OF CLAYTON CRAMER

well be true but at least some nineteenth century laws prohibiting concealed of arms had an exception for those travelling: "Sec. 1. BE it enacted by the general assembly of the commonwealth of Kentucky, That any person in this common-wealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, *unless when travelling on a journey*, shall be fined in any sum, not less than hundred dollars;"[59] [emphasis added]  Other concealed carry laws that exempted the never statutorily defined "travellers" include the 1820 and 1831 Indiana bans, the 1838 Arkansas ban, and the 1863 California ban.[60]

101.   The California ban was short-lived; it was repealed in 1870.[61]  While some cities and counties passed local bans in following years, there was no statewide ban until 1917.[62]  Travelers in California might well have been unaware of local bans, especially if they were just passing through a restrictive county.   At least for California and states that exempted travelers from the ban on concealed carry, Salzmann's explanation does not work.

102.   In ¶¶78-79, Salzmann points to an 1871 Chicago ordinance banning concealed carry of deadly weapons.  Salzmann tells us, "Chicago, for instance, was the fifth largest U.S. city in 1870, and it was a national leader in the development of intracity and intercity transportation systems."   The careless or busy reader might misread this ordinance ass being limited to "intracity and intercity transportation…"   It was a general ban on concealed carry, not the licensed concealed carry that SB 2

---

[59] ACTS PASSED AT THE FIRST SESSION OF THE TWENTY FIRST GENERAL ASSEMBLY FOR THE COMMONWEALTH OF KENTUCKY 100-101 (1813).

[60] LAWS OF THE STATE OF INDIANA, PASSED AT THE FOURTH SESSION OF THE GENERAL ASSEMBLY 39 (1820); REVISED LAWS OF INDIANA, IN WHICH ARE COMPRISED ALL SUCH ACTS OF A GENERAL NATURE AS ARE IN FORCE IN SAID STATE; ADOPTED AND ENACTED BY THE GENERAL ASSEMBLY AT THEIR FIFTEENTH SESSION 192 (1831); REVISED STATUTES OF THE STATE OF ARKANSAS, ADOPTED AT THE OCTOBER SESSION OF THE GENERAL ASSEMBLY OF SAID STATE, A.D. 1837 Div. VIII, Art. I, § 13, at 280 (1838); Ala. Code § 3274 (1852); Cal. Laws, ch. 485 at 748 (1863); slightly revised to exempt federal officials by  Cal. Laws, ch. 128 at 115 (1864); Tex. Laws ch. 34 at 25 (1871).  The Texas law banned both concealed and open carry.

[61] Cal. Laws ch. 63 at 67 (1870).

[62] HENNING'S GENERAL LAWS OF CALIFORNIA, Act 1182 at 532 (1917).

28

REBUTTAL DECLARATION OF CLAYTON CRAMER

attempts to restrict.  This law is too late for *Bruen* and SB 2 is not analogous to that Chicago ordinance.

103.   Salzmann attempts to climb out of that hole by observing that "Second, the language used in the Chicago law mirrors that used in laws enacted in other states and cities…"This statement is true but irrelevant; state laws and city ordinances regulating concealed carrying of deadly weapons were common and not specific to "intracity and intercity transportation…"

104.   Salzmann's claim in ¶79 that "All of these facts indicate there are compelling reasons to find that there was a past practice of prohibiting the concealed carry of weapons in urban spaces-inclusive of, but not limited to, transportation infrastructure."  Salzmann just keeps digging a deeper hole.  *Bruen* found a right to carry a gun for self-defense.  These broad bans on concealed carry would be a problem under *Bruen* and only included "transportation infrastructure" by default.  They provide no support for the idea that "transportation infrastructure" was regarded as a "sensitive place."

<u>Rebuttal to Zachary Schrag</u>

XX.   Summary

105.   While Dr. Schrag's declaration seems to indicate that he is broadly examining "the difficult historical questions to which Justice Breyer alludes," his declaration is primarily about transportation.  He fails to identify any laws restricting firearms possession specific to transportation infrastructure.  He presents anecdotal evidence of governmental officials disarming people with no apparent lawful authority.

XXI.   Irrelevant

106.   Prof. Schrag spends 28 pages discussing the difficulties of doing historical research to which I can only say, "Amen!"  I have spent roughly thirty years battling these difficulties in determining original meaning; going through dusty volumes in law libraries; reading microfilmed newspapers in the Historic New

REBUTTAL DECLARATION OF CLAYTON CRAMER

Orleans Collection and at UCLA; reading 18th century manuscripts at the Massachusetts Historical Society; making use of digitized newspaper collections at the Library of Congress Chronicling America collection; paying for and using Accessible Archives and Newspapers.com.

107.   The *only* evidence that Prof. Schrag presents relevant to this case is in ¶15:

> In my own work, I cite two examples of firearms regulation that took place not in the statehouse, but on the street. On May 7, 1844, the day after a lethal riot, the mayor of Philadelphia noticed a man at a rally sitting on a double-barreled gun and ordered a police officer to confiscate it, though it was later returned. Two months later, the sheriff of Philadelphia County led a search of a Catholic church, during which he confiscated a great many more arms of various types. These events eventually featured in criminal cases that were reported in newspapers, months after the confiscations, suggesting the need to look beyond the statutes to understand how Americans understood state police power.

108.   It is certainly true that governments have often taken actions that were not authorized by statute and convey a deeper understanding of how gun regulation was implemented.  One of my favorite examples demonstrating this is:

> Cowardly Police and Militia Search Negroe's Homes, Disarm Them, and Then Turn Them Over to the Blood-thirsty Demons Clamoring For Their Lives. Without Arms or Protection 38 are Killed, More than 200 Wounded and 325 Negro Homes are Burned and Looted.[63]'



Rebuttal to Brennan G. Rivas

---

[63] Fiends Incarnate!  KANSAS CITY SUN, Jul. 7, 1917, 1.

