1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   R. MATTHEW WISE
3  Supervising Deputy Attorneys General
   TODD GRABARSKY
4  JANE REILLEY
   LISA PLANK
5  ROBERT L. MEYERHOFF
   Deputy Attorneys General
6  State Bar No. 298196
    300 South Spring Street, Suite 1702
7   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6177
8   Fax:  (916) 731-2144
    E-mail:  Robert.Meyerhoff@doj.ca.gov
9  *Attorneys for Rob Bonta, in his Official Capacity as
   Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RENO MAY, an individual, et al.;**<br><br>Plaintiffs,<br><br>v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of the State of California, and Does 1-10,** | Case No. 8:23-cv-01696 CJC (ADSx)<br>         8:23-cv-01798 CJC (ADSx)<br><br>**SUR-REBUTTAL DECLARATION OF DR. BRENNAN RIVAS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date:            December 20, 2023<br>Time:           1:30 p.m.<br>Courtroom:  9B<br>Judge:          Hon. Cormac J. Carney<br>Action Filed: September 15, 2023 |
| **MARCO ANTONIO CARRALERO, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of California,**<br><br>Defendant. | |

**SUR-REBUTTAL DECLARATION OF DR. BRENNAN GARDNER RIVAS**

I, Dr. Brennan Gardner Rivas, declare under penalty of perjury that the following is true and correct:

1. This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

2. I have been retained by the Office of the Attorney General for California as a historical expert on gun regulations that pertained to public carry laws and sensitive places, with a particular focus on regulations related to travelers, transit companies, and transportation-related spaces.

3. I previously provided a declaration in the above-captioned matters in support of the State of California's opposition to the *May* and *Carralero* Plaintiffs' motions for preliminary injunction. See Decl. of Brennan Rivas, *May v. Bonta*, C.D. Cal. No. 8:23-cv-01696 CJC (ADSx) (Dkt. No. 21-9); *Carralero v. Bonta*, C.D. Cal. No. 8:23-cv-01798 CJC (ADSx) (Dkt. No. 20-9) (Rivas Decl.). My professional background and qualifications, and my retention and compensation information, are set forth in Paragraphs 3 through 6 of this previous declaration.

4. I have been asked by the Office of the Attorney General to review and provide an expert opinion regarding some of the statements made in the plaintiffs' reply briefs and supporting documents in these matters. *May* Dkt. Nos. 29, 29-9, 29-14, 29-15; *Carralero* Dkt. No. 29. I have reviewed those briefs and documents, and have prepared this sur-rebuttal declaration in response.

**I.   RESPONSE TO STATEMENTS MADE IN *MAY* PLAINTIFFS' EVIDENTIARY OBJECTIONS TO RIVAS DECLARATION**

5. The *May* Plaintiffs object to several portions of my declaration, claiming that I have provided insufficient citations for my conclusions. *See* Pls.' Evidentiary Objections to Rivas Decl. ¶¶ 4, 7-10, 13-16, 19-21, *May v. Bonta* Dkt. No. 29-2. To the extent that Plaintiffs raise this objection to the sections of my

declaration that summarize my conclusions (*see id.* ¶¶ 9, 13, 20-21; *see also* Rivas Decl. ¶¶ 57, 62, 76, 82), they misunderstand scholarly writing practice. These portions of my declaration do not quote directly from other sources, but rather discuss and explain the numerous historical sources and evidence that I cite to throughout my declaration. The expert analysis and opinions that I provide in Paragraphs 57, 62, 76, and 82 of my declaration are properly grounded in these sources and evidence.

6.    The *May* Plaintiffs' claim that I provided "no citation" in support of Paragraphs 67 and 75 (*see* Pls.' Evidentiary Objections to Rivas Decl. ¶¶ 15, 19, *May v. Bonta* Dkt. No. 29-2) is inaccurate. Both of these paragraphs contain, and are soundly based upon, several citations to the historical record.

