ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
TODD GRABARSKY
JANE REILLEY
LISA PLANK
ROBERT L. MEYERHOFF
Deputy Attorneys General
State Bar No. 298196
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013-1230
 Telephone:  (213) 269-6177
 Fax:  (916) 731-2144
 E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Rob Bonta, in his Official Capacity as*
*Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RENO MAY, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of the State of California, and Does 1-10,**<br><br>Defendants. | Case Nos. 8:23-cv-01696 CJC (ADSx)<br>8:23-cv-01798 CJC (ADSx)<br><br>**SUR-REBUTTAL DECLARATION OF PROF. ADAM WINKLER IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION**<br><br>Date:          December 20, 2023<br>Time:          1:30 p.m.<br>Courtroom:   9B<br>Judge:         Hon. Cormac J. Carney<br>Action Filed: September 15, 2023 |
| **MARCO ANTONIO CARRALERO, an individual, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROBERT BONTA, in his official capacity as Attorney General of California,**<br><br>Defendant. | |

**SUR-REBUTTAL DECLARATION OF PROF. ADAM WINKLER**

Pursuant to 28 U.S.C. § 1746, I, Adam Winkler, declare and state as follows:

1.     I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration and testify based on my personal knowledge and information.

2.     I have been retained by the Office of the Attorney General for California as a historical and constitutional expert on Second Amendment matters. I also have expertise in legal history and its multiple uses in adjudicating constitutional questions.

3.     I previously provided a declaration in the above-captioned matters in support of the State of California's opposition to the plaintiffs' motions for preliminary injunction.  *See* Decl. of Prof. Adam Winkler, *May v. Bonta*, C.D. Cal. No. 8:23-cv-01696 CJC (ADSx) (Dkt. No. 21-12); *Carralero v. Bonta*, C.D. Cal. No. 8:23-cv-01798 CJC (ADSx) (Dkt. No. 20-12).

4.     I have been asked by the Office of the Attorney General to review and provide an expert opinion regarding some of the statements made in the plaintiffs' reply briefs and supporting documents in these matters.  *May* Dkt. Nos. 29, 29-1, 29-14, 29-15; *Carralero* Dkt. No. 29.  I have reviewed those briefs and documents, and have prepared this sur-rebuttal declaration in response.

5.     Although Plaintiffs and their declarant Clayton Cramer generally dispute the breadth of many historical restrictions on the carrying of firearms in sensitive places, the plain meaning of those statutes, is clear—they prohibited the carrying of arms in broad categories of places, including public assemblies.  To give some examples:  Tennessee in 1869 prohibited the carrying of arms "concealed or otherwise" at "any fair, race course, or *other public assembly of the people*." 1869 Tenn. Pub. Acts 23 (emphasis added).  Georgia in 1870 prohibited the carrying of deadly weapons "to any court of justice, or any election ground or precinct, or any place of public worship, or *any other public gathering* in this State, except militia

1    muster-grounds." 1870 Ga. Laws 421 (emphasis added). Texas's 1870 law barred

2    the carrying of firearms in a wide range of sensitive places, including churches,

3    schools, "or other place where persons are assembled for educational, literary or

4    scientific purposes, or into a ballroom, social party or other social gathering

5    composed of ladies and gentlemen." 1870 Tex. Gen. Laws 63. Missouri's 1879

6    sensitive places law went even further than Texas, prohibiting the carrying of

7    firearms into churches, schools, and "any . . . place where people are assembled for

8    educational, literary or social purposes . . . or into *any other public assemblage of*

9    *persons met for any lawful purpose*, other than for militia drill or meetings called

10    under the militia law of this state . . . ." 1879 Mo. Laws 224 (emphasis added).

