1          **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION**

3        **HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

4
       RENO MAY, et al.,                    )
5                                           )
                        Plaintiffs,         )  **Certified Transcript**
6                                           )
            vs.                             )  Case Number:
7                                           )  8:23-cv-01696-CJC-ADS
       ROBERT BONTA, IN HIS OFFICIAL        )
8      CAPACITY AS ATTORNEY GENERAL         )
       OF CALIFORNIA                        )
9                                           )
                        Defendant.          )
10     _____ )
       MARCO ANTONIO CARRALERO, et al.;     )
11                                          )
                        Plaintiffs,         )  Case Number:
12     V.                                   )  8:23-cv-01798-CJC-ADS
                                            )
13     ROB BONTA, IN HIS OFFICIAL           )
       CAPACITY AS ATTORNEY GENERAL OF      )
14     CALIFORNIA,                          )
                                            )
15                      Defendant.          )
       _____ )
16

17

18           REPORTER'S TRANSCRIPT OF PROCEEDINGS
            MOTION FOR PRELIMINARY INJUNCTION
19            WEDNESDAY, DECEMBER 20, 2023
                     1:29 P.M.
20              SANTA ANA, CALIFORNIA

21

22

23     _____

              **DEBBIE HINO-SPAAN, CSR 7953, CRR**
24           FEDERAL OFFICIAL COURT REPORTER
            411 WEST 4TH STREET, ROOM 1-053
25               SANTA ANA, CA 92701
                 dhinospaan@yahoo.com


              **UNITED STATES DISTRICT COURT**

```
 1                    APPEARANCES OF COUNSEL:

 2   FOR MAY PLAINTIFFS:

 3           MICHEL & ASSOCIATES PC
             BY:  ALEXANDER ASCH FRANK, ESQ.
 4           180 East Ocean Boulevard
             Suite 200
 5           Long Beach, California 90802
             562-216-4444
 6           afrank@michellawyers.com

 7           MICHEL & ASSOCIATES P.C.
             BY:  KONSTADINOS T. MOROS, ESQ.
 8           180 East Ocean Boulevard
             Suite 200
 9           Long Beach, California 90802
             562-216-4444
10           kmoros@michellawyers.com

11   FOR CARRALERO PLAINTIFFS:

12           BENBROOK LAW GROUP, PC
             BY:  BRADLEY A. BENBROOK, ESQ.
13           701 University Avenue
             Suite 106
14           Sacramento, California 95825
             916-447-4900
15           brad@benbrooklawgroup.com

16           BENBROOK LAW GROUP, PC
             BY:  STEPHEN MICHAEL DUVERNAY, ESQ.
17           701 University Avenue
             Suite 106
18           Sacramento, California 95825
             916-447-4900
19           brad@benbrooklawgroup.com

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

```
 1                    APPEARANCES OF COUNSEL
                          (Continued):
 2

 3   FOR MAY AND CARRALERO DEFENDANTS:

 4          CAAG - Office of the Attorney General
            BY:  ROBERT LESLIE MEYERHOFF
 5          300 South Spring Street
            Suite 1702
 6          Los Angeles, California 90013
            213-269-6177
 7          robert.meyerhoff@doj.ca.gov

 8          CAAG - Office of the Attorney General
            BY:  LISA JANE PLANK
 9          455 Golden Gate Avenue
            Suite 11000
10          San Francisco, California 94102
            415-510-4445
11          Lisa.Plank@doj.ca.gov

12          CAAG - Office of the Attorney General
            BY:  JANE ELIZABETH REILLEY
13          455 Golden Gate Avenue
            Suite 11000
14          San Francisco, California 94102
            415-510-3879
15          Jane.Reilley@doj.ca.gov

16          CAAG - Office of the Attorney General
            BY:  TODD GRABARSKY
17          300 South Spring Street
            Suite 1702
18          Los Angeles, California 90013
            213-269-6044
19          todd.grabarsky@doj.ca.gov

20

21

22

23

24

25
```

1        SANTA ANA, CALIFORNIA; WEDNESDAY, DECEMBER 20, 2023

2                          1:29 P.M.

3                            - - -

4

01:29PM 5        THE COURTROOM DEPUTY:  Calling Item Number 2,

6    SACV-23-1696, Reno May, et al. vs. Robert Bonta, et al.;

7    SACV-23-01798, Carralero, et al. vs. Rob Bonta.

8              Counsel, please state your appearances.

9              MR. MOROS:  Konstadinos Moros on behalf of the May

01:30PM 10   plaintiff and specially appearing for the Second Amendment

11   Foundation.

12             THE COURT:  Sir.

13             MR. FRANK:  Alexander Frank for the May plaintiffs,

14   and also specially appearing on behalf of the SAF.

01:30PM 15             THE COURT:  Hello, sir.

16             MR. BENBROOK:  Bradley Benbrook for the Carralero

17   plaintiffs.

18             THE COURT:  Hello, sir.

19             MR. DUVERNAY:  Steve Duvernay for the Carralero

01:30PM 20   plaintiffs.

21             THE COURT:  Hello, sir.

22             MR. MEYERHOFF:  Robert Meyerhoff on behalf of the

23   Attorney General.

24             MR. GRABARSKY:  Todd Grabarsky for the Attorney

01:30PM 25   General as well.

```
        1                  THE COURT:  Hello, sir.

        2                  MS. REILLEY:  Jane Reilley for the Attorney General.

        3                  THE COURT:  Hello.

        4                  MS. PLANK:  Lisa Plank for the Attorney General.

01:30PM  5                  THE COURT:  Hello.

        6              I feel outgunned.  No pun intended.

        7              All right.  Well, I have the motion before me.  I

        8   have a few general questions that I think kind of apply to both

        9   sides, and then I'd like to hear from everybody.

01:31PM 10              The general question is -- I just like to understand

       11   from a context -- did the California Legislature or the

       12   Governor make any attempt or effort to analyze Bruen before

       13   SB 2 was enacted and is set to go into effect.

       14              And again, this is a general question.  I'm not so

01:31PM 15   sure it's relevant to the actual legal analysis, but I'm trying

       16   to understand the true purpose behind SB 2 in that it's geared

       17   towards concealed carry permit holders.  And are concealed

       18   carry permit holders the real source of the horrific problem of

       19   these mass shootings and school shootings?