REBUTTAL DECLARATION OF CLAYTON CRAMER

XXII. Summary

109.   Rivas makes extensive use of laws that have been rejected as irrelevant by *Bruen*: the Statute of Northampton (1328), some early Republic analogs, and early Republic surety bonds.   She makes extensive use of laws that banned not only concealed carry but also laws that also required intent to "unlawfully and maliciously, to do bodily harm to some other person."   She misreads *State v. Huntley* (N.C. 1843) and *State v. Smith* (La. 1857) as denying that the public carrying of arms was allowed.

110.   Her sensitive places explanations rely too heavily on outlier post-1868 Texas and a selective reading of other post-1868 decisions defining who was a "traveler" to read *open* carry as prohibited.   Her use of *English* (1872) ignores antebellum Texas case law and the fiercely anti-Mexican sentiments of the *English* decision.

111.   Her explanation of railroad firearms rules relies heavily on her assumptions of what was "reasonable" and a shortage of extant records.   Worst of all, she is relying not on laws but the rules of private companies.   If Greyhound chooses to prohibit possession of handguns by CCW holders, they are certainly free to do so. Government transit entities will need to provide evidence that *laws* existed before 1868 limiting possession of arms on transportation systems.

XXIII.        Colonial Restrictions

112.   In ¶18, Rivas asserts "The mayor of Philadelphia opened a fair by issuing a proclamation that reiterated the obligation of colonists to keep the King's peace, which mandated 'that no person…carry any unlawful weapon, or gallop or strain horses within the built part of the city.'"   True enough, but as Rivas admits in n. 9: "Watson provided the 1753 mayoral proclamation as an example of how such fairs would be opened. The suggestion is that the process of opening with a proclamation along these lines was standard procedure."   This might well be tradition.

REBUTTAL DECLARATION OF CLAYTON CRAMER

113.   Her n. 9 also claims: "It is worth noting that the rules laid out in the proclamation align with the Statute of Northampton and the common law view of keeping the peace." *Bruen* has already considered and rejected the relevance of the Statute of Northampton to the Second Amendment. because of temporal distance to 1791 and evidence that it was not a general prohibition on being armed in public: "Rather, it appears to have been centrally concerned with the wearing of armor…. If it did apply beyond armor, it applied to such weapons as the "launcegay," a 10- to 12-foot-long lightweight lance."[64]   Why Rivas is making a claim already rejected by *Bruen* eludes me.

114.   ¶¶19-22 examine the development of roads and transportation systems with not a word about arms regulation.  Ditto, for ¶¶23-24 on public gatherings; ¶¶25-29 public buildings; ¶30, private library; ¶31, hospitals; ¶32, theaters and ¶¶33, taverns.   After all this expensive but irrelevant history, Rivas in ¶34 admits: "Although the city council and other government bodies with authority over Philadelphia did not enact weapon-specific regulations for these places of public assembly, city leaders were certainly aware of and sensitive to potentially unruly gatherings there."   Their solution was "to put a stop to the large gatherings of children, servants, and slaves that caused a nuisance to other residents by making noise, swearing, etc."  Rivas goes on to discuss ordinances "requiring the dispersal of people from the vicinity of the courthouse, marketplace, and public buildings (most of which were located near Second and High Streets at that time). Constables were charged with enforcing the rule and bringing violators before a magistrate."  She lists no firearms regulations for any of these areas.

115.  She does mention, "Philadelphia militia laws prohibited militia members from meeting on muster days at taverns, ostensibly for fear that they would become inebriated and *fail to perform their duties*."  [emphasis added]  There is no suggestion by her that public safety was a concern.

---

[64] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2140 (2022).

32

REBUTTAL DECLARATION OF CLAYTON CRAMER

116.   "There was also a consideration to close tavern barrooms on Sundays 'as it would prevent youth from committing excesses to their own ruin, the injury of their masters, and the affliction of their parents and friends.'"  If Rivas was writing a declaration in support of Prohibition this might be relevant.

117.   At ¶35: "At times, armed men caused problems in Philadelphia's public spaces.   Watch houses and lamps were constructed to provide the necessary infrastructure for policing the public square and protecting the peace. The constables employed by the government, in addition to the residents drafted into night watch service, were the first line of defense against such disturbances."  She lists no laws that regulate carrying of arms and in fact recites a story that if anything suggests even the *use* of arms was not a major regulatory concern:

> Penn, Jr. argued with members of the night watch about local politics and the formation of a militia, when the encounter turned into a brawl. At some point, he called on his friends to draw their pistols but was given a "severe beating" after the street light was put out. A grand jury heard evidence about the fracas, which ended Penn, Jr.'s career in Pennsylvania even though the case was dropped.  In 1716, a man "armed with pistols" attacked the Speaker of the House of the colonial assembly and was indicted. The failure to prosecute and punish him cased "great dissatisfaction" to other members of the Assembly.

XXIV.      American Law

## A.      Public Carry Restrictions

118.   I was still waiting for the regulation of firearms.  Here it came in ¶36, but the punchline does not complete the joke.   "As early as 1850, persons found carrying deadly weapons at any riotous gathering were 'deemed guilty of an intention to riot, whether said fire-arms, or deadly weapon, shall be used or not . . . .'"  The punishment for deadly weapons was based on one's involvement in a "riotous gathering."  Carrying of deadly weapons was not a crime in itself.

119.   State lawmakers subsequently punished the carrying of 'any fire-arms, slung-shot, other deadly weapon concealed upon his person' in Philadelphia, 'with the intent therewith unlawfully and maliciously to do injury to any other person.'"

33

REBUTTAL DECLARATION OF CLAYTON CRAMER

Carrying concealed arms was not enough; it also required criminal intent.  It was not unlawful in itself.

120.   Evidence for this comes from *Wright* v. *Commonwealth* (Pa. 1875).  A Jonathan Wright was indicted in April, 1871, in Schuylkill County, charging that: "he 'did unlawfully and maliciously carry on and about (his) person, a certain concealed deadly weapon, commonly called a pistol, with intent, with the pistol aforesaid, unlawfully and maliciously, to do bodily harm to some other person, to the inquest unknown, &c.'"