7.    Similarly, the *May* Plaintiffs' claim that I cited only to my own scholarship in support of my statements in Paragraph 56 (*see id.* ¶ 8) is also untrue. In addition to my own publication, I also cited to John Thomas Shepherd's law review article, "Who is the Arkansas Traveler," in support of the statements made in this Paragraph. *See* Rivas Decl. ¶ 56, n.98.

8.    The *May* Plaintiffs also object to my statement in Paragraph 36 of my declaration, that "[b]y the Civil War Era, the carrying of concealed weapons was more common than it had been in the eighteenth century, and pocket-sized pistols were more readily available to consumers." *See* Pls.' Evidentiary Objections to Rivas Decl. ¶ 4, *May v. Bonta* Dkt. No. 29-2. But this statement is clearly supported by the historical evidence set forth in my declaration, including but not limited to evidence of the influx of less expensive pistols throughout the country following the expiration of Samuel Colt's patent on his revolver design in 1857. *See* Rivas Decl. ¶ 43; *see also* Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 56 (stating that few eighteenth-century Americans owned handguns).

9. Further, the *May* Plaintiffs object to my high-level discussion of the development of transportation infrastructure in the nineteenth-century United States, set forth in Paragraph 65 of my declaration, by claiming that these statements are not supported by sufficient citations. *See* Pls.' Evidentiary Objections to Rivas Decl. ¶ 14, *May v. Bonta* Dkt. No. 29-2. To clarify, these statements were drawn from knowledge that I have gained from reading numerous peer-reviewed books and articles in the course of my historical scholarship, as well as from the research I conducted in preparing my declaration in these cases (particularly sources pertaining to colonial Philadelphia). Additional readings related to river and rail transportation in the United States which I have read include but are not limited to: Michael Allen, *Western Rivermen, 1763-1861: Ohio and Mississippi Boatmen and the Myth of the Alligator Horse* (Baton Rouge: Louisiana State University Press, 1990; Bonnie Stepenhoff, *Working the Mississippi: Two Centuries of Life on the River* (Columbia: University of Missouri Press, 2015); Richard White, *Railroaded: The Transcontinentals and the Making of Modern America* (New York: W.W. Norton, 2011); for general histories of the United States that discuss transportation, see Daniel Walker Howe, *What Hath God Wrought: The Transformation of America, 1815-1848* (New York: Oxford University Press, 2007); and Richard White, *The Republic for Which It Stands: The United States during Reconstruction and the Gilded Age, 1865-1896* (New York: Oxford University Press, 2015).

10. Finally, the *May* Plaintiffs object to several sections of my declaration that relate to historical appellate cases by attempting to characterize them as "legal argument." *See* Pls.' Evidentiary Objections to Rivas Decl. ¶¶ 6, 11, 12 and 18, *May v. Bonta* Dkt. No. 29-2. However, I do not purport to provide legal arguments or opinions regarding these historical appellate cases; rather, I treat them as primary sources that provide firsthand accounts of how American gun laws were understood and interpreted at the time they were in effect. In the instances where I discussed

historical appellate cases in my declaration, they formed a crucial part of the history which I described and analyzed. Using such historical legal opinions as primary sources is a proper historical practice.

## II. RESPONSE TO STATEMENTS MADE IN CLAYTON CRAMER'S REBUTTAL DECLARATION FILED IN SUPPORT OF *MAY* PLAINTIFFS' REPLY

11. In two important respects, the *May* Plaintiffs' declarant, Clayton Cramer, concurs with the opinions and conclusions set forth in my declaration. First, Cramer is in agreement that the 1753 Philadelphia mayoral proclamation—which mandated that no person carry any unlawful weapon and indicates that the Statute of Northampton was in effect in colonial Philadelphia—"might well be tradition." *See* Clayton Cramer Rebuttal Decl. ¶ 112, *May v. Bonta* Dkt. No. 29-15. Second, in Paragraph 41 of my declaration, I cited to *State v. Smith* (1856) as evidence that partially concealed weapons were considered violations of Louisiana's then-existing concealed carry law; notwithstanding Cramer's objections to my analysis, he did agree that "carrying fully or even partially concealed [weapons] was illegal." *Id.* ¶ 136.