11       6.    Cramer criticizes any reliance on the Statute of Northampton as rejected

12    by *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), but he

13    misunderstands why that law is relevant in analyzing historical laws restricting

14    firearms in sensitive places. *See* Clayton Cramer Rebuttal Decl. ¶¶ 166-172. One

15    reason the Court refused to rely heavily on the Statute was because it was unclear

16    which types of weapons were covered by the law. *Bruen*, 142 S. Ct. at 2140

17    (expressing uncertainly whether the Statute applied beyond armor to offensive

18    weapons like launcegays). What is unambiguous about the Statute of Northampton,

19    however, is the special concern it shows for sensitive places like "fairs" and

20    "markets." Regardless of which weapons it covered, the law clearly imposed

21    special limits on the possession of them in these places of public gathering.

22    Individuals were lawfully able to wear or carry the covered weaponry or armor

23    elsewhere in public but explicitly prohibited from doing do in fairs and markets.

24       7.      Cramer correctly notes that my earlier declaration mistakenly cited

25    1857, not 1836, as the date of Colt's patent on the revolver. Cramer Rebuttal Decl.

26    ¶ 175. What my earlier declaration meant to say was that Colt's revolver patent

27    *expired* in 1857. The result was that legal limits on copying his popular design

28    were lifted and numerous other gun manufacturers began selling the firearm. *See*

Sur-Rebuttal Declaration of Adam Winkler
(Case Nos. 8:23-cv-01696 and 8-23-cv-01798)

1  Lee A. Silva, "Sam Colt's Big Business Blunder Was a Boon to Other Gunmakers,"

2  *Wild West* (February 2013), at p. 68 (attached hereto as **Exhibit A);** WILLIAM

3  HOSLEY, COLT: THE MAKING OF AN AMERICAN LEGEND 47 (1996) ("With the

4  expiration of Colt's patent in 1857, a rash of imitators [including Remington, Josyln

5  Arms Company, and Starr Arms] . . . all entered into competition with Colt's.")

6  (attached hereto as **Exhibit B**).

7       8.     What Cramer seems to ignore is the point of referring to Colt's patent

8  in the first place:  that after the Civil War, the popularity of personal firearms rose

9  dramatically, spurring concerns about gun violence and with it gun safety

10  legislation.  Gun manufacturers that had ramped up production capacity to support

11  the war effort turned to the civilian market once the war ended.  By the end of the

12  1870s, numerous gunmakers were producing abundant cheap revolvers, marketing

13  them through mail order catalogues and newspapers, and selling them at low cost to

14  consumers.  See Robert J. Spitzer, *Understanding Gun Law History After Bruen:*

15  *Moving Forward By Looking Back*, 51 FORDHAM URB. L.J. 57, 81-82 (2023).

16  Prices plummeted, and whereas Colt's initial revolvers sold for a then-expensive

17  $35, by 1900 the two-dollar pistol was commonplace.  *Id.* at 81.

18       9.     Cramer's contention that only pre-1868 laws are relevant fails to

19  account for constitutional history.  Prior to the ratification of the Fourteenth

20  Amendment, which incorporated the Bill of Rights to the states, state and local

21  governments were not bound by the Second Amendment. *See Barron v. Baltimore*,

22  32 U.S. 243 (1833).  Laws adopted at the state level prior to 1868 did not reflect the

23  original public understanding of governmental authority under the Second

24  Amendment.  It was only after the Fourteenth Amendment was adopted that state

25  lawmakers had any reason to concern themselves with the meaning and scope of the

26  Second Amendment.  Thus, laws adopted immediately after the Fourteenth

27  Amendment's ratification—such as the aforementioned sensitive places laws of

28  Tennessee, Georgia, Texas, and Missouri—are strong evidence of the original

1    public understanding of government authority over firearms once the Second

2    Amendment was binding on the states. Unlike earlier state laws, these sensitive

3    places restrictions were enacted with the Second Amendment in mind.

4         10.    While Cramer characterizes as "irrelevant" that no court in the

5    nineteenth century held sensitive places legislation unconstitutional under the

6    Second Amendment or similar state constitutional guarantees, he does not dispute

7    this historical fact.  Cramer Rebuttal Decl. ¶ 182.