01:32PM 20              And then another question I have is what are the

       21   public places that are left for concealed carry permit holders

       22   to carry their firearms or handguns in light of the scope of

       23   SB 2?

       24              And then here's one question that I know that is

01:32PM 25   part of the legal analysis of Bruen:  Is there any dispute
```

among the parties that the plain text of the Second Amendment

protects the plaintiff's right to carry and use their handguns

to protect themselves in public?

        All right.  Pretty general questions, but I thought

01:32PM the briefing on both sides was quite thorough and quite

helpful, and I appreciate it.  And everybody submitted their

historical analog; so I get that.

        So these questions, I know, are -- most of my

questions are really more big picture in context, but I'd like

01:33PM to understand it.

        Should I hear from the plaintiffs first?

        MR. FRANK:  Yes, Your Honor.  Should I approach?

        THE COURT:  Please.

        MR. FRANK:  So unsurprisingly, Your Honor, I

01:33PM prepared some remarks.  I'm going to address the Court's

questions before I proceed to that.

        Prior to entering, I conferred with the Carralero

plaintiff's counsel.  And because there's some overlap in what

we were seeking to enjoin, we've tentatively agreed to split up

01:34PM those issues to conserve time here today.  So there may be

things that you might expect me to hear about -- or my

co-counsel to talk about which may be a little bit of a left

wing -- or rather a left-field change, but with that, I'll

proceed.

01:34PM         So, to respond to the Court's first question, I

believe in the preamble to SB 2, there was some -- something to
the effect of we've researched and determined that SB 2 would
withstand scrutiny under *Bruen*.  They didn't say a whole lot
more than that.  And I remember when I read it myself, I
01:34PM thought, oh, that's interesting.  I'd like to see how to
build -- how that essentially converts the mere entirety of the
space outside the home into a sensitive place could comport
with the *Bruen* ruling.  Seems to be incongruous.

Be that as it may, I didn't see much in the
01:34PM legislative record on anybody's behalf, whether it was the
Attorney General or the state legislature or the Governor, to
actually dig into the historical analysis to see whether or not
SB 2 would withstand scrutiny under *Bruen*.  And by that, I mean
historical scrutiny.

01:35PM THE COURT:  Was there any public statements made by
the Governor or any of the proponents of SB 2 about *Bruen* and
whether it was a good decision or bad decision?

MR. FRANK:  There were.  I believe the Governor, in
no uncertain terms, expressed his displeasure with the Supreme
01:35PM Court.  I believe he said something to the effect of "this is
going to create chaos and how could it possibly be wise of the
Supreme Court to expand the right to be armed outside of the
home to the whole nation."  He -- I don't believe he had
anything positive to say about it at all.

01:35PM I believe shortly after the *Bruen* decision came down

1    in 2022, the Attorney General posted some official press

2    releases that announced that certain aspects of California law

3    were likely -- couldn't be reconciled with the Supreme Court

4    decision, and that specifically the good cause requirement

01:36PM 5    would have to be struck down because it was essentially the

6    same as the good cause requirement that the -- that was at

7    issue before the Supreme Court in *Bruen* was struck down.  He --

8    I don't believe the Attorney General used any language as

9    sharply critical as Governor Newsom did.

01:36PM 10    So going to the next question, the Court is correct,

11    that SB 2 regulates people who are lawfully carrying pursuant

12    to permits.  And that does create a strange question to ask

13    here, which is the State of California mandates that people go

14    through rather extensive vetting, you know.  You have to be a

01:36PM 15    nonprohibited person to get a permit to own a gun to lawfully

16    have possession of a firearm everywhere in the country,

17    especially in California.

18    And in addition to that, you have to take classes,

19    you have to pay, in which -- in some cases, exorbitant fees.

01:36PM 20    They're never less than a few hundred dollars.  And it begs the

21    question:  Well, if the utility of that permit with SB 2 in

22    place is brought to a near nullity, well, what's the point of

23    getting it?

24    And why is the State so concerned about preventing

01:37PM 25    people who have proven that they are not prohibited people?

1  And the people who have been willing to go through all the

2  hoops that the State has directed for them, why are we turning

3  this into a nullity for them?  We should be rewarding them.

4  They have a constitutional right to be armed outside the home

01:37PM  5  for self-defense.

6          And turning to the third question in which I think

7  I've probably answered to some degree, under my reading of

8  SB 2, it sure seems like there isn't much more than the

9  sidewalk left for somebody.  There are a couple provisions in

01:37PM 10  particular, particularly what's colloquially become known as

11  the vampire rule, which is the rule that provides that --

12  believe it's Subdivision (a)(26) of 2630, that creates a

13  default presumption on any commercial private property, which

14  is the vast sum of places where people actually spend their

01:38PM 15  time outside of their home, that carry is not okay.  And in

16  order to veto that default presumption, you have to post

17  signage.  Not a gigantic sign, but you have to make it clear,

18  and now people can carry.

19          We live in a -- in an area that's politically

01:38PM 20  diverse, and it's, you know, not going to surprise me to see

21  that hardly any of the places that I frequent don't have that

22  sign.

23          So this is a big problem.  This is a total inversion

24  of what it means to have a right to be armed outside the house

01:38PM 25  in public.  Most of the time when we're out in public -- I

mean, maybe I'm a bad exception because I'm an attorney and I
spend a lot of time in government buildings.

THE REPORTER:  I'm sorry, Counsel, can you slow
down, please.

01:38PM  MR. FRANK:  I can.  My apologies.

For most people what they think is the public space
is not the public space.  It's privately-owned commercial
property.  That's where most people spend most of their time.
Even office buildings most of the time are considered
01:39PM commercial property.

So the vast majority of places that people actually
are and presume that the right that *Bruen* recognized to be
armed outside of your home for self-defense are within the
scope of this one provision of SB 2, which is extraordinarily
01:39PM powerful.  And it's really no surprise that every jurisdiction
that's enacted a law like this, post-*Bruen*, has seen a Federal
District Court strike it down.  It effectively nullifies the
right that *Bruen* announced.

And then, when you look at all the other places that
01:39PM are specifically precluded under SB 2, it makes you scratch
your head and wonder, "Well, where can I do this?  I suppose
when I'm walking my dog outside on the public sidewalk or in my
car driving somewhere.  But the way that the law is written, I
really have to be careful about where I'm driving."
01:39PM Because if I'm driving to, say, meet a friend for

1    lunch and I do not plan on having any alcohol, if there's a

2    parking lot that's shared with an establishment that serves

3    alcohol on premises consumption, well, driving to that parking

4    lot and getting in my car is illegal.  So I might as well just

01:40PM 5    leave my gun at home.

6         I think there is definitely -- you can definitely

7    see the intent to nullify *Bruen* in certain subdivisions of

8    SB 2, particularly those two.

9         THE COURT:  Before you go to the last question, I

01:40PM 10   just take it from the briefs -- and you said that too, I think,

11   already -- you don't believe that SB 2 is going to mitigate,

12   reduce the horrific shootings that we see across the country.

13        All right.  So let's assume I agree with you.  Then

14   why do you think California legislature has enacted this law?

01:40PM 15   What's the purpose?

16        MR. FRANK:  I think it's animosity towards the

17   Second Amendment.  I think that there is -- you know, there's a

18   raging culture war in our country, and the Second Amendment is

19   one of the key battle zones of that culture war.  And it's no

01:41PM 20   surprise to me when I see elected representatives in our state

21   or any other states that skew politically the way the State

22   does, they announce that.  They think that not just *Bruen* is a

23   disaster decision, but that *Heller* was a disaster decision, it

24   was erroneously decided.

01:41PM 25        And the militia clause of the Second Amendment means

**UNITED STATES DISTRICT COURT**

1    that you're only allowed to have a gun in the context of the

2    malicious service.  There's been intransigence of that issue

3    since day one of the federalization of the right to bear arms

4    and that that hasn't abated.

01:41PM 5        So I really do think that California has -- at least

6    most of the elected representatives in the state of California

7    just have a barely concealed animosity for the right to bear

8    arms, and they think that -- they don't really draw much of a

9    distinction between, you know, an honest citizen with a firearm

01:42PM 10   and criminals who would do terrible things.

11       And it strains all -- it strains common sense for me

12   to, you know, to look at all the evidence that we have of all

13   the horrific carnage that unfortunately has been committed with

14   firearms in our society in recent memory, terrible mass

01:42PM 15   shootings, and think, well, this criminal violated every gun

16   law there is.

17       I mean, murder is already a crime, and clearly the

18   sign that said this is a gun-free zone didn't stop this

19   criminal from walking into a purportedly gun-free zone and

01:42PM 20   murdering strangers who were defenseless because they were

21   complying with the law that said they can't have a gun.  But,

22   clearly, that law didn't stop the mass murderer from entering

23   and taking an innocent life.

24       THE COURT:  These mass shootings, to your knowledge,

01:42PM 25   at least limited to California, any done by concealed carry

permit holders?

          MR. FRANK:  Not to my knowledge.  I'm aware that in some cases -- and probably more than some cases, the people who perpetrate mass shootings obtain their firearms illegally because they are not prohibited persons.  They lack the criminal record and, in most cases, seem to be demonstratively mentally ill, but for various reasons have slipped through the cracks in the health care system.  They can go pass a background check and they get a gun and do something horrible with it.

          But as far as concealed carry permit holders committing crimes, the data that I'm aware of is highly questionable, because in some cases the data, it lumps in -- it takes situations where people who have permits have been arrested for, say, DUI or for fraud or crimes that have nothing to do with violence and then uses these statistics to say that people who carry permits are X times more likely to commit crimes or commit crimes at a certain percentage.

          There's a famous study done by a well-known academic who often is an expert witness on behalf of state government Second Amendment cases.  And when you dig into the data, you say, okay, this data has been -- it's questionable.  The way that they have constructed this data clearly was to reach a predetermined conclusion, and that's to honestly and scientifically say, "What do we know about people who are

1    permit holders?"

2           To my knowledge, there's no data that says any

3    concealed carry permit holder in California or anywhere has

4    perpetrated a mass shooting.

01:44PM 5           THE COURT:  Now, you said it in a, quite frankly, a

6    little bit of a negative way, that you believe the legislators

7    have a hostility towards the Second Amendment.  Could you say

8    it in a positive way, that they feel in this modern day and age

9    that if you're not in the military, you're not in the police,

01:44PM 10   we should be pacifists and we shouldn't have -- it's not good

11   for our psyche, our morale to arm ourselves and defend

12   ourselves in public?

13          MR. FRANK:  I think that debate is as old as time.

14   And I can probably -- if I strain myself, I can -- I probably

01:45PM 15   don't have to actually strain myself.  There are reasonable

16   people on the opposite side of the political spectrum on this

17   issue who think that if we just had fewer guns, we'd be better

18   off.  I don't think these people are necessarily lying about

19   that.  I think it's a philosophical difference of opinion

01:45PM 20   about, you know, what is the proper approach to weapons in

21   society.

22          But I think in many cases there's a -- that point of

23   view, very often it doesn't leave enough space for the -- for

24   the legitimate concerns on the other side, which are that

01:45PM 25   people have a right to self-defense.  Some people think that's

**UNITED STATES DISTRICT COURT**

a God-given right.  Some people view it as foreign from the Constitution or from other humanistic principles.  It doesn't matter.

Most people would agree that people have a moral -- there's a moral -- it's morally legitimate to exercise self-defense even if that means killing in self-defense.  And whether that's inside your home or outside your home shouldn't make a difference.  And that's what the Supreme Court echoed in *Heller*, and that's what the Supreme Court echoed in *Bruen*.  It predates the Constitution.  Second Amendment codified a preexisting right, I believe was the language that Justice Scalia used.

So, yeah, it's hard --

THE REPORTER:  Counsel, slow down.

MR. FRANK:  My apologies.

It is a -- there's a limit to the charity to which I'm willing to extend because of the shear volume of noises coming from elected representatives that would like to see the Second Amendment be nullified.

THE COURT:  I want to confirm.  What's before me in effect is handguns; right?  We're not talking about assault rifles or machine guns?

MR. FRANK:  That's correct, Your Honor.  You cannot get a permit -- well, first of all, you can't own a machine gun in California.  That's been an awful long time and we're not

challenging that here today.  You cannot put an assault weapon

on a permit card.  Most restrictions will limit the number of

firearms you're allowed to have.

01:47PM

THE COURT:  It's pretty hard to conceal it on your

person.

MR. FRANK:  It is.  It is.

THE COURT:  So that -- because I understand there is

cases out there where that's being challenged.  That's not

before me.

01:47PM

MR. FRANK:  That's correct, Your Honor.

THE COURT:  The focus is just on handguns.

MR. FRANK:  Correct.  And if I recall, the

statute -- the concealed carry issue and statute might

reference handguns specifically.  I think it probably does.

01:47PM

But, yeah, there's obviously an issue with

concealing a rifle of any sort.  It's nearly impossible without

completely changing, you know, one's everyday clothes.

THE COURT:  I think I was the one who diverted you.

You were about ready to address my fourth question.

01:47PM

MR. FRANK:  Right.  The dispute over the plain text.

I believe in the State's briefing there was some argument to

the effect of -- and this goes to the question of how does the

*Bruen* test apply.  There's this language that courts have

interpreted as establishing a threshold inquiry about whether

01:48PM

the plaintiff's conduct is covered by the Second Amendment's

text.

          And I believe there were some -- at least as far as

some of the subdivisions that we're challenging here today,

there was some dispute as to whether or not plaintiffs have

01:48PM  passed the threshold inquiry, whether the Second Amendment

extends to carrying those particular places that we believe it

does and State believes it doesn't.

          But there really shouldn't be -- in my opinion, you

can't read -- you can't read *Bruen* and dispute that the plain

01:48PM  text doesn't -- is not implicated when we're talking about

carrying handguns in public.  I believe that the express

formulation under the *Bruen* opinion is that the conduct here is

carrying handguns in public.  It wasn't even carrying concealed

handguns in public, and it wasn't carrying handguns in most of

01:49PM  the places that people go in public; it was general.  And the

word "general" appears in *Bruen*.  We're supposed to define the

conduct at issue in this threshold inquiry generally.

          The State contends we don't.  The State thinks we

define it as narrowly as possible because that would help the

01:49PM  State.  But you can't reconcile that with the plain text under

*Bruen*.  It says we do this generally.  And the same issue here

is the same issue in *Bruen*.

          THE COURT:  All right.  What did you want to go

over?  You said you had --

01:49PM  25      MR. FRANK:  I feel like I've been up here a while.

1    I don't want to deny the Carralero counsel an opportunity to

2    address some of those same questions.  I'm happy to continue.

3    It's your courtroom, Your Honor.

4            THE COURT:  Whatever you want.  It's your record.

01:49PM 5            MR. FRANK:  I take it I'll have another opportunity

6    to come up here?

7            THE COURT:  You will.

8            MR. FRANK:  Thank you.

9            MR. BENBROOK:  Afternoon, Your Honor.

01:50PM 10            THE COURT:  Good afternoon, sir.

11            MR. BENBROOK:  Getting to your first couple of

12    questions about attempts to analyze *Bruen*, comply with *Bruen,*

13    and the true purpose of the law, I don't think there can be any

14    legitimate dispute that the true purpose of this law is to --

01:50PM 15    for the State legislature to thumb its nose at the Supreme

16    Court and the *Bruen* decision.  This is referred to generally by

17    many people as a *Bruen* response bill that many states had that

18    enacted.  And the response to *Bruen* is to say "We object.  We

19    don't like it, and we're going to do something about it."

01:50PM 20            *Bruen* established a general right to public carry.

21    You carry -- you can carry for self-defense when you leave your

22    home.  The Court was very explicit that you cannot treat areas

23    as sensitive just because they're crowded.  Indeed, it's

24    stressed.  There are relatively few sensitive places,

01:51PM 25    historically, and it identified only three.

1           California, reading that, has decided now all of a

2    sudden, nearly every place outside the home is sensitive, just

3    as counsel acknowledged.  And we agree with respect to

4    Your Honor's question, where is it left to carry?  Basically,

01:51PM  5    all we can come up with is sidewalks.

6           So how can it be that all of a sudden every place is

7    sensitive?  By definition, a sensitive place is different than

8    a normal place.  If these places at issue in this lawsuit were

9    actually sensitive, California could have and would have

01:51PM 10    treated them as such long before *Bruen*.  But California has

11    been carrying in these locations for 173 years, since the State

12    became a state in 1850.

13           And just a side note, Your Honor, which we might get

14    back to later, the fact that SB 2 is now radically changing the

01:52PM 15    status quo is really worth emphasizing in the preliminary

16    injunction stage.  And joining these new bans will maintain the

17    status quo.

18           I'd like to go over a couple of additional -- couple

19    themes, big picture points, and whether you'd like -- we're at

01:52PM 20    Your Honor's disposal whether you'd like us to start running

21    through the different supposed sensitive places with the

22    plaintiffs first or sensitive to the State's burden.  We might

23    suggest that they go first when it comes to identifying the

24    specific locations, and we can respond.

01:52PM 25           But while I'm here, I'd like to take a few minutes

|       | to go over additional themes and points that we ask Your Honor |
| 1 | |

1   to go over additional themes and points that we ask Your Honor

2   to keep in mind as you're hearing from the State.

3           THE COURT:  Well, I would welcome and I appreciate

4   the themes.  I -- there's a lot of different places that the

01:53PM  5   Attorney General is -- wants to designate as sensitive.  And I

6   thought the briefing on the historical analogs was very

7   thorough on both sides.  So I want to use this time

8   efficiently.

9           So I encourage big themes and issues you want me to

01:53PM 10   have front and center.  If there are any specific places that

11   you think that briefing addresses but you want to reiterate

12   your points, I encourage that too.  But I don't think it's

13   necessary, at least from where I'm sitting, to go through each

14   of the individual areas.

01:53PM 15           MR. BENBROOK:  Okay.

16           THE COURT:  Because there are so many.

17           MR. BENBROOK:  That's helpful, Your Honor.  And I

18   may have to put that in mind.  We may go through my notes and

19   come back up a little bit, but I'll do my best.

01:53PM 20           At this point, I'd like --

21           THE COURT:  I have no -- what I was intending to do

22   was give plaintiffs their first, then give the defense their

23   shot, give plaintiffs their shot, and then defendants have the

24   last word as far as the procedure.

01:54PM 25           MR. BENBROOK:  Okay.  Well, I'll try to be as

UNITED STATES DISTRICT COURT

1  efficient as possible, Your Honor.

2          So in terms of big pictures and themes, one of

3  the -- the unifying theme for sensitive places identified in

4  *Bruen* is that the Government provided comprehensive security at

01:54PM  5  those locations.  When the Government is providing security,

6  the people do not need to carry to defend themselves.  This is

7  referred to in the *Kopel* and *Greenlee* article, the sensitive

8  places doctrine, and *Bruen* cited it.  *Bruen* recognized that

9  concept.

01:54PM 10          The Government claims, one of -- its principal claim

11  here really is that there is a very different unifying theme,

12  and that theme is that crowded areas are sensitive.  But *Bruen*

13  categorically rejects this argument in its discussion of

14  sensitive places.  It says:

01:55PM 15          "Expanding the category of sensitive places

16          simply to all places of public congregation that

17          are not isolated from law enforcement would

18          eviscerate the general right to public carry."

19          It's far -- it would be "expand the category of

01:55PM 20  sensitive places far too broadly," it says.

21          Next theme -- next big picture point.  To carry its

22  burden, the State needs to be able to point to distinctly

23  similar historical regulations, but it can't.  In fact, after

24  *Bruen* identified the few sensitive places that had been

01:55PM 25  recognized, it said that states trying to establish new

1    sensitive places can try to -- try to analogize to those few

2    sensitive places to justifying, meaning the three places that

3    identify:  courthouses, legislative assemblies and polling

4    places.  The State doesn't even try to do that.

01:56PM    5         Again, the central theme of the argument is that

6    locations are sensitive because people congregate in them.  But

7    *Bruen* was very clear, that concern over gun violence in crowded

8    places has existed since the founding.  As a result, any new

9    regulation that addresses the social problem that's been around

01:56PM 10   that long -- in order to justify that new regulation, the State

11   needs to point to a distinctly similar historical regulation.

12        *Bruen* said it's a straightforward historical inquiry

13   when a new law addresses an old problem.  And when the founders

14   could have adopted a regulation to address that problem, but

01:56PM 15   didn't, that's good evidence that the new regulation going in a

16   different direction is unconstitutional.

17        Next, important to point out, Your Honor, that

18   regulations from the late 1800s that are inconsistent with the

19   regulatory tradition of the founding cannot suffice to carry

01:57PM 20   the State's burden.  If there was no well-established practice

21   of limiting carry, the founding for a particular type of

22   location, new regulations limiting carry that started appearing

23   in the late 1800s are -- and are inconsistent with the founding

24   era should not be considered.

01:57PM 25        This is very important because throughout the

1    State's briefing, location after location after location, they

2    use the same five or six laws, supposed historical analogs, two

3    of them from the late 1700s and then the rest from the

4    mid-to-late 1800s, which we can -- we have addressed in detail

01:57PM 5    in the briefing.  I'm happy to address it further.  But the

6    point is from the laws in the 1850s and beyond that are

7    inconsistent with the founding should not be considered.

8         Now, they may point to *Bruen's* language saying that

9    "Well, there's a scholarly debate about whether the founding

01:58PM 10   controls or the adoption of the Fourteenth Amendment should

11   control or even be relevant or equally relevant."  But *Bruen*

12   really left little doubt about how that debate would be

13   resolved.

14        It said courts look to mid and late 1800s laws to

01:58PM 15   see whether they confirm a preexisting condition.  Set in

16   footnote 28, evidence of late 19th and early 20th Century

17   regulations that does not provide insight into the meaning of

18   the Second Amendment when it contradicts earlier evidence and

19   will not even be considered as a result.

01:58PM 20        So, Your Honor, if in the scholarly debate the

21   Civil War era were equally as important in 1791, the Court

22   would not have said that.  And the *Espinoza* case is really a

23   perfect example of this.  This dealt with a claim that

24   Government aid to religious schools violated the establishment

01:59PM 25   clause.

1           By the late 1800s, 30 states had adopted the

2    so-called "No-Aid" clause.  But in *Espinoza*, the Court said

3    that number doesn't matter.  If in the late 1800s those laws

4    were inconsistent with the understanding of the First Amendment

01:59PM  5    establishment clause right at the founding, they don't control.

6    And Justice Barrett, in *Bruen*, pointed to *Espinoza* and said

7    *Espinoza* shows how you can't have freewheeling reliance on late

8    1800s regulations.

9           If, however, laws from the understanding of right

02:00PM 10    from the mid-to-late 1800s should play a role here, it's

11    important to note that California has zero history of

12    regulating in 170 years, since its statehood was established in

13    1850.  Any of these locations as sensitive, despite a history

14    of significant violence throughout the state in the second half

02:00PM 15    of the 1800s, is literally the Wild West that California never

16    called any of these places sensitive.

17           So again, if Your Honor is inclined to consider

18    these 1800s regulations, which we have explained in great

19    detail why they shouldn't be considered, why they're not

02:00PM 20    analogous, California's history should play an important role

21    as well.

22           So with that, Your Honor, I do have a couple of

23    little points, but I would like -- if Your Honor wouldn't mind,

24    I'll -- we'll give the State a chance to talk.  Or if Mr. Frank

02:01PM 25    would like to talk, I'll get a little bit more organized since

     1    Your Honor -- in light of Your Honor's request.

     2            THE COURT:  That would be fine.

     3            MR. BENBROOK:  Thank you.

     4            THE COURT:  Okay.  So why don't I hear, then, from

02:01PM 5    the State.

     6            MR. MEYERHOFF:  Good afternoon, Your Honor.

     7            To address the questions you raised in your opening,

     8    I'll take them in order.  First as to the motivations of the

     9    legislature, the legislature did make express findings in

02:01PM 10   passing this law.  One of those express findings was to protect

     11   California in their exercise of other fundamental rights and to

     12   prevent them from being killed, injured, or traumatized by gun

     13   violence.  Indeed, the statute identifies research which shows

     14   that California would be less likely to exercise fundamental

02:02PM 15   rights, including voting and other rights, if firearms were

     16   present in particular sensitive locations.

     17           I would submit, however, that the intentions of

     18   legislatures that are relevant are the historical legislatures

     19   in the historical analogs we identify, not California's

02:02PM 20   legislature today.  However, I will note that California's

     21   legislature expressly said that they were passing this law to

     22   comply with the Supreme Court's decision in *Bruen*.

     23           Second, as to concealed carry weapons permit

     24   holders, as I mentioned, the role -- the legislature passed

02:02PM 25   SB 2 not simply to protect -- to prevent crime, but also to

1    prevent intimidation or to prevent people from being deterred

2    in the exercise of other fundamental rights.

3          It's also important to note that while -- even if

4    it's true that concealed carry permit holders are less likely

02:03PM 5    to participate in mass shootings, as Your Honor made the point,

6    there's still the danger of accidental shootings and shootings

7    in self-defense, both of which potentially would not be

8    criminal acts by concealed permit holders.  We can understand

9    that in sensitive places, for example, schools, the legislature

02:03PM 10   could be rightly concerned about accidental shootings or

11   self-defense shootings.

12         THE COURT:  But don't you think that there is almost

13   a natural right of self-defense, even if you don't want to

14   exercise that right?  But traditionally -- and I have to

02:03PM 15   believe that what was behind the founders' thinking when they

16   enacted the Second Amendment was people have a right to defend

17   themselves in public and harm.  They don't have a right to arm

18   themselves to create terror.  I get that.  But isn't there a

19   very strong right that you can go out in public and protect

02:04PM 20   yourself?

21         Maybe this is an unfair analogy or question for you.

22   But we all know what's going on in Gaza and it's horrifying.

23   And I've seen many things on the news about the intense hostile

24   rhetoric on campuses.  I see rabbis at synagogues, they're

02:04PM 25   actually learning how to use a firearm and training the women

UNITED STATES DISTRICT COURT

1    how to use firearms.

2         And if I were Jewish, at this day and age with all

3    that rhetoric, I'd be concerned having my child at a Jewish

4    daycare center with what I see.  And shouldn't they be able to

02:05PM 5    arm themselves to defend from that kind of harm?

6         MR. MEYERHOFF:  I would note as an initial matter

7    that Subsection (a)(22), which governs places of worship, does

8    provide that if the operator of that place of worship wishes to

9    permit individuals to carry firearms on the property, they can

02:05PM 10    post a sign to that effect.

11         I think you're exactly right to point to the public

12    understanding of the Second Amendment at the time it was

13    ratified.  The way to identify that public understanding, in

14    addition to other evidence, is to look at the statutes that

02:05PM 15    existed at the time.  So the *Bruen* opinion is not about

16    sensitive places, but there is a discussion of sensitive

17    places, and it identifies legislatures, polling places, and

18    courthouses as three examples that uses an e.g., not an i.e.,

19    it lists them as examples.  It also approvingly acknowledges

02:06PM 20    that *Heller* listed schools and government buildings, which

21    plaintiffs didn't mention.

22         So we know that that universe of five sensitive

23    places, those are examples, as plaintiffs' counsel admitted,

24    the Court in *Bruen* expressly acknowledges that governments can

02:06PM 25    analogize to other sensitive places using the broader *Bruen*