121.   While the jury found Wright innocent, they did order him to pay court costs.  The defendant appealed the order to pay court costs, arguing that the May 5, 1864, county ordinance which prohibited the carrying of concealed weapons was a violation of the 21st section of Pennsylvania's Bill of Rights.  Since his indictment was for an action which was not a crime, Wright felt that he should not be obligated to pay court costs.

122.   The Pennsylvania Supreme Court's ruling is short, without citation of either precedent or authority for their decision about the constitutionality of the law in question: "Such an unlawful act and malicious intent as this has no protection under the 21st section of the Bill of Rights, saving the right of the citizens to bear arms in defence of themselves and the state."  The Court further held that the jury must have had a good reason for imposing court costs on the defendant, even if they found him innocent.  The headnotes for this decision assert that "prohibiting the carrying of concealed weapons, is not obnoxious to the Bill of Rights, sect. 21," the decision itself specifies both "an unlawful act and malicious intent,"[65] suggesting that the combination of the two elements was required to constitute a crime.  But did the court consider the carrying of concealed weapons to be part of the malicious intent, or was some other evidence of criminal intent required?

---

[65] Wright v. Commonwealth, 77 Pa. St. 470, 471 (1875).

34

REBUTTAL DECLARATION OF CLAYTON CRAMER

123.   An additional interesting question is what part, if any, the 1873 Pennsylvania Constitutional Convention played.   The 1790 Pennsylvania Constitution, Article IX, §21, contained the guarantee: "That the right of citizens to bear arms, in defence of themselves and the State, shall not be questioned."[66]  At the 1873 constitutional convention, an attempt was made to add the word "openly" after the word "citizens". Thomas Struthers, the proponent of the change, argued that persons charged with carrying arms secretly "fall back on the Constitution, which they say authorizes the bearing of arms, and therefore the act of Assembly is unconstitutional."[67]

124.   Delegate MacVeah argued that

I understand that among other things that cannot be taken from a man, is the privilege he has to defend his life and to protect himself. Of course he is answerable to the fullest extent for the use of it, and your law against carrying concealed weapons does not interfere with the habit among the dangerous classes. But there are periods in every community, periods of excitement, when it may be necessary for a man to say in his own behalf, *"Say what you please and do what you please, but you must not beat or maltreat me, "  and with all the inequalities of physical condition that exist, it is the very worst thing in the world to say that if a man of my condition offends a man like Judge Woodward, he is to take a severe beating whenever his enemy chooses to inflict it* . I do not believe in it. I believe in the right of self-defence of the weak against the strong, and I do not propose to allow any man to maltreat me at his pleasure, as long as there are any weapons of de fence to be had by which I can equalize my strength with his.[68] [emphasis added]

125.   Delegate Beere explained:

I trust the Convention will not go into committee of the whole for the purpose of putting in this amendment. For more than four years in the oil regions of Pennsylvania, during the excitement of speculation and during the war, *no man's life would have been safe had it not been well understood that every man carried concealed weapons*. No man had any business to be there without them. Highway robbery even was best prevented by the assailed getting frequently the advantage of the first shot. Thieves and murderers never would and never do regard any law of this kind, and the revolver under such circumstances is the best conservator of the public peace in the hands of law abiding men. No man desires to be in the position of being assailed by a lot of drunken

---

[66] Penn. Const. Article IX, §21 (1790).
[67] 7 DEBATES OF THE CONVENTION TO AMEND THE CONSTITUTION OF PENNSYLVANIA: CONVENED AT HARRISBURG, NOVEMBER 12, 1872 258 (1873).
[68] Id., at 258-259.

35

REBUTTAL DECLARATION OF CLAYTON CRAMER

bullies who are reckless of any thing they may do unless restrained by fear.[69] [emphasis added]

126.   The proposed amendment lost, 54-23.[70]  The state constitution's arms provision was *not* amended to protect only open carry.  It is not clear if the Pennsylvania Supreme Court considered the actions of the constitutional convention two years before, or independently reflected the same sentiments held by the majority of the delegates.

127.   Rivas in ¶36 tells us that, "In 1881, when a US president had been shot by an armed assassin and concealable revolvers were readily available at cheap prices, the mayor of Philadelphia issued a proclamation reiterating the city's public carry restrictions."  Rivas cites only a secondary source by Patrick Charles.  This is both an executive proclamation and by her own admission simply a restatement of an existing prohibition, which she does not describe.  (The convention delegates acknowledged that this was not a statewide law but varied from county to county.)[71]

128.   In ¶37, Rivas again talks of the wonders of Philadelphia and references the Statute of Northampton, "The scale of urban life in Philadelphia sheds light upon the longstanding Statute of Northampton, enforced in England, its overseas empire, and even in the United States. It broadly prohibited the carrying of arms in "Fairs, Markets, nor in the Presence of the Justices or Ministers nor in no Part elsewhere." Again, she provides no evidence that this antique statute was in effect.

### 1.   Laws Already Rejected by *Bruen*

129.   Again in ¶38 Rivas tells us that the Statute of Northampton (1328) prohibited the carrying of arms *contra Bruen*'s rejection of its significance.[72]  In ¶39 she elaborates, claiming that "numerous colonies and states enacted similar measures…"  Among those "numerous colonies and states," she includes "Francois

---

[69] Id., at 259.
[70] Id., at 261.
[71] Id., at 259.
[72] New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111, 2139 (2022).