12. Despite his concurrence with the foregoing points, Cramer raises several purported criticisms of my declaration, which I address below.

### A. Cramer's Statements Regarding Historical Appellate Cases

13. Cramer takes issue with quotations that I used from cases *State v. Huntley* and *State v. Smith*, even claiming that I "quote[d] out of context" from *Huntley*. *See* Clayton Cramer Rebuttal Decl. ¶¶ 132-136, *May v. Bonta* Dkt. No. 29-15. A quotation taken directly from a source document is not "out of context" when it accurately represents the viewpoint of the original statement. The plain language of *Huntley* shows that the court understood the right to bear arms as extending to the carrying of firearms for specific purposes, but not "as one of his every day accoutrements—as a part of his dress," or "as an appendage of manly equipment." *See* Rivas Decl. ¶ 41, n.63.

14. In my declaration, I consulted various historical appellate cases as one of several types of primary sources that help us understand the views, customs, practices, beliefs, and behaviors of the people who lived during that era. Cramer, on the other hand, engages in a narrow reading of appellate cases, often focusing exclusively on a single line or passage and missing the bigger picture as a result.

15. Cramer's statements regarding the case of *Wright v. Commonwealth* (an appellate decision which I did not discuss in my report) illustrate this point. The takeaway from the *Wright* case is that a concealed-carry law, constitutionally challenged as obnoxious to the Pennsylvania constitution's right to bear arms, was upheld as constitutional by the state supreme court. Cramer recounts the setting and disposition of the case and then focuses upon phrases within this short opinion and its headnotes, ultimately positing an unanswerable question about whether that court considered carrying a weapon concealed to be prima facie evidence of malicious intent. *See* Clayton Cramer Rebuttal Decl. ¶¶ 120-122, *May v. Bonta* Dkt. No. 29-15. This question is unanswerable because it is not addressed in the opinion, as the jury found the defendant not guilty. We cannot know if the jury decision rested upon the defendant's proving that he *had not* actually concealed the weapon, or that he *had not* carried it with malicious intent. But we can take away from the case that the defendant engaged in a behavior that at least appeared to violate the law, that he subsequently convinced a jury that he was not guilty of such criminal behavior, and that the state supreme court upheld the challenged statute as constitutional.

16. None of Cramer's statements regarding *Wright v. Commonwealth* undermine the evidence presented in my declaration, nor do they rebut the portion of my declaration which Mr. Cramer claims that they do. Paragraph 36 of my declaration describes certain weapon regulations that were enacted in Philadelphia in the nineteenth century; it does not make claims about concealment of weapons as prima facie evidence of malintent. *See* Rivas Decl. ¶ 36. Furthermore, *Wright v.*

*Commonwealth* involved a public carry law that was not in effect in Philadelphia, but rather in in Schuylkill County, Pennsylvania.

17. Moreover, Cramer's rebuttal declaration contains significant misreadings of certain historical appellate cases. One striking example is his handling of nineteenth-century Texas history and *English v. State*. *See* Clayton Cramer Rebuttal Decl. ¶ 138, *May v. Bonta* Dkt. No. 29-15. Cramer holds up *Cockrum v. State* (1859) as a guiding precedent over *English v. State* (1872), when in fact it was decided under a different constitution and in regard to a sentence enhancement for manslaughter committed by bowie knife (not a public carry law). Moreover, the author of the *Cockrum* opinion later led the state high court during its hearing of *State v. Duke* (1875), which (like *English*) upheld the constitutionality of the deadly weapon law.