8

9         I declare under penalty of perjury under the laws of the United States of

10   America that the foregoing is true and correct.

11        Executed on December _4_, 2023, at _Orien Losangeles, CA._

12

13

14                                        _____

                                          ADAM WINKLER

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# Sam Colt's Big Business Blunder Was a Boon to Other Gunmakers

*He turned down Rollin White's offer, transforming the firearms world*   By Lee A. Silva

**D**uring the shoot-'em-up days of the last half of the 1800s there were plenty of newspaper articles and pulp fiction stories written that described an Old West gunman reaching for his trusty Colt revolver. But you can bet your bottom dollar that there were never any words written about a gunman reaching for his trusty Rollin White revolver. And therein lies one of the strangest and most ironic true stories of the American firearms industry.

For centuries the three major components that were needed to fire a projectile from a gun—the lead ball, the powder charge and the ignition system (first flintlock and then percussion cap) that provided the spark to ignite the powder charge—all had to be loaded into the gun separately. So most guns were single-shot or double-barreled.

But in 1836 Samuel Colt was granted a U.S. patent for a cap-and-ball pistol with a revolving cylinder that could fire five or six shots before it had to be reloaded. Even after an initial production failure, with a patent extension Sam Colt ended up owning the exclusive right to manufacture cap-and-ball revolvers in the United States until his patent expired in 1857. Especially during the California Gold Rush days, no man on the frontier was considered to be properly armed unless he carried one or two of Colt's revolvers. And with a giant new factory in Hartford, Conn., cranking out revolvers by the thousands, by the middle 1850s Sam Colt had become one of the wealthiest manufacturers in the country.

In the meantime, during the 1850s the race was on in both the United States

and Europe to develop what was called the "self-contained cartridge"—a metal "sleeve" that could be loaded into the open breech of a gun with the powder, ball and ignition source already sealed inside the sleeve for instant loading and firing. But the metal sleeve would take several years of experimentation and failure before it would become the common cartridge of today.



**The Smith & Wesson .41-caliber Volcanic pistol.**

ROCK ISLAND AUCTION CO.

Enter a young gunsmith named Rollin White, born in 1818, who went to work in Sam Colt's revolver factory in 1849. White was also an inventive tinkerer. Loyal to Colt, he even paid the factory $18.50 in 1852 for a revolver to experiment with in order to create a workable cartridge revolver. And then he quit the Colt factory in December 1854.



**The .22-caliber Rollin White–marked revolver.**

NATIONAL FIREARMS MUSEUM

On April 3, 1855, Rollin White was granted a U.S. patent for his newfangled cartridge revolver. Whereas Sam Colt's

revolver patent had been granted specifically for a cap-and-ball revolver cylinder with chambers that weren't bored all the way through it, the key to White's new patent was that it was granted for a revolver cylinder with chambers that *were* bored all the way through so that "cartridges" could be inserted into the open back ends of the chambers. It was an act of fate that, out of all the other gunsmiths who were trying to perfect a workable cartridge revolver, it was Rollin White who had first applied for a patent on a revolver cylinder with the simple innovation that its chambers were open from end to end. And now, still loyal to Colt, White offered to sell Colt the exclusive rights to produce cartridge revolvers in the United States. Legend has Sam Colt throwing White out of his office in anger for developing his cartridge-revolver patent on Colt company time. But a future patent-infringement lawsuit by White against another firearms maker merely notes, "After the said patents were granted, he [White] applied to and endeavored to make some arrangements with Col. Colt to manufacture arms on the plan of his said inventions, but without success."

And so, for whatever his reasons, Sam Colt flatly turned down Rollin White's offer to sell him the rights to manufacture cartridge revolvers until White's patent expired in 1869. The stage was now set for one of the most bizarre chain of events in the history of the American firearms industry.