```
 1   test.
 2            I will say that, for example, when it comes to
 3   legislative assemblies and polling places, the Court in Bruen
 4   cited to the article by David Kopel, which I believe that
 5   plaintiffs' counsel mentioned as well.  In that article, the
 6   professors who wrote that article identified two Maryland
 7   colonial statutes, one from 1647 and one from 1650, in support
 8   of restrictions on legislative assemblies.  And they noted one
 9   constitutional provision from Delaware from 1776 as to polling
10   places.
11            There's no evidence in the record, and I'm unaware
12   of any evidence, that there was -- Delaware was a particular
13   site of political violence that required these restrictions in
14   1776 at polling places.  Similarly, that the Maryland
15   legislature had experienced types of mass shootings.  I think
16   the reality is when we consider -- Your Honor was discussing
17   certain, perhaps, policy considerations.  And certainly, the
18   Second Amendment -- there's an outer limit of the Second
19   Amendment.  And that has been defined by Bruen, and that is the
20   test set forth at Stage 2 of the Bruen analysis.
21            But within that, legislatures are free to make
22   policy choices, assuming they don't offend the Second
23   Amendment.  So that's the historical analysis that we have to
24   proceed through, sensitive place by sensitive place is --
25            THE COURT:  I agree with that.  One of the struggles
```

```
      1    for me, and sometimes you can say things that are just going to

      2    get you in trouble, but there just seems, from the judicial

      3    standpoint, such a disagreement on what the law is.  You have

      4    the majority in Bruen, but, of course, you have the justices --

02:08PM 5    the liberal justices saying something completely different on

      6    how this test should be applied.  And then, fortunately or

      7    unfortunately, depending on how you're looking at it, I'm in

      8    the Ninth Circuit, and I found it frustrating, quite frankly,

      9    seeing the strong different views.

02:08PM 10          I mean, reasonable people can disagree on many

      11   issues, and I see that on use of police force and, you know,

      12   what is reasonable under the circumstances what type of force

      13   you should use.  I can get that.  But I don't have nearly the

      14   frustration in that area that I do with the Second Amendment.

02:09PM 15   And it's a very, very different view.  That's the way I read

      16   it.  I don't know.  If you share my frustration or even if you

      17   don't, how do I manage myself between these two competing

      18   camps?

      19          MR. MEYERHOFF:  I would say two things in response

02:09PM 20   to that.  The first is while there was obviously disagreement

      21   in Bruen on the standard and whether, you know, all the

      22   circuits have previously used intermediate scrutiny, Bruen

      23   struck it down.

      24          What there was an agreement on by all of the

02:09PM 25   justices, both the majority and the dissent, was that sensitive
```

```
 1    places restrictions, at least the five listed in sensitive

 2    places -- and those were listed as examples by the majority,

 3    those were constitutional.  You have the majority opinion, and

 4    then you even have the dissenting opinion.  Justice Breyer says

 5    the Court affirms Heller's recognition that states may forbid

 6    public carriage in sensitive places.

 7              So there is agreement, at least on the issue of

 8    sensitive places, that those five examples are settled

 9    sensitive places, and that the courts and the Government can

10    analogize to new sensitive places.

11              I would submit the other response is that the Court

12    must go provision by provision, go through the historical

13    record, go through the Bruen two-stage analysis, and for each

14    sensitive place, determine whether that sensitive place

15    provision is constitutional.  We would welcome the opportunity

16    to do that.

17              I want to address your other questions.  And then to

18    the extent I don't discuss the Bruen standard more generally,

19    I'd like to take a minute or two just to discuss that.

20              THE COURT:  Absolutely.

21              MR. MEYERHOFF:  Thank you, Your Honor.

22              I think the question number 3 was what is the scope

23    of SB 2?  I heard Your Honor's concern about the scope.  I

24    think it's interesting plaintiffs' counsel acknowledged that

25    most of the -- that most of the places that they would be
```

02:10PM 5

02:10PM 10

02:10PM 15

02:11PM 20

02:11PM 25

restricted from going into are subject only to

Subsection (a)(26).  That's the restriction on carriage onto

private property without the owner's express consent.

I'd like to address that provision separately, but I

02:11PM think that plaintiffs have acknowledged that as to the other

provisions, those aren't place that people necessarily mostly

go to.

I'd also like to note that there are exceptions to

the law.  There's an exception at Subsection (c) which applies

02:11PM to if I drive to a parking lot, I can put my firearm in a

locked container, and I can go and, you know, do what I need to

do in the parking lot, come back in.

I would note -- and we can discuss this later, but

many of the historical analogs contain no such exception.

02:12PM Subsection (e) provides for if you're using a public

right-of-way that touches or crosses one of these sensitive

places, as long as you move through that, you're not in

violation of the statute.

Again, (a)(10) specifically, Subsection (a)(10),

02:12PM which applies to permitted public gatherings and special

events, that provides another exception if you need to go to

your residence, business, or vehicle.

And then I'll note that Subsection 25605 which is

separate from the concealed carry permitting regime, that that

02:12PM says that you don't need a permit or license in order to carry

in your home, your place of business or privately-owned

property that you lawfully possess or privately owned.

SB 2 doesn't change that with the exception of

college dormitories.  And we've established a rich historical

02:13PM tradition of regulation therein.

If I have addressed your initial questions, I'd like

to return to the broader *Bruen* standard, if that's possible.

THE COURT:  Please do so.

MR. MEYERHOFF:  So the *Bruen* standard generally is

02:13PM two stages we've discussed.  And we believe that at Stage 1,

it's -- is plaintiffs' proposed course of conduct, is it

covered by the plain text of the Second Amendment?

Now, plaintiffs argue that you can define that

course of conduct at a high degree of generality, but we've

02:13PM cited cases, the *Renna* case as well as another in our briefing,

that discuss how the course of conduct needs to be specifically

defined.  Otherwise, Stage 2 becomes a nullity.

Assuming that the course of conduct is covered by

the Second Amendment's plain text, the burden shifts to the

02:13PM Government to identify a relevantly similar -- not distinctly

similar -- the Court says relatively similar historical analog

or analogs that fit within the nation's historical tradition of

firearms regulation.

I think it's important to contrast the law that's at

02:14PM issue in *Bruen* and the law that's at issue here.  Because I

think sometimes in plaintiffs' briefing, a lot of their
misapprehensions and misapplications come from confusing the
*Bruen* test itself with the application of the *Bruen* test to the
law and facts in that case.

02:14PM    So as a Second Circuit recently noted in the opinion
in *Antonyuk*, which came out earlier this month and relates to
sensitive places, we filed a notice of supplemental authority.
The law that was at issue in *Bruen* was, quote/unquote,
"exceptional."  And it was exceptional for two reasons.

02:14PM    The first reason is that the Court in *Bruen* said
unlike any other right we're aware of, the law that was
challenged in *Bruen* conditions the exercise of that right on a
Government -- on Government's discretion.  It was an
individualized determination of who can exercise that right and
02:15PM    who can't.  Plaintiffs raised other constitutional challenges
to SB 2, but for these sensitive places provisions, there's no
discussion of an individual discretion.

   Now, the other distinction in *Bruen* was *Bruen*
identified an overwhelming evidence of an enduring American
02:15PM    tradition of permitting carriage outside of the home.  Now
contrast that with *Bruen's* discussion of sensitive places where
it listed the five sensitive places and said, "We're aware of
no disputes regarding the constitutionality of such
prohibitions."

02:15PM    Another important distinction between *Bruen* and here