REBUTTAL DECLARATION OF CLAYTON CRAMER

Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792)" in n. 56.  There is no such law; the legislature tasked Martin to sift through all existing British statutes that *might* have some applicability to North Carolina. "I began at Magna Charta. The old statutes, before that period are generally acknowledged to be rather a matter of mere curiosity, and scarcely an authentic record of any of them is extant.... I have inserted every statute unrepealed by subsequent acts, or which did not appear so glaringly repugnant to our system of government as to warrant its suppression."[73]

130.   Her list includes an 1835 Massachusetts surety bond law.  This class of laws *Bruen* rejected as irrelevant to the right to carry for self-defense:

> While New York presumes that individuals have no public carry right without a showing of heightened need, the surety statutes presumed that individuals had a right to public carry that could be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace." Mass. Rev. Stat., ch. 134, § 16 (1836). Thus, unlike New York's regime, a showing of special need was required only *after* an individual was reasonably accused of intending to injure another or breach the peace.  And, even then, proving special need simply avoided a fee.[74]

### 2. Concealed Carry Bans

131.   Rivas opens a discussion of concealed carry bans at ¶40 by moving seamlessly from an 1801 Tennessee variant of Statute of Northampton that at least uses some of that text "publicly ride or go armed to the terror of the people," which implies that someone can see that you are armed,  to a discussion of laws prohibiting concealed carry where no one can see that you are armed.

132.   Rivas in ¶41 quotes out of context *State v. Huntley* (N.C. 1843): ""No man amongst us carries [a firearm] about with him, as one of his every day accoutrements—as a part of his dress—and never we trust will the day come when any deadly weapon will be worn or wielded in our peace loving and law-abiding State, as an appendage of manly equipment."

---

[73] Martin, *A Collection of Statutes of the Parliament of England in Force in the State of North Carolina* iii (1792).

[74] New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111, 2139 (2022).

REBUTTAL DECLARATION OF CLAYTON CRAMER

133.   What she left out is the following sentence:

But although a gun is an "unusual weapon," it is to be remembered that the carrying of a gun, per se, constitutes no offense. For any lawful purpose — either of business or amusement — the citizen is at perfect liberty to carry his gun. It is the wicked purpose, and the mischievous result, which essentially constitute the crime. He shall not carry about this or any other weapon of death to terrify and alarm, and in such manner as naturally will terrify and alarm a peaceful people."[75] [emphasis added]

134.   This utterly demolishes Rivas' claim: "Individuals generally did not view concealed carry laws as giving permission to openly carry in populated places during a person's ordinary activities."

135.   The defendant Huntley had indeed ridden about armed making deaths threats and one of the targets of Huntley's wrath "showed himself once, but for too short a time to enable him to do so, and that he mistook another man for him, and was very near shooting him."[76]  The decision also specifically rejected the relevance of the Statute of Northampton:

The argument is, that the offense of riding or going about armed with unusual and dangerous weapons, to the terror of the people, was *created* by the statute of Northampton, 2 Edward III, ch. 3, and that, whether this statute was or was not formerly in force in this State, it certainly has not been since the first of January, 1838, at which day it is declared in the Revised Statutes, ch. 1, sec. 2, that the statutes of England or Great Britain shall cease to be of force and effect here.[77] [emphasis in original]

136.   Rivas in ¶41 misreads *State v. Smith* (La. 1856), which is an admittedly ugly piece of writing: "And a Louisiana case from 1856 held that a partially visible weapon was a violation of the concealed carry law because it was "the result of accident or want of capacity in the pocket to contain, or clothes fully to cover the weapon, and not the extremely unusual case of the carrying of such weapon in full open view, and partially covered by the pocket or clothes."[78]  What was "extremely unusual" was a "weapon in full open view, and partially covered by the pocket or clothes."  Earlier in the decision, "The offence created by this statute is the carrying

---

[75] State v. Huntley, 25 N.C. 418, 422, 423 (1843).
[76] Id., at 285.
[77] Id., at 285.
[78] State v. Smith, 11 La.Ann. 633, 634 (1856).

38
REBUTTAL DECLARATION OF CLAYTON CRAMER

of the weapon, pistol, bowie knife or dirk, &c. , concealed on or about the person. By the first section of the Act of 1813, a weapon of the kind designated was defined as concealed when, being carried by a person, it did not appear in full open view."[79] Open carry was accepted; carrying fully or even partially concealed was illegal.

## B.   Sensitive Places

137.   Starting at ¶42, Rivas starts citing post-1868 laws, which are irrelevant under *Bruen*.

138.   At ¶¶47-49, Rivas points to the *English v. State* (Tex. 1872) as some sort of evidence that the Second Amendment does not protect a right to carry arms. *Bruen* post-dates *English* and is a superior court. *Bruen* also specifically rejects English as an outlier.[80]  Rivas ignores that the Texas Supreme Court in *Cockrum v. State* (Tex. 1859) had recognized a right to bear arms under the Second Amendment and the Texas Constitution's arms guarantee.

139.   In *Cockrum v State*: "The object of the clause first cited, has reference to the perpetuation of free government, and is based on the idea, that the people cannot be effectually oppressed and enslaved, who are not first disarmed.  The clause cited in our bill of rights, has the same broad object in relation to the government, and in addition thereto, secures a personal right to the citizen.  The right of a citizen to bear arms, in the lawful defence of himself or the state, is absolute."[81]  Rivas also ignores *English*'s incorrect blaming the Texas arms provision's origin on Mexicans:

> We will not say to what extent the early customs and habits of the people of this state should be respected and accommodated, where they may come in conflict with the ideas of intelligent and well-meaning legislators.  A portion of our system of laws, as well as our public morality, is derived from a people to most peculiar perhaps of any other in the history and derivation of its own system.  Spain, at different periods of the world, was dominated over by the Carthagenians, the Romans, the Vandals, the Snevi, the Allani, the Visigoths, and Arabs; and to this day there are found in the Spanish codes traces of the laws and customs of teach of these nations blended together into a system by

---

[79] Id.
[80] New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111, 2139 (2022).
[81] *Cockrum* v. *State*, 24 Tex. 394, 401 (1859).