18. Cramer also claims that I "ignore[d] *English*'s incorrect blaming the Texas arms provision's origin on Mexicans." *Id.* ¶ 139. In making this claim, Cramer seems to erroneously read a portion of the opinion as attributing the weapon regulations of 1870 and 1871 to Texas's Hispano-Mexican heritage. In fact, that portion of the opinion responds to one of three arguments mounted against the challenged statutes (a public carry law and a sensitive places law): that they violated the customs of the people of Texas. Judge Moses Walker's words in the *English* opinion point to a low view of the Hispano-Mexican legacy in Texas, but he connected its influence to *weapon-carrying*, not weapon regulation. The bigoted and racist sentiments of historical Americans are rightfully viewed as deplorable from our modern perspective, but sifting through such material with the guidance of quality historical scholarship is an important part of the historian's task. Cramer seemingly reads and attempts to analyze legal opinions in a vacuum, divorced from their context and without such guidance from appropriate secondary sources. As a result, he errs in his reading of *English*.

19. Cramer's objection to my review of historical appellate cases also reaches to travel-related cases, again focusing narrowly on particular phrases and missing the bigger picture. For example, Cramer objects to my description of *Eslava v. State* and its import. *See* Clayton Cramer Rebuttal Decl. ¶¶ 145-147, *May v. Bonta* Dkt. No. 29-15. In my declaration, I stated that the *Eslava* decision described the traveler exception as only applying outside of organized towns and cities, meaning that it did not apply to everyday, intracity transportation. *See* Rivas Decl. ¶ 59. In response, Cramer focuses upon a single sentence from the opinion: that the man charged with carrying unlawfully did not deposit his guns upon arriving in town or adjust the manner of wearing them (from concealed to open carry). *See* Clayton Cramer Rebuttal Decl. ¶ 146, *May v. Bonta* Dkt. No. 29-15. However, this point does nothing to rebut or contradict the opinions set forth in Paragraphs 56-62 of my declaration, which explain how nineteenth-century courts interpreted travel exceptions.

20. Finally, regarding the case *Carr v. State* (1879), Cramer focuses only upon the fact that the case was reversed and remanded because the guns carried by the defendant were unloaded and inoperable, rather than what the case had to say about the scope of the traveler exception. *See* Clayton Cramer Rebuttal Decl. ¶ 144, *May v. Bonta* Dkt. No. 29-15. Again, nothing in Cramer's declaration negates the *Carr* court's holding that "[t]ravelers do not need weapons, whilst stopping in towns, any more than citizens do." Rivas Decl. ¶ 59.

**B. Cramer's Statements Regarding Evidence Cited in my Declaration**

21. In addition, Cramer repeatedly misconstrues evidence presented in my declaration. For example, Cramer appears to believe that I invoked the 1725 South Carolina ferry law as an example of a historical gun regulation. *See* Clayton Cramer Rebuttal Decl. ¶ 150, *May v. Bonta* Dkt. No. 29-15. I did not. In fact, plaintiffs invoked that law in an attempt to support their position that carrying weapons aboard public transportation was common at the time of the Founding.

My discussion of the law in question sought to place it within its regional and political context. In doing so, I offered a *potential explanation* for why ferry operators were mandated not to charge armed men in times of emergency, not a positive argument about whether firearms were carried aboard ferries during times of peace. *See* Rivas Decl. ¶ 64. Cramer appears to believe that a "formal logic term" can highlight some fallacy on my part, when in fact it is Cramer who makes the redundant argument that not charging armed men to ride the ferry during emergencies necessarily means that armed men rode the ferry. Of course, this sheds absolutely no light on the question that matters—whether carrying weapons aboard ferries was common—because the no-charge rule only applied during *emergencies* when such arming was a matter of communal security. This is another point that I made in my declaration: that the law does not indicate "that customers carried weapons on their person in times of peace." *Id.*

22. Cramer also raises the point that laws authorizing railroad police do not in and of themselves limit the rights of train passengers to carry weapons. *See* Clayton Cramer Rebuttal Decl. ¶ 158, *May v. Bonta* Dkt. No. 29-15. I did not introduce the subject of railroad police in an effort to make that assertion. Rather, I explained that the authorization of railroad police demonstrates that nineteenth-century Americans understood laws and statutes (including public carry laws) to apply aboard trains. *See* Rivas Decl. ¶ 68.