Over in Norwich, Conn., gunsmiths Horace Smith, Daniel Wesson and B. Tyler Henry had been working on a contrary, years-old, tubular magazine, lever-action, repeating rifle mechanism

that fired a special self-contained cartridge developed by Wesson. In 1854 this mechanism became Smith & Wesson's first pistol, made in .31- and .41-caliber sizes, and it is known today as the Smith & Wesson lever-action Volcanic pistol. About 1,700 were produced before Smith & Wesson sold out its interest in them in 1855.

And on November 17, 1856, Smith & Wesson signed an agreement with Rollin White that gave it, not Colt, exclusive rights to manufacture cartridge revolvers in the States until White's patent expired in 1869.

After the Volcanic Co. went bankrupt in 1857, its biggest investor, Oliver Winchester, inherited the company and its assets and moved it to New Haven, Conn. He kept B. Tyler Henry working on its balky lever-action mechanism, and in 1862 the .44-caliber, 15-shot Henry repeating cartridge rifle became an instant hit on the frontier. And the Henry, in turn, evolved into the first Winchester, the Model 1866.

In 1868 the venerable old Remington factory, having overbuilt its production facilities during the Civil War, made a deal with Smith & Wesson to produce 5,000 Army Model cartridge revolvers in .46 caliber. These Remingtons became the first large-caliber cartridge revolvers produced in the United States, and they also temporarily saved the Remington Arms Co. from bankruptcy.

Always undercapitalized, Smith & Wesson started out slowly in its small plant in Springfield, Mass, producing a .22-caliber Model No. 1 revolver beginning in 1857, and the .32- caliber rimfire Models No. 2 and No. 1 1/2 in 1861 and 1865. But Smith & Wesson would not make a big-caliber cartridge revolver, the .44-caliber Model No. 3 American, until 1870, after the Rollin White patent expired.

150 years later we can only speculate on what might have been.

But one thing is certain: If Sam Colt had bought the rights to Rollin White's patent for cartridge revolvers, there would never have been a Smith & Wesson revolver company.

And it is probable: If Colt had sauntered over to the financially strapped Volcanic Co. in New Haven and laid some cash on the frustrated Oliver Winchester before the Henry rifle was perfected, Colt could have ether shut down the factory or produced his own Colt lever-action repeating rifles. And there never would have been a Winchester rifle company.

Also probable: If Colt had bought Rollin White's patent for cartridge revolvers, he probably wouldn't have assigned the rights to Remington to produce its first cartridge revolvers. And Remington might have gone bankrupt years earlier than it finally did.

In 1861, with Smith & Wesson's permission, Rollin White produced about 5,000 .22-caliber cartridge revolvers with his own name on them for the war effort. For 10 years he tried in vain to get a patent extension granted to him for his exclusive rights to produce cartridge revolvers. But he died in firearms history obscurity in 1892.

Samuel Colt died in 1862 without knowing that he had inadvertently created two of the biggest U.S. firearms makers of the 19th century, Smith & Wesson and Winchester, and prolonged the life of a third one, Remington.

In the late 1860s the Colt factory tried to get permission from Smith & Wesson to produce cartridge revolvers. Not surprisingly, Colt was turned down. It was not until 1873, four years after Rollin White's patent for cartridge revolvers expired in 1869, that Colt began producing what became the most popular cartridge six-shooter of the Old West, the Single-Action Army Model. ww