```
  1   is Bruen identified a number of 19 Century opinions that struck
  2   down or otherwise challenged the constitutionality of the
  3   historical analogs that New York and Bruen identified.
  4          Here, by contrast, we are unaware of any challenges
  5   from the 19th Century that were successful to sensitive places
  6   provisions.  Plaintiffs have identified none.  And, in fact,
  7   quite the opposite.  At page 20 and 21 of our opposition, we've
  8   identified numerous cases from the second half of the
  9   19th Century, including Owens, Shelby, Alexander, and several
 10   others that affirm convictions and otherwise rejected
 11   constitutional challenges to sensitive places laws, broad
 12   sensitive places laws in many cases.
 13          So in Bruen, in light of this overwhelming evidence
 14   of a countervailing tradition of permitting carry outside the
 15   home, the Court seemed to require more evidence and more
 16   analogs.  But Bruen noted in the context of sensitive places
 17   provisions, the historical record yields relatively few of
 18   these provisions.  Yet, as the Court in Allam noted, Bruen
 19   seemed to find those few precursors to be compelling.  And, in
 20   fact, we discussed that with having two Maryland laws which
 21   predate the ratification of the Second Amendment by 140 years,
 22   and one Delaware law that's also 15 years before the Second
 23   Amendment.
 24          So with that in mind, I think there's a few
 25   apprehensions in plaintiffs' briefing in that we discuss to
```

UNITED STATES DISTRICT COURT

some extent they repeat it at argument.  The first is they said
that evidence beyond laws cannot be considered.  Well, that's
not what *Bruen* did at all.  *Bruen* considered contemporaneous
legal treatises.  It considered modern law review articles.  It
even considered reports from the Freedmen's Bureau during the
reconstruction era.  Moreover, plaintiff seems to suggest that
evidence from before the founding or after 1868 cannot be
relied on at all.

Now, what *Bruen* said is that evidence from those
time periods cannot be given much weight, whereas, contrasted
with laws from the founding and brief construction that
contradict that.  But in this case, as explained before, there
is no contradiction because there was no dispute as to the
constitutionality of sensitive places laws.

Similarly, plaintiffs in their briefing said that
territorial and local restrictions cannot be relied upon.
Well, again that's not what *Bruen* said.  Indeed, these laws can
reflect the public understanding of the scope of the Second
Amendment.  *Bruen* said nothing about local ordinances, and it
discounted territorial restrictions only because they
contrasted with the overwhelming evidence permitting carry
outside the home.

Finally, plaintiffs appear to say that there is some
percentage of the population that needs to be met in order for
a relevantly historical analog to fit within the nation's

36

historical tradition.  But *Bruen* talks nothing of thresholds.
It only says laws which governed less than 1 percent of the
American population should be given little weight where they
contradict the overwhelming evidence of other more
02:19PM  contemporaneous historical evidence.

        I think with those broad outlines of the case, we
would like the opportunity to go provision by provision.  And I
think some of the themes will come out through that.

        THE COURT:  You may.

02:19PM  MR. MEYERHOFF:  Thank you, Your Honor.

        First, turning to the places of worship provision,
that's Subsection (a)(22), the State has identified numerous
historical analogs.  We identify a Georgia analog from 1870 at
Compendium Exhibit 74; a Texas 1870 law at Compendium
02:19PM  Exhibit 77; a Missouri law from 1875 at compendium Exhibit 92;
and numerous other ones in our opposition at pages 12 through
13.

        I think it bears repeating the discussion of
temporality.  Plaintiffs appear to say that because these laws
02:19PM  were either after 1868 or perhaps because they were too far
from the founding, they can't be considered as historical
analogs.  That's not what *Bruen* says.  And, in fact, as to the
point they raised previously, the Ninth Circuit in both *Alaniz*,
which came out in 2023 and is cited in our brief, and in *Baird*
02:20PM  considered 19 Century evidence.  In fact, the Court in *Alaniz*

1   found a historical tradition to be, quote/unquote,

2   "well-established" based on only 19th Century laws.

3          Moreover, to take a step back, once the State has

4   identified relevantly similar historical analogs, the Court in

02:20PM 5   *Bruen* has not -- did not decide what "relevantly similar"

6   meant.  But what they did say was one possible indication, and

7   the one they used in the *Bruen* case, was whether there were

8   comparable burdens and comparable justification.  Well, in this

9   case, the burdens and justifications are the same.  The burden

02:20PM 10   is the prevention of carriage inside of houses of worship.

11   And, indeed, the justification is the same to prevent violence

12   and intimidation to allow people to worship in peace.

13          And, in fact, California's law is less burdensome

14   than many of these historical analogs we've identified.

02:21PM 15   Because again, it allows houses of worship that wish to permit

16   permittees to bring firearms in to do so, provided they put up

17   a sign.

18          Now, to situate that relevantly similar historical

19   analog within the historical tradition, we point to numerous

02:21PM 20   other states, territories, and localities that have laws

21   prohibiting carrying in houses of worship.  We cite those at

22   our opposition at 12 and 13.

23          To make one other note about temporality, the Court

24   in *Heller* said that schools were sensitive places.  The Court

02:21PM 25   in *McDonald* repeated that.  And then the Court in *Bruen*, again,

discussed how Government buildings and schools were sensitive

places.  It is worth noting that the first state statutes

prohibiting guns in schools emerge in the second half of the

19th Century.  For example, Vermont law that emerges towards

02:22PM  the end of the 19th Century.

So I think when you consider how *Bruen* and *Heller*

have defined sensitive places, that can't really be squared

with plaintiffs' argument that only laws at the founding

matter.

02:22PM  In terms of the historical tradition, we've also

provided expert declarations from Patrick Charles and

Dr. Rivas, both of whom recount the numerous restrictions on

houses of worship.

Now, I will note that plaintiffs discuss these laws

02:22PM  that require -- that required individuals to bring their

firearms to church.  However, our historical experts have

contextualized those laws and explained that in northern

states, they were in response to organized Native American

attacks.  And in southern states, they were in response to a

02:22PM  fear of slave insurrections.  Both of those rationales do not

sound, and as Your Honor discussed, the individual right to

bear arms but more in a collective militia action.

In any event, they merely reflect that under the

public understanding of the Second Amendment at the time,

02:23PM  governments had the ability to regulate the carriage of

1    firearms in houses of worship.

2           We also have case law citations to *Goldstein* and to

3    *Maryland Shall Issue, Incorporated,* both of which are

4    post-*Bruen* cases that have denied preliminary injunctions to

02:23PM   5    restrictions on houses of worship.

6           I think it makes sense to next turn to public

7    gatherings and special events.  That's Subsection (a)(10).

8    We've identified numerous historical analogs.  Here again, the

9    1786 Virginia law at Compendium Exhibit 31; the 1792

02:23PM 10    North Carolina law at Compendium Exhibit 33; 1831 law from

11    Louisiana, Compendium Exhibit 44, and many others.

12           Again, if we consider relevant similarity and we

13    look at comparable burden and comparable justification, the

14    burden from California's law is, in fact, much less than the

02:24PM 15    laws -- than these historical analogs from the relevant time

16    period.  It's so, because California's law applies only to

17    permitted special events and public gatherings and, as we

18    discussed before, contains an exception for those who are

19    passing through.

02:24PM 20           Contrast with many of these historical laws which

21    contain no exception for passing through and which applied to

22    all public gatherings, not merely permitted ones.  And, indeed,

23    if we think to the 19th Century, there may well have been no

24    permitted events.  Every public gathering may have occurred

02:24PM 25    without a permit, given the sophistication of the government at

the time.  So, in fact, California's law is much less

restrictive than these historical analogs.

        Now, these fit within the historical tradition

because there is a tradition in England going back to the

14th Century of restricting firearms at fairs and markets.

        Now, in plaintiffs' briefing, they said that English

history was irrelevant and can't be considered.  That's not

what *Bruen* said.  *Bruen* said that English history can't be

considered when there's no evidence that that tradition crossed

the Atlantic or existed at the time of the founding.  But here,

both the Virginia law and the North Carolina law I just

mentioned were closely patterned on the Statue of Northampton.

        So far, from there being no evidence that the

tradition made it, there's strong evidence that that tradition

made it across the Atlantic.

        We've also cited numerous other state territorial

and local laws at page 18 and 19 in our opposition which

restrict public gathering.  If the Court looks at the specific

quotations from those at page 18 and 19, you'll see the

breadth.  They list specific places, but in many cases they say

"and any other public assembly."

        Again, repeating a point I mentioned earlier, we

point to numerous court cases at page 20 of our opposition and

21 -- *Andrews*, *Hill*, *Owen, Shelby*, *Alexander*, *Maupin*, *Pigg,* and

*Wynne* -- all of which upheld these laws which contained broad

1   restrictions on public carry at public gatherings.  And,

2   indeed, if we look at where the cases upheld these

3   restrictions, they even upheld them at Fourth of July barbecues

4   at a mill where workers and customers went to.

02:26PM   5          We also have Patrick Charles's expert declaration,

6   as well as the declaration of Adam Winkler, a leading Second

7   Amendment historian, both of whom discuss how these special

8   event and public gathering restrictions fit squarely within

9   America's tradition of firearms regulation.

02:26PM  10          If we can move on to Subsection (a)(9), locations

11   where liquor is sold for consumption on-site.  Now, the State

12   has identified historical analogs, dead-ringer historical

13   analogs.  The historical twin that *Bruen* said expressly it is

14   not required.  We've identified them anyway:  An 1853 New

02:27PM  15   Mexico law, that's at Compendium Exhibit 58; an 1870

16   San Antonio restriction, that's at Compendium Exhibit 76; and

17   an 1890 Oklahoma law, that's at Compendium Exhibit 144.

18          Now, these laws -- the burden and justifications are

19   the same.  They're certainly relevantly similar.  Now, do they

02:27PM  20   fit within the historical tradition?  We certainly put forward

21   evidence to that effect.  We have a historical tradition, not

22   simply of those dead ringer laws, but also of similar laws that

23   evince a concern with the mixing of alcohol and firearms.

24          So we have prohibitions on sales of alcohol to

02:27PM  25   militia men, prohibitions of sales of alcohol within a certain

1   distance of militia.  We have laws prohibiting firearms

2   carriage by intoxicated people, and we have the declarations of

3   Professor Mancall and Professor Winkler, both of whom discuss

4   the dangers of mixing firearms and alcohol.

02:28PM  5          Now, again, I think this goes back to a

6   misapplication throughout plaintiffs' briefing.  They say that

7   if we haven't identified a dead ringer, that the modern

8   regulation cannot survive.  Well, in many, if not most of these

9   cases, we have identified that dead ringer, but we're not

02:28PM 10  required to.  And, indeed, we've situated these laws within the

11  nation's historical tradition.  I'd also note that the

12  Second Circuit in *Antonyuk* -- the First Circuit Court to deal

13  with sensitive places provisions -- upheld a similar provision.

14          THE COURT:  Mr. Meyerhoff, why don't we give our

02:28PM 15  court reporter a break, and then we'll pick back up, okay?

16          MR. MEYERHOFF:  Thank you, Your Honor.  Of course.

17          THE COURTROOM DEPUTY:  All right.

18          **(Recess from 2:28 p.m. to 2:42 p.m.)**

19          THE COURT:  All right.  Mr. Meyerhoff, please

02:42PM 20  proceed, sir.

21          MR. MEYERHOFF:  Thank you, Your Honor.  With your

22  indulgence, I'd like to continue proceeding provision by

23  provision.

24          I would like to take a step back for a second.  I

02:42PM 25  don't want to lose the forest for the trees here.  If we take a

1    step back, when we look at *Heller*, *Heller* rejected the idea

2    that the -- that a locality jurisdiction could totally ban

3    firearms.  And it left open the question of whether firearms

4    could be confined to the home effectively.  And *Bruen* answered

02:43PM  5    that question.  It said that firearms cannot -- the right -- a

6    government cannot confine the right to bear firearms to the

7    home.

8            *Bruen* also said, and is part of the reasoning for

9    that, said, quote:

02:43PM 10            "A person is a good deal more likely to be

11        attacked on a sidewalk in a rough neighborhood than

12        in his apartment."

13            And it was echoed by Your Honor's opinion in *Boland*

14    which discussed that ordinary people feel the need to possess

02:43PM 15    handguns because, quote, "they live in high-crime

16    neighborhoods," end quote, or "because they must traverse 'dark

17    and dangerous streets.'"

18            Now, as Senate Bill 2 reflects that, it permits

19    individuals to traverse the streets on their way to places, and

02:43PM 20    it doesn't, unlike the law in the *Bruen* case or, as plaintiff

21    suggests, criminalize the possession of firearms in all crowded

22    places.  Indeed, if a permit holder walks up to a crowded

23    sidewalk and there's many people there, they're not required to

24    turn around and walk in the other direction.

02:44PM 25            So I think in terms of -- it's important to think

1    about what does "public carry" mean?  That's what *Bruen* talks

2    about.  It talks about public carry.

3              Now, *Bruen* doesn't define that, but in its

4    discussion of public carry, at the same time it acknowledges

02:44PM 5   that there are numerous -- at least five examples of sensitive

6    places where, notwithstanding the fact that firearms cannot be

7    confined to the home, individuals cannot carry there.  And it

8    talks about new and other analogous sensitive places.  So I

9    think that's just a -- before we move into more sensitive

02:44PM 10  places, I just want to emphasize that point.

11             So if we look at Subsection (a)(8), public transit,

12   we've identified historical analogs in the form of broad public

13   gathering laws that we mentioned previously, as well as school

14   laws that are undisputed by *Bruen*.  And those school laws are

02:45PM 15  motivated by the protection of a vulnerable population:

16   children.  Many -- as we put in the record, many public school

17   children take public transportation to work.  We've also

18   identified as a historical analog Government building laws.

19   Those are recognized again by *Heller* as being settled.

02:45PM 20             I think there's two points to note here.  It seems

21   as though plaintiffs are requiring a dead ringer in the public

22   transit space or historical twin.  That's not what *Bruen*

23   requires.  The other thing to note -- and this is where the

24   expert evidence is particularly important -- is that we've

02:45PM 25  presented evidence for Professor Salzmann and Professor Rivas

**UNITED STATES DISTRICT COURT**

that demonstrate that public transportation did not exist in

the form it is today or any meaningful form until the

20th Century.

We also provided evidence in their declarations that

private railroad companies, which did operate railroads in the

19th Century, restricted the carriage of firearms.  It would be

puzzling indeed if the mere fact that the Government has taken

on a service, which private companies did in the 19th Century,

could expand the scope of the Second Amendment.

Indeed, if in the 19th Century -- 18th or

19th Century, if you ask an individual, you know, "Can you

carry on a railroad?" they would have said, based on the

evidence we put forward, "Probably not."

And so the mere fact that the Government is now

providing that service, it would be puzzling if that were to

expand the scope of the Second Amendment.  We've identified the

*Kipke* case which denied a preliminary injunction for public

transit.  We also cited the *Marique* case in our briefing, which

is a government building case.  It's an NIH case.  Now, NIH

provides services today that perhaps the Government did not

provide in the 19th Century, but nonetheless, the Government

building exception applies.

Now, I think it's important in concerning public

transit, for example, to think about the idea of silence in the

record.  And as the Second Circuit in *Antonyuk* noted,

interpreting from silence is risky.  I think one of the places

where our expert testimony is particularly helpful is that it

explained the silences in the record.  So in this case, for

example, we put forward strong evidence that there was no

02:47PM  public transit, and so the search for 18th or 19th Century

historical twins or dead ringers would be fruitless, but that

does not mean that those laws do not fit -- those modern

regulations do not fit within the nation's tradition of

firearms regulation.

02:47PM             THE COURT:  Mr. Meyerhoff, let me ask you a few

questions about public transit.

             MR. MEYERHOFF:  Yes, Your Honor.

             THE COURT:  I'm just trying to understand how I

apply this analysis to these facts.  And I guess there has to

02:47PM  be hypothetical facts because they're not in the record.  But

I've taken public transportation in and around Los Angeles, and

I've taken it in and around Santa Ana.  I don't know if you've

ever been in L.A. or Santa Ana after 6:00 o'clock, but it's

quite a criminal element.  Some of it being homeless are out

02:48PM  and about.

             And candidly, I'm not a tiny guy, but I feel quite

unsafe.  And I do know that court staff, both in Los Angeles

and in Santa Ana, going to and from those public transport

areas, transit areas, they've been assaulted and attacked, and

02:48PM  some knife has been brought out.

1          I think the point -- what I'm trying to say is don't

2     they have the right to defend themselves?  You know, I have to

3     take public transit to get to work to make a living, and this

4     day in age, the government, I don't think they can protect us

02:49PM 5     at all times, at all places, nor can police.  And especially

6     with the climate and some of our cities and municipalities of

7     defunding the police, people are not safe going to use public

8     transit meaningfully.  Tell me why they shouldn't be able to

9     defend themselves, you know -- and by carrying -- if they can

02:49PM 10    meet the qualifications for carrying a concealed permit.

11         MR. MEYERHOFF:  I think it's important to note at

12    the outset -- I believe it's Section 25605 -- you had mentioned

13    the State would have the last word, and so I can -- I will

14    confirm that with my colleagues, but I believe that section of

02:49PM 15    the Penal Code provides as long -- when you're acting in

16    self-defense with a firearm, as long as you, you know, quickly

17    attempt to contact law enforcement -- I can provide the exact

18    citation when I come back up to the podium, but there is an

19    exception in California law for self-defense.  So I think that

02:50PM 20    addresses your concern.

21         THE COURT:  Doesn't -- because I'm trying to

22    understand that.  How do I know whether I'm going to be

23    assaulted or I'm going to need it and the law says I can't

24    carry it?  So it would seem to me what you're saying is, okay,

02:50PM 25    I can violate the law, and if I have a problem and I have to

1    use my firearm, I'm not going to be prosecuted?  Is that what

2    you're saying?  Or am I missing your response?

3              MR. MEYERHOFF:  I mean, I think ultimately the

4    prosecution decisions are left up to local jurisdictions.  I'm

02:50PM 5    just pointing to a section of the statute that does provide a

6    self-defense exemption.  I think the broader point is in these

7    discussions about whether firearms should be allowed on public

8    transit.

9              Ultimately, state legislatures have the authority to

02:51PM 10   make these policy decisions unless they offend the Second

11   Amendment.  And so an individual citizen or Your Honor may

12   disagree with the California's legislature's decision to

13   restrict the carriage of firearms on public transit.

14             THE COURT:  But it's not my place.  And I -- if I'm

02:51PM 15   understanding you, I can't tell the legislature how to do their

16   job, but I can say if you're violating the Constitution.  And

17   so that goes back to some of my earlier questions:  Isn't there

18   a natural right codified in the Second Amendment that you have

19   the right to carry a firearm, in this case, a handgun, to

02:51PM 20   protect yourself from harm?

21             I'm just trying to understand how the Second

22   Amendment, in the sensitive places, in practical reality work.

23   And some of these sensitive places, I don't have a lot of

24   firsthand experience.  I can't really identify with it.  But I

02:52PM 25   can tell you, depending on the day of time [sic], I am nervous

going to and from public transit areas.  And I can certainly

understand how a person would want to carry a handgun to

protect himself or herself.

        And if I had certain individuals who are smaller,

02:52PM  like a five-three young woman and she's going at that late

hour, I would want her to be able to protect herself.  I don't

feel comfortable saying, "You can't protect yourself.  You got

to just take your risk."  And it just seems to me that the way

SB 2 is working is you can't -- you can't carry your firearm to

02:53PM  and from your work or you're going to have to leave early when

the risk of attack or assault are low.  Am I missing something?

I mean, you can -- please feel free to tell me if I'm

misunderstanding how the statute works.

        MR. MEYERHOFF:  Yes, Your Honor.  So I think the

02:53PM  first question is you're discussing it, and I think it's the

appropriate question, what is the -- doesn't one have a Second

Amendment right to bear arms for self-defense?  And the Court

in *Heller* acknowledged that in the home, and the Court in *Bruen*

said you have the right to carry outside of the home.  But in

02:53PM  the same breath, it acknowledges you have the right to public

carry -- and again, it didn't define what "public carry" means.

It can't mean all places open to the public because in the same

breath, it describes courthouses which are -- foundationally

and constitutionally they are fundamentally public places.  And

02:54PM  so, obviously, when the --

1          THE COURT:  I feel -- I feel very safe in this

2     courthouse.  And I don't have any court security in here

3     because it's a secured -- it's a civil matter.  But for my

4     criminal matters I've got a team of marshals, and then I've got

02:54PM 5     court security officers.  I've got buttons here (indicating).

6     At any point -- if you want me to test it, I'll show you --

7     they'll come locked and loaded ready to go.  An entirely

8     different sense of comfort and security.  I have the opposite,

9     they're never leaving me alone.  Whereas, when I'm outside the

02:54PM 10    courthouse going to the train station or going to the bus

11    station, which is the main terminal right by the train station,

12    or in Downtown Los Angeles, trying to take some of the buses to

13    go to different areas, you know, I don't feel safe.

14          MR. MEYERHOFF:  Well, to answer your most pressing

02:55PM 15    question, no, I do not think you need to test out the button on

16    me, at least.

17          I think to address sort of two of the points you

18    brought up, ultimately, we are talking about policy choices.

19    And so there are many courthouses throughout the country that

02:55PM 20    do not provide security.  In fact, we've cited materials in our

21    briefing that show that up until the 2000s, most schools did

22    not provide security or even armed security.  And so those are

23    policy choices that the individual legislatures of those states

24    have made.

02:55PM 25          And so the State of Idaho may decide to not prohibit

1  carriage of firearms in sensitive places like public transit.

2  Certainly those five sensitive places are not requirements for

3  the State, you know, it didn't say states must secure federal

4  courthouses, they must secure schools, they must secure polling

02:56PM 5  places.  Indeed, most polling places, as far as I understand

6  them, are not secured by armed guards or panic buttons or

7  anything like that.

8        And I think the Supreme Court, including many

9  justices on the Court in *Bruen* have often extolled states as

02:56PM 10  the laboratory of democracy.  So policy choices are made there.

11  California has made a different set of policy choices and

12  people may be upset about any one of those policy choices.  But

13  unless that policy choice offends the Second Amendment, their

14  address is to the legislature, through petition, through

02:56PM 15  voting.

16        So I think that is sort of the answer to the

17  question that you are raising.  I'd like to address a slightly

18  different point that I think you brought up and plaintiffs

19  brought up.  They attack our theory of the case, our theory of

02:57PM 20  sensitive places, and they say they want all crowded places to

21  be sensitive places.  Again, we're not arguing that Los Angeles

22  is a crowded place or San Francisco is a sensitive place, as

23  New York tried to do at argument in *Bruen*.

24        Their theory of the case or their theory of

02:57PM 25  sensitive places is both underinclusive and ahistorical.  So

1    they say government buildings, schools, courthouses,

2    legislative assemblies and polling places, those are sensitive

3    places because they're secured by armed guards.  Federal court

4    houses may be an example of that.  But as we said before, many

02:57PM 5    schools don't have armed guards.  Many DMV offices don't have

6    armed guards.  Many polling places don't have metal detectors.

7          At the time, we cite in our brief that the State --

8    the U.S. Capitol had one security guard who may have been a

9    groundskeeper through the 19th Century.  The metal detectors

02:57PM 10   didn't exist in the capital until the 1983 bombing, or at least

11   generally in the capitol.  The senate chamber had it slightly

12   earlier because sensitive places then and today don't

13   necessarily have those features.

14         It's also underinclusive because -- I don't know if

02:58PM 15   you're a Dodger's fan, but if you go to Dodger Stadium today,

16   they have metal detectors.  That is a private place.  I believe

17   they also have security, some of which are probably armed.  So

18   that --

19         THE COURT:  They also have a lot more LAPD because

02:58PM 20   of some of the terrible tragic incidents that have happened.

21         MR. MEYERHOFF:  That's correct.  And I will note

22   that Justice Roberts, in the *Bruen* argument, appeared to assume

23   that, of course, stadiums would be sensitive places perhaps due

24   to their crowded nature.  He didn't say all crowded places are

02:58PM 25   sensitive, but that was certainly a factor he considered in