REBUTTAL DECLARATION OF CLAYTON CRAMER

no means to be compared with the sound philosophy and pure morality of the common law.[82]

140.   Rivas in ¶53 claims, "The majority opinion in *NYSRPA v. Bruen* treated the 1871 Texas statute as an outlier, but its discussion was limited to Section 1 of that law banning open and concealed carry of arms in public altogether."   Examining *Bruen*'s discussion shows nothing of the kind:

> The Court acknowledges two Texas cases— *English v. State*, 35 Tex. 473 and *State v. Duke*, 42 Tex. 455—that approved a statutory "reasonable grounds" standard for public carry analogous to New York's proper-cause requirement. But these decisions were outliers and therefore provide little insight into how postbellum courts viewed the right to carry protected arms in public. See *Heller*, 554 U.S. at 632, 128 S.Ct. 2783. Pp. 2150 - 2154.[83]

141.   Rivas in ¶¶53-55 continues citing post-1868 laws as though *Bruen* has not spoken on this matter of dates.

### 1.    Travelers

142.   Starting in ¶56, Rivas argues that the "traveler" exceptions in many state public carry laws implies a general ban on carry in populated areas. In ¶57:

> The kind of "travel" which it described was not the everyday movement through public spaces like town squares and commercial districts, or the kind of travel associated with modern transportation. Instead, it encompassed a type of travel that separated a person, small group, or family from the protections of the law that went hand-in-hand with organized society and were a fundamental feature of community life— courts, magistrates, constables, and the security of being among one's neighbors. To be a traveler was to venture outside one's community sphere and become vulnerable to dangers such as robbers and predatory animals.

143.   Her claim might have some merit in Texas law, which was unusually restrictive.

144.   Rivas in ¶59 quotes at length from *Carr v. State* (Ark. 1879) but neglects to mention the last part of the decision which reversed the conviction and remanded the case:

---

[82] English v. State, 35 Tex. 473, 489 (1872).
[83] New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111, 2120 (2022).

REBUTTAL DECLARATION OF CLAYTON CRAMER

In this case, the implements found on defendant were pistols, and worn concealed. But they were not, either of them, loaded; and one was wholly unfit for use, if it had been. These things, affirmatively shown, rebut the presumption that the pistols were worn to be used as weapons. They could not be so used. If the state, in a given case, should show that pistols were worn concealed, the jury might well presume that they were loaded, and worn as weapons. But the defendant might remove the presumption by proof. It would be one of fact, and not of law.[84]

145.   Rivas also misreads *Eslava v. State* (Ala. 1873):

An Alabama appellate court affirmed the decision of a lower court judge who, even though he acquiesced that the defendant had a right to carry a concealed weapon while traveling on a dangerous stretch of road, instructed the jury that "if they further believed, from all the evidence in the case, that the defendant was in the daily habit of coming to the city, engaging in his business in the city from morning until evening, mingling with the inhabitants of the city in business and social intercourse, and carried a pistol concealed about his person during this time, not being justified or excused otherwise than for the reason of his having to travel" along the dangerous stretch of roadway, "then he would be guilty, as charged in the indictment."

146.   What Rivas conveniently leaves out is the Court's acknowledgment that the defendant's error was in not changing to open carry in town.

If the necessity existed only while he was travelling, then, if after he reached the city and had a reasonable opportunity of divesting himself of the weapon, or of changing the manner of carrying it so as not to offend the statute, he continued to bear it concealed about his person, he is guilty as charged.[85]

147.   Again, this is post-1868.  My point is that Rivas' characterization of the defendant's problem is that public carry was lawful, even if *concealed* carry was not.

148.   In any case, her "traveler implies bans on carry in cities" would perhaps justify banning CCW holders from being armed in cities, where the hazards of being a victim of violent crime are highest, but SB 2 does not do that.

149.   Rivas at ¶62 summarizes her claims as: "Public carry laws in force during the late eighteenth and nineteenth centuries, whether they employed language from English common law or took the shape of concealed-carry laws, applied to public spaces in American communities large and small. The exceptions which some concealed weapon laws carved out for travelers remained closely guarded by

---

[84] Carr v. State, 34 Ark. 448 (Ark. 1879).
[85] Eslava v. State, 49 Ala. 355 (Ala. 1873).

REBUTTAL DECLARATION OF CLAYTON CRAMER

appellate courts and did not apply to everyday travel."  What Rivas seems to have missed in *Bruen* is that *Bruen* no longer treats concealed carry as a broad prohibition with a few traveler exceptions.

## 2. Transportation

150.   Rivas at ¶64 points to colonial laws requiring ferries to "transport armed men free of charge during times of emergency."  She then claims, "The adoption of this policy indicates that some ferry operators may have been charging fares to militiamen, posses, or messengers during times of emergency, not that customers carried weapons on their person in times of peace."  She has no evidence that ferries were prohibiting the carrying of armed men.  I am not sure what the formal logic term for this error is, but if armed men were being charged so that an exemption was required, the logical assumption is that amed men used the ferries.

151.   At ¶65, Rivas points to increasing violence in America as… making some point that I cannot fathom.  From here, in ¶66, Rivas:  claims "expansion of America's rail system reasonably suggests that railroad companies might have had policies—written or unwritten, preserved or lost—that affected passengers' access to firearms and deadly weapons while aboard."  This may be reasonable to her but what people of that period thought was "reasonable" often startles historians.   Her reference to policies "written or unwritten, preserved or lost" suggests that she could not find them, or may not have existed.

152.   Anecdotal evidence is worth little, but it is more powerful than evidence that an historian calls unwritten" or "lost."  Francis Law Olmsted's description of a not completely concealed Colt revolver on a Kentucky railroad in 1853 suggested that concealed carrying, and *almost* concealed carrying, of handguns was at least common, if not widespread:

> In the cars in Kentucky a modest young man was walking through with the hand[le] of a Colt out of his pocket-skirt behind.  It made some laugh & a gentleman with us called out, "You'll lose your Colt, Sir."  The man turned and after a moment joined the laugh and pushed the handle into the pocket.

42

REBUTTAL DECLARATION OF CLAYTON CRAMER

John said, "There might be danger in laughing at him." "Oh no," replied our companion, evidently supposing him serious, "he would not mind a laugh." "It's the best place to carry your pistol, after all," said he. "It's less in your way than anywhere else. And as good a place for your knife as anywhere else is down your back, so you can draw over your shoulder."