### C. Cramer's Statements Regarding the Statute of Northampton

23. Cramer suggests that the Statute of Northampton and common law precedent regarding the carrying of weapons were not in effect in the nineteenth-century United States. *See* Clayton Cramer Rebuttal Decl. ¶¶ 128-129, *May v. Bonta* Dkt. No. 29-15. He is mistaken.

24. The fact that Francois Xavier Martin (who, according to Cramer, was tasked with compiling all British laws that may have effect in North Carolina, *see* Clayton Cramer Rebuttal Decl. ¶ 129, *May v. Bonta* Dkt. No. 29-15) included the

Statute of Northampton in his compilation indeed proves its efficacy. Cramer also points to the court in *Huntley* (1843) rejecting the Statute of Northampton as good law in North Carolina as a result of state legislation dating to 1838 that abandoned English common law. *Id.* ¶ 135. But headnotes from the case state that "[t]he offence of riding or going armed with unusual and dangerous weapons, to the terror of the people, is an offence at common law, and is indictable in this State."[1] The *Huntley* court may have read the 1838 legislation to replace the Statute of Northampton itself, but it did not reject the common law tradition regarding the restriction of weapon carrying that derived from the Statute of Northampton.

25. This evidence from North Carolina's *Huntley* decision supports the notion that Americans absorbed into their law and legal practice the common law traditions regarding weapon-carrying, which were most succinctly encapsulated in the Statute of Northampton. Moreover, I quoted a Tennessee statute from 1801 which used very similar language to the Statute of Northampton, and reviewed the "Massachusetts Model" laws that did much the same. *See* Rivas Decl. ¶¶ 40 n.59. Finally, the 1753 Philadelphia mayoral proclamation that opened the market days (*id.* ¶ 18) used language quite similar to the Statute of Northampton. As previously noted, Cramer's rebuttal declaration concedes that "[t]his might well be tradition." *See* Clayton Cramer Rebuttal Decl. ¶ 112, *May v. Bonta* Dkt. No. 29-15.

**D.  Cramer's Statements Regarding UPRR Special Agents**

26. Finally, Cramer points out that Paragraph 70 of my declaration was missing a footnote related to UPRR special agents. *See* Clayton Cramer Rebuttal Decl. ¶ 161, *May v. Bonta* Dkt. No. 29-15. The information regarding the Federal Bureau of Investigation's 1950 correspondence comes from the Union Pacific Railroad Collection housed at the California State Railroad Museum Library and Archives. The following text should have been included in a footnote: "Firearms

---

[1] *State v. Huntley*, 25 N. C. 418 (1843). This sentence from *Huntley*'s headnotes was subsequently quoted in *Roten v. State*, 86 N. C. 701 (1882).

Records," MS 54, Box 3, Folder 1, Union Pacific Railroad collection. California State Railroad Museum Library and Archives.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 7, 2023, at Fort Worth, Texas.

*Brennan Gardner Rivas*
Dr. Brennan Gardner Rivas

## CERTIFICATE OF SERVICE

Case Names:   *Reno May, et al. v. Robert Bonta, et al.;*
*Carralero, Marco Antonio, et al. v. Rob Bonta*

Case Nos.   **8:23-cv-01696-CJC (ADSx); 8:23-cv-01798-CJC (ADSx)**

I hereby certify that on December 7, 2023, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**SUR-REBUTTAL DECLARATION OF DR. BRENNAN RIVAS IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on December 7, 2023, at San Francisco, California.

| Vanessa Jordan | *Vanessa Jordan* |
|---|---|
| Declarant | Signature |