## An American Firearms Family Tree

| Colt (Cap-and-ball period) | Remington (Flintlock and cap-and-ball period) | (Experimental cartridge period) | |
|---|---|---|---|
| **1836** Paterson model | **1816** Founded | **1848** Walter Hunt patents his bullet | |
| **1842** Bankruptcy | 1816 to 1857 Single-shot pistols and rifles produced | **1849** Walter Hunt patents his rifle | |
| **1847** Walker model | | **1850** Jennings rifles | |
| **1848** Dragoon model | | **1851** Smith-Jennings rifles | |
| **1849** Patent extension | | | |
| **1850** Navy model | | **1854 Smith & Wesson lever-action pistols** | |
| **1855** Root model | | **1855** Volcanic Arms Co. | |
| **Colt refuses Rollin White's cartridge-revolver patent** | | | |
| | | **(Early cartridge period)** | |
| | | **Smith & Wesson revolvers** | **Winchester lever-action rifles** |
| **1857** Colt's cap-and-ball-revolver patent expires | **1857** First revolver produced, Beal's pocket model | **1856 Smith & Wesson buys Rollin White's cartridge-revolver patent** | |
| **1858** Pocket model of Navy caliber | **1860** Beal's Army, Navy and Rider models | **1857** First cartridge revolver produced, Model No. 1 | **1857** New Haven Arms Co. |
| **1860** Models 1860, 1861 and 1862 | **1861** Civil War begins | **1861** Civil War begins Model No. 2 introduced | **1861** Civil War begins |
| **1861** Civil War begins | **1862** 1861 models | **Rollin White–marked revolvers** | **1862** Henry rifle |
| **1865** Civil War ends | **1863** New model revolvers | **1865** Civil War ends Model 11/2 introduced | **1865** Civil War ends |
| **1868** Theur front-loading cartridge conversions | **1865** Civil War ends | **1868 Allows Remington to make large-caliber cartridge revolvers** | **1866 Winchester Model 1866** |
| **(Cartridge period)** | **(Cartridge period)** | | |
| **1871** First conversions to cartridge revolvers | **1868 Remington produces first large-caliber cartridge revolver by permission of Smith & Wesson** | **1869 Rollin White patent expires** | |
| **1872** 1872 Open-top model | **1869** .44-caliber conversions | **1870** No. 3 American .44 caliber | **1873** Model 1873, .44 caliber |
| **1873** Single Action Army model .45 caliber | **1874** Frontier model, .44 caliber | | |

Copyright of Wild West is the property of Weider History Group and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.

# Exhibit B

# COLT

*The Making of an American Legend*

**William Hosley**



**University of Massachusetts Press, Amherst**

*Published in association with the Wadsworth Atheneum, Hartford*

*In memory of Eileen (Tony) Learned (1908-1995). She embodied the qualities of self-sovereignty.*

*To Christine Ermenc, whose companionship, wisdom, and love are my constant inspiration.*

*To Hartford, Connecticut—the inner mounting flame of cantankerous old New England.*
*Its light is inextinguishable so long as memory endures.*

THE ROAD LESS TAKEN IS PAVED WITH LOVE.

Copyright © 1996 by The University of Massachusetts Press
All rights reserved
Printed in Canada

LC 96-24139
ISBN 1-55849-042-6 (cloth); 043-4 (pbk.)

Design and composition by *Group* C Inc New Haven/Boston
OK, CK, MK, FS, OK, ED
Set in Adobe Linotype Centennial
Printed and bound by Friesens Corporation

Library of Congress Cataloging-in-Publication Data
Hosley, William N.
Colt : the making of an American legend / William Hosley.
p.   cm.
Includes bibliographical references (p.   ).
ISBN 1-55849-042-6 (cloth : alk. paper). — ISBN 1-55849-043-4 (pbk. : alk. paper)
1. Colt, Samuel, 1814-1862.
2. Gunsmiths—Connecticut—Hartford—Biography.
3. Colt revolver—History.
4. Hartford (Connecticut)—History.
I. Title.
TS533.62.C65H67  1996
683.4'0092'2—dc20
[B]  96-24139
British Library Cataloguing in Publication Data are available.

*Page three:* Illustration from *Armsmear* depicting a variety of Colt firearms. Engraving by Nathaniel Orr.
Unless otherwise credited, all illustrated items belong to the Wadsworth Atheneum.