```
    1   opining that sensitive places appeared -- stadiums appeared to

    2   be sensitive places.

    3          If I may return to the provision-by-provision

    4   analysis.  So we discussed public transit.  Turning to

02:59PM 5   Subsection (a)(12) and (13), we've identified numerous

    6   historical analogs, including Compendium Exhibit 60, the

    7   restriction at Central Park; Compendium Exhibit 67, the

    8   restriction at Prospect Park; Compendium Exhibit 83, the

    9   restriction at Golden Gate Park, and many other municipal

02:59PM 10   restrictions.

   11          Again, when we discuss expert testimony, in the role

   12   of expert testimony, we put forward evidence from leading

   13   historians on the topic that -- contrary to plaintiffs'

   14   claim -- that Boston Common was like a park, it was not.  And

02:59PM 15   public parks, as we understand them today, only emerged in the

   16   second half of the 19th Century.  The historical analysis that

   17   we identified, it follows closely in time to those merely

   18   contemporaneously.  And we put forward declarations from

   19   Professor Young and Professor Glaser to that effect.

03:00PM 20          Similarly, with state parks, we identify Compendium

   21   Exhibits 198 through 200, as well as Professor Glaser's

   22   surrebuttal declarations at Exhibit 1 through 15, numerous

   23   state park restrictions from California, Connecticut, Kansas,

   24   Michigan, New York, across the country.

03:00PM 25          Moreover, the burdens and justifications of the
```

modern regulation and the historical regulation, which the

Court in *Bruen* said determines whether they're relevantly

similar are the same, a flat ban to protect parks as places

that propose relaxation and recreation.

03:00PM      The other thing to note, of course, is that

Exhibit 201, we point out that close in time to the founding of

national parks, there was a ban on firearms in federal parks

that lasted for almost 70 years.  That's at Compendium

Exhibit 201.

03:00PM      We also cite the *Antonyuk* case and *Kipke* case, both

of which are post-*Bruen* and uphold restrictions at parks, both

state and/or municipal.

      Turning to Subsection (a)(7), which is the

restriction on hospitals.  We've identified numerous historical

03:01PM analogs that restrict carriage of firearms at places of

educational and/or scientific purposes, and 1870 Texas law at

Compendium Exhibit 77; 1874 at Missouri; 1889 at Arizona.

That's at -- 1889 Arizona law, that's at 138.

      Again, I think it bears repeating that *Heller* and

03:01PM *Bruen,* which recognize schools as sensitive places, we don't

see the emergence of state laws prohibiting firearms in schools

until the exact same time period.  So plaintiffs' argument

about "Oh, these come too late," both don't reflect the *Bruen*

analysis we discussed earlier where laws after reconstruction

03:01PM can be considered or during reconstruction.  It also doesn't

1    reflect the Supreme Court's own jurisprudence on sensitive

2    places.

3            The Second Circuit in *Antonyuk* makes a good point

4    which is obviously the Second Amendment is ratified in 1868.

03:02PM 5    It doesn't mean that in 1869 the voters and legislatures have a

6    completely different conception of the Second Amendment.   In

7    fact, the voters who approve these laws or the legislatures may

8    have been the exact same voters and legislatures who ratified

9    the Fourteenth Amendment.

03:02PM 10           So clearly these close-in-time restrictions are

11   relevant particularly when we consider the Court credited 1650s

12   restrictions in Maryland as to legislative assemblies and

13   finding those places were settled.

14           In terms of hospitals, we also identified analogs in

03:02PM 15   schools and colleges.   There's the presence of vulnerable

16   populations.   The burdens and justifications are the same in

17   both.   There are bans on carriage and they prevent the

18   disruption of scientific and educational purposes and protect

19   vulnerable populations.

03:02PM 20           Again, we put forward evidence from leading

21   historians, Dr. Fissell and Dr. Kisacky, who explain the modern

22   hospital did not exist in the form we understand it with

23   sensitive equipment and teaching facilities until the 20th

24   Century.

03:03PM 25           Again, many of these experts -- *Bruen* countenanced

1    when there is a dramatic technological chain or unprecedented

2    societal concerns, the Court should apply a more nuanced

3    approach.  One of the ways the nuance approach comes into

4    effect is when there is a reason to explain the silence on why

03:03PM 5    there may not have been hospital laws in 1791.  Indeed,

6    practice, custom, private rules, which we talked about in the

7    railroads context as well, are relevant in determining that

8    historical tradition.

9          Turning to libraries, zoos, and museums, at (a)(17)

03:03PM 10   and (a)(20), again, we identified those historical analogs for

11   scientific and educational purposes throughout the 19th

12   Century.  We also identify the restrictions in schools and

13   colleges, the presence of education and -- presence of

14   children, both are relevantly similar.  We have comparable

03:04PM 15   burdens and comparable justifications.  And we point to the

16   declaration of Leah Glaser, who talks about these are places

17   where children gather.

18         We also point to the declaration of Professor

19   Brewer.  And she cites to four restrictions on carrying and

03:04PM 20   keeping firearms on campuses, at Yale College, the University

21   of Georgia, the University of North Carolina, and the

22   University of Virginia.

23         Now, these technically may not be statutes, but

24   we're not arguing that they are the historical analogs.  Rather

03:04PM 25   we're arguing this evidence as well as our expert evidence and

  1  other secondary sources defines the historical tradition that

  2  *Bruen* talks about.  So we are required to identify a relevantly

  3  similar analog or analogs and place those within the historical

  4  tradition.

03:05PM  5          And, indeed, in *Jones v. Bonta*, which we didn't cite

  6  in our briefs, but which was issued on December 8th in the

  7  Southern District of California, that's a 2023 WL 8530834, at

  8  page 9, the Court said:

  9          "Contrary to plaintiffs' assertions,

03:05PM 10      defendants do not conflate these university rules

 11      with laws, but use them to demonstrate the general

 12      understanding during the relevant historical

 13      period."

 14          Now, *Jones* involved a challenge to California's

03:05PM 15  restriction on the purchase of certain firearms by 18- to

 16  20-year-olds, but the point remains the same.

 17          Turning to Subsection (a)(11), we're looking at

 18  playgrounds.  We identify schools as strong historical analogs.

 19  They are relevantly similar.  the burdens and justifications

03:06PM 20  are the same: no carriage of firearms is the burden; the

 21  justification and protection of the children.  Again, our

 22  declarations help explain the particular silence:  Why were

 23  there no restrictions on playgrounds at the founding?

 24  Playgrounds did not exist in the founding era.  And

03:06PM 25  additionally, they were often -- later they were often found

1    within schools and parks.

2           I think it's important to stop here for just a

3    moment and discuss, for example, public transit.  Plaintiffs

4    identify -- they say there was public transit, and they

03:06PM  5    identify a single 1725 South Carolina example of public

6    transit.  We present evidence from Dr. Rivas to show that

7    that's not really a relevant example.  But more to the point,

8    and this is, again, a point that *Antonyuk* raises -- the Second

9    Circuit in *Antonyuk* raises.  And I think it's applicable here.

03:06PM 10    They point out that there may be a variety of reasons why a

11    legislature or a municipality may have chosen not to regulate a

12    particular location, and they provide the example of a town

13    that has a single daycare.

14           Now, there may be a variety of reasons why the State

03:07PM 15    did not pass a law or locality did not pass a law addressing

16    that daycare.  One of the reasons may have been that daycare

17    had its own private rule, and so it was considered unnecessary.

18           Indeed, legislatures, we would hope, are seeking to

19    address problems and provide solutions to them, not find

03:07PM 20    solutions and then identify problems.  And so I think

21    interpreting silence as meaning that there's a countervailing

22    tradition is risky, because that's not what it means.  Indeed,

23    that's what the Second Circuit found.

24           We also have restrictions on playgrounds at a

03:07PM 25    Subsection 11, that *We Are Patriots* case which we cite in our

1    brief from New Mexico refuse to enjoin those restrictions on

2    playgrounds.

3              If we look at (a)(15), (a)(16) and (a)(19) -- those

4    are casinos, stadiums, and amusement parks -- we identify

03:08PM 5    numerous historical analogs restricting carriage of firearms in

6    places of amusement and social gathering.  We identify an 1816

7    New Orleans law at Compendium Exhibit 38 that restricts

8    carriage in public ballrooms, an 1871 Texas law at Compendium

9    Exhibit 80 that restricts assemblies for amusement, an 1889

03:08PM 10   Arizona law at 138 that restricts circuses, a 1903 Montana law

11   where -- which restricts where persons are assembled for

12   amusement.

13             Again, for these institutions, a more nuanced

14   approach is required because these types of places did not

03:08PM 15   exist at the founding.  I mean, for example, casinos were

16   largely regulated out of existence until the second half of the

17   20th Century.  And as I mentioned before, Justice Roberts, in

18   oral argument in *Bruen*, suggested strongly that he believed

19   that stadiums would classify as sensitive places.

03:09PM 20             The May plaintiffs specifically also challenge the

21   parking lot restrictions or certain of SB 2's provisions

22   restrict carriage in parking lots as well.  We have addressed

23   this in our briefing.  We have identified dead-ringer

24   historical analogs or at least very closely similar.

03:09PM 25             There's a 1776 Delaware constitutional provision at

1    Compendium Exhibit 28, which outlaws battalions or companies

2    from coming within a mile of polling places during the

3    election.

4         We identify an 1870 law which prohibits -- which

03:09PM  5    restricts the carriage of firearms within a half-mile of a

6    place of registration.  Indeed, these laws -- the burden is

7    less severe because none of California's restrictions cover

8    5,280 feet or half of that.  And the justification is the same,

9    to prevent the disruption that firearms would cause.

03:10PM 10        I think it's important to look additionally at a

11   number of cases.  I would recommend to you most prominently the

12   D.C. Circuit's opinion in 2019 in the class case which we cite

13   in our brief.  In class, the D.C. Circuit found the same

14   security interest which remit regulation of firearms in a

03:10PM 15   Government building, permit regulation of firearms on the

16   property surrounding those buildings.  We can certainly

17   understand why in legislative assemblies and courthouses.

18        We would not want to restrict firearms within them,

19   but someone standing on the sidewalk 15 feet away, the same

03:10PM 20   logic applies to the sensitive places restrictions we've

21   identified.  And, indeed, both pre-*Bruen* and post-*Bruen*,

22   numerous courts have upheld buffer zones and parking lot

23   restrictions.

24        We identify the *Bonidy* case, the *Dorosan* case.

03:10PM 25   Those are pre-*Bruen*.  We identified the post-*Bruen* *Maryland*

1   case.  And we also identified a number of school zone cases.

2   The federal Gun-Free School Zones Act provides for 1,000-foot

3   buffer around schools.

4           We cited numerous District Court cases -- *Walters*,

03:11PM  5   *Allam*, *Lewis*, pre- and post-*Bruen* that uphold those

6   restrictions.

7           I'd like to turn briefly to (a)(23), which is the

8   restriction on financial institutions.  We've identified

9   historical analogs that are relevantly similar in the form of

03:11PM 10   government buildings and courthouses in the 18th and 19th

11   Century.  We presented evidence from a leading financial

12   historian, Professor Murphy, who demonstrates that banks did

13   not hold the place in American society they do today.  There

14   was no mass commercial banking, financial institutions or the

03:11PM 15   province of a few elite individuals and, indeed, some of the

16   functions that banks hold today, including notaries public were

17   actually resided in courthouses in the 18th and 19th Century.

18           And, indeed, the other concern which motivates and

19   which would go to the justification, the justification for

03:12PM 20   restrictions on government buildings and courthouses is clearly

21   the disruption of American civic life.  In the same way, banks

22   and financial institutions occupy a central place in American

23   life today.  And again, considering the dramatic technological

24   change, we can consider the more nuanced approach which allows

03:12PM 25   us to analogize at a higher level.

**UNITED STATES DISTRICT COURT**