"Are pistols generally carried here?"

"Yes, very generally."

Allison said *commonly*, but he thought not generally [emphasis in original].[86]

153.   At ¶66 Rivas points to jury instructions describing how a railroad "a railroad company has a right to require of its passengers the observance of all reasonable rules, calculated to insure the comfort, convenience, good order and behavior of all persons on the train…" Her implication is that this would mean rules prohibiting the carrying of firearms.  If you believe that firearms represent a hazard, this might be a reasonable rule.  If you believe that they are not a hazard, that would not be a reasonable rule.

154.   Rivas did find one institutional rule for the North Pennsylvania Railroad from 1875 that requires conductors to not allow passengers to bring guns into the passenger cars.  She cites an unpublished article that lists several railroad rules that were specific to guns, some requiring them to be stored in cases, unloaded, although with the passenger.  As Rivas admits, some treated guns as just more luggage for which the railroad "would be held liable for lost, damaged, or stolen firearms."  In other cases, they could be carried into the passenger car.[87]  *Institutional rules* are not *laws*.  If private businesses wish to limit possession of firearms on their premises, this is not a Second Amendment issue.  Even were these rules backed up by the authority of the government the burden of proof is on the government to show such examples before 1868.

---

[86] Frederick Law Olmsted, 2 THE PAPERS OF FREDERICK LAW OLMSTED, 232-233 (1981).
[87] CENTRAL PACIFIC RAILROAD AND LEASED LINES RULES, REGULATIONS AND INSTRUCTIONS FOR THE USE OF AGENTS, CONDUCTORS, ETC. 204 (1882).

43

REBUTTAL DECLARATION OF CLAYTON CRAMER

155.   Rivas at ¶67: "In the event that it was legal and permissible by company policy for a passenger to transport a firearm or other deadly weapon, stowing it away in closed baggage was altogether different from carrying in one's pocket or waistband (which was de facto a violation of the law in many American jurisdictions, as previously described).

156.   Several states had "traveler" exemptions from concealed weapon bans as Rivas admits.  At least some nineteenth century laws prohibiting concealed of arms had an exception for those travelling: "Sec. 1. BE it enacted by the general assembly of the commonwealth of Kentucky, That any person in this common-wealth, who shall hereafter wear a pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon, *unless when travelling on a journey*, shall be fined in any sum, not less than one hundred dollars;"[88] [emphasis added]   Other concealed carry laws that exempted the never statutorily defined "travelers" include the 1820 and 1831 Indiana bans, the 1838 Arkansas ban, and the 1863 California ban.[89]

157.   The California ban was short-lived; it was repealed in 1870.[90]  While some cities and counties passed local bans in following years, there was no statewide ban until 1917.[91]  Travelers in California might well have been unaware of local bans, especially if they were just passing through a restrictive county.  At least for California and states that exempted travelers from the ban on concealed carry, Rivas' explanation does not work.

---

[88] Acts Passed at the First Session of the Twenty First General Assembly for the Commonwealth of Kentucky 100-101 (1813).
[89] Laws of the State of Indiana, Passed at the Fourth Session of the General Assembly 39 (1820); Revised Laws of Indiana, in Which Are Comprised All Such Acts of a General Nature as Are in Force in Said State; Adopted and Enacted by the General Assembly at Their Fifteenth Session 192 (1831); Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837 Div. VIII, Art. I, § 13, at 280 (1838); Ala. Code § 3274 (1852); Cal. Laws, ch. 485 at 748 (1863); slightly revised to exempt federal officials by Cal. Laws, ch. 128 at 115 (1864); Tex. Laws ch. 34 at 25 (1871).  The Texas law banned both concealed and open carry.
[90] Cal. Laws ch. 63 at 67 (1870).
[91] Henning's General Laws of California, Act 1182 at 532 (1917).

REBUTTAL DECLARATION OF CLAYTON CRAMER

158.   Rivas at ¶68: "Conductors were considered the authority figures on trains and streetcars, and some states vested them with the same powers as policemen." "Still, there was not a hard-and-fast rule about it, and public sentiment did not necessarily support the carrying of firearms by conductors aboard their trains or cars." Her evidence for this is a single newspaper account from 1902. "There is no evidence that unarmed conductors justified preemptive arming by passengers." Nor is there any the other direction. The burden is on the state to prove such bans, and before 1868.

159.   Rivas at ¶69 points to state authorization of private railroad police. This in no way limited the authority of passengers to be armed. Idaho has police who attempt (and pretty successfully, compared to California) to protect Idahoans from violent crime. As citizens of a *free* state, we are also allowed, with very few restrictions, to be armed for self-defense.

160.   Rivas at ¶70 tells us concerning the Union Pacific Railroad: "Extant records from the early 1930s show that some of the firearms held in the company gun locker were classified as 'confiscated guns,' presumably confiscated from passengers carrying them illegally." Illegally might include persons without a valid concealed weapon permit for that state, or who had come to the attention of railroad police for some other unlawful activity. Rivas makes an assumption convenient to her cause, but provides no evidence to support it.

161.   Rivas also tells us without apparent source: "correspondence from the Federal Bureau of Investigation from 1950 shows the FBI requesting the assistance of all law enforcement agencies, including the UPRR special agents, in tracking down the carriers of certain guns that had been used in the commission of crimes." Doubtless UPRR agents encountered persons carrying guns because of criminal activity or happenstance. To assume that no passenger could carry a gun on a train meets Rivas' needs but needs some evidence, or at least a source for her claim.

45

REBUTTAL DECLARATION OF CLAYTON CRAMER

162.   Rivas at ¶¶71-74, attempts to explain the absence of evidence in support of her claims by "the lack of extant sources documenting their internal ridership policies…. my brief exploration of their finding aids indicates that most of these records are from 1900 or later." This may well be the reason that the evidence that she seeks is not there, but it may also be the evidence of absence; there may not be much evidence of firearms restrictions on nineteenth-century trains because there were none or little restriction.