*Practically Perfect*

Cheney Brothers Silk Mills, devised a tube-fed, breech-loading rifle of his own that surpassed even the Henry rifle in speed and firepower. Patented in March 1860, the Spencer rifle contained a magazine of seven spring-fed metallic cartridges in a tube with a lever-action trigger guard that fed and ejected cartridges and empty cases at breakneck speed. With the financial backing of Charles Cheney, the Spencer Repeating Rifle Co. was incorporated in January 1862, with manufacturing based in the Chickering and Sons piano factory in Boston.[51]

The Spencer rifle could discharge seven bullets in twelve seconds, or twenty-one per minute and was renowned during the Civil War as the rifle that "was loaded on Sunday and fired all week." Maj. Gen. James H. Wilson field tested the Spencer, which he described as "the best fire-arm yet put into the hands of the soldier.... I have never seen anything else like the confidence inspired by it."[52] The Henry rifle and the Sharps rifle were also widely used during the war, contributing to Hartford's reputation as the center of firearms manufacturing in the United States.

In spite of the deadly effectiveness of the breech-loader and the tube-fed repeater as instruments of warfare, it was not the rifle but the revolver—especially the Colt revolver—that became synonymous in the popular imagination with "the fast gun." Although Colt himself claimed to have invented the revolver, the evidence suggests otherwise. The first U.S. patent revolver, Elisha Collier's revolving flintlock of 1813, was almost certainly known to Colt when he began dabbling in the design of chambered-breech, revolving pistols. Moreover, Colt's own collection of repeating firearms (fig. 24), the first assembled in the United States, contains specimens of

European and American make clustered around and predating the time of his own invention.

Nor was Colt's revolver the best or only design of its type. The British-made Adams and Deane double-action revolver, patented by Robert Adams in 1851, was in many ways a better gun.[53] With the expiration of Colt's patent in 1857, a rash of imitators, notably the Joslyn Arms Company's (Stonington, Connecticut) revolver of 1858, Savage and North's (Middletown, Connecticut) patent of 1859, the Starr Arms Company's (New York City) double-action revolver of 1859, the Remington Arms Company (Ilion, New York) solid-frame revolver patented in 1858, and a near duplicate of Colt's revolver manufactured by Rogers and Spencer in Utica, New York, all entered into competition with Colt's. But Colt created the market and retained a production advantage that earned his gun its status as the standard by which all others were judged. Design considerations aside, the convergence of myth and reality gained Colt's revolver a status that transcended the particulars of design during a period when Colt's design and engineering were never far behind and often ahead of all his direct competitors. By the time the *Hartford Times* reported that a "tailor in London has invented a waistcoat on the principle of Colt's revolver... a garment with four fronts," the association between Colt and the revolver had already entered the realm of mythology.[54]

Sam Colt never acknowledged his indebtedness to his predecessors or his competitors. Nor did he recognize the role of the Springfield Armory as an incubator of technological innovation in the arms industry. Even during his controversial feud with the Hartford Common Council, when he threatened to relocate to New York City,

*23. Model 1860 Henry Rifle, 1861, .44 caliber, 15-shot, serial #9, gold mounted and engraved as a presentation to President Abraham Lincoln from the New Haven Arms Co. (Courtesy of the National Museum of American History, Smithsonian Institution.)*



## CERTIFICATE OF SERVICE

Case Names:    ***Reno May, et al. v. Robert Bonta, et al.;***
               ***Carralero, Marco Antonio, et al. v. Rob Bonta***

Case Nos.      **8:23-cv-01696-CJC (ADSx); 8:23-cv-01798-CJC (ADSx)**


I hereby certify that on <u>December 7, 2023</u>, I electronically filed the following document with the Clerk of the Court by using the CM/ECF system:

**SUR-REBUTTAL DECLARATION OF PROF. ADAM WINKLER IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTIONS FOR PRELIMINARY INJUNCTION (with Exhibits A-B)**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished electronically by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct.

Executed on <u>December 7, 2023</u>, at San Francisco, California.


| | |
|---|---|
| Vanessa Jordan | *Vanessa Jordan* |
| Declarant | Signature |