```
  1              I'd also note that financial institutions fits
  2     squarely within airports.  They are places that are sites of
  3     organized group violence.  And, in fact, just as airports and
  4     airplanes have been the site of political terrorism, banks have
03:12PM 5     also been the site of political terrorism, both to send a
  6     message as well as to collect resources for terrorist
  7     organizations.  Thus, the Ninth Circuit, in its *Davis* opinion
  8     in 2008 have little trouble finding that airports were
  9     affirming -- had little trouble affirming a conviction for
03:13PM 10    carrying a firearm in an airport.
 11              I'd like to turn to the private property provision,
 12     (a)(26).  Now, (a)(26) is unique in our argument because there,
 13     we have made what we see as a compelling Stage 1 argument that
 14     plaintiffs' proposed course of conduct is not covered by the
03:13PM 15    plain text of the Second Amendment.  Put simply, the Second
 16     Amendment does not extend to private property.
 17              As we discussed in *Heller*, *Heller* said you cannot
 18     ban guns in the home.  It left open the question about
 19     confining them to the home.  *Bruen* answered that question.  But
03:13PM 20    it did not define what "public carry" meant.
 21              Now, plaintiffs argue that "public carry" means
 22     "includes private property open to the public."  They believe
 23     in some sense -- their argument relies on the fact that in some
 24     sense the Second Amendment extends to private property.
03:14PM 25    Without some sort of conclusion to that effect, their course of
```

UNITED STATES DISTRICT COURT

conduct does not implicate the Second Amendment.  And frankly,

respectfully, if a court is to make a determination that the

Second Amendment extends to another's private property, that

decision should come from the highest court in the land.

03:14PM    5          *Bruen*, as we understand it, the Second Amendment was

enshrined within the scope.  It was understood at the time.

Now, there's no evidence that carriage on private property

during the founding or reconstruction eras on another's private

property during that time period was derived from some Second

03:14PM 10 Amendment right as opposed to state property law.

11          Additionally, on the private property provision,

plaintiffs lack Article III standing.  There is no state action

that is fairly attributable to their supposed injury here.

Shifting the means by which a property owner gives consent is

03:15PM 15 not state action.

16          Now, plaintiffs say that this court does not enjoin

this provision.  It will be the State deciding as a default

presumption who can enter and who cannot.  But Your Honor,

that's true regardless of whether you enjoin this provision,

03:15PM 20 either as a default everyone will be permitted to carry on

private property -- private commercial property, unless the

owner consents, or no one will.  But either way, that's a

decision, in their view, being made by the State.  In reality,

it's not a decision being made by the State; it's a decision,

03:15PM 25 regardless of whether you enjoin the law or not, being made by

        1    private property owners.

        2            Now, at Stage 2 of the analysis, even if we proceed

        3    there, the State would still be able to show that the law --

        4    that this subsection fits within the nation's historical

03:16PM  5    tradition of firearms regulation.  We've identified numerous

        6    analogs including a 1721 Pennsylvania law at Compendium

        7    Exhibit 17, a 1722 New Jersey law at Compendium Exhibit 18, and

        8    five other historical analogs.  Now, contrary to plaintiffs'

        9    argument, these analogs do not apply only to hunting, they

03:16PM 10    apply broadly to private property.

       11            Now, these historical laws fit within the nation's

       12    historical tradition of firearms regulation, and, indeed, the

       13    sanctity of private property.  Other rights derived from the

       14    Constitution do not extend on to another's private property.

03:16PM 15    And, indeed, it's likely that these historical restrictions

       16    were just as broad, if not broader, than California's

       17    challenged private property provision today.  Because even

       18    though these restrictions mention plantations and farms,

       19    America, at the time, is a profoundly agrarian society.  And so

03:17PM 20    it's likely that these provisions acted even more broadly in

       21    restricting firearms carriage than these modern restrictions

       22    do.

       23            If I could briefly address the May plaintiffs' First

       24    Amendment claim.

03:17PM 25            THE COURT:  A lot of what you said -- I mean, it's

```
      1   been helpful, but we've almost been going for two hours and I

      2   still got to give everybody a round.  So a lot of what you

      3   said, it has been in the briefs.  So I'm just trying to think

      4   as time management, because I know the plaintiffs are going to

03:17PM 5   say, "Hey, listen, we spoke for about 25 to 30 minutes, and

      6   you've been speaking for an hour and a half."  I appreciate it.

      7   I don't want you to feel bad.  It's just now I think I got to

      8   time manage this better.

      9           MR. MEYERHOFF:  Yes, Your Honor.  Will we have an

03:18PM 10  opportunity to briefly respond?

     11           THE COURT:  Yes, you will.

     12           MR. MEYERHOFF:  Thank you.  I appreciate it.

     13           MR. BENBROOK:  Few quick points of specific

     14   responses to counsel's argument, Your Honor.  First, counsel

03:18PM 15  suggests that, "Hey, under SB 2, people can traverse the

     16   streets and sidewalks.  So what's the big deal?"  The big deal

     17   is you can't go anywhere else.  You can -- under these

     18   restrictions.  Because if you go to a parking lot to go to a

     19   place that is, for example, a private business or a Government

03:19PM 20  building, you can't be in the parking lot with the firearm.

     21           So the point is, *Bruen* repeatedly says there is a

     22   general right to public carry.  Not a right to carry on

     23   sidewalks and streets, but a general right to public carry.

     24           Relatedly, counsel found it significant that

03:19PM 25  Mr. Frank, for the May plaintiffs, said that mostly these
```

1    restrictions are -- fall within the private default rule, and

2    so again, kind of "What's the big deal with all the others --

3    all the other restrictions?"  Well, that's not the test.  It's

4    not a how burdensome is this in the whole?

03:19PM   5        If Your Honor takes each location one by one -- and

6    we do not concede as to all people that the private default is

7    the most onerous.  All the ones we've chosen we believe offend

8    the Second Amendment.  So we take each location one at a time.

9    And maybe I misheard or didn't hear, but it's -- to me, I think

03:20PM  10   counsel failed to address Your Honor's question of what's left.

11   He said, basically, I guess his answer is streets and

12   sidewalks.

13        Next, with respect to counsel's argument that *Heller*

14   and *Bruen* establish five sensitive places including a broad

03:20PM  15   category of Government buildings, I point Your Honor to

16   pages 11 and 24 of the reply brief where we respond to that

17   argument and note in reference to government building was a

18   reference to the subset of government buildings that have

19   previously been identified.

03:21PM  20        Counsel mentioned that it's significant that there

21   are -- is not much, if any, record of challenges to these few

22   sensitive locations laws or regulations that they've

23   identified.  And perhaps the answer to that is because there

24   are so few of them, but also because, in fact, many of the

03:21PM  25   locations -- the so-called sensitive location regulations

they're talking about are actually codifications of the law of

affray and not sensitive location restrictions at all.  They're

restrictions on carrying to terrify the public.  And we'll get

to that in a second.

03:21PM  With respect to the contradiction point and how that

works, again, it's important to emphasize that *Bruen* itself

says that 18 -- 19th Century regulations can contradict the

founding era tradition when there is no regulation of the same

kind in the founding era.  In other words, it says that when

03:22PM the founders could have addressed it the same way subsequent

legislatures chose to but didn't, that's important evidence to

show that the new regulations are inconsistent with the Second

Amendment.

And I was trying to take notes with respect to the

03:22PM very odd, confusing exchange Your Honor had with counsel about

the alleged self-defense exception.

I would ask counsel which number was it that you

were referring to so we can look at that?

And I won't be able to respond right here, but we

03:23PM will.

THE COURT:  While they're trying to find that, let

me ask you a bigger picture context.  And maybe it's just

that's a problem that I've got to face, but the Supreme Court

in *Bruen* said there are sensitive places, and one of those

03:23PM sensitive places are schools.  And it just seems to me in this

day and age, a lot of our schools, there's not adequate

protection provided by police.  And if you're dropping one of

your kids off at these schools or you're around the area when

one of these mass shooters -- because some of these horrific

03:24PM  shootings have happened at schools, Sandy Hook and others --

maybe the body count wouldn't have been so horrific if there

were several concealed carry permit holders around.

So here's my question.  It's probably not a good

one.  So if the Supreme Court says, "Even in these situations,

03:24PM  you know, you got to leave schools alone under our analysis,"

I'm thinking, well, the whole point of the Second Amendment is

so a person can protect himself, herself, and their loved ones.

How can you not protect yourselves in this day and age?

MR. BENBROOK:  I agree, Your Honor.  I'll start with

03:24PM  the caveat that I don't -- we have not raised a challenge to

schools or playgrounds.  The May plaintiffs did challenge the

playgrounds, so counsel can address that.  But one way of

looking at it, Your Honor, is while the State suggests that,

"Oh, *Heller* set aside -- identified schools as a sensitive

03:25PM  place," that is not ironclad, Your Honor.  That was among the

so-called presumptively lawful regulations including sensitive

places that was referred to as a presumptively lawful

regulation.

But *Bruen* clarified in its discussion of sensitive

03:25PM  places that particular sensitive place restrictions, if they're

1  challenged, still need to satisfy the history test.  So, I

2  mean, our case is not about schools.  I agree with Your Honor.

3  But I would just offer that as a partial response.

4        THE COURT:  So let's see if I can drill down on

03:26PM 5  that.  The Supreme Court have said schools is a sensitive

6  place, but my point is schools are not safe.  Our history shows

7  that they're not safe.  Are you saying that under the *Bruen*

8  analysis, even though they recognize that exception, that you

9  can readdress whether you can have a concealed carry permit

03:26PM 10  holder at schools?  I'm not talking about the students.

11        MR. BENBROOK:  Right.

12        THE COURT:  But teachers, parents -- parents aren't

13  allowed to roam around the school property.  I found that out

14  the hard way once when I was trying to check up on my kids.

03:27PM 15  But certainly in the parking lots or waiting outside, as I

16  understand SB 2, you can't have a gun there.

17        MR. BENBROOK:  Including parking lots, Your Honor,

18  which is particularly onerous.

19        THE COURT:  Right.  And what I'm trying to

03:27PM 20  understand is how do I analyze this when you have the Supreme

21  Court saying, in *Bruen*, that there are certain sensitive

22  places, schools being one of them, and we're not challenging

23  that, and then these other places, playgrounds where there's

24  children and centers, youth centers, why is that not within

03:27PM 25  this exception that the Supreme Court had been talking about?

UNITED STATES DISTRICT COURT

1          MR. BENBROOK:  Your Honor, I don't think I can add

2    much more than what I mentioned.  To my -- again, the caveat

3    that we're not challenging here, my understanding is schools

4    are among the presumptively lawful but not ironclad.  No one

03:28PM 5    can ever challenge this ever again.  It has to satisfy the

6    history test.  And at the risk of venturing into an area we're

7    not talking about, you know, one important theory or one

8    important aspect of that, perhaps the most important is the

9    analogs, the rules, the rules of the schools that the State

03:28PM 10   points to all arise in the context of strict *in loco parentis*

11   controls of the schools.  While the students may have been

12   disarmed, the faculty and others were not.

13          THE COURT:  Okay.

14          MR. BENBROOK:  So moving on, Your Honor -- and

03:28PM 15   again, if counsel has identified that self-defense --

16          MR. MEYERHOFF:  May I?

17          THE COURT:  Please.

18          MR. MEYERHOFF:  Penal Code Section 26045.

19          MR. BENBROOK:  I'll ask my colleagues to look at

03:29PM 20   that.  Thank you.  Thank you, Counsel.

21          All right.  Let's talk about Subsection 10, public

22   gatherings.  We dispute the suggestion of the State that this

23   is not a big deal, this is not a big burden.  We point out in

24   the brief that it is a significant restriction.  It applies to

03:29PM 25   public meetings that require a permit.  And many events do

**UNITED STATES DISTRICT COURT**

         1    require such a permit.  We've identified them.

         2          This is an important part of the briefing, though,

         3    because a lot of the meat comes in there and gets repeated and

         4    refers back, so I'm going to cover it.

03:29PM  5          Counsel talked about the churches, the rule of

         6    requiring citizens to bring their arms to church, but I didn't

         7    hear counsel address the requirements in Connecticut,

         8    Massachusetts, Maryland, Rhode Island, and Virginia that we

         9    cite, all requiring them to bring their guns to public

03:30PM 10    meetings.  When there is evidence of a founding era requirement

        11    to carry in public gatherings, it's impossible for the State to

        12    meet its burden of showing the opposite tradition.  In fact,

        13    some of the State's declaration support us.

        14          For example, the Rivas declaration, he details all

03:30PM 15    sorts of public meeting places in Philadelphia in the late

        16    1700s and concludes at paragraph 34 that the City did not enact

        17    weapon specific regulations for these places of public

        18    assembly.  And again, *Bruen* tells this, the absence of

        19    regulations that the founders could have adopted but did not is

03:31PM 20    evidence that new regulations are not consistent with the

        21    Second Amendment.

        22          Otherwise, the State rolls out a set of laws that

        23    it's using to justify in many of the other circumstances, and

        24    we've covered extensively in the brief why the Statute of

03:31PM 25    Northampton should not -- is not a proper analog here.

1          So I want to focus on four that the State does and

2   focus on and that apply in many other settings.  First is the

3   1786 Virginia law, Exhibit 31.  This is very important.  They

4   say that this is an example of a founding era, Northampton

03:31PM 5   statute that restricted carrying at public gatherings.  But as

6   I read it in the details of the statute, the actual text shows

7   this was not a sensitive place regulation at all.  It did not

8   distinguish between places since acting in terror of the county

9   was the main offense.  It says:

03:32PM 10          "You may not go nor ride armed by day nor

11          by" -- "by night or day in fairs or markets or in

12          other places in terror of the county."

13          So to my reading, that's not a sensitive place

14   restriction.  That says you cannot ride to terrorize the

03:32PM 15   people, and that's not challenged here.

16          The next, quickly, is the 1792 supposed

17   North Carolina law.  We addressed this in the reply brief.  But

18   I would add *Bruen* tells us at 142 S.Ct. 2145 that in *State v.*

19   *Huntley*, in 1843, North Carolina Supreme Court confirmed,

03:32PM 20   quote, "that the carrying of a gun for a lawful purpose per se

21   constitutes no offense."  And again, accepting and reading it

22   to the -- limited to affray or terrorizing the people.

23          Third, 1820 New Hampshire law regarding parades.

24   The State's brief says a prohibited carry, quote, "near

03:33PM 25   parades."  But the details show otherwise.  It actually applied

1    only to noncommissioned officers who come on to parade, they

2    could not carry armed.  Did not apply beyond them and did not

3    apply to the people watching the parade.  It's more akin to

4    saying if you're going to be in a public performance, you can't

03:33PM 5    have live ammunition.  It's nothing like an across-the-board

6    prohibition.

7            Next, the 1876 Iowa law, the State says in its brief

8    that this prohibits firearms on trains.  The details show

9    otherwise.  It actually banned, quote:

03:33PM 10            "...presenting or discharging any gun,

11        pistol, or other firearm at any railroad, train,

12        car, or locomotive engine."

13            Right after, it also barred, quote, "throwing any

14    stone or other substance of any nature."  Has nothing to do

03:34PM 15    with carrying on a train.

16            So we continue, Your Honor, when it comes to

17    Subsection 10, these analogs do not come anywhere close to

18    satisfying the State's burden.  I've got a couple more, and

19    then I'll turn it over to co-counsel to cover some of the other

03:34PM 20    locations.

21            THE COURT:  Very well.

22            MR. BENBROOK:  As to stadiums and amusement parks,

23    Subsection 16 and 19, these fail for the same reasons that the

24    public gatherings fail.  There is no tradition.  Again, the

03:34PM 25    State falls back on the fairs or markets from the Statute of

**UNITED STATES DISTRICT COURT**

1    Northampton and the Virginia law that I just described which

2    was not the sensitive location law.

3           It's important to stress here that while the State

4    says over and over again, "Well, there's just so many different

03:35PM 5    things, you can't" -- founders couldn't have imagined something

6    as big and ornate as Dodger Stadium, not withstanding the

7    thousand years before the Romans had built the Colosseum, which

8    is bigger than Dodger Stadium.  There were many forms of

9    entertainment where lots of people gather.

03:35PM 10          Our brief references the proliferation of racetracks

11   in the 1700s, the existence of circuses dating back to

12   George Washington's time.  The State's own evidence shows this

13   as well.

14          The Blakey article cited by the State in the

03:35PM 15   *Rutgers Law Journal* knows there was an opera occurring in

16   Charleston in 1735.

17          The Rivas declaration at paragraph 32 talks about a

18   major theater in Philadelphia in the late 1700s, right next to

19   Independence Hall, that housed 2,000 people.  And then he tells

03:36PM 20   us two paragraphs later in paragraph 34 that Philadelphia never

21   banned guns there.

22          In short, the founders were very familiar with the

23   idea of amusement and sporting events and gatherings for those

24   purposes, but they didn't think to ban firearms there.

03:36PM 25          And while public transport isn't one of my

1   subsections, my co-counsel will cover, but I can't help but

2   observed that since the State has referred to the oral argument

3   at *Bruen* and Justice Roberts' comment about Giants Stadium, I

4   come in, Your Honor, to the transcript of the oral argument and

03:36PM  5   Justice Alito's line of questioning from the New York Attorney

6   General's office where he asked how it's possibly fair that

7   law-abiding citizens can't carry a gun to defend themselves on

8   the subway when everyone in the world knows that criminals are

9   riding the subways with their own guns.

03:37PM 10          Second to the last for me, gambling casinos,

11   Subsection 15.  The State argues that nothing like casinos

12   existed and totally ignores the Louisiana law or the fact that

13   we point out that the Louisiana government itself established a

14   casino in 1753 and didn't ban carry.

03:37PM 15          State says it's sensitive now because gambling takes

16   place in the casino and that attracts bad people, so they

17   shouldn't be allowed to carry.  This is the policy argument.

18   And counsel talked about policy considerations over and over

19   again.  But certainly, in this context as a justification,

03:37PM 20   *Bruen* says those policy justifications do not apply.  It's a

21   text and history test.

22          So as a matter of history, again, when it comes to

23   gambling, the State's own materials make our case for us.  They

24   show that gambling was very common at the founding.  The

03:38PM 25   Mancall declaration tells us about gambling and taverns.

**UNITED STATES DISTRICT COURT**