<u>Winkler Rebuttal</u>

XXV. Summary

163.   Winkler's declaration makes use of statutes already considered and rejected by the Court in *Bruen*.

164.   Winkler makes claims about American law for which he provides no evidence ("states increasingly enacted laws prohibiting firearms from places where the public gathered for social and commercial activity")

165.   His claims about regulation of alcohol and firearms are almost entirely post-1868. The two laws pre-1868 fit into *Bruen*'s outliers category and can be dismissed.

XXVI.      Ancient and Discredited History

166.   Winkler at ¶11 starts his declaration with the Statute of Northampton (1328), which *Bruen* specifically rejected because of temporal distance to 1791 and evidence that it was not a general prohibition on being armed in public: "Rather, it appears to have been centrally concerned with the wearing of armor…. If it did apply beyond armor, it applied to such weapons as the "launcegay," a 10- to 12-foot-long lightweight lance."[92]   Why Winkler is making a claim already rejected by *Bruen* eludes me.

---

[92] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2140 (2022).

REBUTTAL DECLARATION OF CLAYTON CRAMER

167.   Even for this claim, Winkler makes assertions of fact as to "What made fairs and markets sensitive" that are best described as conjecture.  The Statute of Northampton's text is remarkably short in explanation of purpose:

> Item, it is enacted, that no man great nor small, of what condition soever he be, except the king's servants in his presence, and his ministers in executing of the king's precepts, or of their office, and such as be in their company assisting them, and also [upon a cry made for arms to keep the peace, and the same in such places where such acts happen,] be so hardy to come before the King's justices, or other of the King's ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers, nor in no part elsewhere, upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure. And that the King's justices in their presence, sheriffs, and other ministers in their bailiwicks, lords of franchises, and their bailiffs in the same, and mayors and bailiffs of cities and boroughs, within the same cities and boroughs, and borough-holders, constables, and wardens of the peace within their wards, shall have power to execute this act. And that the justices assigned, at their coming down into the country, shall have power to enquire how such officers and lords have exercised their offices in this case, and to punish them whom they find that have not done that which pertained to their office.

168.   Winkler may be surmising an intent from some evidence not available to the *Bruen* Court which gave as an explanation:

> The Statute of Northampton was, in part, "a product of . . . the acute disorder that still plagued England." A. Verduyn, The Politics of Law and Order During the Early Years of Edward III, 108 Eng. Hist. Rev. 842, 850 (1993).[93]

169.   Winkler appears unfamiliar with the literature for this period.   In particular "Armed" seems to have been mistranslated in the official STATUTES OF THE REALM.[94]  The phrase translated to "arms" in the original Norman French is *a force & arms*.[95] "A Statute Forbidding Bearing of Armour" of 1313 would seem to be of the same purpose.  While unclearly written (or perhaps translated), it decrees that "every man shall come without all force and armour, well and peaceably, to the

---

[93] *New York State Rifle & Pistol Assn., Inc. v. Bruen,* 142 S.Ct. 2111, 2139 (2022).
[94] 1 Statutes: Revised Edition (1870).
[95] 2 Edw. III, Stat. Northampt., § 3 (1328).

REBUTTAL DECLARATION OF CLAYTON CRAMER

honour of us, and to the peace of us and our realm."[96]  The Norman French phrase *force & sannz armes* is translated in the official STATUTES OF THE REALM as "without force and (5)armor." Note 5 explains that this means "without armour."  This statute is not exactly a prohibition, almost like a suggestion that this is how you should approach the King and Parliament.   Why was this mistranslated in the 1870 official version?  I suspect because native speakers of Norman French were by this point "ashes to ashes, dust to dust."

170.   Sir John Knight was charged in the 17th century under the Statute of Northampton with carrying arms, but the charges were dismissed.  One summary of the case includes the following notes: it did not apply of course to royal officials or "persons executing his precepts, or themselves endeavouring to keep the peace" (thus excluding otherwise law-abiding persons intent on self-defense or the defense of other innocent parties) and the punishment includes "forfeiting their armour"[97] (again evidence the Statute was aimed at wearing armor in a manner likely to engender fear).

171.   Subsequent legal writing recognized that the Statute prohibited wearing armor not carrying arms.  Even in the nineteenth century, a manual for justices of the peace in Ireland discussing the Statute explains that "A man cannot excuse the wearing of such armour in public."[98]  Even as to wearing arms in the modern sense, this volume is clear that "no wearing of arms is within the meaning of this statute, unless it be accompanied with such circumstances as are apt to terrify the people…"[99]  Concerning those wearing armor under their clothes: "And persons armed with privy coats of mail, to the intent to defend themselves, against their adversaries, are not within the meaning of this statute, because they do nothing in terror of the people."[100]  The reference to coats of mail seems to include only armor in the modern sense.  As

---

[96] 7 Edw. II (1313).
[97] Humphry William Woolrych, A PRACTICAL TREATISE ON MISDEMEANOR 221-2 (1842).
[98] Leonard MacNally, 1 THE JUSTICE OF THE PEACE FOR IRELAND: CONTAINING THE AUTHORITIES AND DUTIES OF THAT OFFICER 32 (1808).
[99] MacNally, *op cit.*
[100] *Id.*

48

REBUTTAL DECLARATION OF CLAYTON CRAMER

a prohibition on carrying arms, it seems to only prohibit open carry of weapons. At most, the original intent appears to have been to prohibit the wearing of armor by knights and nobles other than royal officials, out of concern that wearing armor would terrify common people, by suggesting that combat was imminent.

172.  Blackstone's discussion of the Statute of Northampton compares it to "by the laws of Solon, every Athenian was finable who walked about the city in armour."[101]   While "armour" might refer to weapons, the use of the word "in" suggests something one wears; it would be difficult indeed to be inside a sword or a mace.