```
  1  Mancall declaration tell us about gambling at horse races.  The
  2  Brewer declaration refers to gambling at cock fights.
  3          The State also offers the Mancall declaration and
  4  the Blakey article to show that gambling was heavily regulated,
03:38PM  5  but nowhere can they point to any founding era regulation that
  6  limited guns where people gamble.  Under *Bruen*, that's the end
  7  of the story.
  8          Finally, for me, Your Honor, the private-property
  9  default rule, again, *Bruen*, quote, "...guarantees a general
03:39PM 10  right" -- says in the Second Amendment "...guarantees a general
 11  right to public carry."
 12          Subsection 26, the private-property default rule,
 13  says on its face that it applies to commercial establishments
 14  that are open to the public.
03:39PM 15          SB 2 says we don't care what *Bruen* says about
 16  general right to public carry.  You don't have a general right
 17  to carry in public unless the business owner affirmatively
 18  consents.  Counsel talks -- and we -- we talk in the brief
 19  about the history of the -- the justification for the
03:39PM 20  assumption that people bring their -- come to publicly open
 21  businesses attendant with all their other rights arises from
 22  the concept that members of the public have implied consent to
 23  be there with their rights unless the consent is affirmatively
 24  conditioned or withdrawn, and the State wants to flip that
03:40PM 25  presumption.
```

 1          With respect to the test itself, the State says we

 2    don't even get to history because the text doesn't cover.

 3    Well, it actually does cover.  The Second Amendment text does

 4    not distinguish where the right to keep and bear arms shall not

03:40PM  5    be infringed.  It says the right to keep and bear arms shall

 6    not be infringed.  The argument about where it implies is what

 7    we're here to talk about.  We're talking about the so-called

 8    sensitive places.

 9          So when counsel says, "Oh, you know, this doesn't

03:40PM 10    even pass the textual point," the reality is the argument about

11    whether it applies to private property by necessity falls

12    within the second *Bruen* prong.  That's the whole point of what

13    we're here to talk about.

14          In any even, the concept that there's no State

03:40PM 15    action here doesn't make any sense.  Candidly, Your Honor,

16    respectfully, it's like saying a state can ban speech on

17    property or can say certain things can be said on private

18    businesses, but certain things -- basically content -- a

19    noncontent neutral speech restriction and say, "Well, hey, the

03:41PM 20    State -- this is not State action."  It is State action.

21          The supposed analogs justifying this don't come

22    close.  We've covered it in the brief.  The laws -- the text of

23    those laws speak for themselves.  They refer to hunting.

24    They're about enclosed lands.  They're radically different how

03:41PM 25    they limit long guns on farms for hunting.  Nothing like saying

no carrying in any private business.  The scope is totally

different.  It's erratically different.  Why?  To prevent long

gun violence against animals, not to prevent violence among

people.

03:42PM  Finally, it's worth noting that every court -- my

understanding is each of the reported decisions to cover this

similar rule have rejected it.

So I will conclude with that and turn it over to

co-counsel.  Thank you, Your Honor.

03:42PM  THE COURT:  I appreciate your argument.  Thank you.

MR. FRANK:  Thank you for the opportunity to be

heard again, Your Honor.  Appreciate it.

One of the themes that I picked up on when listening

to the Attorney General speak, Your Honor, was that the proper

03:42PM  way to proceed with the analogical analysis, meaning when we're

looking at places today that are very different than they were

during the ratification era, or even places that may be

completely new that have no real analog -- what I'm hearing the

Deputy Attorney General argue for is that the Second Amendment

03:43PM  is only coterminous with a degree that we can recognize modern

places and say that they're similar to those in the past.  But

if we can't, the Second Amendment doesn't apply.

And this argument has been made in other civil

rights situations -- circumstances, and *Heller* had to remind us

03:43PM  that that's not how we deal with constitutional civil liberty

interest.  The First Amendment extends to any place where
people -- any instrumentality that people are using to
communicate.  And just because we didn't have satellites in
1791 doesn't mean that the Government doesn't need to get a
03:43PM  warrant to use a satellite to pry into the content of your
communications.  And it's easy to lose track of that, but that
is a logical consequence of this very expansive approach to the
more nuanced approach that the Attorney General advances, which
is that if we can't really find a reasonable location analog,
03:44PM  well, then the tie goes to the State's police interest and we
can forget about the constitutional nature of the right that
we're talking about here.

And when you look at the consequence of that, what's
left is the sidewalk.  That can't be what the Supreme Court had
03:44PM  in mind.  It's not possible.  And it is hard to know.  It's
hard to discern what to make of *Heller's* language about
sensitive places.  Those issues were not squarely before the
Court in *Heller* or *Bruen*.  *Heller* did not -- was not asked are
schools sensitive places, are local government buildings
03:44PM  sensitive places.  It just -- in fashion, it looks more like
dicta than holding.

It said these places are presumptively.  Well,
presumptively means subject to rebuttal.  It's bizarre to start
thinking about the question about whether or not the Supreme
03:45PM  Court did that intentionally, whether they intentionally

**UNITED STATES DISTRICT COURT**

1     announced that there were carve-outs from historical Second

2     Amendment scrutiny and started with those three.  There might

3     have been prudential reasons why they did that.  But I'm of the

4     opinion that when the Supreme Court establishes a standard of

03:45PM  5     review, they expect courts to apply that standard of review.

6     And that standard of review is the historical scrutiny that

7     we're here today to apply.

8            And related to that question of what really makes a

9     place sensitive, I think we have to look at -- well, we can

03:45PM 10     start with this building, which we all agree we feel very safe.

11     I know I do.  I know Your Honor does.  There are armed men at

12     every point of ingress and egress, and the people who are in

13     this building most of the time are people of importance.  You

14     have jurists, you have assistant U.S. attorneys, you have

03:45PM 15     members of law enforcement community.

16            And so the Government says, you know, this space

17     needs to be safe because important government activities are

18     unfolding here on a daily basis.  And people with appointed

19     positions of power in our society are often the targets of

03:46PM 20     violence.  And so, of course, this place is a sensitive place,

21     so is the White House.

22            And I believe in a 2015 opinion, Judge Tymkovich

23     said, you know, the White House and the curtilage, essentially,

24     of the White House is all sensitive.  We're not going to split

03:46PM 25     hairs and say the White House lawn is less important than the

interior of the Oval Office.  It's all important.  But when you
go down the hierarchy of the significance of the people and the
government buildings and the nature of the work that they're
doing, it starts to look much more fuzzy of what really is a
03:46PM  sensitive location.

If I take -- if I need to get a replacement driver's
license at the DMV, is that -- is the local government DMV
building really as important as the White House or the Ronald
Reagan Federal Court that we're in right now?  I think
03:47PM  reasonable minds can disagree about that.  And that all flows
from taking a very specific look at what is actually going on
in these places.  And it's not enough to point to areas in
society and say that these places are dense like a metro car or
that there are vulnerable people such as children who often use
03:47PM  the metro cars in public transportation.

I see children everywhere I go.  I see children when
I go shopping.  I see children when I play golf.  I see
children at the shooting range.  I see them everywhere I go.
Under the State's expansive notion of how we spot and identify
03:47PM  a sensitive place, virtually everything starts to look pretty
sensitive.  And paradoxically, that's what makes the right to
carry so important because people want to go with families
wherever they go.  And if the they have a right to carry a gun
with them, if something terrible happens, they can at least
03:47PM  have some shot at self-defense.  They should have that right,

    1   and that's what the Supreme Court said.

    2           We saw Roberts and Alito allude to that.  Alito gave

    3   the -- at oral argument, Alito gave the example of, well, what

    4   about if somebody has a job working late at a restaurant and

03:48PM  5   they get off work late at night and have to ride the subway

    6   home?  If density is what makes a sensitive place, well, then

    7   they can't carry on the subway.  It seemed very clear -- it

    8   didn't make it into the text of the *Bruen* opinion, but it

    9   seemed clear that we're not going to narrowly construe this

03:48PM 10   right that we're recognizing in the Second Amendment text to be

   11   outside the home.

   12           So if under the State's conception of what *Bruen*

   13   will tolerate, government property is a place where a lawfully

   14   issued permit is not -- is not going to be recognized.  And

03:48PM 15   private property -- at least private commercial property is

   16   also a place where it's presumptively not going to be

   17   recognized.  What's left?  Not much.  And that is not -- that

   18   is not consistent with the right announced in *Bruen*.

   19           With those points made, I'd like to address just a

03:49PM 20   few things about the specific subdivisions that the May

   21   plaintiffs have targeted.

   22           THE COURT:  If you could be brief.

   23           MR. FRANK:  I will absolutely attempt to be brief.

   24   I'll begin with health care facilities.  So the State fails to

03:49PM 25   show any historical tradition of banning arms at hospitals.

**UNITED STATES DISTRICT COURT**

1    And while it's true that health care facilities in the 1790s

2    were very different than modern health care facilities of

3    today, we still know that they had health care facilities.

4            And given this State's expert's descriptions of

03:49PM  5    these places, they seem like the kind of place that is more

6    akin to almost a correctional facility, in some sense, than a

7    hospital.  These indigent people had nowhere else to go and

8    quality of medical care was not very modern, to say the least.

9    But we see no tradition.  So it's not enough for the State to

03:49PM 10    say, "Well, modern hospitals are different and there's

11    vulnerable people there; therefore, the right to carry doesn't

12    extend that."

13            And the State's attempt to slip in hospitals into

14    the back door of these -- of schools being sensitive places or

03:50PM 15    being educational facilities kind of leads us back to a

16    fundamental problem which is that we need to look at what it is

17    about these facilities that make them look like schools.

18    There's not much that I can see on the record.

19            And moving to public transportation, which I briefly

03:50PM 20    talked about, the State is right, that public transportation as

21    we know it didn't exist in the 1790s.  But we know that

22    railroads emerged in the 1800s --

23            **(Reporter requests clarification**

24            **for the record.)**

03:50PM 25            MR. FRANK:  We know that the only regulations that

**UNITED STATES DISTRICT COURT**

1    we see for railroads are a few private company rules about if

2    you're going to bring a firearm, you're going to have to stow

3    it or something like that.

4              So it's not enough to point to the density and the

03:51PM  5    people in close locations.  And it also isn't enough to say,

6    well, most public transportation is publicly owned.  So it's a

7    public building and therefore we can slip in public

8    transportation into that exception.  Because, like I explained,

9    government buildings are not all created equal.  And public

03:51PM 10    transportation, in some sense, is the opposite of a place like

11    the building that we're in now or the White House.  It's public

12    transportation.  Anyone can go there.  There is no controlled

13    points of ingress or egress.  There are occasionally guards,

14    but these days not so often.  But that alone wouldn't suffice

03:51PM 15    to make it a sensitive place.

16              Now, the playgrounds and parks aspect of SB 2 do

17    merge a little bit.  In some respects, playgrounds are going to

18    be similar to schools because virtually every school has a

19    playground.  But there are also places that are not affiliated

03:52PM 20    with schools that also have playgrounds.  Occasionally, I see

21    playgrounds at pop-up farmers markets and public streets.  I

22    also see them inside shopping malls.  And I see them in places

23    that I can't always discern whether they're a public park or

24    private property, which is a good thing.  It's good to see

03:52PM 25    communities build playgrounds.

1              But it's not enough to simply say playgrounds are

2    often associated with schools and therefore schools are

3    sensitive, because of what *Heller* and *Bruen* said about them.

4    We still have to -- we still have to show why they are like

03:52PM 5    that.  And at least at public playgrounds and parks, there is

6    no *in loco parentis* dimension to that.  Any member of the

7    public can visit a park as we know.  Most parks today have at

8    least some small area of the park that's set aside seemingly

9    for homeless encampments.  So anyone can be there.

03:53PM 10             If I start to think of a place that anyone can be,

11   it starts to look a lot like the general public, which is what

12   I believe the Supreme Court had in mind when they were

13   establishing there's a right to be armed when you're out in

14   public areas.

03:53PM 15             Regarding parks, the problem with the State's

16   argument is that it throws *Bruen's* requirement for a -- to

17   demonstrate -- to marshal evidence of a well-subscribed and

18   representative tradition of regulation.  We know that parks

19   were, in some sense, a creature of the 19th Century.  But what

03:53PM 20   we see are a handful of regulations that ban carry in a handful

21   of specific parks across ten states at a time where I believe

22   there were an average of 45 or so states admitted to the union.

23   So this is a minority of states selecting only a few parks.

24   And the State doesn't do enough -- doesn't pay enough attention

03:53PM 25   to the difference between an urban park and rural park, which

is somebody that Justice Roberts brought up at oral argument.

He joked about it being the only threat is a deer.  It's a

point well taken.  There's no historical tradition banning

carry in parks just broadly.  The most that the State has

mustered is insufficient to satisfy the *Bruen* requirement.

Continuing on to -- forgive me -- places of worship.

So as Your Honor noted earlier, there's been terrible acts of

violence at places of worship.  And the place of worship aspect

of SB 2 is, I'd say, a high rate of vampire rule because it

imposes an obligation on places of worship to opt out of a

default presumption.

But it should go without saying that houses of

worship were present in the 1790s.  And the historical

tradition that we actually see is a historical tradition of

requiring people to bring arms.  And the Attorney General has

characterized that as a quasi-militia type of law.  I don't see

that in my review of the record.  I see a lot that requires you

to bring arms into a church as frankly it speaks for itself.

And nor is it appropriately characterized as an indication that

the right to bear arms could be regulated.  I mean that

completely inverts the analysis.

The argument that I believe I heard the Attorney

General make was that this is proof that we can regulate.

Well, it seems to me like they're telling you to bring arms to

church, not telling you can't have them.  So accept that as a

1    historical regulatory analog for a ban to me -- I'm not sure

2    what that means, but I wouldn't make that argument.

3          And then turning to financial institutions, it's

4    true that modern financial retail banking institutions are

03:56PM 5    something of a creature of modernity.  But what we know is that

6    we don't really see any laws regulating them, and we can't just

7    say, "oh, banks are similar to airports or banks are similar to

8    government buildings," which is an argument that the Attorney

9    General makes.  In what sense is a bank truly like a government

03:56PM 10   building?  Banks aren't owned by the government.  There's no