XXVII.   American Law

173.  Winkler in ¶12 attempts to establish this legal understanding as applying to America, *contra Bruen:*

> The principle that weapons can be prohibited from places of public gathering found expression in early America in a manual for justices of the peace, which stated that peace officers had the authority to arrest those who "go or ride armed with unusual and offensive weapons . . . among any great Concourse of the People." James Davis, The Office and Authority of a Justice of the Peace 13 (Newbern, James Davis 1774)

174.  Those who read his Exhibit 3 will notice that p. 13's header is "Armour." This is consistent with *Bruen*'s understanding of the Statute of Northampton as a limitation on the wearing of armor not the carrying of arms.

175.  In ¶13, Winkler claims, "In the nineteenth century, as the nation's size and population grew, states increasingly enacted laws prohibiting firearms from places where the public gathered for social and commercial activity."  Winkler attributes this in part to "the patenting of Samuel Colt's design for the revolver in 1857."  This is a surprising mistake, as Colt's revolver patent was issued Feb. 25, 1836.[102]

---

[101] William Blackstone, 2 Commentaries on the Laws of England 110 (1838).

[102] U.S. Patent Office, *Improvement In Fire-Arms,* https://patentimages.storage.googleapis.com/bb/74/4b/f767ebf3be82e3/USX9430.pdf, last accessed November 13, 2023.

REBUTTAL DECLARATION OF CLAYTON CRAMER

176.   In ¶14: "By adopting new laws restricting guns in these and other places, lawmakers were not innovating. They were maintaining a tradition of regulating weapons in new places of public gathering that had gained popularity." And in ¶15 he elaborates "The laws of numerous states prohibited guns in "any public gathering," "social gathering," "ballroom," and any "other public assembly of the people," yet he lists no laws from before the Civil War that support this claim.

177.   In ¶¶16-25, Winkler lists a number of such laws, all of them post-1868 and thus irrelevant under *Bruen*.

XXVIII.      Arms and Alcohol

178.   In ¶¶26-31, Winkler lists laws prohibiting being armed while intoxicated or armed in a place serving alcohol.  With two exceptions all of these laws are post-1868. The two that predate the 1868 date that *Bruen* requires are examined here.  One is an 1852 (actually 1853 if Winkler had read carefully) New Mexico Territory law that prohibits carrying weapons to balls or Fandangos where alcohol is served.  The other is an 1867 Kansas law that prohibits "any person under the influence of intoxicating drink" from carrying deadly weapons.

179.   These two laws fall into the category that *Bruen* dismissed as outliers:

> The exceptional nature of these western restrictions is all the more apparent when one considers the miniscule territorial populations who would have lived under them. To put that point into perspective, one need not look further than the 1890 census. Roughly 62 million people lived in the United States at that time. Arizona, Idaho, New Mexico, Oklahoma, and Wyoming combined to account for only 420,000 of those inhabitants—about two-thirds of 1% of the population. See Dept. of Interior, Compendium of the Eleventh Census: 1890, Part I.-Population 2 (1892). Put simply, these western restrictions were irrelevant to more than 99% of the American population. We have already explained that we will not stake our interpretation of the Second Amendment upon a law in effect in a single State, or a single city, "that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms" in public for self-defense. Heller, 554 U.S. at 632, 128 S.Ct. 2783; see *supra,* at 2153. Similarly, we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also "contradic[t] the overwhelming weight" of other, more

REBUTTAL DECLARATION OF CLAYTON CRAMER

1    contemporaneous historical evidence. Heller, 554 U.S. at 632, 128 S.Ct. 2783.[103]

2    180.    The population of New Mexico Territory at the 1860 census was 93,516;

3    the State of Kansas at the 1870 census, 364,399. [104]  New Mexico Territory at the

4    1860 census was thus 0.2% of the U.S. population.  At the 1870 census, New Mexico

5    Territory was 91,874.  The total of New Mexico Territory and Kansas was 456,273,

6    or 1.2% of the U.S. population.  The combination of New Mexico being a territory

7    which *Bruen* treated as a special case[105] and the tiny percentage of the U.S. population

8    make these two laws outliers.

9    181.    Additionally, these two laws differ in one substantial manner.   The

10   Kansas law prohibited carrying arms while intoxicated; the New Mexico law

11   prohibited being armed where alcohol was available. The former at least has some

12   obvious connection to public safety; drunks make horrible decisions.  A person who

13   is not drinking is not a public safety hazard; a case could be made that in a facility

14   where some persons are impaired by alcohol, having one person armed might well

15   provide the opportunity to turn a knife fight from a murder into an assault with a

16   deadly weapon.

17   XXIX.      Sensitive Places Restrictions

18   182.    In ¶¶32-35 Winkler argues "no court in the nineteenth century held

19   sensitive places legislation to be unconstitutional under the Second Amendment or

20   similar state constitutional guarantees". He only cites post-1868 Texas law, making

21   this section of his declaration irrelevant.

_____

Clayton Cramer
Declarant

---

[103] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2154, 2155 (2022).
[104] U.S. Census Bureau, *New Mexico*,
https://www2.census.gov/library/publications/decennial/1940/population-volume-1/33973538v1ch07.pdf,
last accessed November 9, 2023.
[105] New York State Rifle & Pistol Assn, Inc. v. Bruen, 142 S. Ct. 2111, 2139, 2121 (2022).
("Finally, these territorial restrictions deserve little weight because they were, consistent with the transitory nature of territorial government, short lived. Some were held unconstitutional shortly after passage, and others did not survive a Territory's admission to the Union as a State.")

51

# CERTIFICATE OF SERVICE

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

Case Name: *May, et al. v. Bonta*
Case No.: 8:23-cv-01696 CJC (ADSx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**REBUTTAL DECLARATION OF CLAYTON CRAMER**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Robert L. Meyerhoff, Deputy Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
Email: Robert.Meyerhoff@doj.ca.gov
*Attorney for Defendant*

I declare under penalty of perjury that the foregoing is true and correct.

Executed November 20, 2023.

Christina Castron

Christina Castron