11   government employees transacting business there.  I fail to see

12   any factual basis to say -- to hold these akin.  Nor are they

13   like airports.

14         When I go visit the bank, I don't surrender myself

03:56PM 15   to the territory of the federal government and pass through

16   multiple metal detectors and armed men.  These are not in any

17   sense similar enough to qualify as sensitive places under that.

18         And the final thing I'd like to make a few remarks

19   about is the vampire rule, the opt-out provision.  So *Bruen*

03:57PM 20   expressly says that expanding the category of sensitive places

21   simply to all places of public congregation that are not

22   isolated from law enforcement defines the category of sensitive

23   places far too broadly.

24         And to be clear, we are not stating that we have a

03:57PM 25   right superior to the right of any commercial private property

owner.  They have the right.  If they do not want to carry on

their premises, that's fine.  Similarly, the State can install

a default rule that restricts people's right to carry in places

that are open to the public.  I don't need to pass through a

03:57PM 5    metal detector to go to In-N-Out Burgers.  This is true of the

vast majority of the people in the public space.

So the State says that private property has the

sanctity to it.  It doesn't want to intrude into the domain of

private property owners but then passes a law that makes a

03:57PM 10    decision for every private property owner in the State.  So

that doesn't work.  That does way too much damage to the right

that *Bruen* established.

So with that, unless the Court has any questions for

me, I'm --

03:58PM 15    THE COURT:  No.  It's been very thorough.

MR. BENBROOK:  Your Honor, I'm sorry, I should have

mentioned Mr. Duvernay will address the self-defense issue

raised by counsel and --

THE COURT:  Briefly.

03:58PM 20    MR. BENBROOK:  -- and briefly talk about alcohol and

maybe zoos, but brief.

MR. DUVERNAY:  I promise I've been allocated to

locations that are nearest and dearest to the heart.

Good afternoon, Your Honor.  Earlier you asked our

03:58PM 25    friend on the other side about the possibility that a staff

member or someone may want to carry a firearm and feel the need

for self-defense while riding on public transits and walking to

and from, say, a government building or place of work.  And

Mr. Meyerhoff identified Penal Code Section 26045 as a possible

03:59PM  safety net here.

That statute provides your staff member or any of

our friends in that situation no solace in this instance.  It's

a defense of justifiable violation of law when carrying a

firearm is necessary to preserve life or property against an

03:59PM  immediate grave danger.  And immediate is defined by that

statute as the brief interval to allow for law enforcement

response.  So this does not provide for a freewheeling right to

evade the general prohibitions on carry in the instance that

you provided.  It is circumscribed to a precise situation, and

03:59PM  it's a defense to a criminal charge.

Turning briefly to the prohibition against carrying

in any place where intoxicating liquors are sold for on-site

consumption, this does not just apply to a crowded nightclub or

rowdy dive bar, it applies to Olive Garden, to wineries, even

04:00PM  the coffee shop down the street that sells hard kombucha.  And

it applies not just to people who are intoxicated or consuming

alcohol but to anyone who's present there.

And here, it's important to focus on what the State

has actually provided in its evidence.  It has declarations

04:00PM  from Mr. Charles, Mr. Mancall, and Professor Winkler that show

UNITED STATES DISTRICT COURT

1    a long history of licensing and government regulations dating

2    back to the 18th Century of saloons and similar establishments.

3    But what they don't show is a comparable history of analogous

4    regulation.

04:00PM    5        The State's identified a handful of territorial and

6    local laws prohibiting the carrying of firearms in bars and

7    similar establishments.  Those aren't well established or

8    representative.  But even if they were, the majority of the

9    laws they identify are aimed at keeping folks who are active

04:01PM    10   members of the militia from carrying firearms in a bar or

11   similar establishment, not carrying if you are intoxicated,

12   criminalizing that sort of conduct.

13       But *Bruen* teaches that when a general societal

14   problem has persisted since the 18th Century, those regulations

04:01PM    15   have to be distinctly similar.  And there's an absence of

16   distinctly similar regulation here.

17       Turning finally to zoos, museums, and libraries, I

18   will be very brief here.  The State's arguments focus on the

19   general presence of crowded areas on the one hand and

04:02PM    20   vulnerable populations of the other.  My colleagues have

21   addressed those both with respect to the general affray and

22   similar statutes as well as the regulations governing schools

23   and playgrounds.

24       I will direct Your Honor, though, to the *Koons*

04:02PM    25   decision out of -- that's K-o-o-n-s -- *v. Platkin*, out of the

         1    District of New Jersey, that rejected identical arguments from

         2    the State there in each of those locations.

         3              THE COURT:  Thank you.

         4              All right.  Mr. Meyerhoff.

04:02PM   5              MR. MEYERHOFF:  Thank you, Your Honor.

         6              I'd like to address the point that I think multiple

         7    plaintiffs' counsel made where they said the State of

         8    California thinks it's not a big deal.  That's not true.  The

         9    State of California has recognized a range of societal

04:03PM  10    problems.  And as we talked about at the beginning, issued

        11    legislative findings had passed a law compliant with *Bruen* that

        12    restricts the carry in certain sensitive places.

        13              Plaintiffs' counsel I believe agreed that ultimately

        14    analysis needs to go provision by provision.  We certainly

04:03PM  15    agree with that.  I think it's interesting that at one point --

        16    I can't recall the exact terminology, but they said, you know,

        17    "We've only identified the onerous provisions."

        18              And at another point they talked about that there's

        19    something intuitive about the White House.  Of course the White

04:03PM  20    House would be protected.  It's intuitive that airports are

        21    sensitive places, but they don't really provide a framework for

        22    why.  And if *Bruen* is concerned with the text of the Second

        23    Amendment and limiting governments, of course, and intuitions,

        24    and seems like it makes sense, that can't be the test.  And

04:04PM  25    indeed, if we talk about these places we discussed earlier that

schools -- many schools do not have armed security.  I think an

argument was made about the *in loco parentis* idea that because

parents drop their kids off at school and because there's

security there that -- or that that's the reason, but, in fact,

04:04PM 5  if you look at many of the early statutes that we've identified

relating to schools, including an 1870 Texas law, which is in

our compendium, 1874 Missouri law, 1893 Oklahoma law, those

broadly restrict carry within school rooms.  There's no

exception for teachers.  There's no exception for other

04:04PM 10  faculty.  So the idea that there's an *in loco parentis* and does

school have armed guards, that's a historical.  That's not

reflected in the historical record.

I also heard from plaintiffs' counsel an attempt to

balance, to say, well, a courthouse feels more secure than a

04:05PM 15  post office.  So that should be sufficient.  Well, I don't know

if that's true.  The New York Stock Exchange is a financial

institution.  One could imagine its importance is perhaps

greater than a school.  I would not make that argument, but

certainly some could.  But this attempt to sort of interest

04:05PM 20  balance and intuit and think, of course, this is how it should

be, that can't drive the analysis.

And, indeed, airports were mentioned.  I don't want

to reveal my age because I -- but I remember a time when you

didn't need to have a ticket to go to the -- to go to the gate.

04:05PM 25  And I'm not even sure you need it to pass through a metal

1    detector.  I think security at airports only really emerged in

2    any real form beginning in the 1970s with hijackings and things

3    like that.  So I think there's a danger in looking at today

4    identifying features of sensitive places and then trying to

04:06PM 5    read that back to 1791.  The Court in *Bruen* doesn't allow that.

6         I think when we look at health care facilities and

7    public transit, again we hear from plaintiffs the desire for a

8    dead ringer.  They don't have the same statute, but that's not

9    what the Court in *Bruen* required.  The court in *Bruen* said it

04:06PM 10   was examples that used an e.g., not an i.e., and it's

11   specifically countenanced new and analogous sensitive places.

12        On the municipal parks and state parks point, we

13   identify numerous municipal parks in major cities.  There's no

14   evidence that those restrictions were challenged either in

04:06PM 15   court or in secondary sources that could have been presented to

16   the court in which people complain that those restrictions were

17   unconstitutional.

18        We also, in our compendium of exhibits -- we

19   identify numerous, at least more than a dozen, state park

04:07PM 20   restrictions all from the beginning of the 20th Century when

21   the state park system emerged.

22        I think in terms of houses of worship, plaintiff

23   said, well, how could the Attorney General make the argument

24   that these requirements bring firearms to church reflected the

04:07PM 25   sense that the legislatures have long exercised significant

regulatory power over firearm carry in churches?  Well, they

suggested it's outlandish.  It's not.  In fact, the court, in

*Goldstein*, which we cited in our briefs -- that's a quotation

from there.  They refused to preliminarily enjoin firearms

04:07PM  restrictions.

Again, I think with racetracks and circuses, they

mention "Here's a single historical example."  "Here's another

singular historical example."  I think, again, we need to

caution the fact that an opera may or may not have existed in a

04:08PM  single city in America in a particular period.  The fact that

we don't see numerous legislatures or even the legislature of

the State regulating against that, I think that's the danger of

reading silence as a contrary tradition.  As the Court may have

mentioned, that's a risky proposition.

04:08PM  Indeed, there's a variety of reasons that a

legislature may not choose to pass a law.  Legislatures do not

legislate to their constitutional limits.  Indeed, I think we

would all hope that they don't, that they don't, in every

particular case, pass as many laws as is constitutionally

04:08PM  possible.  Instead of saying where are the multitude of laws

from the particular period, that's how plaintiffs want to read

*Bruen*.  But instead, what *Bruen* commands us is that we look at

the public understanding of the right.  And so the mere fact

that legislatures chose not to address a particular problem in

04:08PM  a particular time period may be reflective of a variety of

1    reasons.

2            I think in terms of the private property

3    restriction, the question is not whether there is state action,

4    SB 2, it's obviously a state action, the question is, is

04:09PM  5    plaintiffs' harm fairly attributable to that state action?  And

6    I think plaintiffs can't circle the square.  Either the

7    Second Amendment has some application to private property or it

8    doesn't.  And there's no evidence in the historical record that

9    it does.

04:09PM 10            I think -- the analogy I can think of is if I have a

11    friend who lives across from the embassy of a country whose

12    policies I oppose, and they say, "You can come onto my property

13    and protest that country," I go onto their property and

14    protest, I'm exercising my First Amendment rights to protest

04:09PM 15    this country that I oppose, but I'm not on this person's

16    property pursuant to my First Amendment right.

17            The First Amendment gives me no right or presumption

18    to be on their property.  I'm simply exercising a right free of

19    government interference on someone's private property because I

04:10PM 20    have permission to do so.  And I don't believe the Second

21    Amendment codifies how that permission is granted.  Is it

22    express?  Is it implied?  And I don't think plaintiffs have

23    pointed to anything around the time of the Second Amendment or

24    around reconstruction that suggests it codified that.

04:10PM 25            In terms of the exception that we mentioned, which

is in the record, we interpret that exception, for example,

that if I am walking on a public thoroughfare, a dark and

dangerous street, as Your Honor mentioned, and I'm walking by a

playground and I see someone committing a crime on that

04:10PM playground, well, I think there's an argument made that CCW

holders are law-abiding citizens.  They want to contribute to

the safety of society.  Our interpretation of that section is

that would permit an individual to go into that playground with

their concealed firearm and potentially use that firearm in

04:11PM defense of themselves or another.

So I think that is the exception that comes into

play.  And again, we're operating against the backdrop of broad

restrictions on carriage and any public assembly that didn't

contain the exceptions that we talk about.

04:11PM          I think finally plaintiffs have suggested in their

briefing here today that it is the State that has a limitless

interpretation of *Bruen*.  There is no restriction on what the

State can do.  That is their opinion of our argument.  It's

not.  We are the ones who have gone provision by provision and

04:11PM followed the *Bruen* test.  Where is the relevantly similar

historical analog?  Are the comparable burdens and

justifications the same or similar?

And then we take that law and situate it within the

nation's historical tradition.  We do so because *Bruen* talked

04:12PM about laws that were outliers.  And so those laws did not fit

within the nation's historical tradition.  But we brought

forward leading experts, not only on the Second Amendment, but

also individuals who have never opined on the Second Amendment

before, historians on specific places who can provide context

04:12PM 5  for those places.  In fact, it appears that it is plaintiffs

who have a limitless argument.

I read *Bruen* to find that the five sensitive places

that are listed there are settled, that they're aware of no

dispute as to the constitutionally of these places.  But it

04:12PM 10  appears that even plaintiffs suggest maybe that's not settled,

which seems to fly in the face of *Bruen* but also goes back to

the point I brought up earlier, which is it's plaintiffs who

seem to say an airplane kind of feels like a place that we

shouldn't have firearms, so we won't have them.  And I guess a

04:13PM 15  school feels like a place that we shouldn't have firearms.

But these things change over time.  When I was in

high school, parents could wander in and out of the school.

There was no problem.  They could wander in, wander out.

Alumni could come, they could come back.  When I visit my

04:13PM 20  school today, 23 years later, I have to get a pass.  There's

security everywhere.  So modernity has changed.  Places have

changed, but that can't alter the constitutional analysis.

So while plaintiffs seem to be proposing some sort

of free-floating test based on course and balancing and what

04:13PM 25  places are more sensitive than others, defendants have, place

1    by place, gone through the *Bruen* analysis, identified those

2    relevant historical analogs and situated them within the

3    historical tradition.  For those reasons and those set forth in

4    the briefing, this Court should deny the preliminary injunction

04:14PM  5    in its entirety.

6             I will say, and we mentioned in our briefing as

7    well, to the extent the Court is inclined to enjoin any of the

8    provisions, we would ask for a stay pending appeal.

9             Thank you, Your Honor.

04:14PM 10             THE COURT:  Well, I appreciate the briefing, and I

11   appreciate all the arguments that I heard today.  I'll take it

12   under submission and try to get a decision out as soon as

13   possible and forthwith.

14             THE COURTROOM DEPUTY:  All rise.

04:14PM 15             **(Proceedings concluded at 4:14 p.m.)**

16                          **--oOo--**

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1      *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                             )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  January 11, 2024*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN*

20                              *Debbie Hino-Spaan, CSR No. 7953*
                                *Federal Official Court Reporter*

21

22

23

24

25

**UNITED STATES DISTRICT COURT**